**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT T. KENNEDY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| | ) | Case No. 1:08-cv-1862 |
| Plaintiff, | ) ) | |
| | ) | Honorable George M. Marovich |
| | ) | |
| BUTLER FINANCIAL SOLUTIONS, LLC,) HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC., f/k/a HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., and JOHN DOES 1-10, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs, through their counsel and pursuant to Fed. R. Civ. P. 23(a), 23(b)(3) and 23(g),

move this Court for an Order certifying a Class and appointing Class Counsel. In support of this

Motion, Plaintiffs state that they satisfy the Fed.R.Civ.P. 23(a) numerosity, commonality,

typicality and adequacy requirements, meet the predominance and superiority requirements of

Fed. R. Civ. P. 23(b)(3), and that their counsel satisfy the requirements of Fed. R. Civ. P. 23(g).

In further support of their Motion, Plaintiffs rely upon the accompanying Declaration of Scott R.

Shepherd (attached as Exhibit A to this Motion), the exhibits attached thereto and upon their

supporting Memorandum of Law.

Respectfully submitted,

Date: May 29, 2008                    **HARRISON & HELD LLP**


By:      s/George N. Vurdelja, Jr.
         George N. Vurdelja, Jr.
         333 W. Wacker Drive, Suite 1700
         Chicago, Illinois 60606
         Telephone: 312/753-6161
         Facsimile: 312/332-1150
         gvurdelja@harrisonheld.com

         Jeffrey A. Berens
         **DYER & BERENS LLP**
         682 Grant Street
         Denver, Colorado  80203
         Telephone: 303/861-1764
         Facsimile: 303/395-0393
         jeff@dyerberens.com

         Scott R. Shepherd
         **SHEPHERD, FINKELMAN, MILLER
          & SHAH, LLP**
         1640 Town Center Circle, Suite 216
         Weston, FL 33326
         Telephone: 954/943-9191
         Facsimile: 954/943-9173
         sshepherd@sfmslaw.com

         Douglas P. Dehler
         **SHEPHERD, FINKELMAN, MILLER
          & SHAH, LLP**
         111 East Wisconsin Avenue, Suite 1750
         Milwaukee, Wisconsin 53202
         Telephone: 414/226-9900
         Facsimile:  414/226-9905
         ddehler@sfmslaw.com

James C. Shah
**SHEPHERD, FINKELMAN, MILLER**
 **& SHAH, LLP**
35 E. State Street
Media, Pennsylvania  19063
Telephone: 610/891-9880
Facsimile:  610/891-9883
jshah@sfmslaw.com
**Attorneys for Plaintiffs**

# EXHIBIT "A"

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ROBERT T. KENNEDY, On Behalf
of Himself and All Others Similarly
Situated,

                    Plaintiff,

vs.

BUTLER FINANCIAL SOLUTIONS, LLC,
HERITAGE WARRANTY INSURANCE RISK
RETENTION GROUP, INC., f/k/a HERITAGE
WARRANTY MUTUAL INSURANCE RISK
RETENTION GROUP, INC., and
JOHN DOES 1-10,

                    Defendants.

_____/

Case No. 1:08-cv-1862
Honorable George M. Marovich

**DECLARATION OF SCOTT
R. SHEPHERD IN SUPPORT
OF PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

I, Scott R. Shepherd, do hereby declare:

1.     I am a partner in the law firm of Shepherd, Finkelman, Miller & Shah, LLP, and I am one of the counsel for Plaintiffs, Robert T. Kennedy, JoAnn Mick and Charles C. Mitschow in this matter. I am a member in good standing of the bar of the United States District Court for the Northern District of Illinois. I have personal knowledge of the matters stated herein, and if called upon, I could and would competently testify thereto.

2.     A true and correct copy of the Vehicle Service Contract ("VSC") of Plaintiff, Robert T. Kennedy is attached as Exhibit 1 to this Declaration.

1

3.    A true and correct copy of the VSC of Plaintiff, Charles C. Mitschow is attached as Exhibit 2 to this Declaration.

4.    A true and correct copy of the Affidavit of Jeanine M. Folz, Senior Vice President of Insurance Services and Assistant Corporate Secretary for Warrantech Corporation, dated September 18, 2007 is attached as Exhibit 3 to this Declaration.

5.    A true and correct copy of the Affidavit of Harris Miller, Consultant and former Manager for Butler, dated September 18, 2007 is attached as Exhibit 4 to this Declaration.

6.    A true and correct copy of the Affidavit of Paul Miles, Treasurer of Heritage, dated July 27, 2007 is attached as Exhibit 5 to this Declaration.

7.    A true and correct copy of "Butler's Memorandum in Opposition to Heritage's Motion for Preliminary Injunction," Case No. 2:07-cv-02627 DCN, United States District Court for the District of South Carolina, September 19, 2007 is attached as Exhibit 6 to this Declaration.

8.    A true and correct copy of the Preliminary Injunction Motion Hearing Transcript, Case No. 2:07-cv-02627 DCN, United States District Court for the District of South Carolina, September 21, 2007 is attached as Exhibit 7 to this Declaration.

9.    A true and correct copy of the resume of Dyer & Berens LLP is attached as Exhibit 8 to this Declaration.

10.    A true and correct copy of the resume of Shepherd, Finkelman, Miller & Shah, LLP is attached as Exhibit 9 to this Declaration.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

2

Executed this 29th day of May, 2008, Media, Pennsylvania.

_____
Scott R. Shepherd

3

# EXHIBIT 1

**Warrantybynet**

# DECLARATION PAGE

If this Vehicle Service Contract has been financed, the Lienholder shall be entitled to any refunds resulting from the cancellation of this Vehicle Service Contract for whatever reason. This would include cancellation for non-payment, repossession of the vehicle, or total loss of the vehicle.

| | | | | |
|---|---|---|---|---|
| **This is your CUSTOMER CONTRACT NUMBER.** Please use this number in any phone or written communication. | WWTN35244 | 84100UK7 | 720045 | ✔ NEW |
| | YOUR CONTRACT NUMBER | YOUR CONTRACT PLAN CODE | SELLING DEALER CODE | USED |

CONTRACT HOLDER (You, Your):

ROBERT T. KENNEDY

CONTRACT HOLDER ADDRESS: (Phone: (303)798-8400)

3469 SOARING EAGLE LANE

CASTLE ROCK, CO  80109

DESCRIPTION OF YOUR VEHICLE:

| YEAR | MAKE | MODEL | VEHICLE ID NUMBER | CONTRACT CHARGE | DEDUCTIBLE |
|---|---|---|---|---|---|
| 2003 | Gmc | ENVOY | 1GKDT13S432222730 | $1,332.00 | $0.00 |

| | | |
|---|---|---|
| | **REDUCING DEDUCTIBLE** (Does not apply unless checked yes) | **TERM** |

| MONTHS | MILEAGE |
|---|---|
| 84 | 100000 |

FULL PAY

✔ PAY AS YOU GO

**ADDITIONAL**

4WD

| *CONTRACT PURCHASE DATE | *ODOMETER MILEAGE AT CONTRACT PURCHASE DATE |
|---|---|
| 12/20/2002 | 50 |

DEALER/LESSOR:

Warrantybynet

ADDRESS  393 Mantoloking Rd. Brick, NJ 08723

LIENHOLDER: (Entity financing VSC)

DEALER PHONE NUMBER   (800) 962-4720

AUTHORIZED DEALER SIGNATURE  _RP_

*CONTRACT PURCHASE DATE  12/20/2002

DATE  12/20/2002  Contract Purchase Date

VEMCO

Administrator
Vemco, Inc.
P.O. Box 410
Alvarado, TX 76009
1-800-543-8801 (NAT'L)

*New vehicle plan [Premier (plan code UK7) and Peak (plan code XD7) Advantage Series] expiration is measured in time/mileage from the Contract Purchase Date and zero (0) miles.
*Used vehicle plan [Powertrain (plan code XP7), Select (plan code XF7), and Value (plan code XD7) Advantage Series] expiration is measured in time/mileage from the Contract Purchase Date and Odometer Mileage (at Contract Purchase Date).

*All vehicle plans require a mandatory "Waiting Period before Coverage takes effect. The "Waiting Period" is 30 days <u>and</u> 1,000 miles from the Contract Purchase Date and Odometer Mileage at Contract Purchase Date.

The definition of  **"We, Us and Our"** used frequently throughout the Vehicle Service **Contract** is defined as BUTLER FINANCIAL SOLUTIONS, L.L.C., 2300 CORPORATE BLVD., NW, SUITE 214, BOCA RATON, FL  33431.  Please refer to the Vehicle Service **Contract** for additional Definitions.

**Our** obligations under this Vehicle Service **Contract** are insured by a policy issued by Heritage Warranty Mutual Insurance Risk Retention Group, Inc., 1550 South 70th Street, Lincoln, Nebraska 68596, under a motor Vehicle Service Contract reimbursement policy, and reinsured by American Re®. - a national A++ rated company and a member of the Munich Re Group®.  If a covered claim is not paid within sixty (60) days, [except in Arizona thirty (30) days], after proof of loss has been filed, **You** may file a claim directly with the Insurance Company.  Please call 1-800-543-8801 for instructions.

H250502WBN0502

CUSTOMER SUPPORT NUMBER – Please see the box labeled **Your Contract** Number on the Declaration Page. This is **Your** CUSTOMER SUPPORT NUMBER. Please refer to this number in any written or verbal communication, such as requesting information or filing a claim.
**PURCHASE OF THIS VEHICLE SERVICE CONTRACT IS NOT REQUIRED IN ORDER TO PURCHASE OR FINANCE A MOTOR VEHICLE.**

## THINGS TO DO NOW

The **Declaration Page** is an important part of this Agreement. It is **Your** responsibility to notify **Us** if any information is incorrect. Please read all sections carefully and if are unclear about any information call **Us** at 1-800-962-4720. Refer to the bold printed number in any verbal or written communication, such as requesting information or filing a claim.

Check Plan Code – Not every part of **Your Vehicle** is covered by this **Contract**. **Coverage** is identified by the last three (3) letters of the Plan Code as shown on the **Declaration Page** of this **Contract**. Please compare the last 3 letters of the Plan Code on the **Declaration Page** with the Plan Code and Corresponding **Coverage** as listed under **Mechanical Coverage**. If this box was left blank, or Plan Code is inaccurate, contact **Your Administrator** immediately.

Check **Your Deductible** – Please check the box labeled **DEDUCTIBLE** on **Your Declaration Page**. A number should be in the box which identifies the portion of the covered repair **You** will be required to pay if **You** have a claim. If this box was left blank, contact **Your Administrator** immediately.

NOTE: This **Contract** is not valid unless **You** have signed the **Declaration Page** and it has been affixed to the front of this **Contract**.

## THINGS YOU MUST DO THROUGHOUT THE TERM OF YOUR CONTRACT

**Properly Maintain Your Vehicle and KEEP THE RECEIPTS** – This **Contract** is only valid if **Your Vehicle** has been maintained in accordance with the manufacturer's specifications. Keep copies of all receipts (oil changes, lubrication, etc.), as proof of maintenance may be required when **You** file a claim. SEE SECTION: "GENERAL PROVISIONS" FOR SPECIFIC MAINTENANCE REQUIREMENTS.

Obtain approval PRIOR to having work performed that may be covered by this **Contract**. If **You** believe the failure may be covered by this **Contract**, call the **Administrator** personally, or instruct the repair facility performing the work to call and **Register** the claim BEFORE THE WORK IS PERFORMED. SEE SECTION: "WHAT TO DO IN THE EVENT OF A BREAKDOWN".

## DEFINITIONS

The following definitions apply to words frequently used in this **Contract** and appear in **Bold Faced Type**:

**You, Your** – Means the **Contract** Holder shown on the **Declaration Page** or the person to whom this **Contract** was properly transferred.

**We, Us, Our** – Means the obligor of this **Contract** as stated on the **Declaration Page** attached to this **Contract**.

**Administrator** – Means The **Administrator** as shown on the **Declaration Page**.

**Contract** – Means this Vehicle Service **Contract** which **You** have purchased from **Us** to protect **Your Vehicle**.

**Declaration Page** – Means the numbered document which must be attached to and forms part of this **Contract**. It lists information regarding **You**, **Your Vehicle**, **Coverage** selected, and other vital information.

**Mechanical Coverage** – Lists the **Coverages** provided to **You** for **Your Vehicle** under this **Contract**.

**Coverage** – Means the protection **You** have selected, as listed under Mechanical **Coverage** Section.

**Your Vehicle** – Means the vehicle which is described on the **Declaration Page**.

**Deductible** – Means the amount **You** are required to pay, as shown on the **Declaration Page**, for covered **Breakdowns**. Once a part is repaired or replaced under the terms of this **Contract**, there will be no **Deductible** for future repairs to that part.

**Breakdown or Mechanical Failure** – These terms are used interchangeably and mean the failure of a covered part under normal service. A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts. **Subsequent Damages** resulting from the **Breakdown or Mechanical Failure** of a covered part are covered by this **Contract**, except when **You** have failed to perform the recommended maintenance services for **Your Vehicle**.

**Subsequent Damage** – Means the direct or immediate damage to a non-covered part occurring as a singular event or failure originating with the failure of a covered part.

**Consequential Damage** – Means an event or damage that occurs separately as a consequence or result of the failure of a covered or non-covered part, such as, loss of time or use, inconvenience, commercial loss, personal injury or property damage.

**Registered** – Means a claim has been **Registered** only when the **Administrator** has been contacted and has issued a claim reference number.

**Pre-existing** – Means a condition that within all reasonable mechanical probability relates to the mechanical fitness of **Your Vehicle** prior to **Contract** issuance.

**Preferred Repair Facility** – A Repair Facility that has been selected and assigned by the **Administrator** to provide quality service to the customer.

## GENERAL PROVISIONS

**This CONTRACT is between US and YOU, and is subject to all the Terms and Conditions contained herein.**

1. **CONTRACT PERIOD**
   **Coverage** under this **Contract** begins 30 days and 1,000 miles from the **Contract** Purchase Date and Odometer Mileage at **Contract** Purchase Date and will expire according to the time and/or mileage of the term/miles selected, whichever occurs first, as shown on the **Declaration Page**.
   a) New Vehicle Plan (Premier and Peak Advantage Series) expiration is measured in time/mileage from the **Contract** Purchase Date and zero (0) miles.
   b) Used Vehicle Plan (Powertrain, Select, and Value Advantage Series) expiration is measured in time/mileage from the **Contract** Purchase Date and Odometer Mileage (at **Contract** Purchase Date).

2. **COVERAGE**
   The **Coverage** afforded **You** for **Your Vehicle** is fully described in this **Contract**. Please see section: "**Mechanical Coverage**" of this **Contract**.

3. **BREAKDOWN OF COVERED PARTS**
   **We** will pay or reimburse **You** for reasonable costs to repair or replace any **Breakdown** of a part listed under **Mechanical Coverage**. REPLACEMENT PARTS MAY BE NEW, REMANUFACTURED, OR REPLACEMENT PARTS OF LIKE KIND AND QUALITY.

4. **DEDUCTIBLE**
   In the event of a **Breakdown** covered by this **Contract**, **You** may be required to pay a **Deductible**. No **Deductible** payment is required with respect to Towing/Road Service, Rental, Trip Interruption, and Lost Key/Lockout **Coverages**, if they are provided by this **Contract**.
   **You** have a Per Repair Visit **Deductible**, as shown on the **Declaration Page**, the **Deductible** amount will be applied on a per repair visit basis. Should a covered **Breakdown** take more than one visit to repair, only one **Deductible** will apply for that **Breakdown**.
   In addition, if **You** bring **Your Vehicle** to a Preferred Repair Facility, $50 (fifty) dollars of any **Deductible** will be waived. **Our Administrator** will assist **You** in locating a Preferred Repair Facility.

5. **TERRITORY**
   This **Contract** applies only to **Breakdown** that occur and repairs made within the United States of America and Canada.

6. **LIMITS OF LIABILITY**
   a. **Per Repair Visit** – **Our** liability for any one (1) Repair Visit shall in no event exceed the trade-in value of **Your Vehicle** at the time of said Repair Visit, as listed in the Kelly Blue Book Used Car Guide.
   b. **Aggregate** – The total of all claims and benefits paid or payable while this **Contract** is in force shall not exceed the price **You** paid for **Your Vehicle** (excluding tax, title and license fees).

H520502WBN0602

## GENERAL PROVISIONS CONT'D

**7. MAINTENANCE REQUIREMENTS**

a. You must have **Your Vehicle** checked and serviced in accordance with the manufacturer's recommendations, as outlined in the Owner's Manual. NOTE: **Your** Owner's Manual lists different servicing recommendations based on **Your** individual driving habits and climate conditions. **You** are required to follow the maintenance schedule that applies to **Your** conditions. Failure to follow the manufacturer's recommendations that apply to **Your** specific conditions may result in the denial of **Coverage**. If an Owner's Manual is not provided, **You** can contact the **Administrator** and the servicing recommendations will be provided to **You**.

b. It is required that verifiable receipts be retained for the service work. Or, if **You** perform **Your** own service, **You** must retain verifiable receipts showing purchases of all required parts and materials necessary to perform the required maintenance showing the date and mileage when the services were performed. Maintenance and/or service work receipts may be requested by the **Administrator**.

**8. TRANSFER OF YOUR VEHICLE SERVICE CONTRACT**

a. **Your Contract** may be transferable to someone to whom **You** sell or otherwise transfer **Your Vehicle** while this **Contract** is still in force. This **Contract** cannot be transferred if the title transfer of **Your Vehicle** passes through an entity other than the subsequent buyer, or **Your Vehicle** is sold or traded to a dealership, leasing agency or entity/individual in the business of selling vehicles. This **Contract** can only be transferred once and the transfer must be initiated by the original **Contract** Holder.

b. To transfer, the following must be submitted to the **Administrator** within 30 days of the change of ownership to a subsequent individual purchaser:
   - A completed transfer form; with
   - Name and Address of New owner, date of sale to new owner, current mileage; and
   - $50.00 Transfer Fee made payable to the **Administrator**.

c. Any remaining manufacturer's warranty must also be transferred at the same time as vehicle ownership transfer. Copies of all maintenance records showing actual oil changes and manufacturers maintenance must be given to the new owner. These maintenance records must be retained along with similar documentation for future maintenance work which the new owner has performed in accordance with the Maintenance Requirements of this **Contract**. If necessary, these documents will be verified by the **Administrator**.

**9. OUR RIGHT TO RECOVER PAYMENT**

If **You** have a right to recover against another party for anything **We** have paid under this **Contract**, **Your** rights shall become **Our** rights. **You** shall do whatever is necessary to enable **Us** to enforce these rights. **We** shall recover only the excess after **You** are fully compensated for **Your** loss.

**10. REPAIR INSPECTIONS**

**We** reserve the right to inspect **Your Vehicle** to evaluate covered repairs.

**11. FINANCIAL AGREEMENTS**

If this Agreement was financed (purchased on a payment plan) by a funding party, they shall be entitled to any refund(s) resulting from cancellation of this Agreement for any reason including repossession of **Your Vehicle**, or total loss of **Your Vehicle**. Failure to make monthly payments in a timely manner may result in cancellation of this Agreement and no refund will be due. Should a claim arise before this Agreement is paid in full, the balance owed will be deducted from the claim payment.

**12. REFUND POLICY FOR PRE-AUTHORIZED CHECK PAYMENTS**

If payment has been made by a pre-authorized check(s), **You** must submit all original cancelled pre-authorized check(s) to the funding party. For purposes of refund, photocopies of pre-authorized check(s) are not accepted. With receipt of **Your** refund, **Your** original pre-authorized check(s) will be returned to **You**.

**13. REINSTATEMENT**

If this Vehicle Service **Contract** is cancelled due to non-payment, **We** reserve the option to reinstate the Agreement. As a condition of reinstatement, the full amount of **Contract** price must be paid and **We** will not be responsible or liable to **You** for any **Mechanical Failure** to **Your Vehicle** during the first thirty (30) days and 1,000 miles from the effective date and miles at the time of the Reinstatement Notice.

**14. VEHICLE SERVICE CONTRACT RENEWAL**

Contracts may be renewed depending on the odometer's mileage and age of vehicle at the time of renewal. This Vehicle Service **Contract** may be renewed at **Our** option, provided that the vehicle is not more than ten (10) model years old and has less than 100,000 total odometer miles. Please contact **Us** at least 30 days and 1,000 miles prior to the expiration of this Agreement to be eligible for the renewal.

**15. TAXES**

**Coverage** includes State and local taxes where applicable.

**16. FLUIDS**

**Coverage** includes fluids to complete a covered repair.

**17. SEALS AND GASKETS**

All Seals and Gaskets for the specific components listed are covered, as either an individual repair or in conjunction with the repair of a covered component.

## CANCELLATION OF YOUR CONTRACT

a. **You** may cancel this **Contract** by sending a letter of cancellation along with the **Contract** to 393 Mantoloking Rd., Brick, NJ 08723. A notarized statement indicating the odometer reading must be submitted.

b. **We** may cancel this **Contract** for non-payment of the **Contract** charge, or for misrepresentation in the submission of a claim. **We** may cancel this **Contract** if **Your Vehicle** is found to be modified in a manner not recommended by the manufacturer, or **Your Vehicle** is found to be used as a commercial vehicle.

c. If **Your Vehicle** and this **Contract** have been financed, the lienholder shown on the **Declaration Page** may cancel this **Contract** for non-payment or if **Your Vehicle** is declared a total loss or is repossessed.

d. If this **Contract** is cancelled within the first thirty (30) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first thirty (30) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date **Coverage** begins, less a twenty five ($25.00) dollar administrative fee. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. The total amount of all authorized claims will be deducted from all refunds.

## WHAT TO DO IN THE EVENT OF A BREAKDOWN

**A. IF YOUR VEHICLE INCURS A BREAKDOWN, YOU MUST TAKE THE FOLLOWING STEPS TO FILE A CLAIM:**

1. _Prevent Further Damage_ – Take immediate action to prevent further damage. This **Contract** will not cover the damage caused by not securing a timely repair when a **Breakdown** has occurred. The operator is responsible for observing vehicle warning lights and gauges, and taking appropriate action immediately. Failure to do so, may result in the denial of **Coverage**.

2. _Take **Your Vehicle** to a Licensed Repair Facility_ - If **Your Vehicle** breaks down, take **Your Vehicle** to any licensed repair facility (**You** may contact the **Administrator** for help in locating a repair facility).

3. _Provide Repair Facility with a copy of **Your Contract** and/or **Your Contract Number**._

4. _Register repairs with the **Administrator**_ – Prior to any repair being made, instruct the Service Manager at the repair facility to contact the **Administrator** to **Register** the claim. Any claim for repairs that have not been **Registered** will not be covered except as provided under Emergency Repairs. The amount **Registered** with the **Administrator** is the maximum amount that will be paid for repairs covered under the terms of the **Contract**. Any additional amount must be **Registered** with the **Administrator**, prior to submitting the claim for payment.

5. _Authorize Teardown and/or Inspection_ – In some cases, **You** may need to authorize the repair facility to inspect and/or teardown **Your Vehicle** in order to determine the cause and cost of the repair. **You** will be responsible for these charges if the failure is not covered under this **Contract**. We reserve the right to require an inspection of **Your Vehicle** prior to any repair being made.

6. _Review Coverage_ – After the **Administrator** has been contacted, review with the Service Manager what will be covered by this **Contract**.

H520502WBN0602

## WHAT TO DO IN THE EVENT OF A BREAKDOWN CONT'D

7. Pay any applicable **Deductible** – **We** will pay the repair facility or **You** for the cost of the work performed on **Your Vehicle** that is covered by this **Contract** and previously authorized, less the **Deductible** (if any). Once authorization is obtained, and the repair is completed, all repair orders and documentation must be submitted to the **Administrator** within sixty (60) days to be eligible for payment.

8. Emergency Repairs – Should an emergency occur which requires a **Breakdown** repair be made at a time when, due to circumstances beyond **Our** control, the **Administrator's** office cannot be contacted, **You** must call the **Administrator's** office within five (5) business days from the date of repair to determine if such repair will be covered by this **Contract**. If covered, **You** will be reimbursed for the repair.

**B. IF YOUR VEHICLE BREAKS DOWN ON THE ROAD:**

Follow the same steps as above. If necessary, the repair facility will be paid, less **Your Deductible** (if any), by the **Administrator's** national charge card system (MasterCard or VISA) on **Your** behalf. In some case, **You** may need to pay the repair bill in full. If so, **You** will be reimbursed for the **Registered** amount of the repair, less **Your Deductible** (if any). If **You** have any questions regarding claim procedures or **Coverages**, please call the **Administrator** at the number below and ask for a Customer Support Representative:

**Vemeco, Inc.**
**P. O. Box 410**
**Alvarado, TX 76009**
**Customer Service/Claims (800) 543-8801\***
**Available 24 hrs/day–365 days/year**
**\*For Towing/Road Service and Lost Key/Lockout assistance, Call (800) 765-6622**

## SERVICE MANAGER'S GUIDE TO FILING A CLAIM
## STEPS TO FOLLOW WHEN FILING A CLAIM:

1. Advise **Contract Holder** -- That evaluating the cause of the failure does not mean that the failure is covered under this **Contract**. All covered repairs must be **Registered** with the **Administrator**.

2. Contract Holder's Approval for Evaluation – Obtain approval from the **Contract** Holder to inspect and/or teardown vehicle to determine cause and cost of repair. Save all components including fluids and filters, in the event the **Administrator** requires an inspection. Inform the **Contract** Holder that the cost of the teardown will not be paid if the failure of the component disassembled is not covered under the **Contract**.

3. Cause, Cure and Cost – Assess the problem(s), cause, cure of the failure and cost of the repairs.

**NOTE: Any major component failure that has a verifiable complaint, i.e., slipping transmission, knocking engine, etc., should be called in prior to any teardown.**

4. Register the Repair with the **Administrator** – Call the **Administrator's** Service Manager's Support representative at (800) 543-8801 to Register the claim. Please have the following items ready when you place the call:
   a. Customer's **Contract** Number
   b. Cause of Failure and Cure
   c. Cost of the Repair
   d. Factory Part Number(s)

5. The Support Representative will verify the **Coverage** and –
   A. Register Claim – The **Administrator** will Register the claim by issuing a Reference Number. Record this Reference Number on the Repair Order. The **Registered** claim amount is the maximum that will be paid. Any additional amounts must be **Registered** with the **Administrator**, prior to submitting the claim for payment.
   
   **OR**
   
   B. Request Additional Evaluation – Request further evaluation, teardown or outside inspection.
      I. Inspection – The **Administrator** reserves the right to require an inspection of the vehicle prior to any repair being accomplished. Diagnostic procedures not associated with the teardown are not covered.
      II. Teardown – If a teardown is necessary in order to determine the cause of failure, the **Contract** Holder must approve the teardown. Please advise the **Contract** Holder that, if the component disassembled is not covered, then the **Contract** Holder must pay for the teardown.
   Listed below is the Inspection Teardown Policy:
      a. Save all components, including fluids and filters, that need to be inspected.
      b. The Support Representative will arrange for inspection.
      c. If not visited within 48 hours, call the Support Representative.
   
   **OR**
   
   C. Deny Claim – Deny the request and issue a Reference Number.

6. Review Repairs with Contract Holder – After the **Administrator** has been contacted, review with the **Contract** Holder what will be covered by the **Contract** and what portions of the repairs, if any, will not be covered.

7. Contract Holder's Approval for Repairs – Obtain the **Contract** Holder's approval to complete the repairs. All repair orders must have customer's signature.

8. Submit Repair Orders for Payment – All repair orders and documentation must be submitted to the **Administrator**, at the address noted under "What To Do In The Event Of A Breakdown" within sixty (60) days.

## MECHANICAL COVERAGE

## POWERTRAIN SERIES 1-5 (Plan Code XP7)

 **1. Engine:** Cylinder Block, Cylinder Head(s), Rotary Housing and all internal lubricated parts contained within the engine including: Pistons; Piston Rings; Connecting Rod Bearings; Crankshaft; Crankshaft Main Bearings; Camshaft; Camshaft Bearings; Cam Followers; Timing Chain or Belt; Timing Gears, Guides, Tensioners; Rocker Arms; Rocker Shafts; Rocker Bushings; Cylinder Head Valves; Valve Guides; Valve Lifters; Valve Springs; Valve Seals; Valve Retainers; Valve Seats; Push Rods; Water Pump; Fuel Pump; Oil Pump and Oil Pump Housing; Harmonic Balancer; Oil Pan; Timing Chain Cover; Intake and Exhaust Manifolds; Valve Covers; Engine Mounts; Cam Gear Bolt; Harmonic Balancer Bolt; Head Bolts; and Seals and Gaskets.

**2. Turbocharger/Supercharger:** (factory installed only) Turbocharger/Supercharger Housing and All Internal Parts; and Seals and Gaskets.

**3. Transmission:** (Automatic or Standard) Transmission Case and all Internal Parts plus: Torque Converter; Flywheel/Flex Plate, Vacuum Modulator; Electronic Shift Control Unit; Transmission Cooler; Transmission Mounts; Oil Pan; Slave/Clutch Master Cylinder; Pilot Bearing; Throw-Out Bearing; and Seals and Gaskets.

**4. Transfer Case:** Transfer Case and All Internal Parts; and Seals and Gaskets.

**5. Drive Axle:** (Front and Rear) Drive Axle Case; All Internal Parts contained within the Drive Axle; Locking Hubs; Drive Shafts; Center Support Bearings; Universal Joints; Constant Velocity Joints; Axle Bearings; Four–Wheel Drive Actuator; Differential Cover; and Seals and Gaskets.

H520502WBN0602



**6. Steering:** All internal parts contained within the Steering Box; Rack and Pinion Gear; Power Steering Pump; Power Steering Hoses; Steering Knuckles; Pitman Arm; Idler Arm; Tie Rod Ends and Drag Link; Steering Damper; Upper and Lower Steering Column Shafts and Couplings, including Internal Tilt-Wheel Mechanism; Steering Box and Rack and Pinion Gear Housings; Power Steering Assist Cylinder; Power Steering Pump Cooler; Twin "I" Beam & Bushings; and Steering Travel Stop. **Rear Wheel Steering:** Rear Steering Shaft and Couplings; Power Cylinder and Pump; Electronic Control Unit/Solenoid; Phase Control Unit; Stepper Motor; Steering Box; Control Valve; Rack; Tie Rod Ends; and Seals and Gaskets.

**7. Brakes:** Master Cylinder; Power Brake Cylinder; Vacuum/Hydro Assist Booster; Disc Brake Caliper; Wheel Cylinders; Compensating Valve; Brake Hydraulic Lines and Fittings; Hydraulic Control Unit; Hydraulic Trailer Brake Assembly and it's Components. The following ABS Parts are also covered: Electronic Control Processor; Wheel Speed Sensors; Hydraulic Pump/Motor Assembly; Pressure Modulator Valve/Isolation Dump Valve; Accumulator; and Seals and Gaskets.

**8. Electrical:** Alternator; Voltage Regulator; Starter Motor; Starter Solenoid and Starter Drive; Engine Compartment Wiring Harness; Computerized Timing Control Unit; Electronic Ignition Module; Crank Angle Sensor; Knock Sensor; Ignition Switch; Ignition Switch Lock Cylinder; Front and Rear Window Wiper Motor, Washer Pump and Switch; Stop Lamp Switch; Headlamp Switch; Turn Signal Switch; Heater/A.C. Blower Speed Switch; Manual Heater/A.C. Control Head; Horns; Trailer Brake Wiring Harness; Auxiliary Power Supply Wiring; Exterior Cab Lighting;  Auxiliary Fuel Tank Switching Unit and Switch; and O-2 Sensors.

**9. Air Conditioner:** Condenser; Compressor, Compressor Clutch and Pulley; Air Conditioning Lines and Hoses; Evaporator; Idler Pulley and Idler Pulley Bearing; High/Low Compressor Cut-off Switch; Expansion Valve; Pressure Cycling Switch; and Seals and Gaskets.  The following parts are also covered if they are required in connection with the repair of a covered part listed above: Accumulator/Receiver Dryer; Orifice Tube; Oil and Refrigerant.

## PEAK AND VALUE ADVANTAGE SERIES 1-13 (Plan Code XD7)

**10. Front and Rear Suspension:** Upper and Lower Control Arms; Control Arm Shafts and Bearings or Bushings; Upper and Lower Ball Joints; Radius Arm and Bushings; Torsion Bars, Mounts and Bushings; Stabilizer Bar, Links and Bushings; Struts; Strut Bearing Plates; Spindle and Spindle Support; Wheel Bearings; Panhard Bar; Track Bar; Suspension Bumpers; Leaf Springs; Leaf Spring Shackels and Hardware; Load Assist Shocks; Shocks; Load Assist Springs; Coil Springs; and Seals and Gaskets. **Variable Dampening Suspension:** Compressor; Control Module; Dampening Actuator; Solenoid; Struts; Height Sensor; Mode Selector Switch; and Seals and Gaskets.

**11. Enhanced Electrical:** Automatic Climate Control Programmer; Electronic Instrument Cluster; Mileage Computer; Distributor; Ignition Coil; Electronic Combination Entry System (Does Not Include Transmitters and Receivers for Remote Locks); Cruise Control Module, Transducer, Servo and Amplifier; Powertrain Control Module; Headlamp Motors; Power Window Motor; Power Seat Motor; Power Mirror Motor; Power Antenna Motor/Mast Assembly; Convertible Top Motor; Power Sunroof Motor; Power Window Switch; Cruise Control Engagement Switch; Power Seat Switch; Power Mirror Motor Switch; Rear Defogger Switch; Power Door Lock Actuator and Switch.

**12. Fuel Delivery:** Fuel Injection Pump and Injectors; Vacuum Pump; Fuel Tank; Fuel Tank Sending Unit; Metal Fuel Delivery Lines; Fuel Pressure Regulator; and Fuel Tank Switching Unit/Switch.

**13. Cooling:**  Engine Cooling Fan and Motor; Fan Clutch; Belt Tensioner; Radiator; Heater Core; Thermostat; Blower Motor; Hot Water Valve; Engine Oil Cooler; Cooler Lines and Fittings.

## PREMIER ADVANTAGE SERIES (Plan Code UK7)

**Premier Advantage Series:**  We will pay or reimburse **You** for reasonable cost to repair or replace any **Breakdown** of all parts listed under **Mechanical Coverage** and any other parts, except for those items listed in the Exclusions Section of this **Contract**.

