**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT T. KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-01862 |
| | ) | |
| v. | ) | Judge George M. Marovich |
| | ) | |
| BUTLER FINANCIAL SOLUTIONS, | ) | |
| LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**BUTLER'S ANSWER TO PLAINTIFF'S FIRST**
**AMENDED CLASS ACTION COMPLAINT AND CROSS-**
**CLAIM AGAINST HERITAGE WARRANTY RISK RETENTION GROUP**

Defendant Butler Financial Solutions, LLC ("Butler") by its attorneys, Law Offices of

Michael Murphy Tannen, P.C., hereby tenders its response to Plaintiffs' (collectively "Plaintiffs")

First Amended Class Action Complaint as follows and its cross-claim against Defendant Heritage

Warranty Risk Retention Group ("Heritage").

**NATURE OF CASE**

1.      Plaintiffs bring this class action on behalf of themselves and a class of similarly

situated individuals who purchased Vehicle Service Contracts ("VSCs") pursuant to which

Defendant, Butler Financial Solutions, LLC ("Butler") is obligated to provide repair and service

coverage on new and used motor vehicles. Under the plain terms of the VSCs, Butler must pay the

reasonable costs associated with certain automobile part failures or mechanical breakdowns

experienced by the contract holders' vehicles.

**ANSWER:**     Butler admits that Plaintiffs seek to bring a lawsuit on behalf of themselves and a
class of allegedly similarly situated individuals who purchased VSCs.    The
remaining allegations of Paragraph 1 are legal conclusions as to which no response is
required, and are therefore denied.

2.      The VSCs further state that Butler's obligations to pay covered claims under the VSCs are insured under a Vehicle Service Contract Reimbursement Policy ("Insurance Policy") issued by defendant Heritage Warranty Insurance Risk Retention Group, Inc., f/k/a Heritage Warranty Mutual Insurance Risk Retention Group, Inc. ("Heritage"). The Insurance Policy specifically states that Heritage must directly pay VSC claims if Butler fails to do so: "Upon failure of the Insured *[i.e.,* Butler] to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured *[i.e.,* Butler], coverage hereunder shall be provided directly to the service contract holder claimant."

**ANSWER:**    Butler admits that the VSCs generally recite that Butler's obligations to perform under the VSCs is insured by a Vehicle Service Contract Reimbursement Policy ("Insurance Policy") issued by Heritage. Butler further admits that Plaintiffs have correctly transcribed a portion of the Insurance Policy issued by Heritage to Butler. Butler denies the remaining allegations of Paragraph 2

3.      Despite these express representations, promises and contractual obligations, both Butler and Heritage refuse to pay covered claims under the VSCs. Instead of paying claims as required under the express terms of the VSCs, Butler takes the position that only Heritage is responsible for paying all claims. According to Heritage, Butler has yet to pay for a single repair under the VSCs.

**ANSWER:**    Butler denies the allegations in this paragraph that relate to its wrongful conduct. Further answering, Butler further states that its contentions have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v. Butler*, Case No. 07 CV 6977.

4.      Similarly, Heritage had, as of December 2006 at the latest, decided that it too has no responsibility to pay claims, directly or indirectly, under the VSCs, and it has reaffirmed that it will refuse to pay such claims in the future. Heritage's refusal is made in the face of the Insurance Policy, which clearly states that if Butler fails to pay a covered claim under a VSC, Heritage must pay that claim on Butler's behalf Heritage's responsibility to VSC holders is further confirmed by

an "Administrative Agreement" between Heritage and Warrantech Automotive, Inc. ("Warrantech") which states that Warrantech shall maintain a Heritage-funded bank account for the purpose of paying all valid VSC claims (the "Loss Reserve Fund").

**ANSWER:**   Butler admits that as of December 2006, Heritage announced to Butler that it had no responsibility to pay VSC claims and that since then, Heritage has re-asserted that position repeatedly. Butler admits that Heritage's failure to fund or honor VSC claims is contrary to the provisions of the Insurance Policy and the Administrative Agreement. Butler further admits that under the Administrative Agreement, Warrantech was to maintain a Heritage-funded and Heritage-controlled Loss Reserve Fund.

5.     Defendant Warrantech also shares significant responsibility for misleading all VSC holders regarding the policies they purchased, resulting in the unpaid claims and significant damages to Plaintiffs and Class members. The VSC program at issue in this action was designed, priced, administered, marketed and distributed jointly by Warrantech and Heritage. However, as structured, the entire program was essentially a pyramid scheme which would necessarily need to rely upon the sale of new VSCs to fully fund the payment of claims on the existing VSCs.

**ANSWER:**   The first sentence of Paragraph 5 is not directed at Butler, and therefore it makes no answer thereto. To the extent that the allegations of this sentence are construed to relate to or implicate Butler, those allegations are denied. Further answering, Heritage controlled all aspects of the so-called VSC program and Warrantech acted as Heritage's administrator under Heritage's control with respect to the day-to-day administering and handling of VSC claims. Butler denies the allegations in the last sentence of Paragraph 5.

6.     Despite accepting more than *$25* million in VSC premiums from consumers, Warrantech and Heritage failed to design and execute the program in a manner which would ensure that sufficient funds would be set aside in the Loss Reserve Fund account to fully fund future VSC claims. And, as recent sworn court filings make clear—unbeknownst to the VSC holders and contrary to the plain language of the VSC contracts, neither Butler nor Heritage ever intended to

3

take on the risk or responsibility for fully funding VSC claims in the event the monies set aside in

the Loss Reserve Fund were insufficient to pay valid claims.

**ANSWER:**    The first sentence of paragraph 6 is not directed at Butler, and therefore it makes no
answer thereto. To the extent that the allegations of this sentence are construed to
relate to or implicate Butler, those allegations are denied. Further answering,
Heritage controlled all aspects of the so-called VSC program and failed to comply
with the terms of the Insurance Policy and failed to adequately fund the Loss
Reserve Fund. Further answering, Butler denies that it never intended to take on the
risk or responsibility for fully funding VSC claims in the event the monies set aside
in the Loss Reserve Fund were insufficient to pay valid claims since Butler
established its financial responsibility under the provisions of Illinois' Service
Contract Act and the service contract statutes of numerous other states by purchasing
the Insurance Policy from Heritage which required Heritage to pay VSC claims in
excess of monies in the Loss Reserve Fund. Butler further states that its contentions
have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case
No. 07CV3539 and in *Heritage v. Butler,* Case No. 07 CV 6977.

7.    As a result of the foregoing, claims made by hundreds if not thousands of contract

holders have been denied by Defendants without any proper legal basis. According to Heritage,

claims under the VSC policies are being submitted at a rate exceeding $200,000 per month. Despite

outstanding claims which greatly exceed $1 million, Heritage now admits that it has paid merely

$220,000 to VSC holders.

**ANSWER:**    Butler denies that its conduct is wrongful or without proper legal basis. Butler lacks
sufficient information to form a belief as to the truth or falsity of the remaining
allegations of Paragraph 7 and therefore neither admit nor same, but demand strict
proof thereof.

8.    Absent action by this Court, Butler and Heritage will continue to refuse valid VSC

claims in the future, so that even with compensation now Class members and indeed all holders of

the VSCs who develop service contract claims will likely go un-reimbursed despite their coverage.

**ANSWER:**    Butler denies the allegations of Paragraph 8.

9.    By this action, Plaintiffs seek damages and other relief on their own behalf, and on

behalf of a nationwide class of other similarly situated individuals who purchased or hold the VSCs.

As alleged more fully below, Defendants are liable to Plaintiffs and other Class members for, among other things, violations of the Magnuson-Moss Warranty Act, breach of express contract and breach of third-party beneficiary contracts. Plaintiffs also request that the Court provide injunctive and/or declaratory relief, including an order declaring that Butler or Heritage, or both, are obligated to pay covered claims and that the VSCs are voidable at the option of the VSC holders.

**ANSWER:**   Butler admits that Plaintiffs seek damages and other relief for themselves and on behalf of a nationwide class.  Butler denies that it is liable for damages to Plaintiffs, and deny the remaining allegations of paragraph 9.

## PARTIES

10.   Plaintiff Robert T. Kennedy ("Kennedy") is an individual residing in Castle Rock, Colorado. In December 2002, Mr. Kennedy purchased a VSC, a true and correct copy of which is attached hereto as Exhibit A. He paid $1,332 for his VSC, which provides coverage for a period of 84 months or 100,000 miles.

**ANSWER:**   Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 10 and therefore neither admit nor same, but demand strict proof thereof.  Further answering, on information and belief Plaintiff Kennedy has attached a true and correct copy of his VSC.

11.   Plaintiff JoAnn Mick ("Mick") is a citizen and resident of Lake Forest, Illinois. On November 1, 2002, Ms. Mick purchased a VSC, Policy No. WWTN33859 but is currently unable to locate her copy. However, Defendants Heritage, Warrantech and Butler have acknowledged its existence, at the terms described, by, *inter alia*, paying her for a valid claim before the Heritage-Butler dispute caused the impasse described in this Complaint, and a full and complete copy of Ms. Mick's VSC is available to each of the Defendants on their computer systems. She paid $1,270 for her VSC, which was supposed to provide coverage for a period of sixty (60) months or 100,000 miles.

**ANSWER:**    Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 11 and therefore neither admit nor same, but demand strict proof thereof.

12.    Plaintiff Charles C. Mitschow ("Mitschow") is a citizen and resident of Hendersonville, North Carolina. In June 2003, Mr. Mitschow purchased a VSC, a true and correct copy of which is attached hereto as Exhibit B. He paid $1,500 for his VSC, which was supposed to provide coverage for a period of 72 months or 100,000 miles.

**ANSWER:**    Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 12 and therefore neither admit nor same, but demand strict proof thereof.

13.    Defendant, Butler, is a Delaware Limited Liability Company which, at the time the above-referenced VSCs were sold to Plaintiffs, had its principal place of business in Boca Raton, Florida. In approximately October 2005, Butler relocated its corporate offices to Ashville, North Carolina. Butler is the primary obligor under the VSCs.

**ANSWER:**    Butler admits the allegations of the first two sentences of paragraph 13, admits it is an obligor under the VSCs and denies the remaining allegations of Paragraph 13.

14.    Defendant, Heritage, is a South Carolina corporation in the business of insurance, with its principal place of business also located in South Carolina. Heritage issued the Insurance Policy with respect to Butler's obligations under the VSCs. According to Butler, Heritage (along with Warrantech) monitored and controlled the terms, conditions and pricing of the VSCs, and set the amount of money from the sale of VSCs that would be placed in its Loss Reserve Fund for the payment of VSC claims. Heritage received, up front, more than $25,000,000 in premiums and other monies from the sale of the VSCs.

**ANSWER:**    Butler admits that Heritage is a South Carolina corporation in the business of insurance, but denies the remaining allegations of the first sentence of Paragraph 14. Butler admits that Heritage issued its Insurance Policy to Butler by which Butler established its financial responsibility under the provisions of Illinois' Service Contract Act and the service contract statutes of numerous other states by purchasing

6

the Insurance Policy from Heritage which required Heritage to pay VSC claims in excess of monies in the Loss Reserve Fund. Butler admits that it has claimed that Heritage monitored and controlled the terms, conditions and pricing of the VSCs, and set the amount of money from the sale of VSCs that would be placed in its Loss Reserve Fund for the payment of VSC claims. Butler also admits that it has claimed that Heritage received, up front, more than $25,000,000 in premiums. Butler denies that Warrantech controlled the VSC Program.

15. Defendant, Warrantech, is a Connecticut corporation with its principal place of business in Bedford, Texas. Warrantech is a wholly-owned subsidiary of Warrantech Corporation, which develops, markets, distributes, and administers vehicle service contracts. According to Warrantech, it marketed, distributed and administered the 'VSCs. According to Heritage, Warrantech also initially designed and priced the VSC program. According to Butler, Warrantech (along with Heritage) monitored and controlled the terms, conditions and pricing of the VSCs, and set the amount of money from the sale of 'VSCs that would be placed in its Loss Reserve Fund for the payment of VSC claims. According to Heritage, Warrantech represented to both Butler and Heritage that they would not bear any risk or downside exposure on the VSCs and would not be called upon to pay claims exceeding the amounts already set aside in the Loss Reserve Fund. According to Butler, Heritage knew that Butler would not and could not pay VSC claims in the first instance. According to American Re (the reinsurance company identified on the VSCs), Warrantech fraudulently induced it into providing insurance on some or all of the VSCs by falsely representing, among other things, that American Re would not bear any risk or downside exposure on the VSCs and would not be called upon to pay claims exceeding the amounts already set aside in the Loss Reserve Fund.

**ANSWER:**    On information and belief, Warrantech [Automotive] is a Connecticut corporation with its principal place of business in Texas. Butler lacks sufficient information to form a belief as to (i) Warrantech Automotive's relationship with Warrantech Corporation or (ii) the allegations of AmRe's lawsuit in Alabama, and therefore neither admits not denies same, but demands strict proof thereof. Furtheransweringthe contentions of Butler, Warrantech, and Heritage have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v.Butler*, Case No. 07 CV 6977.

16.    The John Doe Defendants are persons or entities whose identities are not yet known to Plaintiffs who, in concert with the other Defendants, caused the damages alleged in this Complaint.

**ANSWER:**    The allegations of Paragraph 16 are not directed at Butler and therefore, Butler makes no answer thereto. To the extent that the allegations of Paragraph 16 are construed to relate to or implicate Butler, those allegations are expressly denied.

17.    Defendants Butler, Heritage and Warrantech are collectively referred to herein as "Defendants."

**ANSWER:**    The allegations of Paragraph 17 are not directed at Butler and therefore, Butler makes no answer thereto. To the extent that the allegations of Paragraph 17 are construed to relate to or implicate Butler, those allegations are expressly denied.

18.    The following pending lawsuits directly or indirectly concern the VSC program and the ongoing dispute as to which entity or entities are obligated to pay the VSC claims of Plaintiffs and the Class: (i) *Warrantech v. Heritage,* Case No. 07CV3539 (ND. Ill.); (ii) *Heritage v. But/er et al.,* Case No. 07CV6977 (N.D. Ill.); and (iii) *American Resources In. Co., Inc. v. Warrantech et at,* Case No. 07-850-WS-M (S.D. Ala.).

**ANSWER:**    Butler admits that *Warrantech v. Heritage,* Case No. 07CV3539 (ND. Ill.) and (ii) *Heritage v. But/er et at,* Case No. 07CV6977 (N.D. Ill.) are lawsuits that directly or indirectly concern the VSC program and the ongoing dispute as to which entity or entities are obligated to pay the VSC claims that arise under Heritage's Policy. Butler lacks sufficient information to form a belief as to the truth or falsity as to the allegation about the nature of the lawsuit pending in Alabama and therefore neither nor deny same, but demand strict proof thereof. Butler denies the remaining allegations of Paragraph 18.

## JURISDICTION AND VENUE

19.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §l332(d)(2). Upon information and belief, this case involves claims that have a total value in excess of $5,000,000, exclusive of interest and costs. No individual claim is less than the sum or value of $25 and there are thousands of VSC holders that are members of the putative Class.

**ANSWER:**    On information and belief, Butler denies the allegations of Paragraph 19.  Further answering, Butler denies that a class action is factually or legally appropriate.

20.    Venue in this judicial district is proper pursuant to 28 U.S.C. §1391 because:

a.    The Administrative Agreement between Heritage and Warrantech provides that, in the event of a dispute between them, litigation must be covered in federal or state courts within the State of Illinois to resolve disputes and that Illinois law shall apply;

b.    The Insurance Policy purchased by Butler from Heritage states that Heritage will submit to the competent jurisdiction of any court in the United States, and Butler has sought to litigate relevant issues under the policy in this District;

c.    There are two related actions in this District where Butler, Heritage and Warrantech are already seeking a determination of their rights and obligations under the VSCs, the Insurance Policy and the Administrative Agreement;

d.    The resolution of the two related cases will impact the rights of Plaintiffs and Class members;

e.    Defendant Butler has conceded that venue is proper in this District by seeking and achieving a transfer of its related action from South Carolina to this District and seeking to intervene in the other related action which is also pending in this District;

f.    Heritage, Butler and Warrantech do substantial business in this District and, upon information and belief, some VSCs were sold in this District;

g.      Plaintiffs and the Class initially filed their action in the United States District Court for the District of Florida, formerly the site of Butler's headquarters, and both Heritage and Butler argued that such venue was improper and the Florida court transferred this action to this District;

h.      Defendant Butler has argued that this District is the proper venue for this action;

i.      Plaintiff Mick and other members of the Class reside in this District; and

j.      Upon information and belief, some of the witnesses with knowledge of the facts related to this action are currently located in this District.

**ANSWER:**   Butler admits the allegations contained in Paragraph 20(a)-(j).

## FACTUAL BACKGROUND

21.    When purchasing an automobile, a consumer may also buy a third-party VSC to supplement any manufacturer's warranties. A VSC typically requires that the issuer pay for certain types of automobile repairs during the term of the contract. Upon information and belief, Butler is a leading provider of VSCs and is the obligor with respect to hundreds of thousands of VSCs that were sold, and continue to be sold, to vehicle purchasers throughout the country.

**ANSWER:**   Butler admits that when a consumer purchases an automobile, the consumer may also buy at the time or later a third party which provides coverage for specified auto repairs for a certain period of time, generally one to seven years. Further answering, the financial responsibility laws of most states, including Illinois, North Carolina, and Colorado typically require that VSCs be backed by reimbursement insurance policies. Butler admits that it is an obligor for many VSCs and denies the remaining allegations of Paragraph 21.

22.    The VSCs at issue here are standard form contracts pursuant to which Butler promises to "pay or reimburse You [the VSC purchaser] for reasonable costs to repair or replace any Breakdown of a part listed under Mechanical Coverage."

**ANSWER:**  Butler admits that the VSCs at issue here were approved by Heritage and that Plaintiffs correctly recite a portion of the language from the VSCs.

23.    The VSCs further state that Butler's obligations are "insured by a policy issued by Heritage Warranty Mutual Risk Retention Group, Inc   and that: "[i]f a covered claim is not paid within sixty (60) days after proof of loss has been filed, You [the purchaser] may file a claim directly with the Insurance Company [Heritage]." The Insurance Policy itself specifically states that Heritage must directly pay VSC claims if Butler fails to do so: "Upon failure of the Insured *[i.e.,* Butler] to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured *[i.e.,* Butler], coverage hereunder shall be provided directly to the service contract holder claimant."

**ANSWER:**  Butler admits that Plaintiffs have correctly recited provisions from the VSCs and the Insurance Policy regarding Heritage's payment obligations for VSC claims arising under the Insurance Policy.

24.    Heritage's responsibility to VSC holders is further confirmed by the Administrative Agreement between Warrantech and Heritage. The agreement specifically states that Warrantech shall maintain a Heritage-funded and controlled Loss Reserve Fund bank account solely for the purpose of paying out and settling all valid claims submitted by VSC holders.

**ANSWER:**  Butler admits that Plaintiffs have correctly characterized provisions from the Administrative Agreement regarding Heritage's payment obligations for VSC Claims arising under the Insurance Policy.

25.    Despite these unequivocal contractual obligations, both Butler and Heritage routinely and uniformly refuse to pay covered claims under the VSCs.

**ANSWER:**  Butler admits that Heritage's payment obligations are clear and unequivocal and that Heritage continues to routinely and uniformly refuse to honor VSC claims. Butler denies the remaining allegations of Paragraph 25.

26.    Instead of paying claims as required under the express terms of the VSCs, Butler takes the position that Heritage is solely responsible for funding the Loss Reserve Fund account for

the purpose of paying out and settling all covered VSC claims. Butler further contends that it has no

financial ability to pay claims itself or otherwise fund the Loss Reserve Fund account, and states

that Heritage is obligated to, and until recently has always, controlled and funded the Loss Reserve

Fund account and timely paid VSC claims.

**ANSWER:**    Butler denies the allegations of Paragraph 26 as stated and further states that its contentions have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v. Butler*, Case No. 07 CV 6977..

    27.    Likewise, Heritage takes the position that it has no responsibility to pay VSC

claims, and that Butler must pay these claims. As recently as September 14, 2007, Heritage has

reaffirmed in sworn legal pleadings that it will continue to refuse to pay such claims in the future.

**ANSWER:**    The allegations of Paragraph 27 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the allegations of this sentence are construed to relate to or implicate Butler, those allegations are denied.

    28.    Heritage's after-the-fact rationale and purported legal basis for not paying valid VSC

claims has been inconsistent. In court filings, Heritage claims that under the Insurance Policy it is

only obligated to pay claims if and when Butler actually declares bankruptcy. On the other hand,

according to a sworn statement of Butler's former manager in September 2007:

> Heritage has, since its initial failure to pay claims in February 2007, made statements to service contract holders (claimants) that their [sic] obligation to Butler no longer existed because the policy had been canceled effective January 31, 2007. Heritage has made statements to claimants that Heritage's insurance obligations with respect to claims made under the terms of service contracts issued while their [sic] insurance policy was in full force and effect no longer existed. To the best of my knowledge, such statements to claimants continue to be made by Heritage personnel.

**ANSWER:**    The allegations of Paragraph 28 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the allegations of Paragraph 28 are construed to relate to or implicate Butler, those allegations are denied.  Further answering, Butler states that Heritage's refusal to honor VSC claims arising under the Insurance Policy is inconsistent with the language of the Insurance Policy, Administrative Agreement, the VSCs, the course of dealing between Butler, Warrantech, and Heritage between 2001 and 2006, and with the provisions of the service contract statutes of Illinois, North Carolina, and Colorado.   Butler further states that its contentions have been

set forth in pleadings and motions filed  in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v. Butler*, Case No. 07 CV 6977., Case No. 07 CV 6977.

29.     As the proximate result of Butler's and Heritage's refusal to pay valid claims, hundreds or perhaps thousands of valid claims remain unpaid. Upon information and belief, unpaid VSC claims are well in excess of $1 million.

**ANSWER:**     Butler denies that any losses sustained by VSC holders is not the proximate result of its conduct, but the result of Heritage's failure to honor claims consistent with the language of the Insurance Policy, Administrative Agreement, the VSCs, the course of dealing between Butler, Warrantech, and Heritage between 2001 and 2006, and with the provisions of the service contract statutes of Illinois, North Carolina, and Colorado.

30.     Although Butler and Heritage have unequivocal contractual obligations to timely pay valid VSC claims, Warrantech shares significant responsibility for misleading all VSC holders regarding the VSC policies they purchased, resulting in significant damages. The VSC program at issue in this action was designed, priced, administered, marketed and distributed jointly by Warrantech and Heritage.

**ANSWER:**     The allegations of Paragraph 30 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the allegations of Paragraph 30 are construed to relate to or implicate Butler, those allegations are denied.

31.     As structured, however, the VSC program was essentially a pyramid scheme which necessarily relied upon the sale of new VSCs to fully fund the Loss Reserve Fund account, which was the only source of payment for claims on the outstanding VSCs. Despite accepting more than $25,000,000 in VSC premiums from consumers, Warrantech and Heritage failed to design and execute the program in a manner which would ensure that sufficient funds would be set aside in the Loss Reserve Fund account to fund all future VSC claims.

**ANSWER:**     The allegations of Paragraph 31 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the allegations of Paragraph 31 are construed to relate to or implicate Butler, those allegations are denied.  Butler denies that the VSC Program is a pyramid scheme.

32.     Unbeknownst to the VSC holders and contrary to the plain language of their VSC

contracts, neither Butler nor Heritage ever intended to take on the risk or responsibility for fully

funding VSC claims in the event that the monies set aside in the Loss Reserve Fund account

were insufficient to pay valid claims.

**ANSWER:**     Butler denies that it intended that VSC claims would not no honored.  Butler
                purchased the Insurance Policy from Heritage to establish its financial responsibility
                pursuant to the service contract statutes of Illinois, North Carolina, Colorado and
                many other states and to ensure that VSC claims would be honored.  Heritage's
                refusal to honor VSC claims arising under the Insurance Policy is inconsistent with
                the language of the Insurance Policy, Administrative Agreement, the VSCs, the
                course of dealing between Butler, Warrantech, and Heritage between 2001 and 2006,
                and with the provisions of the service contract statutes of Illinois, North Carolina, and
                Colorado.  Further answering, the Insurance Policy requires Heritage to pay VSC
                claims in excess of the Loss Reserve Fund subject to the limits of liability on the
                declarations page.

33.     According to court filings, Butler, the named obligor, has never paid any money

toward the payment of VSC claims, and never intended to. While Heritage partially funded the Loss

Reserve Fund account as the VSCs were sold and monies received, despite its contractual

responsibilities and the nature of its role as insurer, Heritage never intended to bear any risk that the

Fund would be insufficient. According to Heritage, in putting together the VSC program,

Warrantech told Heritage that it would be only a "fronting insurer" without "any downside

exposure" since funds taken from the sale of the VSCs would be sufficient to cover all claims.

Warrantech allegedly made similar representations to Butler. Further, according to a lawsuit filed by

American Re (the reinsurer for Heritage's VSC obligations) in Alabama, it was told by Warrantech

that there would be no risk to it for insuring the VSCs and that it would not be called upon to pay

any claims. Thus, each Defendant knew that, contrary to the language of the VSCs, neither the

obligor (Butler) nor the insurer (Heritage) nor the reinsurer (American Re), had any intention of

taking on the risk that the funds available from the sale on VSCs would be insufficient to pay valid VSC claims.

**ANSWER:**   Butler states that its contentions have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v. Butler,* Case No. 07 CV 6977, Case No. 07 CV 6977. Further answering, Butler denies the allegation that it did not intend to honor VSC claims insofar as the premiums it paid to Heritage were intended to honor VSC claims. Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations relating AmRe's suit in Alabama, and therefore neither admits nor denies same, but demands strict proof thereof.

34.   Moreover, according to a sworn statement by Butler's manager:

"Between 2001 and January 31, 2007, on information and belief, Heritage paid every claim from day one on all VSC claims which arose after the Heritage Policy went into effect. During this time, Heritage knew, understood, and agreed that Butler would not pay any covered claims under the VSCs in the first instance."

"Between 2001 and April 2007, at no time has Butler ever (i) paid or reimbursed any Heritage insured VSC claim that Warrantech determined was covered...";

"Between 2001 and April 2007, to the best of my knowledge, Heritage has never requested or required, as conditions to Heritage's payment of covered claims, that (ii) 60 days elapse before Heritage would pay or honor a claim

**ANSWER:**   Butler states that its contentions have been set forth in pleadings and motions filed in *Warrantech v. Heritage,* Case No. 07CV3539 and in *Heritage v. Butler,* Case No. 07 CV 6977., Case No. 07 CV 6977 and that the above statements ascribed to Butler were proffered in that litigation.

35.   Needless to say, none of the above facts were disclosed to VSC purchasers. As a result, all VSC holders have been misled and claims made by hundreds if not thousands of VSC contract holders have been systematically denied without any proper legal basis. According to Heritage itself, claims under the VSC policies are being submitted, but not paid, at a rate exceeding $200,000 per month. Despite outstanding claims which by now must exceed $1 million, Heritage now states that it has paid merely $220,000 in claims to VSC holders.

**ANSWER:**   Butler denies that it misled any VSC holders but states that it was misled by Heritage when Heritage terminated the Insurance Policy and simply stopped paying VSC claims although the Insurance Policy expressly required Heritage to honor claims under VSCs purchased before the Insurance Policy was terminated.

## PLAINTIFFS' VSC CLAIMS

36.    In December 2002, Mr. Kennedy purchased his VSC to cover a 2003 GMC Envoy, which he bought new in Colorado. In August 2007, Kennedy's vehicle sustained a mechanical failure which was covered by his VSC. Plaintiff took the vehicle to a local dealer which contacted Butler's claims administrator and submitted the claim. The administrator approved the repair being sought and acknowledged that the repair was covered under the VSC, but nonetheless refused to authorize payment for the repair--telling Kennedy and his dealer that they would need to seek payment directly from Defendant Heritage. Likewise, the website of Defendant Warrantech, Warrantybynet.com, also instructed VSC holders to submit claims directly to Defendant Heritage:

> From June 1, 2002 through August 2004, Warrantybynet, Inc. marketed and sold vehicle service contracts administered by Vemeco, Inc. ("Vemeco"). If you refer to the Declarations Page of your contract, you will see that the obligor is Butler Financial Solutions, LLC ("Butler"). As the obligor, Butler is responsible for the payment of all covered claims. You will also see that Butler's obligation to pay covered claims is insured by Heritage Warranty Insurance RRG, Inc. ("Heritage"), pursuant to Insurance Policy HWMIRRG-SC-WAR-0001, and reinsured through American Re.

> Warrantybynet, Inc. has recently learned, that although the insurance premiums that were collected on your behalf were remitted to Heritage several years ago, Heritage has stopped funding Vemeco for the purpose of paying covered claims. As such, you should follow the instructions on your Declarations Page and submit any claims directly to Heritage at its present address of 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017.

**ANSWER:**   Butler denies that Warrantech was Butler's claim administrator; instead, Warrantech was Heritage's administrator.  Butler lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 36 and therefore neither admits nor denies same, but demands strict proof thereof.

37.    After Butler rejected his claim, Mr. Kennedy contacted Defendant Heritage which likewise denied that it had any responsibility for paying for the repairs under the VSCs, explained that Butler is the responsible party under the contracts, and refused to pay, telling Plaintiff that any payment would have to come from Butler.

**ANSWER:**    Butler denies that it rejected Kennedy's claim. Further answering, on information and belief, Heritage has wrongfully advised VSC holders that Butler would have to satisfy their claims. The remaining allegations of Paragraph 30 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the allegations of Paragraph 30 are construed to relate to or implicate Butler, those allegations are denied.