## PREMIER WRAP SERIES

| Hyundai/Kia (Plan Code HU7) | Isuzu (Plan Code IW7) | Volkswagen (Plan Code VU7) | Chrysler (Plan Code CW7) | All Others (Plan Code WK7) |
|---|---|---|---|---|

**Premier Wrap Series:** We will pay or reimburse **You** for reasonable costs to repair or replace any **Breakdown** of all parts listed under **Mechanical Coverage** and any other parts, except for Engine, Turbocharger/Supercharger, Transmission, Transfer Case, and Drive Axle components as listed in the Powertrain Series and except for those items listed under the Exclusions Section of this **Contract**.

## SURCHARGED OPTIONAL COVERAGES

**CONVERSION COVERAGE:** If the **Contract** Registration Page shows that **You** purchased the **Conversion Coverage** option, **You** will have the following **Coverage** (All parts listed must be installed by Licensed Conversion Company):

Electronic—Compact Disc Player; Cassette Player; Speakers; VideoCassette Player/Recorder; Auxiliary Light Switches; and Captain Chair Motor and Switch.

Rear Air Conditioner—Expansion Valve; Evaporator; Capacitors; Relays; Blower Motor and Switch; and Seals and Gaskets.

Camping Accessories—Refrigerator; Stove; LP Gas Regulator, Lines and Fittings; Fresh Water System Pump; Tank; Lines; Faucets and Fittings.

## BENEFITS

**TOWING/ROAD SERVICE:**  In the event **Your Vehicle** is disabled, **We** will pay or reimburse **You** for receipted towing or road service expenses up to fifty dollars ($50) per occurrence.  For Trucks and/or SUV's **We** will pay or reimburse **You** for receipted towing or road service expenses up to seventy-five dollars ($75) per occurrence and up to one hundred dollars ($100) for flatbed (four-wheel drive trucks and SUV's only) per occurrence.  Any payment shall be for actual towing or road service charges in excess of any applicable reimbursement from the manufacturer or any other towing or road service  **Coverage**.

**Road Service Coverage** includes the following:
Battery Service — If a battery failure occurs, a jump start will be applied to start the covered vehicle.
Flat Tire Assistance — Service consists of removal of the flat tire and its replacement with the spare tire.
Fuel, Oil, Fluid and Water Delivery Service — An emergency supply of fuel, oil, fluid and water will be delivered if **You** are in immediate need. **You** must pay for the fuel or the fluid when it is delivered.
No **Deductible** will apply to this benefit.

**RENTAL:** In the event of a **Breakdown** covered by this **Contract**, **We** will pay or reimburse **You** for receipted expenses to rent a replacement vehicle (from a licensed rental agency) or for alternate public transportation while **Your Vehicle** is at a licensed repair facility.  **Coverage** will be provided to **You** on the following basis, up to a maximum of thirty dollars ($30) for every eight (8) labor hours, or portion thereof, of applicable labor time required to complete the repair, up to a maximum of one hundred fifty dollars ($150) for each repair visit.  This **Coverage** does not apply to the time waiting for parts, services, weekends or other delays beyond the control of the repair facility or the **Administrator**. However, an additional three (3) days of rental **Coverage** applies in the event of a parts delay when an internal repair or replacement is performed on a major component (Engine, Transmission, Drive Axle).  No **Deductible** will apply to this benefit.

**TRIP INTERRUPTION:**  In the event of a **Breakdown** covered by this **Contract** occurs more than one hundred (100) miles from **Your** home and results in a repair facility keeping **Your Vehicle** overnight, **We** will reimburse **You** for receipted hotel and restaurant expenses, up to one hundred dollars ($100) per day for a maximum of five (5) days (Total benefit per occurrence of $500).  No **Deductible** will apply to this benefit.

**LOST KEY/LOCK OUT:**  In the event the keys for **Your Vehicle** are lost, broken or accidentally locked in **Your Vehicle**, **We** will reimburse **You** for receipted expenses, up to a maximum of thirty-five dollars ($35) for locksmith services.  No **Deductible** will apply to this benefit.

H520502WBN0602

6.  Review Coverage – After the Administration

H520502WBN06

## EXCLUSIONS

This Vehicle Service Contract Provides No Coverage or Benefits:

A. FOR ANY PART NOT SPECIFICALLY LISTED UNDER MECHANICAL COVERAGE, INCLUDING ANY OF THE FOLLOWING PARTS: CARBURETOR, BATTERY, STANDARD TRANSMISSION CLUTCH ASSEMBLY, FRICTION CLUTCH DISC AND PRESSURE PLATE, DISTRIBUTOR CAP AND ROTOR, SAFETY RESTRAINT SYSTEMS (INCLUDING AIR BAGS), GLASS, LENSES, SEALED BEAMS, LIGHT BULBS, FUSES, CIRCUIT BREAKERS, CELLULAR PHONES, TELEVISION/VCR, GAME CENTERS, ELECTRONIC TRANSMITTING/RECEIVING DEVICES, GLOBAL POSITIONING SYSTEMS, VOICE RECOGNITION SYSTEMS, BRAKE ROTORS AND DRUMS, ALL EXHAUST COMPONENTS, AND THE FOLLOWING EMISSION COMPONENTS: EGR PURGE VALVE/SOLENOIDS, VACUUM CANISTER, VAPOR RETURN CANISTER, VAPOR RETURN LINES/VALVES, AIR PUMP/LINES/VALVES, CATALYTIC CONVERTER/FILTERING/SENSORS, EMISSION VAPOR SENSORS, WEATHER STRIPS, TRIM, MOLDINGS, BRIGHT METAL CHROME, UPHOLSTERY AND CARPET, PAINT, OUTSIDE ORNAMENTATION, BUMPERS, BODY SHEET METAL AND PANELS, FRAME AND STRUCTURAL BODY PARTS, VINYL AND CONVERTIBLE TOPS, ANY CONVERTIBLE TOP ASSEMBLIES, HARDWARE OR LINKAGES, TIRES (EXCEPT AS MAY OTHERWISE BE PROVIDED UNDER MECHANICAL COVERAGE), WHEEL/RIMS. EXTERNAL NUTS, BOLTS AND FASTENERS ARE NOT COVERED UNLESS SPECIFICALLY LISTED UNDER MECHANICAL COVERAGE (EXCEPT WHERE REQUIRED IN CONJUNCTION WITH A COVERED REPAIR).

B. FOR MAINTENANCE SERVICES AND PARTS DESCRIBED IN YOUR VEHICLE'S OWNER'S MANUAL AS SUPPLIED BY THE MANUFACTURER AND OTHER NORMAL MAINTENANCE SERVICES AND PARTS WHICH INCLUDE, BUT ARE NOT LIMITED TO: ALIGNMENTS, ADJUSTMENTS, WHEEL BALANCING, TUNE-UPS, SPARK PLUGS, SPARK PLUG WIRES, GLOW PLUGS, HOSES, DRIVE BELTS, BRAKE PADS, BRAKE LININGS/SHOES, AND WIPER BLADES.  FILTERS, LUBRICANTS, COOLANTS, FLUIDS AND REFRIGERANTS WILL BE COVERED ONLY IF REPLACEMENT IS REQUIRED IN CONNECTION WITH A BREAKDOWN.

C. FOR ANY DAMAGE AND/OR BREAKDOWN RESULTING FROM COLLISION, ROAD HAZARD, FIRE, THEFT, VANDALISM, RIOT EXPLOSION, LIGHTNING, EARTHQUAKE, FREEZING, RUST OR CORROSION, WINDSTORM, HAIL, WATER OR FLOOD, ACTS OF GOD, SALT, ENVIRONMENTAL DAMAGE, CHEMICALS, CONTAMINATION OF FLUIDS, FUELS, COOLANTS OR LUBRICANTS.

D. FOR ANY BREAKDOWN CAUSED BY MISUSE, ABUSE, NEGLIGENCE, LACK OF NORMAL MAINTENANCE REQUIRED BY THE MANUFACTURER'S MAINTENANCE SCHEDULE FOR YOUR VEHICLE, OR IMPROPER SERVICING OR REPAIRS SUBSEQUENT TO PURCHASE. FOR ANY BREAKDOWN CAUSED BY SLUDGE BUILD-UP RESULTING FROM YOUR FAILURE TO PERFORM RECOMMENDED MAINTENANCE SERVICES, OR FAILURE TO MAINTAIN PROPER LEVELS OF LUBRICANTS AND/OR COOLANTS, OR FAILURE TO PROTECT YOUR VEHICLE FROM FURTHER DAMAGE WHEN A BREAKDOWN HAS OCCURRED OR FAILURE TO HAVE YOUR VEHICLE TOWED TO THE SERVICE FACILITY WHEN CONTINUED OPERATION MAY RESULT IN FURTHER DAMAGE.

E. FOR ANY REPAIR OR REPLACEMENT OF ANY COVERED PART IF A BREAKDOWN HAS NOT OCCURRED OR IF THE WEAR ON THAT PART HAS NOT EXCEEDED THE FIELD TOLERANCES ALLOWED BY THE MANUFACTURER.

F. IF ANY ALTERATIONS HAVE BEEN MADE TO YOUR VEHICLE OR YOU ARE USING OR HAVE USED YOUR VEHICLE IN A MANNER NOT RECOMMENDED BY THE MANUFACTURER, INCLUDING BUT NOT LIMITED TO, THE FAILURE OF ANY CUSTOM OR ADD-ON PART, ALL FRAME OR SUSPENSION MODIFICATIONS, LIFT KITS, ANY TIRE THAT IS NOT RECOMMENDED BY THE ORIGINAL MANUFACTURER IF IT CREATES AN ODOMETER/SPEEDOMETER VARIANCE OF GREATER THAN 4%, TRAILER HITCHES, EMISSIONS AND/OR EXHAUST SYSTEMS MODIFICATIONS, ENGINE MODIFICATIONS, TRANSMISSION MODIFICATIONS, AND/OR DRIVE AXLE MODIFICATIONS.

G. IF YOUR ODOMETER HAS CEASED TO OPERATE AND ODOMETER REPAIRS HAVE NOT BEEN MADE IMMEDIATELY, OR THE ODOMETER HAS BEEN ALTERED IN ANY WAY SUBSEQUENT TO PURCHASE, OR IF YOUR VEHICLE HAS EVER BEEN A TOTAL LOSS, SALVAGED OR REBUILT.

H. FOR ANY LIABILITY FOR PROPERTY DAMAGE, OR FOR INJURY TO OR DEATH OF ANY PERSON ARISING OUT OF THE OPERATION, MAINTENANCE OR USE OF YOUR VEHICLE DESCRIBED IN THIS CONTRACT, WHETHER OR NOT RELATED TO THE PARTS COVERED.  FOR LOSS OF USE, TIME, PROFIT, INCONVENIENCE, OR ANY OTHER CONSEQUENTIAL LOSS (EXCEPT AS MAY OTHERWISE BE PROVIDED UNDER MECHANICAL COVERAGE), INCLUDING ANY CONSEQUENTIAL DAMAGE TO A NON-COVERED PART THAT RESULTS FROM A BREAKDOWN.

I. WHEN THE RESPONSIBILITY FOR THE REPAIR IS COVERED BY AN INSURANCE POLICY, MANUFACTURER AND/OR DEALER CUSTOMER ASSISTANCE PROGRAM, OR ANY WARRANTY FROM THE MANUFACTURER, SUCH AS EXTENDED DRIVE TRAIN, MAJOR COMPONENT OR FULL COVERAGE WARRANTIES (REGARDLESS OF THE REMAINING MANUFACTURER'S WARRANTY WHEN YOU PURCHASED  THIS CONTRACT), OR A REPAIRER'S GUARANTEE/WARRANTY.  FURTHER, COVERAGE UNDER THIS CONTRACT IS SIMILARLY LIMITED IN THE EVENT OF A BREAKDOWN IF THE MANUFACTURER HAS ANNOUNCED ITS RESPONSIBILITY THROUGH ANY MEANS, INCLUDING PUBLIC RECALLS AND FACTORY SERVICE BULLETINS.

J. IF YOUR VEHICLE IS USED FOR TOWING (USED AS A COMMERCIAL UNIT, FARMING OR RANCHING, ROUTE WORK, JOB-SITE ACTIVITIES, SERVICE OR REPAIR WORK, DELIVERY OF GOODS, OR IS USED FOR RENTAL), OR IS USED FOR RENTAL, TAXI, LIMOUSINE OR SHUTTLE, TOWING/WRECKER SERVICE, DUMPING (DUMP BEDS), CHERRY PICKERS, LIFTING OR HOISTING, POLICE OR EMERGENCY SERVICE, PRINCIPALLY OFF-ROAD USE, RACING OR COMPETITIVE DRIVING.

K. FOR ANY BREAKDOWN OCCURRING PRIOR TO THE CONTRACT PURCHASE DATE, OR IF THE INFORMATION PROVIDED BY YOU, OR THE REPAIR FACILITY CANNOT BE VERIFIED AS ACCURATE OR  IS FOUND TO BE DECEPTIVELY INACCURATE.

L. FOR BREAKDOWNS THAT OCCUR AND/OR REPAIRS MADE OUTSIDE OF THE UNITED STATES OF AMERICA AND CANADA.

M. FOR DIAGNOSTIC AND/OR TEARDOWN PROCEDURES THAT ARE NOT LISTED, OR ARE IN EXCESS OF THE TIMES LISTED IN THE CURRENT YEAR'S NATIONAL FLAT RATE HOURLY GUIDE IN CONJUNCTION WITH A COVERED REPAIR.

## SPECIAL STATE REQUIREMENTS/DISCLOSURES

### ALASKA

EXCLUSIONS SECTION –
Item J. is amended by adding the following:
This **Contract** does provide **Coverage** if **Your Vehicle** is used for snow removal, provided **Your Vehicle** is properly equipped for such use and is not used commercially.

Item N. is added as follows:
This **Contract** does not provide **Coverage** for damages for bad faith, punitive or exemplary damages, personal injury including bodily injury, property damage (except as specifically stated in the **Contract**), and attorney's fees.

### ARIZONA

**Our** obligations under this Service **Contract** are insured by a policy issued by the Insurance Company as stated on the **Declaration Page**. If a covered claim is not paid within thirty (30) days after proof of loss has been filed, **You** may file a claim directly with the Insurance Company.
CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item a. is amended by adding the following:
a. **You** may also cancel this contract by returning it to the **Administrator**, Vemaco, Inc., as listed on the **Declaration Page**.

Item b. is deleted and replaced with the following –
b. **We** may cancel this **Contract** for non-payment of the **Contract** charge, or for misrepresentation in the submission of a claim made by **You**.  **We** may cancel this **Contract** if **Your Vehicle** is found to be modified by **You** in a manner not recommended by the manufacturer, or **Your Vehicle** is found to be used as a commercial vehicle.

### CALIFORNIA

DEFINITIONS SECTION – The definition of **Breakdown** is deleted and replaced with the following:
**Breakdown**– Means the failure of a covered part under normal service due to defects in material and workmanship.  A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item d. is deleted and replaced with the following:
d. If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid.  If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date **Coverage** begins, less an administration fee of twenty five ($25.00) dollars or 10% of the **Contract** charge, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.  The total amount of all authorized claims will be deducted from all refunds.

H520502WBN0602

## CONNECTICUT

Connecticut Public Act, 87-393, Laws 1987, requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

Used vehicles with a sale price of $3,000 but less than $5,000

Provides **Coverage** for 30 days or 1,500 miles, whichever occurs first.

Used vehicles with a sale price of $5,000 or more

Provides **Coverage** for 60 days or 3,000 miles, whichever occurs first.

The vehicle **You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, **Coverages** and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

## GEORGIA

**Our** obligations under this Service **Contract** are insured by a policy issued by the Insurance Company as stated on the **Declaration Page**. If a covered claim is not paid within sixty (60) days after proof of loss has been filed, **You** may file a claim directly with the Insurance Company.

EXCLUSIONS SECTION – Item **J.** is deleted and replaced with the following:

**J.** If **Your Vehicle** is used for towing (unless **Your Vehicle** is equipped with factory installed or factory authorized tow package), or is used as a commercial unit, or is used for rental, taxi, limousine or shuttle, commercial delivery, towing or road repair operations, construction, job site activities, commercial hauling, police or emergency service, principally off-road use, prearranged or organized racing or competitive driving, snow removal, route-work, service or repair.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **d.** is deleted and replaced with the following:

**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the price or the miles driven based on the term of the plan selected and the date **Coverage** begins. An administration fee of 10% of the pro-rata refund amount will be applied if this **Contract** is cancelled by **You**. In the event of cancellation, if this **Contract** is financed, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. If **You** have cancelled this **Contract** and have not received the refund from **Us** or the **Administrator** within sixty (60) days of such cancellation, **You** may contact the Insurance Company identified on the **Declaration Page**. The total amount of all authorized claims will be deducted from all refunds.

## HAWAII

DEFINITIONS SECTION – The definition of **Breakdown** is deleted and replaced with the following:

**Breakdown** – Means the failure of a covered part under normal service due to defects in material and workmanship. A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non–covered parts.

Hawaii Revised Statutes requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

Used vehicles with less than 25,000 miles at the time of sale

Provides **Coverage** for 90 days or 5,000 miles, whichever occurs first.

Used vehicles with 25,000 miles or more but less than 50,000 miles at the time of sale

Provides **Coverage** for 60 days or 3,000 miles, whichever occurs first.

Used vehicles with 50,000 miles or more but not more than 75,000 miles at the time of sale

Provides **Coverage** for 30 days or 1,000 miles, whichever occurs first.

The vehicle **You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, **Coverages** and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

**BENEFITS** – Towing/Road Service and Rental is not available.

## IDAHO

Notice – **Coverage** afforded under this **Contract** is not guaranteed by the Idaho Insurance Guarantee Association.

## ILLINOIS

EXCLUSIONS SECTION – Item **E.** is amended to read:

**E.** For any repair or replacement of any covered part if a **Breakdown** has not occurred. A gradual reduction in operating performance due to wear and tear does not constitute a **Breakdown**.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **d.** is deleted and replaced with the following:

**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the price or the miles driven based on the term of the plan selected and the date **Coverage** begins. The Vehicle Service **Contract** provider may retain a cancellation fee not to exceed the lesser of 10% of the Vehicle Service **Contract** price or fifty dollars ($50). In the event of a cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. The total amount of all authorized claims will be deducted from all refunds.

LIMITS OF LIABILITY – Item **b.** Aggregate is amended to read as follows:

**b. Aggregate** – The total of all claims and benefits paid or payable while this **Contract** is in force shall not exceed the Actual Cash Value for **Your Vehicle** (excluding tax, title and license fees).

## INDIANA

**Your** proof of payment to the issuing dealer for this **Contract** shall be considered proof of payment to the Insurance Company which guarantees **Our** obligations to **You**, providing such insurance was in effect at the time **You** purchased this **Contract**.

## IOWA

If **You** have any questions regarding this **Contract**, **You** may contact the **Administrator** by mail or by phone. Refer to the **Declaration Page** for the **Administrator's** address and toll free telephone number. Iowa residents only may also contact the Iowa Insurance Commissioner at the following address: Iowa Insurance Department, 6th floor, Lucas State Office Building, Des Moines, Iowa 50319.

## MASSACHUSETTS

NOTICE TO CUSTOMER: **PURCHASE OF THIS CONTRACT IS NOT REQUIRED IN ORDER TO REGISTER OR FINANCE A VEHICLE. THE BENEFITS PROVIDED MAY DUPLICATE EXPRESS MANUFACTURER'S OR SELLER'S WARRANTIES THAT COME AUTOMATICALLY WITH EVERY SALE. THE SELLER OF THIS COVERAGE IS REQUIRED TO INFORM YOU OF ANY WARRANTIES AVAILABLE TO YOU WITHOUT THIS CONTRACT.** Chapter 90, Section 7N 1/4 of Massachusetts General Laws requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

6

H520502WBN0602

## SPECIAL STATE REQUIREMENTS/DISCLOSURES CONT'D

### MASSACHUSETTS CONT'D

Used vehicles with less than 40,000 miles at the time of sale
    Provides **Coverage** for 90 days or 3,750 miles, whichever occurs first.
Used vehicles with 40,000 miles or more but less than 80,000 miles at the time of sale
    Provides **Coverage** for 60 days or 2,500 miles, whichever occurs first.
Used vehicles with 80,000 miles or more but less than 125,000 miles at the time of sale
    Provides **Coverage** for 30 days or 1,250 miles, whichever occurs first.
The vehicle **You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, **Coverages** and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

### MINNESOTA

The **Coverages** listed below are provided to **You** by the dealer at no charge as required by Minnesota Statute 325F.662. The term of the required warranty is based on the mileage at the time of sale as follows:
Used vehicles with less than 36,000 miles at the time of sale
    Provides **Coverage** for 60 days or 2,500 miles, whichever occurs first.
Used vehicles with 36,000 miles or more but less than 75,000 miles at the time of sale
    Provides **Coverage** for 30 days or 1,000 miles, whichever occurs first.
**Engine:** Lubricated Parts; Intake Manifolds; Engine Block; Cylinder Heads; Rotary Engine Housings; and Ring Gear; Water Pump; Externally Mounted Mechanical Fuel Pump; Radiator; Alternator; Generator; and Starter. **Transmission:** Case; Internal Parts; Torque Converter; or, the Manual Transmission Case and Internal Parts. **Drive Axle:** Axle Housings and Internal Parts; Axle Shafts; Drive and Output Shafts; and Universal Joints; but excluding the Secondary Drive Axle on vehicles other than passenger vans, mounted on a truck chassis. **Brakes:** Master Cylinder; Vacuum Assist Booster; Wheel Cylinders; Hydraulic Lines and Fittings; and Disc Brake Calipers. **Steering:** Gear Housing and all Internal Parts; Power Steering Pump; Valve Body; Piston; and Rack. Note: The following parts are covered only on vehicles with less than 36,000 miles: Steering Rack; Radiator; Alternator; Generator; and Starter.

The above **Coverages** are excluded from this **Contract** during the applicable warranty period, unless the dealer becomes unable to meet its obligations. **Your** rights and obligations are fully explained in the dealer issued used vehicle limited warranty document.
CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **d.** is amended by adding the following:
**d.** If **You** have cancelled this **Contract** and have not received the refund from **Us** or the **Administrator** within sixty (60) days of such cancellation, **You** may contact the Insurance Company identified on the **Declaration Page**.
**Definition: "Pre-existing"** is not applicable to Minnesota residents.
EXCLUSIONS SECTION -
**Coverage** Exclusion for breakdowns caused by rust, corrosion, sludge build up or damage to a covered part by a non-covered part does not apply to Minnesota residents.

### NEVADA

This Service **Contract** is not renewable. The provisions of this **Contract** apply only to the original purchaser of the Service **Contract**.
CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Items **b.** and **d.** are DELETED and REPLACED with the following:
**b.** **We** may cancel this **Contract** within 70 days from the date of purchase for any reason. After 70 days, **We** may only cancel this Service **Contract** for fraud, material misrepresentation, nonpayment by **You** or a substantial breach of duties by **You** relating to the covered property or its use. **We** may cancel this **Contract** if **Your** Vehicle is found to be modified in a manner not recommended by the manufacturer, or if **Your** Vehicle is found to be used as a Commercial vehicle. If **We** cancel **Your** Contract, **You** will be entitled to a refund on the unearned **Contract** fee according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date **Coverage** begins, no administrative fee will be deducted. In the event **We** cancel this **Contract**, written notice will be sent to **Your** last known address at least 15 days prior to cancellation with the effective date of the cancellation.
**d.** **You** may cancel this **Contract** at anytime. If **You** have made no claim and **Your** request for cancellation is within 30 days, the full price **You** paid for the Service **Contract** will be refunded and no administrative fee will be deducted. If **You** have made a claim under the **Contract**, or if **Your** request is beyond the first 30 days, **We** will refund to **You** an amount based on the pro-rata method, less a $25.00 administrative fee. If **Your** **Contract** was financed, the outstanding balance will be deducted from any refund, however, **You** will not be charged for claims paid or repair service fees. If **You** cancel this **Contract** and the refund is not processed within 45 days, a 10% penalty will be added to the refund for every 30 days the refund is not paid. The total amount of all authorized claims will be deducted from all refunds.

### NEW HAMPSHIRE

GENERAL PROVISIONS SECTION – Item **8b.** is deleted and replaced with the following:
**b.** To transfer, the following must be submitted to the **Administrator** within 30 days of the change of ownership to a subsequent individual purchaser:
    Original **Contract** and **Declaration Page**; and name and address of new owner, date of sale to new owner, current mileage.
CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **d.** is deleted and replaced with the following:
**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date **Coverage** begins. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. The total amount of all authorized claims will be deducted from all refunds.

### NEW YORK

Section 196b of New York General Business Law requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
Used vehicles with 36,000 miles or less at the time of sale
    Provides **Coverage** for 90 days or 4,000 miles, whichever occurs first.
Used vehicles with more than 36,000 miles but less than 80,000 miles at the time of sale
    Provides **Coverage** for 60 days or 3,000 miles, whichever occurs first.
Used vehicles with 80,000 miles or more but no more than 100,000 miles at the time of sale
    Provides **Coverage** for 30 days or 1,000 miles, whichever occurs first.
The vehicle **You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, **Coverages** and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

### NORTH CAROLINA

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **d.** is deleted and replaced with the following:
**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date **Coverage** begins, less an administration fee of $25 or 10% of the pro-rata refund amount, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. The total amount of all authorized claims will be deducted from all refunds.

H520502WBN0602

**SPECIAL STATE REQUIREMENTS/DISCLOSURES CONT'D**

## OKLAHOMA

**Disclosure Statement:** This service warranty is not issued by the manufacturer or wholesale company marketing the product. This warranty will not be honored by such manufacturer or wholesale company.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** Section – Item **d.** is deleted and replaced with the following:

**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro–rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date **Coverage** begins. An administration fee of 10% of the pro–rata refund amount will be applied if this **Contract** is cancelled by **You**. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. The total amount of all authorized claims will be deducted from all refunds.

## RHODE ISLAND

Section 31-5.4 of Rhode Island General Business Law requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

Used vehicles with 36,000 miles or less at the time of sale
  Provides **Coverage** for 90 days or 4,000 miles, whichever occurs first.
Used vehicles with more than 36,000 miles but less than 100,000 miles at the time of sale
  Provides **Coverage** for 30 days or 1,000 miles, whichever occurs first.

The vehicle **You** have purchased may be covered by this law. If so, the following is added to this **Contract**: In addition to the dealer warranty required by this law, **You** have elected to purchase this **Contract**, which may provide **You** with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. **You** have been charged separately only for this **Contract**. The required dealer warranty is provided free of charge. Furthermore, the definitions, **Coverages** and exclusions stated in this **Contract** apply only to this **Contract** and are not the terms of the required dealer warranty.

## SOUTH CAROLINA

If **You** have any questions regarding this **Contract**, or a complaint against the Obligor, **You** may contact the South Carolina Department of Insurance at 300 Arbor Lake Drive, Columbia, South Carolina 29223, (803)-737-6180.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **b.** is amended by adding the following:

**b.** If **We** cancel this **Contract We** shall mail a written notice to **You** at the last known address held by **Us** at least 15 days prior to cancellation, providing **You** with notice of cancellation date and the reason for cancellation. However, prior notice is not required if the reason for cancellation is nonpayment of the provider fee, a material misrepresentation by the Service **Contract** holder to the provider, or a substantial breach of duties by the Service **Contract** holder relating to the covered product or its use.

Items **d.** is deleted and replaced with the following:

**d.** If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro–rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date **Coverage** begins, less a twenty-five ($25.00) dollar administrative fee. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. A ten percent penalty per month shall be added to a refund that is not paid or credited within 45 days after return of the Service **Contract** to the provider. The total amount of all authorized claims will be deducted from all refunds.

## TEXAS

If **You** have any questions regarding the regulation of the Service **Contract** provider or a complaint against the Obligor, **You** may contact the Texas Department of Licensing & Regulation, 920 Colorado, P.O. Box 12157, Austin, Texas 78711, (800) 803-9202.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **b.** is amended by adding the following:

**b.** If **We** cancel this **Contract We** shall mail a written notice to **You** at the last known address held by **Us** before the fifth day preceding the effective date of cancellation. The notice will state the effective date and the reason for the cancellation. However, prior notice is not required if the reason for cancellation is nonpayment of the provider fee, a material misrepresentation by the Service **Contract** holder to the provider, or a substantial breach of duties by the Service **Contract** holder relating to the covered product or its use.

Item **d.** is amended by adding the following:

**d.** If a Service **Contract** is cancelled under this section and the provider does not pay the refund or credit the Service **Contract** holder's account before the 46th day after the date of the return of the Service **Contract** to the provider, the provider is liable to the **Contract** holder for a penalty in an amount not to exceed 10 percent of the amount outstanding per month.

## UTAH

Note: **Coverage** afforded under this **Contract** is not guaranteed by the Property and Casualty Guarantee Association.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item **b.** is deleted and replaced with the following:

**b.** **We** may cancel this **Contract** for the following reasons by sending to **You** notice of cancellation and the reason for cancellation, via first class mail, to **Your** last known address:

1. **We** may cancel this **Contract** for non-payment of the **Contract** charge. Such cancellation will be    effective 10 days after mailing of notice.
2. **We** may cancel this **Contract** for misrepresentation of a claim, if **Your Vehicle** is found to be modified in a manner not recommended by the manufacturer, or if **Your Vehicle** is found to be used as a Commercial vehicle and the applicable surcharge has not been marked on the Declaration **Page** and payment has not been received for this surcharge. Such cancellation will be effective 30 days after mailing of  notice.

## WASHINGTON

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Items **a.** and **b.** are deleted and replaced with the following:

**a.** **You** may cancel this **Contract** by returning it to the **Administrator**. An odometer statement indicating the odometer reading at the date of the request will be required. A ten percent (10%) penalty will be added to any refund that is not paid within 30 days of return of the **Contract** to the **Administrator**.

**b.** **We** may cancel this **Contract** for non-payment of the **Contract** Charge, or for misrepresentation in obtaining this **Contract** or in the submission of a claim. If cancelled, written notice of cancellation, including the actual reason for the cancellation, will be mailed to the last mailing address known to the **Administrator** at least:

1. 10 days before the effective date of cancellation if cancelled for non-payment of the **Contract** charge.
2. 45 days before the effective date of cancellation if cancelled for any other reason.

## WISCONSIN

THIS WARRANTY IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.

WHAT TO DO IN THE EVENT OF A BREAKDOWN – Item **A.4.** is deleted and replaced with the following:

**4.** Obtain Authorization from the **Administrator** – Prior to any repair being made, instruct the Service Manager at the repair facility to contact the **Administrator** to obtain an authorization for the claim. Failure to obtain authorization prior to having repairs made may jeopardize **Coverage** under this **Contract**, except as provided under Emergency Repairs.

The amount authorized by the **Administrator** is the amount that will be paid for repairs covered under the terms of this **Contract**. Any additional amount must receive prior approval.

8

## VEHICLE MAINTENANCE LOG

| DATE SERVICE | MILEAGE WHEN SERVICE / REPAIR ORDER NUMBER | SERVICE PERFORMED | NAME AND ADDRESS OF SERVICING FACILITY | MECHANIC OR SERVICE MANAGER |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

9

H520502WBN0602

b. **Aggregate** -- The total of all claims and benefits Vehicle (excluding tax, title and license fees).

1

H520502WBN0

# EXHIBIT 2

# DECLARATION PAGE

Warrantybynet

This is your CUSTOMER CONTRACT NUMBER. Please use this number in any phone or written communication.

| WWTN39388 | 72100UK7 | 720045 | ✓ NEW |
|---|---|---|---|
| YOUR CONTRACT NUMBER | YOUR CONTRACT PLAN CODE | SELLING DEALER CODE | USED |

CONTRACT HOLDER (You, Your):

CHARLES C. MITSCHOW

CONTRACT HOLDER ADDRESS: (Phone: (860)868-9908)

289 LITCHFIELD TURNPIKE
NEW PRESTON, CT 06777

**DESCRIPTION OF YOUR VEHICLE:**

| YEAR | MAKE | MODEL | VEHICLE ID NUMBER | CONTRACT CHARGE | DEDUCTIBLE |
|---|---|---|---|---|---|
| 2000 | Chevrolet | BLAZER | 1GNDT13W3Y2179706 | $1,500.00 | $0.00 |

REDUCING DEDUCTIBLE
(Does not apply unless checked yes)

TERM

| MONTHS | MILEAGE |
|---|---|
| 72 | 100000 |

FULL PAY

✓ PAY AS YOU GO

ADDITIONAL

4WD

*CONTRACT PURCHASE DATE: 6/12/2003

*ODOMETER MILEAGE AT CONTRACT PURCHASE DATE: 35331

DEALER/LESSOR:

Warrantybynet

ADDRESS 399 Mantoloking Rd, Brick, NJ 08723

LIENHOLDER: (Entity financing VSC)

DEALER PHONE NUMBER (800) 962-4720

AUTHORIZED DEALER SIGNATURE _____

*CONTRACT PURCHASE DATE ___ 6/12/2003

DATE ___ 6/12/2003
Contract Purchase Date

FEMECO
Administrator
Vemaco, Inc.
P.O. Box 410
Alvarado, TX 76009
1-800-545-8801 (NAT'L)

If this Vehicle Service Contract has been financed, the Lienholder shall be entitled to any refunds resulting from the cancellation of this Vehicle Service Contract for whatever reason. This would include cancellation for non-payment, repossession of the vehicle, or total loss of the vehicle.

*New vehicle plan [Premier (plan code UK7) and Peak (plan code XD7) Advantage Series] expiration is measured in time/mileage from the Contract Purchase Date and zero (0) miles.
*Used vehicle plan [Powertrain (plan code XP7), Select (plan code XF7), and Value (plan code XD7) Advantage Series] expiration is measured in time/mileage from the Contract Purchase Date and Odometer Mileage (at Contract Purchase Date).

*All vehicle plans require a mandatory "Waiting Period before Coverage takes effect. The "Waiting Period" is 30 days and 1,000 miles from the Contract Purchase Date and Odometer Mileage at Contract Purchase Date.

The definition of "We, Us and Our" used frequently throughout the Vehicle Service **Contract** is defined as BUTLER FINANCIAL SOLUTIONS, L.L.C., 2300 CORPORATE BLVD., NW, SUITE 214, BOCA RATON, FL 33431. Please refer to the Vehicle Service **Contract** for additional Definitions.

**Our** obligations under this Vehicle Service Service **Contract** are insured by a policy issued by Heritage Warranty Mutual Insurance Risk Retention Group, Inc., 1550 South 70th Street, Lincoln, Nebraska 68596, under a motor Vehicle Service Contract reimbursement policy, and reinsured by American Re®. - a national A+ rated company and a member of the Munich Re Group®. If a covered claim is not paid within sixty (60) days, [except in Arizona thirty (30) days], after proof of loss has been filed, **You** may file a claim directly with the Insurance Company. Please call 1-800-543-8801 for instructions.