38.    At this point, Kennedy had the approval of the claims administrator for his repair, and both of the parties who were liable to him for payment had refused, not for any substantive or procedural reasons, but simply because each said the other was responsible for payment. Kennedy also was aware that these same Defendants were in litigation with each other, and that neither was paying the similar legitimate bills of other VSC holders. Faced with this impasse, Kennedy filed his class action Complaint on behalf of himself and a class of VSC holders on September 11, 2007.

**ANSWER:**    Butler admits that Kennedy, a Colorado resident, filed suit in Florida, a venue which had no connection to the transaction, in September 2007.  The remaining allegations of Paragraph 38 are not directed at Butler, and therefore it makes no answer thereto. To the extent that the remaining allegations of Paragraph 38 are construed to relate to or implicate Butler, those allegations are denied.

39.    In *Warrantech Automotive, Inc. v. Heritage Warranty Insurance Risk Retention Group, Inc.,* Docket No. I :07-cv-3539 (" *Warrantech v. Heritage"),* Warrantech sued Heritage, and Heritage brought a counterclaim against Warrantech Automotive, Inc. and a third party claim against Warrantech Corp. and Vemeco, the administrators for Butler. In this litigation, these Defendants have made clear that they will continue to refuse to pay legitimate claims of Class members.

17

**ANSWER:**    Butler admits that in Case No. 07-3539, Warrantech sued Heritage, and in turn, Heritage sued Warrantech, Warrantech Corp. and Vemeco. Butler denies that any of these entities are administrators for Butler. Butler denies the remaining allegations of Paragraph 39 to the extent they relate to Butler.

40.    Thereafter, Heritage continued to refuse to pay claims of VSC holders, as did Butler.

**ANSWER:**    Butler admits that Heritage has continued to refuse to pay VSC claims and denies the remaining allegations of Paragraph 40.

41.    By course of dealing, and by its express rejection of Plaintiff Kennedy's claim, Heritage rejected Plaintiff Kennedy's claim, in advance of the 60 day period.

**ANSWER:**    The allegations of Paragraph 41 are not directed at Butler, and therefore it makes no answer thereto. To the extent that the allegations of Paragraph 41 are construed to relate to or implicate Butler, those allegations are denied.

42.    In spite of Heritage's refusal to pay Mr. Kennedy's claim or other Class members' claims, and its affirmative statements in sworn pleadings and elsewhere to that effect, once Heritage recognized that Kennedy had filed suit, and that Defendants had no legitimate defense to his claims, Heritage sent to Kennedy a check purportedly in full payment of his claim. Because he had filed his action as the representative of the Class asserted herein, and assumed the duties of a Class representative, Kennedy refused and demanded that Heritage "extend the present offer of settlement to include full relief to all individuals who have submitted valid claims but have not been reimbursed under their policies." Heritage has refused this demand. In subsequent sworn pleadings, Butler has ratified Heritage's attempt to buy off Mr. Kennedy's claims and Heritage's rejection of Kennedy's demand for class-wide relief.

**ANSWER:**    In information and belief, Heritage tendered payment to Kennedy in full payment of his claims. The remaining allegations of Paragraph 42 are not directed at Butler, and therefore it makes no answer thereto. To the extent that the remaining allegations of Paragraph 42 are construed to relate to or implicate Butler, those allegations are denied.

43.     Heritage, ratified by Butler, took the actions set out in Paragraph 42 above because (a) it had no defense to Mr. Kennedy's claim, and (b) it wanted to avoid Mr. Kennedy's lawsuit seeking relief on behalf of all other VSC holders.

**ANSWER:**     Butler denies that it ratified any conduct of Heritage.  The remaining allegations of Paragraph 43 are not directed at Butler, and therefore it makes no answer thereto. To the extent that the remaining allegations of Paragraph 43 are construed to relate to or implicate Butler, those allegations are denied.

44.     In June 2003, Mr. Mitschow purchased his VSC to cover a 2000 Chevrolet Blazer which he purchased in Connecticut. In May 2007, Mr. Mitschow's vehicle sustained a mechanical failure which was covered by his VSC. Mitschow took his vehicle to a local repair shop which contacted Butler's claims administrator and submitted the claim. The administrator never authorized payment for the repair .. indicating that Mr. Mitschow would need to seek payment directly from Defendant Heritage.

**ANSWER:**     Butler denies that Warrantech was Butler's claim administrator; instead, Warrantech was Heritage's administrator.  Butler lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 44 and therefore neither admits nor denies same, but demands strict proof thereof.

45.     In August 2007, Mr. Mitschow's vehicle sustained another mechanical failure which was covered by his VSC. Plaintiff took his vehicle to a different repair shop, contacted Butler's claims administrator, which never authorized payment for the repair .. indicating to Plaintiff that he would need to seek payment directly from Defendant Heritage. Thereafter, in mid-August 2007, Mr. Mitschow sent the two claims directly to Defendant Heritage via certified mail. A month later, in pleadings in *Warran tech v. Heritage,* Heritage confirmed that it was refusing to pay the claims of any VSC holders. Neither Heritage nor Butler has paid Mr. Mitshcow's claims.

**ANSWER:**     Butler denies that Warrantech was Butler's claim administrator; instead, Warrantech was Heritage's administrator.  Butler lacks sufficient information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 45 and therefore neither admits nor denies same, but demands strict proof thereof.

46.     On November 1, 2002, Ms. Mick purchased her VSC through Warranty-By-Net to cover a 1999 Jeep Grand Cherokee. The contract provided coverage for 60 months, five (5) years or 100,000 miles, with a zero deductible on claims. Prior to the Heritage-ButlerWarrantech dispute described in this Complaint, Heritage had paid Ms. Mick on valid claims as late as May 2007. Thereafter, though, the Defendants' dispute changed the Defendants' positions.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 46 and therefore neither admits nor denies same, but demands strict proof thereof.

47.     In September, 2007, Ms. Mick's vehicle required repairs that were covered by her VSC. Ms. Mick presented her facts to Warrantech through Vemeco, the Warrantech entity administering the VSC contract.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 47 and therefore neither admits nor denies same, but demands strict proof thereof.

48.     Ms. Mick received approval for her claim, but Warrantech refused to honor the approved claim.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 48 and therefore neither admits nor denies same, but demands strict proof thereof.

49.     Ms. Mick then sent a letter dated October 9, 2007 to Warrantech reiterating her request for payment. On October 16, 2007, Vemeco, through its legal department, sent Ms. Mick a letter stating that the VSC was underwritten by Heritage, that Heritage was not funding the account, and that therefore Vemeco could "only register this claim" and send a copy of the receipt to both Heritage and Butler to request reimbursement.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 49 and therefore neither admits nor denies same, but demands strict proof thereof.

20

50.     On November 9, 2007, Ms. Mick telephoned Heritage. On that same day, she received a response call from Heritage, and she complied with Heritage's request by faxing her invoice, receipt and the October 16, 2007 Vemeco letter.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 50 and therefore neither admits nor denies same, but demands strict proof thereof.

51.     Ms. Mick received no further response from Heritage and on December 6, 2007 she sent an e-mail to Warrantech and Heritage demanding payment. This e-mail was also ignored. Despite further telephone calls, Ms. Mick's claim has not been paid, and she has not received any further response.

**ANSWER:**     Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 51 and therefore neither admits nor denies same, but demands strict proof thereof.

## CLASS ACTION ALLEGATIONS

52.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other persons similarly situated, as members of a proposed class ("Class") defined as follows:

> All persons who purchased or hold a VSC: (i) in which Butler Financial Solutions, LLC is identified as the obligor; and (ii) which is currently in effect or was in effect as of December 2006.

Specifically excluded from the proposed Class are Defendants and their officers, directors and employees.

**ANSWER:**     Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate.

53.     The Class, as currently defined, is identifiable and unambiguous based upon objective information and criteria. Plaintiffs reserve the right to expand, limit, amend or otherwise

alter the class definition, or propose subclasses in response to facts learned through formal or concerns of the Court, or otherwise.

**ANSWER:**   Butler denies the first sentence of Paragraph 53.  The remaining allegations of Paragraph 53 are not directed at Butler, and therefore it makes no answer thereto.  To the extent that the remaining allegations of Paragraph 53 are construed to relate to or implicate Butler, those allegations are denied.

54.     Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. While the precise number of Class members is unknown to Plaintiffs, Defendant Warrantech recently represented in a sworn statement that, as of September 2007, "247,921 VSCs have been sold in the United States with Butler as the obligor." Because the identity of Class members are known to Defendants, the Class may readily be notified of the pendency of this action.

**ANSWER:**   Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate.  Further answering, Butler denies the allegations of Paragraph 54.

55.     Existence and Predominance of Common Questions of **Law and Fact.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions will include, but are not limited, to the following:

a.      Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. §2306, and whether they are therefore liable to Plaintiffs and the Class;

b.      Whether Butler is contractually obligated to pay claims under the VSCs;

c.      Whether a refusal to pay claims by Butler constitutes a breach of its VSCs with Class members;

d.      Whether Heritage's failure to fund or otherwise pay claims excuses Butler from its obligation to pay Class members' claims pursuant to the VSCs;

    e.      Whether Defendants' conduct, representations and/or omissions at the time the VSCs were entered into renders the contracts voidable at the option of the Class members;

    f.      Whether Heritage is contractually obligated to pay Class members' claims pursuant to the VSCs, the Insurance Policy and/or the Administrative Agreement;

    g.      Whether Class members are third-party beneficiaries of the Insurance Policy and/or the Administrative Agreement;

    h.      Whether Heritage breached its contracts with Butler and/or Warrantech by failing to fund or otherwise pay claims under the VSCs; and

    i.      Whether the Court should declare the parties' rights under the VSCs, the Insurance Policy and/or the Administrative Agreement, enjoin Butler and/or Heritage from continuing to refuse to pay claims under the VSCs by asserting that they have no obligations thereunder, and/or declare the VSCs voidable at the Class members' option.

**ANSWER:**    Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate. Further answering, Butler denies the allegations of Paragraph 55.

56.     Typicality. Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and each member of the Class are purchasers or holders of the VSCs at issue, have the same contractual rights with respect to Butler and Heritage, and received the same written disclosures with respect to the terms and conditions of their VSCs.

**ANSWER:**    Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate. Further answering, Butler denies the allegations of Paragraph 56.

57.     Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the members of the Class and Plaintiffs intend to prosecute this action vigorously and in the interests of the Class. To that effect, when Heritage attempted to "buy off" Plaintiff Kennedy by offering him the opportunity to have his individual claim satisfied at the expense of the Class,

23

Kennedy refused Heritage's chicanery. Plaintiffs Mick and Mitschow likewise disavow any similar effort by Defendants to "buy off" their claims at the expense of the Class. Plaintiffs have no interests that are adverse or antagonistic to those of other Class members, and have retained counsel experienced in complex consumer class action litigation.

**ANSWER:**    Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate. Further answering, Butler denies the allegations of Paragraph 57.

58.    Superiority. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts, and would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here. In addition, adequate notice can be given to Class members directly using information maintained in Defendants' records and, if appropriate, through publication notice.

**ANSWER:**    Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate. Further answering, Butler denies the allegations of Paragraph 58.

59.    Furthermore, the prosecution of separate actions by individual members of the Class would create a risk of (i) inconsistent or varying adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for Defendants; and (ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members who are not parties to the adjudications or substantially impair or impede their ability to protect their interests. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**ANSWER:** Butler admits that Plaintiffs seek to bring a class action per Rule 23 of the Federal Rules of Civil Procedure, but denies that a class action is factually or legally appropriate. Further answering, Butler lacks sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 59 and therefore neither admits nor denies same, but demands strict proof thereof.

### FIRST CLAIM FOR RELIEF
### (Violations of the Magnuson-Moss Warranty Act Against All Defendants)

60.     Plaintiffs assert this claim against Defendants on behalf of themselves and the Class, and incorporate by reference and reallege all paragraphs alleged herein.

**ANSWER:** Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

61.     Plaintiffs are consumers, as defined in the Magnuson-Moss Warranty Act ("MMWA").

**ANSWER:** Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

62.     Each Defendant is a "service contractor" under the MMWA.

**ANSWER:** Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

63.     The VSCs at issue in this action are "service contracts" as defined in the MMWA.

**ANSWER:** Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

64.    Plaintiffs have complied with all requirements and prerequisites under the

MMWA.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

65.    Under the MMWA, 15 U.S.C. §2306, the terms and conditions of a service contract

must be fully, clearly and conspicuously disclosed.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

66.    Defendants failed to fully, clearly and conspicuously disclose the terms and

conditions of the VSCs since, among other things:

a.    Each VSC states that Butler is the obligor. However, this disclosure is false

and misleading, since the Defendants never intended that Butler would pay or otherwise fund any

VSC claims as obligor, and Butler never did so. Unbeknownst to VSC holders, as structured, the

entire program was essentially a pyramid scheme which would necessarily need to rely upon the sale

of new VSCs to fully fund the payment of claims on the existing VSCs since, contrary to the

disclosures made, no party had assumed the risk that actual VSC claims would exceed the anticipated

amount;

b.    Each VSC states that Heritage insures the obligations of Butler under the

VSCs. However, this disclosure is false, misleading and, at best, incomplete, since Heritage

never intended to fully insure the obligations of Butler, except—it contends—in the case where

Butler actually declares bankruptcy. According to Heritage, it was only a "fronting insurer" without

"any downside exposure." Unbeknownst to VSC holders, as structured, the entire program was

essentially a pyramid scheme which would necessarily need to rely upon the sale of new VSCs to

fully fund the payment of claims on the existing VSCs since, contrary to the disclosures made, no

party had assumed the risk that actual VSC claims would exceed the anticipated amount;

c.    Each VSC states that it is reinsured by an additional insurance company, such as American Re. However, this disclosure is false, misleading and, at best, incomplete, since the reinsurers were told by Warrantech that there would be no risk to them for insuring the VSCs and that they would not be called upon to pay any claims. Thus, each Defendant knew that, contrary to the disclosures made in the VSCs, neither the obligor (Defendant Butler) nor the insurer (Defendant Heritage) nor the reinsurer (American Re), had any intention of taking on the risk that the funds available from the sale on VSCs would be insufficient to pay valid VSC claims;

d.    Each VSC states that if a covered claim is not paid in sixty days, VSC holders may file a claim directly with "the Insurance Company." However, the term "Insurance Company" is not defined and it is unclear whether it means just Heritage or Heritage and the reinsurer. Moreover, this disclosure is false, misleading and, at best, incomplete, since it suggests that the claims would be timely paid by an insurance company if not timely paid by Butler. Additionally, the disclosure did not state that the insurer would only pay if and when Butler declared bankruptcy or that payments would only be made if there were sufficient funds set aside from previous sales of VSCs. It also failed to disclose that neither the obligor (Defendant Butler) nor the insurer (Defendant Heritage) nor the reinsurer (American Re) had any intention of taking on the risk if the funds available from the sale on VSCs would be insufficient to pay valid VSC claims; and

e.    Each VSC states that if a covered claim is not paid in sixty days, VSC holders may file a claim directly with "the Insurance Company." Yet, this disclosure is false, misleading and at best, incomplete, since it suggests that a VSC holder must file a second claim should Butler fail to pay the initial filed claim within sixty days. In reality, and unbeknownst to

VSC holders, Heritage is contractually obligated to timely pay claims that were previously submitted to Butler whether or not the claim is resubmitted. Indeed, it did so without waiting for sixty days to elapse until 2007, when the Loss Reserve Fund account was largely dissipated. According to the contract between Butler and Heritage: "Upon failure of the Insured *[i.e.,* Butler] to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder claimant."

**ANSWER:**   Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

67.   Plaintiffs and Class members have suffered, and continue to suffer, damages as a result of Defendants' false, misleading and incomplete disclosures and their failure to comply with their obligations under 15 U.S.C. §2306 and the terms of the VSCs.

**ANSWER:**   Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(1) and 15 U.S.C. Section 1512.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract Against Butler)

68.   Plaintiffs assert this claim against Butler on behalf of themselves and the Class, and incorporate by reference and reallege all paragraphs alleged herein.

**ANSWER:**   Butler incorporates and re-alleges herein its answer to paragraphs 1-67 above.

69.   Butler is party to, and owes contractual duties under, the VSCs with Plaintiffs and other members of the Class.

**ANSWER:**   Butler admits it is a party to the VSCs and admits those duties imposed upon it by law, but denies it breached any contractual duties or those imposed by law.

70.   Butler is contractually obligated to pay claims under the VSCs to contract holders, and breached its contractual duties to Plaintiffs and other members of the Class by routinely and uniformly refusing to pay any of their claims under those contracts.

**ANSWER:**   Butler denies the allegations of Paragraph 70.

71.   As a direct result of Butler's breaches of its contractual obligations, Plaintiffs and other members of the Class have sustained damages in an amount to be determined. The measure of damages may include, *inter a/ia,* the amount paid for the VSCs, as those contracts have no value to Plaintiffs and Class members in light of the fact that Defendants uniformly refuse to pay any claims under those contracts.

**ANSWER:**   Butler denies the allegations of Paragraph 71.

**THIRD CLAIM FOR RELIEF**
**(Voidable Contracts Against All Defendants)**

72.   Plaintiffs assert this claim against Defendants on behalf of themselves and the Class, and incorporate by reference and reallege all paragraphs alleged herein.

**ANSWER:**   Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

73.   As a result of Defendants' failure to communicate all of the essential terms, conditions, exclusions and limitations of the VSCs and/or their inability or unwillingness to pay valid claims, the VSCs were entered into as a result of fraud or mistake and they never formed enforceable contracts with Plaintiffs and the Class.

**ANSWER:**   Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

74.   Based on the foregoing, Plaintiffs and the Class are entitled to a ruling that the VSCs are voidable at the option of Plaintiffs and the Class. Plaintiffs and the Class are also entitled to compensatory damages in an amount to be determined. The measure of damages may include, *inter a/ia,* the amount paid for the VSCs, as those contracts have no value to Plaintiffs and Class members in light of the fact that Defendants uniformly refuse to pay any claims under.

**ANSWER:**   Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FOURTH CLAIM FOR RELIEF
### (Breach Of Third-Party Beneficiary Contracts Against Heritage)

75.    Plaintiffs assert this claim against Heritage on behalf of themselves and the Class, and incorporate by reference and reallege all paragraphs alleged herein.

**ANSWER:**    This count is not directed at Butler and therefore, Butler makes no answer thereto.

76.    Heritage issued the Insurance Policy to Butler, whereby it agreed to pay claims under the VSCs if Butler failed to perform under those contracts. The Insurance Policy states:

> UPON FAILURE OF THE INSURED *[i.e., Butler]* TO PERFORM UNDER THE SERVICE CONTRACTS *[i. e.,*the VSCs], HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC. SHALL PAY ON BEHALF OF THE INSURED ANY SUMS THE INSURED IS LEGALLY OBLIGATED TO PAY OR SHALL PROVIDE THE SERVICE THAT THE INSURED IS LEGALLY OBLIGATED TO PERFORM ACCORDING TO THE INSURED'S CONTRACTUAL OBLIGATION UNDER THE SERVICE CONTRACTS ISSUED BY THE INSURED...

It further states:

> "UPON FAILURE OF THE INSURED *[i.e.* Butler] TO PAY OR PROVIDE SERVICE ON A VALID CLAIM WITHIN SIXTY (60) DAYS AFTER PROOF OF LOSS HAS BEEN FILED WITH THE INSURED *[i.e.* Butler] COVERAGE HEREUNDER SHALL BE PROVIDED DIRECTLY TO THE SERVICE CONTRACT HOLDER CLAIMANT."

Thus, as evident by the contractual language, and the parties' own conduct, Butler and Heritage clearly manifested their intent that the contract primarily and directly benefit Plaintiffs and the Class.

**ANSWER:**    This count is not directed at Butler and therefore, Butler makes no answer thereto.

77.    Heritage breached its contract with Butler by refusing to pay the claims of Plaintiffs and the Class, thereby causing them damage.

**ANSWER:**    This count is not directed at Butler and therefore, Butler makes no answer thereto.

78.   Heritage is also a party to the Administrative Agreement with defendant Warrantech, by which Heritage agreed to, among other things, be responsible for all VSC claim costs, to fund an account for payment of VSC claims and to indemnify Warrantech in numerous situations, including Heritage's failure to pay claims. Thus, as evident by the contractual language, and the parties' own conduct, Warrantech and Heritage clearly manifested their intent that the contract primarily and directly benefit Plaintiffs and the Class.

**ANSWER:**   This count is not directed at Butler and therefore, Butler makes no answer thereto.

79.   Heritage breached its contract with Warrantech by refusing to fully fund the Loss Reserve Fund account and/or indemnify Warrantech for its wrongful actions so that valid claims could be paid, thereby causing damage to Plaintiffs and the Class.

**ANSWER:**   This count is not directed at Butler and therefore, Butler makes no answer thereto.

80.   As a result of Heritage's actions, consumers who present valid claims are having their claims rejected or ignored, and the Defendants by their litigation have made clear that none of them will pay legitimate claims. Thus, even if Heritage were to pay currently submitted claims, it has declared its intent not to do so in the future, and Plaintiffs and the Class have a reasonable expectation that absent a Court order, Heritage will continue to breach its contracts in the future.

**ANSWER:**   This count is not directed at Butler and therefore, Butler makes no answer thereto.

81.   Based on the foregoing, Plaintiffs and the Class are entitled to: (i) a ruling that the Insurance Policy and/or the Administrative Agreement create an obligation on Heritage's behalf to pay the valid claims of Plaintiffs and the Class; and (ii) an order requiring Heritage to pay their claims as well as any future claims. Plaintiffs and the Class are also entitled to compensatory damages in an amount to be determined. The measure of damages may include, *inter alia,* the

31

amount paid for the VSCs, as those contracts have no value to Plaintiffs and Class members in light of the fact that Defendants uniformly refuse to pay any claims under those contracts.

**ANSWER:**    This count is not directed at Butler and therefore, Butler makes no answer thereto.

### FIFTH CLAIM FOR RELIEF
### (Declaratory Relief Against All Defendants)

82.    Plaintiffs assert this claim against Defendants on behalf of themselves and the Class, and incorporate by reference and reallege all paragraphs alleged herein.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

83.    Plaintiffs and other members of the Class hereby seek declaratory relief in the form of an order declaring their rights under the VSCs, the Insurance Policy and the Administrative Agreement, including their contractual rights to require both Butler and Heritage to pay claims under those contracts.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

84.    Plaintiffs and other members of the Class hereby seek declaratory relief in the form of an order declaring that Butler, Heritage and Warrantech failed to fully, clearly and conspicuously disclose the terms and conditions of the VSCs, thereby entitling them to an award of damages and rendering the VSCs voidable at the Class members' option.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

85.    The equities support granting the declaratory relief requested herein, as Plaintiffs and other Class members have been deprived of the value of the VSCs because of an actual controversy that is ripe for adjudication as to the extent of Defendants' obligations under the various contracts.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

86.    Plaintiffs and Class members have a reasonable fear and expectation that Butler and Heritage will continue to refuse payment on legitimate VSC claims in the future, leaving them with worthless VSCs, unreimbursed VSC claims and claims that may accrue in the future.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

87.    Moreover, Heritage has alleged that Warrantech refuses to cooperate with Heritage and refuses to administer the VSCs, making future damage to Plaintiffs, the Class and other VSC holders inevitable.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

88.    Granting the declaratory relief requested herein would be just and equitable under the circumstances, particularly because there are believed to be tens of thousands of consumers who purchased VSCs that are still in force, all of whom would benefit from a judicial declaration that Defendants cannot lawfully refuse to pay valid claims solely by "pointing fingers" at each other.

**ANSWER:**    Butler has moved to dismiss this count pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel of record to represent the Class;

B.    For compensatory damages sustained by Plaintiffs and other members of the Class as a result of Defendants' breaches and awarding such prejudgment interest as may be allowed by law;

C.    For imposition of a constructive trust, in favor of Plaintiffs and members of the

Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

  D.  For declaratory relief as set forth above, including a declaration that the VSCs are voidable at the option of Plaintiffs and the Class;

  E.  For restitution, disgorgement and/or other equitable relief as the Court deems proper;

  F.  For a permanent injunction prohibiting Defendants and their agents, employees, representatives and all persons acting on their behalf from engaging in the conduct and practices

  G.  For reasonable attorneys' fees and costs of suit, including, *inter a/ia,* filing fees, costs and expert witness fees; and

  H.  For such other and further relief as this Court may deem just and proper.

**ANSWER:**  Butler denies that Plaintiffs are entitled to any relief whatsoever from Butler.

### <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

## BUTLER FINANCIAL SOLUTIONS, LLC'S CROSS-CLAIM
## AGAINST HERITAGE WARRANTY MUTUAL RISK RETENTION GROUP

Defendant, Butler Financial Solutions, LLC ("Butler") brings this Cross-Claim against Heritage Warranty Mutual Risk Retention Group, Inc. a/k/a Heritage Warranty Insurance RRG, Inc.("Heritage"), and alleges as follows:

### Nature of Action

1.       This is an action against Heritage arising from its failure to pay or fund the payment of covered repair claims and/or losses arising under the terms of vehicle service contracts ("VSCs"). These VSCs were sold while an insurance policy issued by Heritage to Butler was in full force and effect.  These covered claims and/or losses, and Heritage's obligation to honor, pay, and fund them arise under both (i) the Heritage policy and (ii) in accordance with agreements relating to the administration of those claims. Heritage has breached its obligations to Butler and the purchasers of vehicle service contracts, including purchasers of such contracts in Illinois.

2.       Butler has sustained damage to its reputation and its ability to conduct business, and is facing the specter of almost limitless liability from tens of thousands of VSC holders.  (The policy issued by Heritage to Butler is attached hereto as **Exhibit A**.  The administration agreement and amendment are attached hereto as **Exhibit B** and are collectively referred to herein as "Administrative Agreements.")   In addition, Heritage has improperly demanded from Butler reimbursement of $220,000.00 for payment of losses which Heritage is in fact obligated to pay and honor.

3.       Butler is the obligor under Vehicle Service Contracts ("VSCs") which consumers typically purchase in conjunction with their purchase of automobiles or, later, through such media as the internet.  Under the laws of many states, the obligors of VSCs are required to establish proof of financial responsibility through various means, including acquiring insurance coverage such as was provided by Heritage in this case through the policy and Administration Agreements.

4.      As obligor, Butler is initially responsible for paying or funding claims submitted under the VSCs for the repairs to the subject vehicles. However, under the operative agreements in this case and pursuant to service contract statutes in many states, including Illinois, Heritage, as insurer, agreed to insure, fund, honor, and pay these repair claims. Indeed, as will be established in more detail below, Heritage controlled virtually all aspects of the VSC program, including the amount of premium to be charged for the VSCs, the amount of money to be placed in Heritage's so-called Loss Fund Reserve for each VSC, and withdrawals from the Loss Fund Reserve.

5.      Over the course of the five years that Heritage insured Butler and its liability incurred under the VSCs, over 50,000 VSCs insured by Heritage were sold across the United States, including Illinois, and Heritage collected more than $25,000,000 in premiums and Loss Reserve Funds in connection with the estimate of losses to be incurred for claims arising under the VSCs.

6.      At all relevant time hereto, claims and/or losses arising under the Heritage policy and the Administrative Agreements have been administered by Warrantech Automotive, Inc. ("Warrantech") or its affiliates. Warrantech is Heritage's third party administrator. In breach of its obligations under the insurance policy and the administrative agreements, Heritage has failed and refused to pay, honor, and fund valid claims and losses submitted by VSC holders, to the financial detriment of Butler and the VSC holders.

7.      As will be discussed in further detail below, the Heritage policy and the associated Administrative Agreement relate to the same subject matter, expressly refer to each other, and must be read together to understand the rights, obligations and liabilities of Heritage, Butler and Warrantech.

8.      VSC holders continue to tender covered claims to Warrantech (or its subsidiaries), in its capacity as Heritage's third party administrator for payment by Heritage as required by its

insurance policy. Heritage, however, is directing VSC holders to look to Butler for payment of claims.

9.      As a result of Heritage's refusal to fund, pay, and honor its obligations under the insurance policy it issued to Butler and the administrative agreements, Butler is facing mounting claims and potential exposure to legal actions by VSC holders with unsatisfied claims, and other damages, for which Heritage is responsible. Butler has been named as a Defendant in this instant, purported nation-wide class action suit arising out of Heritage's wrongful refusal to honor VSC claims (hereinafter referred to as "VSC Holder Class Action"). The VSC Holder Class Action was originally filed in federal court in Florida. That case was recently transferred to this district and has been assigned Case No. 08-CV-01862.

### Parties

10.      Butler is a limited liability company organized under the laws of the state of Delaware. Butler's principal place of business is located in North Carolina, and the sole member of the limited liability company is domiciled in Florida.

11.      Upon information and belief, Heritage is a South Carolina corporation whose principal place of business is in Ohio and/or Nebraska.

### Jurisdiction and Venue

12.      This Court has jurisdiction over the parties and matters alleged herein pursuant to 28 U.S.C. § 1332, and venue herein is appropriate pursuant to 28 U.S.C. § 1391.

13.      This Court also has jurisdiction over Heritage because Heritage has, within relevant time periods, contracted to insure a person, property or risk located within the State of Illinois at the time of contracting and/or transacted business within Illinois, including insuring hundreds and hundreds of VSCs in Illinois which were sold while the Insurance Policy was in effect.

14.    Venue is also appropriate in this Court because the Heritage, Warrantech and Butler expressly agreed that if a dispute arose between the parties under the administrative agreements, which could not be resolved amicably, either party "could make use of the federal and/or state courts of the State as of Illinois for the purpose of resolving such dispute." (See Amendment No. 1 to Administrative Agreement, attached hereto as **Exhibit B**.) In addition, pursuant to the Heritage policy and at Butler's request, Heritage must submit itself to the jurisdiction of any court in the event Heritage refuses to honor and pay claims arising under the policy. Warrantech filed its action in Illinois state court pursuant to this venue provision and Butler files this Cross-Claim in this Court pursuant to this venue provision.