H250502WBN0502Rev 03/03

*Butler Financial*
*(Bms)*

828
654
0244

877
358
1500

## IMPORTANT INFORMATION YOU NEED TO KNOW

CUSTOMER SUPPORT NUMBER – Please see the box labeled **Your Contract** Number on the Declaration Page. This is **Your** CUSTOMER SUPPORT NUMBER. Please refer to this number in any written or verbal communication, such as requesting information or filing a claim. PURCHASE OF THIS VEHICLE SERVICE CONTRACT IS NOT REQUIRED IN ORDER TO PURCHASE OR FINANCE A MOTOR VEHICLE.

## THINGS TO DO NOW

The **Declaration Page** is an important part of this Agreement. It is **Your** responsibility to notify **Us** if any information is incorrect. Please read all sections carefully and if are unclear about any information call **Us** at 1-800-962-4720. Refer to the bold printed number in any verbal or written communication, such as requesting information or filing a claim.

Check Plan Code – Not every part of **Your Vehicle** is covered by this **Contract**. **Coverage** is identified by the last three (3) letters of the Plan Code as shown on the **Declaration Page** of this **Contract**. Please compare the last 3 letters of the Plan Code on the **Declaration Page** with the Plan Code and Corresponding **Coverage** as listed under **Mechanical Coverage**. If this box was left blank, or Plan Code is inaccurate, contact **Your Administrator** immediately.

Check Your Deductible – Please check the box labeled **DEDUCTIBLE** on **Your** Declaration Page. A number should be in the box which identifies the portion of the covered repair **You** will be required to pay if **You** have a claim. If this box was left blank, contact **Your Administrator** immediately. NOTE: This **Contract** is not valid unless **You** have signed the **Declaration Page** and it has been affixed to the front of this **Contract**.

## THINGS YOU MUST DO THROUGHOUT THE TERM OF YOUR CONTRACT

Properly Maintain Your Vehicle and KEEP THE RECEIPTS – This **Contract** is only valid if **Your Vehicle** has been maintained in accordance with the manufacturer's specifications. Keep copies of all receipts (oil changes, lubrication, etc.), as proof of maintenance may be required when **You** file a claim. SEE SECTION: "GENERAL PROVISIONS" FOR SPECIFIC MAINTENANCE REQUIREMENTS.

Obtain approval PRIOR to having work performed that may be covered by this **Contract**. If **You** believe the failure may be covered by this **Contract**, call the **Administrator** personally, or instruct the repair facility performing the work to call and **Register** the claim BEFORE THE WORK IS PERFORMED. SEE SECTION: "WHAT TO DO IN THE EVENT OF A BREAKDOWN".

## DEFINITIONS

The following definitions apply to words frequently used in this **Contract** and appear in **Bold Faced Type**:

**You, Your** – Means the **Contract** Holder shown on the **Declaration Page** or the person to whom this **Contract** was properly transferred.

**We, Us, Our** – Means the obligor of this **Contract** as stated on the **Declaration Page** attached to this **Contract**.

**Administrator** – Means **The Administrator** as shown on the **Declaration Page**.

**Contract** – Means this Vehicle Service Contract which **You** have purchased from **Us** to protect **Your Vehicle**.

**Declaration Page** – Means the numbered document which must be attached to and forms part of this **Contract**. It lists information regarding **You**, **Your Vehicle**, **Coverage** selected, and other vital information.

**Mechanical Coverage** – Lists the **Coverages** provided to **You** for **Your Vehicle** under this **Contract**.

**Coverage** – Means the protection **You** have selected, as listed under **Mechanical Coverage** Section.

**Your Vehicle** – Means the vehicle which is described on the **Declaration Page**.

**Deductible** – Means the amount **You** are required to pay, as shown on the **Declaration Page**, for covered **Breakdowns**. Once a part is repaired or replaced under the terms of this **Contract**, there will be no **Deductible** for future repairs to that part.

**Breakdown or Mechanical Failure** – These terms are used interchangeably and mean the failure of a covered part under normal service. A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts. **Subsequent Damages** resulting from the **Breakdown or Mechanical Failure** of a covered part are covered by this **Contract**, except when **You** have failed to perform the recommended maintenance services for **Your Vehicle**.

**Subsequent Damage** – Means the direct or immediate damage to a non-covered part occurring as a singular event or failure originating with the failure of a covered part.

**Consequential Damage** – Means an event or damage that occurs separately as a consequence or result of the failure of a covered or non-covered part, such as, loss of time or use, inconvenience, commercial loss, personal injury or property damage.

**Registered** – Means a claim has been **Registered** only when the **Administrator** has been contacted and has issued a claim reference number.

**Pre-existing** – Means a condition that within all reasonable mechanical probability relates to the mechanical fitness of **Your Vehicle** prior to **Contract** issuance.

**Preferred Repair Facility** – A Repair Facility that has been selected and assigned by the **Administrator** to provide quality service to the customer.

## GENERAL PROVISIONS

This **CONTRACT** is between **US** and **YOU**, and is subject to all the Terms and Conditions contained herein.

1. **CONTRACT PERIOD**
   **Coverage** under this **Contract** begins 30 days and 1,000 miles from the **Contract** Purchase Date and Odometer Mileage at **Contract** Purchase Date and will expire according to the time and/or mileage of the term/miles selected, whichever occurs first, as shown on the **Declaration Page**.
   a) New Vehicle Plan (Premier and Peak Advantage Series) expiration is measured in time/mileage from the **Contract** Purchase Date and zero (0) miles.
   b) Used Vehicle Plan (Powertrain, Select, and Value Advantage Series) expiration is measured in time/mileage from the **Contract** Purchase Date and Odometer Mileage (at **Contract** Purchase Date).

2. **COVERAGE**
   The **Coverage** afforded **You** for **Your Vehicle** is fully described in this **Contract**. Please see section: "Mechanical Coverage" of this **Contract**.

3. **BREAKDOWN OF COVERED PARTS**
   **We** will pay or reimburse **You** for reasonable costs to repair or replace any **Breakdown** of a part listed under **Mechanical Coverage**. REPLACEMENT PARTS MAY BE NEW, REMANUFACTURED, OR REPLACEMENT PARTS OF LIKE KIND AND QUALITY. If necessary, the repair facility will be paid, less **Your Deductible** (if any), by the **Administrator's** national charge card system (MasterCard or VISA) on **Your** behalf.

4. **DEDUCTIBLE**
   In the event of a **Breakdown** covered by this **Contract**, **You** may be required to pay a **Deductible**. No **Deductible** payment is required with respect to Towing/Road Service, Rental, Trip Interruption, and Lost Key/Lockout **Coverages**, if they are provided by this **Contract**. **You** have a Per Repair Visit **Deductible**, as shown on the **Declaration Page**, the **Deductible** amount will be applied on a per repair visit basis. Should a covered **Breakdown** take more than one visit to repair, only one **Deductible** will apply for that **Breakdown**. In addition, if **You** bring **Your Vehicle** to a **Preferred Repair Facility**, $50 (fifty) dollars of any **Deductible** will be waived. **Our Administrator** will assist **You** in locating a **Preferred Repair Facility**.

5. **TERRITORY**
   This **Contract** applies only to **Breakdown** that occur and repairs made within the United States of America and Canada.

6. **LIMITS OF LIABILITY**
   a. Per Repair Visit – **Our** liability for any one (1) Repair Visit shall in no event exceed the trade-in value of **Your Vehicle** at the time of said Repair Visit, as listed in the Kelly Blue Book Used Car Guide.
   b. Aggregate – The total of all claims and benefits paid or payable while this **Contract** is in force shall not exceed the price **You** paid for **Your Vehicle** (excluding tax, title and license fees).

1

H520502WBN0602Rev 02/03

## WHAT TO DO IN THE EVENT OF A BREAKDOWN CONT'D

7. Pay any applicable Deductible – We will pay the repair facility or You for the cost of the work performed on Your Vehicle that is covered by this Contract and previously authorized, less the Deductible (if any). Once authorization is obtained, and the repair is completed, all repair orders and documentation must be submitted to the Administrator within sixty (60) days to be eligible for payment.

8. Emergency Repairs - Should an emergency occur which requires a Breakdown repair be made at a time when, due to circumstances beyond Our control, the Administrator's office cannot be contacted, You must call the Administrator's office within five (5) business days from the date of repair to determine if such repair will be covered by this Contract. If covered, You will be reimbursed for the repair.

**B. IF YOUR VEHICLE BREAKS DOWN ON THE ROAD:**
Follow the same steps as above. If necessary, the repair facility will be paid, less Your Deductible (if any), by the Administrator's national charge card system (MasterCard or VISA) on Your behalf. In some case, You may need to pay the repair bill in full. If so, You will be reimbursed for the Registered amount of the repair, less Your Deductible (if any). If You have any questions regarding claim procedures or Coverages, please call the Administrator at the number below and ask for a Customer Support Representative:

Vemeco, Inc.
P. O. Box 410
Alvarado, TX 76009
Customer Service/Claims (800) 543-8801*
Available 24 hrs/day–365 days/year
*For Towing/Road Service and Lost Key/Lockout assistance, Call (888) 248-8289

## SERVICE MANAGER'S GUIDE TO FILING A CLAIM
## STEPS TO FOLLOW WHEN FILING A CLAIM:

1. Advise Contract Holder – That evaluating the cause of the failure does not mean that the failure is covered under this Contract. All covered repairs must be Registered with the Administrator.

2. Contract Holder's Approval for Evaluation – Obtain approval from the Contract Holder to inspect and/or teardown vehicle to determine cause and cost of repair. Save all components including fluids and filters, in the event the Administrator requires an inspection. Inform the Contract Holder that the cost of the teardown will not be paid if the failure of the component disassembled is not covered under the Contract.

3. Cause, Cure and Cost – Assess the problem(s), cause, cure of the failure and cost of the repairs.

NOTE: Any major component failure that has a verifiable complaint, i.e., slipping transmission, knocking engine, etc., should be called in prior to any teardown.

4. Register the Repair with the Administrator – Call the Administrator's Service Manager's Support representative at (800) 543-8801 to Register the claim. Please have the following items ready when you place the call:
   a. Customer's Contract Number
   b. Cause of Failure and Cure
   c. Cost of the Repair
   d. Factory Part Number(s)

5. The Support Representative will verify the Coverage and –
   A. Register Claim – The Administrator will Register the claim by issuing a Reference Number. Record this Reference Number on the Repair Order. The Registered claim amount is the maximum that will be paid. Any additional amounts must be Registered with the Administrator, prior to submitting the claim for payment.

OR

   B. Request Additional Evaluation – Request further evaluation, teardown or outside inspection.
      i. Inspection – The Administrator reserves the right to require an inspection of the vehicle prior to any repair being accomplished. Diagnostic procedures not associated with the teardown are not covered.
      ii. Teardown – If a teardown is necessary in order to determine the cause of failure, the Contract Holder must approve the teardown. Please advise the Contract Holder that, if the component disassembled is not covered, then the Contract Holder must pay for the teardown.
   Listed below is the Inspection Teardown Policy:
      a. Save all components, including fluids and filters, that need to be inspected.
      b. The Support Representative will arrange for inspection.
      c. If not visited within 48 hours, call the Support Representative.

OR

   C. Deny Claim – Deny the request and issue a Reference Number.

6. Review Repairs with Contract Holder – After the Administrator has been contacted, review with the Contract Holder what will be covered by the Contract and what portions of the repairs, if any, will not be covered.

7. Contract Holder's Approval for Repairs – Obtain the Contract Holder's approval to complete the repairs. All repair orders must have customer's signature.

8. Submit Repair Orders for Payment – All repair orders and documentation must be submitted to the Administrator, at the address noted under "What To Do In The Event Of A Breakdown" within sixty (60) days.

## MECHANICAL COVERAGE

## POWERTRAIN SERIES 1-5 (Plan Code XP7)

**1. Engine:** Cylinder Block, Cylinder Head(s), Rotary Housing and all internal lubricated parts contained within the engine including: Pistons; Piston Rings; Connecting Rod Bearings; Crankshaft; Crankshaft Main Bearings; Camshaft; Camshaft Bearings; Cam Followers; Timing Chain or Belt; Timing Gears, Guides, Tensioners; Rocker Arms; Rocker Shafts; Rocker Bushings; Cylinder Head Valves; Valve Guides; Valve Lifters; Valve Springs; Valve Seals; Valve Retainers; Valve Seats; Push Rods; Water Pump; Fuel Pump; Oil Pump and Oil Pump Housing; Harmonic Balancer; Oil Pan; Timing Chain Cover; Intake and Exhaust Manifolds; Valve Covers; Engine Mounts; Cam Gear Bolt; Harmonic Balancer Bolt; Head Bolts; and Seals and Gaskets.

**2. Turbocharger/Supercharger:** (factory installed only) Turbocharger/Supercharger Housing and All Internal Parts; and Seals and Gaskets.

**3. Transmission:** (Automatic or Standard) Transmission Case and all Internal Parts plus: Torque Converter, Flywheel/Flex Plate, Vacuum Modulator; Electronic Shift Control Unit; Transmission Cooler; Transmission Mounts; Oil Pan; Slave/Clutch Master Cylinder; Pilot Bearing; Throw-Out Bearing; and Seals and Gaskets.

**4. Transfer Case:** Transfer Case and All Internal Parts; and Seals and Gaskets.

**5. Drive Axle:** (Front and Rear) Drive Axle Case; All Internal Parts contained within the Drive Axle; Locking Hubs; Drive Shafts; Center Support Bearings; Universal Joints; Constant Velocity Joints; Axle Bearings; Four–Wheel Drive Actuator; Differential Cover; and Seals and Gaskets.

H520502WBN0602Rev 02/03

# EXCLUSIONS

### This Vehicle Service Contract Provides No Coverage or Benefits:

A. FOR ANY PART NOT SPECIFICALLY LISTED UNDER MECHANICAL COVERAGE, OR FOR PREMIER ADVANTAGE SERIES, ANY OF THE FOLLOWING PARTS: CARBURETOR, BATTERY, STANDARD TRANSMISSION CLUTCH ASSEMBLY, FRICTION CLUTCH DISC AND PRESSURE PLATE, DISTRIBUTOR CAP AND ROTOR, SAFETY RESTRAINT SYSTEMS (INCLUDING AIR BAGS), GLASS, LENSES, SEALED BEAMS, LIGHT BULBS, FUSES, CIRCUIT BREAKERS, CELLULAR PHONES, TELEVISION/VCR (UNLESS APPROPRIATE SURCHARGE IS NOTED ON REGISTRATION PAGE AND HAS BEEN PAID FOR), GAME CENTERS, ELECTRONIC TRANSMITTING/RECEIVING DEVICES, GLOBAL POSITIONING/NAVIGATION SYSTEMS (UNLESS APPROPRIATE SURCHARGE IS NOTED ON REGISTRATION PAGE AND HAS BEEN PAID FOR), VOICE RECOGNITION SYSTEMS, BRAKE ROTORS AND DRUMS, ALL EXHAUST COMPONENTS, AND THE FOLLOWING EMISSION COMPONENTS: EGR PURGE VALVE/SOLENOIDS, VACUUM CANISTER, VAPOR RETURN CANISTER, VAPOR RETURN LINES/VALVES, AIR PUMP/LINES/VALVES, CATALYTIC CONVERTER/FILTERING/SENSORS, EMISSION VAPOR SENSORS, WEATHER STRIPS, TRIM, MOLDINGS, BRIGHT METAL CHROME, UPHOLSTERY AND CARPET, PAINT, OUTSIDE ORNAMENTATION, BUMPERS, BODY SHEET METAL AND PANELS, FRAME AND STRUCTURAL BODY PARTS, VINYL AND CONVERTIBLE TOPS, ANY CONVERTIBLE TOP ASSEMBLIES, HARDWARE OR LINKAGES, TIRES (EXCEPT AS MAY OTHERWISE BE PROVIDED UNDER MECHANICAL COVERAGE), WHEEL/RIMS. EXTERNAL NUTS, BOLTS AND FASTENERS ARE NOT COVERED UNLESS SPECIFICALLY LISTED UNDER MECHANICAL COVERAGE (EXCEPT WHERE REQUIRED IN CONJUNCTION WITH A COVERED REPAIR).

B. FOR MAINTENANCE SERVICES AND PARTS DESCRIBED IN YOUR VEHICLE'S OWNER'S MANUAL AS SUPPLIED BY THE MANUFACTURER AND OTHER NORMAL MAINTENANCE SERVICES AND PARTS WHICH INCLUDE, BUT ARE NOT LIMITED TO: ALIGNMENTS, ADJUSTMENTS, WHEEL BALANCING, TUNE-UPS, SPARK PLUGS, SPARK PLUG WIRES, GLOW PLUGS, HOSES, DRIVE BELTS, BRAKE PADS, BRAKE LININGS/SHOES, AND WIPER BLADES. FILTERS, LUBRICANTS, COOLANTS, FLUIDS AND REFRIGERANTS WILL BE COVERED ONLY IF REPLACEMENT IS REQUIRED IN CONNECTION WITH A BREAKDOWN.

C. FOR ANY DAMAGE AND/OR BREAKDOWN RESULTING FROM COLLISION, ROAD HAZARD, FIRE, THEFT, VANDALISM, RIOT EXPLOSION, LIGHTNING, EARTHQUAKE, FREEZING, RUST OR CORROSION, WINDSTORM, HAIL, WATER OR FLOOD, ACTS OF GOD, SALT, ENVIRONMENTAL DAMAGE, CHEMICALS, CONTAMINATION OF FLUIDS, FUELS, COOLANTS OR LUBRICANTS.

D. FOR ANY BREAKDOWN CAUSED BY MISUSE, ABUSE, NEGLIGENCE, LACK OF NORMAL MAINTENANCE REQUIRED BY THE MANUFACTURER'S MAINTENANCE SCHEDULE FOR YOUR VEHICLE, OR IMPROPER SERVICING OR REPAIRS SUBSEQUENT TO PURCHASE. FOR ANY BREAKDOWN CAUSED BY SLUDGE BUILD-UP RESULTING FROM YOUR FAILURE TO PERFORM RECOMMENDED MAINTENANCE SERVICES, OR FAILURE TO MAINTAIN PROPER LEVELS OF LUBRICANTS AND/OR COOLANTS, OR FAILURE TO PROTECT YOUR VEHICLE FROM FURTHER DAMAGE WHEN A BREAKDOWN HAS OCCURRED OR FAILURE TO HAVE YOUR VEHICLE TOWED TO THE SERVICE FACILITY WHEN CONTINUED OPERATION MAY RESULT IN FURTHER DAMAGE.

E. FOR ANY REPAIR OR REPLACEMENT OF ANY COVERED PART IF A BREAKDOWN HAS NOT OCCURRED OR IF THE WEAR ON THAT PART HAS NOT EXCEEDED THE FIELD TOLERANCES ALLOWED BY THE MANUFACTURER.

F. IF ANY ALTERATIONS HAVE BEEN MADE TO YOUR VEHICLE OR YOU ARE USING OR HAVE USED YOUR VEHICLE IN A MANNER NOT RECOMMENDED BY THE MANUFACTURER, INCLUDING BUT NOT LIMITED TO, THE FAILURE OF ANY CUSTOM OR ADD-ON PART, ALL FRAME OR SUSPENSION MODIFICATIONS, LIFT KITS, ANY TIRE THAT IS NOT RECOMMENDED BY THE ORIGINAL MANUFACTURER IF IT CREATES AN ODOMETER/SPEEDOMETER VARIANCE OF GREATER THAN 4%, TRAILER HITCHES, EMISSIONS AND/OR EXHAUST SYSTEMS MODIFICATIONS, ENGINE MODIFICATIONS, TRANSMISSION MODIFICATIONS, AND/OR DRIVE AXLE MODIFICATIONS.

G. IF YOUR ODOMETER HAS CEASED TO OPERATE AND ODOMETER REPAIRS HAVE NOT BEEN MADE IMMEDIATELY, OR THE ODOMETER HAS BEEN ALTERED IN ANY WAY SUBSEQUENT TO PURCHASE, OR IF YOUR VEHICLE HAS EVER BEEN A TOTAL LOSS, SALVAGED OR REBUILT.

H. FOR ANY LIABILITY FOR PROPERTY DAMAGE, OR FOR INJURY TO OR DEATH OF ANY PERSON ARISING OUT OF THE OPERATION, MAINTENANCE OR USE OF YOUR VEHICLE DESCRIBED IN THIS CONTRACT, WHETHER OR NOT RELATED TO THE PARTS COVERED. FOR LOSS OF USE, TIME, PROFIT, INCONVENIENCE, OR ANY OTHER CONSEQUENTIAL LOSS (EXCEPT AS MAY OTHERWISE BE PROVIDED UNDER MECHANICAL COVERAGE), INCLUDING ANY CONSEQUENTIAL DAMAGE TO A NON-COVERED PART THAT RESULTS FROM A BREAKDOWN.

I. WHEN THE RESPONSIBILITY FOR THE REPAIR IS COVERED BY AN INSURANCE POLICY, MANUFACTURER AND/OR DEALER CUSTOMER ASSISTANCE PROGRAM, OR ANY WARRANTY FROM THE MANUFACTURER, SUCH AS EXTENDED DRIVE TRAIN, MAJOR COMPONENT OR FULL COVERAGE WARRANTIES (REGARDLESS OF THE REMAINING MANUFACTURER'S WARRANTY WHEN YOU PURCHASED THIS CONTRACT), OR A REPAIRER'S GUARANTEE/WARRANTY. FURTHER, COVERAGE UNDER THIS CONTRACT IS SIMILARLY LIMITED IN THE EVENT OF A BREAKDOWN IF THE MANUFACTURER HAS ANNOUNCED ITS RESPONSIBILITY THROUGH ANY MEANS, INCLUDING PUBLIC RECALLS AND FACTORY SERVICE BULLETINS.

J. IF YOUR VEHICLE IS USED FOR TOWING (EXCEPT AS A COMMERCIAL UNIT, FARMING OR RANCHING, ROUTE WORK, JOB-SITE ACTIVITIES, SERVICE OR REPAIR WORK, DELIVERY OF GOODS, OR IS USED FOR RENTAL), OR IS USED FOR RENTAL, TAXI, LIMOUSINE OR SHUTTLE, TOWING/WRECKER SERVICE, DUMPING (DUMP BEDS), CHERRY PICKERS, LIFTING OR HOISTING, POLICE OR EMERGENCY SERVICE, PRINCIPALLY OFF-ROAD USE, RACING OR COMPETITIVE DRIVING.

K. FOR ANY BREAKDOWN OCCURRING PRIOR TO THE CONTRACT PURCHASE DATE, OR IF THE INFORMATION PROVIDED BY YOU, OR THE REPAIR FACILITY CANNOT BE VERIFIED AS ACCURATE OR IS FOUND TO BE DECEPTIVELY INACCURATE.

L. FOR BREAKDOWNS THAT OCCUR AND/OR REPAIRS MADE OUTSIDE OF THE UNITED STATES OF AMERICA AND CANADA.

M. FOR DIAGNOSTIC AND/OR TEARDOWN PROCEDURES THAT ARE NOT LISTED, OR ARE IN EXCESS OF THE TIMES LISTED IN THE CURRENT YEAR'S NATIONAL FLAT RATE HOURLY GUIDE IN CONJUNCTION WITH A COVERED REPAIR.

# SPECIAL STATE REQUIREMENTS/DISCLOSURES

## ALASKA

EXCLUSIONS SECTION –
Item J. is amended by adding the following:
This **Contract** does provide **Coverage** if **Your Vehicle** is used for snow removal, provided **Your Vehicle** is properly equipped for such use and is not used commercially.

Item N. is added as follows:
This **Contract** does not provide **Coverage** for damages for bad faith, punitive or exemplary damages, personal injury including bodily injury, property damage (except as specifically stated in the **Contract**), and attorney's fees.

## ARIZONA

Our obligations under this Service **Contract** are insured by a policy issued by the Insurance Company as stated on the **Declaration Page**. If a covered claim is not paid within thirty (30) days after proof of loss has been filed, **You** may file a claim directly with the Insurance Company.
CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item a. is amended by adding the following:
a. **You** may also cancel this contract by returning it to the **Administrator**, Vemeco, Inc., as listed on the **Declaration Page**.

Item b. is deleted and replaced with the following –
b. **We** may cancel this **Contract** for non-payment of the **Contract** charge, or for misrepresentation in the submission of a claim made by **You**. **We** may cancel this **Contract** if **Your Vehicle** is found to be modified by **You** in a manner not recommended by the manufacturer, or **Your Vehicle** is found to be used as a commercial vehicle.

## CALIFORNIA

DEFINITIONS SECTION – The definition of **Breakdown** is deleted and replaced with the following:
**Breakdown**– Means the failure of a covered part under normal service due to defects in material and workmanship. A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts.

CANCELLATION OF VEHICLE SERVICE **CONTRACT** SECTION – Item d. is deleted and replaced with the following:
d. If this **Contract** is cancelled within the first sixty (60) days and no claims have been filed, **We** will refund the entire **Contract** charge paid. If this **Contract** is cancelled after the first sixty (60) days or a claim has been filed, **We** will refund an amount of the **Contract** charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date **Coverage** begins, less an administration fee of twenty five ($25.00) dollars or 10% of the **Contract** charge, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

5

# SPECIAL STATE REQUIREMENTS/DISCLOSURES CONT'D

## MASSACHUSETTS CONT'D

Used vehicles with less than 40,000 miles at the time of sale
Provides Coverage for 90 days or 3,750 miles, whichever occurs first.
Used vehicles with 40,000 miles or more but less than 80,000 miles at the time of sale
Provides Coverage for 60 days or 2,500 miles, whichever occurs first.
Used vehicles with 80,000 miles or more but less than 125,000 miles at the time of sale
Provides Coverage for 30 days or 1,250 miles, whichever occurs first.
The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

## MINNESOTA

The Coverages listed below are provided to You by the dealer at no charge as required by Minnesota Statute 325F.662. The term of the required warranty is based on the mileage at the time of sale as follows:
Used vehicles with less than 36,000 miles at the time of sale
Provides Coverage for 60 days or 2,500 miles, whichever occurs first.
Used vehicles with 36,000 miles or more but less than 75,000 miles at the time of sale
Provides Coverage for 30 days or 1,000 miles, whichever occurs first.
Engine: Lubricated Parts; Intake Manifolds; Engine Block; Cylinder Heads; Rotary Engine Housings; and Ring Gear; Water Pump; Externally Mounted Mechanical Fuel Pump; Radiator; Alternator; Generator; and Starter. Transmission: Case; Internal Parts; Torque Converter; or, the Manual Transmission Case and Internal Parts. Drive Axle: Axle Housings and Internal Parts; Axle Shafts; Drive and Output Shafts; and Universal Joints; but excluding the Secondary Drive Axle on vehicles other than passenger vans, mounted on a truck chassis. Brakes: Master Cylinder; Vacuum Assist Booster; Wheel Cylinders; Hydraulic Lines and Fittings; and Disc Brake Calipers. Steering: Gear Housing and all Internal Parts; Power Steering Pump; Valve Body; Piston; and Rack. Note: The following parts are covered only on vehicles with less than 36,000 miles: Steering Rack; Radiator; Alternator; Generator; and Starter.

The above Coverages are excluded from this Contract during the applicable warranty period, unless the dealer becomes unable to meet its obligations. Your rights and obligations are fully explained in the dealer issued used vehicle limited warranty document.
CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is amended by adding the following:
d. If You have cancelled this Contract and have not received the refund from Us or the Administrator within sixty (60) days of such cancellation, You may contact the Insurance Company identified on the Declaration Page.
Definition: "Pre-existing" is not applicable to Minnesota residents.
EXCLUSIONS SECTION –
Coverage Exclusion for breakdowns caused by rust, corrosion, sludge build up or damage to a covered part by a non-covered part does not apply to Minnesota residents.

## NEVADA

The provisions of this Contract apply only to the original purchaser of the Service Contract.
CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Items b. and d. are DELETED and REPLACED with the following:
b. We may cancel this Contract within 70 days from the date of purchase for any reason. After 70 days, We may only cancel this Service Contract for fraud, material misrepresentation, nonpayment by You or a substantial breach of duties by You relating to the covered property or its use. We may cancel this Contract if Your Vehicle is found to be modified in a manner not recommended by the manufacturer, or if Your Vehicle is found to be used as a commercial vehicle. If We cancel Your Contract, You will be entitled to a refund on the unearned Contract fee according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date Coverage begins, no administrative fee will be deducted. In the event We cancel this Contract, written notice will be sent to Your last known address at least 15 days prior to cancellation with the effective date of the cancellation.
d. You may cancel this Contract at anytime. If You have made no claim and Your request for cancellation is within 30 days, the full price You paid for the Service Contract will be refunded and no administrative fee will be deducted. If You have made a claim under the Contract, or if Your request is beyond the first 30 days, We will refund to You an amount based on the pro-rata method, less a $25.00 administrative fee. If Your Contract was financed, the outstanding balance will be deducted from any refund, however, You will not be charged for claims paid or repair service fees. If You cancel this Contract and the refund is not processed within 45 days, a 10% penalty will be added to the refund for every 30 days the refund is not paid.

## NEW HAMPSHIRE

GENERAL PROVISIONS SECTION – Item 8b. is deleted and replaced with the following:
b. To transfer, the following must be submitted to the Administrator within 30 days of the change of ownership to a subsequent individual purchaser:
Original Contract and Declaration Page; and name and address of new owner, date of sale to new owner, current mileage.
CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is deleted and replaced with the following:
d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

## NEW YORK

Section 196b of New York General Business Law requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
Used vehicles with 36,000 miles or less at the time of sale
Provides Coverage for 90 days or 4,000 miles, whichever occurs first.
Used vehicles with more than 36,000 miles but less than 80,000 miles at the time of sale
Provides Coverage for 60 days or 3,000 miles, whichever occurs first.
Used vehicles with 80,000 miles or more but no more than 100,000 miles at the time of sale
Provides Coverage for 30 days or 1,000 miles, whichever occurs first.
The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

## NORTH CAROLINA

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is deleted and replaced with the following:
d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins, less an administration fee of $25 or 10% of the pro-rata refund amount, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

7                                                                                                 H520502WBN0602Rev 02/03

# EXHIBIT 3

☑ 001/008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC. f/k/a HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., | Civil Action No. 2:07cv 2627-DCN |
| Plaintiff, | |
| v. | |
| BUTLER FINANCIAL SOLUTIONS, LLC, | |
| Defendant. | |

## AFFIDAVIT OF JEANINE M. FOLZ

STATE OF TEXAS      )
                         )   ss:
TARRANT COUNTY     )

     I, Jeanine M. Folz, having been duly sworn, depose and say as follows:

     1.     My name is Jeanine M. Folz. I am Senior Vice President, Insurance Services and Assistant Corporate Secretary for Warrantech Corporation. I have personal knowledge regarding the matters asserted herein and, if called upon, could testify competently thereto.

     2.     Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc. and Vemeco, Inc. (collectively referred to herein as "Warrantech") are subsidiaries of Warrantech Corporation. Warrantech develops, markets, distributes and administers Vehicle Service Contracts ("VSC") that individuals can purchase for their vehicles. With the purchase of a VSC, a VSC holder is promised that he or she will not have to pay for certain types of covered repairs for a certain period of time, generally one to seven years. Instead, those repair costs are to be paid by the party that sells the VSC to the holder.

09/18/2007 16:28 FAX                                                                          ☑002/008

3.        Most states have laws that regulate the marketing, distribut on and administration of VSC's. Many of these laws require that VSC's be backed by an "obligor," an entity that is responsible for making sure that repairs are performed and/or paid for when VSC holders make claims under their VSC's. The obligor must establish that it is financially capable of having the repairs performed and/or paid for. One way an obligor can establish its fin ncial responsibility is by purchasing an insurance policy that insures VSC holders' claims and re imburses, or pays on behalf of, the obligor all covered sums that the obligor is legally obligated to pay.

4.        As Senior Vice President of Insurance Services, my respon ibilities include:  (1) securing the insurance that backs the service contracts marketed and admi istered by Warrantech; (2) assisting the insurance carriers in developing programs to insure the VSC's; (3) ensuring that Warrantech adheres to the insurance carriers' underwriting a d claims handling guidelines for the VSC's; (4) monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss costs for the programs; and (5) ensuring the VSC programs' compliance with applicable regulations.

5.        The obligor on many of the VSC's marketed, distributed and administered by Warrantech since April of 2000 is Butler Financial Solutions, LLC ("Butle "). As of the date of this Affidavit, 247,921 VSC's have been sold in the United States with Bu ler as the obligor.

6.        Butler is not a subsidiary of Warrantech Corporation or any other Warrantech entity. No Warrantech entity is a member of Butler. No Warrantech officer or employees are also officers or employees of Butler. No Warrantech entity has financial control over Butler. No Warrantech entity "created" or "sponsored" Butler as alleged by Heritage Warranty Insurance Risk Retention Group, Inc. ("Heritage") in Paragraph 6 of its Complaint fil d against Butler in the United States District Court for South Carolina.

7.        In its Complaint, Heritage does not accurately or complete.y describe statements made by Warrantech in its public filings with the SEC concerning its relat onship with Butler. I would refer interested parties to Warrantech's Form 10-K filings for a cor plete and accurate description of Warrantech's relationship with Butler, including the 10-K f led on June 28, 2002 for the period ending March 31, 2002, the 10-K filed on August 16, 2004  or the period ending March 31, 2004 and the 10-K filed on July 3, 2006 for the period ending March 31, 2006.

8.        Butler obtained from Heritage a "Service Contract Reimbu sement Insurance Policy," Policy No. HWMIRRG-SC-WAR-001 (the "Heritage Insurance I olicy"), to insure its obligation to have repairs performed and/or paid for under the VSC's.

9.        On March 1, 2001, Warrantech entered into an "Administra:ive Agreement" with Heritage. A true and correct copy of the March 1, 2001 Administrative Ag eement is attached as Exhibit A.

10.        On December 17, 2002, Warrantech entered into "Amendr ent Number 1" to the Administrative Agreement. A true and correct copy of the December 17, 2 02 Amendment Number 1 is attached as Exhibit B. (The Administrative Agreement and A.nendment Number 1 are referred to collectively herein as the "Administrative Agreements".)