15.    Furthermore, venue is proper in this Court because the United States District Court for the Southern District of Florida granted Butler's motion to dismiss or transfer for improper venue of *forum non conveniens*

## **Choice of Law**

16.    The parties to the Administrative Agreement expressly agreed that the agreement "shall be interpreted in accordance with the laws of the State of Illinois." (See Administrative Agreement, **Exhibit B**, provision XX.)

17.    The material terms of the Administrative Agreement and of the Insurance Policy, to the extent the terms of the Insurance Policy were negotiated and the parameters of the VSC program were originally negotiated in Illinois in a meeting in Illinois.

18.    In addition, the Insurance Policy and the associated Administrative Agreement relate to the same subject matter, expressly refer to each other, and must be read together to understand the rights, obligations and liabilities of Heritage, Butler and Warrantech, and accordingly, Illinois law governs the interpretation of the Insurance Policy.

19.     In addition, at all relevant times hereto, there existed in the State of Illinois, a statute commonly known as the Service Contract Act, 215 ILCS 152/1, *et seq.* The Service Contract Act imposes certain requirements upon service contract providers such as Butler and insurance carriers of service contracts such as Heritage. Colorado, the home state of Plaintiff Kennedy, and North Carolina, the home state of Plaintiff Mitschow, have enacted similar service contract statutes, C.R.S.A. 42-11-101, *et seq.*, and N.C.G.S.A. 66-370, *et seq.*

20.     *Inter alia,* the Illinois Service Contract Act essentially requires as a condition of selling vehicle service contracts in this State, vehicle service contracts must be backed by an insurance policy which will reimburse the service contract provider or pay on behalf of the service contract provider all covered sums which the service contract provider is legally obligated to pay. The service contract statutes of Colorado and North Carolina contain similar provisions.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Vehicle Service Contracts

21.     When a consumer purchases an automobile, the consumer also can purchase a VSC. A consumer can also purchase a VSC independently over the internet or through other means. A VSC is akin to an extended service warranty. With the purchase of a VSC, the consumer is insured for certain types of covered auto repairs for a certain period of time, generally one to seven years. A copy of a typical VSC is attached hereto as **Exhibit C**.

22.     The VSCs at issue herein were marketed, distributed and administered by Heritage's third-party administrator, Warrantech. Heritage maintained control over and subject to various state regulations, approved all aspects of the VSC Program administered by Warrantech, including the terms and conditions of the VSCs and the premiums to be charged for each VSC sold and the Loss Reserve Fund to be set aside for each VSC sold.

23.    Heritage also controlled the amount of money to be held in or transferred to the Loss Reserve Fund for losses and claims arising under the Heritage policy and Administration Agreements.

24.    Heritage established and/or approved various fiduciary accounts from which VSC claims were to be paid or satisfied including, on information and belief, a Dealer Remit Holding Account, a Claims Imprest Account, a Claims Management Reserve Fund Account, and a Reinsurance Trust Account.

25.    The VSCs at issue approved by Heritage herein expressly informed purchasers that Butler's obligation to perform thereunder was insured by Heritage and reinsured by American Re.

26.    At all relevant times hereto, Butler had no authority to make, alter, modify any terms of any VSCs and the premiums to be paid to Heritage or the amount of the Loss Reserve Fund to be set aside.

27.    On information and belief, the existence of reinsurance for an insurer of a service contract provider is not required by statute.  In addition, the procurement by Heritage of and the continued existence of reinsurance for Heritage were not material terms of either the insurance policy issued by Heritage or the Administrative Agreements.

28.    Accordingly, the absence, commutation, discontinuance, cancellation, expiration, or decrease in the limits of reinsurance for Heritage were not grounds for Heritage to terminate the policy or the Administrative Agreements or to cease honoring claims and/or losses under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements.

29.    Butler provides services to Warrantech, including acting as the obligor for the VSCs in states where it is authorized by law to do so. Butler also acts as the obligor for VSCs where acting as obligor is no precluded by state law.

### The Insurance Policy Issued by Heritage

30.    The VSCs for which Butler is the obligor are insured by a "Service Contract Reimbursement Insurance Policy," Policy No. HWMIRRG-SC-WAR-001 (the "Heritage Policy") issued by Heritage to Butler. A true and correct copy of the Heritage Policy is attached hereto as **Exhibit A** and incorporated herein by reference.

31.    Butler is the named insured under Heritage's policy and is a party in interest in this case.

32.    Approximately forty states, including Illinois, have consumer protection/financial responsibility laws which regulate the marketing, distribution and administration of and insurance coverage for VSCs. These laws impose certain requirements upon service contract providers such as Butler and insurance carriers of service contracts such as Heritage.

33.    Typically, before VSCs can be sold or marketed in a particular state, a contract provider or obligor like Butler is required to establish its financial responsibility in one of three ways: (i) maintain net worth of at least one million dollars; (ii) maintain a funded reserve account in an amount equal to or greater than forty (40%) percent of the sums received for the payment of VSCs; or (iii) purchase an insurance policy directly from an insurer or through a risk retention group. Such insurance and the VSC state statutes ultimately protect the VSC holder and the consumer from loss under VSCs.

34.    Butler chose the third option, an insurance policy from Heritage, to establish its financial responsibility and to comply with the VSC statutes of Illinois and other states where VSCs were marketed and sold.

35.    Because Heritage issued the policy and was required to honor and pay VSC claims arising under its policy, Heritage sought to control and maintain the ultimate authority as to how the VSC program at issue was run, funded and how, when and in what amount claims were to be paid

for. Heritage wielded this control to minimize the exposure to Heritage to an underwriting loss or to a defalcation on another party's part.

36.     The Heritage Policy covers twelve (12) month periods and automatically renews unless terminated by notice each period. The first period for the Heritage Policy commenced on December 31, 2001, and the Policy automatically renewed each year thereafter.

37.     Heritage received premiums for the Heritage Policy from revenues generated from the sales of VSCs. In fact, although the duration of the VSCs could run for as long as 5 to 7 years, Heritage charged and received up-front all premiums for VSCs. Heritage received all the premiums up front because Heritage was obligated to honor, pay, and fund claims under all VSCs purchased while the Heritage Policy and Administrative Agreements were in full force and effect.

38.     In other words, any cancellation or termination by Heritage of the Heritage Policy and the Administrative Agreements would not terminate or cancel Heritage's obligation to fund, honor, and pay claims and losses for then-existing VSCs, premium for which Heritage had fully received.

39.     Under the Policy, Heritage agreed to pay for the cost of repairs, claims, and/or losses that are covered under the terms of the VSCs.

40.     In Section I.1, under the Heritage Policy's insuring agreements, Heritage agrees to pay all repair and replacement costs of VSC holders under each VSC:

> The Company will indemnify the Insured against Loss, subject to the Loss Reserve Fund provision herein, arising out of the reasonable and customary cost of repair or replacement under and in accordance with all the terms of the Service Contracts issued by the Insured on or after the inception date of this Policy, as follows:
>
> UPON FAILURE OF THE INSURED TO PERFORM UNDER THE SERVICE CONTRACTS, HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC. SHALL PAY ON BEHALF OF THE INSURED ANY SUMS THE INSURED IS LEGALLY OBLIGATED TO PAY OR SHALL PROVIDE THE SERVICE THAT THE INSURED IS LEGALLY OBLIGATED TO PERFORM ACCORDING TO THE INSURED'S CONTRACTUAL OBLIGATION UNDER THE SERVICE CONTRACTS ISSUED BY THE INSURED, And

HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., WILL PAY CLAIMS AGAINST THE INSURED FOR RETURN OF THE UNEARNED PURCHASE PRICE OF THE SERVICE CONTRACT.

41.     Section I.1 requires Heritage to pay the claims and/or losses of VSC holders directly when Butler fails to make payments on covered claims:

> Upon failure of the Insured to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder claimant.

42.     Heritage also agrees in Section I.3 of the Policy to "indemnify the Insured or, in the alternative, pay directly to the repairing agency or Service Contract Holder in accordance with the Service Contract issued by the Insured."

43.     Under Section II.1 of the Heritage Policy, the term "Administrator" is defined as "[Heritage's] designated administrator in accordance with the Administration and Service Agreement."

44.     Under Section II.5 of the Heritage Policy, "Loss" is defined as "any and all valid claims arising during the period covered by the terms and conditions of the Service Contract at the time the Service Contract was issued."

45.     Under Section IV.20 of the Heritage Policy, Heritage may cancel the Policy with "written notice stating a date not less than thirty (30) days thereafter when such cancellation shall be effective."

46.     Although the VSCs are issued for periods of one to seven years, allowing the submission of claims over the course of several years, Section IV.2 of the Heritage Policy provides that the premium from each VSC "shall be fully earned" by Heritage at the time it is issued.

47.     The VSCs reflect that Heritage is the insurance company that will stand behind them and provide protection in the event that claims are made. For example, the VSC attached hereto as Exhibit CA states:

> The obligation of the provider [Butler] to perform under this Contract is insured by Heritage Warranty Mutual Insurance Risk Retention Group, Inc. . . . under a motor Vehicle Service Contract reimbursement policy, and reinsured by American Re – a national A+ rated company and a member of the Munich Re Group. If a covered claim is not paid within sixty (60) days [except in Arizona thirty (30) days], after proof of loss has been filed, You may file a claim directly with the Insurance Company.

The 60-day requirement for Heritage to honor and pay claims and losses tracks the 60 day requirement for same under the Illinois Service Contract Act and similar statutes in other states.

48.    The Heritage policy contains a cancellation clause which requires Heritage to provide Butler at least 30 days prior written notice of Heritage's intent not to renew the policy, that is, December 1 is the latest date in any year which Heritage can notify Butler of its intent not to renew the subject policy.

49.    Butler's address for the receipt of notices required under the policy is 2300 Corporate Boulevard NW, Suite 214, Boca Raton, Florida, 33431.

50.    The Heritage policy is not a claims made policy with respect to Heritage's requirement to pay or perform its obligations under VSCs after the cancellation of its policy. In fact, Heritage's obligation to pay claims under existing VSCs survives the cancellation of the policy: "Cancellation of this Policy shall not reduce the Company's [Heritage's] liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect." The laws of many states, including for example, Illinois, require that an insurance policy, such as the one issued by Heritage in this case, reimburse or pay all covered sums which the service contract provider is required to pay. See e.g., 215 ILCS 152/20. The service contract statutes of Colorado and North Carolina contain similar provisions.

### The Administrative Agreement Between Butler, Warrantech and Heritage

51.    On or about March 15, 2001, Warrantech and Heritage entered into an Administrative Agreement. The Administrative Agreement sets forth the rights and obligations

between the parties with respect to the VSCs sold by others and administered by Warrantech and under which valid claims are to be paid by Heritage pursuant to the Heritage Policy. A true and correct copy of the Administrative Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

52.     The Heritage policy and the associated Administrative Agreement relate to the same subject matter, expressly refer to each other, and must be read together to understand the rights, obligations and liabilities of Heritage, Butler and Warrantech.

53.     Heritage requested that Butler agree to and acknowledge the terms and conditions under which Warrantech would act as the third party administrator for Heritage under Heritage's liability for claims and losses arising under VSCs for which Butler was the obligor, which claims and losses were to be honored, paid and funded under the policy issued by Heritage for which Butler was the named insured.

54.     At all relevant times hereto, Warrantech acted as an administrator and claims adjuster for both Heritage and the VSC holders under Heritage's direction and authority. Warrantech determines whether a particular repair is covered under the terms of the VSC program and pays the reasonable cost of that repair from a fund established and maintained by Warrantech pursuant to the Administrative Agreement and the Heritage Policy.

55.     Butler has played no role in the administration of claims, the day-to-day operations and management of the Administration Agreement, the setting of premiums, or the determination of the amount of funds to be deposited into the Loss Reserve Fund.  In addition, at all relevant times hereto, Butler had no authority to make, alter, modify any terms of any VSCs, the premiums to be paid to Heritage on the sale of each VSC or the amount to be set aide for the Loss Reserve Fund.

56.     Heritage exercised control over virtually all aspects of the VSC program including (a) the amount of premium to be charged for the VSCs; (b) the amount of money to be placed in

45

Heritage's Loss Reserve Fund for each VSC sold; and (c) withdrawals of monies from the Loss Fund Reserve.

57.     Heritage, as the insurer of Butler, is responsible and liable to pay or reimburse VSC holders for covered claims and losses in accordance with the terms and conditions of the VSCs.

58.     The Administrative Agreement provides that Heritage retained the services of Warrantech solely to "market and administer" VSCs sold to vehicle purchasers "pursuant to the terms and conditions set forth herein and pursuant to the terms and conditions of the insurance provided by [Heritage]."

59.     The Administrative Agreement provides at Section I.B that "Warrantech shall serve as [Heritage's] administrator of Vehicle Service Contracts which are provided by [Heritage]." Warrantech is not Butler's third party administrator.

60.     Section III of the Administrative Agreement provides that the Administrative Agreement is subject to the terms and conditions of the Heritage Policy:

> This Agreement, and the duties to be performed by Warrantech and [Heritage] as contained herein, are in conjunction with the insurance provided by[ Heritage] for Programs. To the extent, that terms and conditions of this Agreement conflict in any way with any of the terms and conditions of the Insurance, as defined in the insurance contract, the terms and conditions of the insurance contract shall prevail.

61.     Like the Heritage policy, Heritage's obligations under the Administrative Agreements to pay or reimburse claims under then existing VSCs continues even after the Administrative Agreement is terminated or cancelled, Section XI.F.1 requires Heritage

> to continue to perform all functions and obligations required by this AGREEMENT as if this AGREEMENT were in full force with respects [sic] to all Vehicle Service Contracts with effective dates prior to the termination date of this AGREEMENT. Such service shall continue until all Vehicle Service Contracts expire or are canceled and all Claims thereunder have been paid or a mutually acceptable arrangement for the fulfillment of such obligations is evidenced by a written agreement between the parties.

62.     Heritage could terminate the Administrative Agreement in certain specified ways for a number of specified reasons. Among other things, Heritage could terminate the Agreement if

Warrantech violated the Agreement, Heritage notified Warrantech of the default in writing, and the default was not cured within 30 days.

63.    In addition, in Section VIQ of the Administrative Agreement, Heritage granted Warrantech, its third party administrator, the authority to propose to Heritage changes and revisions to the VSCs to increase profits and decrease losses the parties might sustain under VSCs. Warrantech could not change any of the VSC programs unilaterally; instead, Heritage had sole authority to accept or reject any such proposals and to unilaterally make changes to the VSC programs.

64.    Any alleged negligence by or failure of Warrantech in proposing changes to VSC programs to Heritage would only result in Heritage's withdrawal of its grant of authority to Warrantech to propose changes to the VSC programs.  Therefore, Such failure or negligence could not be invoked by Heritage to terminate the Heritage policy it issued to Butler, to terminate the parties' Administrative Agreements, or to cease honoring claims or losses incurred under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements.

65.    In the Claims Handling Addendum to the Administrative Agreement, Section I.I.1, Warrantech maintains a "[Heritage] funded [and] controlled disbursement claim payment bank account" for the purpose of paying out and settling all covered VSC claims. Under Section VI.H.2 of the Administrative Agreement, Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."

66.    Section II.F of the Claims Handling Addendum to the Administrative Agreement states, "Heritage is responsible for all claim costs and all claim administration costs."

67.    On December 17, 2002, Heritage and Warrantech executed Amendment Number 1 ("Amendment 1") to the Administrative Agreement modifying the rights and obligations between

the parties. Under Amendment 1, Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."

68.    Section II.b of Amendment 1 states again that "Warrantech shall maintain a [Heritage] funded and controlled disbursement claim payment bank account at an FDIC insured bank . . . selected by Heritage." Section II.b specifies this account is for the "payment of Claims" submitted by VSC holders.

69.    Section II.g of Amendment 1 requires that Heritage "promptly fund the Claims... submitted by Warrantech from the bank account more specifically described in Section I(I)(1) of this Addendum."

70.    Heritage had the sole authority and ability to determine how much of the premiums to place into loss reserve funds and disbursement claim bank accounts.  On information and belief, Heritage conducted its own underwriting and actuarial analyses and calculations of loss frequency and severity based on its own data and on information supplied by Warrantech.

71.    From the sale of VSCs, Heritage received up front, on information and belief, more than $25,000,000.00 in insurance premiums and other monies from the sale of VSCs.  Heritage treated this money as fully earned premium.

## Course of Dealing

72.    At all relevant times, Heritage knew, understood, and agreed that Butler would not pay any covered claims under VSCs in the first instance. Rather, Warrantech would report all covered claims and/or losses to Heritage and pay those claims and/or losses out of the bank account set up and funded by Heritage.

73.    Between approximately late 2001 through April 2007, Warrantech, as Heritage's administrator, administered and adjusted claims made by VSC holders and insured by Heritage. Warrantech determined which VSC claims were covered and the amount that should be paid for

48

these claims. Upon information and belief, Warrantech with Heritage's approval either authorized the payment of these claims from the disbursement claims payment bank accounts and loss reserve funds which were funded and controlled by Heritage or was reimbursed for monies advanced by Warrantech for the payment of valid VSC claims.

74.    At no time did Heritage require, as conditions to Heritage paying covered claims, that: (i) Butler demonstrate financial inability to pay or any other reason for not paying covered claims; (ii) the dollar amounts paid for covered claims exceed any particular threshold or limit; or (iii) Butler fail to pay any claims for sixty (60) days or any other period of time. Heritage continued to pay all covered claims under the VSCs without requiring Butler to fulfill these conditions for five years.

### Heritage's Refusal To Pay Claims

75.    At all relevant times, Heritage represented that American Re-Insurance Company ("American Re") reinsured Heritage as further security for covered VSC claims. With Heritage's knowledge and acquiescence, VSCs were sold with the express written representation that Heritage's payment obligations were fully reinsured by American Re. (See Exhibit C.)

76    On information and belief, in May 2006, American Re advised Warrantech that American Re's reinsurance agreements with Heritage were fully commuted and no longer in effect.

77.    Under the claims handling addendum, Warrantech was prohibited from communicating with Heritage's reinsurers. Heritage retained the sole right and responsibility to report to its reinsurers all facts, notices, documents, and information sufficient to comply with Heritage's reporting requirements to its reinsurers.

78.    The commutation of reinsurance was done without the knowledge or consent of Butler, Warrantech, or the VSC holders.

79.    In April 2007, Heritage informed Butler for the first time that in late 2006 and early 2007, the amount of re-insurance funds from Heritage's other re-insurers had been dissipated or were depleted.

80.    Heritage's loss of its reinsurance safety net is an improper ground to terminate the insurance policy issued by Heritage or the parties' Administrative Agreements or to cease honoring claims under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements.

81.    The commutation, loss, reduction, or cancellation of Heritage's reinsurance, particularly if it was done with Heritage's knowledge and acquiescence, does not constitute commercial impracticability which would excuse Heritage's obligations to perform all payment and performance obligations under the Heritage policy or the Administration Agreements.

82.    On December 15, 2006, Heritage informed Warrantech that Heritage would "look to Warrantech to continue to pay claims" "if Butler fails to perform as [the VSC] programs' service contract obligor or files a claim under the Heritage policy."

83.    In direct violation of Section IV.20 of the Heritage Policy requiring thirty (30) day notice of cancellation, on December 29, 2006, Heritage wrote to Butler purporting to cancel the Heritage Policy "effective at midnight on December 31, 2006." Heritage did not send the cancellation notice to Butler in Florida as required by the policy; instead it sent the purported cancellation notice to Butler in care of Warrantech in Texas.

84.    On information and belief, by letter dated March 23, 2007 to Warrantech, Heritage agreed to resume paying all covered VSC claims and cancellations "for an interim period" subject to a reservation of rights.

85.    On information and belief, by letter dated April 11, 2007 to Warrantech, Heritage again refused to continue satisfying covered VSC claims and stated that, "Warrantech should

continue to pay losses and cancellations as they are incurred applying whatever funds may be available."

86.    The commutation, loss, reduction, or cancellation of Heritage's reinsurance, on information and belief, magnified the problem caused by Heritage's failure to adequately or properly fund the amount of money contained in the Loss Reserve Fund.

87.    Further, Heritage has claimed that it cancelled the insurance policy and Administrative Agreement because Warrantech was allegedly negligent in not modifying the VSC programs and raising the rates charged for same. However, as set forth above, Warrantech only had the authority to suggest changes to Heritage regarding the pricing structures for the VSC programs, and any negligence by Warrantech in this regard could not be validly be relied upon by Heritage to terminate the Heritage policy and Administrative Agreements or to cease honoring claims under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements.

88.    As of the date of this action, Heritage continues to refuse to pay covered VSC claims and losses, both those already submitted and those that may be submitted in the future.

89.    Upon information and belief, Heritage has been and continues to be contacted by numerous VSC holders seeking payment or resolution of their claims. Upon information and belief, Heritage has been informing, and continues to inform, VSC holders to seek payment or resolution of their claims from Butler. Butler has received and continues to receive numerous calls from VSC holders and from repair facilities seeking payment or resolution of claims.

90.    In addition, since Warrantech  first filed this action in May 2007, Heritage has engaged in contradictory, improper, and harassing forum shopping and procedural fencing which has forced Butler to incur thousands of dollars in attorneys fees' and costs.

91.    This includes but is not limited to (i) moving in July 2007 in this Court for an extension of 60 days to respond to Warrantech's complaint on the grounds that Heritage needed

time to recover and review documents; (ii) filing a comprehensive complaint against Butler only in

federal court in South Carolina and seeking a mandatory injunction against Butler in that suit; (iii)

opposing Butler's application to intervene in this Court in the summer of 2007 on the grounds that

Butler's claims had nothing to do with Warrantech's complaint; (iv) in the South Carolina action,

opposing Butler's motion to dismiss or transfer that cause to this Court and to dismiss for failure to

join Warrantech as an indispensable party on the grounds that the Illinois and South Carolina

actions had nothing to do with each other; and (v) after Butler's motion to dismiss and/or transfer

the South Carolina action to this Court was granted, Heritage completely reversed course, dropped

its opposition to Butler's application to intervene and moving to consolidate the Illinois and South

Carolina actions because they were legally and factually entwined and arose from the same

transactions and course of conduct.

## COUNT I

### (Preliminary and Permanent Injunctive Relief)

92.    Butler repeats its allegations in paragraphs 1 through 91 as if fully set forth herein,

and further allege as follows:

93.    Butler seeks a preliminary and permanent injunction enjoining Heritage from

terminating its funding of the covered VSC claims.

94.    The entry of a preliminary and permanent injunction as requested herein is necessary

in order to prevent immediate and irreparable injury to Butler and VSC holders.  Monetary

compensation will not afford Butler adequate relief in light of the fact that VSC claims are

continually being submitted for payment. The failure by Heritage to fund the claims will result in

escalating financial exposure to Butler and the refusal of repair facilities to perform repairs or

release vehicles for which repairs already have been made. This likely would expose Butler to

claims that it does not have the ability to pay, causing Butler to suffer financial losses currently,

almost limitless losses in the future, the specter of regulatory oversight resulting from Heritage's termination of the policy and Administration Agreements, and the nightmare of having to defend itself in the VSC Holder Class Action.

95.     Heritage must be ordered to fund covered VSC claims pursuant to its contractual obligations because: (i) consumers are entitled to the VSC protection promised by Heritage; (ii) Butler has no adequate remedy at law and would be irreparably harmed if Heritage continues to expose Butler to claims from thousands of consumers; (iii) the threatened injury to Butler, including without limitation, adverse action taken by insurance regulators in Illinois and other states resulting from Heritage's improper termination of insurance and an adverse result in the VSC Holder Class Action, outweighs any harm that might be suffered by Heritage; and (iv) granting the injunction is in the public interest.

WHEREFORE, Butler Financial Services, LLC respectfully requests a judgment order in its favor and against Defendant Heritage Warranty Insurance Risk Retention Group, Inc. a/k/a Heritage Warranty Insurance RRG, Inc. enjoining Defendant from disclaiming its responsibility under the insurance policy and associated Administration Agreement to pay and cover claims and losses submitted by Butler, Warrantech, and VSC holders.

## COUNT II

### (Declaratory Judgment)

96.     Butler repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 95 as if fully set forth herein.

97.     Butler seeks declaratory judgment for the purpose of determining a question of actual controversy between the parties concerning Heritage's obligation to pay covered VSC claims under the Heritage Policy and the Administrative Agreement.

98.    Butler respectfully seeks a declaration by this Court that: (i) Heritage has an immediate obligation to pay, or fund the payment of, all valid claims submitted by VSC holders; (ii) an immediate obligation to reimburse all valid, previously submitted VSC claims that remain unpaid as of the date of this complaint; and (iii) an obligation to pay, or fund the payment of, all valid claims submitted in the future arising during the period covered by the terms and conditions of VSCs issued during the effective dates of the Heritage Policy.

99.    Butler requests a trial by jury for this count.

WHEREFORE, Butler Financial Services, LLC respectfully requests a judgment order in its favor and against Defendant Heritage Warranty Insurance Risk Retention Group, Inc. a/k/a Heritage Warranty Insurance RRG, Inc. declaring that Heritage has: (i) an immediate obligation to pay, or fund the payment of, all covered VSC claims; (ii) an immediate obligation to reimburse all covered, previously submitted VSC claims that remain unpaid as of the date of this complaint; and (iii) an obligation to pay, or fund the payment of, all covered VSC claims submitted in the future arising during the period covered by the terms and conditions of VSCs issued during the effective dates of the Heritage Policy.

## COUNT III

### (Breach of Contract)

100.    Butler repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 99 as if fully set forth herein.

101.    Butler fulfilled all of its obligations and satisfied all condition precedents specified by the Heritage Policy. Prior to Heritage's wrongful and premature cancellation of the insurance policy and Administrative Agreements, Butler had never been declared to be in default of the operative agreements or been advised by Heritage of the need to cure said defaults.

102.    Heritage breached its obligations under the Heritage Policy and the Administrative Agreements in one or more breaches of its own administrator, Warrantech, of the following ways:

(a)    Refusing to honor claims and losses under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements

(b)    Using the loss of reinsurance from American Re and other re-insurers as grounds to terminate the Heritage policy and Administrative Agreements and to cease honoring claims and losses under existing VSCs as required by the terms of the Heritage policy and Administrative Agreements;

(c)    Not providing Butler with 30 days prior written notice of its intent to terminate the Heritage policy and by sending the notice to the wrong address;

(d)    Using the alleged breaches of its own administrator, Warrantech, of the Administrative Agreements as grounds to cancel Heritage's Insurance Policy issued to Butler and as grounds to cease honoring claims under existing VSCs as required by the terms of the Heritage Insurance Policy and Administrative Agreements;

(e)    After five years of paying all VSC claims from day one without any preconditions, terminating the Insurance Policy in December 2006 on the grounds that it is a "bankruptcy policy" under which Heritage's payment obligations were not triggered for 60 days and/or until Butler demonstrated a financial inability to first honor VSC claims.

(f)    Raising Butler's conduct and  coverage defenses as to Butler as grounds to avoid its payment obligations to VSC holders who are statutory beneficiaries of the Insurance Policy and related agreements, which Insurance Policy was issued pursuant to the financial responsibility statute of Illinois and other states.

(g)    Retaining millions of dollars of fully paid premiums while simultaneously and wrongfully refusing to honor claims under existing VSCs as required by the terms of the Heritage Insurance Policy and Administrative Agreements.

(h)    Improperly treating the Heritage policy as a claims made policy when the Heritage Insurance Policy and Administrative Agreements expressly command Heritage to honor claims under existing VSCs after cancellation of the Heritage policy;

(i)    Accusing Warrantech of alleged negligence in setting prices to the VSC programs as a ground for terminating the Insurance Policy and Administrative Agreements when (i) Heritage had the authority to make and approve changes to the VSC programs and (ii) Warrantech's alleged authority to propose price changes and could not be used to terminate all operative agreements;

(j)    Inadequately managing and/or funding the Loss Reserve Fund in such a way as to honor, fund, and pay valid claims and losses;

55

(k)    Subjecting Butler to the specter of regulatory and administrative proceedings in the State of Illinois and other states resulting directly from Heritage's improper, unjustified, and precipitous cancellation of statutorily required insurance;

(l)    Subjecting Butler to the annoyance, expense and potential liability in the instant VSC Holder Class Action;

(m)    The foregoing breaches constitute wrongful repudiation of Heritage's obligations under the operative agreements and improper anticipatory breach of these operative agreements;

(n)    The foregoing breaches constitute violations of the Illinois Service Contract Act and the service contract statutes of Colorado and North Carolina; and

(o)    Breached the implied duty of good faith and fair dealing which is implied in every contract.

103.    As the direct and proximate result of Heritage's breaches of contract, Butler has suffered and will suffer damages, the exact amount to be proven at trial, including but not limited to consequential damages, damages for liability imposed on Butler under the VSCs, together with attorneys' fees, costs and disbursements that have been incurred to date and which may be incurred by Butler in connection with prosecuting this action.

104.    Butler is entitled to all other damages which reasonably and proximately flow from Heritage's breaches of contract including without limitation damages which might result from claims by VSC holders who make claims without the requisite insurance in place; potential regulatory penalties; and loss of business and reputation.

105.    Butler demands a trial by jury for this count.

WHEREFORE, Butler seeks the entry of a judgment award requiring the payment to Butler of all monetary damages suffered, caused by Heritage's past and ongoing failure to pay covered VSC claims, in accordance with the Heritage Policy and the Administrative Agreements, including, without limitation, compensatory damages in an amount of at least $5,000,000 and all damages which reasonably and proximately flow from Heritage's breaches of contract, exemplary damages

where appropriate, pre- and post-judgment interest, and all attorneys' fees, costs and expenses in maintaining the current action.