11.        Pursuant to the terms of the Administrative Agreements, W.irrantech acts on behalf of Heritage as the administrator and claims adjuster for claims mad  by VSC holders under VSC's that Heritage insures. Warrantech is under an obligation to adjudicate claims fairly and in compliance with the applicable VSC program. Warrantech determir es whether a particular claim is covered under the terms of the applicable VSC and will then pay the claim from a fund established and maintained by Heritage pursuant to the terms of the Administrative Agreements and the Heritage Insurance Policy.

3

12.     The Administrative Agreement provides that Heritage retained the services of Warrantech solely to "market and administer" VSC's sold to VSC holders "pursuant to the terms and conditions set forth herein and pursuant to the terms and conditions of the insurance provided by [Heritage]."

13.     Section I(B) of the Administrative Agreement provides that "Warrantech shall serve as [Heritage's] administrator of Vehicle Service Contracts which are provided by [Heritage]."

14.     Under Section I(I)(1) of the Claims Handling Addendum to the Administrative Agreement, Warrantech maintains a "[Heritage] funded [and] controlled disbursement claim payment bank account" for the purpose of paying out and settling all valid claims submitted by VSC holders. In Section VI(H)(2) of the Administrative Agreement, Heritage specifically requested that Warrantech became responsible for remitting to Heritage "a l Premium for Vehicle Service Contracts reported to Warrantech."

15.     Section II(b) of Amendment Number 1 reiterates the relevant language of Section I(I)(1) of the Claims Handling Addendum and states, "Warrantech shall maintain a [Heritage] funded and controlled disbursement claim payment bank account at an FDIC insured bank . . . selected by Heritage." Section II(b) specifies this account is intended for the "payment of Claims" submitted by VSC holders.

16.     Section II(g) of Amendment Number 1 mandates that Heritage "shall promptly fund the Claims . . . submitted by Warrantech from the bank account more specifically described in Section I(I)(1) of this Addendum."

17.     In Section I(f) of Amendment Number 1, Heritage acknowledges the agency between Heritage and Warrantech, that Heritage is obligated to "indemnify and hold Warrantech

4

harmless" from claims arising from VSCs, and agrees that Heritage is "solely responsible for the satisfaction of such claims."

18.     The VSC's insured by Heritage all represent to Warrantech and VSC holders that American Reinsurance Company ("American Re") provided reinsurance coverage to Heritage to further insure valid claims submitted by VSC holders. It was Warrantech's belief and understanding that American Re provided such reinsurance coverage to Heritage for the VSC's insured by Heritage.

19.     Heritage's description of the reinsurance available for the VSC's insured by Heritage in Paragraphs 30 and 31 of its Complaint is incorrect. Only the funds deposited in the disbursement claim payment bank account were reinsured by Producer Owned Reinsurance Companies. These Producer Owned Reinsurance Companies are owned by car dealerships and other independent sellers of VSC's. The car dealerships and other VSC sellers are not "associates or affiliates" of Warrantech as alleged in Paragraph 30 of Heritage's Complaint, but are merely sellers of the VSC's. If the bank account funds became depleted or the amount of claims exceeded the available funds in the bank account, claims payments were reinsured by the reinsurance that American Re provided to Heritage, not by the Producer Owned Reinsurance Companies as alleged in Paragraph 31 of Heritage's Complaint.

20.     After the execution of the Administrative Agreements, Warrantech administered the VSC's as follows:  when car dealerships or other sellers sold VSC's, the sellers would retain a portion of the sale proceeds as their commissions for the sales. Warrantech also would retain a portion of the sale proceeds as its fee for administering the VSC's. Warrantech then would remit a portion of the remainder to Heritage and place the rest of the remainder into a Loss Reserve account. Heritage used the proceeds it received to fund the disbursement claim payment bank

5

account at a bank selected by Heritage. It is my understanding that Heritage also used a portion of the proceeds to pay American Re for reinsurance.

21.    Heritage had the sole authority and ability to determine how much of the premiums to place into the disbursement claim payment bank account. Heritage conducted its own actuarial analysis and calculation of claims data based on information supplied by Warrantech related to the type of coverage and terms of the VSCs.

22.    Between 2001 and April 2007, Warrantech administered and adjusted claims made by VSC holders and insured by Heritage. Warrantech determined which claims were covered and the amount that should be paid for those claims. Warrantech then authorized the payment of these claims from the disbursement claim payment bank account that was set up and funded by Heritage. Warrantech also paid refunds owed to those VSC holders whose VSC's were cancelled from the disbursement claim payment bank account. Warrantech reported all covered claims and payments to Heritage. Because Heritage was funding the bank account from which these payments were made, Heritage funded every payment on all VSC claims which arose after the Heritage Policy went into effect.

23.    From the sales of the VSC's, Heritage received, up front, more than $25,000,000.00 in insurance premiums and other monies from the VSC's. Heritage allocated a substantial portion of the premiums into the disbursement claim payment bank account upon which Warrantech would draw to pay VSC claims. All premiums due and owing to Heritage for VSC's administered by Warrantech have been received by Heritage.

24.    To my knowledge, at no time has Butler: (I) paid or reimbursed any VSC claim that Warrantech determined was covered; or (2) offered to prove its financial inability to pay or reimburse any VSC claim that Warrantech determined was covered. To my knowledge, at no

6

time has Butler played any role in the administration of claims, the day-to day operations and management of the Administrative Agreements, the setting of premiums f r VSC's, or the determination of the amount of funds to be deposited into the disbursemer t claim payment bank account.

25.       To my knowledge, at no time prior to April 2007 did Herit ge request or require, as conditions to the payment of covered claims, that: (1) Butler demonstr te its financial inability to pay or reimburse any VSC claim; (2) Butler not pay or reimbu se any VSC claim; or (3) the dollar amounts paid for covered claims exceed any particular thresl old or limit. In fact, until April 2007, all VSC claims that Warrantech determined were covere and authorized for payment were funded entirely by Heritage through the disbursement clain payment bank account that Heritage set up and funded with a portion of the premiums it eceived from the sale of VSC's.

26.       By letter dated May 12, 2006, American Re advised Warra tech that it had no reinsurance obligation and represented that its reinsurance agreement with Heritage was fully commuted and no longer in effect. A true and correct copy of American R 's May 12, 2006 letter is attached as Exhibit C.

27.       The commutation of reinsurance was done without the kno ledge or consent of Warrantech. Warrantech has no knowledge of what payment or other cons deration Heritage may have received from American Re to commute the reinsurance.

28.       On December 15, 2006, Heritage advised Warrantech that I eritage would look to Warrantech to continue to pay claims in the event that Butler fails to perfo m as the VSC obligor or if Butler files a claim under the Heritage Policy.

7

29.     By letter dated March 23, 2007 to Warrantech, Heritage agreed to resume paying all valid claims and cancellations "for an interim period" subject to a reservation of rights, including restitution from other parties.

30.     By letter dated April 11, 2007 to Warrantech, Heritage reneged on its promise to continue satisfying valid claims submitted by VSC holders as mandated by the Heritage Agreements. To my knowledge, between 2001 and April 2007, Heritage never declared Warrantech to be in default of its obligations under the Administrative Agreements or the Heritage Policy.

31.     VSC holders continue to tender covered claims to Warrantech, in its capacity as Heritage's third party administrator for payment by Heritage as required by its insurance policy. Heritage, however, is directing VSC holders to look to Butler for payment of claims. As a result of Heritage's refusal to continue to satisfy valid claims submitted by VSC holders, Warrantech filed a lawsuit against Heritage in Illinois state court on May 3, 2007 to enforce the terms of the Administrative Agreements and the Heritage Policy.


FURTHER AFFIANT SAYETH NAUGHT


Jeanine M. Fox

Subscribed and sworn before me this
13th day of September, 2007.

Notary Public

State of Nevada
County of Clark
This instrument was acknowledged
by Jeanine Fox on 13th Sep 2007

8

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC. f/k/a HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., | Civil Action No. 2:07cv2627 |
| Plaintiff, | Judge David Norton |
| v. | |
| BUTLER FINANCIAL SOLUTIONS, LLC, | |
| Defendant. | |

### AFFIDAVIT OF HARRIS MILLER

I, Harris Miller, having been duly sworn, depose and say as follows:

1.    I have personal knowledge of the facts contained in this affidavit and could competently testify thereto if called as a witness.

2.    I submit this affidavit in opposition to the motion for mandatory preliminary injunctive relief filed in this Court by Heritage Warranty Insurance Risk Retention Group, Inc. ("Heritage").

3.    I have been actively involved in and around the vehicle service contract ("VSC") industry for more than thirty years.  From the early 1970s to the early 1980s, I worked for insurance agencies which specialized in marketing of after-sale products to automobile dealers, including VSC programs.  Between 1982 and 1986, I served as an executive for a third party administrator of VSC programs, New Car Dealers Associates in Oakland, California.  In 1988 and 1989, I worked in Dallas for another third party administrator of VSC programs which was subsequently acquired by Warrantech Corporation ("Warrantech").  Between 1989 and 1999, I

worked for Warrantech, including five years as its chief financial officer. I started working for Butler in 2001 and was its manager until mid 2007. I now serve as a consultant to Butler. Based on thirty years of employment in the VSC industry, I am familiar with how VSC programs are marketed, insured and administered; the service contract/consumer protection/financial responsibility statutes throughout the United States which apply to VSC programs; and the tri-partite roles and responsibilities for VSC programs of insurers (like Heritage), third party administrators (like Warrantech) and obligors (like Butler).

4.      I have reviewed Heritage's motion for mandatory preliminary injunctive relief and the supporting affidavit of Paul Miles.

### The Parties' Course of Dealing Between 2001 and 2006— Heritage Immediately and Unconditionally Pays All VSC Claims Without First Looking to Butler

5.      Between 2001 and January 31, 2007, on information and belief, Heritage paid every claim from day one on all VSC claims which arose after the Heritage Policy went into effect. During this time, Heritage knew, understood, and agreed that Butler would not pay any covered claims under VSCs in the first instance.

6.      After the execution of the Administrative Agreements, between 2001 and April 2007, on information and belief, Warrantech remitted to Heritage all premiums and Claims Reserve Funds for VSC's insured by Heritage and then Heritage used these Claims Reserve Funds to fund the disbursement claim payment bank account at a bank selected by Heritage. Under the Administrative Agreement, Heritage had the sole authority and ability to specify how much in Claims Reserve Funds to place into this bank account.

7.    Between 2001 and April 2007, Warrantech administered and adjusted claims made by VSC holders and insured by Heritage. Warrantech determined which claims were covered and the amount that should be paid for those claims. Upon information and belief, Warrantech then, with the approval of Heritage, authorized the payment of these claims from the disbursement claim payment bank account that was set up and funded by Heritage or was reimbursed by Heritage   money advanced for the payment of valid claims . Warrantech reported all covered claims and payments to Heritage.

8.    Between 2001 and April 2007, at no time has Butler **ever** (i) paid or reimbursed any Heritage insured VSC claim that Warrantech determined was covered , or (ii) demonstrated or offered to or been requested to by Heritage to demonstrate its financial inability or failure to pay or reimburse any VSC claim that Warrantech determined was covered.

9.    Between 2001 and April 2007, to the best of my knowledge, Heritage has **never** requested or required, as conditions to Heritage's payment of covered claims, that (i) Butler demonstrate its financial inability or failure to pay or reimburse any VSC claim; (ii) 60 days elapse before Heritage would pay or honor a claim; or (iii) Butler not pay or reimburse any VSC claim..

10.    In fact, until January 31, 2007, to the best of my knowledge, all VSC claims that Warrantech determined were covered and authorized for payment were funded entirely by Heritage through the disbursement claim payment bank account that Heritage set up and funded with a portion of the monies it received from the sale of VSCs.  In addition, to the best of my knowledge, all VSC claims submitted by VSC holders were promptly and expeditiously processed by Warrantech and paid by Heritage.

11.    At no time has Butler played any role in the administration of claims, the day-to-day operations and management of the Administrative Agreements, the setting of premiums for VSCs, or the determination of the amount of funds to be deposited into the disbursement claim payment bank account.

### Butler and Warrantech Are Separate Entities

12.    Preliminarily, I take strong issue with Heritage's contentions and allegations that Warrantech controls Butler and that Warrantech and Butler are one and the same entity, to wit:

- Butler is a limited liability company organized under the laws of the state of Delaware. Butler's principal place of business is located in North Carolina, and the sole member of the limited liability company is domiciled in Florida. Butler is owned by parties unrelated to Warrantech. The members of Butler are SPG Financial Corp., and the company's current manager is Richard Rodriguez.

- Warrantech and Butler do not have common managers, officers or directors. None of the members or managers of Butler are officers or directors of Warrantech.

- To the best of my knowledge and belief Butler caused its own incorporation. Contrary to Heritage's allegation I believe that Butler was neither created nor sponsored by Warrantech for the purpose of isolating financial risk associated with Warrantech's operations.

- Butler's income, expenses, assets, and liabilities are not consolidated with those of Warrantech.

- Warrantech does not own any of Butler's capital stock.

- Warrantech does not exercise any control over Butler's financial affairs or financial reporting.

- Warrantech does not use Butler's property as its own.

- Warrantech does not finance Butler's day-to-day operations.

4

13.    In its pleadings in this Court, Heritage emphasizes that earnings derived from transactions with Butler are included in Warrantech's SEC filings. As set forth in Warrantech's 10K filings, Warrantech modified its financial statements for financial reporting purposes and disclosed its transactional ties with Butler.

14.    The parties' tri-partite relationship and responsibilities are not determined by the 10Ks but are determined primarily by the course of dealing between them for the last five years and by certain written agreements, including the Heritage policy and an Administrative Agreement between Heritage and Warrantech.  As will be set forth below, certain operative provisions in the Heritage Policy and the Administrative Agreement are required by state VSC laws in South Carolina and elsewhere.

### General Description of VSC Programs and the Paramount Importance of Insurance

15.    A VSC is a contract typically sold by an automobile dealer or other approved entity to a vehicle purchaser/owner which offers coverage for a specified period of time ( a term of from one to ten years) and/or an elapsed number of miles (sometimes up to 150,000 miles or to an unlimited number of miles) .  VCS plans provide customers with expanded product breakdown coverage in the event of the failure of a broad range of mechanical components occurring during the term of the VSC, other than failures encompassed by a manufacturer's warranty.

16.    Butler, where authorized by law or otherwise not precluded from doing so, is the obligor under Vehicle Service Contracts ("VSCs") which consumers typically purchase in conjunction with their purchase of automobiles or, later, through such media as the internet.

17.    As obligor, Butler is responsible for paying or funding claims submitted under the VSCs for the repairs to the subject vehicles. However, under the operative agreements in this case and pursuant to statutes in many states, including South Carolina, Heritage, as insurer, agreed to insure, fund, honor, and pay these repair claims, and as matter of practice, Heritage was a party to the funding mechanism established by Heritage which paid all VSC claims between 2001 and the end of 2006 in the first instance.

18.    Heritage exercised control over virtually all aspects of the VSC program, including (a) the amount of premium to be charged for the VSCs, (b) the amount of money to be placed in Heritage's Loss Reserve Fund for each VSC sold, and withdrawals of monies from the Loss Fund Reserve.

14.    Approximately 40 states have consumer protection/financial responsibility laws which regulate the marketing, distribution and administration of and insurance coverage for VSCs. These laws impose certain requirements upon service contract providers such as Butler and insurance carriers of service contracts such as Heritage. I am generally familiar with these states' laws since I have been working in the VSC industry for three decades and I have communicated with various state insurance regulators about VSC programs. In addition, the provisions of the statutes in all these states are very similar since these statutes were premised on a model service contract statute proposed by stakeholders in the VSC industry, such as the National Association of Insurance Commissioners..

15.    Typically, the state statutes allow for three different methods by which a service contract provider or obligor like Butler can provide assurances of faithful performance of its obligations to VSC holders:  (i) maintain net worth of at least $100,000,000.00; (ii) maintain a funded reserve account in an amount equal to or greater than 40% of the sums received for the

payment of VSCs: or (iii) purchase an insurance policy directly from an insurer or through a risk retention group  Such insurance and the VSC state statutes ultimately protect the VSC holder, and the consumer from loss under VSCs.

16.    In my thirty years of experience in the VSC  industry. service contract providers almost invariably opt for the third option. namely  to procure insurance to cover claims.    It is also been my experience. that when insurance is chosen as the method by which  assurances of faithful performance of its obligations are given to VSC holders, the insurance company controls and maintains the ultimate authority as to how the VSC program is run, funded, and claims are paid for.  Based on my experience. the insurer exercises such control to minimize the exposure to the insurer to an underwriting loss or to a defalcation on another parties part.

17.    In addition, VSC consumer protection statutes throughout the United States require that insurers policies include certain provisions to  ensure that VSC holders are assured that covered VSC claims are actually paid.  To my knowledge, every state VSC statute has a provision substantially similar to Section 38-78-40(A).

18.    A review of the Heritage Policy, the Administration Agreement, and a Claims Handling Addendum establish in my view (i) the control Heritage wields over the VSC program; (ii) renders Heritage's claimed reasons for terminating the policy improper and pretextual; and (iii) warrants denial of Heritage's motion for mandatory preliminary injunctive relief.

### The Insurance Policy Issued by Heritage—Heritage Agreed to Pay and Honor All VSC Claims

19.    Based on the Heritage's insurance policy issued to Butler and the terms of the Administrative Agreement between Heritage and Warrantech. the relationship between these three parties worked as follows:  Every time a vehicle dealer sold a VSC, the proceeds from the sale would be distributed as follows:  (1) The dealer kept a portion of the proceeds as its

7

commission from the sale; (2) Warrantech received a fee for serving as the administrator of the VSC; Butler received a fee for being the obligor under the VSC; (3) Heritage received a fee as the premium payment for Heritage's insurance policy on the VSC; (4) Heritage paid a portion of its premium fee to American Reinsurance Company ("American Reinsurance") or other reinsurers to provide reinsurance coverage to Heritage; and (4) the remaining proceeds from the sale were placed into a Loss "Reserve Fund" (a/k/a a Reserve Pool) established to pay the valid claims made under the VSCs. The amount placed in the Reserve Fund was based on Heritage's actuarial analysis and calculations of anticipated claims experience. The data utilized in such analysis by Heritage may have been supplied by Warrantech or may have been Heritages's own historical data  Under the terms of the Administrative Agreement, Warrantech, acting as Heritage's third-party claims administrator, was authorized to use the funds in the Reserve Loss Fund to pay covered warranty claims under the VSCs.

     20.    The VSCs for which Butler is the obligor are insured by a "Service Contract Reimbursement Insurance Policy," Policy No. HWMIRRG-SC-WAR-001 (the "Heritage Policy") issued by Heritage to Butler. A true and correct copy of the Heritage Policy is attached hereto as **Exhibit** A and incorporated herein by reference.

     21.    In its pleadings and motions filed in this Court, Heritage repeatedly calls its policy a "bankruptcy policy." The word "bankruptcy" does not appear in the policy, and the phrase "bankruptcy policy" is not a term of art I have encountered in my 30 years in the VSC industry.

     22.    The Heritage Policy covers twelve (12) month periods and automatically renews unless terminated by notice each period. The first period for the Heritage Policy commenced on December 31, 2001, and the Policy automatically renewed each year thereafter.

23.    Under the Policy, Heritage agreed to pay for the cost of repairs, claims, and/or losses that are covered under the terms of the VSCs.  (See Section 1.1 of **Exhibit A** and quoted verbatim in Butler's supporting memorandum.

24.    In Section 1.1, under the Heritage Policy's insuring agreements, Heritage agreed to pay all repair and replacement costs of VSC holders under each VSC:

25.    Section 1.1 requires Heritage to pay the claims and/or losses of VSC holders directly when Butler fails to make payments on covered claims:

> Upon failure of the Insured to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder claimant.

The 60 day time frame for Heritage's payment of claims has nothing to do with the insolvency of the obligor.  Based on my experience and knowledge, this time frame instead finds its genesis in the  service contract regulations mentioned above and the time frame seeks to help ensure that VSC holders promptly receive the benefits of the VSCs they purchased.  Based on my three decades in the VSC industry,  this 60 day time frame provision can be found in a VSC issued in virtually every state which has passed a VSC statute.

26.    The Heritage Policy states that subject to the Loss Reserve Fund provisions, Heritage is liable for the payment of losses arising from the reasonable and customary cost of repair or replacement under the provisions of VSCs issued by Butler on or after the inception date of the Heritage Policy.

27.    Under Section II.1 of the Heritage Policy, the term "Administrator" is defined as "[Heritage's] designated administrator in accordance with the Administration and Service Agreement."  Thus, under the Heritage Policy, Warrantech was Heritage's administrator, not Butler's as alleged by Heritage in its pleadings.

28.    On information and belief, Heritage received all premiums due Heritage for the Heritage Policy. Such premiums came from revenues generated from the sales of VSCs. Although the duration of the VSCs could run for as long as 5 to 7 years, <u>Heritage charged and received all premiums for VSCs</u> up-front.

29.    Although the VSCs are issued for varying periods of time, usually periods of one to seven years, allowing the submission of claims over the course of several years, Section IV.2 of the Heritage Policy provides that the premium from each VSC "shall be fully earned" by Heritage at the time it is issued.

30.    After the Heritage Policy went into effect, more than 50,000 consumers in numerous jurisdictions purchased VSCs. From the sales of these VSCs, Heritage received, up front, more than $25,000,000.00 in insurance premiums and other monies for claim/loss reserves. Heritage and Warrantech agreed upon the portion of the VSC sale proceeds that would be allocated to premiums and the claims/loss reserve funds amount to be allocated to the payment of claims from the Loss Reserve Funds. Butler played no role in this calculus.

31.    Heritage does not claim  that it has not received all premiums due for the risk Heritage assumed under the terms of its policy. On information and belief, all premiums due and owing Heritage have been received by Heritage.

32.    Heritage's obligation to honor, pay, and fund VSC claims would survive Heritage's termination or cancellation of the Policy. The Heritage Policy states as follows:

> **Cancellation of this Policy shall not reduce the Company's [Heritage's] liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect.**

33.    Again, the VSC statutes of numerous states expressly stipulate that after the termination of a VSC policy, an insurer is still, nonetheless, obligated to honor and pay claims arising under all VSCs sold prior to the cancellation or termination of insurance.  These states include, without limitation, Alabama, Arkansas, Georgia, Hawaii, Idaho, Iowa, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New York, North Carolina, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming.

34.    Heritage has, since its initial failure to pay claims in February 2007 made statements to service contract holders (claimants) that their obligation to Butler no longer existed because the policy had been canceled effective January 31 2007.  Heritage has made statements to claimants that Heritage's insurance obligations with respect to claims made under the terms of service contracts issued while their insurance policy was in full force and effect no longer existed. To the best of my knowledge, such statements to claimants continue to be made by Heritage personnel.

35.    The VSCs, in accordance with statute and as approved by Heritage, state that Heritage is the insurance company that will stand behind them and provide protection in the event that claims are made. For example, the VSC attached hereto as Exhibit C states:

> The obligation of the provider [Butler] to perform under this Contract is insured by Heritage Warranty Mutual Insurance Risk Retention Group, Inc. . . . under a motor Vehicle Service Contract reimbursement policy, and reinsured by American Re – a national A+ rated company and a member of the Munich Re Group. If a covered claim is not paid within sixty (60) days [except in Arizona thirty (30) days], after proof of loss has been filed, You may file a claim directly with the Insurance Company.

The 60-day requirement for Heritage to honor and pay claims and losses tracks the 60-day requirement for same under the service contract statutes in many states.

11

36.     Under Section IV.20 of the Heritage Policy, Heritage may cancel the Policy with "written notice stating a date not less than thirty (30) days thereafter when such cancellation shall be effective."

37.     The Heritage policy contains a cancellation clause which requires Heritage to provide Butler at least 30 days prior written notice of Heritage's intent not to renew the policy, that is, December 1 is the latest date in any year which Heritage can notify Butler of its intent not to renew the subject policy.

38.     Butler's address for the receipt of notices required under the policy is 2300 Corporate Boulevard NW, Suite 214, Boca Raton, Florida, 33431 and Butler's current mailing address in North Carolina was provided to Heritage in 2005.

### The Administrative Agreement Between Warrantech and Heritage— Heritage Controls All Aspects of the VSC Program

39.     On March 15, 2001, Warrantech and Heritage entered into an Administrative Agreement. The Administrative Agreement sets forth the rights and obligations between the parties with respect to the VSCs sold by others and administered by Warrantech and under which valid claims are to be paid by Heritage pursuant to the Heritage Policy. A true and correct copy of the Administrative Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

40.     It was requested that Butler, as the obligor, agree to and acknowledge the terms and conditions of the Administrative Agreement. Under the terms of this agreement Warrantech would act as the third party administrator for Heritage and, among other things, adjudicate claims made under VSC's for which Heritage was liable, subject to the so-called Claims Reserve Funds, under the terms and conditions of the Heritage policy. The Administrative Agreement gives Heritage control over the disbursements from the Claims Reserve Funds.

41.    Butler has played no role in the receipt and disposition of premiums and claims reserve funds; administration of claims; the day-to-day operations and management of the Administration Agreement; the setting of premiums; or the determination of the amount of funds to be deposited into the Loss Reserve Fund. In addition, at all relevant times hereto, Butler had no authority to make, alter, modify any terms of any VSCs, the premiums to be paid to Heritage on the sale of each VSC or the amount to be set aside for the Loss Reserve Fund.

42.    The very first provision of the Administrative Agreement confirms that Warrantech acted as an administrator and claims adjuster for Heritage under Heritage's direction and authority

I.    Administration

A.    COMPANY [Heritage] hereby grants WARRANTECH authority to serve as administrator to perform the duties set forth below and vests in WARRANTECH authority to accomplish, effect, and execute such duties upon the terms and conditions set forth in the AGREEMENT.

B.    WARRANTECH shall serve as COMPANY'S administrator of Vehicle Service Contracts which are provided by COMPANY.
**(Exhibit __, at p. 2).**

Again, the terms of the Administrative Agreement contradict Heritage's allegation that Warrantech is Butler's third party administrator.

43.    The Administrative Agreement sets forth Warrantech's role as the administrator in the overall tripartite relationship between Heritage, Warrantech, and Butler. In short, under the Administrative Agreement, Warrantech, among other things, determines whether a particular repair is covered under the terms of the VSC program. Warrantech pays the repair facility or directly reimburse the VSC holder for the reasonable cost of that repair from an account maintained by Warrantech pursuant to the Administrative Agreement and the Heritage Policy.

44.    With respect to premiums collected from the sale of VSCs, under the terms of the Administrative Agreement, Section H, Premium., Warrantech acted as Heritage's fiduciary. The funds used to pay VSC claims were drawn from a Loss Reserve account which was controlled by Heritage and for which Warrantech acted solely as trustee.

45.    The Underwriting Authority section of the Administrative Agreement establish that Heritage controlled the terms, conditions, and pricing (premiums and claims reserve funds) for VSC programs. Specifically, in Section VIQ of the Administrative Agreement, Heritage granted Warrantech, its third party administrator, only the authority to propose to Heritage changes and revisions to the VSC programs based on loss severity data, loss frequency data, and earning patterns to increase profits and decrease losses the parties might sustain under VSCs. (Exhibit B at pp. 9-10.) Warrantech could not change any of the VSC programs unilaterally; instead, Heritage had sole authority to accept or reject any such proposals and to unilaterally make changes to the VSC programs. (Id.) Heritage's retention of the ultimate authority under the Administrative Agreement to change the terms and pricing of VSC programs is consistent with VSC industry practice based on my thirty years in the VSC business. Based on my knowledge and experience, VSC insurers typically do not cede their right and ability to modify VSC programs to third parties.

46.    On information and belief, Heritage had its own staff and actuaries on hand to track underwriting profits or  losses under VSCs; perform audits; perform longitudinal and historical analyses of claims made under the VSCs they insured; as well as loss frequency and loss severity. On information and belief, Heritage's actuaries also could determine whether modifications to the pricing and terms of VSCs were necessary to ensure that Heritage's loss fund would not be depleted. Similarly, based on my 30-years' experience, Heritage could

mandate premium and claims reserve increases to the VSC programs. In the past, I have seen VSC insurers implement increases in premium and loss reserves, overruling the recommendations of their administrators.

47. The terms of the Administrative Agreement state that any alleged negligence by or failure of Warrantech in proposing changes to VSC programs to Heritage might only result in Heritage's withdrawal of its grant of authority to Warrantech to propose changes to the VSC programs. (See **Exhibit B**, Section Q4 at p. 4

48. Like the Heritage policy, Heritage's obligations under the Administrative Agreements to pay or reimburse claims under then existing VSCs continues even after the Administrative Agreement is terminated or cancelled. Page 15, Section X,.F.1, requires Heritage to continue to perform all functions and obligations required by this AGREEMENT as if this AGREEMENT were in full force with respects [sic] to all Vehicle Service Contracts with effective dates prior to the termination date of this AGREEMENT. Such service shall continue until all Vehicle Service Contracts expire or are canceled and all Claims thereunder have been paid or a mutually acceptable arrangement for the fulfillment of such obligations is evidenced by a written agreement between the parties.

49. On December 17, 2002, Heritage and Warrantech executed Amendment Number 1 ("Amendment 1") to the Administrative Agreement modifying the rights and obligations between the parties. Under Amendment 1, Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech." Section II.b of Amendment 1 states again that "Warrantech shall maintain a [Heritage] funded and controlled disbursement claim payment bank account at an FDIC insured bank . . . selected by Heritage." Section II.b specifies this account is for the "payment of Claims" submitted by VSC holders.

Section II.g of Amendment 1 requires that Heritage "shall promptly fund the Claims... submitted by Warrantech from the bank account more specifically described in Section I(1)(1) of this Addendum." (See Addendum attached hereto as **Exhibit C**.)

50.     Section I(f) of Amendment Number 1, states that Heritage is obligated to "indemnify and hold Warrantech harmless" from claims arising from VSCs, and agrees that Heritage is "solely responsible for the satisfaction of such claims." Section II(g) of Amendment Number 1 states that Heritage "shall promptly fund the Claims . . . submitted by Warrantech from the bank account more specifically described in Section I(1)(1) of this Addendum."

### The Claims Handling Addendum—Warrantech Processes Claims and Pays Claims from a Loss Reserve Account Controlled by Heritage

51.     Heritage also delineated Warrantech's duties in a Claims Handling Addendum, attached hereto as **Exhibit D**. Like the Administrative Agreement, Heritage granted authority to Warrantech for claims handling. Again, Butler has played no role at any time in the day-to-day handling of claims.

52.     In Section I.1.1 of the Claims Handling Addendum, Warrantech agreed to maintain a "[Heritage] funded [and] controlled disbursement claim payment bank account" for the "sole" purpose of paying out and settling all covered VSC claims. Under Section VI.H.2 of the Administrative Agreement, Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."

### Purported Cancellation of the Policy and Its Cited Reasons

53.     The tripartite relationship between Heritage, Butler, and Warrantech proceeded smoothly until 2006. Between 2001 and 2006, Heritage paid all VSC claims from the Loss Reserve Fund. To the best of my knowledge and belief, during this time, as set forth above,

Heritage never required or even asked that Butler demonstrate a failure or inability to pay VSC claims as a pre-condition to Heritage's payment of a covered VSC claim.

54.     Starting in mid 2006 and continuing through 2007, on information and belief, two separate and discrete events occurred which have prompted Heritage's precipitous purported termination of the Policy and its failure to pay and honor VSC claims:  (i) Heritage's loss of reinsurance by American Reinsurance, and (ii) the depletion of the Loss Reserve Fund.  I will address these events *seriatim*.

i.     **The Commutation of Heritage's Reinsurance**

55.     The declaration page of the VSC's insured by Heritage all represent to Butler  and VSC holders that American Reinsurance Company ("American Re") provided reinsurance coverage to Heritage to further insure valid claims submitted by VSC holders.

56.     By letter dated May 12, 2006, American Re advised Warrantech that it had no longer had a reinsurance obligation and represented that its reinsurance agreement with Heritage was fully commuted and no longer in effect.

57.     The commutation of reinsurance was done without the knowledge or consent of Butler.  Butler has no knowledge of what payment or other consideration Heritage may have received from American Re to commute the reinsurance.

58.     The existence of reinsurance for an insurer of a service contract provider is not required by any VSC statute with which I am familiar

ii.     **Depletion of the Loss Reserve Fund Due to Warrantech's and Butler's Alleged Negligence**

59.     In a letter dated December 15, 2006, Heritage advised Butler, in care of Warrantech, that Butler and Warrantech had "inadequately priced" several programs, violating "one of your promises to maintain loss ratios at no more than 90%." Heritage further asserted

that "Warrantech's failure to charge adequate rates has recently or will result soon in the depletion of several program's Loss Reserve Funds." (The December 15 letter is attached hereto as **Exhibit E.**)

60.    Heritage also cited Butler's and Warrantech's supposed negligence in setting and maintaining adequate prices for the VSCs as the reason for seeking to cancel the Heritage Policy on December 29, 2006, effective December 31, 2006.    (Heritage's purported termination letter of December 29, 2006 is attached hereto as **Exhibit F.**)[1]

61.    Based upon my knowledge and belief, I dispute that any claimed negligence by Butler or Heritage in the setting of VSC prices and rates or in the administration of the VSC program is a valid ground for terminating the Heritage Policy for several reasons:

- As set forth above, the authority for setting and modifying VSC prices ultimately resided in Heritage.

- Butler played no role at all, and was not permitted to play any role, in the administration of the VSC program generally, or specifically, to set or change rates and prices for VSCs.

- Pursuant to the underwriting authority provisions of the Administrative Agreement, Warrantech only had the authority to suggest changes to Heritage regarding the pricing structures for the VSC programs.

62.    Prior to Heritage's filing of its lawsuit in this Court, I articulated to Heritage in March 2007 Butler's stance about Heritage's termination of the Policy and how this termination could injure innocent VSC holders (See letter attached hereto as **Exhibit G.**)

---

[1]    As a threshold matter, I do not believe that Heritage's letter of December 29, 2006 complied with the termination provision in its Policy. In direct violation of Section IV.20 of the Heritage Policy requiring thirty (30) day notice of cancellation, on December 29, 2006, Heritage wrote to Butler purporting to cancel the Heritage Policy "effective at midnight on December 31, 2006." Heritage did not send the cancellation notice to Butler in Florida or to Butler in North Carolina, as required by the policy and previous written instruction; instead it sent the purported cancellation notice to Butler in care of Warrantech in Texas. Because Heritage sent the termination letter to the wrong person at the wrong address, Butler did not learn of Heritage's cancellation of the Policy until mid January, 2007.