## COUNT V

### (Consumer Fraud and Deceptive Business Practices – 815 ILCS 505/2)

106.   Butler repeats and re-alleges each and every allegation set forth in Paragraphs 1 through 105 as if fully set forth herein.

107.   At all relevant times herein, there was an Illinois statute commonly known as the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.* The Consumer Fraud and Deceptive Practices Act, as more particularly described therein, prohibits deception, misrepresentation, concealment, and omission of material fact in the conduct of any trade or commerce, including the insurance trade.

108.   The Consumer Fraud and Deceptive Practices Act is designed to protect consumers and businesses from unfair or deceptive acts and practices.

109.   Between December 2001 and December 2006, Heritage collected premiums to insure VCSs under the Heritage Policy that it issued to Butler.

110.   The Consumer Fraud and Deceptive Practices Act defines a "consumer" as any person "who purchases or contracts for the purchase of merchandise. . . ." Further, "merchandise" is defined as including "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or *services*." (Emphasis added.)

111.   Proof of public injury, a pattern, or other effects on consumers generally is not required to sustain a claim under the Act.

112.   The sale of insurance is a service within the ambit and protection of the Consumer Fraud and Deceptive Practices Act.

113.    Butler is a "consumer" as that term is defined in the Consumer Fraud and Deceptive Practices Act.

114.    The VCS holders are "consumers" as that term is defined in the Consumer Fraud and Deceptive Practices Act. Numerous VCS holders are located within the state of Illinois.

115.    The Heritage Policy, upon information and belief, was offered and issued by Heritage on a take-it-or-leave-it basis.

116.    Heritage's conduct implicates consumer protection concerns. This is particularly so because Heritage made representations to consumers in Illinois and throughout the United States, including Illinois, that their VCSs were fully insured and protected by Heritage's insurance and Heritage's re-insurance.

117.    The failure by Heritage to fund covered VCS claims will result in escalating financial exposure to Butler and the refusal of repair facilities to perform repairs or release vehicles for which repairs already have been made. This likely would expose Butler to claims for which Heritage was paid millions of dollars in premiums to honor and pay. VCS holders throughout the United States, including Illinois, will be left without the protection that Heritage represented to them they would have when they purchased VCSs.

118.    While reliance is not a necessary element for a cause of action under the Illinois Consumer Fraud and Deceptive Practices Act, Butler reasonably relied to its detriment on Heritage's aforementioned acts and omissions.

119.    Heritage's conduct, as described above, constitutes prohibited conduct under § 2 of the Illinois Consumer Fraud and Deceptive Practices Act, which has proximately caused damages to Butler, and accordingly, Butler is entitled to damages, costs, and attorneys' fees, in an amount to be determined at the trial of this cause.

120.   Heritage's conduct, as described above, was reckless, unscrupulous, opprobrious, malicious, willful, unethical, wanton, oppressive and contrary to the ordered norms of commercial practice. Heritage's conduct also offended public policy as established by statutes and consumer law.

121.   Butler requests a trial by jury for this count.

WHEREFORE, Butler Financial Services, LLC respectfully requests judgment in its favor and against Defendant Heritage Warranty Insurance Risk Retention Group, Inc. awarding damages based on the violations of the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2, including an award of attorneys' fees and costs.

### Count VI—Statutory Claim for Unreasonable and Vexatious Conduct by an Insurer Per 215 ILCS 5/155

122.   Butler re-alleges and incorporates herein by reference Paragraphs 1 to 121 as if fully set forth herein.

123.   At all relevant times hereto, a remedial statute in Illinois existed which permits insureds like Butler to recover damages, and attorneys' fees and costs if the insurer's failure or refusal to honor claims under its policy is unreasonable and vexatious. 215 ILCS/ 5/155. This statute was the Illinois legislature's remedy for an insured who encounters unnecessary difficulties when an insurer unreasonably withholds coverage.

124.   The purposes of this statute include without limitation to penalize vexatious delay or rejection of legitimate claims arising under insurance policies; to discourage insurers from using their superior financial condition to profit at their insureds' expense.

125.   Heritage's conduct, as outlined throughout this Cross-Claim constitutes unreasonable and vexatious conduct prohibited by Section 155 and constitutes unfair claims handling practices outlawed by 215 ILCS 5/154.6, including without limitation subsections (a), (b), (d), (e), (i), and (r).

59

126.    Heritage has filed to raise any legitimate policy defenses for its failure to honor VSC claims arising under its policy and Heritage has assumed a legal position contrary to the language of its policy, the Service Contract Act, and the parties' course of dealing.    Accordingly, there is no *bona fide* dispute regarding Heritage's failure to honor claims.

127.    Butler has been damaged by Heritage's unreasonable and vexatious conduct.

128.    Butler requests a trial by jury for this count.

WHEREFORE, Butler Financial Services, LLC respectfully requests judgment in its favor and against Defendant Heritage Warranty Insurance Risk Retention Group, Inc. awarding damages based on the violations of 215 ILCS 154.6 and 155, including an award of attorneys' fees and costs.

Respectfully submitted,

LAW OFFICES OF MICHAEL MURPHY TANNEN, P.C.

By: s/ *Michael M. Tannen*
        Attorneys for Butler Financial Solutions, LLC

Law Offices of Michael Murphy Tannen, P.C.
Michael M. Tannen (#6204635)
Jim D. DeMars (#6292689)
39 S. LaSalle Street, Suite 905
Chicago, IL 60603
(312) 641-6650

# EXHIBIT A

# HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.

## SERVICE CONTRACT REIMBURSEMENT INSURANCE POLICY DECLARATIONS PAGE

### NOTICE

This Policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your state. State insurance insolvency guaranty funds are not available for your risk retention group.

| | | |
|---|---|---|
| 1. | Insured: | Butler Financial Solutions, LLC. |
| | Address: | 2300 Corporate Blvd. NW<br>Suite 214<br>Boca Raton, FL 33431 |
| 2. | Policy Period: | Twelve (12)-month period ending December 31; automatically renewed unless noticed prior to 12-31, subject to provisions of insurance policy. |
| 3. | Insurance Company: | Heritage Warranty Mutual Insurance Risk Retention Group, Inc.<br>Keenan Building, Third Floor<br>1330 Lady Street<br>Columbia, South Carolina 29201 |
| 4. | Policy Number: | HWMIRRG-SC-WAR-001 |
| 5. | Premium: | Refer to pricing information provided by Company. |
| 6. | Limit of Liability | Market value of covered vehicle or $75,000.00, whichever is less, per underlying service contract. |

*Signed and Accepted:*

Heritage Warranty Mutual Insurance Risk Retention Group, Inc.:

_____        President        12-17-01
Signature                      Title            Date

Insured: Butler Financial Solutions, LLC.

_____        President        1/9/02
Signature                      Title            Date

# HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.

# SERVICE CONTRACT REIMBURSEMENT INSURANCE POLICY

## NOTICE

This Policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your state. State insurance insolvency guaranty funds are not available for your risk retention group.

### POLICY PROVISIONS

Heritage Warranty Mutual Insurance Risk Retention Group, Inc. (a Mutual Insurance Company), hereafter referred to as the Company, in consideration of the payment of the premium and in reliance upon the statements in the Declarations Page and subject to the limits of liability, exclusions, conditions and other terms of this Policy agrees with the Insured as follows:

## I. INSURING AGREEMENTS

1. **Definition of Coverages**

   The Company will indemnify the Insured against Loss, subject to the Loss Reserve Fund provision herein, arising out of the reasonable and customary cost of repair or replacement under and in accordance with all the terms of the Service Contracts issued by the Insured on or after the inception date of this Policy, as follows:

   UPON FAILURE OF THE INSURED TO PERFORM UNDER THE SERVICE CONTRACTS, HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., SHALL PAY ON BEHALF OF THE INSURED ANY SUMS THE INSURED IS LEGALLY OBLIGATED TO PAY OR SHALL PROVIDE THE SERVICE THAT THE INSURED IS LEGALLY OBLIGATED TO PERFORM ACCORDING TO THE INSURED'S CONTRACTUAL OBLIGATION UNDER THE SERVICE CONTRACTS ISSUED BY THE INSURED, And HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., WILL PAY CLAIMS AGAINST THE INSURED FOR RETURN OF THE UNEARNED PURCHASE PRICE OF THE SERVICE CONTRACT.

   Coverage hereunder shall be provided on a claims made basis.

HWMIRRG-SC-WAR-001

Upon failure of the Insured to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder claimant.

Revocation or other termination of Insured's registration as a service contract provider in any state, for any reason, shall be construed to be a default by the Insured under service contracts sold in such state(s). In the event of such revocation or other termination, the Company shall provide for direct coverage to the covered service contract holders in such state(s) without having to wait sixty (60) days.

Suspension of Insured's registration as a service contract provider in any state, for more than 60 days, shall be construed to be a default by the Insured under service contracts sold in such state(s). In the event of such suspension, the Company shall provide for direct coverage to the covered service contract holders in such state(s) without having to wait sixty (60) days, until such time as the Insured is permitted to resume business in such state(s).

2.   **Loss Reserve Fund**

The Company's liability herein shall be limited to covered Loss in excess of the Loss Reserve Fund applicable to the Insured, subject to the Limit of Liability specified on the Declarations Page.

Upon the suspension, revocation or other termination of Insured's registration as a service contract provider in any state(s), for any reason, the Insured shall grant to Company control, possession, and all ownership rights and interest in a portion of the above-mentioned Loss Reserve Fund equal to the part of said Loss Reserve Fund covering losses under service contracts sold in such state(s).

3.   **Settlement of Company's Liability**

The Company agrees to indemnify the Insured or, in the alternative, pay directly to the repairing agency or Service Contract Holder in accordance with the Service Contract issued by the Insured.

## II.   DEFINITIONS

The following terms, which are capitalized whenever they appear in this Policy or any endorsements to this Policy, have special or limited meanings, set forth below in alphabetical order:

1.   **"Administrator"** means the Company's designated administrator in accordance with the Administration and Service Agreement.

2.   **"Company"** means Heritage Warranty Mutual Insurance Risk Retention Group, Inc.

3.   **"Covered Unit"** means the product marketed or manufactured by the Insured for which the Insured has issued a Service Contract.

4.    "**Insured**" means the named insured specified in Item 1 of the Declarations Page.

5.    "**Loss(es)**" means any and all valid claims arising during the period covered by the terms and conditions of the Service Contract at the time the Service Contract was issued.

6.    "**Loss Reserve Fund**" means any loss reserve fund as may be established from time to time by the Administrator on behalf of the Insured to cover Losses under Service Contracts.

7.    "**Policy**" means this Service Contract Reimbursement Insurance Policy issued by the Company.

8.    "**Policy Period**" means the period specified in Item 2 of the Declarations Page.

9.    "**Service Contract(s)**" means service contract(s) issued by the Insured on or after the inception date of this Policy and for which a premium has been paid.

10.   "**Service Contract Holder**" means a person, or legal entity, owning a Service Contract acquired directly from the Insured, or a qualified transferee, which is currently in force.

## III.    EXCLUSIONS

Notwithstanding anything herein contained, this Policy does **NOT** cover:

1.    Any Loss caused by or contributed to by a dishonest, criminal or fraudulent act of the Insured, a partner thereof, or a director, officer, trustee, employee or agent thereof;

2.    Any Loss arising from fines, penalties, punitive or exemplary damages;

3.    Any Loss caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such Loss be direct or indirect, proximate or remote, or be in whole or part caused by, contributed to, or aggravated by the peril(s) insured against in this Policy;

4.    Any Loss caused by:

     a)    hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual impending or expected attack, (1) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (2) by military, naval or air forces; or (3) by an agent of any such government, power, authority or forces;

     b)    any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

c)   insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;

5.   Any Loss arising from any liability assumed by the Insured or the Service Contract Holder by any contract or agreement, except the Service Contract(s);

6.   Any Loss while the Covered Unit is used in any illicit trade or transportation or in the commission of a felony; or

7.   Any Loss to any Covered Unit if that unit is rented by the Insured or Service Contract Holder.

## IV.   CONDITIONS

1.   **INSPECTION AND AUDIT:** The Company shall be permitted to inspect and examine the Insured's premises, books and records (insofar as such books and records relate to the premium basis or the subject matter of this insurance) at any time during the Policy Period and any extension thereof and within one (1) year after the final termination of this Policy, and one (1) year after the termination of all outstanding liability on all issued Service Contracts.

2.   **PREMIUM PROVISIONS:** Upon the inception of coverage as provided by this Policy for the Insured's liability under each Service Contract issued, the premium for such coverage shall be fully earned by the Company and no part thereof shall be refundable to the Insured, except that:

a)   this provision shall be amended to conform with specific cancellation requirements of a lien holder, and

b)   a partial refund shall be made by the Company to the Insured for each Service Contract canceled by the Service Contract Holder. Such partial refund shall be based on a short rate cancellation table published from time to time by the Company, a current copy of which is available upon request.

Premium for this Policy shall be specified by endorsement.

3.   **MONTHLY REPORTING PROVISION:** The Insured shall maintain and keep an accurate record of Service Contracts issued in accordance with the Administration and Service Agreement and, not later than fifteen (15) days after the closing of the preceding month, report to the Company or its authorized representative the Service Contracts issued during the monthly reporting period. The Company shall not be liable under any Service Contract issued by the Insured unless so reported. In the event of Policy cancellation, the Insured shall report all Service Contracts issued up to and including the date the cancellation becomes effective.

4.   **NOTICE OF LOSS:** In the event of Loss under this Policy, the Insured shall give notice of loss to the Company or its designated agent or representative as soon thereafter as practicable

and shall file with the Company or its designated agent, within ninety (90) days from the date of Loss, a detailed proof of loss. Failure by the Insured to report the said Loss and to file such proof of loss as hereinbefore provided shall invalidate any claim under this Policy for such Loss.

5.   **PAYMENT FOR LOSS:**  Payment for Loss may not be required nor shall action lie against the Company unless, as conditions precedent thereto, the Insured shall have fully complied with all terms of this Policy, thirty (30) days shall have elapsed after proof of loss is filed, and the amount of Loss shall have been determined as provided in this Policy. It is also a condition of this insurance, precedent to payment of any claim, that the Insured or an authorized representative of the Insured shall have carried out the repair and/or replacement on which the claim is based, after having received prior authorization from the Company or its designated agent or Administrator.

6.   **ASSIGNMENT:**  This Policy is personal to the Insured, any purported assignment of interest in the Policy by the Insured or transfer of interest by operation of law or any act of insolvency on the part of the Insured shall immediately render this Policy canceled as of such date. Any assignment of interest under this Policy shall not bind the Company.

7.   **APPROVED SERVICE CONTRACTS:**  It is a condition of this insurance that the Service Contract(s) issued by the Insured are identical to the specimen copy(s) on file with and approved by the Company and will remain unaltered unless the Company is duly notified of any proposed alteration and written consent to such proposed alteration is given by the Company.

8.   **TERRITORY:**  This Policy covers Service Contracts issued by the Insured within the United States.

9.   **SUBROGATION:**  In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's right of recovery thereof against any person or organization, and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after Loss to prejudice such rights.

10.   **BURDEN OF PROOF:**  It is a condition of this Policy that the Insured will be required to prove any Loss sustained as a precedent to payment of any claim.

11.   **SALVAGE & RECOVERY:**  All salvages, recoveries and payments received subsequent to a loss settlement under this Policy shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made by the parties hereto.

12.   **ASSISTANCE AND COOPERATION OF THE INSURED:**  The Insured shall cooperate with this Company and, upon this Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits.

13.   **CONFORMITY OF STATUTE:**  The terms of this Policy which are in conflict with the statutes of the state wherein this Policy is issued are hereby amended to conform to such statutes.

14.  **OTHER INSURANCE:** If, at the time of Loss hereunder, there is other insurance for such Loss in the name of or for the benefit of the Insured, this insurance shall be considered as excess insurance and shall not apply to nor contribute to the payment of any Loss until all such other insurance shall have been exhausted.

15.  **CHANGES:** This Policy, including the Declarations Page, terms, conditions, limitations, exceptions, and exclusions, together with the endorsements and attached papers, if any, constitutes the entire Policy of insurance. No change in the Policy shall be endorsed hereon or attached thereto without the prior written approval of the Company. No agent has authority to change the Policy or to waive any of its provisions.

16.  **ACTION AGAINST COMPANY:** No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Policy.

17.  **SERVICE OF SUIT:** In the event the Company fails to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Further, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer (if specified for that purpose in any relevant statute) or his successor or successors in office, as the Company's true and lawful attorney upon whom, at his offices in the state where the Insured resides, may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the following as the person to whom the said officer is authorized to mail such process or a true copy thereof:

> Heritage Warranty Mutual Insurance Risk Retention Group, Inc.
> Attn: Mr. Gary Osborne, Captive Manager
> Keenan Building, Third Floor
> 1330 Lady Street
> Columbia, South Carolina 29201

18.  **DEFENSE AND SETTLEMENT:** The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought against the Insured; however, the Company shall have the right, and shall be afforded the opportunity, to associate with the Insured in the defense and control of any claim or suit.

19.  **FRAUD AND MISREPRESENTATION:** This Policy shall be void if the Insured has concealed or misrepresented or created any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or submission of false or inflated claims or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, whether before or after a Loss.

20.  **TERM AND CANCELLATION:** The Policy Period shall be for a term of one year (ending on December 31 of each year) subject to automatic renewals, unless either the Insured or

HWMIRRG-SC-WAR-001                    6

the Company gives prior notice to the other party of its intention not to renew this Policy. The initial Policy Period may be for a term of less than one year, unless this Policy is effective on January 1 of such Policy Period. Prior notice of non-renewal by the Company must be mailed to the Insured at least thirty (30) days prior to the termination of the Policy Period.

This Policy may be canceled at any time by the Insured by mailing to the Company written notice stating when thereafter such cancellation shall be effective. This Policy may also be canceled by the Company at any time by mailing to the Insured, at the address shown on the Declarations Page, written notice stating a date not less than thirty (30) days thereafter when such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by the Company shall be equivalent to mailing. Cancellation of this Policy shall not reduce the Company's liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect. Should no Service Contracts be submitted pursuant to the provisions of Section IV, paragraph 3, of this Policy for a period of three (3) consecutive months, it will constitute an automatic withdrawal from coverage by the Insured. The Company may, at its option, waive this provision.

This Policy does not provide Bodily Injury or Property Damage Liability Insurance nor does it comply with any financial responsibility law. The limit of the Company's liability shall not exceed the limits specified herein, in accordance with the terms of this Policy.

**IN WITNESS WHEREOF,** the Company has caused this Policy to be executed and attested these presents, but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Rhoderick J. Beery, President

(Heritage Excess Insurance Policy)

# EXHIBIT B

# ADMINISTRATIVE AGREEMENT

Among

**Warrantech Automotive, Inc.**
150 Westpark Way
Euless, TX 76040

Warrantech Automotive of Florida, Inc.
150 Westpark Way
Euless, TX 76040

**Vemeco, Inc.**
150 Westpark Way
Euless, TX 76040

and

**Heritage Warranty Mutual Insurance Risk Retention Group, Inc.**
1550 South 70th Street
Lincoln, NE 68506

EFFECTIVE DATE:   March 15, 2001

# ADMINISTRATIVE AGREEMENT

**THIS ADMINISTRATIVE AGREEMENT**, (the "AGREEMENT") is among Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc. and Vemeco, Inc., each of which are located at 150 Westpark Way, Euless, TX 76040, (hereinafter collectively referenced as "WARRANTECH"), and Heritage Warranty Mutual Insurance Risk Retention Group, Inc., (hereinafter referenced as "COMPANY") located at 1550 South 70th Street , Lincoln, NE 68506.

**WHEREAS**, WARRANTECH engages in the business of developing, marketing and administration of Vehicle Service Contract programs, which includes automobiles and recreational vehicles offered through retailers and manufacturers (hereinafter referenced as "PROGRAM" or "PROGRAMS") and

**WHEREAS**, COMPANY desires to retain WARRANTECH in its capacity as an administrator, to market and administer, and WARRANTECH, as an administrator, desires to market and administer, such PROGRAMS, pursuant to the terms and conditions set forth herein and pursuant to the terms and conditions of the INSURANCE provided by COMPANY.

**THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties agree to the following:

**I.    ADMINISTRATION**

    **A.**    COMPANY hereby grants WARRANTECH authority to serve as administrator to perform the duties set forth below and vests in WARRANTECH authority to accomplish, effect and execute such duties upon the terms and conditions set forth in this AGREEMENT.

    **B.**    WARRANTECH shall serve as COMPANY's administrator of Vehicle Service Contracts which are provided by COMPANY.

**II.    DEFINITIONS**

As used in this AGREEMENT, the following terms will have the meanings shown:

"**Claim**" shall mean a request for payment or performance of service by a Vehicle Service Contract Holder in accordance with the terms of a valid Vehicle Service Contract.

"**Confidential Information**" shall mean proprietary information obtained from either party to the AGREEMENT including statistical data relating to PROGRAM underwriting results, such as Premium amounts, earnings, losses, loss frequency and loss severity. Confidential Information shall not include information which:

    1.    Is or becomes generally available to the public other than as a result of a breach of this AGREEMENT;

2.     Was previously known to the other party or independently derived or developed by such other party;

3.     Is disclosed to the other party on a non confidential basis by a third party who has the right to disclose such information; or

4.     Is required to be disclosed by any regulatory authority.

"Dealer" shall mean any company who provides, sells and issues warranties and Vehicle Service Contracts on automobiles and recreational vehicles under PROGRAMS which are covered by the INSURANCE provided by COMPANY.

"Dealer Cost" shall mean that amount that the Dealer must remit to WARRANTECH for the sale of each Vehicle Service Contract.

"Premium " shall mean that portion of the Dealer Cost, net of cancellations, which is required to be paid by WARRANTECH to the COMPANY, and or other entities as COMPANY may direct, to provide INSURANCE for PROGRAMS and the Vehicle Service Contracts.

"Vehicle Service Contract" shall mean the document issued by the Dealer to indicate coverage under a PROGRAM and for which Premium have been paid to COMPANY.

"Vehicle Service Contract Holder" shall mean any person or legal entity who holds or acquires the rights to a valid Vehicle Service Contract as defined herein.

## III.    POLICIES

This AGREEMENT, and the duties to be performed by WARRANTECH and COMPANY as contained herein, are in conjunction with the INSURANCE provided by COMPANY for PROGRAMS. To the extent, that terms and conditions of this AGREEMENT conflict in any way with any of the terms and conditions of the INSURANCE, as defined in the insurance contract, the terms and conditions of the insurance contract shall prevail. Further, any and all obligations of COMPANY contained herein are limited by the terms and conditions of the contract of insurance.

## IV.    TERM OF AGREEMENT

This AGREEMENT shall be effective commencing March 15, 2001, and continue for a five (5) year period continuing through and including March 14, 2006, unless terminated pursuant to Section X, Termination, of this AGREEMENT.

After March 14, 2006, this AGREEMENT shall automatically renew for additional one-year terms unless terminated pursuant to Section X, Termination, of this AGREEMENT.

V.  **WARRANTECH'S RELATION TO COMPANY**

This AGREEMENT is not a contract of employment and nothing herein contained shall be construed to create the relationship of employer and employee between COMPANY and WARRANTECH. WARRANTECH is an independent contractor and shall be free to exercise judgement and discretion with regard to the conduct of business as administrator for COMPANY.

VI.  **AUTHORITY AND DUTIES OF WARRANTECH**

A.  Review of Agreements

WARRANTECH shall ensure all Vehicle Service Contracts submitted by Dealers are in compliance with the terms and conditions of PROGRAMS with respect to underwriting, pricing, eligibility and other requirements as agreed to by COMPANY and WARRANTECH.

B.  Policy Issuance

WARRANTECH shall timely and properly issue and execute or countersign policies, certificates, endorsements and binders on forms approved by COMPANY and appropriate regulatory authority, as required by law, for the policies authorized under this Agreement. WARRANTECH will arrange for all policy countersignatures through agents authorized by COMPANY.

C.  Quality of Services

WARRANTECH shall use commercially reasonable efforts to serve COMPANY faithfully, to promote all acts necessary for the proper conduct of the business on behalf of COMPANY and shall maintain a staff of competent and trained personnel, supplies and equipment for the purpose of performing WARRANTECH's duties under this AGREEMENT.

D.  Change in Ownership

WARRANTECH shall notify COMPANY, in writing, within ten (10) days if there is a change in ownership of fifty percent (50%) or more of the stock of WARRANTECH or its parent company, in one transaction or in a series of related transactions.

E.  Representations

WARRANTECH shall not make any representation to any applicant or holder of any Vehicle Service Contract regarding coverage which is not consistent with the actual terms and conditions of the Vehicle Service Contract.

F. <u>Legal Compliance</u>

    1.    WARRANTECH shall use all reasonable efforts to carry out its activities in connection with this AGREEMENT in such a way as to comply in all material respects with all applicable laws of the jurisdictions involved, including all licensing requirements, as well as all other applicable laws governing the conduct of business under this AGREEMENT.

    2.    Any fines or penalties, resulting from non-compliance with regulatory requirements for which WARRANTECH was responsible, shall be the responsibility of WARRANTECH.

G. <u>Reporting</u>

    1.    WARRANTECH agrees to report, within twenty-five (25) days from each month's end, the total Vehicle Service Contracts sold and cancelled and the Premium due to COMPANY with respect to preceding month reported to WARRANTECH. Such reporting shall be in form acceptable to COMPANY.

    2.    WARRANTECH agrees to provide COMPANY, at WARRANTECH's expense, additional written reports, as needed by COMPANY, to ensure COMPANY'S compliance with any reporting requirements or regulations as promulgated, from time to time, by any regulatory authority of competent jurisdiction. WARRANTECH shall provide COMPANY reinsurance ceding statements, proof of deposit and statements from financial depositories. WARRANTECH shall make every effort to see that such reporting shall be in a time frame to enable COMPANY to meet reporting dates as promulgated by said regulatory authorities.

    3.    WARRANTECH agrees to provide COMPANY, at WARRANTECH's expense, additional reports, as reasonably needed by COMPANY and in a reasonable time frame as prescribed by COMPANY, to ensure COMPANY is able to monitor and assess the status of PROGRAMS administered by WARRANTECH.

H. <u>Premium</u>

    1.    WARRANTECH shall act as a fiduciary to COMPANY and will hold all premiums collected and received on policies for COMPANY in a fiduciary account at the time of premium calculation in accordance with Section H.3. below. These funds will then be held separate and apart from all other funds of WARRANTECH or others in a bank(s) approved in writing by COMPANY that is a member of the Federal Reserve System. The bank account(s) shall be designated by WARRANTECH in such a manner as to clearly establish that WARRANTECH is holding and acting as trustee for COMPANY with respect to the funds in the account. WARRANTECH may retain interest or other income, if any, accruing on these premium trust funds for its own account so long as WARRANTECH is current on all accounts with COMPANY. The trust funds so held may be used by WARRANTECH as necessary to return and refund premiums to Vehicle Service Contract Holders or their authorized representatives. Except as may be prohibited by applicable law or regulation, WARRANTECH may

place such funds only in a checking account, bank money market account, bank certificate of deposit, or investments insured by, or obligations of the United States of America.

2.     WARRANTECH shall be responsible for remitting to COMPANY and/or such other entity as COMPANY may direct, all Premium for Vehicle Service Contracts reported to WARRANTECH. WARRANTECH may extend credit terms to its Dealers and such extensions of credit shall be at the sole risk of WARRANTECH.

3.     Except as may be otherwise provided in this AGREEMENT, the accounting, reporting and remitting of Premium shall be made as follows:

WARRANTECH shall remit to COMPANY, and/or such other entity as COMPANY may direct, by the twenty fifth (25th) day after the end of each month, the total Premium due COMPANY for Vehicle Service Contracts reported and paid to WARRANTECH during the immediate preceding month.

4.     In the event of termination of this AGREEMENT in accordance with Section X. TERMINATION, a full and final accounting and payment of all Premium due COMPANY for all Vehicle Service Contracts sold under PROGRAMS by WARRANTECH and Dealers shall be made within ninety (90) days of such termination.

5.     All Premium due COMPANY received by WARRANTECH on behalf of COMPANY is the property of COMPANY and shall be held by WARRANTECH as trustee until delivered to COMPANY. COMPANY's ownership of unpaid Premium which has not been collected by WARRANTECH, and the trust nature of these funds, shall not be held to be modified, affected or waived by any actions taken by either WARRANTECH or COMPANY.

I.     Maintenance of Records; Company's Access to Records

1.     WARRANTECH shall keep complete records of all transactions pertaining to Vehicle Service Contracts written pursuant to this AGREEMENT, originals of which shall remain in WARRANTECH's sole and exclusive possession. Such records shall be maintained for a period of time in accordance with regulatory record retention requirements. During the term of this AGREEMENT and for such time thereafter as COMPANY shall deem reasonably necessary for the protection of COMPANY's property and/or interests, COMPANY shall have the right, and WARRANTECH shall permit and authorize COMPANY, through any person(s) designated by COMPANY and at COMPANY's expense and as often as COMPANY may reasonably request:

a)     To visit, inspect, examine, audit and verify, on a semi annual basis, at any of WARRANTECH's offices or elsewhere, any of the properties, accounts, books, records, financial statements or work papers belonging to or in the possession of WARRANTECH pertaining to matters arising under the terms of this AGREEMENT; provided, however, if any such audit reveals a material error or deficiency in WARRANTECH's claims handling practices, COMPANY shall be entitled to

perform a follow-up audit prior to the next semi annual period for purposes of confirming that said error or deficiency has been corrected. COMPANY will provide WARRANTECH with not less than ten (10) business days advance written notice of all such visits, examinations, inspections and audits. Any audit conducted hereunder shall be deemed by the parties to be final and conclusive with respect to the time period of such audit.