**Butler Is Being Currently Harmed by Heritage's Refusal
To Pay and Honor VSC Claims—Butler and Innocent VSC Holders
Will Be Irreparably Harmed
If Heritage's Motion for Mandatory Injunctive Relief Is Granted**

63.     VSC holders continue to tender covered claims to Warrantech (or its subsidiaries), in its capacity as Heritage's third party administrator. Heritage has instructed its administrator to authorize valid claims but has refused payment of such claim, either from the Claims Reserve Funds or from its capital and surplus as required by its insurance policy. Heritage, however, is directing VSC holders to look to Butler for payment of claims.

64.     As of the date of this affidavit, Heritage continues to refuse to pay covered VSC claims and losses, both those already submitted and those that may be submitted in the future.

65.     On information and belief, Heritage has been and continues to be contacted by numerous VSC holders seeking payment or resolution of their claims. Upon information and belief, Heritage has been informing, and continues to inform, VSC holders to seek payment or resolution of their claims from Butler. Butler has received and continues to receive numerous calls from VSC holders and from repair facilities seeking payment or resolution of claims.

66.     Butler had never been declared to be in default of the operative agreements or been advised by Heritage of the need to cure said defaults.

67.     As a result of Heritage's refusal to pay claims under the Policy and Administrative Agreement, Butler is facing mounting claims and potential exposure to legal actions by VSC holders with unsatisfied claims, and other damages.

68.     Heritage's continued refusal to honor and pay VSC claims is subjecting Butler to the specter of regulatory and administrative proceedings in the State of Illinois and other states resulting directly from Heritage's cancellation of statutorily required insurance.

69.    The failure by Heritage to fund covered VCS claims will result in escalating financial exposure to Butler and the refusal of repair facilities to perform repairs or release vehicles for which repairs already have been made. This likely would expose Butler to claims for which Heritage was paid millions of dollars in premiums to honor and pay. More importantly, VSC holders throughout the United States will be left without the protection that Heritage represented to them they would have when they purchased VSCs.

70.    Butler does not have the financial wherewithal to pay claims arising under the Heritage Policy for several reasons.

- The existence of insurance through Heritage was the manner by which Butler, as obligor, has provided proof of financial responsibility in the states where VSCs are sold, on which Butler is named as the obligor are sold. This insurance had been in place for five years. Upon information and belief, Heritage paid all VSC claims for five years without requiring Butler to establish an inability or failure to pay these claims. Butler had no ability to establish financial responsibility by other methods countenanced by state statutes—the amassing of $100,000,000 in net worth or the establishment of a reserve fund equal to at least 40% of the amount or premiums received from the sale of VSCs.

- Upon information and belief, at the time that Heritage issued the Policy in 2001, Heritage knew that Butler's role was limited to that of VSC obligor and named insured. Heritage knew that Butler played no role in the administration of the VSC program or the handling of claims. Heritage never expected or demanded that Butler pay VSC claims in the first instance to be reimbursed by Heritage at a later date, or that it was expected that Butler would be required to fail to pay VSC claims before Heritage's payment obligations were triggered.

- Butler owes Warrantech approximately **in excess of $10,000,000.00.** Butler's indebtedness results from a loan that Warrantech made to Butler in 2001 after one of Butler's prior VSC insurers, Reliance Insurance was placed in liquidation. When Reliance went under, Butler, as the obligor, became obligated to honor VSC claims arising under the Reliance policy. Without this loan, Butler was likely facing the specter of bankruptcy and the reputations and market share of both Butler and Warrantech in the VSC industry was threatened by the insolvency of Reliance, an event entirely outside of Butler's control..

20

FURTHER AFFIANT SAYETH NAUGHT

Butler Financial Solutions, LLC

_Harris Miller_
Harris Miller, Its CONSULTANT

_Sharon G. Ponder_
Notary Public

Michael M. Tannen, Esq.
Law Offices of Michael Murphy Tannen, P.C.
39, S. LaSalle Street, Suite 905
Chicago, Illinois 60603
312.641.6650
mtannen@tannenlaw.com

David J. Parrish
Nexsen Pruet Adams Kleemeier LLC
205 King Street, Suite 400
Charleston, South Carolina 29402
843.577.9440
dparrish@nexsenpruet.com

Buncombe County, North Carolina
I, a Notary Public for said County and State, do hereby
certify that **Harris G. Miller**
personally appeared before me this day and acknowledged
the execution of the foregoing instrument. Witness My Hand
and Seal this **18th** day of **September, 2007**
_Sharon G. Ponder_
NOTARY PUBLIC **Sharon G. Ponder**
MY COMMISSION EXPIRES **10-15-2011**

SHARON G. PONDER
Notary Public
Buncombe County
State Of North Carolina
My Commission Expires 10-15-2011

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| HERITAGE WARRANTY INSURANCE | ) | CIVIL ACTION NO : 2:07CV2627-DCN |
| RISK RETENTION GROUP, INC | ) | |
| F/K/A HERITAGE WARRANTY | ) | |
| MUTUAL INSURANCE RISK | ) | |
| RETENTION GROUP, INC , | ) | |
| | ) | **AFFIDAVIT OF PAUL MILES** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BUTLER FINANCIAL SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

PERSONALLY APPEARED BEFORE ME, Paul Miles, who deposes and says that:

1.  He is a citizen and resident of Columbus, Ohio, over the age of eighteen (18), and
    is the Treasurer of Heritage Warranty Insurance Risk Retention Group, Inc.
    ("Heritage")

2.  Beginning in December 2001, Heritage provided a bankruptcy reimbursement
    insurance policy to Butler Financial Solutions, LLC ("Butler").  That policy
    remained in effect until Heritage gave thirty (30) days notice of cancellation to
    Butler on or about December 29, 2006.

3.  Upon information and belief, Butler continues to sell VSCs to consumers
    throughout the country   Those VSCs are insured by insurance companies other
    than Heritage pursuant to state financial responsibility statutes.

4   Since cancellation, Butler, by and through its claims administrator Warrantech
    Corporation ("Warrantech"), has made numerous demands upon Heritage to fund
    claims submitted by holders of Butler's vehicle service contracts ("VSC")

5   On several occasions, Heritage has informed Butler and Warrantech that Heritage
    is under no obligation to fund claims made by Butler or its VSC holders  Heritage



also has demanded that Butler satisfy the obligations of its VSCs, but Butler to date has refused and has not paid any claims submitted by holders of its VSCs.

6.   In response to substantial pressure to satisfy consumers, and subject to a full reservation of rights, Heritage has nevertheless funded over $220,000 in VSC claims since the policy was cancelled and despite the fact that neither Butler nor Warrantech Corporation are bankrupt, and that the coverage attachment point has not been met.

7.   Heritage is placed in a precarious financial position by paying these substantial sums where no coverage is owed. From an underwriting standpoint, the risk of loss presented by the bankruptcy reimbursement insurance policy issued to Butler was sold and reserved under the belief that Butler intended to respond to its own VSC holders.

8.   The current rate of claims submitted by Butler VSC holders is over $200,000 a month.

9.   At that rate, if Heritage were to continue to fund those claims, Heritage would be out of cash in less than a year. At that point, its viability as a going concern would be substantially impaired, and it would be unable to respond to legitimate claims submitted by its other owner policyholders.

10.  Butler's VSCs ordinarily have terms of five (5) to seven (7) years, and most of the protection afforded by the VSCs does not go into effect until the original manufacturer's warranty expires. It is expected that Butler's liability on VSCs insured by Heritage's bankruptcy policy extends well into 2011 and possibly beyond. At the current rate of consumer claims, Heritage will become insolvent well before 2011 if it continues to pay Butler's obligations.

11.  Any reduction in Heritage's capital and surplus will have a corresponding limit in Heritage's ability to support its existing business and to obtain new business. Heritage's opportunity to derive investment income is likewise reduced.

(Signature on Next Page)

FURTHER AFFIANT SAYETH NAUGHT

HERITAGE WARRANTY INSURANCE
RISK RETENTION GROUP, INC.

By: _____
        Paul Miles

Its:    Treasurer

Subscribed and sworn to before me
this 27th day of July , 2007
_____
Notary Public
State of Ohio
My commission expires: _____



CRAIG D. ANDREW
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147 03 R C.

3

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| Heritage Warranty Insurance Risk Retention Group, Inc. f/k/a Heritage Warranty Mutual Insurance Risk Retention Group, Inc., | Civil Action No.  2:07-CV-02627-DCN |
| Plaintiff, | **BUTLER'S MEMORANDUM IN OPPOSITION TO HERITAGE'S MOTION FOR PRELMINARY INJUNCTION** |
| vs. | |
| Butler Financial Solutions, LLC, | |
| Defendant. | |

## SUMMARY

Defendant Butler Financial Solutions, LLC ("Butler"), as the named insured under a policy of insurance issued by Plaintiff Heritage Warranty Insurance Risk Retention Group, Inc. (Heritage"), respectfully submits that Heritage's motion for a mandatory preliminary injunction seeking to allow Heritage to not paying claims under its insurance policy should be denied on the following grounds:

1.  Heritage is required to continued paying the claims under S.C. Code Ann. 38-78-40;

2.  Heritage is required to pay the claims under the express terms of the insurance policy it issued to Butler;

3.  Heritage has been responsible for paying the claims since 2001, and the granting of the preliminary injunctive relief Heritage seeks would alter the status quo between the parties; and

4.  Granting Heritage's motion is against public policy and could harm consumers by terminating insurance coverage for the vehicle extended warranty programs insured by Heritage.

# FACTS

This lawsuit presents issues arising under an insurance policy, contractual agreement, and course of dealing between three entities: (1) Butler, (2) Heritage, and (3) a third-party, Warrantech. The majority of the factual information set forth below in this Memorandum concerning the course of dealing between these three entities is reflected in Warrantech's 2003, 2004, 2005, and 2006 Annual Report (Form: 10-K) filings with the Securities and Exchange Commission.[1]  As such, the below information was published and available for scrutiny by the SEC, the public, and Heritage years before Heritage filed this lawsuit.  In addition, the factual information is supported by the Affidavits of Harris Miller of Butler and Jeanine Fultz of Warrantech, which are included as exhibits to this memorandum.

### A.      Warrantech

Warrantech Corporation is a Nevada corporation and maintains its executive offices and operating facilities in Bedford, Texas.  Warrantech, through its wholly owned subsidiaries, markets and administers service contracts, after-market warranties and replacement plans on a variety of products, including automobiles, automotive components, recreational vehicles, appliances, consumer electronics, homes, computer and computer peripherals for retailers, distributors and manufacturers.  Warrantech is a third-party administrator for a variety of dealers in selected industries and offers call center and technical computer services.

### C.      Vehicle Service Contacts (VSCs)

Warrantech's Automotive Segment markets and administers vehicle service contract ("VSC") programs, GAP insurance and other related automotive after-sale products for automobiles, light trucks, motorcycles, recreational vehicles and automotive components. These

---

[1] At the beginning of this year Warrantech converted from a publicly traded to a privately held company.

products are sold principally by franchised and independent automobile and motorcycle dealers, leasing companies, repair facilities, retail stores, financial institutions and other specialty marketers. The VSC is a contract between either a vehicle dealer or a third-party obligor and the vehicle purchaser/lessee that offers coverage to pay for the cost of covered mechanical failures and losses. In other words, the VSCs are extended vehicle warranties.

**D.    Butler**

Each VSC contains a named an obligor under the contract. Prior to April 1, 2000, one of the Warrantech's subsidiaries or the vehicle dealer would be named as the obligor. Beginning in April 1, 2000, however, Butler began serving as the obligor under all VSCs administered by Warrantech. Butler became the obligor in exchange for receiving a fee payable by the vehicle dealers upon the sale of every VSC. Butler is the obligor on VSCs sold in forty-eight states. Warrantech arranged for an independent insurance company to issue an insurance policy to cover Butler' liabilities under the VSCs. In exchange for providing the coverage, the insurance company receives a premium on each VSC sold. As such, the actual repairs are performed by an authorized repair facility, the insurance company pays the cost of the repairs, and Warrantech acts as the third-party administrator on behalf of the insurance companies. The insurance policy indemnifies the obligors against losses resulting from service contract claims and protects the consumers by ensuring their claims will be paid.

**E.    Reliance Insurance**

Great American Insurance Company is the primary insurer of most of the VSC programs. Unfortunately, however, Reliance Insurance Company was the insurer of certain VSC programs offered to large automobile dealerships. Reliance insured approximately 48% of the VSCs administered by Warrantech during a period of approximately 1-1/2 years ending in November

2001. On October 3, 2001, the Commonwealth Court of Pennsylvania placed Reliance Insurance Company in liquidation.[2] The liquidation of Reliance eliminated the insurance coverage under the VSCs insured by Reliance. When this occurred, Warrantech, aided by the Great American Insurance Company, assisted Butler and the other obligors under the VSCs insured by Reliance to arrange a means of funding payment of the claims. A surcharge fee on each new VSC sold was placed in a fund used pay claims under the VSCs insured by Reliance. Until the fund created by the surcharge fees becomes sufficient to cover claims under those service contracts, Warrantech agreed to make loans to Butler to cover any shortfalls in funds needed to cover the claims.

### F.    Relationship between Warrantech and Butler

Butler is a limited liability company formed under the laws of Delaware, with its headquarters and principal place of business located in North Carolina, while Warrantech is Nevada corporation headquartered in Texas. Contrary to the suggestion in Heritage's Complaint, Butler and Warrantech are separate and independent companies. Butler is included in Warrantech's financial results based upon SEC staff review requests as a result of the transactions and dealings between Butler and Heritage arising from Reliance's liquidation. Butler and Warrantech, however, are legally separate and distinct entities, they do not share a common ownership, and Butler is not related to Warrantech other than by virtue of the transactional relationship between the companies and the fact that the owners of the companies have been close friends for many years.

### G.    Heritage

As a result of the liquidation of Reliance Insurance, in 2001 Warrantech and Butler entered into agreements with Heritage in which Heritage became the insurer for certain of the

---

[2] See ww.relianceinsurance.com.

VSCs.  Heritage issued a "Service Contract Reimbursement Insurance Policy" insuring Butler's obligations under VSCs issued nationwide.  At the same time Heritage entered into an "Administrative Agreement" with Warrantech under which Heritage agreed to pay Warrantech to serve as Heritage's a third-party administrator and claims adjustor of the VSCs.

Based on the Heritage's insurance policy issued to Butler and the terms of the Administrative Agreement between Heritage and Warrantech, the relationship between these three parties worked as follows:  Every time a vehicle dealer or other authorized party sold a VSC, the proceeds from the sale would be distributed as follows:  (1) The dealer kept a portion of the proceeds as its commission from the sale; (2) Warrantech received a fee for serving as the administrator of the VSC; Butler received a fee for being the obligor under the VSC; (3) Heritage received a fee as the premium payment for Heritage's insurance policy on the VSC; (4) Heritage paid a portion of its premium fee to American Reinsurance Company ("American Reinsurance") and other reinsurers that provided reinsurance coverage to Heritage; and (5) the remaining proceeds from the sale were placed into a "Loss Reserve Fund" (a/k/a a Reserve Pool) established to pay claims under the VSCs.  The amount placed in the Loss Reserve Fund was based on Heritage's actuarial analysis and calculation of claims data on data supplied by Warrantech related to the type of coverage and terms of the VSCs.  Under the terms of the Administrative Agreement, Warrantech, acting as Heritage's third-party claims administrator, used the funds in the Loss Reserve Fund to pay covered warranty claims under the VSCs. Warrantech reported all covered claims and payments to Heritage.  Butler did not participation in the fund, receipt of claims, or disbursements from the Loss Reserve Fund.

H.    **Heritage tries to dump coverage.**

This relationship between the three parties proceed smoothly from 2001 until 2006. During that period all warranty claims were covered and paid out of the Loss Reserve Fund. Over these years Heritage never requested or required, as conditions to the payment of a covered claim, that Butler demonstrate its financial inability to pay or reimburse any VSC claim, and Butler never paid or reimburse any VSC claim. However, the relationship turned to sour in 2006, when Heritage projected that the rate of claims under the VSCs would exceed the amounts in the Loss Reserve Fund. In a letter dated May 12, 2006,[3] American Reinsurance advised Warrantech that its reinsurance obligation with Heritage was fully commuted and no longer in effect. Soon thereafter, in December 2006,[4] Heritage for the first time advised Warrantech that it would look to Warrantech to continue to pay claims in the event that Butler fails to perform as the VSC obligor or if Butler filed a claim under the Heritage Policy.

Following a series of negotiation between Warrantech and Heritage, Heritage agreed to resume paying the claims "for an interim period" subject to a reservation of rights, including restitution from other parties. However, in an April 11, 2007 letter to Warrantech, Heritage indicated its intent to renege on that agreement. As a result on May 3, 2007, Warrantech filed a lawsuit against Heritage that is currently pending in the Illinois Federal District Court in the case captioned *Warrantech Automotive, Inc. v. Heritage Warranty Insurance Risk Retention Group, Inc.*, Case No. 07-CV-3539. After Warrantech filed the lawsuit, Heritage indicated it would continue paying the claims, requested and received an extension of time to file an answer, and then filed this present case against Butler in this Court, in which Heritage is seeking a

---

[3] A letter attached as Exhibit C to the Affidavit of Jeanine Fultz.

[4] See letters attached as Exhibits E & F to the Affidavit of Harris Miller.

preliminary injunction and declaration allowing it to stop paying warranty claims under the VSCs insured by its policy.

**DISSCUSSION**

Heritage's motion for a preliminary injunction allowing it to not pay warranty claims under the VSCs insured by the Heritage should be denied for the following reasons:.

**I.   HERITAGE IS REQUIRED TO CONTINUE PAYING THE CLAIMS UNDER S.C. CODE 38-78-40.**

The VSCs and the Heritage Insurance Policy are governed by S.C. Code Ann § 38-78-10 to 120 (Law. Co-op 2007), which governs the sale of motor vehicle warranty and service contracts in this state.  Under the definitions set forth in the § 38-78-20:

1.  Warrantech is the "Administrator," § 38-78-20(1);

2.  Butler is the "Provider," § 38-78-20(9);

3.  The VSCs are "Vehicle Service Contracts," § 38-78-20(12);

4.  Heritage has issued a "Reimbursement Insurance Policy," § 38-78-20(11); and

5.  The vehicle owners that purchase a VSC are the "Service Contract Holder" or "Contract Holder,"(§ 38-78-20(13).

Under § 38-78-30, the provider of VSCs (i.e., Butler) must secure its obligations to the VSC contract holders by one of three means:  (1) maintain, or have a parent company maintain, a net worth of $100 million § 38-78-20(D)(3); (2) maintain a funded reserve of at least forty percent of the gross revenue under the VSCs to fund repair claims; or (3) insure all of the VSCs under a reimbursement policy issued by an insurer.  The latter method (insurance) is the method chosen by the parties to secure the VSCs at issue in this case.  A portion of the funds received by Heritage from the sale of VSCs are considered premiums for reimbursement insurance coverage

for the VSCs. § 38-78-90(A) ("Insurers issuing reimbursement insurance to providers are deemed to have received the premiums for such insurance upon the payment of provider fees by consumers for service contracts issued by such insured providers.)

Section 38-78-40 governs the reimbursement insurance policy issued by Heritage and states as follows:

> (A) Reimbursement insurance policies insuring service contracts issued, sold, or offered for sale in this State shall conspicuously state that the insurer that issued the policy shall either reimburse or pay on behalf of the provider any covered sums the provider is legally obligated to pay or in the event of the provider's nonperformance, shall provide the service which the provider is legally obligated to perform according to the provider's contractual obligations under the service contracts issued or sold by the provider.
>
> (B) *In the event covered service is not provided by the service contract provider within sixty days of proof of loss by the service contract holder, the contract holder is entitled to apply directly to the reimbursement insurance company.* [emphasis added]

As such, Heritage has an independent statutory obligation to pay the VSC claims, and Heritage's proper recourse is to continue paying the claims and seek indemnification or subrogation from Warrantech and Butler. See § 38-78-90 ("This chapter does not prevent or limit the right of an insurer which issued a reimbursement insurance policy to seek indemnification or subrogation against a provider if the issuer pays, or is obligated to pay, the service contract holder . . . .).   Accordingly, the injunctive relief sought by Heritage to stop paying the VSC claims is barred under the laws of the State of South Carolina and could ultimately harm the consumers that purchases the VSCs.

II.    **HERITAGE IS REQUIRED TO PAY THE CLAIMS UNDER THE TERMS OF THE INSURANCE POLICY IT ISSUED TO BUTLER.**

In South Carolina, insurance policies must be liberally construed in favor of the insured and strictly against the insurer. *E.g., Kraft v. Hartford Ins. Co.*, 279 S.C. 257, 305 S.E.2d 243 (1983). When a term in an insurance policy is ambiguous or capable of two reasonable interpretations, the policy most be construed in favor of the insured and strictly against the insurer. *E.g., Diamond State Ins. Co. v. Homestead Industries, Inc.*, 318 S.C. 231, 456 S.E.2d 912 (1995). A policy clause of exclusion must be narrowly construed against the insurer, while a clause of inclusion should be broadly construed for the benefit of the insured. *Bundy v. Nationwide Mutual Ins. Co.*, 250 S.C. 332, 157 S.E.2d 633 (1967); *McPherson v. Michigan Mutual Insurance Co.*, 310 S.C. 316, 319, ; 426 S.E.2d 770, 771 (1993).

Here, the insurance policy issued by Heritage is not a "bankruptcy" policy as alleged by Heritage in its Complaint. Butler's bankruptcy is not a requirement to trigger coverage under the policy—in fact, the work "bankruptcy" does not even appear in the policy. Instead, Heritage's insurance policy states that it will provide coverage if claims ever exceeded the amount available in the Loss Reserve Fund, which is the exact situation presented here:

    1.    Definitions of Coverages

        [Heritage] will indemnify the [Butler] against Loss, subject to Loss Reserve Fund provision herein, arising out of the reasonable and customary cost of repair or replacement under and in accordance with the terms of the Service Contracts issued by Butler . . . .

        UPON FAILURE OF [BUTLER] TO PERFOM UNDER THE SERVICE CONTRACTS, [HERITAGE] SHALL PAY ON BEHALF OF [BUTLER] ANY SUMS [BUTLER] IS OBLIGATED TO PAY . . . .

        Upon failure of [Butler] to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder [i.e., the automobile owner].

    2.    Loss Reserve Fund

[Heritage's] liability herein shall be limited to covered Loss in excess of the Loss Reserve Fund applicable to [Butler] . . . .
. . . .

[Definitions, Section II.6.] "Loss Reserve Fund" means any loss reserve fund as may be established by the Administrator [i.e., Warrantech] on behalf of [Butler] to cover Loss under the contract.

Heritage's insurance policy issued to Butler specifically contemplates Heritage paying VSC claims in the event the claims ever exceeded the amount available in the Loss Reserve, which is has happened in this case. Heritage is now trying to dump coverage for the very event it insured based on the fact that it miscalculated the loss projections.

Further, Heritage's policy is not a "claims made policy" within the customary meaning of that term such as would allow Heritage to avoid coverage as alleged by Heritage, because paragraph 20 (on page 7) of the policy states:

"Cancellation of this policy shall not reduce [Heritage's] liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect."

In short, the Heritage policy is not a bankruptcy policy, policy coverage is triggered if claims exceed Loss Reserve Funds, and the purpose and terms of the policy is to provide insurance under the exact situation presented in this case.

## III.    THE GRANTING THE MADATORY PRELIMINARY INJUNCTIVE RELIEF HERITAGE SEEKS WOULD NOT MAINTAIN THE STATUS QUO BETWEEN THE PARTIES AND COULD HARM THE PUBLIC.

As the Fourth Circuit has noted, "[f]ederal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir.1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 787, 800 (3d Cir.1989)). In determining whether to grant such relief, the Fourth Circuit "has consistently followed the

'hardship balancing test,' " as stated in *Blackwelder Furniture Co. v. Seilig Manufacturing. Co.*, 550 F.2d 189, 195 (4th Cir. 1977). Under this test, four factors are considered:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
>
> (2) the likelihood of harm to the defendant if the requested relief is granted,
>
> (3) the likelihood that the plaintiff will succeed on the merits, and
>
> (4) the public interest.

*Direx*, 952 F.2d at 812 (quoting *L.J. By and Through Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988)). "[T]he plaintiff bears the burden of establishing that each of these factors supports granting the injunction." *Id.* (quoting *Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984)).

Further, Heritage is seeking a mandatory, as opposed to a prohibitive, preliminary injunction. "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.2d 266, 270 n.2 (4th Cir. 1994). "The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel V. Edwards*, 635 F.2d 283, 286 (4th. Cir. 1980) (citation omitted). [P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances. . . . [T]he application of this exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature." *In re Microsoft Corporation Antitrust Litigation*, 333 F.3d 517, 524 (4th Cir. 2003) (citation omitted).

Here, Heritage cannot satisfy any of the requirements for granting a mandatory preliminary injunction:

### 1. Likelihood of irreparable harm to Heritage.

Heritage must show that without a preliminary injunction, it may suffer irreparable harm. Irreparable harm is "an injury that cannot be undone through monetary relief." *Verbena United Methodist Church v. Chilton County Bd. of Educ.*, 765 F. Supp. 704, 714 (M.D.Ala.1991). "Moreover, the required 'irreparable harm' must be 'neither remote nor speculative, but actual and imminent.' " *Direx*, 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.3d 969, 975 (2d Cir.1989)). In other words, the plaintiff must make a "clear showing" of irreparable harm. *Direx*, 952 F.2d at 812 (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987)).

Heritage does not meet any of these requirements. As a threshold matter, Heritage is required to continue paying the claims under S.C. Code Ann. § 38-78-40, and Heritage cannot claim irreparable harm from complying with the terms of a statue governing its operations in this state. Further, this case is solely about money and who pays it. Heritage's claimed injury can "be undone through monetary relief" via a successful claim for indemnity and subrogation as specifically contemplated in S.C. Code S.C. Code Ann. § 38-78-90. In fact, that is exactly what Heritage is seeking to accomplish as reflected in the counterclaim it recently filed against Warrantech in the lawsuit pending between those parties in the Illinois Federal District Court.[5]

Further, as stated in its Complaint (Comp. ¶ 29), "Heritage reinsured 100% of its coverage under the [VSC] Master Policy with certain reinsurance companies," and such reinsurance should protect Heritage from its claimed risk of financial harm in having to pay claims under its policy. Finally, any claimed "harm" to Heritage is the direct result of its own

---

[5] Exhibit 3

actions in issuing the policy and entering into a contractual obligation with Warrantech to insure the VSCs. When it issued the policy, Heritage insured the risk of paying the VSC claims, and Heritage received and accepted premium payments for insuring that risk. Heritage cannot now claim a substantial risk of harm and irreparable injury arising from the very event it insured. Accordingly, Heritage does not face a threat of imminent, irreparable harm sufficient to warrant injunctive relief, and the denial of injunctive relief will maintain the existing status quo between the parties.

### 1. Likelihood of irreparable harm to Butler.

Butler does not have the financial ability to pay VSCs claims in excess of the Loss Reserve Fund insured under the Heritage Policy. Butler owes a large outstanding debt to Warantech as result of the loans Warrantech advanced to cover claims after Reliance Insurance was liquidated. More importantly, the relationship between Heritage, Butler, and Warrantech was established on the premise and belief that the Loss Reserve Fund would cover the claims insured by Heritage, and the insurance issued in the event claims exceeded the amounts in the Loss Reserve Fund. Butler does not have the financial ability to cover the VSC claims in the absence of Heritage's insurance coverage, and Butler faces being placed in a position of default, bankruptcy, and irrepairable injury to its reputation if Heritage does not pay the claims it insured. Accordingly, Butler faces an immediate risk of irrepairable harm if Heritage's motion is granted.

### 3. Likelihood Heritage will succeed on the merits.

Both § 38-78-90 and the terms of its policy require Heritage to pay coverage if claims exceed the amount of funds in the Loss Reserve Fund. That is what has happened, so at the very least serious questions exist regarding the likelihood Heritage can succeed in avoiding its insurance coverage obligations. Heritage seeks extraordinary injunctive relief that flies in the

face of the insurance policy it drafted and a state statute which was crafted to protect VSC holders. Heritage's claimed reasons for dumping coverage—the loss of reinsurance and the supposed negligence of Warrantech in administering a VSC program Heritage fully controlled— cannot be invoked by Heritage to avoid its clear cut contractual and statutory obligations to honor and pay VSC claims.

### 4. Public Interest

Granting Heritage's motion would violate against public policy and harm consumers by terminating insurance coverage for the VSCs insured by Heritage. As noted above, Butler does not have the financial ability to cover the VSCs claims in the absence of Heritage's insurance coverage. Warrantech is not an obligor and has no obligation to pay claims under the VSCs. The rate of claims is exceeding the amounts in the Loss Reserves Fund, and there will be insufficient funding available to cover consumer warranty claims in the absence of Heritage's insurance coverage, which Heritage specifically issued for these very circumstances. The public consumer of the VSCs is the one that ultimately stands the greatest risk of harm if Heritage discontinues paying the claims, and granting the injunction relief sought by Heritage would be directly adverse to the public interest.

### CONCLUSION

For reasons discussed above, Heritage's motion for a preliminary injunction should be denied.

s:/David J. Parrish
David J. Parrish
NEXSEN PRUET ADAMS KLEEMEIER, LLC
205 King Street, Suite 400 (29401)
P.O. Box 486
Charleston, South Carolina  29402
Phone:  843.577.9440
Facsimile:  843.7201777
Email: dparrish@nexsenpruet.com
*Attorneys for Defendant*
*Butler Financial Solutions, LLC*

Of Counsel:
Michael M. Tannen, Esquire
Law Offices of Michael Murphy Tannen, P.C.
39 S. LaSalle Street
Suite 905
Chicago, IL  60603
Phone:  312.641-6650
Facsimile:  312.641.6656

September 19, 2007

# EXHIBIT 7

1

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF SOUTH CAROLINA
2                          CHARLESTON DIVISION

3    HERITAGE WARRANTY INSURANCE RISK    :
     RETENTION GROUP, INC., f/k/a        :
4    HERITAGE WARRANTY MUTUAL INSURANCE  :
     RISK RETENTION GROUP, INC.,         :
5                                        :
              vs.                        :
6                                        :
     BUTLER FINANCIAL SOLUTIONS, LLC     :    2:07 CV 2627
7

8

9

10        Motion hearing held Friday, September 21, 2007, commencing

     at 11:35 a.m., before the Hon. David C. Norton, in Courtroom
11
     II, United States Courthouse, 81 Meeting Street, Charleston,
12
     South Carolina, 29401.
13

14

15

16   APPEARANCES:

17              JOHN P. SEIBELS, JR., ESQUIRE, 165-A, King St.,
                Charleston, SC, appeared for plaintiff.
18
                DAVID J. PARRISH, ESQUIRE, P.O. Box 486,
19              Charleston, SC, appeared for defendant.

20

21

22

23
                REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR
24                          P.O. Box 835
                        Charleston, SC  29402
25                          843/723-2208

2

1    THE COURT:  We're ready when y'all are.

2    MR. SEIBELS:  May it please the Court, Your Honor.

3  I'm Jay Seibels; my client is Heritage Warranty Insurance Risk

4  Retention Group, Inc., a South Carolina insurance corporation,

5  and we're here on our Rule 65 motion for injunctive relief,

6  and I'll get right to it.

7    I want to start by addressing the standard, and I want to

8  make clear that we are not requesting what has been

9  characterized as mandatory preliminary injunctive relief,

10  we're requesting a preservation of the status quo until trial.

11  We're not trying to alter the status quo.  And what I'll -- I

12  see the quizzed look on your face.

13    THE COURT:  I guess so, because if somebody said

14  we're going to alter the status quo, but we want them to pay

15  the money, that doesn't seem to be the status quo, because the

16  status quo was they're not paying the money.

17    MR. SEIBELS:  The status quo, there's an important

18  question is when is the status quo.  Is the status quo created

19  by, in our view, what we view to be wrongful conduct by the

20  defendant, that the defendant undertook this year; or is the

21  status quo the -- which is the impetus of the litigation -- or

22  is the status quo the five-and-a-half-year business

23  relationship that existed until it was changed by the wrongful

24  act which we contend -- and which was the impetus of -- which

25  is the impetus of the litigation.  We submit to you the status

3

1   quo is the five-and-a-half-year business relationship, and the

2   way the money flowed up until the summer of this year, when it

3   stopped.

4        And I'll illustrate in a second that the money flowed from

5   Butler to consumers to pay claims, promptly within days of

6   approval of the claim.  And in the summer that was altered by

7   Butler's decision unilaterally to stop funding the loss

8   reserve fund.  They created --

9        THE COURT:  You can dance around that all you want,

10   but what you're saying is the mandatory injunction, you're

11   going to lose that argument.

12        MR. SEIBELS:  Okay.

13        THE COURT:  Okay?

14        MR. SEIBELS:  I'll stop --

15        THE COURT:  I can give you the death of a thousand

16   cuts or I can shoot you between the eyes, whichever you want.

17        MR. SEIBELS:  I understand.

18        THE COURT:  Because what you're asking, the status

19   quo as if the day that you filed your injunction is the day

20   the status quo you want; the status quo you want is to reverse

21   their reversal of their five-year business relationship.

22        MR. SEIBELS:  Well, I've got --

23        THE COURT:  You're requiring them to do something, as

24   opposed to stop doing something.

25        MR. SEIBELS:  We want a resumption -- a return to

1  normalcy.  We want a resumption of what they had been doing

2  until they did something that caused the litigation.

3         THE COURT:  Okay.

4         MR. SEIBELS:  And I've got -- I'll leave you just

5  with a couple of cases that would indicate to you I'm not

6  making this up as I go along.

7         THE COURT:  I don't say you were making it up.  But

8  you're doing the best you can; that's fine with me.

9         MR. SEIBELS:  Yes, sir.  Dominion Video, it's a Tenth

10  Circuit case, 269 F.3d 1149 2001.  A Second Circuit case

11  called Lake Charles Diesel, that's 328 F.3d 192, it's 2003,

12  Fifth Circuit, not Second, Fifth Circuit.

13         THE COURT:  Okay.

14         MR. SEIBELS:  Third -- my third case is the Second

15  Circuit case, 60 F.3d 27 Second Circuit 1995.

16         THE COURT:  Those cases, what are the propositions

17  that they stand for?

18         MR. SEIBELS:  That it is not a mandatory request for

19  mandatory injunction if the movant is simply trying to restore

20  the parties to where they were before the act which caused the

21  litigation to arise.  And the reasoning behind it is that a

22  party could unilaterally alter the status quo, and thereby

23  raise the threshold, raise the standard on the moving party,

24  and say look, the status quo was what -- how it existed in the

25  last four days, ever since I sent them a cancellation notice.