To make or to have WARRANTECH make in a timely fashion, at COMPANY's expense, copies and extracts of any of the items listed in Paragraph a. above in conjunction with any such semi annual visit, inspection, examination or audit.

To perform, at COMPANY's offices, at COMPANY's discretion as reasonably requested, and with reasonable frequency, routine audit tests of WARRANTECH's accounting records in order to ensure reasonable internal accounting controls surrounding WARRANTECH's issuance of Vehicle Service Contracts.

To discuss the affairs, finances, and accounts of the Programs with WARRANTECH's directors or officers at such times as WARRANTECH and COMPANY mutually agree.

2.     All records of transactions pertaining to INSURANCE written under this AGREEMENT shall be in a form approved by COMPANY and regulatory authorities.

3.     When the PROGRAM transactions are recorded on WARRANTECH's proprietary data processing system(s), WARRANTECH shall, on at least a weekly basis, back-up records of all transactions. WARRANTECH shall maintain said backup records at a location other than the location where original records are maintained.

4.     In lieu of maintaining physical copies of the records described hereunder, WARRANTECH may keep said records in a form of electronic media of its choosing.

J.     <u>Advertising and Public Relations</u>

1.     WARRANTECH and COMPANY shall agree, in writing, to a standard reference to COMPANY that may be used by WARRANTECH in its advertising, promotional materials and press releases of Vehicle Service Contracts which are insured by COMPANY. Except as agreed to and provided for in this fashion, WARRANTECH shall not use the name or logo of COMPANY without COMPANY's prior written approval.

2.     COMPANY and WARRANTECH shall agree, in writing, to a standard reference to WARRANTECH that may be used by COMPANY in its advertising, promotional materials and press releases. Except as agreed to and provided for in this fashion, COMPANY shall not use the name or logo of WARRANTECH without WARRANTECH's prior written approval.

K.  **Ownership of Program Data**

Except as is otherwise provided in Section X, Termination, the PROGRAM results, losses and pricing data, and other related program data is the joint property of WARRANTECH and COMPANY.

L.  **Expenses**

1.  Except as may be expressly provided in this AGREEMENT and addenda attached hereto, WARRANTECH shall pay all expenses related to the performance of WARRANTECH's duties under this AGREEMENT, including but not limited to rentals, transportation, facilities, clerical expense, commissions or fees paid to Dealers, solicitor's fees, postage, advertising, or miscellaneous expenses. WARRANTECH shall not charge or commit COMPANY to any expense, agreement, payment, debt, or obligation other than the insurance expressly described herein unless prior written approval is obtained from COMPANY.

2.  WARRANTECH shall pay for all data processing hardware utilized by WARRANTECH and shall be responsible for fees for data processing and communication software and technology, including but not limited to, necessary line charges.

M.  **Insurance Maintained by WARRANTECH**

WARRANTECH is required to maintain in full force and effect during the term of this AGREEMENT a policy (or policies) of professional errors and omissions in at least an amount of two million dollars ($2,000,000) each claim; and two million dollars ($2,000,000) in the aggregate, comprehensive general liability policy (including commercial auto coverage) in at least an amount on one million dollars ($1,000,000) each occurrence, blanket employee dishonesty bond covering all employees of Agent who provide Agent with exposure to loss of any funds due COMPANY in at least an amount of five million dollars ($5,000,000) each loss, which are issued by an insurer rated no less than B+VI by A.M. Best Company. Such insurance shall be maintained by WARRANTECH at WARRANTECH's sole cost and expense and shall be primary and provide non-contributing coverage over any valid and collectible insurance available to COMPANY. WARRANTECH shall provide notification to COMPANY in the event of lapse and shall furnish proof of such insurance at inception of this AGREMENT and at each subsequent renewal of the insurance policy.

N.    Underline Financial Statements

    1.    Prior to executing this AGREEMENT, WARRANTECH shall furnish to COMPANY WARRANTECH's most recent year-end annual financial statements.

    2.    Not later than ninety (90) calendar days after the end of its fiscal year, which is March 31, WARRANTECH shall provide COMPANY its year-end audited financial statements.

O.    Claims Settlement

    WARRANTECH accepts responsibility for settling claims, in accordance with Addendum B, CLAIMS HANDLING AUTHORITY, which is attached, for valid claims which occur as a result of Vehicle Service Contracts, or warranties written through the PROGRAM. WARRANTECH agrees to all of the other terms and provisions set forth in Addendum B, CLAIMS HANDLING AUTHORITY, which is incorporated in and made a part of this AGREEMENT.

P.    Management

    WARRANTECH shall notify COMPANY of the change of any WARRANTECH's senior management personnel who are directly involved with the PROGRAMS and with whom COMPANY communicates on a regular basis.  Such notification shall be in writing and within thirty (30) days of the personnel change.

Q.    Underwriting Authority

    1.    PROGRAMS shall include types and classes of business, policies of insurance and lines which have been reviewed and approved by COMPANY, and are attached hereto as addendum B. Additional types and classes of business, policies of insurance and lines may only be added with the prior written approval of COMPANY.

    2.    WARRANTECH shall have authority to accept, under the same terms and conditions that are in effect for the PROGRAMS, new Dealers and manufacturers for Vehicle Service Contracts issued under the PROGRAMS.

    3.    WARRANTECH shall have authority to propose changes, revisions and amendments to PROGRAMS as follows:

        a.    WARRANTECH shall develop historical statistical data in support of changes, revisions and amendments.  Such data shall include, but is not limited to, loss severity data, loss frequency data, earning patterns for all terms and projected ultimate loss ratios.

b.    WARRANTECH shall submit such proposals to COMPANY at the following address:

> Hyle H. Erwin, General Counsel
> Heritage Warranty Mutual Insurance
> 1550 South 70th Street
> Lincoln, NE 68506

Such proposals shall include supporting historical data, coverage amendments, and projections of results relating to the change.

c.    COMPANY shall respond, in writing, to WARRANTECH's proposal of changes, revisions and amendments within a reasonable time of COMPANY's receipt of said proposal, which in no event shall exceed two weeks from the date of receipt.    WARRANTECH will submit a copy of all proposals to FAX Agency.    COMPANY's response shall indicate COMPANY's approval or rejection of WARRANTECH's proposal.

d.    COMPANY shall respond, in writing, to WARRANTECH's proposal of changes, revisions and amendments, which involve "essentially similar" products and/or plan types within a reasonable time of COMPANY's receipt of said proposal, which shall in no event exceed two weeks from the date of receipt. WARRANTECH will submit a copy of all proposals to FAX Agency. COMPANY's response shall indicate COMPANY's approval or rejection of WARRANTECH's proposal.

e.    "Essentially similar" changes shall be defined as changes to existing PROGRAMS which do not involve new technology, a change in technology, or does not materially change the PROGRAM. In the event WARRANTECH and COMPANY disagree as to whether changes meet the definition of "essentially similar", then COMPANY shall decide if the proposed change, revision or amendment is "essentially similar".

f.    WARRANTECH shall be responsible to make all required filings relating to the Vehicle Service Contracts as required as required by regulatory entities or organizations, including all rates and policy forms. WARRANTECH shall provide COMPANY, within thirty (30) days of receipt, a copy of all filings, including correspondence, submitted to regulatory entities or organizations.

4.    Failure by WARRANTECH to comply with any of the terms and conditions of Section VI.Q., Underwriting Authority, may at COMPANY's sole discretion, result in the withdrawal of the authority granted herein.  Such withdrawal of the authority shall be immediate upon WARRANTECH's receipt of notification from COMPANY and shall not be subject to the notification provisions contained in Section X, Termination, of this AGREEMENT.

R.    Certificates and Additional Insureds

WARRANTECH shall have authority to issue certificates of insurance to, and add as additional insureds, Dealers and manufacturers who issue Vehicle Service Contracts under PROGRAMS covered by INSURANCE. Said certificates and additional insureds, shall be reported in a format prescribed by COMPANY and shall be reported to COMPANY within five (5) business days of issuance by WARRANTECH.

S.    Policy Cancellation

WARRANTECH shall cancel or otherwise terminate policies bound or written by or through WARRANTECH as required by applicable underwriting standards and consistent with applicable regulatory and policy conditions. COMPANY shall always retain the right to direct the termination of policies by WARRANTECH or to terminate policies by direct notice to Insureds. Neither COMPANY nor WARRANTECH shall make permit or cause general or indiscriminate cancellation, termination or replacement of policies.

T.    Notification of Changes in PROGRAM Segment, Premium, Coverage and Eligibility

1.    WARRANTECH and COMPANY agree that the rate plans for the PROGRAMS used to produce reinsurance funds as of the date of this AGREEMENT, shall remain in effect for a eighteen (18) month period, not to exceed September 15, 2002; provided, however, that each individual account within the PROGRAMS shall not exceed a ninety (90) percent loss ratio. In the event any individual account loss ratio exceeds ninety (90) percent, then WARRANTECH and COMPANY shall jointly review the data for the PROGRAMS to determine if changes to rate plans are necessary for those individual accounts. Not withstanding the aforementioned joint review of data by WARRANTECH and COMPANY, COMPANY retains the unconditional right to make changes to rate plans to produce a ninety (90) percent loss ratio for each individual account. Reinsurance funds are defined as Premium less COMPANY's fee, less the dealer renegade fee of five dollars per vehicle service contract issued, less a loss adjustment fee of fifteen dollars per vehicle service contract issued.

2.    WARRANTECH and COMPANY agree that the rate paid COMPANY will be an insurance fee of $40.00 per vehicle service contract, which COMPANY agrees to adjust downward to account for loss experience or competitive reasons. COMPANY further requires that five dollars per vehicle service contract be paid to COMPANY for renegade fund dealer captives.

3.    In accordance with this provision, upon notification that a change(s) to Premium is (are) required, WARRANTECH shall have a reasonable time, not to exceed ninety (90) days, from the receipt of said request to implement the requested change, subject to the completion of all necessary regulatory filings required by the request.

**VII.    AUTHORITIES AND DUTIES OF COMPANY**

A.    Regulatory Assistance

COMPANY shall use reasonable efforts to assist WARRANTECH in connection with any regulatory filing or form of compliance required of WARRANTECH's to effect the marketing and administration of the PROGRAM. Such assistance shall include but shall not be limited to providing information, and documents necessary to complete regulatory filings on COMPANY's behalf.

B.    Certificates of Insurance

For the INSURANCE provided by COMPANY, COMPANY shall provide certificates of insurance when necessary or when required by regulatory authority. Nothing contained in this section shall limit or restrict in any way, COMPANY's right to decline to issue, non-renew or cancel any policy or insurance. Provided, however, that COMPANY shall not cause any indiscriminate cancellation of such certificates, endorsements to, or the policy of insurance.

C.    Legal Compliance

COMPANY shall use all reasonable efforts to operate in compliance with all regulatory authorities of competent jurisdiction. Such compliance shall include but is not limited to procuring and maintaining all licenses, permits and other authorizations legally required for it to operate as an admitted insurance carrier.

D.    Changes in Ownership

COMPANY shall notify WARRANTECH, in writing, within ten (10) days if there is a change in ownership of twenty percent (20%) or more of the stock of COMPANY or its parent company.

E.    Best Rating

COMPANY shall endeavor to maintain reinsurance with a reinsurance company with an A.M. Best rating of 'A' "Excellent" or better during the term of this AGREEMENT and any extensions thereto. COMPANY agrees to meet either the insurance or financial ratings required to insure Vehicle Service Contracts written in the state of Florida or any other state which promulgates such rating requirements.

F.    Management

COMPANY shall notify WARRANTECH of the change of any COMPANY's management personnel who are directly involved with COMPANY's WARRANTECH program and with whom WARRANTECH communicates on a regular basis. Such notification shall be in writing and within thirty (30) days of the personnel change.

G.    COMPANY agrees that it will hold all renegade fund fees and loss adjustment expense fees separate and apart from all other funds of COMPANY. The fees will be held in an interest bearing account. WARRANTECH will receive the interest on these fees, as well as monies remaining in the accounts upon expiration of all Vehicle Service Contracts.

## VIII.   LIMITATIONS OF AUTHORITY

Except as may be otherwise provided for in this AGREEMENT, WARRANTECH is authorized to issue insurance policies, complete all regulatory filings perform administrative and marketing services only for those PROGRAMS which COMPANY has given WARRANTECH prior written approval. Changes to existing PROGRAMS by WARRANTECH must be in writing and presented to COMPANY for its written approval before implementation by WARRANTECH.

Changes to existing PROGRAMS by COMPANY must be made in writing and submitted to WARRANTECH for implementation.

## IX.   AGREEMENT

A.    COMPANY agrees to pay WARRANTECH fees based upon the number of actual claims for which WARRANTECH provides administrative services, at a rate of twenty dollars ($20.00) per claim administrated by WARRANTECH. A Claim shall be deemed to have been made each time WARRANTECH is contacted for the first time by a Vehicle Service Contract Holder with respect to any matter that such Holder believes might be the basis for a formal Claim under the Vehicle Service Contract, which results in a repair order number which is subsequently paid. These fees will be paid to WARRANTECH to the extent loss adjustment funds are available and if there remains in the loss adjustment fund Five Dollars ($5.00) per active service contract.

B.    On all Vehicle Service Contracts issued pursuant to this AGREEMENT for which coverage has been canceled, or where Premium have been reduced or refunded, WARRANTECH shall be responsible for refunding such returned or refunded Premium to Service Agreement Holders. Such amounts due from COMPANY shall be offset against current month's business. In the event of termination of this agreement, COMPANY shall reimburse WARRANTECH within thirty (30) days of receipt of invoice. In each case such returned or refunded Premium shall be calculated using the same Net Revenue rate originally paid to COMPANY and within the period of time required by the rules and regulations of COMPANY

C.    WARRANTECH is required to pay out of its remuneration all amounts owing to Dealers on business written through WARRANTECH.

## X.   TERMINATION

A.    Subject to the conditions set forth in this Section, except as stated in Section X.B., X.C. and X.D. below, and notwithstanding Section IV, Term of Agreement, each party to this AGREEMENT shall have the right to terminate this AGREEMENT by giving the other party written notice, by certified mail, to be received not less than one hundred eighty (180) days prior to the effective date thereof.

B.     COMPANY may terminate this AGREEMENT if WARRANTECH violates any provision of this AGREEMENT and/or any provision of the addenda attached hereto.

    1.     In the event of such violation, COMPANY must:

        a.     Notify WARRANTECH in writing of the violation, and

        b.     Provide WARRANTECH thirty (30) days, from the receipt of the notice of violation, to cure the violation.

    2.     If violation is not cured within thirty (30) days, COMPANY may immediately exercise its right of termination by providing WARRANTECH written notification thereof.

C.     COMPANY may also terminate this AGREEMENT upon ten (10) days advance notice to WARRANTECH if any one or more of the following events occur:

    1.     WARRANTECH assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, mergers or consolidates the PROGRAM business without COMPANY'S prior written consent which shall not be unreasonably withheld.

    2.     WARRANTECH sells, transfers or causes to be sold or transferred all or substantially all assets to a third party, without COMPANY'S prior written consent which shall not be unreasonably withheld.

D.     This AGREEMENT will automatically terminate if any one or more of the following events occur:

    1.     WARRANTECH, or any of WARRANTECH's subsidiary corporations, if any, is (are) unable to pay its (their) debts as those debts mature; make(s) an assignment for the benefit of creditors; is (are) dissolved; a receiver or liquidator is appointed for WARRANTECH or such subsidiary corporation(s) or a substantial part of its (their) property; or insolvency, bankruptcy, reorganization, arrangement or similar proceedings are instituted by or against WARRANTECH or such subsidiary corporation(s).

    2.     WARRANTECH misappropriates any of COMPANY's funds or property including, but not limited to, the violation of WARRANTECH's fiduciary responsibilities to COMPANY regarding Premium due to COMPANY in accordance with Section VI.H. of this AGREEMENT.

    3.     WARRANTECH abandons or discontinues business or is determined by COMPANY to be guilty of fraud, or gross and willful misconduct.

COMPANY shall provide WARRANTECH written notification of such termination. The failure of COMPANY to provide WARRANTECH written notification or to promptly notify WARRANTECH of such termination, does not waive COMPANY's rights hereunder.

E.      Upon termination of this AGREEMENT, WARRANTECH shall immediately communicate such termination and its effective date to all Dealers who produce PROGRAM business.

F.      Upon termination or cancellation of this AGREEMENT:

1.      WARRANTECH and COMPANY agree to continue to perform all functions and obligations required by this AGREEMENT as if this AGREEMENT were in full force with respects to all Vehicle Service Contracts with effective dates prior to the termination date of this AGREEMENT. Such service shall continue until, all Vehicle Service Contracts expire or are canceled and all Claims thereunder have been paid or a mutually acceptable arrangement for the fulfillment of such obligations is evidenced by a written agreement between the parties. Fulfillment of WARRANTECH's obligations under this provision shall entitle WARRANTECH to receive, and obligate COMPANY to pay compensation, if any, in accordance with Section IX of this AGREEMENT.

2.      Should WARRANTECH, for any reason, fail to fulfill its obligations as defined in Section X.F.1, above, then WARRANTECH shall forfeit all unpaid and future compensation due under this AGREEMENT. COMPANY shall use all such forfeited compensation as offsets against expenses incurred by COMPANY as a result of WARRANTECH's failure to perform its duties under this AGREEMENT. If, as a result of WARRANTECH's failure to fulfill its obligations as described above, COMPANY desires to select a new administrator for the outstanding Vehicle Service Contracts, COMPANY agrees that such new administrator shall comply with and be bound by all claims handling policies, procedures and practices as in effect immediately prior to the transition of administrative responsibility and made known to COMPANY prior to the transition to the new administrator.

Any transition of administrative responsibility from WARRANTECH due to the request of COMPANY shall be made without cost or expense to WARRANTECH, provided, however, that WARRANTECH shall be responsible for the reasonable costs and expenses incurred by it in the physical transfer of all files and records, both paper and electronic, to the new administrator in a manner sufficient to enable said administrator to carry out its administrative obligations.

3.      WARRANTECH shall provide COMPANY upon termination, all Vehicle Service Contracts and files relating to Vehicle Service Contract Holders under the PROGRAMS, and claim files if applicable, which may be required for servicing PROGRAM business or to meet record retention requirements mandated by regulatory organizations or required by COMPANY policy. WARRANTECH shall continue to provide electronic data transfer of contract and claim information as provided herein in a timely fashion during the transfer period. Such files shall include, but shall not be limited to the following information:

a.      For each Vehicle Service Contract Holder, the Vehicle Service Contract Holders' name and addresses, type of Vehicle Service Contract, terms of Vehicle Service Contract, effective and termination dates of Vehicle Service Contract, description of covered item and serial number and related correspondence.

b.    For each Vehicle Service Contract, identifying all approved service/repair centers and Dealers, copies of the Vehicle Service Contracts correspondence and any other information that WARRANTECH possesses and which COMPANY requires to service PROGRAM business.

c.    For each Vehicle Service Contract, identifying all claims paid and/or pending with regard to the PROGRAM.

## XI.    CONFIDENTIALITY

A.    During the term of this AGREEMENT and thereafter as may be required to fulfill the terms and conditions of this AGREEMENT, COMPANY may receive Confidential Information of WARRANTECH.    COMPANY agrees it shall use all reasonable efforts to keep all Confidential Information of WARRANTECH confidential. However, COMPANY may disclose Confidential Information of WARRANTECH in accordance with Section X, Termination, and:

1.    To such COMPANY directors, officers, employees and other authorized personnel (hereinafter collectively referenced as "Representative") of COMPANY, in order for COMPANY to fulfill its obligations under this AGREEMENT and related INSURANCE. Such Representatives shall be advised by COMPANY of the confidential nature of such information and shall agree to maintain the confidentiality of the information:

2.    To the extent that WARRANTECH provides its prior written approval of such disclosure;

3.    To the extent that COMPANY, or any Representative of COMPANY, is legally required to make such disclosure, provided that, WARRANTECH is notified by COMPANY prior to making the disclosure. In such case or cases, COMPANY or any Representative of COMPANY, agrees to disclose only that Confidential Information which is required by law.

B.    During the term of this AGREEMENT and thereafter as may be required to fulfill the terms and conditions of this AGREEMENT, WARRANTECH may receive Confidential Information of COMPANY. WARRANTECH agrees it shall use all reasonable efforts to keep all Confidential Information of COMPANY confidential. However, WARRANTECH may disclose Confidential Information of COMPANY:

1.    To such WARRANTECH directors, officers, employees and other authorized personnel (hereinafter collectively referenced as "Representatives") of WARRANTECH, in order for WARRANTECH to fulfill its obligations under this AGREEMENT. Such Representatives shall be advised by WARRANTECH of the confidential nature of such information and shall agree to maintain the confidentiality of the information;

2.    To the extent that COMPANY provides its prior written approval of such disclosure;

3.    To the extent that WARRANTECH, or any Representative of WARRANTECH, is legally required to make such disclosure, provided that, COMPANY is notified by

WARRANTECH prior to making the disclosure. In such case or cases, WARRANTECH or any Representative of WARRANTECH, agrees to disclose only that Confidential Information which is required by law.

C.      Upon termination or cancellation of this AGREEMENT, COMPANY agrees not to disclose Confidential Information to any non-affiliated third party, other than as provided in Section XI.A. above.

D.      All Programs and Rates under this agreement are confidential.

## XII.    INDEMNITY

A.      A. COMPANY agrees to indemnify, defend and hold WARRANTECH, its affiliates, directors, officers, agents, representatives and employees harmless from and against any and all claims, suits, actions, liability, losses, expenses or damages, including compensatory, punitive and exemplary damages and attorney fees, now existing or which hereafter arise caused by or resulting from any of the following, provided WARRANTECH has not contributed or compounded such error:

1.      Any wrongful act by COMPANY or any of its affiliates, directors, officers, agents, representatives and employees;

2.      The failure of COMPANY or any of its affiliates, directors, officers, agents, representatives and employees failure to comply with any law or regulation regardless of whether such failure was intentional or unintentional, or resulted from mistake, negligence or lack of knowledge;

3.      Any material inaccuracy in or any material breach of any representation, warranty, covenant or agreement of COMPANY contained in this AGREEMENT or in any agreement, document or certificate delivered in connection herein;

4.      Any claims, suits, actions, liability, losses, expenses or damages incurred in which COMPANY caused, compounded or contributed to such error.

B.      In exchange for COMPANY protecting WARRANTECH, WARRANTECH must notify COMPANY immediately of any claim against WARRANTECH. WARRANTECH must also allow COMPANY to make any investigations, settlement or defense COMPANY feels is appropriate. However, WARRANTECH shall have the right to participate jointly with COMPANY in the defense of any claim, demand, suit or other proceeding in connection with such claim for which indemnification is made and no such claim, demand, suit or other proceeding may be settled or otherwise compromised without the consent of both COMPANY and WARRANTECH.

C.      WARRANTECH agrees to indemnify, defend and hold COMPANY, its affiliates, directors, officers, agents, representatives and employees harmless from and against any and all claims, suits actions, liability, losses, expenses or damages, including compensatory, punitive and exemplary damages and attorney fees, now existing or which hereafter arise caused by resulting from any of the following, provided COMPANY has not contributed to or compounded such error:

1. Any wrongful act by WARRANTECH, or any of its affiliates, directors, officers, agents, representative and employees;

2. The failure of WARRANTECH or any of its affiliates, directors, officers, agents, representatives and employees failure to comply with any material law or regulation regardless of whether such failure was intentional or unintentional, or resulted from mistake, negligence or lack of knowledge;

3. Any material inaccuracy in or any material breach of any representation, warranty, covenant or agreement of WARRANTECH contained in this AGREEMENT or in any agreement, document or certificate delivered in connection herein;

4. Any fraudulent or unauthorized use of the claims disbursement account and the claims deposit account required to be maintained pursuant to Addendum B, CLAIMS HANDLING AUTHORITY;

5. Any claims, suits, actions, liability, losses, expenses or damages existing or incurred in which WARRANTECH caused, compounded or contributed to such error.

D. In exchange for WARRANTECH protecting COMPANY, COMPANY must notify WARRANTECH immediately of any claim against COMPANY. COMPANY must allow WARRANTECH to make any investigations, settlement or defense WARRANTECH feels is appropriate. However, COMPANY shall have the right to participate jointly with WARRANTECH in the defense of any claim, demand, suit or other proceeding in connection with such claim for which indemnification is made and no such claim, demand, suit or other proceeding may be settled or otherwise compromised without the consent of both WARRANTECH and COMPANY.

E. For purposes of this section of the AGREEMENT, COMPANY and WARRANTECH shall not be considered affiliates or agents for each other.

## XIII. NO WAIVER

The failure of COMPANY or WARRANTECH to insist on strict compliance with this AGREEMENT, or to exercise any right or remedy hereunder shall not constitute a waiver of any rights contained herein nor stop the parties from thereafter demanding full and complete compliance therewith nor prevent the parties from exercising such remedy in the future.

## XIV. FULL AGREEMENT

A. This AGREEMENT supersedes and makes null and void any and all previous agreements covering the subject matter herein, whether written or oral, between COMPANY and WARRANTECH or their predecessors with respect to the type of business to be written hereunder and constitutes the full agreement between the parties. No amendment to this AGREEMENT shall be valid unless in writing, and signed by the parties except that the addenda attached hereto and the written rules, regulations and instructions of COMPANY communicated to WARRANTECH from time to time, shall be binding on the parties the same as though printed herein.

B.    Therefore, this AGREEMENT shall be the only agreement in effect for the kinds of Vehicle Service Contracts defined herein and referred to as the PROGRAM or PROGRAMS.

## XV.    SEVERABILITY

Wherever possible, each provision of this AGREEMENT will be interpreted in such manner and to such an extent as to be effective and valid under applicable law.  If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition of invalidity.

## XVI.    THIRD PARTY BENEFICIARIES

The provisions of this AGREEMENT are for the sole benefit of the parties and, except as otherwise provided in Section XII. Indemnity, neither party shall be liable to any person not a party hereto for loss, liability, damage, expense or for any claim whatsoever.

## XVII.    NOTICES

A.    Any notices required or permitted to be given under this AGREEMENT shall be in writing and shall be deemed duly given if delivered personally, by registered mail, by overnight delivery service signature required or by certified mail to the party for whom it is intended at the following address or such other address as the recipient may designate from time to time.

      For WARRANTECH      Warrantech
                                    150 Westpark Way
                                    Euless, TX 76040
                                    Attn:  Jeanine M. Folz

Copies to the Chief Executive Officer and Corporate General Counsel at the following address:

                                    Warrantech Corp.
                                    1 Canterbury Green
                                    Stamford, CT 06901

      For COMPANY:          Hyle H. Erwin, General Counsel
                                    Heritage Warranty Mutual Insurance
                                    1550 South 70th Street
                                    Lincoln, NE 68506

B.    Such notice shall be deemed to be given when deposited in the United States mail, postage prepaid.

## XVIII. ARBITRATION

A.    It is understood that this AGREEMENT is made in good faith and should there arise, a difference of opinion or of interpretation of this AGREEMENT, which cannot be settled

amicably between senior representatives of COMPANY who are not involved in the day-to-day management of the PROGRAM and WARRANTECH, or any dispute arising from or relating to the performance or breach of this AGREEMENT, such differences, interpretations or disputes shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting in Chicago, IL. This provision does not preclude COMPANY from seeking injunction relief where authorized under this AGREEMENT.

B.      WARRANTECH and COMPANY shall each appoint its arbitrator, and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint an arbitrator within sixty (60) days after being requested to do so by the claimant, the latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within four (4) weeks after their nominations, each of them shall name three (3), of whom the other shall decline two (2) and the decision shall be made by drawing lots. The claimant shall submit its initial brief in twenty (20) days thereafter, and the claimant may submit a reply brief within ten (10) days after filing of the respondent's brief.

C.      The board shall make an award with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its award in writing based upon a hearing at which evidence may be introduced without following strict rules of evidence but in which cross-examination and rebuttal shall be allowed. The board shall make its award within sixty (60) days following the termination of the hearing unless the parties consent to an extension. A decision by the majority of the members of the board shall become binding upon all parties to the proceeding.

D.      Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceeding shall be allocated by the board.

E.      The aforementioned Section XVIII, Arbitration, shall survive the termination of this AGREEMENT.

## XIX.   OTHER COMPANIES

WARRANTECH agrees to advise COMPANY of existing and future agency agreements entered into with other insurance companies with respect to business covered by this AGREEMENT.

## XX.   APPLICABLE LAW

This AGREEMENT shall be interpreted in accordance with the laws of the State of Illinois.

## XXI.   CAPTIONS

The captions of this AGREEMENT are not part of the AGREEMENT, but are merely for reference and should have no force or effect. If any caption is inconsistent with any provision of the AGREEMENT such provision shall govern.

IN WITNESS WHEREOF, the parties intending to be legally bound have caused this Administration Agreement to be signed and to take effect on the above date.

**WARRANTECH:**

DATED: 5/17/01

Warrantech Automotive, Inc.

BY: _Jeanine M. Polz_ (LS)

NAME: JEANINE M. POLZ

TITLE: Senior Vice President

DATED: 5/17/01

Warrantech Automotive of Florida, Inc.

BY: _Jeanine M. Polz_ (LS)

NAME: JEANINE M. POLZ

TITLE: Senior Vice President

Vemeco, Inc.

DATED: 5/17/01

BY: _Jeanine M. Polz_ (LS)

NAME: JEANINE M. POLZ

TITLE: Senior Vice President

**COMPANY:**

Heritage Warranty Mutual Insurance Risk Retention Group, Inc.