5

1    I have canceled.  They want me to rescind the cancellation

2    notice, and that's causing me to do something.

3        How you overcome that argument is you say no, no, no, no;

4    we say the cancellation notice was improper, we want to

5    restore the parties to their way of dealing all along until we

6    can litigate the propriety of the cancellation notice.  In

7    other words, the bad conduct doesn't stand until trial, but

8    the status quo relationship stands until trial.

9            THE COURT:  Okay.

10           MR. SEIBELS:  And I want to illustrate how the

11   relationship did work for five and a half years up until the

12   summer.

13       Butler sells these services contracts in the marketplace,

14   receives a contract consideration, money, in exchange for its

15   promise to repair a vehicle if it's a covered loss.  They get

16   the money.  And the money, a portion of that money goes into a

17   loss reserve fund.  It's not Heritage's money, it's Butler's

18   money.  This loss reserve fund is actually required by our

19   policy, and it is set up on behalf of Butler.  That's in the

20   definition of loss reserve fund insurance contract.  From

21   those funds, which is the -- a portion of the funds Butler

22   received, claims have been paid for five and a half years,

23   which is to say Butler's been paying claims for five and half

24   years until now.  Until June.  And in June, and well before

25   June, my client let Butler know that some of these loss

6

1   reserve fund accounts -- it's not one giant account, but

2   several accounts -- were going to be at zero soon and more

3   money was necessary to fund it, so the consumers could

4   continue to be paid with Butler's money, as they have been for

5   five and a half years. Butler refused, said we're not paying

6   any more. And this litigation ensued.

7       In the meantime what happened was some of, but not all of

8   the loss reserve funds did hit zero, consumers made their

9   claims, the claims administrator approved the claim as being a

10  covered loss, and that claim was sent either to us or to

11  Butler for payment. And when no money came out, because

12  there's no money left, the consumer called us and said you

13  guys are supposed to pay, it says right here on the first page

14  of my contract. To which we said no, no, Butler pays. If

15  Butler doesn't pay in 60 days, come back to us.

16      And so the consumers are being forced by Butler to wait 60

17  days, then they come back to us. And we have funded the

18  claims account since. That is not the way the relationship

19  has worked, that is an entirely new relationship, and it's

20  wrongful.

21      We want Butler to resume funding the loss reserve account,

22  to the extent it's capable. If they filed for bankruptcy,

23  different story. But we believe they have the means to do it.

24  And absent evidence to the contrary, they should do it, and

25  good faith requires them to do it. And they have done it for

7

1     five and a half years.

2         That's confirmed by the Foltz affidavit submitted by

3     Butler, it's in Butler's brief, there's no -- I don't think

4     there's any controversy that Butler's been paying claims with

5     their money for five and a half years, and then they said, I'm

6     not doing it anymore, without any justification.

7         The important thing now is to move to the law of these

8     insurance policies.  And the law is in the South Carolina Code

9     at 38-78-40, where obligors, providers of insurance of --

10    sorry -- vehicle service contracts, are required to

11    demonstrate financial responsibility.  They can do it a couple

12    different ways; one is to buy an insurance policy from people

13    like my client.  They did that.

14        What's important is 38-78-40 describes two different kinds

15    of insurance that would satisfy, it's an either/or statute.

16    And it says that the policy will either reimburse or pay on

17    behalf of the provider a covered claim, or -- and this is the

18    policy they bought, they bought the or -- in the event of the

19    provider's nonperformance, shall provide the service which the

20    provider is legally obligated to perform.  That's the policy

21    they bought.

22        That's a critical distinction that you need to -- that I

23    need you to appreciate.  Butler wants to either blur the

24    distinction, or persuade you that they bought the first kind

25    of insurance, what we sometimes called first dollar insurance,

1    which means the insurance company has really stepped into the

2    obligation of the obligor.

3        Here, we have no duty to pay anything unless Butler fails,

4    and then our duty is triggered subject to some other terms and

5    conditions, 60 days later.  And we know that because on the

6    very first page of the insurance policy, on the insuring

7    agreement in bold it says, upon failure of the insured to

8    perform under the service contracts, Heritage shall pay on

9    behalf of the insured any sums the insured's legally obligated

10   to pay.  So we don't pay unless and until Butler fails to pay.

11   And of course then there's a 60-day lag.  Meanwhile, the

12   consumer's car's sitting in the garage, presumably,

13   unrepaired.

14       Butler is trying to convince you that when Butler

15   purchased its insurance policy, and thereby proved financial

16   responsibility, it then had no financial responsibility, and

17   the whole obligation was transferred to Heritage.  But that's

18   not what the policy says.  It's what the policy could have

19   said.  It's authorized to go that way under South Carolina

20   Code, but that's not what they bought, and that's not what we

21   sold, and that's not what we underwrote, and that's not what

22   we have to do.

23       They want us to pay the claims on the first day, now.

24   We've never done it, we didn't contract to do it.  That's the

25   subject on the merits of the case later.  The question for you

1   today is, who pays in the first 60 days.  If it's Butler, they

2   should be ordered to pay.  That's the only issue before you.

3   We are obligated to pay on the sixtieth day, sixty-first day,

4   subject to a bunch of other terms in the contract, but we

5   don't even have to get bogged down in those necessarily.  But

6   it's the 60-day lag that never existed for five and a half

7   years, which started in June, and is creating a whole lot of

8   unrest for both parties.  We're getting consumer complaints --

9   they are -- presumably.  Remarkably, we haven't been sued yet

10  by a consumer, but it's reasonable to expect that that's going

11  to happen unless somebody starts paying consumer claims on the

12  day they're approved.  But that's not our contractual

13  obligation, it's Butler's contractual obligation.

14      I want to address some of Butler's failed argument in its

15  brief and it's affidavit.  Again, Butler is taking the

16  position that our policy assumes their total obligation, when

17  it doesn't.  Their obligation is to pay.  If they fail to pay,

18  then we pay, subject to a bunch of other terms.

19      They offer absolutely no explanation for why they're not

20  paying in the first 60 days, why they're not funding the loss

21  reserve account.  I fully expected them to have an explanation

22  for why they're not doing it, and they haven't.  They

23  aren't -- I hope we hear it today -- a justification for why

24  they don't pay their contract holders' approved claims in the

25  first 60 days.  Why are they sitting on their hands, why

1   aren't they stepping up to do what they're supposed to do?

2   Absent a good reason, I think they should pay -- it's our

3   position they should be ordered to do what they promised to

4   do.  It's a good faith requirement, it's part of our total

5   deal that they do it, and to the extent they can.

6      Butler admits on page five of their brief that the loss

7   reserve fund has been funded with their money all along, that

8   that's what's stopped this year.  On page seven of their brief

9   they discuss their obligation to demonstrate financial

10  responsibility, but they offer no analysis of how, once

11  they've done that, that their next position is true.  Their

12  next position is that once they've done it, they actually have

13  no obligation anymore, and they have -- there's no analysis

14  for that position.

15     Their brief says that Heritage should be required to

16  continue to pay claims.  We want it clear that -- and as you

17  can see in Paul Miles' second affidavit, Heritage has never

18  been called upon to pay a claim under this policy under

19  reservation of rights, and had to begin doing so in June.

20  That is a total change in the status quo of how the

21  relationship existed all along.  They're the ones forcing a

22  change on us.  We're not forcing a change on them.

23     It's inconceivable that Butler could claim to be harmed,

24  if they're ordered to honor their commitments to consumers.

25  According to their affidavits, they've sold a quarter million

1    of these contracts, and according to their affidavits, they

2    don't owe those people a nickel.  And I don't know how you

3    reconcile that.

4        The public interest is served by prompt --

5        THE COURT:  You skipped a little thing; it's called

6    irreparable harm to your client.

7        MR. SEIBELS:  It's coming.

8        THE COURT:  Good.  I just want to make sure you

9    didn't forget it.  You can do it whenever you want to it.

10        MR. SEIBELS:  The public interest is served by the

11    prompt payment of consumer claims.  Public interest is not

12    served by forcing consumers to wait 60 days.  There's nothing

13    in their contract that says they must wait 60 days.  Butler is

14    putting them in a position of waiting 60 days.  If you grant

15    the relief that we are requesting, the public interest in that

16    regard is going to be severed, because the consumer's going to

17    get their money promptly as promised in the contract that they

18    have in their glove box.

19        On the subject of irreparable harm.  Insurance companies

20    more than any other company, their stock in trade is cash

21    money, they have to have cash money to support the policies

22    that they sell.  If in between now and trial, as you can see

23    from the affidavits, if the trend continues, my client will be

24    in a cash crunch, he won't be able to pay the claims.  Not

25    only that, without cash, we won't be able to support our

12

1    ongoing business that performs the way it's supposed to

2    perform.  Butler's not our only policyholder.  And our

3    irreparable harm is based on the viability of our ongoing

4    business.  And if we are forced to pay claims that were not --

5    we didn't underwrite, we didn't promise to pay, and in bad

6    faith we're being forced to pay by Butler's change in conduct

7    this summer, we won't be in business by the time of trial.

8    We've got about 10, 11 months.  In the meantime, there's a

9    parade of horribles which will occur, which would include

10   possible increased regulation by the South Carolina Department

11   of Insurance.  I can assure you they are keenly interested in

12   the outcome of this case.  I had an hour-long conference call

13   with the South Carolina Department of Insurance yesterday to

14   explain to them how this was going to go today, or how this

15   was going to be presented today.  They've reviewed my briefs,

16   our affidavits, they've reviewed Butler's briefs and

17   affidavits.  They are real interested in knowing whether

18   Heritage is going to have to continue to pay these claims for

19   the next foreseeable period of time.  Because they know, as we

20   put in our affidavits, we can't do it for very long.

21       And I have -- I didn't even introduce my client, Peter

22   Knolla, he's the secretary of the corporation, seated to my

23   left.  And he's here because this is a bet-the-company kind of

24   problem for them, and it's very important this get returned to

25   the relationship that everybody had up until June of this year

1    when Butler changed its mind about how it was going to treat

2    its people.

3            THE COURT:  But of course what you're asking for is

4    to win.

5            MR. SEIBELS:  No.

6            THE COURT:  Winning is getting them to pay the

7    claims.

8            MR. SEIBELS:  To the extent they're able.  Our case,

9    in the complaint, is about the construction of our policy and

10   its cancellation.  That's not even before you here.  A win for

11   us is a declaration of no coverage at all; that's what we're

12   asking.  But I'm not asking you to talk about coverage or not

13   coverage today.  I'm asking you to --

14           THE COURT:  You mean no coverage at all after

15   December of last year.

16           MR. SEIBELS:  That's right, January 30th.  And what

17   that means on the claims made policy.  All that's got to be

18   construed.  There's a legitimate controversy there that's

19   going to have to be fleshed out.  That's the case before you,

20   that's a win for my client.  It is not a win, necessarily, for

21   my client, for the parties to go back to behaving the way they

22   did for five years.  That's just let's get back to where we

23   were, and then argue over what the contract says.  But

24   everybody should continue to do what they've been doing until

25   trial.  Then at trial we'll determine what the obligations of

1    everybody has been, and what they should be going forward.

2    That's the win, that's the merits.   The merits of the case

3    really don't touch on who pays between now and then, that's

4    the merits of this motion.

5         So I really don't think, and I hope I've demonstrated that

6    a win today does nothing to our coverage argument.   Doesn't

7    help it, doesn't hurt it.

8              THE COURT:   A loss today doesn't help or hurt the

9    ultimate either, does it?

10             MR. SEIBELS:   No, I just wonder if we're going to be

11   in business then.   And, you know, this company has other

12   policyholders who expect it to be in business.   This company

13   has a regulatory authority who is in charge of either making

14   sure it stays solvent, or taking it over if it's not.   There's

15   a lot of interested parties out here wanting to know how

16   you're going to rule.

17        It's a pretty hollow victory in five, six, seven months

18   from now, if we have no policyholders, no surplus; two months

19   from now is fine, too.   Nevertheless, the company's got to

20   stay in business, or it's going to be forced to cancel

21   policies, going to be subject to increased regulation, all of

22   those things are imminent.   It's not a flight of fancy, it's

23   an imminent harm, imminent risk, it's going to happen, because

24   money's not there.   And they don't contend, I want you to know

25   they don't contend we have a bunch of money and that we're

15

1   able to do it.  They don't take that position.  They know that

2   they're going to run us out of business, they don't contend

3   otherwise.  So on this issue of harm, it's not in controversy,

4   it's true.

5       And then finally, there's a whole bunch of noise about the

6   relationship between Butler and Warrantech, which seems to --

7   it's more of a side show than anything else.  But what we do

8   know is that -- a lot of things we didn't know before

9   Wednesday -- Butler owes Warrantech $10 million.  And that

10  loan, and I don't know what the original amount was, they say

11  they owe 10 million now, six years ago that loan was made,

12  which was before they entered into our contract.  But we

13  didn't know they were -- you know, if they're insolvent, they

14  were insolvent when they signed our deal.  And that would have

15  been a nice thing for them to tell us, that they were --

16  there's no way they could pay the first consumer claim, if you

17  believe them.

18      So notwithstanding they can't -- once you believe that

19  they can't pay the next one, well, according to their filings,

20  they were insolvent then.  But what we know from the 10-K

21  filings, and I brought them with me, and I'd like to give them

22  to you and leave them with you, is that Warrantech is a

23  guarantor of Butler's business.  It's in the 10-K filing.

24      So I'm not that interested in who owns what, but I do know

25  in the public filings with the SEC, Warrantech reveals itself

1    as Butler's guarantor.  So I don't -- I don't really care

2    about much more than that.

3         Now, this entity was created by Warrantech, its manager

4    was Warrantech's CFO, it assumed everything Warrantech had

5    done up to the point when it was formed.  It has no business

6    with any other entity than Warrantech.  It's Warrantech's

7    baby.  And they've guaranteed certain obligations of Butler as

8    well.  That's the only reason why there's all this Warrantech

9    noise.

10        And there should be no real surprise that Warrantech

11   signed an affidavit in support of Butler's position, because

12   Warrantech has 10 million reasons why they need Butler to not

13   pay these claims.  Because every dollar that Butler pays on

14   these claims, is a dollar that's got to be found somewhere

15   else to pay the $10 million obligation that Butler owes

16   Warrantech.  So no question Warrantech would like you to rule

17   differently.  No question that they were able to get an

18   affidavit out of Warrantech's officer in advance of this.  Who

19   should be surprised?  But yet part of the affidavit is, we

20   don't really know each other, we don't really do anything

21   together, we're two separate entities.

22        Thank you, Your Honor.

23             THE COURT:  Thank you.

24             MR. PARRISH:  Thank you, Your Honor, David Parrish.

25   I got this case three weeks ago, and last weekend working on

17

1    that memo, it clicked on what this case is about.  This is a

2    dispute between Warrantech and Heritage over who miscalculated

3    the loss reserve funds on these policies.

4              THE COURT:  Let me ask you a question.  Why would you

5    be working on the memo last weekend, when it was due before

6    that?  And why would you give me 15 or -- you know, six or

7    eight inches of paper yesterday, for a hearing that's been

8    scheduled today, and continued for you one time.

9              MR. PARRISH:  Your Honor, I want to apologize for

10   that.  We were on the phone --

11             THE COURT:  You know, it's --

12             MR. PARRISH:  We're here --

13             THE COURT:  You've got 15 days, that's the rule.  Did

14   you ask for more time?  No.  Did you ask for more time on the

15   hearing?  Yes.  And then you dumped all this stuff on us

16   yesterday, when my bench memo was already done, which causes

17   my law clerk and my interns some concern about having to do a

18   professional job for me at a hearing at 11:30 this morning.

19   And the basis for that concern is that you're trying to

20   sandbag me, and the opposition.  And, you know, all you have

21   to do is call and ask for more time or do something, but don't

22   sandbag me.  You ought to know better than that.

23             MR. PARRISH:  Your Honor, I want to assure you there

24   was no sandbagging.  I had difficulty.  Warrantech is not

25   related to Butler.  I'm having to deal with outside counsel.

18

1    The problem we've got is Butler has no knowledge of what's
2    happening.  I've got the Harris Miller, his affidavit, I
3    got -- the affidavits got in my office Tuesday morning.  I
4    apologize; I should have called the Court.  Was trying to get
5    those things.  I didn't prepare the affidavits.  I had to rely
6    on Chicago counsel for Butler and Chicago counsel for
7    Warrantech, who do not necessarily see eye to eye with each
8    other.  I was actually on the phone going, I have to have this
9    information.
10            THE COURT:  I get to beat you around, I don't get to
11    beat around Chicago counsel, unless they show up.  Anybody
12    here from Chicago?  You're the Chicago counsel he's talking
13    about?
14            MR. PARRISH:  Mr. Tannen's here, he's Butler's
15    Chicago counsel, yes.  And he can --
16            THE COURT:  Is he pro hac in this case?
17            MR. PARRISH:  No, sir, not yet.
18            THE COURT:  I can't beat him around yet.
19            MR. TANNEN:  I have a motion.
20            MR. PARRISH:  Harris Miller, who is Warrantech's
21    representative, is a -- he's basically a consultant, they
22    don't have any employees.  All the books and records are at
23    Warrantech.  The affidavit shows Butler has had no role in
24    this situation.  And simply trying to find information was
25    time consuming.  And I promise you there was no intent to

19

1   sandbag the Court.  I was actually in a lot of stress on

2   Monday, Tuesday and Wednesday.

3          THE COURT:  Not as much as you're in right now

4   though, right?

5          MR. PARRISH:  Well, no, that's true, I'm probably a

6   little more stressed right now, but that was never the

7   intention.

8          THE COURT:  Why would Warrantech not know anything

9   about this, when they filed a 57-page complaint against

10  Mr. Seibels' client in Illinois four months ago.

11         MR. PARRISH:  They filed a motion -- I'm sorry.

12  Warrantech knows a lot about it; Butler doesn't.  I represent

13  Butler, not Warrantech.  Warrantech's not a party here.

14  Butler recently filed to intervene in Chicago, and Mr. Tannen

15  and I have been on the phone for literally every day most of

16  the day for a week, trying to gather the information.  I was

17  on line trying to read 10-Ks on Saturday, trying to understand

18  what was going on here.

19         But I really want to -- to represent to Your Honor, I

20  should have picked up the phone in hindsight and called you,

21  but that was not my intent.  I was on the phone, I need these

22  affidavits.  In fact, they got faxed in on the fax machine.

23  In fact, the ones that are filed have the fax header at the

24  top.  I got the memo here as soon as I had the affidavits in

25  support of them.  And so that was my mistake, I take blame for

20

1    it, but I can promise you there was no intent to sandbag.  In

2    fact, we had affidavits that were just filed in this case by

3    the other side last week, and as late as yesterday, trying to

4    understand what's going on in this situation.  So I want to

5    make that clear.  For what it's worth, there sure was not an

6    intent.  It maybe ended up that way, but that is not the way

7    we tried to do this at all.

8         THE COURT:  I'm sure I won't have to say this, but

9    don't do it again.

10        MR. PARRISH:  Your Honor, very well noted.  In fact,

11   the whole focus the last couple days is get something in this

12   Court as rapidly as possible.  And that's, unfortunately, as

13   fast as I could get it here.

14        THE COURT:  All right, go ahead.

15        MR. PARRISH:  Anyway.  If you've had a chance to look

16   at that, and I know they're thick, I wasn't happy about

17   sending that over here, I just didn't have the ability to get

18   them cut down; the affidavits were too long, but I didn't have

19   the control over the witness to cut the affidavit down.

20        What those affidavits clearly show is what this is about.

21   Warrantech and Heritage are fussing about loss reserve

22   calculations.  What Heritage is trying to tap dance around in

23   this case is the fact that from day one, Warrantech and

24   Heritage were hooked up as tight as you can possibly get at

25   the hip, and came up with this relationship.  Butler's out

1    there as a statutorily-approved kind of obligor in name only;

2    that's what there is, I'm not going tap dance around that.

3    Mr. Miller's affidavit says the company doesn't have the

4    financial ability to pay these claims.  It says it in there.

5    And, in fact, the company has never paid these claims from day

6    one.  What Heritage has tried to kind of ignore in this case,

7    is the fact that the administrative agreements between these

8    parties, claim handling agreements and addendums, show that

9    the insurance was issued in connection with this arrangement

10   between Warrantech and Heritage, who are up in Illinois

11   fussing about this.  The administrative agreement says the

12   policy was issued in conjunction with it.  The addendum

13   between Heritage and Warrantech says that Heritage funded and

14   controlled disbursements from the account.  That's this party.

15   Not Butler and not Warrantech.  The claims handling addendum

16   that are in the record -- and once again, I do apologize, it

17   was not my intent to do that, I hope the Court can take

18   that -- my total sincerity.

19              THE COURT:  No problem.

20              MR. PARRISH:  My mistake was not picking up the

21   telephone.  The claims handling addendum between the parties

22   in the record show that Heritage funded and controlled the

23   disbursement of claim payments from the account.

24        The clear -- what's in the record and what's signed by

25   Heritage is these guys got together, Heritage and Warrantech,

1    took enough of these premiums to put them in a pot, supposedly

2    to be sufficient to pay the claims, and then kept whatever is

3    left over.  They funded the loss reserves.  And somebody

4    between Heritage and Warrantech, or maybe both, miscalculated

5    that number, and has gone upside down.

6        There was a reference awhile ago to Jeanine Foltz'

7    affidavit, she's a Warrantech lady, and contrary to what was

8    suggested, she flat says in her affidavit in several places

9    that Butler never played a role in this, they never disbursed

10   claims, they never made any payments, they never funded these

11   claims.  It all came out of that pot of money that Heritage

12   controlled and administered via its contract with Warrantech.

13   The W word is missing from the courtroom very bad here.

14       What the records and documents show, and to a certain

15   extent what's not refuted, is the fact that there was a three-

16   way relationship, you had Heritage and Warrantech calling the

17   shots, and Butler was kind of sitting out here to comply with

18   the South Carolina statute.

19       The only thing that has not been correctly presented by

20   Heritage, or is factually disputed, is the affidavits we have

21   showing that Butler never paid these.  They never intended to

22   pay it and they never had any involvement in it.  And that's

23   been the situation since 2001.  And that's what's in the

24   affidavits that were belatedly submitted to the Court.  And

25   Heritage does not claim that in its affidavits that Butler

23

1    funded these.  That's just not what happened.  It's unrefuted,
2    and Mr. Miller's affidavit that I brought with me here today
3    in case the Court had any questions of him, that it does not
4    have the financial ability to pay, if it wanted to, and also
5    it never intended for it to pay.
6        And we mention in there about the issue of reliance,
7    insurance going into liquidation caused some problems between
8    Warrantech and Butler.  So there's a lot of reasons they can't
9    pay, and more importantly, the agreement was never set up for
10   them to pay.  That was not the intent between the parties that
11   are based on the documents between the parties themselves.
12       As far as Heritage's claimed irreparable harm, paragraph
13   29 in the complaint says they 100 percent reinsured all of
14   these risks.  Butler once again knows nothing about it.  All
15   the information flows between Heritage and Warrantech.  But
16   Heritage's own complaint says they reinsured 100 percent all
17   of its obligations.  So Butler is a little bit at a loss to
18   understand how they could be at such a substantial risk of
19   paying the claims they insured, when they themselves allege in
20   this lawsuit that they reinsured all of them.
21       And there's also an affidavit in the agreements between
22   Heritage and Warrantech about the reinsurance fees that were
23   coming out of that.
24       So the status quo between the parties since 2001 is Butler
25   has been back here knowing nothing, it's all been between

24

1    Heritage and Warrantech.  That's what they've been doing.  The

2    of two them are now suing and fussing with each other in

3    Illinois over that issue.  Mr. Tannen got involved with Butler

4    only about the same time I did, because he filed the

5    intervention action in Illinois.

6        So the status quo is Butler's never paid, it wasn't

7    intended to pay, and it can't pay here today.  And that's

8    what's in the record before the Court; again, maybe belatedly.

9        And like I say, in and of itself, Heritage is claiming

10   they reinsured all of these risks, ignoring the status quo.

11   That position right there would seem to undercut its claim

12   that it's subject to a substantial risk of harm if it gets the

13   relief it's seeking in this court today.

14       And I also note that there is a public policy issue out

15   there, they've got a quarter million of these policies sold.

16   The South Carolina statute requires Heritage to pay these

17   claims.  How it can seek the relief it seeks here today.  And

18   I'll be happy to answer any questions, and Mr. Miller is here

19   prepared, and I know you don't plan to ask him any questions,

20   but he is available if there's something we didn't touch on to

21   your satisfaction in scrambling to get these affidavits

22   together.

23            THE COURT:  Okay, what do you say, Mr. Seibels?

24            MR. SEIBELS:  Your Honor, thank you.

25       I may take these in reverse, because this reinsurance

25

1     issue, just know that the reinsurance agreements track the

2     underlying agreement.

3         If the Court were to order that there's coverage under

4     this underlying agreement, we may be able to present a

5     reinsurance claim against our reinsurers.  It's our position

6     and the position, we believe, of our reinsurers, that nobody

7     should be paying these claims except Butler, until they're

8     bankrupt.  And then subject to the attachment point and some

9     other things, our policy comes into play.  But there's --

10            THE COURT:  There's nothing in the policy that says

11    anything about bankruptcy, is there?

12            MR. SEIBELS:  Well, it's a -- there's a --

13            THE COURT:  I guess the answer is yes or no.

14            MR. SEIBELS:  Beg your pardon?

15            THE COURT:  Bankruptcy is a pretty plain term.

16    There's nothing in the policy that references bankruptcy, is

17    there?

18            MR. SEIBELS:  I agree with that.  The policy instead

19    says upon failure of the insured to perform, which is -- is

20    volunteering -- it's selling -- it sold a quarter million of

21    these contracts; I bet it sold ten today.  It's still selling

22    them.  I bet it sold by lunchtime.  And if the world knew that

23    Butler had no assets, I wonder, you know, what are they

24    selling?  What are they selling?  This is -- there's a bunch

25    about this case I've learned since -- a bunch about Butler

26

1    I've learned since Wednesday, that Butler is in this

2    marketplace promising consumers that they're going to pay

3    stuff, but it has no money, in fact, it's upside down to

4    Warrantech.

5        The bankruptcy aspect of it is a term of art used in this

6    sector of the insurance industry, we'll have expert witnesses

7    on this at trial.  But --

8            THE COURT:  How are you going to have expert

9    witnesses on trial on bankruptcy, when the word doesn't appear

10   in the insurance policy?  It seems to me that there's some

11   kind of legal maxim against that kind of thing.

12           MR. SEIBELS:  Well, the motion's already being

13   formulated.  The reason why it's called a bankruptcy policy,

14   what an expert witness would tell you, if allowed, is that

15   this policy tracks the statute that says --

16           THE COURT:  It doesn't mention bankruptcy; it says

17   nonperformance in 60 days and you're on the hook.

18           MR. SEIBELS:  And it has to do with good faith.

19   If --

20           THE COURT:  It doesn't say good faith nonperformance,

21   just says nonperformance.

22           MR. SEIBELS:  Well, no, the good faith term is

23   implied in every contract, it doesn't have to say that.

24   There's a good faith relationship between, we thought, between

25   Heritage and Butler, that Butler was going to pay the claims.

1  The only way they can't pay the claims is if they're bankrupt.

2  So we have presented them with a bankruptcy policy that says

3  we're going to pay, if you fail to pay.

4      Now, in good faith, it's not a choice, they don't get to

5  make the choice that, okay, today I'm not paying, this one's

6  on you.  That's not the way the relationship was designed to

7  operate.  And if that is the way they treat it, that is bad

8  faith.  It is bad faith to pick and choose which ones they're

9  going to pay, and which ones, for their independent reasons,

10  notwithstanding the contractual promise they made to a

11  consumer, that they're just not going to pay.  And by that

12  decision, they force that obligation on us.  It's arbitrary

13  and it's in bad faith.

14      Now, if they're bankrupt, it's not arbitrary.  Now, there

15  may be some other reasons, and I don't read into the fact that

16  it says bankruptcy -- the fact that it doesn't say bankruptcy,

17  bankruptcy is a justification, a good faith basis to not pay,

18  which would then trigger our obligation; only after 60 days,

19  but it would then trigger our obligation.  If they have some

20  other reason, let's hear it.  I don't think they're bankrupt,

21  they're guaranteed by Warrantech, they've got the money.  They

22  got 10 million out of Warrantech seven years ago, or more than

23  10 million.  They're selling contracts today.  I don't get how

24  they can't pay.  Let's see it.  Let's see a good faith reason

25  to not pay your customers.  These people are driving around

28

1   with these contracts that say Butler all over them, that

2   Butler is going to pay them.  And they're -- now these

3   contracts are sitting in their glove compartment and garages

4   in 48 states, that Butler is not paying.

5       Then this other argument that Butler has never paid,

6   there's no explanation for that.  They just say it.  Here's

7   how Butler paid.  They sold a contract for 1000 bucks; 700 of

8   their consideration went into a loss reserve fund.  It was

9   their money.  Who's money was it?  It's their money.  It went

10  into a loss reserve fund.  Whose money was used to pay claims

11  out of the loss reserve fund?  The same money that Butler got

12  for selling the contract.  They're paying.  If they weren't

13  paying, I'd like to know who was.  Because we got no -- we've

14  got nothing on our balance sheet that indicates money going

15  out until June of this year.  You have an affidavit on that.

16  And the argument was that we don't contend otherwise; check

17  the affidavit.  The affidavit says we haven't made a single

18  payment on Butler's behalf until this year.  All the claims so

19  far were paid out of consideration Butler got for selling

20  these pieces of paper that they don't want to honor, they want

21  to pretend they don't exist.

22      That's how -- and for them to say -- I'd like to hear it

23  again, that they've never paid one of these claims, I'd like

24  to hear an explanation about who did and where did the money

25  come from, whose money was it?  It wasn't our money.  You have

29

1    an affidavit that says it wasn't our money.

2         And the flow of funds is undisputed, it's in Jeanine

3    Foltz' affidavit, how the money flowed.  It was Butler sold a

4    contract, some of that money from the sale went into a loss

5    reserve account.  It was Butler's money.  That's the same

6    money that's been paying claims for five and a half years.

7         Then this other defense that we don't know anything, you

8    know, need I say more about that defense?  They contracted

9    with other parties to do their business.  That's perfectly

10   okay.  But it doesn't make it no longer their business, they

11   just subcontract it to somebody else to handle the claims, to

12   collect the money, to flow the funds, while its owners and

13   managers, I guess, worked on other things.  It's perfectly

14   okay to sign someone else up to do your work, but it doesn't

15   make it not your work.  And to claim, well, gosh, for seven

16   years, six years, this went on and we don't know anything and

17   we can't even tell our lawyers how this works?  You know, I

18   hope that you're not going to rule on that basis, that that's

19   okay.

20        And then, you know, they want you to read the agreements,

21   I want you to read the agreements.  All it means is who

22   handled Butler's business for them.  Even the policy says a

23   loss reserve fund will be created on Butler's behalf.  And it

24   was.  And it was funded with Butler's money, and Heritage had

25   a role in how it got administered, Warrantech really

30

1    administered it, but it's just -- it's a flow of funds that

2    starts with Butler, because they're the ones getting money.

3          THE COURT:  Seems to me that your position is that

4    Butler's in bed with Warrantech, and Butler's position is that

5    Warrantech's in bed with you, and since y'all are all in bed

6    together, why don't you figure it out?

7          MR. SEIBELS:  I wondered.  I wonder why they don't

8    figure it out.

9          THE COURT:  It's a ménage à trois.

10         MR. SEIBELS:  It is, but yet nobody is guaranteeing

11   our obligations; Warrantech's guaranteeing their obligations.

12         THE COURT:  Your obligations are reinsured, they're

13   not guaranteed.

14         MR. SEIBELS:  Our point is this was not yet our

15   obligation.

16         THE COURT:  $700 goes to your fund.

17         MR. SEIBELS:  By my example, yes.

18         THE COURT:  By your example.

19         MR. SEIBELS:  Easy to think about.

20         THE COURT:  Then y'all just keep that $700 until

21   Butler needs some money, you send it back to them and they pay

22   the claims?  Is that what you're saying?

23         MR. SEIBELS:  The funds remain are -- they remain in

24   that account until Butler gets a claim.  That claim is deemed

25   by the claims administrator to be covered, it's a part that's

31

1    covered that failed, and then --

2         THE COURT:  Who sends the check?

3         MR. SEIBELS:  Warrantech.  They're the claims

4    administrator.  But a lot of it is very plain.

5         THE COURT:  It's a tri-part symbiotic relationship,

6    is what you're telling me.

7         MR. SEIBELS:  And there's nothing hidden about it.

8    There's nothing hidden about it.  That's why I want you to

9    read the agreements.

10        THE COURT:  Except your position is that Butler's

11   hiding the fact that they're not going to pay any claims, and

12   they're defrauding everybody they're selling a policy to.

13        MR. SEIBELS:  Now they've gone public with that

14   position.

15        THE COURT:  Okay.

16        MR. SEIBELS:  But they're defending it.

17        THE COURT:  Give it to the U.S. Attorney.

18        MR. SEIBELS:  I'm --

19        THE COURT:  Okay?

20        MR. SEIBELS:  All I'm suggesting is they're not

21   really defending their position, they're just stating their

22   position and saying we're not stepping up, and I'm here to

23   demonstrate, well, whose problem does that become?  It becomes

24   our problem.  Is that right?  No, of course not.

25        THE COURT:  Anything else, Mr. Parrish?

1    MR. PARRISH:  Your Honor, it just took me three weeks

2  to figure all this out, but the bottom line is who has to pay

3  it.  And what's coming down the track right behind this is the

4  motion that I did file and go ahead and brief when it was

5  filed, is this issue about the intervention in Illinois and

6  the interrelation down here.  This case doesn't make sense

7  that Warrantech is not involved, because it is a ménage à

8  trois, or I call it an incestuous relationship between these

9  three parties.

10    The problem we have down here is they're trying to get all

11  three lined up in Illinois; we only have two of them down

12  here.  Warrantech has a lot of documents.  The checks and the

13  claims flowed between these other two parties, they didn't

14  come out of Butler, and that's -- there was -- Butler is a

15  little bit in the dark in the picture.  And I'm concerned

16  about even basic discovery, that down here we'll have to

17  commission.

18    Warrantech -- the three parties need to be in the same

19  courtroom; where that is, I know that motion's not before the

20  Court today, but that's -- without Warrantech here, this whole

21  thing does not make a bit of sense, and I don't see how you

22  can even clearly deal with it and grasp the whole concept.