DATED: _____

BY: _____ (LS)

NAME: _____

TITLE: _____

Acknowledged and Agreed to this _____ day of April, 2001

Butler Financial Solutions, LLC

DATED: 5/19/01

BY: _Harris Miller_ (LS)

NAME: HARRIS G. MILLER

TITLE: PRESIDENT

## AMENDMENT NO. 1 TO ADMINISTRATIVE AGREEMENT

**THIS AMENDMENT NO. 1 TO ADMINISTRATIVE AGREEMENT** ("Amendment"), dated as of the 17th day of December, 2002, is entered into by and among Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc. and Vemeco, Inc., each of which has its principal office at 2200 Highway 121, Suite 100, Bedford, Texas 76021 (hereinafter referred to, collectively, as "WARRANTECH"), and Heritage Warranty Mutual Insurance Risk Retention Group, Inc. with its principal office located at 8055 "O" Street, Lincoln, Nebraska 68510 (hereinafter referred to as "COMPANY").

**WHEREAS,** WARRANTECH and COMPANY have entered into that certain Administrative Agreement, effective as of March 15, 2001 (hereinafter referred to as the "Agreement"); and

**WHEREAS,** WARRANTECH and COMPANY now desire to amend certain provisions of the Agreement;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and for good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

I. <u>AMENDMENTS TO THE AGREEMENT</u>:

a)    The first sentence of Section VI(H)(2) is hereby amended and restated in its entirety as follows:

"WARRANTECH shall be responsible for remitting to COMPANY, and/or such other entity as COMPANY may direct, all Premium for Vehicle Service Contracts reported to WARRANTECH, net of cancellations and net of all Claims and Allocated Loss Expenses (as defined n Addendum A hereto) paid by WARRANTECH during the month corresponding to the month for which the relevant Premium was reported."

b)    Section VI(O) is hereby amended by changing all references to "Addendum B" to "Addendum A".

c)    Section VI(Q)(3)(b) is hereby amended by deleting the address set forth therein and substituting the following in lieu thereof:

Peter Knolla
Heritage Warranty Mutual Insurance
8055 "O" Street
Lincoln, Nebraska 68510

d)        Section VI(T)(2) is hereby amended and restated in its entirety as follows:

"WARRANTECH and COMPANY agree that the rate paid Company per vehicle service contract will be comprised of a management fee of $36 and an excess insurance fee of $4, which COMPANY agrees to adjust downward to account for loss experience or competitive reasons."

e)        Section VII(G) is hereby deleted in its entirety.

f)        Section IX(A) is hereby amended and restated in its entirety to read as follows:

"COMPANY hereby acknowledges that WARRANTECH enters into agreements with qualified repair facilities for the purpose of settling Claims against Vehicle Service Contracts under the Insurance.  COMPANY hereby acknowledges and agrees that WARRANTECH enters into such agreements solely as agent for COMPANY and that the obligations undertaken and performed by WARRANTECH thereunder with respect to such Claims are the true and valid obligations of COMPANY.  In the event that any repair facility shall assert a claim against WARRANTECH arising out of work performed by such repair facility under a Vehicle Service Contract, COMPANY shall be solely responsible for the satisfaction of such claim and shall indemnify and hold WARRANTECH harmless therefrom; provided, however, that such claim shall not result directly from the gross negligence and/or willful misconduct of WARRANTECH."

g)        Section XVII(A) is hereby amended and restated in its entirety as follows:

"Any notices required or permitted to be given under this AGREEMENT shall be in writing and shall be deemed duly given if delivered personally, by registered mail, by overnight delivery service (signature required), or by certified mail to the party for whom it is intended at the following address or such other address as the recipient may designate from time to time.

For WARRANTECH:        Warrantech Automotive, Inc.
                        2200 Highway 121
                        Suite 100
                        Bedford, Texas 76021

Copies to the Chief Executive Officer and General Counsel at the following address:

                        Warrantech Corporation
                        350 Bedford Street
                        Suite 203
                        Stamford, Connecticut 06901

For COMPANY:          Peter Knolla
                      Heritage Warranty Mutual Insurance
                      8055 "O" Street
                      Lincoln, Nebraska 68510

h)      Section XVIII is hereby re-titled, amended and restated in its entirety as follows:

## "XVIII.   RESOLUTION OF DISPUTES

A.      It is understood and agreed that this AGREEMENT is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this AGREEMENT, or any dispute arising from or relating to the performance or breach of this AGREEMENT, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and/or state courts of the State of Illinois for the purpose of resolving such dispute.

B.      If a dispute referred to in Paragraph A above arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and irreparable adverse impact on the other party. Therefore, the parties hereby agree that the party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with Paragraph A above with respect to any such dispute.

## II.    AMENDMENTS TO ADDENDUM A

a)      Section I(F) is hereby amended by deleting the address set forth therein and substituting the following in lieu thereof:

                      Peter Knolla
                      Heritage Warranty Mutual Insurance
                      8055 "O" Street
                      Lincoln, Nebraska 68510

                      Tel:    402-489-7777
                      Fax:    402-489-7153

b)      Section I(I)(1) is hereby amended and restated in its entirety as follows:

"WARRANTECH shall maintain a COMPANY funded and controlled disbursement claim payment bank account at an FDIC insured bank (the "Bank") selected by COMPANY. This account shall be used solely for the payment of Claims and Allocated Loss Expenses pursuant to the terms of the AGREEMENT and this ADENDUM and only in the event that Claims and Allocated Loss Expenses paid by

WARRANTECH for a given month exceed the Premium reported to WARRANTECH (net of cancellations) for the corresponding month. With each request submitted to COMPANY for payment of Claims from this account, WARRANTECH will include a Claims disbursement file reasonably satisfactory to COMPANY."

c)    Section I(I)(3) is hereby amended by deleting "Bank One" and inserting in lieu thereof "the Bank".

d)    The first sentence of Section I(I)(6) is hereby amended and restated in its entirety as follows:

"WARRANTECH shall maintain the following minimum accounting controls concerning the bank account specified herein:"

e)    Sections I(K) and (L) are hereby amended by deleting the addresses set forth therein and substituting the following in lieu thereof:

Peter Knolla
Heritage Warranty Mutual Insurance
8055 "O" Street
Lincoln, Nebraska 68510

Tel:    402-489-7777
Fax:    402-489-7153

f)    Section I(N) is hereby amended and restated in its entirety as follows:

"WARRANTECH shall store paper files closed with payment for three (3) years from the date of expiration of the relevant Vehicle Service Contracts or from the date of COMPANY's last state insurance department examination."

g)    A new Section II(G) is hereby added to read as follows:

"Provided that WARRANTECH has provided COMPANY with the requisite Claims disbursement file, COMPANY shall promptly fund the Claims and/or Allocated Loss Expenses submitted by WARRANTECH from the bank account more specifically described in Section I(I)(1) of this ADDENDUM."

h)    Section III(C) is hereby amended by restating the first sentence thereof as follows:

"As part of WARRANTECH's claims settlement ADDENDUM, WARRANTECH shall issue checks, not to exceed $50,000, drawn on COMPANY's funded account."

i)      Section X(E) is hereby amended and restated in its entirety as follows:

"Any notice required under this provision of this ADDENDUM shall be made in writing, by overnight delivery service, or by registered or certified mail, to the parties at the following addresses:

WARRANTECH:          Jeanine M. Folz
                     Warrantech Automotive, Inc.
                     2200 Highway 121
                     Suite 100
                     Bedford, Texas 76021

COMPANY:             Peter Knolla
                     Heritage Warranty Mutual Insurance
                     8055 "O" Street
                     Lincoln, Nebraska 68510

III.    GENERAL

a)      Except as otherwise specifically set forth herein, the Agreement, including all Addenda and Exhibits (if any), remain in full force and effect.

b)      This Amendment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused this Amendment to be signed and to take effect as of the date first set forth above.

WARRANTECH:                    Warrantech Automotive, Inc.

DATED: 12/17/02                BY: _____

                               NAME: YEANINE FOLZ

                               TITLE: SVP


DATED: 12/17/02                Warrantech Automotive of Florida, Inc.

                               BY: _____

                               NAME: JEANINE FOLZ

                               TITLE: SVP

DATED: _12/17/02_

Vemeco, Inc

BY: _____

NAME: _TERMINE FOLZ_

TITLE: _SVP_

**COMPANY:**

DATED: _____

Heritage Warranty Mutual Insurance Risk Retention Group, Inc.

BY: _____

NAME: _____

TITLE: _____

Acknowledged and agreed to this 17th day of December, 2002.

Butler Financial Solutions, LLC

BY: _____

NAME: _Harris G. Miller_

TITLE: _President_

orig – J Morganlee
Harris Miller
P. Krella
cc – C Ford
R Garvin
A Folz

ADDENDUM A

## CLAIMS HANDLING ADDENDUM

The terms "COMPANY", and "PROGRAM" shall have the meanings ascribed to them in the attached Administrative Agreement.

COMPANY hereby grants WARRANTECH claims handling authority for the PROGRAM. WARRANTECH's responsibilities and duties for claims handling are subject to all policies and procedures as outlined in this Addendum B.

In addition, the responsibilities of WARRANTECH and the rights of COMPANY stated in this ADDENDUM shall be in addition to, and not in limitation of, those responsibilities and duties of WARRANTECH and rights of COMPANY set out in any applicable sections of the attached Administrative Agreement.

I.    RESPONSIBILITIES AND DUTIES OF WARRANTECH:

A.    WARRANTECH shall investigate, evaluate, document, and settle claims and loss reports submitted to WARRANTECH under Vehicle Service Contracts, and in accordance with policies covered by this ADDENDUM.

B.    WARRANTECH will document each claim with a written chronology of all actions taken with respect to the underlying claim, including but not limited to disbursement of monies.

C.    In situations where the claim is covered under the policy, WARRANTECH shall settle the claim through the disbursement of monies in accordance with Section III of this ADDENDUM and as follows:

1.    If the WARRANTECH authorized repair shops determine that the item covered under the Vehicle Service Contract is repairable, then the disbursement of monies will be issued to the repair shop as reimbursement for repair work.

2.    If the WARRANTECH authorized repair shops determine that the item covered under the Vehicle Service Contract must be replaced, then the disbursement of monies will be issued to the retailer for reimbursement of the new product.

3.    If the WARRANTECH authorized repair shops determine that the item covered under the Vehicle Service Contract is neither repairable nor replaceable, then the disbursement of monies will be issued to the consumer who purchased the Vehicle Service Contract, as reimbursement for the damaged item.

4.    Claims payments shall include the cost of replacement or repair of the damaged item and shall specifically exclude interest expense, fees and miscellaneous other charges.

D.    WARRANTECH shall perform all reasonable and necessary work in connection with claims handling or loss reports including, but not limited to, clerical, record keeping and administrative functions.

Claims Handling Addendum - Final                                                    - 1 -

E.   WARRANTECH shall establish and maintain a Claim file for each reported Claim or loss. The originals of such files shall remain in WARRANTECH's possession. All such files shall be subject to review at any reasonable time by COMPANY. All information submitted in support of claims payments and requests for claims payments are, and shall remain, the exclusive property of COMPANY. At COMPANY's request and expense, WARRANTECH shall make copies of any of such files.

F.   WARRANTECH shall promptly and fully report to COMPANY all information with respect to claims exceeding WARRANTECH's settlement ADDENDUM (Section III of this ADDENDUM), and all claims or reports of loss where fraud is suspected. Said reporting shall include a clear synopsis of the facts regarding the claim or loss, date of loss, date reported, name of Vehicle Service Contract Holder, name of dealer, and other information that COMPANY may require. WARRANTECH shall send this information, within seventy-two hours of receipt, to:

> Hyle H. Erwin, General Counsel
> Heritage Warranty Mutual Insurance
> 1550 South 70th Street
> Lincoln, NE 68506
>
> Tel: 402-489-7777
> Fax: 402-489-7153

G.   WARRANTECH shall cooperate with COMPANY to ensure that all required claims information is reported to or accessible by COMPANY. Such required claim information may be extracted by COMPANY using data processing systems, or transmitted by WARRANTECH in accordance with COMPANY described specifications, and may include but shall not be limited to date of loss, date reported, name of Vehicle Service Contract Holder, name of dealer, date of payments, amount of payment, check number and other information the COMPANY may require.

H.   WARRANTECH shall designate trained, qualified staff members, acceptable to COMPANY, who will be solely dedicated to the investigation, evaluation and settlement of claims.

I.   1.   WARRANTECH shall maintain a COMPANY funded controlled disbursement claim payment bank account at Bank One located in Texas. This account shall be used solely for loss transactions specified under the AGREEMENT between COMPANY and WARRANTECH.

     2.   COMPANY agrees to pay the normal and customary bank fees and expenses related to establishing and maintaining said bank account. WARRANTECH agrees to indemnify and hold harmless COMPANY for all obligations and liabilities, excluding bank fees and related expenses, that COMPANY may incur by reason of WARRANTECH maintaining said bank account. Not withstanding anything to the contrary in this provision, WARRANTECH shall not be responsible for liabilities arising solely out of COMPANY's acts or omissions.

WARRANTECH and COMPANY agrees that the net proceeds of all salvage and subrogation activities shall be divided eighty percent (80%) to WARRANTECH and twenty percent (20%) to COMPANY. Such distribution shall occur within thirty (30) days of WARRANTECH's receipt of the net proceeds from the salvage and subrogation activities. Payment to COMPANY by WARRANTECH shall also include an accounting of items sold, price received and expenses deducted by WARRANTECH. Net proceeds do not include the cost of shipping and warehousing.

3. WARRANTECH agrees to have COMPANY receive all advices, statements, and reconciliations directly from Bank One. COMPANY will maintain a reconciliation of this account.

4. WARRANTECH shall indemnify COMPANY from any losses or costs associated with unauthorized use of this account and/or inappropriate or erroneous transactions processed through this account arising out of the gross negligence or willful misconduct of WARRANTECH or any of its officers, directors, employees or agents.

5. WARRANTECH shall maintain true and complete records of all transactions on the account, including, but not limited to, positive pay account requirements, records of check numbers available, issued, spoiled, stop payments, and amounts and dates of checks issued. Such records may be audited or examined by representatives of COMPANY during normal business hours with thirty (30) days prior written notice or by any Department of Insurance or other state regulatory authority at any time. Any such audit shall not include or entitle COMPANY to a review of claims files or other claims specific materials. Any audit conducted hereunder shall be deemed by the parties to be final and conclusive with respect to the time period of such audit.

6. WARRANTECH shall maintain the following minimum accounting controls concerning WARRANTECH's Bank One bank account specified under this AGREEMENT:

   a. The supply of unused checks must be maintained in a locked file or facility with access limited to only those authorized personnel who are not authorized check signers.

   b. Check signing machine and corresponding signature plates must be maintained in a locked file or facility with access limited to authorized personnel.

   c. A permanent register of checks issued, checks spoiled, and stop payments must be maintained which reconciles with the record total of checks issued on check signing machines or through data processing systems.

   d. Check issuance procedures, for claim payments, must be documented in accounting manuals and submitted to COMPANY for review.

7. WARRANTECH shall assist COMPANY in escheat analysis of any open issue check that is four (4) months old

8. WARRANTECH shall maintain records and provide COMPANY with all documentation that pertains to salvage and subrogation.

Claims Handling Addendum - Final

- 3 -

J.       WARRANTECH shall designate no more than three staff members as authorized check signers for claim payment made for the PROGRAM. The names of WARRANTECH's authorized check signers must be communicated to COMPANY, in writing, within two weeks of the effective date of this ADDENDUM.

K.       WARRANTECH shall notify COMPANY of any lawsuit received by WARRANTECH in which COMPANY is named as a defendant. Such notices shall be FAXED to COMPANY is named as a defendant. Such notices shall be FAXED to COMPANY, within twenty-four (24) hours of receipt, at the following address and fax number:

>           Hyle H. Erwin, General Counsel
            Heritage Warranty Mutual Insurance
            1550 South 70th Street
            Lincoln, NE 68506

            Tel: 402-489-7777
            Fax: 402-489-7153

L.       WARRANTECH shall notify COMPANY of all claims-related Department of Insurance complaints resulting from claims settlement practices, procedures or from any incident relating to the PROGRAM. Such notice shall be forwarded to COMPANY, within twenty-four (24) hours, at the following address:

            Hyle H. Erwin, General Counsel
            Heritage Warranty Mutual Insurance
            1550 South 70th Street
            Lincoln, NE 68506

            Tel:   402-489-7777
            Fax:   402-489-7153

A copy of COMPANY's response shall be provided to WARRANTECH for documentation.

M.       WARRANTECH shall obtain COMPANY's written approval prior to retaining any professional or expert including, but not limited to, claims adjusters, special investigators, engineers, expert witnesses and accountants, who are not employees of WARRANTECH and whose services may be contracted for by WARRANTECH in the investigation and evaluation of COMPANY claims. This clause does not apply to assignments made by WARRANTECH to authorized repair shops for the purposes of determining if damages are covered by the warranty and for estimating repair cost.

N.       WARRANTECH shall store paper files closed with payment for two (2) years from date of closure and files without payment for six (6) years from date of closure.

Claims Handling Addendum - Final                                                          - 4 -

II.     **RESPONSIBILITIES AND DUTIES OF COMPANY:**

A.     COMPANY shall coordinate the training and education of WARRANTECH's staff member(s) concerning the procedures, policies, workflow and system of COMPANY. Additional training, if necessary, regarding loss adjustment techniques is available to WARRANTECH on a tuition basis.

B.     COMPANY may conduct audits of WARRANTECH's claims handling and settlement performance on a semi annual basis; provided, however, if any such audit reveals a material error or deficiency in WARRANTECH's claims handling practices, COMPANY shall be entitled to perform a follow-up audit prior to the next semi annual period for purposes of confirming that said error or deficiency has been corrected. COMPANY shall provide WARRANTECH with not less than ten (10) business days advance notice of such audits. Any audit conducted hereunder shall be deemed by the parties to be final and conclusive with respect to the time period of such audit.

C.     COMPANY shall make all decisions regarding coverage disclaimer issues, reservations of rights issues and ex gratia payments.

D.     COMPANY may, at its discretion, assume control of any claim in which COMPANY is named as a defendant.

E.     COMPANY may, at its discretion assume the handling of any claim at any time, and WARRANTECH agrees to deliver promptly the claim file to the COMPANY which COMPANY may request, as well as funds accrued for the purpose of paying the claim.

F.     COMPANY is responsible for all claim costs and all claim administration costs.

III.     **CLAIMS SETTLEMENT ADDENDUM GRANTED:**

A.     WARRANTECH is granted $6,000 claims settlement ADDENDUM per Vehicle Service Contract claim file.

B.     Claims settlement, as used in this ADDENDUM, is defined as the extension of an offer of consideration, in response to covered claims for repair or replacement under Vehicle Service Contracts, covered by an in-force insurance policy issued by COMPANY.

C.     As part of WARRANTECH's claims settlement ADDENDUM, WARRANTECH shall issue checks, not to exceed $50,000 drawn on WARRANTECH's COMPANY funded account. Disbursements shall be in accordance with written instructions from COMPANY and with Section I of this ADDENDUM, and shall only be for the settlement of claims arising from policies written as part of the PROGRAM.

IV.     **CLAIMS SETTLEMENT ADDENDUM RESTRICTIONS:**

A.     WARRANTECH has no rights to issue business payments, drawn on WARRANTECH's COMPANY funded account, or to reform coverage after a claim has been presented, without the prior written approval of COMPANY.

B.     COMPANY shall permit WARRANTECH to handle subrogation and salvage on claim files managed by WARRANTECH. WARRANTECH will maintain a "Salvage Log" to include entries as follows: date of entry, claim number, name of Vehicle Service Contract

Holder, name of dealer, date of loss, amount paid, date of recovery amount recovered, name of vendor who remitted recovery proceeds, and the date closed

V.    **COMPLIANCE WITH STATE INSURANCE CODES:**

A.    WARRANTECH agrees to operate and maintain, at all times, all necessary licensing in compliance with every applicable insurance code, statute or regulation set forth in the state or jurisdictions in which WARRANTECH services claims or losses on behalf of COMPANY.

B.    In the event WARRANTECH is in violation of any state insurance code, statute or regulation due to the acts or omissions of the WARRANTECH, WARRANTECH shall defend, indemnify and hold COMPANY harmless from all liability, expenses (including attorney's fees and other legal expenses), fines or other fees incurred by COMPANY as a result of such violations or alleged violations.

VI.    **PROPRIETARY INFORMATION**

A.    If, and to the extent that WARRANTECH shall, in connection with this ADDENDUM, come into possession of any information, business or technology of COMPANY which is not then known to the public, WARRANTECH agrees to treat such information as confidential and not to disclose such information to others not a party to this ADDENDUM.

B.    WARRANTECH shall, in connection with this ADDENDUM, maintain the integrity and security of any data processing system(s), and provide COMPANY or representative of COMPANY, access to any data processing system(s) provided by COMPANY and used in the handling and/or payment of service warranty claims.

VII.    **EXPENSES:**

A.    WARRANTECH shall make all payments with respect to Claims and pay all Allocated Loss Expenses (as defined in paragraph B below) from the Claims disbursement account.

B.    The term "Allocated Loss Expenses" shall mean the following items of expense incurred or authorized by WARRANTECH that are directly allocable to a specific Claim and that are reasonable and necessary in connection with WARRANTECH's duties:

1.    Attorney's fees and disbursements.

2.    Court reporter services and transcripts.

3.    Stenographic services and transcripts.

4.    Witness attendance fees.

5.    Court costs.

6.    Appeal bonds.

7.    Printing costs related to trials and appeals.

8.   Testimony, opinions, appraisals, reports, surveys, and analysis of professionals and experts.

9.   Trial and hearing attendance fees.

10.  Reports from government agencies and branches.

11.  Credit bureau reports.

12.  Private investigators.

13.  Photographs.

14.  Extraordinary Claim investigation and/or travel expense incurred at the request of COMPANY.

15.  Inspection fees.

C.   WARRANTECH shall not incur any expenses on behalf of COMPANY or assess COMPANY for any expenses, other than for charges for services rendered as defined in Section VII. of this ADDENDUM, without the prior written approval by COMPANY.

## VIII.   TERMINATION:

A.   COMPANY shall have the right to terminate this ADDENDUM for any reason by giving WARRANTECH written notice to be received ninety (90) days prior to the effective date thereof.

B.   WARRANTECH shall have the right to terminate this ADDENDUM for any reason by giving COMPANY written notice to be received one hundred eighty (180) days prior to the effective date thereof.

C.   The COMPANY may terminate this ADDENDUM immediately by sending a written notice if WARRANTECH violates any provision of this ADDENDUM.

D.   This ADDENDUM shall terminate automatically upon the termination of the attached ADMINISTRATIVE AGREEMENT.

E.   At the COMPANY's discretion, the ADDENDUM and responsibility of WARRANTECH to adjust, settle and service claims or losses under the terms of this ADDENDUM, shall continue until such time as all claims or losses reported to WARRANTECH have been finally adjusted and closed.

## IX.   REINSURANCE:

COMPANY shall have the sole right and responsibility to report to any and all reinsurers all facts, notices, documents and information sufficient to comply with reporting requirements of said reinsurers. WARRANTECH shall make no such reports, and all contacts shall be made by or through COMPANY. WARRANTECH further agrees to cooperate with COMPANY in meeting COMPANY's obligations to reinsurers.

## X.   GENERAL PROVISIONS:

A.  This ADDENDUM shall, without prior notice, be automatically modified to conform with any law or governmental regulation having application to or jurisdiction over the subject matter of the parties hereto.

B.  This ADDENDUM may not be altered or modified, except in writing, signed by the parties hereto.  A waiver by COMPANY of any breach or default by WARRANTECH under this ADDENDUM shall not constitute a continuing waiver or a waiver by COMPANY of any subsequent act in breach or in default hereunder.

C.  WARRANTECH will make available to the COMPANY, when directed by the COMPANY, exact copies of all correspondence and documents received or issued pursuant to this ADDENDUM. WARRANTECH shall keep true and complete records of all transactions and correspondence received and sent hereunder.  Such records may be audited, examined and copied by representatives of the COMPANY at any time during business hours upon reasonable advance written notice and shall be made available for examination by any State Insurance Department or regulatory body which so requires.

D.  WARRANTECH shall advise COMPANY of existing and future claims administration agreements with other insurance companies with respect to the classes of business covered by this ADDENDUM.

E.  Any notice required under this provision of this ADDENDUM shall be made in writing, by telex or registered or certified mail, to the parties at the following addresses:

WARRANTECH                    Jeanine M. Folz, Senior Vice President
                              Warrantech Corp.
                              150 Westpark Way
                              Euless, TX 76040

COMPANY

                              Hyle H. Erwin, General Counsel
                              Heritage Warranty Mutual Insurance
                              1550 South 70th Street
                              Lincoln, NE 68506

Claims Handling Addendum - Final                                    - 8 -

## Addendum B

- Service Contract Application/Registrationn
  - o Dealer Obligor – Form# G791100DONY1100
  - o Third Party Obligor – Form# G741100AONY1100
- Service Contract
  - o RepairMaster TruckCare Plus – Form# R981299TRUCKVSC0100
  - o RepairMaster Vehicle Service Contract – Form# R981299VSC0100
- Rates (Dealer Cost) and Class Listing
  - o Cars and Vans Rates and Class Listing – Form# CVRMO10400/CAR
  - o TruckCare Plus Rates and Class Listing – Form# CVTCPO10400/TRUCK
- Agent Agreement – Revised 12/19/97
- Dealer Agreement – Form# R470200AO/DO0300
- Marketing Materials
  - o Brochure – Form# R160400C/V0500
  - o Brochure – Form# R160400T/S0500
  - o Brochure – Form# R150200RMCORP0200
- Insurance Remit Charts (Reinsurance Trust + Claim Management Fund + Renegade Fund)
  - o RepairMater TruckCare Plus – Form# 2000 RepairMaster Truck Premium
  - o RepairMaster VSC – Form# 2000 RepairMaster Premium
- Risk Retention Group Application
- Risk Retention Group Certificate of Membership
- Insurance Policy Declarations Page
- VSC Reimbursement Insurance Policy – Form# HWMIRRG-SC-WAR-001
- Insurance Policy Endorsement
- Program Flow Chart
- Monthly Report Format – Report to be provided by Warrantech monthly
- Contract / Claim / Cancel Data Specification – Data to be provided by Warrantech monthly
- Asset Management Program - Investment Specifications – Draft Copy Included
- Earning Patterns – Provided by Warrantech but not yet approved by Heritage
- Reinsurance Agreement – Not Attached
- Trust/Custodial Agreement – Not Attached

● **Lewis** Companies   817-640-1444

This is your **CUSTOMER CONTRACT NUMBER**. Please use this number in any phone or written communication.

**14   860370**

YOUR CONTRACT NUMBER | YOUR CONTRACT PLAN CODE | SELLING DEALER CODE | LOCAL AGENT CODE

CONTRACT HOLDER (You, Your):

CONTRACT HOLDER ADDRESS: (Phone:

**DESCRIPTION OF YOUR VEHICLE:**

YEAR | MAKE | MODEL

VEHICLE ID. | | DEDUCTIBLE | FULL PAY | INSTALLMENT

*CONTRACT PURCHASE DATE

TERM | MILEAGE

4WD/AWD | ENHANCED ELECTRICAL
DIESEL | CONVERSION VAN
TURBO/SUPERCHARGER | SEALS AND GASKETS
COMMERCIAL USE | ONE TON

LIENHOLDER: (Needed only when VSC is financed)

DEALER/LESSOR:

ADDRESS:

DEALER PHONE NUMBER: ( )

CONTRACT HOLDER SIGNATURE:                        DATE:

AUTHORIZED DEALER SIGNATURE                        DATE         Vehicle Purchase Date

FOLD HERE

Distribution: White – Administrator; Green – Agent; Canary – Dealer Copy; Pink – Customer Copy; Goldenrod – Lienholder Copy

• New vehicle plan expiration is measured in time/mileage from the Contract Purchase Date and zero (0) miles.
• Used vehicle plan expiration is measured from Contract Purchase Date and odometer mileage at Contract Purchase Date.

The definition of "We, Us and Our" used frequently throughout the Vehicle Service Contract is defined as BUTLER FINANCIAL SOLUTIONS, L.L.C., 2300 Corporate Blvd., NW, Suite 214, Boca Raton, Florida 33431. Please refer to the Vehicle Service Contract for additional Definitions.

Our obligations under the Vehicle Service Contract are insured by a policy issued by American Modern Home Insurance Company, 7000 Midland Blvd., Amelia, OH 45102. If a covered claim is not paid within sixty (60) days, (except in Arizona thirty (30) days), after proof of loss has been filed, You may file a claim directly with the Insurance Company. Please call 1-800-577-6824 for instructions.

Administrator
Windhaven
P.O. BOX 1776, Amelia, TX, Texas
1-800-577-6824 (36711)

07411000AWY1100

*Contract Purchase Date

If this Vehicle Service Contract has been financed, the Lienholder shall be entitled to any refunds resulting from the cancellation of this Vehicle Service Contract for whatever reason. This would include cancellation for non-payment, repossession of the vehicle, or total loss of the vehicle.

EXHIBIT C



# Peace Of Mind From RepairMaster™

## Extended Protection You Can Count On.

Next to your home, your vehicle is probably the biggest investment you'll ever make. An investment that should be safeguarded with the best protection available

You can protect your vehicle now – and in the future – with an Extended Service Contract from Warrantech Automotive, Inc.

All our plans are custom designed by the person who knows your needs best, you! You select the combination of term, coverage and deductible that is right for you.