23  Because the contracts between Warrantech and Heritage are what

24  this case is all about, and what Heritage is trying not to

25  talk about here today.

1      So unless the Court has any questions, I'll sit down and

2  keep my mouth shut.

3          THE COURT:  Okay.

4          MR. SEIBELS:  If I may.  Warrantech doesn't need to

5  be here for you to decide who pays consumers in the first 60

6  days.  If you decide nobody, that's your decision and that's

7  okay.  Warrantech doesn't need to be here for that.  The issue

8  before you today is who pays consumers in the first 60 days;

9  nobody, which is the way it is now, or Butler.  There's nobody

10  taking the position that we're supposed to pay them within 60

11  days, there's no provision for that anyway.  So that's the

12  issue before you.  And the only people who have a dog in that

13  fight are in front of you.  And the other issue has been

14  briefed by both parties, we'll deal with it --

15          THE COURT:  So your client has a relationship with

16  Warrantech, too.

17          MR. SEIBELS:  We have an administrative -- we had,

18  not anymore, an administrative agreement with Warrantech.

19          THE COURT:  That quit as of December of last year,

20  too?

21          MR. SEIBELS:  That was canceled when they sued us.

22  We decided we didn't want to be in business with them while

23  they were suing us, so we canceled that contract.

24          THE COURT:  Mr. Parrish, is or is not Butler the

25  primary obligor under the --

34

1      MR. PARRISH:  Yes, sir, it is primary obligor.

2      THE COURT:  So they're supposed to pay first, and if

3    they don't pay within 60 days, then Mr. Seibels' client pays,

4    right?

5      MR. PARRISH:  In isolation, without the agreement

6    between Heritage and Warrantech, that would be the case, yes,

7    sir.

8      THE COURT:  What agreement between Heritage and

9    Warrantech?

10      MR. PARRISH:  The ones that are in the Foltz

11    affidavit, Harris Miller.  There's three documents.  There's

12    an administrative agreement, there's a claims handling

13    addendum and there's an amendment to the administrative

14    agreement.  And those documents, for example, the claims

15    handling addendum, and I can specifically point the Court to

16    it, says in part that Warrantech maintains a Heritage-funded

17    and controlled disbursement claim payment bank account.  And

18    that is in the Miller affidavit.  If you'll -- Beg the Court's

19    indulgence one moment.

20      THE COURT:  That's fine.  Help us plow through these

21    things; that would be good.

22      MR. PARRISH:  Yes, sir.  The claims handling addendum

23    is Exhibit D, as in Delta, to the Miller affidavit.  On page

24    two.

25      THE COURT:  Okay.

35

1        MR. PARRISH:  At the bottom, it's paragraph (i),

2   Roman numeral two.  Says Warrantech shall maintain a

3   company -- and the front page defines company as being

4   Heritage -- shall maintain a Heritage-funded controlled

5   disbursement claim payment bank account.  And these agreements

6   are just full of references to the fact that they set up these

7   accounts.  This agreement is between Heritage, Heritage hired

8   Warrantech to be its administrator of the claims.  And what

9   the affidavits and the documents say is that from day one,

10  Heritage paid Warrantech to administer these policies on its

11  behalf.

12       And actually Butler doesn't sell the policies -- that's in

13  the affidavits -- dealers do.  Butler's setup out there is

14  basically an LLC, which is authorized under South Carolina

15  State statute.  The statute gives you three ways; if you're

16  going to be the obligor on these, you either have to have

17  $100 million in net worth or stockholder equity, you have to

18  put 40 percent of the reserves into an account, or you have to

19  write reinsurances.  And Butler and Warrantech got together --

20  excuse me, Heritage and Warrantech got together and picked

21  that third option, and then Butler was formed.

22       And, Your Honor, like I say, part of this I was, you know,

23  waiting for some information to come in Saturday, I was going

24  through Warrantech's 10-Ks trying to struggle to get the facts

25  together.  So a lot of what's in that memo has been in

36

1    publicly-filed SEC accounts. So I'll admit, when I first saw
2    this, I'm like, what's going on with Butler, this is just a
3    little LLC with nothing out there. But then when you
4    understand and see the agreements between Warrantech and
5    Heritage about how they handle this, all the sudden it goes
6    from looking kind of cheesy to like, okay, these guys made a
7    business decision, Heritage and Warrantech, and they set up
8    this relationship. And they did this -- Warrantech -- excuse
9    me -- Heritage got $25 million in premiums since 2001. That's
10   in the Foltz affidavit. 25 million in premiums. So it's not
11   like they were out here getting taken care of.

12       This arrangement, they've signed these contracts, it's
13   between those two companies, and that's what the fuss is
14   about. They were all happy until the loss reserve projections
15   went upside down.

16       So when Heritage says it never paid a claim, there's a
17   little bit of truth and not truth to that. It came out of
18   their reserve fund account that was administered on it by
19   Warrantech, and this is what's in the affidavit, but they
20   never had to maybe fund money in, because all the premiums
21   were coming in to cover it. But all the sudden between
22   Heritage and Warrantech and their actuaries, they didn't put
23   enough money into the reserve account, and now all of a sudden
24   the numbers have gone upside down. But what is crystal clear
25   in here is Butler never paid out of here on that.

37

1    And I can take you through, I've got these documents

2    highlighted, and it's -- that arrangement is set forth in the

3    administrative agreement, the claims handling agreement that's

4    attached to it, and this is between Warrantech and these guys,

5    and in the addendum to the agreement, it all talks about

6    Warrantech and Heritage.

7    And both Warrantech and Butler affidavit, and I've got

8    Mr. Miller who is with the company, Butler, he's now retired

9    as a consultant, his affidavit and Warrantech's affidavit both

10   say Butler never paid any money out of these policies.  Just

11   how it wasn't set up that way.

12   So I -- frankly, I was a little worried when I first saw

13   this, there was something a little below board going on, but

14   when I see this stuff that's put out in 10-K filings that

15   Google showed up, this arrangement makes sense.  But like I

16   say, it doesn't make sense if you don't look at what's going

17   on between Warrantech and Heritage.  If you take that third

18   leg out of here, this whole thing looks wrong and it doesn't

19   make sense.  But when you bring that third leg of the triangle

20   into it, it's clear what was happening here.  Butler was the

21   little kind of do nothing company sitting here, and our South

22   Carolina statute allowed it, given the reinsurance and the

23   insurance arrangements.

24        THE COURT:  Okay.

25        MR. SEIBELS:  Paragraph 20 of Jeanine Foltz's

38

1    affidavit says exactly the opposite of what he just said.  It

2    says that Butler's contract consideration was received by

3    Warrantech and deposited in the loss reserve fund.  Harris

4    Miller says, I don't know what was going on, so don't read his

5    affidavit for what happened.

6              THE COURT:  Let me see the policy you just said that

7    they're selling -- they've already sold ten or 12 this

8    morning?

9              MR. SEIBELS:  Yes, sir.

10             MR. PARRISH:  Your Honor, I don't --

11             MR. SEIBELS:  It's attached as an exhibit to the

12   complaint, too.

13             MR. PARRISH:  I don't know if they're selling them

14   today or not, but if they are, my assumption is, like I say,

15   this isn't in the record, is they are reinsured under a

16   different company now that Heritage has disappeared.  So I

17   don't know if that's the case or not, but there's nothing in

18   the record, and I could ask Mr. Miller to find out, if you

19   need me to.  And --

20             MR. TANNEN:  Your Honor, this is Michael Tannen --

21             MR. PARRISH:  I've warned Mr. Tannen that he's not

22   admitted pro hac, and I don't want to stretch the Court's

23   patience.

24             THE COURT:  He has a First Amendment right.

25             MR. SEIBELS:  May I approach, Your Honor?

1        THE COURT:  Sure.

2        MR. SEIBELS:  And, David, I'm handing the judge the

3    10-K as well, that I provided already.  And it's -- I know

4    it's highlighted exactly as David's is highlighted.  And

5    here's the document, if I may, Butler financial exclusion is

6    identified in there at the bottom of the page.

7        THE COURT:  Thank.

8        MR. PARRISH:  Your Honor, may I just address one

9    thing that was stated awhile ago?  I feel a need to respond to

10    it.  The reference to Mrs. Foltz's affidavit paragraph 20 --

11    she's Warrantech -- says after the agreement with Heritage was

12    entered into, Warrantech administered the VSCs, about

13    Warrantech putting the money in.  The reference was made to

14    Butler funding those.  That's not what the paragraph says.

15    And you go on over to 23 on in her affidavit, and I'm just

16    paraphrasing because these are long paragraphs, but it goes on

17    in 23 through 27 in her affidavit it says Butler had no role

18    in this, that it was all done between Heritage and Warrantech.

19    That Butler -- excuse me -- Heritage never requested or

20    required Butler to show ability to pay.  It never asked Butler

21    to pay.  Once again, it goes back to the fact that Warrantech

22    and Heritage, from 2001 to 2006, would take this money -- in

23    fact, her affidavit says that it went into Heritage's account.

24    In fact, in paragraph -- that Warrantech administered pursuant

25    to account, and that Heritage had control over this situation,

1   that Butler's never been involved in this role.  And the only

2   time that Butler's name came up on the radar scope is when

3   Heritage realized that uh-oh, the loss reserve funds are going

4   upside down.  So that's been the course of dealing between

5   these parties as set forth in our affidavit.  And the

6   statement -- it's not in there that it says Butler has been

7   paying these, it says Warrantech and Heritage.  That's what's

8   in the affidavit before the Court right now.

9           MR. SEIBELS:  I just want to reiterate that the

10  reason why Butler wasn't involved is they chose to contract it

11  to somebody else.  It doesn't make it not their obligation, if

12  they have someone else do their work.

13      I wanted to add one more thing; that throughout every one

14  of these agreements, it says to the extent this agreement

15  conflicts with the insurance policy, the insurance policy

16  controls.  That's a critical point I failed to make.

17          THE COURT:  Of course, in my 17 years on the bench,

18  every time somebody's argued a preliminary injunction motion,

19  the lawyer who is asking for the injunction, has never

20  addressed the fourth issue or the fifth issue, which is the

21  bond.

22          MR. SEIBELS:  I'd be happy to address that; I

23  expected them to brief it.  Only they can tell you what type

24  of money would protect them.  I'm not able to say.  I know

25  we've got -- we're in it for over 220,000 so far.  I would --

41

1   maybe when they spend 220,000, a bond would be appropriate

2   going forward.   Then their skin would be equal to our skin at

3   that point.   But I'm happy to address it, if they would give

4   me something to address.   And I realize I've turned upside

5   down what you said, but I don't know that the moving party is

6   in a position to tell you what bond would protect the

7   nonmoving party.

8           THE COURT:   The moving party would say it ought to be

9   $500, okay?

10          MR. SEIBELS:   Well, I'm sure I could say that, but I

11  know we're in it for 220, and they're in it for nothing, so

12  I'd like to see them in it for 220 before we had to post a

13  bond.

14          THE COURT:   Okay.   What's your idea?

15          MR. PARRISH:   Your Honor, I do not have enough

16  information today to present that to the Court.   These

17  documents are in the control and possession mostly of

18  Warrantech and Heritage.   I do know there are 250,000 policies

19  out there in Mrs. Foltz affidavit, and Mr. Miller submitted an

20  affidavit to the Court that says Butler does not have the

21  financial ability to pay those claims.   And once again --

22          THE COURT:   Of course, what does that mean?   They

23  don't have the financial ability to pay one claim or they

24  don't have the financial ability to pay 250,000 claims?

25          MR. PARRISH:   Your Honor, my understanding is the

1   funds remaining in the bank account are $200,000.  That's all

2   that's left in this company.  You saw in the 10-K filings that

3   Reliance Insurance went under.  And right now when they sell

4   certain policies, a portion of those go in just to fund claims

5   due under the old Reliance-insured policies.  That's where the

6   books, if you -- like I say, the 10-Ks, Warrantech's 10-Ks

7   explain this.  Butler's an LLC.  Warrantech puts this out in

8   the 2003, '4, '5 and '6 SEC filings explained the fact why the

9   SEC made Warrantech account for some of Butler's income on its

10  books, because Warrantech had to loan Butler $10 million to

11  cover the failed Reliance.

12      And once again I'm struck by the fact that -- somewhat

13  stunned that there's an insurance company that insured these

14  claims, and they're about to push Butler into bankruptcy, but

15  the insurance company's claiming it cannot afford to pay the

16  claims that it insured, is what we're looking at here today.

17  It has rights of subrogation and indemnification.  And, in

18  fact, in the last document, tab three, that was submitted to

19  you late on Wednesday, Heritage filed a counterclaim against

20  Warrantech in Illinois Federal District Court seeking that

21  Warrantech be required to fund and pay these claims and

22  eliminate that obligation.  So once again, this whole

23  situation stems between Warrantech and Heritage.  Butler was

24  never involved in this deal.  And they are the ones trying to

25  change this status quo between the parties, which is based on

43

1    both the affidavits and the written agreements.  These claims

2    handling agreements, administrative agreements and the

3    addendum aren't between Butler and Heritage, they're between

4    Heritage and Warrantech, and they talk about how you handle

5    the policies under which Butler is the obligor.

6        But to answer your question, I don't have enough

7    information, Mr. Miller doesn't have enough information.  We

8    have to get with Warrantech, which has been somewhat -- I

9    won't say difficult, but it hasn't been the easiest thing in

10   the world to do, and calculate that.  And that is something

11   that would take time and probably take actuarials.  Heritage

12   is the one that projected the loss reserves exceeding the

13   amount.  That's clearly what triggered its position in this

14   case.  They have that information better in front them than I

15   do right now.

16        THE COURT:  All right.  And tell me what's going on

17   in Illinois.

18        MR. PARRISH:  Your Honor, would you like me --

19        MR. SEIBELS:  Our counterclaim does not say

20   Warrantech has to pay these claims.  It doesn't say that.

21        THE COURT:  You misunderstood my question.  I don't

22   care what your counterclaim says.

23        MR. PARRISH:  I'm sorry.

24        THE COURT:  What is going on in Illinois?

25        MR. PARRISH:  In April of this year Warrantech sued

44

1   Heritage in Illinois Federal District Court, after Heritage

2   sent a letter saying we're no longer insuring the Butler

3   claims.

4         THE COURT:  Actually they sued them in State Court,

5   and it got removed.

6         MR. PARRISH:  It got removed into Federal Court, yes.

7   It's pending in the Federal Court.  Heritage got a delayed

8   answer and ran down here and filed this action against Butler.

9   So Warrantech versus Heritage and Butler versus -- Heritage

10   versus Butler down here.  Mr. Tannen was retained by Butler to

11   file an intervention motion in the Illinois Federal District

12   Court, which was heard by the judge preliminarily, about two

13   weeks ago.  And the judge gave Heritage time to brief that

14   issue.  I think --

15         THE COURT:  Now, Butler intervened in the lawsuit as

16   a what?

17         MR. PARRISH:  Third-party intervener in the case.

18         MR. SEIBELS:  As a plaintiff.  They want to sue us

19   there.  Apparently not here.

20         MR. PARRISH:  Like I said, Mr. Tannen, part of the

21   reason he's here, if there's a question of the Court, I can

22   get that from him.  I do know that there's -- what was

23   submitted by Heritage to you in this case doesn't reflect that

24   what Heritage submitted to the judge in Illinois, trying to

25   stay out of that, try not to let Butler in, there's a

1    representation that Mr. Tannen has it, that this issue will be

2    resolved in front of you in four or five months, and,

3    therefore, there's no reason Butler should be allowed to

4    intervene in that pending Illinois action.

5        And the bottom line is I hope that if nothing else is

6    clear here today, that Warrantech is a key missing piece of

7    this puzzle.  And between the two forums, it needs to be, all

8    three of these need to be at the same place.  And the only

9    reason there may be an issue for them trying to sue Warrantech

10   down here is there's a venue provision in the arbitration

11   clause between Heritage and Warrantech up there, so they may

12   have trouble bringing Warrantech into this proceeding.  That's

13   why I suggested that it makes sense to the prior pending

14   action, this all flows out of the administrative agreements

15   between Heritage and Warrantech that are pending up in front

16   of the Senior District Judge up in Illinois Federal District

17   Court.

18             THE COURT:  Where?  Chicago?

19             MR. TANNEN:  May I speak?

20             THE COURT:  Yeah, sure.

21             MR. TANNEN:  The action's currently pending in the

22   Federal District Court for the Northern District of Illinois

23   in front Judge George Marovich.  In order to expedite things,

24   Judge Marovich suggested that we submit the matter to the

25   magistrate judge, which we immediately agreed to.  We've not

46

1   yet heard from Heritage in that regard.   Heritage filed their

2   third-party complaint and a counterclaim just recently against

3   Warrantech where they allege, among other things, breach of

4   contract.   And specifically they say, as a result of

5   Warrantech's failures, including but not limited to failing to

6   properly price a Warrantech program, failing to institute

7   price increases as necessary, failing to safeguard the premium

8   dollars and failing to properly administer and adjudicate the

9   VSCs, the reserve set aside to pay valid VSC claims are not

10   sufficient to pay such claims.

11        And my point, Your Honor, is everyone's teed up in

12   Illinois to address those issues, and Warrantech's attempts to

13   proceed in two forums doesn't make sense to us.   Their

14   counterclaim against Warrantech claims that their conduct is

15   causing the exact same damage that they're alleging down here

16   against Butler.

17             MR. SEIBELS:   That's --

18             MR. TANNEN:   Your Honor, maybe I'm overstating what's

19   going on, but I just wanted to tell you that Judge Marovich

20   said he'd be ruling on the intervention motion as soon as the

21   briefs are filed.   My reply is due on Tuesday or Wednesday of

22   next week.

23             THE COURT:   Great.

24             MR. SEIBELS:   The issue before you is much much

25   simpler than they make it out to be.   It's a coverage

1   question, and who pays in the first 60 days between now and

2   trial.

3            THE COURT:  Same thing in Illinois, who pays.

4            MR. SEIBELS:  Your Honor, I respectfully disagree.

5   The issue in Illinois --

6            THE COURT:  It's always about money, Mr. Seibels.  No

7   matter what, it's always who pays.

8            MR. SEIBELS:  I can assure you that it's impossible

9   for Judge Marovich to decide the issue that's before you.

10           THE COURT:  Okay.

11           MR. SEIBELS:  Butler's not in the case, Heritage sued

12   us --

13           THE COURT:  But Butler is going to be in the case.

14           MR. SEIBELS:  Perhaps.  Heritage -- Warrantech sued

15   us in Illinois.  We counterclaimed in Illinois, because we

16   think they mismanaged their duties, and that has cost us

17   money.  The question of mismanaged -- of policy coverage is

18   not going to even be before the judge up there.  In other

19   words, what we're asking you to decide is whether from June to

20   the end of time, what's these parties' relationships here

21   before you.  And what is before the magistrate -- before Judge

22   Marovich, is who harmed who from '01 to '07.

23           MR. TANNEN:  Judge, if I may, the action that

24   Warrantech originally filed against Heritage, which was

25   removed to District Court in May of 2007, contains a count two

1    for declaratory judgment, which Heritage has finally answered

2    after getting 90 days of extensions.  Warrantech is seeking a

3    declaration by the Court in Illinois, that Heritage has an

4    immediate obligation to pay or fund the payment of valid

5    claims submitted by VSC holders, and an immediate obligation

6    to reimburse all valid previously submitted VSC claims.

7    That's the nub of the action that's going on in Illinois, to

8    which Butler is seeking to intervene.  And Heritage is

9    opposing that, saying everything's being handled here.

10           MR. SEIBELS:  That cause of action is subject to a

11   motion to dismiss, because Warrantech has no standing to

12   assert policyholder rights, they're not a policyholder,

13   they're an administrator, and they can't -- if Butler feels

14   differently, they can bring a counterclaim here.

15           THE COURT:  A corporate ménage à trois ought to be in

16   one place.  Whether it's here, there, I'm not going to decide

17   right now, but it's going to be in one place.

18           MR. SEIBELS:  As I've put in my submission on the

19   issue that's not before you, we're happy if Warrantech wants

20   to be here.  There's big venue reasons to be here.  If

21   Warrantech wants to intervene or if you decide a Rule 19 --

22           THE COURT:  I don't even know whether I have

23   jurisdiction over Warrantech.

24           MR. SEIBELS:  I don't know either.

25           THE COURT:  But there is jurisdiction over you in

1    Illinois; we already know that.

2            MR. SEIBELS:  I couldn't tell you one way --

3            THE COURT:  You've answered in the complaint, so --

4            MR. SEIBELS:  My client says yes.  I couldn't -- I

5    just don't know.

6            THE COURT:  All right.  We'll go to step one, then

7    we'll go to step two about where it's going to be, okay?

8            MR. SEIBELS:  Okay.

9            THE COURT:  Thank you very much.

10            MR. PARRISH:  Your Honor, I just want to reiterate,

11    it may have had the effect, but I promise you there was not an

12    intent to sandbag.  I've been trying to herd squirrels here

13    for about two weeks, and -- maybe poorly.

14            MR. SEIBELS:  I put on the record I don't think his

15    intention was to sandbag me.

16            THE COURT:  I'm sure that's true.  Poor choice of

17    words.  All right.

18            MR. TANNEN:  Thank you, Your Honor, for allowing me

19    to speak.

20            THE COURT:  No problem.  Glad to see y'all.

21            MR. PARRISH:  Just for your -- I think right now you

22    have in front of you, we did a motion, which included the

23    discussion, it wasn't just a preliminary motion to dismiss or

24    a transfer this case to Illinois.  That --

25            THE COURT:  You mean the five-page motion that didn't

50

1    cite any cases?

2         MR. PARRISH:  Yes, sir.  I don't know if you would

3    like more supplemental briefing.  The affidavits submitted in

4    this case and memos in this case make it pretty clear what the

5    situation is.

6         THE COURT:  We'll take it one step at a time.  We'll

7    figure out this one first, then if we need something else,

8    we'll let you know.

9         MR. PARRISH:  Thank you, and again, my apologies.

10        THE COURT:  That's no problem.

11

12    (Court adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

<u>REPORTER'S CERTIFICATION</u>

        I, Debra L. Potocki, RMR, RDR, CRR, Official Court
Reporter for the United States District Court for the District
of South Carolina, hereby certify that the foregoing is a true
and correct transcript of the stenographically recorded above
proceedings.

_____
Debra L. Potocki, RMR, RDR, CRR

# EXHIBIT 8

# DYER & BERENS LLP

**682 Grant Street**
**Denver, Colorado  80203**
**Telephone:  303.861.1764**
**Facsimile:  303.395.0393**
**www.DyerBerens.com**

---

## FIRM BIOGRAPHY

The law firm of Dyer & Berens LLP ("Dyer Berens") focuses on representing groups of aggrieved investors, employees, and victims of corporate misconduct nationwide. We are committed to providing our clients with superior personal attention and service, and seek to represent all clients with the highest level of skill, competence, and dedication.

Dyer Berens is located in the Mile-High City of Denver, Colorado.  The majestic Rocky Mountains to the west of our city, with their timeless strength and stability, inspire the firm's guiding tenet, "Justice For All," and symbolize our unwavering commitment to achieving that goal.  We firmly believe that "justice" begins with access to the courthouse "for all" persons, not just for corporations with the seemingly unlimited resources to intimidate and overwhelm those who dare challenge their conduct.

With a proven combination of experience, talent, and perseverance, we have recovered hundreds of millions of dollars for shareholders, employees and consumers. Over the last thirty years, our attorneys have litigated scores of cases, tackled novel legal issues, helped establish new law, and achieved significant class-wide recoveries.  Courts throughout the country have recognized our expertise, time and time again, and have appointed our attorneys as lead or co-lead counsel in dozens of class action cases, including, *Rasner v. FirstWorld Communications, Inc.; Croker v. Carrier Access Corporation; In re Nissan/Infiniti Odometer Cases; Angres v. Smallworldwide, PLC; In re Ultimate Electronics, Inc. Securities Litigation; In re Secure Computing Securities Litigation; Kerns v. SpectraLink Corporation; Queen Uno Ltd. v. Coeur d'Alene Mines Corporation; Garza v. J.D. Edwards & Company; Toothman v. One-Stop Wireless of America, Inc.; In re GeoPharma Securities Litigation; In re Axonyx Securities Litigation; Gregg v. Sport-Haley, Inc.; In re Tele-Communications, Inc. Securities Litigation;* and *Muhr v. Transcrypt International, Inc.*

We are proud of our hard-earned reputation and our long track-record of achieving outstanding results.

*FIRM ATTORNEYS*

## ROBERT J. DYER III

Mr. Dyer, the firm's managing partner, has prosecuted state and federal class action lawsuits for more than thirty years, focusing on shareholder and consumer class action litigation. He has broad trial experience in various state and federal courts, having tried more than twenty-five cases to a jury and more than fifty cases to the court. Mr. Dyer tried and won one of the first class actions ever tried to verdict in the state of Colorado. Additionally, Mr. Dyer has successfully argued numerous appeals to the Colorado Court of Appeals, Supreme Court of Colorado, and the Tenth Circuit U.S. Court of Appeals.

During the course of his career, Mr. Dyer has participated in more than fifty securities and consumer class action lawsuits as lead or class counsel. As a result, Mr. Dyer has been responsible for the recovery of hundreds of millions of dollars for the benefit of aggrieved shareholders and consumers. Some of Mr. Dyer's notable cases include successful litigation against Qwest Communications, Inc., FirstWorld Communications Inc., Samsonite Corporation, J.D. Edwards & Company, Tele-Communications, Inc. (TCI), ICG Communications, Inc., Coeur d'Alene Mines Corporation, One Stop Wireless of America, Inc., Storage Technology Corporation, King Resources Company, Oceanic Exploration, Inc., McCulloch Oil Company, Colorado Western Development Company, Mountain States Telephone and Telegraph Co., and Vicorp Restaurants, Inc.

Before starting the firm, Mr. Dyer attended Oberlin College where he received his undergraduate degree in 1967. Following service in the United States Army as a 1st Lieutenant during the Vietnam conflict, Mr. Dyer attended the University of Michigan Law School, from which he graduated *cum laude* in 1973. During law school, Mr. Dyer served on the staff of and wrote for the University of Michigan Law School publication, *Prospectus: A Journal of Law Reform*. Following law school, Mr. Dyer clerked for a year with the New Mexico Supreme Court.

Mr. Dyer was admitted to the state bar of New Mexico in 1973 and the state bar of Colorado in 1974. He is also admitted to practice before the United States District Court for the District of Colorado, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. He has been admitted *pro hac vice* in a number of other states. Mr. Dyer is AV Rated among his peers, which recognizes his knowledge and skill derived from extensive experience (ranking him at the highest level of professional excellence) according to Martindale-Hubbell and is a member of the National Association of Shareholder & Consumer Attorneys (NASCAT).

## JEFFREY A. BERENS

Mr. Berens, a founding partner of Dyer & Berens LLP, has prosecuted state and federal class action lawsuits for more than a decade, focusing his practice on shareholder, consumer and employment class action litigation. Mr. Berens heads the firm's case evaluation team which is responsible for the monitoring and investigation of possible securities and consumer law violations.

Over the last eleven years, Mr. Berens has had primary responsibility for litigating class action lawsuits against FirstWorld Communications, Inc., Carrier Access Corporation, ICG Communications, Inc., One-Stop Wireless of America, Inc., Tuesday Morning, Inc., Transcrypt International, Inc., and Sport-Haley, Inc., among many others. In 2002, he successfully argued to the Colorado Court of Appeals that the district court had erred in failing to allow thousands of victims of a nationwide boiler room fraud to band together and prosecute their claims in a single class action. The Court of Appeals' opinion in *Toothman v. Freeborn & Peters*, 80 P.2d 804 (Colo. Ct. App. 2002) established new law, making it more difficult for dishonest promoters to evade the reach of the securities laws. Mr. Berens later won entry of a $75.3 million summary judgment against the alleged ringleader of the scheme. Other significant highlights include class-wide recoveries in securities litigation involving Newmont Mining Corporation, Qwest Communications, Tele-Communications, Inc. (TCI), Quovadx, Inc., and Einstein Noah Bagel Corp.

Mr. Berens attended Marquette University Law School, from which he graduated *cum laude* in 1996. While at Marquette, he served as a judicial extern to the Honorable John L. Coffey of the United States Court of Appeals for the Seventh Circuit, and was a member of the Marquette University Law Review. Mr. Berens received his undergraduate degree in business and accounting from the University of Wisconsin-Milwaukee in 1990. Thereafter, he was employed as a corporate accountant for two years, during which time he passed the Certified Public Accountant examination.

Mr. Berens was admitted to the state bar of Wisconsin in 1996 and the state bar of Colorado in 1997. He is also admitted to practice before the United States District Courts for Colorado and the Eastern District of Wisconsin, the Tenth Circuit Court of Appeals, and has been admitted to practice, on a case by case basis, in various state and federal jurisdictions throughout the country. Mr. Berens is the author of *Pleading Scienter Under The Private Securities Litigation Reform Act of 1995*, which was published in *The Colorado Lawyer* in February 2002. Mr. Berens is a member of the Colorado Bar Association and the National Association of Shareholder & Consumer Attorneys (NASCAT).

## DARBY K. KENNEDY

Darby K. Kennedy, an associate of the firm, has more than five years of complex civil litigation experience practicing in state and federal courts. Ms. Kennedy is an integral part of the firm's successful class action practice, focusing on securities fraud and consumer protection litigation. Her strong attention to detail has proven particularly valuable in the firm's many cases involving complex and novel legal issues. Ms. Kennedy was an active member on the teams responsible for favorably prosecuting cases against Ultimate Electronics, Inc., SpectraLink Corporation, and ICG Communications.

Before joining the firm, Ms. Kennedy attended the University of Denver College of Law, from which she graduated in 2002. During her time there, she served as a general editor for the *Denver University Law Review* and was a student member of the American Bar Association. Ms. Kennedy earned several honors and scholastic excellence awards for her legal research and writing abilities. Her *Survey Comment: Recent Developments In Tax Law In The Tenth Circuit* was published in the Review's Twenty-Eighth Annual Tenth Circuit Survey issue for September 2001-August 2002. Prior to law school, Ms. Kennedy attended the University of Arizona on a four-year academic scholarship. While at the U of A, Ms. Kennedy was on the Dean's Honor List, a member of Phi Eta Sigma, and published in the University's *1992-1993 A Student's Guide To Freshman Composition*. In 1995, Ms. Kennedy graduated *cum laude* with a Bachelor of Science in Business Administration.

Ms. Kennedy was admitted to the state bar of Colorado in 2002. She is also admitted to practice before the United States District Court for the District of Colorado and the Tenth Circuit Court of Appeals. Ms. Kennedy is a member of the Colorado Bar Association and the Denver Bar Association.

## CLASS RECOVERIES

Over the past thirty years, our attorneys have had exceptional success in prosecuting shareholder, consumer and employment class actions. Below is a small sampling of some of our more notable cases.

- *In re Qwest Comm'ns Int'l Sec. Litig.*, Case No. 01-cv-1451-REB-CBS (D. Colo.) ($400 million recovered)

- *In re Storage Tech. Sec. Litig.*, Case No. 92-B-750 (D. Colo.) ($55 million recovered)

- *Brody v. Hellman*, Case No. 00CV4142 (Colo.) ($50 million recovered)

- *In re Tele-Communications, Inc. Sec. Litig.*, Case No. 97CV421 (Colo.) ($26.5 million recovered)

- *Rasner v. FirstWorld Comm'ns Inc.*, Case No. 00-K-1376 (D. Colo.) ($25.925 million recovered)

- *Muhr v. Transcrypt Int'l, Inc.*, Case No. CI98-333 (Neb.) (approximately $25 million recovered)

- *Knudson v. Samsonite Corp.*, Case No. 98CV2210 (Colo.) ($24 million recovered)

- *In re ICG Comm'ns Sec. Litig.*, Case No. 00-cv-1864-REB-BNB (D. Colo.) ($18 million recovered)

- *UFCW Local 880 v. Newmont Mining Corp.*, Case No. 05-cv-1046-MSK-BNB (D. Colo.) ($15 million recovered)

- *Toothman v. One Stop Wireless of America, Inc.*, Case No. 98CV931 (Colo.) (approximately $11 million recovered)

- *In re Secure Computing Corp. Sec. Litig.*, Case No. C-99-1927 (N.D. Cal.) ($10.1 million recovered)

- *Angres v. Smallworldwide PLC*, Case No. 99-K-1254 (D. Colo.) ($9.85 million recovered)

- *Croker v. Carrier Access Corp.*, Case No. 05-cv-1011-LTB-OES (D. Colo.) ($7.4 million recovered)

# EXHIBIT 9

# SHEPHERD, FINKELMAN, MILLER & SHAH, LLP

*www.sfmslaw.com*

———————— ■ ————————

CONNECTICUT

FLORIDA

NEW JERSEY

PENNSYLVANIA

WISCONSIN

CALIFORNIA

## SUMMARY OF FIRM QUALIFICATIONS

The Law Firm of Shepherd, Finkelman, Miller & Shah, LLP ("SFMS" or "Firm") concentrates its practice in the areas of complex commercial litigation with a particular emphasis on consumer protection, securities and investment fraud, antitrust, contract, healthcare fraud, ERISA and employment class actions, as well as False Claim Act litigation. The Firm represents the State of Connecticut, privately held corporations, healthcare providers, institutional investors, including pension, health and welfare funds, and private individuals in complex litigation and related matters throughout the United States. The vast majority of the Firm's cases are handled on a contingent fee basis.

As reflected in the accompanying biographical histories, the lawyers at SFMS are accomplished and diverse with years of experience in complex commercial litigation. The Firm's attorneys all are alumni of larger law firms who have chosen the flexible, informal and cooperative atmosphere of a smaller firm while continuing to pursue a sophisticated and challenging practice nationally and, at times, internationally, on behalf of the Firm's clients. In light of the nature of the Firm's practice and in recognition of the skill, professionalism and hard work of the Firm's attorneys, SFMS and its attorneys have served as court-appointed lead counsel and class counsel in state and federal courts throughout the United States. In the cases in which SFMS has served as lead counsel, the Firm has been recognized for the quality of the representation it provides to its clients and for the excellent results that it has achieved.