## Powertrain

    

Engine   Transmission   Transfer Case   Turbocharger Supercharger   Drive Axle

## Select Everything in Powertrain and...

    

Steering   Electrical   Brakes   Air Conditioner

## Deluxe Everything in Select and...

   

Cooling   Front & Rear Suspension   Fuel Delivery   Enhanced Electrical

 **Ultimate** – Provides Coverage for components listed in the Schedule of Coverages and any other parts, except for those items listed in the Exclusions Section of the Contract

 **Ultimate Wrap** – Provides Coverage for components listed in the Schedule of Coverages and any other parts, except for Engine, Turbocharger/Supercharger, Transmission, Transfer Case and Drive Axle components as listed in the Powertrain Coverage and except for those items listed in the Exclusions Section of the Contract

 **Ultimate Diesel / Turbo Wrap** – Provides Coverage for components listed in the Schedule of Coverages and any other parts, except for Engine and Turbocharger/Supercharger and except for those items listed in the Exclusions Section of the Contract



WARRANTECH
Protecting Your Future

Warrantech Automotive, Inc.
P.O. Box 1179, Bedford, TX 76095
1-800-577-6624
www.warrantech.com

G980201RMCOMBO0301Rev 08/03

MGM PRINTING SERVICES, INC. 417-831-7218

If this Vehicle Service Contract has been financed, the Lienholder shall be entitled to any refunds resulting from the cancellation of this Vehicle Service Contract for whatever reason. This would include cancellation for non-payment, repossession of the vehicle, or total loss of the vehicle.

**CONTRACT HOLDER (You, Your):**

This is Your CUSTOMER CONTRACT NUMBER. Please use this number in any phone or written communication.

| YOUR CONTRACT NUMBER | YOUR CONTRACT PLAN CODE | CONTRACT HOLDER ADDRESS (Phone) | |
|---|---|---|---|
| 14 1336509 | CV36100XP2 | SELLING DEALER CODE | LOCAL AGENT CODE |

**DESCRIPTION OF YOUR VEHICLE:**

| YEAR | MAKE | MODEL | VEHICLE ID NUMBER | CONTRACT CHARGE | DEDUCTIBLE |
|---|---|---|---|---|---|

VEHICLE PURCHASE DATE    DEDUCTIBLE PLAN    REIMBURSEMENT

| | | | TERM | MILEAGE |
|---|---|---|---|---|
| | | | 36 | 100,000 |

CONTRACT PURCHASE DATE

$100

DEALER/LESSOR:

ADDRESS

DEALER PHONE NUMBER (   )

AUTHORIZED DEALER SIGNATURE _____    CONTRACT HOLDER SIGNATURE _____    DATE

Distribution: White—Administrator; Green—Agent; Canary—Dealer Copy; Pink—Customer Copy; Goldenrod—Lienholder Copy

FOLD HERE

LIENHOLDER: (Needed only when VSC is financed)

**AUTHORIZED DEALER SIGNATURE**    DATE    Contract Purchase Date

Warranty Administrator
P.O. Box 1178, Brenham, TX Texas
1-800-577-6824 (Parts)

"Contract expiration is measured in time/mileage throughout the Contract Purchase Date and zero (0) miles.

The definition of "We, Us and Our" used frequently throughout this Contract is defined as BUTLER FINANCIAL SOLUTIONS, LLC, 2300 Corporate Blvd, NW, Suite 214, Boca Raton, Florida 33431, (888) 650-4747. Please refer to the Vehicle Service Contract for additional Definitions.

The obligation of the provider to perform under this Contract is insured by Heritage Warranty Mutual Insurance Risk Retention Group, Inc., 1550 South 70th Street, Lincoln, Nebraska 68506, under a motor Vehicle Service Contract reimbursement policy and reinsured by American Re®, a national Reinsurance Company and a member of the Munich Re Group. If a covered claim is not paid within sixty (60) days, issued in Arizona thirty (30) days, after proof of loss has been filed, You may file a claim directly with the insurance Company. Please call 1-800-577-6824 for instructions.

Remove tape strips and place CUSTOMER'S copy of the Registration Page here. Send the WHITE copy of the Registration Page to the Administrator

↑ Start
Peel
Here

## NOTE TO THE CUSTOMER:

## THIS CONTRACT IS NOT VALID UNLESS A COMPLETED
## REGISTRATION PAGE COVERS THIS NOTICE.

Thank You.

G980201RMCOMB00301Rev 08/03

# CONGRATULATIONS

Congratulations on **Your Vehicle** purchase.
**You** have also selected a comprehensive
Vehicle Service **Contract** giving **You** peace of mind and security
against mechanical **Breakdowns** under the terms herein.

## For Assistance Please Call
## 1-800-577-6624



Warrantech Automotive, Inc.
P.O. Box 1179, Bedford, TX 76095
Customer Service / Claims (800) 577-6624* Available 24 hours a day / 365 days a year
Fax (817) 785-6703; Email: wtechautoclaims@warrantech.com
*For Towing/Road Service and Lost Key/Lockout Assistance, Call (888) 248-8289
(does not apply to Recreational Vehicles and Travel Trailers)

G980201RMCOMB00301Rev 08/03

## THINGS TO DO NOW

Verify Registration Page – The Registration Page must be affixed to the inside front cover of this booklet to complete and validate this Contract.

Check Plan Code – Not every part of Your Vehicle is covered by this Contract.   Coverage is identified by the last three (3) letters of the Plan Code as shown on the Registration Page of this Contract. Please compare the last 3 letters of the Plan Code on the Registration Page with the Plan Code and Corresponding Coverage as listed under the Schedule of Coverages. If this box was left blank, or Plan Code is inaccurate, contact Your Selling Dealer immediately.

Check Your Deductible – Please check the box labeled DEDUCTIBLE on Your Registration Page. A dollar amount should be checked in the box which identifies the portion of the covered repair You will be required to pay if You have a claim. If no dollar amount has been checked, contact Your Selling Dealer immediately.
NOTE: This Contract is not valid unless You have signed the Registration Page and it has been affixed to the inside of the front cover of this booklet

## THINGS YOU MUST DO THROUGHOUT THE TERM OF YOUR CONTRACT

Properly Maintain Your Vehicle and KEEP THE RECEIPTS – This Contract is only valid if Your Vehicle has been maintained in accordance with the manufacturer's specifications  Keep copies of all receipts (oil changes, lubrication, etc.), as proof of maintenance will be required when You file a claim  SEE SECTION: "PROVISIONS OF THIS VEHICLE SERVICE CONTRACT" FOR SPECIFIC MAINTENANCE REQUIREMENTS.
OBTAIN APPROVAL PRIOR TO HAVING WORK PERFORMED THAT MAY BE COVERED BY THIS CONTRACT.  If You believe the failure may be covered by this Contract, call the Administrator personally, or instruct the repair facility performing the work to call and Register the claim BEFORE THE WORK IS PERFORMED.  SEE SECTION: "CONTRACT HOLDER'S GUIDE TO FILING A CLAIM".

## IMPORTANT INFORMATION YOU NEED TO KNOW

CUSTOMER SUPPORT NUMBER – Please see the box labeled Your Contract Number on the Registration Page  This is Your CUSTOMER SUPPORT NUMBER  Please refer to this number in any written or verbal communication, such as requesting information or filing a claim  PURCHASE OF THIS VEHICLE SERVICE CONTRACT IS NOT REQUIRED IN ORDER TO PURCHASE OR FINANCE A MOTOR VEHICLE.

| TOPIC / SECTION | PAGE |
|---|---|
| Registration Page | Inside Front Cover |
| Definitions | 1 |
| Provisions of This Vehicle Service Contract | 2-3 |
| Cancellation of Your Contract | 4 |
| Contract Holder's Guide To Filing A Claim | 4-5 |
| Service Manager's Guide To Filing Claim | 6-7 |
| Exclusions | 7-9 |
| Special State Requirements / Disclosures | 9-19 |
| Vehicle Maintenance Log | 21-22 |
| Schedule of Coverages | Insert |

G980201RMCOMBO0301Rev 08/03

## DEFINITIONS

The following definitions apply to words frequently used in this Contract and appear in Bold Faced Type:

**You, Your** – Means the Contract Holder shown on the Registration Page or the person to whom this Contract was properly transferred

**We, Us, Our** – Means the obligor of this Contract as stated on the Registration Page attached to this Contract

**Administrator** – Means The Administrator as shown on the Registration Page.

**Contract** – Means this Vehicle Service Contract which You have purchased from Us to protect Your Vehicle.

**Registration Page** – Means the numbered document which must be attached to and forms part of this Contract. It lists information regarding You, Your Vehicle, Coverage selected, and other vital information.

**Schedule of Coverages** – Lists the Coverages provided to You for Your Vehicle under this Contract.

**Coverage** – Means the protection You have selected, as listed in the Schedule Of Coverages Section

**Your Vehicle** – Means the vehicle which is described on the Registration Page

**Deductible** – Means the amount You are required to pay, as shown on the Registration Page, for covered Breakdowns  Once a part is repaired or replaced under the terms of this Contract, there will be no Deductible for future repairs to that part

**Breakdown** – Means the failure of a covered part under normal service  A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts.  Subsequent Damages resulting from the Breakdown of a covered part are covered by this Contract, except when You have failed to perform the recommended maintenance services for Your Vehicle.

**Subsequent Damage** – Means the direct or immediate damage to a non-covered part occurring as a singular event or failure originating with the failure of a covered part.

**Consequential Damage** – Means an event or damage that occurs separately as a consequence or result of the failure of a covered or non-covered part, such as, loss of time or use, inconvenience, commercial loss, personal injury or property damage

**Registered** – Means a claim has been Registered only when the Administrator has been contacted and has issued a claim reference number.

**Pre-existing** – Means a condition that within all reasonable mechanical probability relates to the mechanical fitness of Your Vehicle prior to Contract issuance.

**Commercial Use** – Means vehicles used for Farming or Ranching, Route Work, Job-Site Activities, Service or Repair Work, Delivery of Goods and Snow Removal (vehicle must be equipped with factory installed or factory authorized snowplow package).  Usage must not exceed manufacturer's ratings and/or limitations.

G980201RMCOMBO0301Rev 08/03

## PROVISIONS OF THIS VEHICLE SERVICE CONTRACT

This CONTRACT is between US and YOU, and is subject to all the Terms and Conditions contained herein.

1. **CONTRACT PERIOD**
   Coverage under this Contract begins on the Contract Purchase Date and will expire according to the time and/or mileage of the term/miles selected, whichever occurs first, as shown on the Registration Page
   a) New Vehicle Plan expiration is measured in time/mileage from the Contract Purchase Date and zero (0) miles.
   b) Used Vehicle Plan expiration is measured in time/mileage from the Contract Purchase Date and Odometer Mileage (at Contract Purchase Date).

2. **COVERAGE**
   The Coverage afforded You for Your Vehicle is fully described in this Contract  Please see section: "Schedule Of Coverages" of this Contract

3. **BREAKDOWN OF COVERED PARTS**
   We will pay or reimburse You for reasonable costs to repair or replace any Breakdown of a part listed in the Schedule Of Coverages.  REPLACEMENT PARTS MAY BE NEW, REMANUFACTURED, INDEPENDENTLY MANUFACTURED/DISTRIBUTED OR OF LIKE KIND AND QUALITY.

4. **DEDUCTIBLE**
   In the event of a Breakdown covered by this Contract, You may be required to pay a Deductible   No Deductible payment is required with respect to Towing/Road Service, Rental, Trip Interruption, Lost Key/Lockout, and Road Hazard Tire Coverages, if they are provided by this Contract  If You have a Per Repair Visit Deductible, as shown on the Registration Page, the Deductible amount will be applied on a per repair visit basis  Should a covered Breakdown take more than one visit to repair, only one Deductible will apply for that Breakdown. If You have a Per Component Deductible, as shown on the Registration Page, the Deductible amount will be applied on a per component basis  Should You experience more than one failed component per repair visit, Your Deductible will be limited as noted below:
   * $50 & $100 Deductible per component – maximum $200 per repair visit
   * $200 Deductible per component – maximum $400 per repair visit

   In addition, if You selected the Reducing Deductible option, $50 (fifty) of any Deductible will be waived, provided You have repairs made at the dealership where You purchased this Contract.
   If the box RED has been checked, You have a $50 per repair visit Deductible that reduces to $0 when returning to the Selling Dealer for repairs

5. **TERRITORY**
   This Contract applies only to Breakdowns that occur and repairs made within the United States of America and Canada

G980201RMCOMBO0301Rev 08/03

PROVISIONS OF THIS VEHICLE SERVICE CONTRACT ( CONTINUED )

6.  LIMITS OF LIABILITY
    a   Per Repair Visit - Our liability for any one (1) Repair Visit shall in no event exceed the trade-in value of Your Vehicle at the time of said Repair Visit, as listed in the NADA Used Car Guide.
    b   Aggregate - The total of all claims and benefits paid or payable while this Contract is in force shall not exceed the price You paid for Your Vehicle (excluding tax, title and license fees).

7.  MAINTENANCE REQUIREMENTS
    a   You must have Your Vehicle checked and serviced in accordance with the manufacturer's recommendations, as outlined in the Owner's Manual. NOTE: Your Owner's Manual lists different servicing recommendations based on Your individual driving habits and climate conditions. You are required to follow the maintenance schedule that applies to Your conditions. Failure to follow the manufacturer's recommendations that apply to Your specific conditions may result in the denial of Coverage. If an Owner's Manual is not provided, You can contact the dealer or Administrator and the servicing recommendations will be provided to You.
    b   It is required that verifiable receipts be retained for the service work. Or, if You perform Your own service, You must retain verifiable receipts showing purchases of all required parts and materials necessary to perform the required maintenance showing the date and mileage when the services were performed. Maintenance and/or service work receipts will be requested by the Administrator.

8.  TRANSFER OF YOUR VEHICLE SERVICE CONTRACT
    a   Your Contract may be transferable to someone to whom You sell or otherwise transfer Your Vehicle while this Contract is still in force. This Contract cannot be transferred if the title transfer of Your Vehicle passes through an entity other than the subsequent buyer, or Your Vehicle is sold or traded to a dealership, leasing agency or entity/individual in the business of selling vehicles. This Contract can only be transferred once and the transfer must be initiated by the original Contract Holder.
    b   To transfer, the following must be submitted to the Administrator within 30 days of the change of ownership to a subsequent individual purchaser:
        -   A completed transfer form; with
        -   Name and Address of New owner, date of sale to new owner, current mileage; and
        -   $50.00 Transfer Fee made payable to Warrantech Automotive, Inc.
    c   Any remaining manufacturer's warranty must also be transferred at the same time as vehicle ownership transfer. Copies of all maintenance records showing actual oil changes and manufacturer's maintenance must be given to the new owner. These maintenance records must be retained along with similar documentation for future maintenance work which the new owner has performed in accordance with the Maintenance Requirements of this Contract. If necessary, these documents will be verified by the Administrator.

9.  OUR RIGHT TO RECOVER PAYMENT
    If You have a right to recover against another party for anything We have paid under this Contract, Your rights shall become Our rights. You shall do whatever is necessary to enable Us to enforce these rights. We shall recover only the excess after You are fully compensated for Your loss.

PAGE 3                                          G980201RMCOMBO0301 Rev 08/03

## CANCELLATION OF YOUR CONTRACT

a   You may cancel this Contract by returning to the issuing dealer. An odometer statement indicating the odometer reading on the date of the request will be required.

b   We may cancel this Contract for non-payment of the Contract charge, or for misrepresentation in the submission of a claim. We may cancel this Contract if Your Vehicle is found to be modified in a manner not recommended by the manufacturer, or Your Vehicle is found to be used as a Commercial vehicle and the applicable surcharge has not been marked on the Registration Page and payment has not been received for this surcharge.

c   If Your Vehicle and this Contract have been financed, the lienholder shown on the Registration Page may cancel this Contract for non-payment, (except in the state of Utah and Wyoming), or if Your Vehicle is declared a total loss or is repossessed.

d   If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date Coverage begins, less a twenty-five ($25.00) dollar administrative fee. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

## CONTRACT HOLDER'S GUIDE TO FILING A CLAIM

A.  IF YOUR VEHICLE INCURS A BREAKDOWN, YOU MUST TAKE THE FOLLOWING STEPS TO FILE A CLAIM:
    1.  Prevent Further Damage - Take immediate action to prevent further damage. This Contract will not cover the damage caused by not securing a timely repair when a Breakdown has occurred. The operator is responsible for observing vehicle warning lights and gauges, and taking appropriate action immediately. Failure to do so, may result in the denial of Coverage.
    2.  Take Your Vehicle to a Licensed Repair Facility - If Your Vehicle breaks down, return to the issuing dealer. If this is not possible, take Your Vehicle to any licensed repair facility (You may contact the Administrator for help in locating a repair facility).
    3.  Provide Repair Facility with a copy of Your Contract and/or Your Contract Number.
    4.  Register repairs with the Administrator - Prior to any repair being made, instruct the Service Manager at the repair facility to contact the Administrator to Register the claim. Any claim for repairs that has not been Registered will not be covered except as provided under Emergency Repairs. The amount Registered with the Administrator is the maximum amount that will be paid for repairs covered under the terms of the Contract. Any additional amount must be Registered with the Administrator, prior to submitting the claim for payment.

PAGE 4                                          G980201RMCOMBO0301 Rev 08/03

CONTRACT HOLDER'S GUIDE TO FILING CLAIM ( CONTINUED )

5   Authorize Teardown and/or Inspection - In some cases, You may need to authorize the repair facility to inspect and/or teardown Your Vehicle in order to determine the cause and cost of the repair. You will be responsible for these charges if the failure is not covered under this Contract. We reserve the right to require an inspection of Your Vehicle prior to any repair being made

6.  Review Coverage - After the Administrator has been contacted, review with the Service Manager what will be covered by this Contract

7.  Pay any applicable Deductible - We will reimburse the repair facility or You for the cost of the work performed on Your Vehicle that is covered by this Contract and previously authorized, less the Deductible (if any). Once authorization is obtained, and the repair is completed, all repair orders and documentation must be submitted to the Administrator within sixty (60) days (365 days in Wisconsin), (as soon as reasonably possible in Utah), to be eligible for payment.

8.  Emergency Repairs - Should an emergency occur which requires a Breakdown repair be made at a time when the Administrator's office cannot be contacted, You must call the Administrator's office within five (5) business days from the date of repair to determine if such repair will be covered by this Contract. If covered, You will be reimbursed for the repair

B.  IF YOUR VEHICLE BREAKS DOWN ON THE ROAD:
Follow the same steps as above. If necessary, the repair facility will be paid, less Your Deductible (if any), by the Administrator's national charge card system (MasterCard or VISA) on Your behalf. In some cases, You may need to pay the repair bill in full. If so, You will be reimbursed for the Registered amount of the repair, less Your Deductible (if any). If You have any questions regarding claim procedures or Coverages, please call the Administrator at the number below and ask for a Customer Support Representative

**Warrantech Automotive, Inc.**
P.O. Box 1179, Bedford, TX 76095
Customer Service / Claims (800) 577-6624*
Available 24 hours a day / 365 days a year
Fax (817) 785-6703; Email: wtechautoclaims@warrantech.com
*For Towing/Road Service and Lost Key/Lockout assistance, Call (888) 248-8289
(does not apply to Recreational Vehicles and Travel Trailers)

PAGE 5                                                      G980201RMCOMBO0301Rev 08/03

## SERVICE MANAGER'S GUIDE TO FILING A CLAIM
### STEPS TO FOLLOW WHEN FILING A CLAIM:

1   Advise Contract Holder - That evaluating the cause of the failure does not mean that the failure is covered under this Contract. All covered repairs must be Registered with the Administrator

2   Contract Holder's Approval for Evaluation - Obtain approval from the Contract Holder to inspect and/or teardown vehicle to determine cause and cost of repair. Save all components including fluids and filters, in the event the Administrator requires an inspection. Inform the Contract Holder that the cost of the teardown will not be paid if the failure of the component disassembled is not covered under the Contract

3   Cause, Cure and Cost - Assess the problem(s), cause, cure of the failure and cost of the repairs.

NOTE: Any major component failure that has a verifiable complaint, i.e., slipping transmission, knocking engine, etc., should be called in prior to any teardown.

4   Register the Repair with the Administrator - Call the Administrator's Service Manager's Support representative at (800)-577-6624 to Register the claim. Please have the following items ready when You place the call:
    a   Customer's Contract Number
    b   Cause of Failure and Cure
    c   Cost of the Repair
    d   Factory Part Number(s)

5   The Support Representative will verify the Coverage and -
    A   Register Claim - The Administrator will Register the claim by issuing a Reference Number. Record this Reference Number on the Repair Order. The Registered claim amount is the maximum that will be paid. Any additional amounts must be Registered with the Administrator, prior to submitting the claim for payment. When You call in to Register the claim, We will adjust the labor hours according to a nationally recognized labor time guide, e.g. Factory, Motors, Mitchell, or All-Data
                                                OR
    B   Request Additional Evaluation - Request further evaluation, teardown or outside inspection
        I   Inspection - The Administrator reserves the right to require an inspection of the vehicle prior to any repair being accomplished. Diagnostic procedures not associated with the teardown are not covered
        II  Teardown - If a teardown is necessary in order to determine the cause of failure, the Contract Holder must approve the teardown. Please advise the Contract Holder that, if the component disassembled is not covered, then the Contract Holder must pay for the teardown

PAGE 6                                              G980201RMCOMBO0301Rev 08/03

Listed below is the Inspection Teardown Policy:
  a   Save all components, including fluids and filters, that need to be inspected   We may require covered components to be retained for Our disposal.
  b   The Support Representative will arrange for inspection
  c   If not visited within 48 hours, call the Support Representative

OR

C.  Deny Claim – Deny the request and issue a Reference Number.

6   Review Repairs with Contract Holder – After the Administrator has been contacted, review with the Contract Holder what will be covered by the Contract and what portions of the repairs, if any, will not be covered

7   Contract Holder's Approval for Repairs – Obtain the Contract Holder's approval to complete the repairs.  All repair orders must have customer's signature

8   Submit Repair Orders for Payment – All repair orders and documentation must be submitted to the Administrator, at the address noted under "Contract Holder's Guide to Filing A Claim" within sixty (60) days.

## EXCLUSIONS

### This Vehicle Service Contract Provides No Coverage or Benefits

A   For any part not specifically listed in the Schedule of Coverages, or for Ultimate Coverage, any of the following parts:  carburetor, battery and battery cable/harness, standard transmission clutch assembly, friction clutch disc and pressure plate, distributor cap and rotor, safety restraint systems (including air bags), glass, lenses, sealed beams, light bulbs, fuses, circuit brakers, cellular phones, television/VCR/DVD players, game centers, AM/FM radio/cassette/CD players not to exceed $300 repair or replacement cost, speakers, audio/video equipment, all touch screen and/or voice activated accessories including related display screens and heads up displays on windshields, electronic transmitting/receiving devices, global positioning systems, voice recognition systems, remote control consoles, radar detection devices, brake rotors and drums, all exhaust components, and the following emission components: EGR purge valve/solenoids/sensors, vacuum canister, vapor return canister, vapor return lines/valves, air pump/lines/valves, catalytic converter/filtering/sensors, emission vapor sensors, gas cap/filler neck, weather strips, trim, moldings, bright metal chrome, upholstery and carpet, paint, outside ornamentation, bumpers, body sheet metal and panels, frame and structural body parts, vinyl and convertible tops, any convertible top assemblies, hardware or linkages, tires (except as may otherwise be provided under the Schedule of Coverages), wheel/rims.  External nuts, bolts and fasteners are not covered unless specifically listed in the Schedule of Coverages (except where required in conjunction with a covered repair).

B   For maintenance services and parts described in Your Vehicle's owner's manual as supplied by the manufacturer and other normal maintenance services and parts which include, but are not limited to:  alignments, adjustments, wheel balancing, tune-ups, spark plugs, spark plug wires, glow plugs, hoses (unless listed as specific covered parts), drive belts, brake pads, brake linings/shoes, and wiper blades.  Filters, lubricants, coolants, fluids and refrigerants will be covered only if replacement is required in connection with a Breakdown.

C   For any damage and/or Breakdown resulting from collision, road hazard, fire, theft, vandalism, riot, explosion, lightning, earthquake, freezing, rust or corrosion, windstorm, hail, water or flood; acts of God, salt, environmental damage, chemicals, contamination of fluids, fuels, coolants or lubricants.

D.  For any Breakdown caused by misuse, abuse, negligence, lack of normal maintenance required by the manufacturer's maintenance schedule for Your Vehicle, or improper servicing or repairs subsequent to purchase  For any Breakdown caused by sludge build-up resulting from Your failure to perform recommended maintenance services, or failure to maintain proper levels of lubricants and/or coolants, or failure to protect Your Vehicle from further damage when a Breakdown has occurred or failure to have Your Vehicle towed to the service facility when continued operation may result in further damage.

E   For any repair or replacement of any covered part if a Breakdown has not occurred or if the wear on that part has not exceeded the field tolerances allowed by the manufacturer.  Any part that a repair facility or manufacturer recommends or requires that it be replaced or repaired, or is an update, and is not a Breakdown, is Your responsibility and expense

F   If any alterations have been made to Your Vehicle or You are using or have used Your Vehicle in a manner not recommended by the manufacturer, including but not limited to, the failure of any custom or add-on part, all frame or suspension modifications, lift kits, any tire that is not recommended by the original manufacturer if it creates an odometer/speedometer variance of greater than 4%, trailer hitches.  Also not covered are any emissions and/or exhaust systems modifications, engine modifications, transmission modifications, and/or drive axle modifications, which includes any performance modifications.

G   If Your odometer has ceased to operate and odometer repairs have not been made immediately, or the odometer has been altered in any way subsequent to purchase, or if Your Vehicle has ever been a total loss, salvaged or rebuilt

H   For any liability for property damage, or for injury to or death of any person arising out of the operation, maintenance or use of Your Vehicle described in this Contract, whether or not related to the parts covered  For loss of use, time, profit, inconvenience, or any other consequential loss (except as may otherwise be provided under the Schedule of Coverages), including any Consequential Damage to a non-covered part that results from a Breakdown

I   When the responsibility for the repair is covered by an insurance policy, manufacturer and/or dealer customer assistance program, or any warranty from the manufacturer, such as extended drive train, major component or full Coverage warranties (regardless of the remaining manufacturer's warranty when You purchased  this Contract), or a repairer's guarantee/warranty.  Further, Coverage under this Contract is similarly limited in the event of a Breakdown if the manufacturer has announced its responsibility through any means, including public recalls and factory service bulletins

**EXCLUSIONS ( CONTINUED )**

J   If Your Vehicle is used for towing (unless Your Vehicle is equipped with factory installed or factory authorized tow package), or is used as a Commercial unit (unless appropriate surcharge is marked on Registration Page and only as defined under "Definitions", "Commercial Use"), or is used for rental, taxi, limousine or shuttle, towing/wrecker service, dumping (dump beds), cherry pickers, lifting or hoisting, police or emergency service, principally off-road use, racing or competitive driving.

K   For any Pre-existing condition or for any Breakdown occurring before Coverage takes effect or prior to the Contract Purchase Date, or if the information provided by You, or the repair facility cannot be accurate as accurate or is found to be deceptively inaccurate.

L   For Breakdowns that occur and/or repairs made outside of the United States of America and Canada

M.  For diagnostic and/or teardown procedures that are not listed, or are in excess of the times listed in the current year's national flat rate hourly guide in conjunction with a covered repair

N   For Tire Service Coverage, the following Exclusions also apply:
   1   Tire damage incurred outside the United States or Canada;
   2   Tire damage resulting from off-road use, racing, collision with curb or another vehicle, misuse, abuse, lack of proper maintenance, misalignment, suspension problems, vandalism, fire, upset, manufacturer defects, and driving on tires which are deflated or improperly inflated;
   3   Tires which are undersized, oversized, or otherwise not recommended by the vehicle manufacturer for Your Vehicle;
   4   Tires transferred from another vehicle;
   5   Tires which do not have at least 3/32 inch tread depth remaining;
   6   Tires mounted on vehicles other than on-road use vehicles, exceeding 13,500 lb. gross vehicle weight rating;
   7   Damage to tires that does not affect their performance or safety;
   8.  Tires not retained by You for inspection by the Administrator.

## SPECIAL STATE REQUIREMENTS / DISCLOSURES
### ALASKA

EXCLUSIONS SECTION -
Item 1. is amended by adding the following:
This Contract does provide Coverage if Your Vehicle is used for snow removal, provided Your Vehicle is properly equipped for such use and is not used commercially.

Item O. is added as follows:
This Contract does not provide Coverage for damages for bad faith, punitive or exemplary damages, personal injury including bodily injury, property damage (except as specifically stated in the Contract), and attorney's fees.