65 MAIN STREET
CHESTER, CT  06412
860/526-1100
FAX  860/526-1120

1640 TOWN CENTER CIRCLE, SUITE 216
WESTON, FL 33326
954/943-9191
FAX 954/943-917335

111 E. WISCONSIN AVENUE, SUITE 1750
MILWAUKEE, WI 53202
414/226-9900
FAX 414/226-9905

475 WHITE HORSE PIKE
COLLINGSWOOD, NJ 08107
856/858-1770
FAX 856/858-7012

35 E. STATE STREET
MEDIA, PA 19063
610/891-9880
FAX 610/891-9883

401 WEST "A" STREET, SUITE 2350
SAN DIEGO, CA 92101
619/235-2416
F AX 619/234-7334

## SFMS' PRIMARY AREAS OF PRACTICE

Although SFMS does not maintain formal departments, the Firm's attorneys generally devote their time and efforts to the following practice areas:

## Securities Fraud and Breaches of Fiduciary Duty

The Firm is actively involved in the litigation of individual and class action cases alleging securities fraud, breach of fiduciary duty, and shareholder derivative claims, on behalf of shareholders, health and welfare and pension funds, and professional investors.  The Firm has played a substantial role in a number of these cases, including the following cases: *In re aai Pharma Derivative* Litigation (U.S.D.C., E.D.N.C.); *In re Adelphia Securities Litigation* (U.S.D.C., E.D.PA.); *In re AFC Enterprises Securities Litigation* (U.S.D.C., N.D.GA.); *Reardon v. Ameripath, Inc.* (Cir.Ct., Palm Beach Cty., FL); *D'Andrea v. CIGNA Securities, Inc.* (Sup. Ct., Camden Cty., N.J.); *Simons v. EMCOR Group, Inc.* (U.S.D.C., D.Conn.); *Smith v. Interstate Bakeries Corp.* (U.S.D.C., W.D.Mo.); *Burnetti v. Maxxim Medical,* (Cir.Ct., Pinellas Cty., FL.); *In re McKesson HBOC, Inc. Securities Litigation* (U.S.D.C., N.D.CA.); *In re Mercator Software Derivative Litigation* (Conn.Super); *In re Star Gas Securities Litigation* (D.Conn.); *In re SupportSoft Derivative Litigation* (Calif. Super.).  The Firm also is currently representing Kornitzer Capital Management, Inc., which has been appointed as the lead plaintiff in *In re Faro Technologies Securities Litigation* (M.D.Fla.), and the International Brotherhood of Teamsters in *In re Coca-Cola Enterprises Derivative Litigation* (Del. Ch.).  In addition, SFMS regularly represents existing institutional and individual clients in significant proceedings before the National Association of Securities Dealers ("NASD")and the New York Stock Exchange ("NYSE") regarding securities fraud and unsuitable investments.

## Consumer Protection Claims

The Firm is actively involved in the prosecution of numerous consumer protection cases nationwide, in both state and federal courts. The Firm and its attorneys have had a leadership role representing consumers in many of these class action cases, including, for example: *Annelli v. Ford Motor Co.* (Conn. Super., New London, J.D.)(secret warranty class action on behalf of Crown Victoria, Grand Marquis and Lincoln Town Car owners and lessees); *Cuellar and McVicker v. Ford Motor Co.* (Milwaukee County Cir. Ct.)(secret warranty class action on behalf of Crown Victoria, Grand Marquis and Lincoln Town Car owners and lessees); *Shorewest Realtors, Inc. v. Journal Sentinel, Inc.* (Milwaukee County Cir. Ct., WI)(overstatement of circulation class action on behalf of newspaper advertisers); *LaRaia  v. Rexall Sundown* (Cir. Ct., Palm Beach Cty., FL)(marketing and sale of dietary supplements); *Hurkes Harris Design Associates, Inc. v. Fujitsu Computer Products of America, Inc.* (Sup. Ct., Santa Clara Cty., CA)(computer hard drives); *Cress v. Independence Blue Cross* (U.S.D.C., E.D. PA) (health plan subscribers recover 99% of their losses); *Doh v. Sears, Roebuck & Co.* (Cir. Ct., Cook Cty., IL)(carpet cleaning service); *Stoddard v. Advanta National Bank* (Sup. Ct., New Castle Cty., DE)(credit card interest rates); *In re American Family Publishers Business Practices Litigation* (U.S.D.C., D. N.J.) (sweepstakes fraud); *Ferguson v. Columbia/HCA* (Cir. Ct., Washington Cty.,

-1-

TN) (hospital charges); *In re:Providian Financial Corp. Credit Card Terms Litigation* (U.S.D.C., E.D. PA) (credit card practices); *Chavers v. Fleet, (RI) N.A.* (Sup. Ct., R.I.) (credit card practices); *Perod v. McKenzie Check Advance* (U.S.D.C., E.D. PA)(payday loans); *Morris v. Odimo.com* (Cir. Ct., Broward Cty., FL)(grey market watch sales); *Fanelli v. Wal-Mart Stores, Inc.* (Sup. Ct., Gloucester Cty., N.J.)(grey market watch sales); *Vega v. B.J.'s Wholesale Club, Inc.*, (C.C.P. Phila., PA)(grey market watch sales); *Troilo v. Oriental Trading Company*, (Dist. Ct., Douglas Cty, NE)(catalog company charges). The Firm also currently represents the State of Connecticut in four separate lawsuits pending in the Superior Court of Connecticut against pharmaceutical companies arising under the Connecticut Unfair Trade Practices Act ("CUTPA") alleging the manipulation of the average wholesale price ("AWP") of certain prescription drugs.

## Employee and Civil Rights

The Firm also specializes in employment and labor litigation on behalf of individuals and employers. Firm attorneys have worked on a diverse variety of employment cases, including cases involving race, gender and age discrimination, ERISA, breach of contract claims, and wage/hour claims. The Firm and its attorneys were Co-Lead Counsel in *Marks v. ACCU Personnel, Inc. et al.* (Sup. Ct., Camden Cty., N.J.), a successful employment discrimination action against a large temporary placement agency which was alleged to place minority employees in lower paying positions than Caucasian employees. The Firm was Lead Counsel in *Russell v. Howell* (U.S.D.C., E.D. TN), achieving a multi-million dollar ERISA recovery for class members where the price of their ESOP stock was alleged to have been driven down improperly by company management, and is Co-Lead Counsel in *Levine v. United Healthcare Corporation* (U.S.D.C., D.N.J.), in which insurance companies are alleged to have violated ERISA duties in the collection of subrogation liens.

The Firm represents a number of highly-compensated individuals in defamation and employment-based claims in proceedings before the NASD, NYSE and in state and federal courts throughout the United States. In these proceedings, attorneys in the Firm have recovered many millions of dollars for its clients. Finally, the Firm serves as national labor counsel for several select employers.

## False Claims

The Firm currently is handling a number of *qui tam* actions under the United States False Claims Act, particularly in health care related areas. Many of these cases, including several very large prosecutions, are "under seal" and therefore cannot be disclosed. Recent successfully concluded False Claims Act cases include *U.S. ex rel. Hutcherson v. Medshares, Inc.* (U.S.D.C., E.D.VA) (multi-million dollar settlement for over charges to Medicare against home healthcare provider)*; U.S. ex rel. Brouder v. Polaroid Corp.* (U.S.D.C., D. Mass.) (multi-million dollar settlement for overcharges to federal government in sale of film); and *U.S. ex rel. Brookhart v. Integrated Health Services, Inc.* (U.S.D.C., S.D. Iowa) (overcharges to Medicare in the sale and leasing of durable medical equipment).

## Antitrust

We have addressed substantive antitrust and unfair trade issues relating to, among others, horizontal price agreements, market allocations, concerted refusals to deal, purchasing and selling arrangements, monopolization, covenants not to compete, price-fixing and tying arrangements. Our attorneys have represented corporations and individuals in antitrust cases involving local and regional markets in the United States. The Firm's attorneys have particular experience representing businesses in actions alleging price discrimination under the Robinson-Patman Act, including successful trials to jury verdict.

The Firm has served in leadership and other roles in the litigation of a number of plaintiffs' class action antitrust cases, most recently including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* (E.D.N.Y.)(monopolistic practices); *In re Dynamic Random Access Memory Antitrust Litigation* (N.D.Cal.)(price fixing); *Chicon v. Intel Corporation* (D.Del.)(monopolistic practices); *Vaughn v. 3M Company* (Cir. Ct., Palm Beach Cty., FL)(monopolistic practices in adhesive tape market); *Luppino v. Visa U.S.A., Inc.* (Cir. Ct., Palm Beach Cty., FL)(monopolistic practices in credit card market) and *In re Compact Disk Antitrust Litigation* (U.S.D.C., C.D. Ca.)(price fixing).

## Insurance Practices

The Firm currently is handling numerous actions against insurance companies concerning marketing practices, settlement and payment practices, and calculation of benefits. The Firm has a substantial role in a number of these cases, including the following cases: *Lerose v. Stewart Title, Inc.* (Cir. Ct., Jackson Cty., MO) (Lead Counsel) (title insurance charges); *Blass v. Fidelity National Title Insurance Company* (Sup. Ct. Gloucester Cty., N.J.) (Lead Counsel) (title insurance charges); *Penn v. Liberty Mutual Insurance Group, et al.*(Sup. Ct., Essex Cty., N.J.) (Lead Counsel) (automobile insurance loss adjustment practices); *In Re Nepomuceno and Related Cases v. Knights of Columbus* (U.S.D.C., N.D. IL) (vanishing premium insurance policies); *Rudin v. Monumental Life Insurance Co.*(Cir. Ct., Kenton Cty., KY) (failure to honor burial insurance policies); *Lane v. Chicago Title Corporation* (Cir. Ct., Cook Cty., IL) (title insurance charges).

## Corporate Contingent Fee Litigation

Increasingly, the Firm has been retained to handle litigation for corporate plaintiffs on a contingent fee basis. We have found that while corporate counsel tend to be reluctant to deviate from tried and true hourly billing procedures, and unaccustomed to working with a "plaintiff's firm," a contingent fee structure ensures the proper incentives and often works to further the corporation's interests. Although certain issues can arise in these commercial lawsuits that present difficulties in the calculation of a percentage-based attorneys' fee (*e.g.*, handling of counterclaims, the value of injunctive relief or licensing rights), we thus far always have been able to create satisfactory arrangements that are fair to everyone.

In one recent example of the contingent fee structure fitting a corporation's circumstances, the Firm was retained by a major consumer products company on a contingent fee basis to handle patent/trademark litigation against distributors and sellers of "knock off" products. This was an area in which the client historically had been content to obtain seizures of

products and injunctions, and was reluctant to initiate damages actions because of the expense and uncertain outcome. The Firm was able to obtain a sizeable recovery, collect revenue that the company otherwise would have foregone, and at the same time help solidify and even enhance the client's reputation for aggressively protecting its trademark and products.

## THE FIRM'S ATTORNEYS

In addition to our professional staff of paralegals, legal assistants and other support staff, as well as the contract attorneys, investigators, economists, accountants and other experts that SFMS regularly engages to assist it in representing the Firm's clients, the following attorneys currently practice with the Firm:

**Scott R. Shepherd** is admitted to practice law in the state courts of Pennsylvania, Illinois and Florida, as well as in the United States District Courts for the Eastern District of Pennsylvania, the Northern District of Illinois, and the Southern and Middle Districts of Florida, the United States Courts of Appeal for the Third, Fourth, Seventh and Eleventh Circuits, and the United States Supreme Court. In addition to these courts and jurisdictions, Scott has worked on cases with local counsel throughout the country. Scott earned his undergraduate degree *summa cum laude* from Westminster College in New Wilmington, Pennsylvania and his law degree from the University of Chicago Law School. Scott began his law practice in 1985 in Chicago, representing defendants in class action, securities and products liability litigation with one of the largest law firms in the country. Returning to Pennsylvania in 1989, Scott worked with a large Philadelphia corporate and defense law firm. After he "switched sides," he became a Partner at Greenfield & Rifkin LLP, a well known class action firm, before he started his own firm in 1998.

Scott's practice is concentrated on the prosecution of consumer class actions, False Claims Act cases and securities class actions. Scott is also experienced in handling antitrust, employment and other complex commercial matters. Among Scott's current (or very recent) cases, he serves as class counsel in a number of class actions pending throughout the country. For instance, he is presently co-lead counsel in cases in Florida state court alleging that Rexall Sundown's marketing of dietary supplements violated consumer fraud acts, and in which Judge Lewis in West Palm Beach recently approved a $16 million settlement. Scott recently served as lead counsel in *Cress et al. v. Independence Blue Cross*, in which Judge Rendell of the United States District Court for the Eastern District of Pennsylvania approved a multi-million dollar settlement which resulted in a recovery by health plan subscribers of over 99% of their out-of-pocket losses. Scott is also co-lead counsel in the Delaware Superior Court case of *Stoddard v. Advanta*, a consumer class action against one of the nation's largest credit card issuers, in which Judge Bifferato recently approved a settlement worth in excess of $10 million, including cash refunds to Advanta cardholders and a decrease in the interest rates on Advanta cards. Scott is also co-lead counsel with James E. Miller in *Hurkes Harris Design Associates, Inc. v. Fujitsu, Inc.*, in which the Superior Court of California recently approved a settlement of $42.5 million in damages.

Scott is also involved in many class actions in the health and life insurance industries. He has represented, and currently represents, policyholders in several cases alleging deceptive sales and marketing practices in connection with "vanishing premium" life insurance policies. He also recently represented a group of 50 retirees in an action against CIGNA Corp., alleging that the retirees were induced to invest lump sum retirement benefits in speculative inappropriate securities. Finally, Scott represents "whistleblowers" in cases brought under the United States

False Claims Act, particularly in the Home Healthcare and Durable Medical Equipment industries. Scott recently authored a widely published article on the Act's application in the context of Medicare and Medicaid fraud. Among his many False Claims Act cases, Scott is currently leading cases in Tennessee, Massachusetts, Virginia, Texas and Iowa.

In addition to his class action practice, Scott has also handled a number of significant *pro bono* matters. He has represented clients in a number of political rights cases, including political asylum and voting rights actions. He has also handled numerous criminal appeals, including death penalty cases. Scott is a member of the Association of Trial Lawyers of America, the American Health Lawyers Association, and the Palm Beach County, Florida and Delaware County, Pennsylvania Bar Associations. He divides his time between the Firm's Pennsylvania and Florida offices.

**Natalie Finkelman Bennett** is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Courts for the Eastern District of Pennsylvania and District of New Jersey, and in the United States Courts of Appeal for the Third and Ninth Circuit. In addition to these courts and jurisdictions, Natalie works on cases with local counsel throughout the country.

Natalie earned her undergraduate degree *magna cum laude* from the Pennsylvania State University in 1986 and was elected a member of Phi Beta Kappa Honor Society. Natalie earned her law degree *magna cum laude* from the Temple University School of Law in 1989. She acted as Managing Editor of the Temple Law Review. After clerking for Chief Judge Farnan in the United States District Court for the District of Delaware, Natalie began at the law firm of Schnader Harrison Segal & Lewis in late 1990. She practiced in many areas of complex commercial litigation, specifically including product liability, insurance coverage and defense, antitrust, contract and commercial lease areas.

In 1996, Natalie became an associate at the law firm of Mager Liebenberg & White, a well known class action firm, where her practice was concentrated in antitrust and consumer protection class action litigation. In 1998, Natalie became a Partner in the law firm of Liebenberg & White, concentrating in antitrust, civil rights, and consumer protection litigation.

Natalie's current practice is concentrated in the prosecution of consumer class actions (with an emphasis on financial services industry cases, payday lender cases, and insurance industry cases). Natalie represents consumers against mortgage lenders (challenging practice of charging mortgagees for prepaying the loan in violation of the parties' contract); credit card companies (challenging the imposition of improper add-on fees for such products as credit protection); and payday lenders (challenging the imposition of usurious interest rates without the proper disclosures). Natalie participated in a panel on Consumer Class Actions: How to Challenge Business Misconduct, on June 2-4, 2000. She authored "Practical Advice about MDL Practice and Procedures," Consumer Advocate, Volume 6, Issue 3, May/June 2000.

Natalie is also involved in many class actions in the health, life and property insurance industries. She has represented, and currently represents, policyholders in several cases alleging deceptive sales and marketing practices in connection with life or mortgage insurance policies. In addition, Natalie represents "whistleblowers" in cases brought under the United States False Claims Act. Natalie is also involved in prosecuting actions on behalf of physicians and authored "Y2K Creates Liability Minefield," Managed Healthcare News, May 1999.

Natalie also devotes a substantial portion of her practice to antitrust class action litigation and has represented plaintiffs and defendants in numerous court treble damages actions throughout the country. Natalie is a member of the American Bar Association, Pennsylvania Bar Association, Philadelphia Bar Association and the National Association of Consumer Advocates. She is also a former member of the Pennsylvania Bar Association Commission on Women in the Profession and the Temple American Inn of Court. She resides in Wallingford, Pennsylvania with her family.

**James E. Miller** is admitted to practice law in the state courts of Connecticut, Pennsylvania and New Jersey, as well as in the United States District Courts for the District of Connecticut, Eastern District of Pennsylvania, District of New Jersey, the United States Court of Appeals for the Third Circuit and the United States Supreme Court. In addition to these courts and jurisdictions, Jim has worked on cases with local counsel throughout the country.

Jim earned his undergraduate degree from Cornell University (B.S. 1988) and his law degree from the University of Pennsylvania School of Law (J.D. 1991). While at Penn Law School, he was awarded the Edwin R. Keedy Cup and was Editor of the Comparative Labor Law Journal. Following graduation, he served as Law Clerk to the Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania.

Jim began his law practice in 1992 at Pelino & Lentz, P.C. in Philadelphia, Pennsylvania and began concentrating his practice in labor and employment litigation, as well as other complex commercial litigation. He practiced at Pelino & Lentz until 2000 and was named a partner at the firm during his tenure. In addition to representing major corporations in commercial and employment litigation and collective bargaining negotiations, at Pelino & Lentz, Jim developed an extensive practice representing plaintiffs in employment discrimination litigation and securities industry professionals in U-5 defamation cases. In those cases, he was successful in obtaining a number of multi-million dollar recoveries, including jury verdicts and arbitration awards.

After relocating to Connecticut with his family in 2000, Jim became a member of a class action law firm with offices in Connecticut and Pennsylvania. At that firm, he concentrated his practice in civil rights/employment and other complex class action litigation, including securities, consumer and antitrust litigation. In addition to serving in a lead role in several consumer and securities class actions, he also represented both institutional and individual investors in major unsuitable trading and churning cases.

In 2002, Jim joined the Firm to open its office in Connecticut. Jim's practice is concentrated on the prosecution of significant employment and defamation cases, securities class actions (on behalf of defrauded shareholders of publicly-traded companies), consumer class actions, and unsuitable trading/churning cases. He also has significant experience in handling antitrust and other complex commercial matters, as well as representing plaintiffs in NASD and NYSE arbitrations. Finally, Jim serves as labor counsel for certain corporate clients of the Firm.

Jim is a member of the National Association of Securities and Consumer Law Attorneys, National Employment Lawyers Association, the American Bar Association, the Connecticut Bar Association, the New Jersey Bar Association, the Pennsylvania Bar Association and the National Association of Securities and Consumer Attorneys. He resides with his family in Chester, Connecticut and is active in community, political and charitable activities.

-6-

**James C. Shah** is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Court for the Eastern District of Pennsylvania and United States District Court for New Jersey. In addition to these courts and jurisdictions, he has also worked on cases with local counsel throughout the country.

James earned his Bachelor of Arts Degree in Political Science from the University of Oregon and his law degree from Temple University School of Law. James was a member of Temple's nationally acclaimed Trial Team and also participated on Moot Court. Before joining the Firm, James practiced as a litigator in Philadelphia with Pelino & Lentz, P.C., where he concentrated his practice on employment and labor law, securities disputes and general commercial litigation.

James is involved in all aspects of class action litigation including, among others, securities fraud, shareholder derivative actions, consumer fraud, products liability and antitrust. In addition to class actions, James also handles cases on behalf of individual investors who have lost money in their savings accounts and individual retirement accounts (IRAs) as a result of unauthorized or unsuitable trading by their brokers. These cases are typically arbitrated before the NASD and NYSE. James has successfully litigated cases in both forums.

James has been a member of the Association of Trial Lawyers of America and Philadelphia County Bar Associations. He resides in Collingswood, New Jersey with his family and is actively involved in the community in Southern New Jersey.

**Douglas P. Dehler** is admitted to practice law in the state courts of Wisconsin, as well as the District Courts for the Eastern and Western District of Wisconsin, and the United States Court of Appeals for the Seventh Circuit. In addition to these courts, Doug has worked on cases with local counsel throughout the country.

Doug received his undergraduate degree from Washington University (B.S.B.A cum laude 1987) in St. Louis, Missouri, and his law degree from the University of Wisconsin Law School (J.D. *cum laude* 1991) in Madison, Wisconsin. Upon graduating from law school, Doug joined the law firm of Michael, Best & Friedrich, LLP, in Milwaukee, Wisconsin, where he concentrated his practice on commercial and insurance litigation. In 1998, Doug became a Partner with Michael, Best & Friedrich, LLP, and served as the Chair of the firm's Insurance and Risk Management Focus Group.

Doug left Michael, Best & Friedrich, LLP in 2002 to take an in-house counsel position with Fortis Insurance Company, a national health insurance company with its corporate headquarters in Milwaukee, Wisconsin. While at Fortis Insurance Company, Doug was Vice President - Legal Risk Management, responsible for supervising a staff of in-house attorneys, paralegals and local attorneys around the country. These attorneys defended and prosecuted lawsuits on behalf of Fortis Insurance Company throughout the nation, and Doug was responsible for reporting to the company president and other senior management regarding the outcome of these lawsuits. In addition to his litigation responsibilities, Doug advised senior management regarding risk management and operational issues arising in the claims and underwriting units of the company.

Doug left Fortis Insurance Company in 2004 to return to private practice and started his own firm. In 2005, Doug joined the Firm and opened its office in Milwaukee, Wisconsin. Doug

is a Partner in the Firm and now focuses his practice on representing business clients, consumers and policyholders in class action lawsuits in Wisconsin and throughout the country. In addition, his practice includes bringing bad faith claims and coverage lawsuits against health and disability insurance companies that have wrongfully denied benefits. Doug also handles a number of other commercial and personal injury lawsuits.

Doug is a member of the Association of Trial Lawyers of America, the State Bar of Wisconsin and the Milwaukee Bar Association. He makes his home in Wauwatosa, Wisconsin, where he lives with his two children.

**Patrick A. Klingman** is Of Counsel to the Firm. Patrick is admitted to practice law in the state courts of Connecticut, New York and the District of Columbia, as well as the United States District Courts for the District of Connecticut, the Eastern, Southern, and Western Districts of New York, and the District of Columbia. In addition to these courts and jurisdictions, Patrick regularly works on cases throughout the country.

Patrick earned his undergraduate degree from Villanova University (B.A. 1987), and his law degree *cum laude* from Syracuse University College of Law in 1990. While at Syracuse, he also earned his master's degree in international relations from the Maxwell School of Citizenship and Public Affairs (M.A. 1990). Patrick also served as the Lead Article Editor for the Syracuse Journal of International Law and Commerce.

From 1990 through 1997, Patrick practiced at the Washington, D.C. law offices of Graham & James, L.L.P. and a predecessor firm, where he worked on a wide variety of complex litigation matters, ranging from aviation-related mass torts to intellectual property disputes, as well as other commercial litigation matters.

In 1997, Patrick moved with his family to Connecticut and joined a Hartford firm. Following this move, he continued his commercial litigation practice in actions as varied as defending a Hartford-based hospital in a contractual dispute in federal court to representing a dairy producer in a copyright action. In 2000, Patrick joined another class action firm based in Connecticut and began to focus on representing plaintiffs in securities, consumer fraud and antitrust litigation. In 2004, Patrick joined the Firm's Connecticut office, where he continues to represent plaintiffs in a variety of transactions while also representing the Firm's corporate and institutional clients in other commercial litigation.

Patrick is a member of the Connecticut Bar Association, the New York State Bar Association, the District of Columbia Bar Association, and the Hartford County Bar Association. He resides in West Hartford, Connecticut with his family and is active in community affairs.

**Laurie Rubinow** is Of Counsel to the Firm. Laurie is admitted to practice law in the state courts of Connecticut and Pennsylvania. In addition, Laurie has worked on cases with local counsel throughout the country.

Laurie earned her undergraduate degree from the University of California at Berkeley (B.A. 1980), where she was Phi Beta Kappa, graduated *summa cum laude*, and earned her law degree from Temple University School of Law (J.D. 1984). She also completed certain of her undergraduate studies at McGill University and, while at Temple Law School, she served as a

legal intern with the United States Attorney's Office, the Public Defender's Office, the Pennsylvania Attorney General's Office and for United States Magistrate Judge Powers. In addition, Laurie has received a Certificate in Negotiation, Mediation and Conflict Resolution from the Seton Hall University School of Law.

Laurie has a diverse legal background, having worked in private practice as an Associate at a law firm and as a solo practitioner for approximately five years before beginning a career as an in-house attorney at a nationally recognized insurance company, where she worked for approximately eleven years, rising to the position of National Manager, where she was responsible for the management of five regional field offices responsible for defending complex insurance related litigation, including toxic tort and environmental actions. She also has served as an Adjunct Professor in the Department of Sociology at Central Connecticut State University. Laurie joined the Firm's Connecticut office in 2005, where she represents plaintiffs in a variety of consumer, securities and insurance litigation. Laurie also is actively involved in the Firm's representation of the State of Connecticut in four complex cases against six different pharmaceutical manufacturers.

Laurie is a member of the Connecticut Bar Association. She resides in Chester, Connecticut with her family and is active in community affairs.

**Stephen M. Donweber** is Of Counsel to the Firm. Steve is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Courts for the Eastern District of Pennsylvania, Middle District of Pennsylvania, District of New Jersey, and the United States Court of Appeals for the Third Circuit. In addition to these courts and jurisdictions, Steve has worked on cases with local counsel throughout the country.

Steve earned his undergraduate degree from Cornell University (A.B. 1989) and his law degree from the Villanova University School of Law (J.D. *cum laude* 1993). While at Villanova Law School, Steve served as Managing Editor of Articles for the Villanova Law Review, was awarded the Law Review Distinguished Service Award, and had his case note, *NLRB v. New Jersey Bell*: The Current Scope of Weingarten Rights in the Third Circuit, published at 37 Vill. L. Rev. 1139 (1992). In addition, Steve was a member of the Order of the Coif, as well as Phi Kappa Phi Honor Society.

In 1993, directly after law school, Steve joined the law firm of Saul Ewing LLP in Philadelphia, Pennsylvania. In his ten years at Saul Ewing, Steve concentrated his practice in complex commercial litigation, with particular emphasis on litigation regarding fundamental corporate transactions, complex bankruptcy litigation, and antitrust cases.

Steve is a member of the Philadelphia, Pennsylvania, and American Bar Associations. He and his wife reside in Boston, Massachusetts.

**Gary Kostow** is Of Counsel to the Firm. Gary earned his Juris Doctor from the Illinois Institute of Technology, Chicago-Kent College of Law in May, 1973, where he served as Editor-in-Chief of the Chicago-Kent Law Review and graduated "with distinction." Following graduation, Gary served a one-year judicial clerkship with the Honorable John J. Sullivan of the Illinois Appellate Court. After his clerkship, Gary joined the Chicago firm of Clausen, Miller, where he became a partner and member of the managing board of directors within four years.

Gary has been admitted to practice in Illinois since 1973, and is also admitted to practice before the United States District Court for the Northern District of Illinois, other federal district courts and the Seventh Circuit Court of Appeals, and is a member of the Federal Trial Bar. Throughout his career, Gary's practice has represented a wide variety of clients, including closely-held and publicly-owned corporations, physicians, hospitals and other health care providers (in medical malpractice claims), condominium associations, architects and engineers. Beginning in 1983, Gary expanded his practice and began representing attorneys and law firms in defense of legal malpractice claims.

Over Gary's career, he has been retained on a number of notable engagements. For instance, for many years, he represented intellectual property firms in significant legal malpractice claims. He was one of two attorneys in the United States hired by the leading underwriter of patent firms to monitor and consult on pending patent related malpractice cases, and recently, this same underwriter retained him to review a pending claim against a prominent intellectual property firm where a claim of $27 million was being made. He was retained to represent a national law firm before the Honorable Thomas Penfield Jackson, in Washington, D.C. in a multi-million dollar claim brought by a failed government contractor. Gary represented banks such as LaSalle National Bank, Melrose National Bank, and Merchandise National Bank in a variety of matters ranging from Uniform Commercial Code claims, forged instrument claims, inter-bank disputes and customer work-out matters.

Gary also successfully tried an $11 million claim for lost management fees and commissions made by a prominent Philadelphia real estate concern before former Judge Paul Dorf in Baltimore, Maryland. In 1997, Gary was appointed by Judge Lee of the United States District Court in Fort Wayne, Indiana to mediate a $40 million securities fraud claim involving the sale of interest in communication satellite slots owned by the Kingdom of Tonga.

In 1992, Gary and Henry Daar founded the Chicago-based law firm of Kostow & Daar, P.C., which became a national litigation firm handling such matters as the Meridian Bank building fire case pending in New York City (involving a claim of $450 million); the Alcoa and PPG property environmental coverage litigation (involving multi-billion dollar claims); the All-Alaskan vessel loss (involving a potential claim of $125 million); the Global Gaming and IGT patent infringement claim ($30 million); and a number of substantial property damage, time element, and sick building claims on behalf of such companies as Allied Signal, Cytec, American Airline, and Kohler. Additionally, Gary represented contractors, design professionals and others in a variety of claims. Gary retired from the Kostow & Daar firm in 1997.

Over the past ten years, Gary has become actively involved in the class action bar, successfully prosecuting separate national class action antitrust cases against Bayer A.G., Miles, Inc., Dial Corp., and S.C. Johnson & Son. Gary has practiced with the Firm since 2003 and offers a unique perspective, drawn from thirty years of experience litigating complex cases.

**Paul M. Rettinger** is Of Counsel to the Firm. Paul is admitted to practice in the state courts of Pennsylvania, as well as in the United States District Court for the Eastern District of Pennsylvania, and the United States Court of Appeals for the Third Circuit. Paul earned his undergraduate degree from the University of Pittsburgh, and did graduate studies in biology and chemistry at the Pennsylvania State University and the University of Pennsylvania. Paul graduated *cum laude* from the Temple University School of Law in 1996, where he was a member of the Environmental Law Council and the Environmental Law and Technology Journal.

-10-

Before entering law school, Paul worked in biomedical research at the Transplant Laboratory of the University of Pittsburgh School of Medicine, and at the Cerebrovascular Research Center of the University of Pennsylvania. After graduation, Paul served for five years as Assistant Counsel to the Pennsylvania Department of Environmental Protection (DEP), primarily in major Superfund litigation. After leaving the DEP, Paul worked as a consultant to the insurance industry, providing training for professional certification examinations for liability underwriters.

Paul is co-author of "EEG Spectroanalysis of Acute Focal Ischemia Under Halothane Anesthesia Using Glutamate Antagonist MK-801," published in the Klinikai Kislerleti Kutato es II, Elettani Intezet, SOTE, June 1990; and "Private Rights of Action Under State Unfair Claims Settlement Practices Acts," published in the Journal of Insurance Regulation, Spring 1998, v. 16. He resides with his family in Chadds Ford, Pennsylvania.

**Tali Joan Segal** is Of Counsel to the Firm. Tali earned her undergraduate degree from Emory University (B.A. 1982), where she was elected a member of Phi Beta Kappa Honor Society and where she served as an award-winning editor-in-chief of the university newspaper, *The Emory Wheel*. She also served as an assistant to former President Jimmy Carter while at Emory. Tali earned her law degree from the National Law Center, George Washington University (J.D. 1986), following which, she served an administrative law clerkship with the Honorable Ralph A. Romano of the U.S. Department of Labor.

After her clerkship, Tali practiced as a commercial litigator and corporate transactional lawyer with the Philadelphia firms of Markowitz & Meo, P.C. (later Markowitz, Meo, Silberman & Raslavitch, P.C.) and Rawle & Henderson. She also established and was the managing attorney of Markovitz & Meo's New Jersey office. Tali concentrated her practice in complex and general commercial, business and civil litigation, including construction law and bankruptcy law, and also served as an arbitrator for the Philadelphia Court of Common Pleas. Tali is admitted to practice law in Pennsylvania and in the United States District Court for the Eastern District of Pennsylvania and works on cases with local counsel throughout the country.

Tali began her involvement in the class action bar in 1995. She has been involved in securities fraud class actions (on behalf of defrauded shareholders of publicly-traded companies), consumer fraud class actions, unsuitable trading/churning cases and antitrust matters. Over the past year, she has been extensively involved in the Average Wholesale Price (AWP) drug industry multidistrict litigation. Tali resides in Fort Washington, Pennsylvania with her family and is involved in many community activities.

**Karen M. Leser-Grenon** is an Associate in the firm. She is admitted to practice law in the state courts of Connecticut and California, as well as in the United States District Court for the District of Connecticut. She is also registered to practice before the United States Patent and Trademark Office. In addition to these courts and jurisdictions, Karen works on cases nationwide. Karen earned her Bachelor of Science Degree in Civil Engineering from the University of Maryland at College Park (B.S. 1997) and her law degree from Quinnipiac University School of Law (J.D. 2001).

Before joining the Firm, Karen practiced law in Connecticut and California, where she concentrated her practice on securities, antitrust, consumer class action and intellectual property

litigation. In 2005, Karen joined the Firm's office based in Chester, Connecticut, where she continues to represent plaintiffs in complex litigation. Karen is a member of the American Bar Association, Connecticut Bar Association, California Bar Association, American Intellectual Property Law Association and Connecticut Trial Lawyers Association. She resides in Madison, Connecticut and is active in her community.

**Nathan Zipperian** is an Associate in the firm. He is admitted to practice law in the state courts of Oregon, Arizona, Pennsylvania and New Jersey, as well as in the United States District Court for the District of Arizona. In addition to these courts and jurisdictions, Nathan works on cases throughout the country.

Nathan earned his Bachelor of Arts Degree in Political Science from the University of Oregon and his law degree from Temple University School of Law. While at Temple, Nathan was an Editor of the Environmental Law and Technology Journal. Before joining Shepherd, Finkelman, Miller & Shah, LLC, Nathan was a litigator in Oregon at Bailey Pinney and Associates, where his practice focused on employee rights and in Arizona with Martin Hart & Fullerton, where he litigated a wide variety of cases including personal injury, medical malpractice and product liability cases.

Nathan joined the Firm in 2005 and is involved in all aspects of the Firm's class action practice. Nathan is a member of the American Bar Association, Oregon Bar Association, Arizona Bar Association, Maricopa County Bar Association and Arizona Association of Defense Counsel. He resides with his family in Swedesboro, New Jersey and is actively involved in the Southern Jersey community.