### CALIFORNIA
IMPORTANT INFORMATION YOU NEED TO KNOW SECTION - THE CONTRACT OBLIGOR IS WARRANTECH AUTOMOTIVE, INC.
DEFINITIONS SECTION – The definition of Breakdown is deleted and replaced with the following:
Breakdown– Means the failure of a covered part under normal service due to defects in material and workmanship. A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non-covered parts

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is deleted and replaced with the following:
   d.  If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins, less an administration fee of twenty five ($25.00) dollars or 10% of the Contract charge, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear

SCHEDULE OF COVERAGES – Trip Interruption, Lost Key/Lockout and Tire Service are not available

### CONNECTICUT
Connecticut Public Act, 87-393, Laws 1987, requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
Used vehicles with a sale price of $3,000 but less than $5,000
   Provides Coverage for 30 days or 1,500 miles, whichever occurs first
Used vehicles with a sale price of $5,000 or more
   Provides Coverage for 60 days or 3,000 miles, whichever occurs first

The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

SPECIAL STATE REQUIREMENTS / DISCLOSURES ( CONTINUED )

## GEORGIA

Our obligations under this Service Contract are insured by the Insurance Company as noted on the Registration Page. If a covered claim is not paid within sixty (60) days after proof of loss has been filed, You may file a claim directly with the Insurance Company

EXCLUSIONS SECTION – Item J. is deleted and replaced with the following:
J.    If Your Vehicle is used for towing (unless Your Vehicle is equipped with factory installed or factory authorized tow package), or is used as a commercial unit, or is used for rental, taxi, limousine or shuttle, commercial delivery, towing or road repair operations, construction, job site activities, commercial hauling, police or emergency service, principally off-road use, prearranged or organized racing or competitive driving, snow removal, route-work, service or repair

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is deleted and replaced with the following:
d.    If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid.  If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins.  An administration fee of 10% of the pro-rata refund amount will be applied if this Contract is cancelled by You.  In the event of cancellation, if this Contract is financed, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.  If You have cancelled this Contract and have not received the refund from Us or the Administrator within sixty (60) days of such cancellation, You may contact the Insurance Company identified on the Registration Page

## HAWAII

DEFINITIONS SECTIONS – The definition of Breakdown is deleted and replaced with the following:
Breakdown – Means the failure of a covered part under normal service due to defects in material and workmanship  A covered part has failed when it can no longer perform the function for which it was designed solely because of its condition and not because of the action or inaction of any non–covered parts  Hawaii Revised Statutes requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

<u>Used vehicles with less than 25,000 miles at the time of sale</u>
Provides Coverage for 90 days or 5,000 miles, whichever occurs first.

<u>Used vehicles with 25,000 miles or more but less than 50,000 miles at the time of sale</u>
Provides Coverage for 60 days or 3,000 miles, whichever occurs first.

<u>Used vehicles with 50,000 miles or more but not more than 75,000 miles at the time of sale</u>
Provides Coverage for 30 days or 1,000 miles, whichever occurs first

## BENEFITS

 **TOWING/ROAD SERVICE:** In the event Your Vehicle is disabled, We will pay or reimburse You for receipted towing or road service expenses up to fifty dollars ($50) per occurrence.  For Trucks and/or SUV's,  We will pay or reimburse You for receipted towing or road service expenses up to seventy-five dollars ($75) per occurrence and up to one hundred dollars ($100) for flatbed (4WD/AWD vehicles only) per occurrence.  Any payment shall be for actual towing or road service charges in excess of any applicable reimbursement from the manufacturer or any other towing or road service Coverage   No Deductible will apply to this benefit

 **RENTAL:** In the event of a Breakdown covered by this Contract, We will pay or reimburse You for receipted expenses to rent a replacement vehicle (from a licensed rental agency) or for alternate public transportation while Your Vehicle is at a licensed repair facility.  Coverage will be provided to You on the following basis, up to a maximum of thirty dollars ($30) for every eight (8) labor hours, or portion thereof, of applicable labor time required to complete the repair, up to a maximum of one hundred fifty dollars ($150) for each repair visit  This Coverage does not apply to the time waiting for parts, services, weekends or other delays beyond the control of the repair facility or the Administrator.  However, an additional three (3) days of rental Coverage applies in the event of a parts delay when an internal repair or replacement is performed on a major component (Engine, Transmission, Drive Axle).
No Deductible will apply to this benefit

 **TRIP INTERRUPTION:**  In the event of a Breakdown covered by this Contract occurs more than one hundred (100) miles from Your home and results in a repair facility keeping Your Vehicle overnight, We will reimburse You for receipted hotel and restaurant expenses, up to seventy-five dollars ($75) per day for a maximum of three (3) days (Total benefit per occurrence of $225).  No Deductible will apply to this benefit

 **LOST KEY/LOCK OUT:**  In the event the keys for Your Vehicle are lost, broken or accidentally locked in Your Vehicle, We will reimburse You for receipted expenses, up to a maximum of thirty-five dollars ($35) for locksmith services.  No Deductible will apply to this benefit

 **ROAD HAZARD TIRE:**  In the event Your Vehicle tire(s) incurs damage from a road hazard, We will pay or reimburse You for receipted expenses for a tire repair, or if not repairable, for tire replacement up to a maximum of twenty dollars ($20) for each tire repaired, or one hundred dollars ($100) for each tire replacement per occurrence, up to a maximum aggregate of four hundred dollars ($400) during the term of this Contract.  A "road hazard" shall mean: pothole, rock, nail, wood, tree limb/branch, or other debris on the road surface.  Please refer to Exclusions Section, Item N, for specific excluded conditions.  No Deductible will apply to this benefit

WARRANTECH
Warrantech Automotive, Inc., P.O. Box 1179, Bedford, TX 76095
Customer Service / Claims (800) 577-6624*  Available 24 hours a day / 365 days a year, Fax (817) 785-6703; Email: wtechautoclaims@warrantech.com
*For Towing/Road Service and Lost Key/Lockout assistance, Call (888) 248-8289 (does not apply to Recreational Vehicles and Travel Trailers)

G980201RMCOMBO0301REV08/03

# SCHEDULE OF COVERAGES

## POWERTRAIN COVERAGE 1-5 ( PLAN CODE XP2 )

 **1 Engine:** Cylinder Block; Cylinder Head(s); Rotary Housing and all internal lubricated parts contained within the engine including: Pistons; Piston Rings; Connecting Rod Bearings; Crankshaft; Crankshaft Main Bearings; Camshaft; Camshaft Bearings; Cam Followers; Timing Chain or Belt; Timing Gears, Guides; Tensioners; Rocker Arms; Rocker Shafts; Rocker Bushings; Cylinder Head Valves; Valve Guides; Valve Lifters; Valve Springs; Valve Seals; Valve Retainers; Valve Seats; Push Rods; Water Pump; Fuel Pump; Oil Pump and Oil Pump Housing; Harmonic Balancer; Oil Pan; Timing Chain Cover; Intake and Exhaust Manifolds; Valve Covers; Engine Mounts; Cam Gear Bolt; Harmonic Balancer Bolt; and Head Bolts.

 **2 Turbocharger / Supercharger:** (factory installed only) Turbocharger / Supercharger Housing and All Internal Parts.

 **4 Transfer Case:** Transfer Case and All Internal Parts

 **3 Transmission:** (Automatic or Standard) Transmission Case and all Internal Parts plus: Torque Converter; Flywheel/Flex Plate; Vacuum Modulator; Electronic Shift Control Unit; Transmission Cooler; Transmission Mounts; Oil Pan; Slave/Clutch Master Cylinder; Pilot Bearing; and Throw-Out Bearing.

 **5 Drive Axle:** (Front and Rear) Drive Axle Case; All Internal Parts contained within the Drive Axle; Locking Hubs; Drive Shafts; Center Support Bearings; Universal Joints; Constant Velocity Joints; Axle Bearings; Four–Wheel Drive Actuator; and Differential Cover.

Seals and Gaskets are included in the above stated Coverage only for Vehicles with less than 80,000 miles at the time of sale, unless applicable surcharge is paid and marked on Your Registration Page. (SEE SURCHARGED OPTIONAL COVERAGES)

## SELECT COVERAGE 1-9 ( PLAN CODE XF2 )

 **6 Steering:** All Internal Parts contained within the Steering Box; Rack and Pinion Gear; Power Steering Pump; Power Steering Hoses; Steering Knuckles; Pitman Arm; Idler Arm; Tie Rod Ends and Drag Link; Steering Dampner; Upper and Lower Steering Column Shafts and Couplings, including Internal Tilt–Wheel Mechanism; Steering Box and Rack and Pinion Gear Housings; Power Steering Assist Cylinder; Power Steering Pump Cooler; Twin "I" Beam & Bushings; and Steering Travel Stop. Rear Wheel Steering: Rear Steering Shaft and Couplings; Power Cylinder and Pump; Electronic Control Unit/Solenoid; Phase Control Unit; Stepper Motor; Steering Box; Control Valve; Rack; and Tie Rod Ends.

 **7 Brakes:** Master Cylinder; Power Brake Cylinder; Vacuum/Hydro Assist Booster; Disc Brake Caliper; Wheel Cylinders; Compensating Valve; Brake Hydraulic Lines and Fittings; Hydraulic Control Unit; Hydraulic Trailer Brake Assembly and its Components. The following ABS Parts are also covered:

Electronic Control Processor; Wheel Speed Sensors; Hydraulic Pump/Motor Assembly; Pressure Modulator Valve/Isolation Dump Valve; and Accumulator

 **8 Electrical:** Alternator; Voltage Regulator; Starter Motor; Starter Solenoid and Starter Drive; Engine Compartment Wiring Harness; Computerized Timing Control Unit; Electronic Ignition Module; Crank Angle Sensor; Knock Sensor; Ignition Switch; Ignition Switch Lock Cylinder; Front and Rear Window Wiper Motor, Washer Pump and Switch; Stop Lamp Switch; Headlamp

Switch; Turn Signal Switch; Heater/A. C. Blower Speed Switch; Manual Heater/A.C. Control Head; Horns; Trailer Brake Wiring Harness; Auxiliary Power Supply Wiring; Exterior Cab Lighting; Auxiliary Fuel Tank Switching Unit and Switch; and O-2 Sensors

 **9 Air Conditioner:** Condenser; Compressor; Compressor Clutch and Pulley; Air Conditioning Lines and Hoses; Evaporator; Idler Pulley and Idler Pulley Bearing; High/Low Compressor Cut–off Switch; Expansion Valve; and Pressure Cycling Switch. The following parts are also covered if they are required in connection with the repair of a covered part listed above: Accumulator/Receiver Dryer; Orifice Tube; Oil and Refrigerant

Seals and Gaskets are included in the above stated Coverage only for Vehicles with less than 80,000 miles at the time of sale, unless applicable surcharge is paid and marked on Your Registration Page. (SEE SURCHARGED OPTIONAL COVERAGES)

## DELUXE COVERAGE 1-13 ( PLAN CODE XD2 )

 **10 Front and Rear Suspension:** Upper and Lower Control Arms; Control Arm Shafts and Bearings or Bushings; Upper and Lower Ball Joints; Radius Arm and Bushings; Torsion Bars, Mounts and Bushings; Stabilizer Bar, Links and Bushings; Struts; Strut Bearing Plates; Spindle and Spindle Support; Wheel Bearings; Pannard Bar; Track Bar; Suspension Bumpers; Leaf Springs; Leaf Spring Shackles and Hardware; Load Assist Shocks; Shocks; Load Assist Springs; and Coil Springs. Variable Dampening Suspension: Compressor; Control Module; Dampening Actuator; Solenoid; Struts; Height Sensor; and Mode Selector Switch

 **11 Enhanced Electrical:** Automatic Climate Control Programmer; Electronic Instrument Cluster; Mileage Computer; Distributor; Ignition Coil; Electronic Combination Entry System (Does Not Include Transmitters and Receivers for Remote Locks); Cruise Control Module, Transducer, Servo and Amplifier; Powertrain Control Module; Headlamp Motors; Power Window Motor; Power Seat Motor; Power Mirror Motor; Power Antenna Motor/Mast Assembly; Convertible Top Motor; Power Sunroof Motor; Power Window Switch; Cruise Control Engagement Switch; Power Seat Switch; Power Mirror Motor Switch; Rear Defogger Switch; Power Door Lock Actuator and Switch

 **12 Fuel Delivery:** Fuel Injection Pump and Injectors; Vacuum Pump; Fuel Tank; Fuel Tank Sending Unit; Metal Fuel Delivery Lines; Fuel Pressure Regulator; and Fuel Tank Switching Unit/Switch

**13 Cooling:** Engine Cooling Fan and Motor; Fan Clutch; Belt Tensioner; Radiator; Heater Core; Thermostat; Blower Motor; Hot Water Valve; Engine Oil Cooler; Cooler Lines and Fittings.

Seals and Gaskets are included in the above stated Coverage only for Vehicles with less than 80,000 miles at the time of sale, unless applicable surcharge is paid and marked on Your Registration Page. (SEE SURCHARGED OPTIONAL COVERAGES)

## ULTIMATE COVERAGE ( PLAN CODE UK2 )

 **Ultimate Coverage:** We will pay or reimburse You for reasonable cost to repair or replace any Breakdown of all parts listed in the Schedule Of Coverages and any other parts, except for those items listed in the Exclusions Section of this Contract.

G980201RMCOMB00301REV08/03

## SCHEDULE OF COVERAGES *(CONTINUED)*

| ULTIMATE WRAP COVERAGE | | | | |
|---|---|---|---|---|
| Hyundai/Kia (Plan Code HW2) | Isuzu (Plan Code IW2) | Volkswagen (Plan Code VW2) | Chrysler (Plan Code CW2) | All Others (Plan Code WK2) |

**Ultimate Wrap:** We will pay or reimburse You for reasonable costs to repair or replace any Breakdown of all parts listed in the Schedule Of Coverages and any other parts, except for Engine, Turbocharger/Supercharger, Transmission, Transfer Case, and Drive Axle components as listed in the Powertrain Coverage, and except for those items listed under the Exclusions Section of this Contract.

### ULTIMATE DIESEL/TURBO WRAP ( PLAN CODE WE2 )

**Ultimate Diesel/Turbo Wrap:** We will pay or reimburse You for reasonable cost to repair or replace any Breakdown of all parts listed in the Schedule Of Coverages and any other parts, except for Engine and Turbocharger/ Supercharger, and except for those items listed in the Exclusions Section of this Contract.

### SURCHARGED OPTIONAL COVERAGE

**COMMERCIAL USE:** If the Contract Registration Page shows that You purchased the Commercial Use option, see Commercial Use Definition for specific usage.

**SEALS AND GASKETS COVERAGE:** If the Contract Registration Page shows that You purchased the Seals and Gaskets option (available for vehicles with more than 80,000 miles on the odometer at the time of sale), You are covered for the following: Seals and Gaskets of covered components designed to prevent the loss of necessary coolants, lubricants and fluids.

**CONVERSION COVERAGE:** If the Contract Registration Page shows that You purchased the Conversion Coverage option, You will have the following Coverage (All parts listed must be installed by Licensed Conversion Company):

Electronic – Compact Disc Player; Cassette Player; Speakers; VideoCassette Player/Recorder; Auxiliary Light Switches; and Captain Chair Motor and Switch

Rear Air Conditioner – Expansion Valve; Evaporator; Capacitors; Relays; Blower Motor and Switch; and Seals and Gaskets.

Camping Accessories – Refrigerator; Stove; LP Gas Regulator, Lines and Fittings; Fresh Water System Pump; Tank; Lines; Faucets and Fittings.

**ENHANCED ELECTRICAL** – If the Contract Registration Page shows that You purchased Enhanced Electrical, the following parts will be covered: Automatic Climate Control Programmer; Electronic Instrument Cluster; Mileage Computer; Distributor; Ignition Coil; Electronic Combination Entry System (Does Not Include Transmitters and Receivers for Remote Locks); Cruise Control Module, Transducer, Servo and Amplifier; Powertrain Control Module; Headlamp Motors; Power Window Motor; Power Seat Motor; Power Mirror Motor; Power Antenna Motor/Mast Assembly; Convertible Top Motor; Power Sunroof Motor; Power Window Switch; Cruise Control Engagement Switch; Power Seat Switch; Power Mirror Motor Switch; Rear Defogger Switch; Power Door Lock Actuator and Switch

G980201RMCOMBO0301REV08/03

---

The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

Schedule Of Coverages - Tire Service is not available.

### IDAHO

Notice – Coverage afforded under this Contract is not guaranteed by the Idaho Insurance Guarantee Association

### ILLINOIS

EXCLUSIONS SECTION - Item E. is amended to read:

E. For any repair or replacement of any covered part if a Breakdown has not occurred. A gradual reduction in operating performance due to wear and tear does not constitute a Breakdown.

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is deleted and replaced with the following:

d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins. The Vehicle Service Contract provider may retain a cancellation fee not to exceed the lesser of 10% of the Vehicle Service Contract price or fifty dollars ($50). In the event of a cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

LIMITS OF LIABILITY – Item b. Aggregate is amended to read as follows:

b. Aggregate – The total of all claims and benefits paid or payable while this Contract is in force shall not exceed the Actual Cash Value for Your Vehicle (excluding tax, title and license fees)

### INDIANA

Your proof of payment to the issuing dealer for this Contract shall be considered proof of payment to the Insurance Company which guarantees Our obligations to You, providing such insurance was in effect at the time You purchased this Contract.

### IOWA

If You have any questions regarding this Contract, You may contact the Administrator by mail or by phone. Refer to the Registration Page for the Administrator's address and toll free telephone number. Iowa residents only may also contact the Iowa Insurance Commissioner at the following address: Iowa Insurance Department, 6th floor, Lucas State Office Building, Des Moines, Iowa 50319

G980201RMCOMBO0301Rev 08/03

SPECIAL STATE REQUIREMENTS / DISCLOSURES ( CONTINUED )

## KANSAS

SCHEDULE OF COVERAGES - Lost Key/Lockout and Tire Service are not available

## MASSACHUSETTS

NOTICE TO CUSTOMER: PURCHASE OF THIS CONTRACT IS NOT REQUIRED IN ORDER TO REGISTER OR FINANCE A VEHICLE. THE BENEFITS PROVIDED MAY DUPLICATE EXPRESS MANUFACTURER'S OR SELLER'S WARRANTIES THAT COME AUTOMATICALLY WITH EVERY SALE. THE SELLER OF THIS COVERAGE IS REQUIRED TO INFORM YOU OF ANY WARRANTIES AVAILABLE TO YOU WITHOUT THIS CONTRACT

Chapter 90, Section 7N 1/4 of Massachusetts General Laws requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

Used vehicles with less than 40,000 miles at the time of sale
  Provides Coverage for 90 days or 3,750 miles, whichever occurs first

Used vehicles with 40,000 miles or more but less than 80,000 miles at the time of sale
  Provides Coverage for 60 days or 2,500 miles, whichever occurs first

Used vehicles with 80,000 miles or more but less than 125,000 miles at the time of sale
  Provides Coverage for 30 days or 1,250 miles, whichever occurs first

The vehicle You have purchased may be covered by this law.  If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired.  You have been charged separately only for this Contract.  The required dealer warranty is provided free of charge.  Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

## MINNESOTA

The Coverages listed below are provided to You by the dealer at no charge as required by Minnesota Statute 325F.662  The term of the required warranty is based on the mileage at the time of sale as follows:

Used vehicles with less than 36,000 miles at the time of sale
  Provides Coverage for 60 days or 2,500 miles, whichever occurs first

Used vehicles with 36,000 miles or more but less than 75,000 miles at the time of sale
  Provides Coverage for 30 days or 1,000 miles, whichever occurs first

G980201RMCOMBO0301Rev 08/03

Engine:  Lubricated Parts; Intake Manifolds; Engine Block; Cylinder Heads; Rotary Engine Housings; and Ring Gear; Water Pump; Externally Mounted Mechanical Fuel Pump; Radiator; Alternator; Generator; and Starter.  Transmission:  Case; Internal Parts; Torque Converter; or, the Manual Transmission Case and Internal Parts.  Drive Axle:  Axle Housings and Internal Parts; Axle Shafts; Drive and Output Shafts; and Universal Joints; but excluding the Secondary Drive Axle on vehicles other than passenger vans, mounted on a truck chassis.  Brakes:  Master Cylinder; Vacuum Assist Booster; Wheel Cylinders; Hydraulic Lines and Fittings; and Disc Brake Calipers.  Steering:  Gear Housing and all Internal Parts; Power Steering Pump; Valve Body; Piston; and Rack   Note: The following parts are covered only on vehicles with less than 36,000 miles:  Steering Rack; Radiator; Alternator; Generator; and Starter.

The above Coverages are excluded from this Contract during the applicable warranty period, unless the dealer becomes unable to meet its obligations.  Your rights and obligations are fully explained in the dealer issued used vehicle limited warranty document.

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item d. is amended by adding the following:
If You have cancelled this Contract and have not received the refund from Us or the Administrator within sixty (60) days of such cancellation, You may contact the Insurance Company identified on the Registration Page

Definition "Pre-existing" is not applicable to Minnesota residents

EXCLUSIONS SECTION – Items G. and K. are deleted in their entirety and replaced by the following:
G.  If Your odometer has ceased to operate and odometer repairs have not been made immediately, or the odometer has been altered in any way subsequent to purchase.
K.  For any Breakdown occurring before Coverage takes effect or prior to the Contract purchase date, or if the information provided by You, or the repair facility cannot be verified as accurate or is found to be deceptively inaccurate

Coverage exclusion for Breakdowns caused by rust, corrosion, sludge build up or damage to a covered part by a non-covered part does not apply to Minnesota residents

## NEBRASKA

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item b. is amended by adding the following:
  Cancellation Of Your Contract - Section b. the following is added: If We cancel this Contract, We will give You sixty (60) days notification, except for non payment, which will be ten (10) days notification

## NEVADA

This Service Contract is not renewable.
Nevada Residents:  The provisions of this Contract apply only to the original purchaser of the Service Contract

G980201RMCOMBO0301Rev 08/03

## NEVADA ( CONTINUED )

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Items b. and d. are DELETED and REPLACED with the following:

b. We may cancel this Contract within 70 days from the date of purchase for any reason. After 70 days, We may only cancel this Service Contract for fraud, material misrepresentation, nonpayment by You or a substantial breach of duties by You relating to the covered property or its use. We may cancel this Contract if Your Vehicle is found to be modified in a manner not recommended by the manufacturer, or if Your Vehicle is found to be used as a Commercial Vehicle and the applicable surcharge has not been marked on the Registration Page, and payment has not been received for this surcharge. If We cancel Your Contract, You will be entitled to a refund on the unearned Contract fee according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date Coverage, no administrative fee will be deducted. In the event We cancel this Contract, written notice will be sent to Your last known address at least 15 days prior to cancellation with the effective date of the cancellation.

d. You may cancel this Contract at anytime. If You have made no claim and Your request for cancellation is within 30 days, the full price You paid for the Service Contract will be refunded and no administrative fee will be deducted. If You have made a claim under the Contract, or if Your request is beyond the first 30 days, We will refund to You an amount based on the pro-rata method, less a $25.00 administrative fee. If Your Contract was financed, the outstanding balance will be deducted from any refund, however, You will not be charged for claims paid or repair service fees. If You cancel this Contract and the refund is not processed within 45 days, a 10% penalty will be added to the refund for every 30 days the refund is not paid.

## NEW HAMPSHIRE

PROVISIONS OF THIS VEHICLE SERVICE CONTRACT SECTION – item b. is deleted and replaced with the following:

b. To transfer, the following must be submitted to the Administrator within 30 days of the change of ownership to a subsequent individual purchaser:
Original Contract and Registration Page; and name and address of new owner, date of sale to new owner, current mileage

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – item d. is deleted and replaced with the following:

d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear

## NEW YORK

Section 196b of New York General Business Law requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:
Used vehicles with 36,000 miles or less at the time of sale
    Provides Coverage for 90 days or 4,000 miles, whichever occurs first.

Used vehicles with more than 36,000 miles but less than 80,000 miles at the time of sale
    Provides Coverage for 60 days or 3,000 miles, whichever occurs first

Used vehicles with 80,000 miles or more but no more than 100,000 miles at the time of sale
    Provides Coverage for 30 days or 1,000 miles, whichever occurs first

The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

## NORTH CAROLINA

CANCELLATION OF VEHICLE SERVICE CONTRACT Section – item d. is deleted and replaced with the following:

d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins, less an administration fee of $25 or 10% of the pro-rata refund amount, whichever is less. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear.

## OKLAHOMA

Disclosure Statement: This service warranty is not issued by the manufacturer or wholesale company marketing the product. This warranty will not be honored by such manufacturer or wholesale company.

CANCELLATION OF VEHICLE SERVICE CONTRACT Section – item d. is deleted and replaced with the following:

d. If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term of the plan selected and the date Coverage begins. An administration fee of 10% of the pro-rata refund amount will be applied if this Contract is cancelled by You. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear

SPECIAL STATE REQUIREMENTS / DISCLOSURES (CONTINUED)

## RHODE ISLAND

Section 31-5.4 of Rhode Island General Business Law requires an automobile dealer to provide a warranty covering certain classes of used motor vehicles as follows:

Used vehicles with 36,000 miles or less at the time of sale

Provides Coverage for 90 days or 4,000 miles, whichever occurs first

Used vehicles with more than 36,000 miles but less than 100,000 miles at the time of sale

Provides Coverage for 30 days or 1,000 miles, whichever occurs first

The vehicle You have purchased may be covered by this law. If so, the following is added to this Contract: In addition to the dealer warranty required by this law, You have elected to purchase this Contract, which may provide You with additional protection during the dealer warranty period and provides protection after the dealer warranty has expired. You have been charged separately only for this Contract. The required dealer warranty is provided free of charge. Furthermore, the definitions, Coverages and exclusions stated in this Contract apply only to this Contract and are not the terms of the required dealer warranty.

## SOUTH CAROLINA

If You have any questions regarding this Contract, or a complaint against the Obligor, You may contact the South Carolina Department of Insurance at 300 Arbor Lake Drive, Columbia, South Carolina 29223, (803) 737-6180.

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item b. is amended by adding the following:

b    If We cancel this Contract We shall mail a written notice to You at the last known address held by Us at least 15 days prior to cancellation, providing You with notice of cancellation date and the reason for cancellation. However, prior notice is not required if the reason for cancellation is nonpayment of the provider fee, a material misrepresentation by the Service Contract holder to the provider, or a substantial breach of duties by the Service Contract holder relating to the covered product or its use

Items d. is deleted and replaced with the following:

d.    If this Contract is cancelled within the first sixty (60) days and no claims have been filed, We will refund the entire Contract charge paid. If this Contract is cancelled after the first sixty (60) days or a claim has been filed, We will refund an amount of the Contract charge according to the pro-rata method reflecting the greater of the days in force or the miles driven based on the term/miles selected and the date Coverage begins, less a twenty-five ($25.00) dollar administrative fee. In the event of cancellation, the lienholder, if any, will be named on a cancellation refund check as their interest may appear. A ten percent penalty per month shall be added to a refund that is not paid or credited within 45 days after return of the Service Contract to the provider.

## TEXAS

If You have any questions regarding the regulation of the Service Contract provider or a complaint against the Obligor, You may contact the Texas Department of Licensing & Regulation, 920 Colorado, P.O. Box 12157, Austin, Texas 78711, (800) 803-9202

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item b. is amended by adding the following:

b.    If We cancel this Contract We shall mail a written notice to You at the last known address held by Us before the fifth day preceding the effective date of cancellation. The notice will state the effective date and the reason for the cancellation. However, prior notice is not required if the reason for cancellation is nonpayment of the provider fee, a material misrepresentation by the Service Contract holder to the provider, or a substantial breach of duties by the Service Contract holder relating to the covered product or its use

Item d. is amended by adding the following:

d.    If a Service Contract is cancelled under this section and the provider does not pay the refund or credit the Service Contract holder's account before the 46th day after the date of the return of the Service Contract to the provider, the provider is liable to the Contract holder for a penalty in an amount not to exceed 10 percent of the amount outstanding per month

## UTAH

Note: Coverage afforded under this Contract is not guaranteed by the Property and Casualty Guarantee Association

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Item b. is deleted and replaced with the following:

b.    We may cancel this Contract for the following reasons by sending to You notice of cancellation and the reason for cancellation, via first class mail, to Your last known address:

1.    We may cancel this Contract for non-payment of the Contract charge. Such cancellation will be effective 10 days after mailing of notice.

2    We may cancel this Contract for misrepresentation of a claim, if Your Vehicle is found to be modified in a manner not recommended by the manufacturer, or if Your Vehicle is found to be used as a Commercial vehicle and the applicable surcharge has not been marked on the Registration Page and payment has not been received for this surcharge. Such cancellation will be effective 30 days after mailing of notice.

## WASHINGTON

CANCELLATION OF VEHICLE SERVICE CONTRACT SECTION – Items a. and b. are deleted and replaced with the following:

a.    You may cancel this Contract by returning it to the Administrator. An odometer statement indicating the odometer reading at the date of the request will be required. A ten percent (10%) penalty will be added to any refund that is not paid within 30 days of return of the Contract to the Administrator.

b.    We may cancel this Contract for non-payment of the Contract Charge, or for misrepresentation in obtaining this Contract or in the submission of a claim If cancelled, written notice of cancellation, including the actual reason for the cancellation, will be mailed to the last mailing address known to the Administrator at least

SPECIAL STATE REQUIREMENTS / DISCLOSURES ( CONTINUED )

**WASHINGTON** ( CONTINUED )

1   10 days before the effective date of cancellation if cancelled for non-payment of the Contract charge
2   45 days before the effective date of cancellation if cancelled for any other reason.

**WISCONSIN**

THIS WARRANTY IS SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE

CONTRACT HOLDER'S GUIDE TO FILING A CLAIM-Item A.4. is deleted and replaced with the following:

4.   Obtain Authorization from the Administrator – Prior to any repair being made, instruct the Service Manager at the repair facility to contact the Administrator to obtain an authorization for the claim  Failure to obtain authorization prior to having repairs made may jeopardize Coverage under this Contract, except as provided under Emergency Repairs

The amount authorized by the Administrator is the amount that will be paid for repairs covered under the terms of this Contract. Any additional amount must receive prior approval.

G980201RMCOMBO0301Rev 08/03

G980201RMCOMBO0301Rev 08/03

## VEHICLE SERVICE CONTRACT MAINTENANCE LOG

| DATE SERVICED | MILEAGE WHEN SERVICED / REPAIR ORDER NUMBER | SERVICE PERFORMED | NAME AND ADDRESS OF SERVICING FACILITY | MECHANIC OR SERVICE MANAGER |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PAGE 21                                        G980201RMCOMBO0301 Rev 08/03

| DATE SERVICED | MILEAGE WHEN SERVICED / REPAIR ORDER NUMBER | SERVICE PERFORMED | NAME AND ADDRESS OF SERVICING FACILITY | MECHANIC OR SERVICE MANAGER |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |