**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROBERT T. KENNEDY, on behalf of himself and all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>BUTLER FINANCIAL SOLUTIONS, LLC, HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC., f/k/a HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., and JOHN DOES 1-10, )<br><br>Defendants. ) | Case No. 1:08-CV-1862 |

**DEFENDANT BUTLER FINANCIAL SOLUTIONS,
LLC'S MOTION TO DISMISS COUNTS I, III AND V OF
PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

Defendant, Butler Financial Solutions, LLC ("Butler"), through its attorneys Law Offices of Michael Murphy Tannen, P.C., hereby submits its motion to dismiss Plaintiff's First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6) and the McCarran-Ferguson Act, 15 U.S.C. Section 1512. In support of this motion, Butler states the following.

1.     Plaintiffs have filed an amended class action complaint against (i) Butler, an obligor of vehicle service contracts ("VSCs"), (ii) Heritage Warranty Insurance Risk Retention Group ("Heritage"), Butler's insurer, and (iii) Warrantech Automotive, Inc. ("Warrantech"), Heritage's administrator of a comprehensive program to manage and pay claims of persons who purchased VSCs while Heritage's insurance policy was in effect.

2.      The three named Plaintiffs are residents of Illinois, North Carolina, and Colorado.   Each of these states has enacted comprehensive financial responsibility statutes which are demonstrably aimed at regulating the business of insurance in the VSC industry. *See* 215 ILCS 152/1, *et seq.,* N.C.G.S.A. Section 66-370, *et seq.,* and C.R.S.A. Section 42-11-101, *et seq.*

3.      Count I of Plaintiffs' amended complaint alleges violations of the Magnuson-Moss Warranty Act, 15 U.S.C.A. Section 2301, *et seq.*("Magnuson-Moss"). Plaintiffs' application of Magnuson Moss to this dispute would invalidate, impair or supersede the VSC statutes which were enacted to regulate the business of insurance. Thus, the McCarran-Ferguson Act, 15 U.S.C.A. Section 1512, precludes the application of Magnuson-Moss in this case.

4.      The courts have enunciated a three-part test to gauge whether McCarran-Ferguson reverse pre-empts the application of a federal statute:

(i)      The federal statute must not "specifically relate" to the business of insurance;

(ii)     The state laws must have been enacted "for the purpose of regulating the business of insurance;" and

(iii)    Application of the federal statute would "invalidate, impair, or supersede" the state law.

*Id.,* at 501; *American Deposit Corporation v. Schact,* 84 F.3d 834 (7th Cir. 1996); *Autry v. Northwest Premium Services Insurance,* 144 F.3d 1037 at 1042 (7th Cir. 1998); see also *Camarena v. Safeway Insurance Company,* 2002 WL 472245 (N.D.Ill.).

5.      Insurance is one of those areas which Congress has for the most part steered clear of and traditionally left to be controlled by the states.   If there is a doubt regarding whether Congress intended to pre-empt a particular state insurance law, there is

2

a presumption against pre-emption. *Opthalmic Mutual Insurance Company v. Musser,* 143 F.3d 1062 (7th Cir. 1998).

6.      Because recognition of Plaintiffs' Magnuson Moss count would "invalidate, impair, or supersede" the service contract insurance statutes of Illinois, Colorado, and North Carolina, McCarran Ferguson warrants dismissal of Count I.

7.      Count III of Plaintiffs' amended complaint seeks to cancel the VSCs *ab initio* because of Butler's fraud. Because Count III is, in part, fraud-based , Plaintiffs must plead this count with particularity per Fed.R.Civ.P. 9(b). Plaintiffs have not met this burden. In addition, Plaintiffs improperly ignore detailed allegations and sworn affidavits for the two other related cases in this court, *Warrantech v. Heritage,* Case No. 07 CV 3539 and *Heritage v. Butler,* Case No. 07 CV 6977.

8.      In Count III, Plaintiffs essentially allege that Butler entered into the VSCs with the knowing intention of never performing. Misrepresentations of the intent to perform future conduct are not actionable fraud under Illinois law. *Claricom Networks, LLC v. Illinois Bell Telephone Company,* 2005 WL 1705831 (N.D.Ill.); *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145 at 168, 545 N.E.2d 672 (Ill. 1989); *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300 at 309, 773 N.E.2d 84 (1st Dist. 2002).

9.      A false promise of future performance is actionable only if it is part of a scheme or device to defraud. Indeed, the Seventh Circuit has commented that promissory fraud is only actionable if it is particularly egregious or it is embedded in a larger pattern of enticements that induces reliance and against which the law ought to provide a remedy. *Desnick v. Am. Broad. Co.,* 44 F.3d 1345 at 1354 (7th Cir. 1995); *Illinois Non-*

*Profit Risk Management Association v. Human Service Center of Metro-East,* 884 N.E.2d 700 at 710 (Ill.App. 2008).

10.    In addition, Count VI, Plaintiffs' declaratory judgment count is duplicative of their Magnuson Moss and breach of contract counts and should be therefore dismissed. *See Amari v. Radio Spirits, Inc.,* 219 F.Supp.2d 942 (N.D. Ill. 2002); *Riviera Distributors, Inc., v. High-Top Amusements, Inc.,* 2008 WL 687385 (C.D. Ill. 2008); *Pelfresne v. Village of Lindenhurst,* 2005 WL 2322228 (N.D. Ill. 2005); *Dixie Gas & Food, Inc. v. Shell Oil Co.,* 2005 WL 1273273 (N.D. Ill. 2005); *Cooper v. Durham School Services,* 2003 WL 22232833 (N.D. Ill. 2003).

11.    Butler has simultaneously filed its supporting memorandum of law and the arguments made in that memorandum therein are incorporated by reference.

WHEREFORE, Defendant Butler Financial Solutions LLC respectfully requests that this Court dismiss Counts I, III, and V of Plaintiffs' First Amended Complaint at Law with prejudice and respectfully requests such other relief as this Court deems just and fair.

Respectfully submitted,

LAW OFFICES OF MICHAEL MURPHY TANNEN, P.C.

By: s/Michael M. Tannen
Attorneys for Butler Financial Solutions, LLC

Law Offices of Michael Murphy Tannen, P.C.
Michael M. Tannen (#6204635)
39 S. LaSalle Street, Suite 905
Chicago, IL 60603
(312) 641-6650
Attorneys for Butler Financial Solutions, LLC

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROBERT T. KENNEDY, on behalf of himself and all others similarly situated, ) ) ) ) Plaintiff, ) ) v. ) ) BUTLER FINANCIAL SOLUTIONS, ) LLC, HERITAGE WARRANTY ) INSURANCE RISK RETENTION ) GROUP, INC., f/k/a HERITAGE ) WARRANTY MUTUAL INSURANCE ) RISK RETENTION GROUP, INC., and ) JOHN DOES 1-10, ) ) Defendants. ) | Case No. 1:08-CV-1862 Judge George M. Marovich |

**DEFENDANT BUTLER FINANCIAL SOLUTIONS, LLC'S
MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS COUNTS I, III, AND V OF
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Defendant, Butler Financial Solutions, LLC ("Butler"), through its attorneys Law Offices of Michael Murphy Tannen, P.C., hereby submits its memorandum in support of its motion to dismiss Counts I, III, and V of Plaintiffs' First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6) and the McCarran-Ferguson Act, 15 U.S.C. Section 1512. In support of this motion, Butler states the following.

## Introduction

Plaintiffs have filed an amended class action complaint against (i) Butler, an obligor of vehicle service contracts ("VSCs"), (ii) Heritage Warranty Insurance Risk Retention Group ("Heritage"), Butler's insurer, and (iii) Warrantech Automotive, Inc.

("Warrantech"), Heritage's administrator of a comprehensive program to manage and pay claims of persons who purchased VSCs while Heritage's insurance policy was in effect.

The three named Plaintiffs are residents of Illinois, North Carolina, and Colorado. Each of these states has enacted comprehensive financial responsibility statutes which are demonstrably aimed at regulating the business of insurance in the VSC industry. *See* 215 ILCS 152/1, *et seq.*, N.C.G.S.A. Section 66-370, *et seq.*, and C.R.S.A. Section 42-11-101, *et seq.* (These VSC statutes are attached hereto as **Exhibit A**.)

The central count of Plaintiffs' amended complaint claims violations of the Magnuson-Moss Warranty Act, 15 U.S.C.A. Section 2301, *et seq.*("Magnuson-Moss"). Plaintiffs allege that Defendants misrepresented that Plaintiffs' VSC claims would be paid and covered by insurance.  As will be discussed below, the application of Magnuson-Moss to this dispute would invalidate, impair or supersede the VSC statutes which were enacted to regulate the business of insurance.  Thus, the McCarran-Ferguson Act, 15 U.S.C.A. Section 1512, precludes the application of Magnuson-Moss in this case.

In addition, Plaintiffs cannot void their VSCs due to fraud and Count III should be dismissed.  Finally, Plaintiffs' declaratory judgment count is duplicative of its breach of contract count and, therefore, Count V should be dismissed.

## Procedural History

Plaintiff Robert Kennedy, a Colorado resident, originally filed a purported class action complaint in the United States District Court for the Southern District of Florida on September 11, 2007. (Kennedy's original complaint is attached hereto as **Exhibit B**.) Kennedy's original complaint contained no federal causes of action: it sounded only in breaches of contract and sought declaratory relief. Kennedy filed his action in Florida

although Florida had no connection whatsoever to the dispute. Kennedy filed his action in Florida even though Kennedy knew Warrantech's related action against Heritage, Case No. 07 CV-3539, had been pending in this Court for five months.

In the name of judicial economy and consistency, Butler moved to dismiss Kennedy's complaint and transfer it to the Northern District of Illinois where Warrantech's action was already pending and where Butler had succeeded at great expense in dismissing and transferring from federal court in South Carolina Heritage's action against Butler. In January 2008, the federal court in Florida granted Butler's motion and transferred Kennedy's case to this Court. In doing so, the court noted, "Plaintiff's [Kennedy] action seeks a determination of liability under the contracts between Heritage and Butler." (See order at p. 1, attached hereto as **Exhibit C**.)

**Standard of Review**

A court may dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) if the plaintiff fails to state a claim upon which relief can be granted. A complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, ---- U.S. ----, 127 S.Ct. 1955 at 1974, 167 L.Ed.2d 929 (2007). A complaint requires more than labels and conclusions, and a formulaic recitation of elements of a cause of action will not do. *Id.,* at 1964-65; *In Re Northfield Laboratories, Inc. Securities Litigation,* 2007 WL 2874050.

Rule 12(b)(6) requires dismissal where the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in plaintiff's favor. *Palda v. General Dynamics Corp.*, 47 F.3d 872, 874 (7th Cir. 1995).

However, a claim must consist of more than conclusory allegations with no factual support in order to survive a motion to dismiss. *Id.* at 875. A claim must be dismissed if it "appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim that would entitle [the plaintiff] to relief." *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996); *Chaney v. Suburban Bus Division of the Regional Transportation Authority*, 52 F.3d 623, 627 (7th Cir. 1995).

While the Federal Rules allow notice pleading, fraud-based claims, like Count III of Plaintiffs' Amended Complaint, must be pleaded with particularity per Fed.R.Civ.P. 9(b). A plaintiff alleging fraud must allege the "who, what, when, where, and how of the claim." *Sears v. Likens*, 912F.2d 889 at 893 (7th Cir. 1990). The particularity requirement of Fed.R.Civ.P. 9(b) serves an important societal goal:

> The purpose of Rule 9(b) is to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual. In the typical commercial case there is a substantial interval between the filing of the complaint and the completion of enough pretrial discovery to enable the preparation and disposition of a motion by the defendant for summary judgment. Throughout that period a claim of fraud will stand unrefuted placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation. The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims.

*Matrix IV, Inc. v. American National Bank and Trust Co. of Chicago*, 2007 WL 853968 (N.D.Ill. 2007), quoting *Fidelity National Title Insurance Co. of New York v. Intercounty National Title Insurance Co.*, 412 F.3d 745 at 748-49 (7th Cir. 2005).

**ARGUMENT**

**I.    COUNT I OF PLAINTIFFS' FIRST AMENDED COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION:    APPLICATION    OF    MAGNUSON-MOSS WOULD    INVALIDATE    STATE    SERVICE    CONTRACT STATUTES WHICH REGULATE VSCS AND THE INSURANCE REQUIRED BY STATE LAWS**

Under the McCarran-Ferguson Act, no act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance. *See* 15 U.S.C. Section 1012(b). McCarran-Ferguson leaves to the individual states a wide swath of laws related to insurance. The "broad category of laws enacted 'for the purpose of regulating insurance' consists of laws that possess the end, intention, or aim of adjusting, managing, or controlling the business of insurance." *SEC v. National Security Insurance,* 390 U.S. 453 at 460. McCarran-Ferguson "overturned the normal legal rules of pre-emption" by imposing a rule "that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting state statutes unless the federal statute provides otherwise." *U.S. Department of Treasury v. Fabe,* 508 U.S. 491 at 507.

The courts have enunciated a three-part test to gauge whether McCarran-Ferguson reverse pre-empts the application of a federal statute:

(i)    The federal statute must not "specifically relate" to the business of insurance;

(ii)    The state laws must have been enacted "for the purpose of regulating the business of insurance;" and

(iii)    Application of the federal statute would "invalidate, impair, or supersede" the state law.

*Id.,* at 501; *American Deposit Corporation v. Schact,* 84 F.3d 834 (7th Cir. 1996)(National Bank Act could not be read to impair or supersede sections of Illinois Insurance Code

which required banks to file certificates of authority with state insurance department before offering retirement certificates of deposit to Illinois residents); *Autry v. Northwest Premium Services Insurance,* 144 F.3d 1037 at 1042 (7th Cir. 1998); see also *Camarena v. Safeway Insurance Company*, 2002 WL 472245 (N.D.Ill.)(plaintiff's class action based on alleged violations of civil rights law dismissed because of McCarran-Ferguson; court noted that numerous provisions of the Illinois Insurance Code, including prohibitions against deceptive and discriminatory practices and enforcement of violations by the Illinois Department of Insurance, and the federal court's involvement in the case would step on the toes of state insurance commissioners"); *Doe v. Mutual of Omaha Insurance Company,* 179 F.3d 557 (7th Cir. 1999).

The service contract statutes of Illinois, Colorado, and North Carolina amply satisfy the three-part test for reverse pre-emption.

### A. Magnuson-Moss Is Not a Federal Statute Which Specifically Relates to the Business of Insurance

First, Magnuson-Moss does not "specifically relate" to the business of insurance. Indeed, the Federal Trade Commission, the federal Magnuson-Moss watchdog, has determined that Magnuson-Moss should not be invoked to upset state regimes which regulate VSCs and their underlying insurance:

> **Section 700.11 Written warranty, service contract and insurance distinguished for purposes of compliance under the Act.**
>
> (a)     The [Magnuson-Moss] Act recognizes two types of agreement which may provide similar coverage of consumer products, the written warranty, and the service contract. In addition, other agreements may meet the statutory definitions of either "written warranty" or "service contract," but are sold and regulated under state law as contracts of insurance. One example is the automobile breakdown insurance policies sold in many jurisdictions and regulated by the state as a form of casualty insurance. <u>The McCarran-Ferguson Act, 15 U.S.C. 1011, *et seq.*,</u>

precludes jurisdiction under federal law over the "business of insurance" to the extent an agreement is regulated by state law as insurance. Thus, such agreements are subject to the Magnuson-Moss Warranty Act only to the extent they are not regulated in a particular state as the business of insurance.

16 C.F.R. Section 700.11(a)(emphasis added)(See **Exhibit D**.)

The FTC's reticence to enter the VSC insurance thicket is further illustrated by its refusal to enact rules which mandate the manner and form in which the terms and conditions of service contracts are to be fully and conspicuously disclosed to consumers. Section 2306 of Magnuson-Moss grants the FTC the power to craft such regulations and it has not done so.[1]

Butler does not dispute that VSCs are service contracts and that service contracts are within the ambit of Magnuson-Moss's protections. *See* 15 U.S.C.A. §2301(8). But, insurance coverage disputes are outside the scope of Magnuson-Moss. Nowhere does Magnuson-Moss state or imply that it is intended to settle insurance disputes. *See* 15 U.S.C. §§2301, *et seq.* Plaintiffs cannot seriously argue that Magnuson-Moss is a federal statute which "specifically relates" to the business of insurance, thus avoiding the preclusive effect of McCarran-Ferguson. Magnuson-Moss does not permit Plaintiffs to allege Magnuson-Moss violations when the underlying dispute is about who is liable under a VSC and an insurance policy to ultimately honor VSC claims.

Indeed, after conducting a nation-wide search for case law addressing Magnuson-Moss and service contracts, Butler was not able to find a single case which addressed insurance coverage for VSCs or whether an obligor, service contract insurer, or service contract administrator was the entity required to make payment under the service

---

[1]   In sharp contrast, Magnuson-Moss mandates a whole laundry list of required disclosures and minimum standards for warranties. *See* 15 U.S.C.A. Section 2302 through 2305

contract. The cases instead concerned whether a repair for a particular defect was included in the terms of the service contract; whether the service contractor had failed to repair the subject consumer product; whether the service contract was in fact a warranty, or whether the plaintiff was a party to the service contract. (Butler has attached hereto as **Exhibit E** an appendix which summarizes the holdings of these Magnuson-Moss service contract cases.)

A review of Plaintiffs' Magnuson-Moss count demonstrates that Plaintiffs' claims are inextricably entwined with the existence and amount of insurance available to satisfy VSC claims and the obligations of Heritage, Butler, and Warrantech to honor and pay those claims.

While Plaintiffs cleverly coat their complaint with a thin veneer of the misrepresentation buzzwords usually associated with a Magnuson-Moss dispute, the true essence of the dispute cannot be disguised. This is an insurance dispute about who should honor VSC claims arising under Heritage's insurance policy. As such, the regulatory schema of Plaintiffs' home states, as evidenced by their service contract statutes, are triggered.

Because Magnuson-Moss is not a federal insurance statute that specifically relates to insurance and because in fact, the FTC by rule has deferred service contract regulation and oversight to the individual states, Butler has established the first prong of McCarran-Ferguson reverse pre-emption.[2]

---

[2]  Heritage is a risk retention group, and some of its activities are governed by the federal Liability Risk Retention Act, 15 U.S.C.A. 3901, *et seq* ( "LRRA"). While it is true that the LRRA is a federal statute relating to the business of insurance, Congress expressly deferred to the states to craft statutes to protect their own citizens. For example, states can specify that risk retention groups comply with financial responsibility requirements. Moreover, states are free to mandate—and risk retention groups are required to adhere to--policy form or insurance coverage requirements under state motor vehicle financial responsibility statutes. *See*, 15 U.S.C.A. 3905(a) and (d). In fact, the 7th Circuit has even given its blessing

**B.    The Service Contract Statutes of Illinois, Colorado and North Carolina Were Enacted for the Purpose of Regulating the Business of Insurance**

The second prong for McCarron Ferguson reverse pre-emption is also satisfied. The service contract statutes of Illinois, North Carolina, and Colorado were undeniably enacted "for the purpose of regulating the business of insurance" and are "aimed at protecting or regulating the relationship between insurer and insured, directly or indirectly." *SEC v. National Sec. Ins. , supra,* 393 U.S. 453 at 460.

As a threshold matter, not surprisingly, Illinois service contract act is contained within Section 215 of Illinois Code, the section relating to insurance. The North Carolina Commissioner of Insurance oversees and enforces that state's service contract statute. Colorado's service contract statute is found in Article 11 of its motor vehicle code entitled "Motor Vehicle Service Contract Insurance."

Courts generally look at three factors to ascertain whether a state law or schema was enacted for the purpose of regulating insurance: (i) does the state law have the effect of transferring or spreading a policyholder's risk; (ii) is the state law an integral part of the policy relationship between the insurer and insured; and (iii) is the state law limited to entities within the insurance industry. *UNUM Life Insurance Company v. Ward,* 526 U.S. 358 at 374. All three factors are readily met here, to wit:

- The service contract statutes of Illinois, North Carolina, and Colorado each permit an obligor to establish its financial responsibility by purchasing insurance policies like the one sold by Heritage, thereby transferring the risk of VSC claims to an insurer.

---

to states to pass financial responsibility state statutes which have the effect of barring a risk retention group from selling insurance in a state altogether. The broad sweep of McCarran-Ferguson precluded the application of federal law. See, *Opthalmic Mutual Insurance Company v. Musser,* 143 F.3d 1062 (7th Cir. 1998).

- The state statutes play an integral part of the policy relationship between the insurer and insured. The state service contract statutes stipulate terms that must be included in VSCs and insurance policies. *See e.g.,* 215 ILCS 152/15(1)(D), 20, 30; C.R.S.A. Sections 42-11-103, 104; N.C.G.S.A. Sections 66-372(d), (e), and (f), and 373( c).

- The statutes each allow obligors to establish their financial responsibility through the purchase of insurance, the terms of which are also mandated by statute. *See e.g.* 215 ILCS 152/15(1)(a); C.R.S.A. Section 42-11-102; N.C. G.S.A Section 66-373.

- The statutes also define "service contract holder," "service contract provider," and "service contract reimbursement insurance policy."

- The service contract statutes require that the VSCs advise consumers that they are allowed to submit unsatisfied VSC claims directly to the insurers. *See e.g.,* 215 ILCS 152/15(d); C.R.S.A. Section 42-11-104. This is irrefutable evidence that these laws transfer an obligor/policyholder's risk directly to an insurance company.

- Each of the three statutes mandate that service contract insurance policies provide for and will pay on behalf of the obligor all sums the obligor is required to pay. *See e.g.,* 215 ILCS 152/20(a); C.R.S.A. 42-11-103; N.C.G.S.A. Section 66-373(c)(1).

- The money paid by VSC purchasers to obligors is referred to as "premiums" earned by VSC insurers which must be refunded by the insurer if the consumer cancels the VSC.. *See e.g.,* 215 ILCS 152/20(c); N.C.G.S.A. Section 66-373 (c)(1) and (5). Of course, this establishes that at some point, the money and risk is transferred from the VSC obligor to the VSC insurer.

The service contract statutes weave a comprehensive regulatory tapestry which links consumers, obligors like Butler, and insurers like Heritage together. The VSCs cannot be separated from the insurance which the states require. For this reason, Butler has demonstrated that the service contract statutes were enacted "for the purpose of regulating the business of insurance."

**C.    Application of Magnuson-Moss Would Invalidate, Impair or Supersede the Service Contract Statutes and Regulatory Schema of Illinois, Colorado and North Carolina**

The gist of Plaintiffs' Magnuson-Moss claim can be found in Paragraph 66 of their amended complaint. That single allegation is more than two and a half pages long. Shorn to its essence, Plaintiffs contend that the subject VSCs—which were subject to and approved by the individual states--did not clearly and conspicuously inform VSC holders that their claims would not be honored if Heritage's Loss Reserve Fund was depleted. Plaintiffs cannot use a consumer protection statute, that is more appropriate for a misleading warranty on a toaster or other consumer product, to upend and upset the service contract insurance regimes enacted by each state.

Applying Magnuson-Moss to this insurance coverage dispute would "invalidate, impair, or supersede" the service contract statutes of Illinois, Colorado, and North Carolina and the meticulous financial responsibility schema established by these three states. The dearth of Magnuson-Moss case law that addresses insurance coverage issues proves the point. (See **Exhibit E**) So too does the FTC's express decision to leave the oversight of VSCs to the states.

If more detail is needed, Butler can provide it:

- The service contract statutes require that **both** service contracts **and** the insurance policies contain specific provisions, including that the service contracts are backed or guaranteed by insurance and that consumers may make direct claims with the insurance company if the VSC obligor does not pay or perform.   See e.g., 215 ILCS 152/15 and 20; C.R.S.A.  42-11-104; N.C.G.S.A. 62-373(c)(1).

- The service contract statutes do not permit the use of misleading or deceptive provisions and/or require that certain provisions be conspicuously and understandably disclosed.  See e.g., 215 ILCS 152/30; C.R.S.A. 42-11-104; N.C.G.S.A. 66-372(d).

- The required insurance policies which back the VSCs must be filed with the states and/or must be issued by an authorized insurer. See e.g., 215 ILCS 152/15(b); C.R.S.A. 42-11-102; N.C.G.S.A. 62-373(d).

- Magnuson-Moss understandably does not define "insurer," yet Plaintiffs seek to ensnare Heritage within Magnuson-Moss's provisions.

- The insurance departments of North Carolina and Illinois oversee or enforce the provisions of their service contract statutes. See 215 ILCS 152/50; N.C.G.S.A. 66-373(b) and (d).

While the overall intent of the respective service contract statutes of Illinois, Colorado and North Carolina is crystal clear, the language and provisions of the three statutes are not identical. Indeed, the differences between the state service contract statutes highlight the underlying rationale of McCarran-Ferguson: each state should be a laboratory to design its own insurance statutes and financial responsibility regulations to protect its own citizens.[3] To permit Plaintiffs to engraft Magnuson-Moss violations upon these carefully drafted state statutes would not only be a disservice to the state legislators and administrators who write and enforce these statutes. Doing so would wreak havoc and uncertainty upon these insurance regulatory regimes.

Because recognition of Plaintiffs' Magnuson-Moss count would "invalidate, impair, or supersede" the service contract insurance statutes of Illinois, Colorado, and North Carolina, McCarran Ferguson warrants dismissal of Count I. *See also, Opthalmic Mutual Insurance, supra,* 143 F.3d 1062 at 1067 ("[I]nsurance is one of those areas which Congress has for the most part steered clear of and traditionally left to be controlled by the states…[and] if there is a doubt regarding whether Congress intended to pre-empt a particular state insurance law, there is a presumption against pre-emption").

---

[3] The diversity of state service contract statutes can also be seen in the VSCs which Plaintiffs attached to their amended complaint. Four of the eleven pages of the VSC meticulously itemize the so-called "Special State Requirements/Disclosures" under 23 different state service contract statutes.

## II.    COUNT III OF PLAINTIFFS' FIRST AMENDED COMPLAINT MUST BE DISMISSED BECAUSE ILLINOIS DOES NOT RECOGNIZE FRAUD WITH RESPECT TO FUTURE CONTACT

Count III of Plaintiffs' amended complaint seeks to cancel the VSCs *ab initio* because of Butler's fraud or because of mistake.  Because Count III is, in part, fraud-based, Plaintiffs must plead this count with particularity per Fed.R.Civ.P. 9(b).  Plaintiffs have not met this burden.

At bottom, Plaintiffs allege that Butler perpetrated a fraud because Butler failed to disclose, when Plaintiffs purchased their VSCs, that Butler "never intended" to pay or fund any VSC claims or take on the risk or responsibility of funding VSC claims should Heritage's Loss Reserve Fund run dry.  (See First Amended Complaint at pars. 32 and 66(a).  Plaintiffs do not include any facts to support these inflammatory allegations or that Heritage's VSC Program was a "pyramid scheme."

Plaintiffs punctuate their amended complaint with repeated characterizations of the positions taken by Butler in the earlier lawsuits in this Court and in the lawsuit then pending in South Carolina (*Id.,* at pars. 6, 14, 15, 26, 33, 34).  Remarkably, Plaintiffs ignore the most seminal allegations and arguments made by Butler in those lawsuits, including those proffered in sworn affidavits.

Plaintiffs cannot cherry pick facts and averments that they like from related litigation and at the same time, simply ignore the facts and averments that do not help them.

Those facts establish that Butler was as surprised as anyone, except Heritage, when the Loss Reserve Fund was apparently depleted and the insurance policy was cancelled. The VSC Program ran swimmingly, at least as far as Butler knew, between

2001 and 2005. Heritage paid dollar one from day one for every VSC claim without first insisting that Butler pay or be bankrupt. Then, in the middle of 2006, without Butler's knowledge, AmRe commuted re-insurance. In late December 2006, Heritage took its proverbial ball and went home. Heritage cancelled the insurance policy based on the alleged negligence of Warrantech, Heritage's administrator, in running the very VSC Program Heritage controlled per the parties' agreement.

Butler has pleaded and established that Heritage's precipitous cancellation of the insurance policy and its failure to honor VSC claims were contrary to state service contract statutes and the language of the insurance policy Heritage drafted and the VSC it approved. The VSC and insurance policy expressly allow VSC holders to make direct claims upon Heritage for payment. The insurance policy clearly stated, "Cancellation of this Policy shall not reduce the Company's [Heritage's] liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect." Moreover, Heritage's stance that it bears no liability after the Loss Reserve Fund is depleted is flatly contradicted by its own policy: "The Company's liability herein shall be limited to covered Loss in excess of the Loss Reserve Fund applicable to the Insured, subject to the Limits of Liability specified on the Declarations Page."

Plaintiffs cannot rescind the VSCs based on Butler's alleged fraud. Plaintiffs essentially alleges that Butler entered into the VSCs with the knowing intention of never performing. Misrepresentations of the intent to perform future conduct is not actionable fraud under Illinois law. *Claricom Networks, LLC v. Illinois Bell Telephone Company,* 2005 WL 1705831 (N.D.Ill.); *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145 at 168, 545 N.E.2d 672 (Ill. 1989). "Even a false promise of future

conduct with no current intent to fulfill that promise will not constitute fraud." *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300 at 309, 773 N.E.2d 84 (1st Dist. 2002). A false promise of future performance is actionable only if it is part of a scheme or device to defraud. Indeed, the Seventh Circuit has commented that promissory fraud is only actionable if it is particularly egregious or it is embedded in a larger pattern of enticements that induces reliance and against which the law ought to provide a remedy. *Desnick v. Am. Broad. Co.,* 44 F.3d 1345 at 1354 (7th Cir. 1995); *Illinois Non-Profit Risk Management Association v. Human Service Center of Metro-East,* 884 N.E.2d 700 at 710 (Ill.App. 2008).

In dismissing a complaint for promissory fraud, this Court noted in *Claricom Networks, LLC, supra* at p. 3 that "promissory fraud is a disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove and disprove," *citing Bower v. Jones,* 978 F.2d 1004 at 1012 (7th Cir. 1992):

> In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent—a scheme or a device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed.

*Claricom Networks, LLC, id., quoting Bower v. Jones.*

Since Plaintiffs' threadbare complaint does not plead the requisite elements of promissory estoppel with specificity as required by Fed.R.Civ.P. 9(b), Count IV must be dismissed with prejudice.

### III.    COUNT V OF PLAINTIFFS' AMENDED COMPLAINT MUST BE DISMISSED BECAUSE IT SEEKS DECLARATORY RELIEF WHICH IS IDENTICAL TO RELIEF SOUGHT IN OTHER COUNTS

The Declaratory Judgment Act gives any court of the United States discretion to declare the rights and other legal relations of any interested parties. 28 U.S.C. § 2201. This discretion allows federal courts to decline to hear a declaratory judgment action that is otherwise within their jurisdiction. *Tempco Electric Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987). Indeed, federal district courts in this state routinely dismiss requests for a declaratory judgment when the declaration would serve no useful purpose. *See Amari v. Radio Spirits, Inc.*, 219 F.Supp.2d 942 (N.D. Ill. 2002) (declaratory judgment served no useful purpose where the same issues would be resolved in substantive action); *Riviera Distributors, Inc., v. High-Top Amusements, Inc.*, 2008 WL 687385 (C.D. Ill. 2008); *Pelfresne v. Village of Lindenhurst*, 2005 WL 2322228 (N.D. Ill. 2005) (motion to dismiss declaratory judgment was granted because plaintiff sought declaration of defendant's statutory violation in addition to money damages relating to the violation and "plaintiff . . . ha[d] no need for a declaratory judgment establishing the same unlawful conduct"); *Dixie Gas & Food, Inc. v. Shell Oil Co.*, 2005 WL 1273273 (N.D. Ill. 2005); *Cooper v. Durham School Services*, 2003 WL 22232833 (N.D. Ill. 2003) (motion to dismiss declaratory judgment was granted when declaratory relief was duplicative of claim for breach of contract and therefore the declaratory judgment "serve[d] no useful purpose"). A declaratory judgment is useless when other, more substantive claims, would resolve the issues raised by the declaratory judgment. *Amari*, 219 F.Supp.2d at 944.

Plaintiffs bring substantive claims under the Magnuson-Moss Warranty Act ("Magnuson-Moss" or "the Act") and common law breach of contract. First Am. Comp. at ¶ 67. Plaintiffs also seek a declaratory judgment that is identical to their substantive claims. *Id.* at ¶¶ 83, 84. Specifically, in their breach of contract claim, Plaintiffs ask this Court to determine who is liable under the VSCs, the Insurance Policy, and the Administrative Agreement, and award damages. *Id.* at ¶ 71. Then, Plaintiffs seek a declaration that Butler must pay claims under the VSCs, the Insurance Policy, and the Administrative Agreement. *Id.* at ¶ 83.

In addition, Plaintiffs ask this Court for a finding of liability and damages under Magnuson-Moss in Count I, while simultaneously praying for a declaration that Magnuson-Moss was violated.    This is exactly the type of duplicative relief that is prohibited by federal courts in this state.

For example, in *Riviera Distributors*, High-Top Amusements, Inc. filed a counter-complaint against Riviera based on a settlement agreement between the parties. *Riviera*, 2008 WL 687385 at 3. Included in the counter-complaint was a request for a declaratory judgment regarding the rights and obligations of the parties under the settlement agreement, and a breach of contract claim alleging that Riviera violated the agreement. *Id.* Riviera moved to dismiss the declaratory judgment request. *Id.* at 4.

The court held that "a party cannot seek declaratory relief simply as a predicate for a subsequent damages claim," and that "a declaration that High-Top did not breach the [s]ettlement [a]greement and Riviera did [breach the agreement] is effectively a determination of the merits of the parties' respective breach of contract claims." *Id.*

Therefore, Riviera's motion to dismiss was granted because the declaratory judgment was duplicative of High-Top's other counterclaims and affirmative defenses. *Id.* at 5.

In *Dixie Gas*, Shell Oil Co. filed a motion to dismiss all nine counts of Dixie's complaint. *Dixie Gas & Food, Inc.*, 205 WL 1273273 at 1. Several counts included allegations of federal and state statutory violations, including the Robinson-Patman Act, the Illinois Franchise Disclosure Act, and the Illinois Deceptive Trade Practices Act. *Id.* at 1-5. The motion to dismiss was granted as to count nine of the complaint, Dixie's request for declaratory judgment. *Id.* at 1.

The court noted that Dixie brought a suit for damages in counts one through eight based on the same issues raised in the declaratory judgment request. *Id.* at 7. The declaration request merely duplicated plaintiffs' other counts, except that it sought a declaration of rights under various contracts and statutes rather than damages. *Id.* As a result, "determination on the merits [was] underway in this suit, and the additional declaratory judgment action requested by plaintiffs [was] redundant." *Id.*

In addition, fairness and judicial economy weighed in favor of dismissing the declaratory judgment count in *Dixie*. *Id.* With the useless declaratory judgment eliminated, "both parties [were] able to have the substantive merits of their positions decided without plaintiffs' declaratory judgment claims, and the litigation [was] made more efficient by eliminating the unnecessary . . . count." *Id.*

In the case at bar, Plaintiffs' declaratory judgment claim is identical to the breach of contract and Magnuson-Moss counts. This Court is asked to hold Butler liable for money damages for breach of contract and violations of Magnuson-Moss. In their count for declaratory judgment, Plaintiffs want a declaration that Butler breached the contract

and violated Magnuson-Moss.   This duplicative declaratory relief is useless and contravenes judicial economy.   Plaintiffs' claim for declaratory judgment must be dismissed.

Respectfully submitted,

LAW OFFICES OF MICHAEL MURPHY TANNEN, P.C.


By: *s/Michael M. Tannen*

Attorneys for Butler Financial Solutions, LLC

Law Offices of Michael Murphy Tannen, P.C.
Michael M. Tannen (#6204635)
Jim D. DeMars (#6292689)
39 S. LaSalle Street, Suite 905
Chicago, IL 60603
(312) 641-6650



FOR EDUCATIONAL USE ONLY

Page 1

**Effective: [See Text Amendments]**

West's Smith-Hurd Illinois Compiled Statutes Annotated Currentness
  Chapter 215. Insurance (Refs & Annos)
    → Act 152. Service Contract Act

**152/1. Short title**

§ 1. Short title. This Act may be cited as the Service Contract Act.

**Effective: [See Text Amendments]**

**152/5. Definitions**

§ 5. Definitions.

"Department" means the Department of Insurance.

"Director" means the Director of Insurance.

"Service Contract" means a contract or agreement whereby a service contract provider undertakes for a specified period of time, for separate and identifiable consideration, to perform the repair, replacement, or maintenance, or indemnification for such services, of any automobile, system, or consumer product in connection with the operational or structural failure due to a defect in materials or workmanship, or normal wear and tear, with or without additional provision for incidental payment or indemnity under limited circumstances, for related expenses, including, but not limited to, towing, rental, and emergency road service. Service contracts may provide for the repair, replacement, or maintenance of such property for damage resulting from power surges and accidental damage from handling. Service contracts shall not include contracts of limited duration that provide for scheduled maintenance only.

"Service contract holder" means the person who purchases a service contract or a permitted transferee.

"Service contract provider" means a person who is contractually obligated to the service contract holder under the terms of the service contract. A service contract provider does not include an insurer.

"Service contract reimbursement insurance policy" means a policy of insurance that is issued to the service contract provider to provide reimbursement to the service contract provider or to pay on behalf of the service contract provider all covered contractual obligations incurred by the service contract provider under the terms and conditions of the insured service contracts issued or sold by the service contract provider.

"System" means the heating, cooling, plumbing, electrical, ventilation, or any other similar system of a home.

**Effective: August 05, 2003**

**152/10. Exemptions**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

A

FOR EDUCATIONAL USE ONLY

§ 10. Exemptions. Service contract providers and related service contract sellers and administrators complying with this Act are not required to comply with and are not subject to any provision of the Illinois Insurance Code. [FN1] A service contract provider who is the manufacturer or a wholly-owned subsidiary of the manufacturer of the product or the builder, seller, or lessor of the product that is the subject of the service contract is required to comply only with Sections 30, 35, 45, and 50 of this Act; except that, a service contract provider who sells a motor vehicle, excluding a motorcycle as defined in Section 1-147 of the Illinois Vehicle Code, [FN2] or who leases, but is not the manufacturer of, the motor vehicle, excluding a motorcycle as defined in Section 1-147 of the Illinois Vehicle Code, that is the subject of the service contract must comply with this Act in its entirety. Contracts for the repair and monitoring of private alarm or private security systems regulated under the Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004 [FN3] are not required to comply with this Act and are not subject to any provision of the Illinois Insurance Code.

[FN1] 215 ILCS 5/11 et seq.

[FN2] 625 ILCS 5/1-147.

[FN3] 225 ILCS 447/5-5, et seq.

**Effective: [See Text Amendments]**

**152/15. Financial requirements**

§ 15. Financial requirements. No service contract shall be issued, sold, or offered for sale in this State unless one of the following conditions are satisfied:

(1)(A) The service contract provider is insured under a service contract reimbursement insurance policy issued by an insurer authorized to do business in this State and providing that the insurer will pay to, or on behalf of, the service contract provider all sums that the service contract provider is legally obligated to pay according to the service contract provider's contractual obligations under the service contracts issued or sold by the service contract provider;

(B) a true and correct copy of the service contract reimbursement insurance policy has been filed with the Director by the service contract provider;

(C) the service contract states that the obligations of the service contract provider to the service contract holder are covered under a service contract reimbursement insurance policy; and

(D) the service contract states the name and address of the issuer of the service contract reimbursement insurance policy and states that in the event covered service is not provided by the service contract provider within 60 days of proof of loss by the service contract holder, the service contract holder may file directly with the service contract reimbursement insurance company.

(2)(A) The service contract provider maintains a funded reserve account for its obligations under its service contracts issued and outstanding in this State. The reserves shall not be less than 40% of the gross consideration received, less claims paid, for all service contracts sold and then in force;

(B) the service contract provider places in trust with the Director a financial security deposit, having a value of not less than 5% of the gross consideration received, less claims paid, for all service contracts sold and then in force, but not less than $25,000, consisting of securities of the type eligible for deposit by authorized insurers in this State and;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(C) the service contract provider provides the Director with an audited financial statement annually of the service contract revenues and claims.

(3)(A) The service contract provider, or its parent company in accordance with subdivision (3)(B), maintains a net worth or stockholders' equity of $100,000,000; and

(B) the service contract provider provides the Director with a copy of the service contract provider's or the service contract provider's parent company's most recent Form 10-K or Form 20-F filed with the Securities and Exchange Commission within the last calendar year or, if the service contract provider does not file with the Securities and Exchange Commission, a copy of the service contract provider's or the service contract provider's parent company's audited financial statements that shows a net worth of the service contract provider or its parent company of at least $100,000,000. If the service contract provider's parent company's Form 10-K, Form 20-F, or audited financial statements are filed to meet the service provider's financial stability requirement, then the parent company shall agree to guarantee the obligations of the provider relating to service contracts issued by the service contract provider in this State.

**Effective: [See Text Amendments]**

**152/20. Reimbursement policy; required provisions**

§ 20. Reimbursement policy; required provisions.

(a) No service contract reimbursement insurance policy shall be issued, sold, or offered for sale in this State unless the policy states that the issuer of the policy will reimburse or pay on behalf of the service contract provider all covered sums which the service contract provider is legally obligated to pay or will provide the service that the service contract provider is legally obligated to perform according to the service contract provider's contractual obligations under the provisions of the insured service contracts issued or sold by the service contract provider.

(b) If covered service is not provided by the service contract provider within 60 days of proof of loss by the service contract holder, the service contract holder may file directly with the insurance company writing the service contract reimbursement insurance policy.

(c) A service contract reimbursement insurance company that insures a service contract shall be deemed to have received payment of the premium if the service contract holder paid for the service contract coverage.

(d) If a service contract is canceled by a service contract holder, the service contract reimbursement insurance company shall be required to return the unearned service contract reimbursement insurance premium for that contract to the insured service contract provider. If the service contract provider fails to refund the amounts required under Section 35 of this Act, the service contract reimbursement insurance company shall be responsible for the refund to the service contract holder.

**Effective: July 01, 2003**

**152/25. Registration requirements for service contract providers**

§ 25. Registration requirements for service contract providers.

(a) No service contract shall be issued or sold in this State until the following information has been submitted to the Department:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY                                                       Page 4

(1) the name of the service contract provider;

(2) a list identifying the service contract provider's executive officer or officers directly responsible for the service contract provider's service contract business;

(3) the name and address of the service contract provider's agent for service of process in this State, if other than the service contract provider;

(4) a true and accurate copy of all service contracts to be sold in this State; and

(5) a statement indicating under which provision of Section 15 the service contract provider qualifies to do business in this State as a service contract provider.

(b) The service contract provider shall pay an initial registration fee of $1,000 and a renewal fee of $150 each year thereafter. All fees and penalties collected under this Act shall be paid to the Director and deposited in the Insurance Financial Regulation Fund.

**Effective: [See Text Amendments]**

**152/30. Required service contract disclosures**

§ 30. Required service contract disclosures. All service contracts issued or sold in this State shall contain the following disclosures written in clear and understandable language.

(1) the name and address of the service contract provider;

(2) the total consideration for the service contract paid by the service contract holder;

(3) the conditions and procedures for obtaining service under the service contract, including the name, address, and local or toll-free telephone number of any person from whom approval is required before covered repairs may be commenced;

(4) the existence and amount of a deductible, if any;

(5) merchandise and services to be provided and any limitations, exceptions, or exclusions;

(6) the terms, conditions, and restrictions governing transferability of the service contract, if any;

(7) the provisions governing cancellation and refunds in accordance with Section 35 of this Act; and

(8) whether or not the service contract covers failure resulting from normal wear and tear.

**Effective: [See Text Amendments]**

**152/35. Cancellation and refunds**

§ 35. Cancellation and refunds. No service contract may be issued, sold, or offered for sale in this State unless the service contract clearly states that the service contract holder is allowed to cancel the service contract. If the service contract holder elects cancellation, the service contract provider may retain a cancellation fee not to exceed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY                                                                Page 5

the lesser of 10% of the service contract price or $50. The service contract cancellation provision must provide that the service contract may be cancelled:

(1) within 30 days after its purchase if no service has been provided and that a full refund of the service contract consideration, less any cancellation fee stated in the service contract will be paid to the service contract holder; or

(2) at any other time and a pro rata refund of the service contract consideration for the unexpired term of the service contract, based on the number of elapsed months, miles, hours, or such other reasonably applicable measure which is clearly disclosed in the service contract, less the value of any service received, and any cancellation fee stated in the service contract will be paid to the service contract holder.

**Effective: [See Text Amendments]**

**152/40. Incidental benefits**

§ 40. Incidental benefits. A service contract may provide full or partial reimbursement for other expenses incurred by the service contract holder as a direct and proximate result of an operational or structural failure if covered by the service contract. A reimbursement for these expenses shall not exceed the purchase price of the property serviced per incident.

**Effective: [See Text Amendments]**

**152/45. Record keeping requirements**

§ 45. Record keeping requirements.

(a) The service contract provider shall keep accurate accounts, books, and records concerning transactions regulated under this Act.

(b) The service contract provider's accounts, books, and records shall include the following:

(1) copies of each type of service contract sold;

(2) the name and address of each service contract holder, to the extend that the name and address has been furnished by the service contract holder;

(3) a list of the locations where service contracts are marketed, sold, or offered for sale; and

(4) written claims files which shall contain at least the date and description of claims related to the service contracts.

(c) Except as provided in subsection (e) of this Section, the service contract provider shall retain all records required to be maintained by Section 45 for at least 3 years after the specified period of coverage has expired.

(d) The records required under this Act may be, but are not required to be, maintained on a computer disk or other record keeping technology. If the records are maintained in other than hard copy, the records shall be capable of duplication to legible hard copy at the request of the Director.

(e) A service contract provider discontinuing business in this State shall maintain its records until it furnishes the Director satisfactory proof that it has discharged all obligations to service contract holders in this State.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY                                    Page 6

**Effective: [See Text Amendments]**

**152/50. Examinations and enforcement provisions**


§ 50. Examinations and enforcement provisions.

(a) The Director may conduct examinations of service contract providers, administrators, or other persons to enforce this Act and protect service contract holders in this State. Upon request of the Director, a service contract provider shall make available to the Director all accounts, books, and records concerning service contracts sold by the service contract provider that are necessary to enable the Director to reasonably determine compliance or noncompliance with this Act.

(b) The Director may take action that is necessary or appropriate to enforce the provisions of this Act and the Director's rules and orders and to protect service contract holders in this State. If a service contract provider engages in a pattern or practice of conduct that violates this Act and that the Director reasonably believes threatens to render the service contract provider insolvent or cause irreparable loss or injury to the property or business of any person or company located in this State, the Director may (i) issue an order directed to that service contract provider to cease and desist from engaging in further acts, practices, or transactions that are causing the conduct; (ii) issue an order prohibiting that service contract provider from selling or offering for sale service contracts in violation of this Act; (iii) issue an order imposing a civil penalty on that service contract provider; or (iv) issue any combination of the foregoing, as applicable. Prior to the effective date of any order issued pursuant to this subsection, the Director must provide written notice of the order to the service contract provider and the opportunity for a hearing to be held within 10 business days after receipt of the notice, except prior notice and hearing shall not be required if the Director reasonably believes that the service contract provider has become, or is about to become, insolvent.

A person aggrieved by an order issued under this Section may request a hearing before the Director. The hearing request shall be filed with the Director within 20 days after the date the Director's order is effective, and the Director must hold such a hearing within 15 days after receipt of the hearing request.

(c) At the hearing, the burden shall be on the Director to show why the order issued pursuant to this Section is justified. The provisions of Section 10-25 of the Illinois Administrative Procedure Act [FN1] shall apply to a hearing request under this Section.

(d) The Director may bring an action in any court of competent jurisdiction for an injunction or other appropriate relief to enjoin threatened or existing violations of this Act or of the Director's orders or rules. An action filed under this Section also may seek restitution on behalf of persons aggrieved by a violation of this Act or orders or rules of the Director.

(e) A person who is found to have violated this Act or orders or rules of the Director may be ordered to pay to the Director a civil penalty in an amount, determined by the Director, of not more than $500 per violation and not more than $10,000 in the aggregate for all violations of a similar nature. For purposes of this Section, violations shall be of a similar nature if the violation consists of the same or similar course of conduct, action, or practice, irrespective of the number of times the conduct, action, or practice that is determined to be a violation of this Act occurred.

[FN1] 5 ILCS 100/10-25.

**Effective: [See Text Amendments]**

**152/55. Rulemaking power**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY    Page 7

§ 55. Rulemaking power. The Director may adopt such administrative rules as are necessary to implement the provisions of this Act.

**Effective: [See Text Amendments]**

**152/60. Applicability**

§ 60. Applicability. This Act applies to all service contracts sold or offered for sale 90 or more days after the effective date of this Act.

**Effective: [See Text Amendments]**

**152/99. Effective date**

§ 99. Effective date. This Act takes effect upon becoming law.

Current through P.A. 95-32 of the 2007 Reg. Sess.
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FOR EDUCATIONAL USE ONLY

Page 1

West's Colorado Revised Statutes Annotated Currentness
    Title 42. Vehicles and Traffic (Refs & Annos)
        Motor Vehicle Repairs
            → Article 9. Motor Vehicle Repair Act (Refs & Annos)

### § 42-9-101. Short title

This article shall be known and may be cited as the "Motor Vehicle Repair Act of 1977".

### § 42-9-102. Definitions

As used in this article, unless the context otherwise requires:

(1) "Auto parts recycler" means any person who purchases motor vehicles for the purpose of dismantling and selling the components thereof and who complies with all federal, state, and local regulations. "Auto parts recycler" includes a vehicle dismantler.

(1.2) "Customer" means the owner, the agent of the owner, or a family member, employee, or any other person whose use of the vehicle is authorized by the owner.

(1.5) "Estimate" means a written or oral assessment that describes structural damage to or mechanical needs of a motor vehicle. The estimate shall include total estimated costs of repair, excluding sales taxes and towing charges, together with a statement as to whether any parts to be installed are new original equipment manufacturer, new nonoriginal equipment manufacturer, used, reconditioned, or rebuilt.

(1.6) "Inflatable restraint system" has the same meaning as is set forth in 49 CFR sec. 507.208 S4.1.5.1(b).

(1.7) "Invoice" means the final statement for services rendered.

(2) "Motor vehicle" means every self-propelled vehicle intended primarily for use and operation on the public highways. The term does not include trucks and truck tractors having a gross vehicle weight of more than eight thousand five hundred pounds, nor does it include farm tractors and other machines and tools used in the production, harvesting, and care of farm products, nor does it include motorcycles.

(3) "Motor vehicle repair facility" means any natural person, partnership, corporation, trust, association, or group of persons associated in fact although not a legal entity which, with intent to make a profit or a gain of money or other thing of value, engages in the business or occupation of performing repairs on a motor vehicle, including repairs on body parts. The term "motor vehicle repair facility" includes a motor vehicle repair garage.

(4) "Necessary" means essential to a desired or projected end as stated by the customer or indispensable to avoid loss or damage.

(5) "Repairs on a motor vehicle" or "repairs" includes maintenance, diagnosis, repairs, service, and parts replacement but does not include washing the vehicle or adding gasoline or oil to the vehicle.

(6) "Work order" means a document that a customer signs to authorize repairs. "Work order" may include an estimate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

§ 42-9-103. Applicability

The provisions of sections 42-9-104, 42-9-105, and 42-9-106 shall not apply where the total cost of the labor and parts is one hundred dollars or less.

§ 42-9-104. When consent and estimate required--original transaction-- disassembly

(1)(a) No repairs on a motor vehicle shall be performed by a motor vehicle repair facility unless the facility obtains the written consent of the customer.

(b) The required written consent is waived by the customer only when the motor vehicle has been towed to the motor vehicle repair facility or the customer has left the motor vehicle with the motor vehicle repair facility outside of normal business hours or when the customer has signed a waiver in compliance with paragraph (b) of subsection (2) of this section. The waiver established by this paragraph (b) for any vehicle that is towed to a motor vehicle repair facility or left with the motor vehicle repair facility outside of normal business hours is limited to a maximum of one hundred dollars for all labor and parts.

(c) When the customer has not given the motor vehicle repair facility written consent to perform repairs, no repairs shall be performed unless the facility first communicates orally to the customer the written estimate of the total cost of such repairs and the customer then consents to the required repairs. A record of such communication and consent shall be made on the work order by the motor vehicle repair facility and shall include the date, time, manner of consent, telephone number called, if any, and the names of the persons giving and receiving such consent. If more than one such communication occurs between the motor vehicle repair facility and the customer, a record of the telephone number need not be made for each subsequent communication if the telephone number is the same as on the initial consent.

(2)(a)(I) Except as provided in paragraph (b) of this subsection (2), no repairs shall be performed by a motor vehicle repair facility unless said facility first submits in writing or, where allowed by this section, orally communicates to the customer an estimate of the total cost of any such repairs. The written estimate shall include the expected completion date of such repairs. A copy of the completed written estimate of the total cost of repair shall be provided to the customer.

(II)(A) Except as provided in sub-subparagraph (B) of this subparagraph (II), storage charges may accrue, beginning on the fourth day, if the customer has not picked up the motor vehicle within three days, exclusive of Saturday, Sunday, any legal holiday, and any days the repair facility is closed for business, after notification of the completion of authorized repairs or if the customer failed to authorize repairs to be performed within three days, exclusive of Saturday, Sunday, any legal holiday, and any days the repair facility is closed for business, after the date of communication of an estimate.

(B) Storage charges shall be assessed in accordance with section 38-20-109, C.R.S., if the facility chooses to sell the customer's property in accordance with article 20 of title 38, C.R.S.

(C) The amounts that a customer may be charged for storage charges shall be conspicuously printed on the separate written authorization provided to the customer.

(III) The work order provided to the customer shall state conspicuously that, except for body shop repair parts and exchanged or warranty parts that shall only be presented to the customer for examination and not returned, and except for inflatable restraint system components, the customer is entitled to the return of the replaced parts if the customer so requests at the time of consenting to or authorizing the repairs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(IV) The work order, or a legible copy thereof, shall be retained by the motor vehicle repair facility for at least three years.

(b) A customer may waive the right to receive any estimate, either written or oral, prior to authorizing repairs by signing the customer's name and the date below the following statement that shall be in bold type: "**I DO NOT WISH TO RECEIVE ANY ESTIMATE, EITHER WRITTEN OR ORAL, TO WHICH I AM ENTITLED BY LAW, BEFORE REPAIRS ARE AUTHORIZED.**" The signing of such waiver does not constitute an authorization of repairs, which shall be a separate statement.

(c)(I) In the event that it is necessary to disassemble, or partially disassemble, a motor vehicle or a motor vehicle part in order to provide the customer with an estimate for required repairs, the written estimate required in paragraph (a) of this subsection (2) shall show the cost of reassembly in the event that the customer elects not to proceed with the repairs of the motor vehicle or motor vehicle part. The estimate shall also include the total cost of labor and parts to replace those expendable items that are normally destroyed by such disassembly. No act of disassembly that would prevent the restoration of the same unit to its former condition may be undertaken unless the motor vehicle repair facility has fully informed the customer of that fact in writing on the work order and the customer consents to the disassembly.

(II) Any estimate of required repairs given after a disassembly shall comply with the requirements of paragraph (a) of this subsection (2); except that such written estimate may then be communicated orally to the customer. A record of such communication shall be made on the work order by the motor vehicle repair facility, including the date, time, manner of communication, telephone number called, if any, and names of persons giving and receiving such consent. If more than one such communication occurs between the motor vehicle repair facility and the customer, a record of the telephone number need not be made for each subsequent communication if the telephone number is the same as on the initial consent.

(d) Towing charges are excluded from the written or oral estimate and consent requirements of this section.

### § 42-9-105. When consent and estimate required--additional repairs--changed completion date

(1) Except when an estimate has been waived pursuant to section 42-9- 104(2)(b), no charge shall be made for labor and parts in excess of the estimate, plus ten percent thereof or twenty-five dollars, whichever is less, without the consent of the customer to the additional charge before performance of the labor or installation of the parts not included in the estimate. Consent by the customer to additional charges may be written or oral. In either case, a record of such consent shall be made on the work order by the motor vehicle repair facility and shall include the date, time, manner of consent, telephone number called, if any, and names of the persons giving and receiving the consent. If more than one such communication occurs between the motor vehicle repair facility and the customer, a record of the telephone number need not be made for each subsequent communication if the telephone number is the same as on the initial consent.

(2)(a) The customer shall be notified in writing on the work order of any changes in the expected completion date of the repairs and of the new expected completion date. Such notification may be communicated to the customer orally, but such communication, written or oral, shall be made no more than twenty-four hours after the original completion date, exclusive of Saturday, Sunday, and any legal holiday. If communicated orally, a record of such communication shall be made on the work order by the motor vehicle repair facility and shall include the date, time, telephone number called, if any, and names of the persons giving and receiving such communication. If the name of the person receiving such communication is different than the original customer, the name and telephone number called, if any, shall be recorded on the work order.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

Page 4

(b) No additional changes in the completion date shall be made unless the consent of the customer to the additional change is obtained. If the required consent is given orally, the motor vehicle repair facility shall make a record of such consent on the work order and shall include the date, time, manner of consent, and the names of the persons giving and receiving such consent.

(c) If the motor vehicle repair facility fails to notify the customer of the change in the completion date or if the customer refuses to consent to an additional change in the completion date, the contract may be cancelled at the option of either the customer or the motor vehicle repair facility. Once the contract has been cancelled in this manner, the motor vehicle repair facility shall be required to reassemble the motor vehicle in substantially the same condition in which it was delivered to the motor vehicle repair facility without cost to the customer unless the customer has been previously notified as to the impracticality of such reassembly; except that the customer shall be required to pay for any repairs already completed as specified in section 42-9-106(3)(a).

## § 42-9-106. Amounts over estimate--storage charges--cancellation of authorized repairs

(1) Except when an estimate has been waived pursuant to section 42-9- 104(2)(b), if the charge for labor and parts is over the original estimate or any subsequent estimate by ten percent thereof or twenty-five dollars, whichever is less, and unless further oral or written consent is given by the customer pursuant to section 42-9-105(1), the motor vehicle repair facility shall return the motor vehicle to the customer upon the payment of the amount of the original estimate or any subsequent estimate plus ten percent thereof or twenty-five dollars, whichever is less, and the motor vehicle repair facility shall not be entitled to a lien for said excess pursuant to section 38-20- 106, C.R.S.

(2) No charge shall be made for storage of the motor vehicle unless the motor vehicle is not picked up by the customer within three days, exclusive of Saturday, Sunday, legal holidays, and any days the repair facility is closed for business, after the customer is notified that the repairs have been completed and the customer was notified, as required by section 42-9- 104(2)(a), that such storage charges would accrue. Storage charges may accrue pursuant to a written agreement, separate from any other repair document, between the motor vehicle repair facility and the customer. The written authorization, in bold type, shall state the following:

### Storage Fee Policy

**A storage fee may not be charged unless a written agreement, separate from any other repair document, for an amount is reached. A storage fee may be charged, beginning on the fourth day, if a motor vehicle is not removed within three days after the customer is notified that repairs have been completed, excluding Saturdays, Sundays, legal holidays, and any days the repair facility is closed for business.**

The motor vehicle repair facility shall make a record of the notice of completion on the work order. The record shall include the date and time of the notice of completion, the manner of communication of the notice, the telephone number called, if any, and the name of the person receiving the notice.

(3)(a) If the customer cancels previously authorized repairs prior to their completion, the motor vehicle repair facility shall be entitled to charge the customer for repairs, including labor and parts, which have already been performed so long as said charge does not exceed the original estimate or any subsequent estimate for the repairs already performed.

(b) In requesting the return of the motor vehicle subsequent to the cancellation of previously authorized repairs, the customer shall specify whether it should be reassembled in substantially the same condition in which it was delivered to the motor vehicle repair facility or in such a lesser condition of assembly as the customer shall

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

designate. Reassembly shall be completed by the motor vehicle repair facility within three days of the customer's request, excluding Saturday, Sunday, any legal holiday, and any days the repair facility is closed for business.

(c) All charges for reassembly, whether or not the requested repairs are completed, shall be included in the original estimate or in any subsequent estimate.

(4) Nothing in this section shall require a motor vehicle repair facility to give an estimate if such facility does not agree to perform the requested repairs.

(5) Payment by the customer of any amount in excess of those allowed by this article or for unauthorized repairs is not a waiver of any of the rights granted by this article to the customer, nor shall such payment be construed as consent to additional repairs or excess charges.

(6) All written estimates and other information required by this section shall be recorded on or attached to the invoice described in section 42-9-108.

### § 42-9-107. Used, reconditioned, or rebuilt parts

The motor vehicle repair facility shall specify in the original estimate whether any parts to be installed are new original equipment manufacturer, new nonoriginal equipment manufacturer, used, reconditioned, or rebuilt and then shall obtain the consent of the customer before any new original equipment manufacturer, new nonoriginal equipment manufacturer, used, reconditioned, or rebuilt parts are installed in the motor vehicle. If such consent is oral, the motor vehicle repair facility shall make a record of such consent on the work order and shall include the date, time, and manner of consent. The telephone number called, if any, and the name of the person giving and receiving the consent, if different than the original customer, shall be recorded on the work order. The motor vehicle repair facility shall adjust the original estimate for new parts to reflect the altered cost if used, reconditioned, or rebuilt parts are authorized and installed.

### § 42-9-108. Invoice

(1) All repairs done by a motor vehicle repair facility shall be recorded on a customer's invoice. A legible copy of the customer's invoice shall be given to the customer when the motor vehicle is returned to the customer. The original or a legible copy of the customer's invoice shall be retained for at least three years by the motor vehicle repair facility.

(2) The customer's invoice shall include the following:

(a) The name and address of the customer;

(b) The year, make, odometer reading on the date the motor vehicle was brought in for repairs, and license number of the motor vehicle;

(c) The date the motor vehicle was received for repairs;

(d) An itemization of each part added to or replaced in the motor vehicle; a description of each part by name and identifying number; clear identification of which parts are used, reconditioned, or rebuilt; and the charges levied for each part added or replaced;

(e) The amount charged for labor, the full name or employee number of each mechanic or repairer who in whole or in part performed repairs, and the identification of the specific stage of repair for which each mechanic or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

repairer named was partially or wholly responsible;

(f) An itemized statement of all additional charges, including storage, service and handling, and taxes;

(g) An identification of any repairs subcontracted to another repair facility;

(h) The legible initials of the person filling out any portion of the invoice not specified in this subsection (2); and

(i) A copy of any warranty issued by the motor vehicle repair facility setting forth the terms and conditions of such warranty.

(3) Itemization of a particular part is not required on the customer's invoice if no charge is levied for that part.

(4) Miscellaneous designations such as "shop supplies", "paint and paint supplies", and "shop materials" may be used on the customer's invoice.

(5) Designation of mechanics, repairers, parts, or labor is not required on the customer's invoice if the customer has been given a flat-rate price, if such repairs are customarily done and billed on a flat-rate price basis and agreed upon by the customer, and if such flat rates are conspicuously posted by the motor vehicle repair garage or otherwise made available to the customer prior to rendering the estimate.

### § 42-9-108.5. Warranty completion date

When a motor vehicle is returned under a warranty issued by the repair facility, the facility shall give the customer a written notice that specifies that the work is under warranty and that provides the customer with a completion date for the repair, as required by section 42-9-104.

### § 42-9-108.7. Motor vehicle repair facility warranties

If a motor vehicle repair facility issues a motor vehicle repair facility warranty, such warranty shall appear with the invoice and shall set forth all terms and conditions of such warranty. The facility warranty shall be limited to the terms and conditions set forth in such warranty.

### § 42-9-109. Return of replaced parts

Except for body shop repair parts, inflatable restraint system components, and parts that the motor vehicle repair facility is required to return to the manufacturer or distributor under a manufacturer warranty or exchange arrangement, the motor vehicle repair facility shall return replaced parts to the customer at the time of the completion of the repairs if the customer so requests at the time of consenting to or authorizing the repairs. A motor vehicle repair facility is not authorized to return any components of an inflatable restraint system to the consumer.

### § 42-9-109.5. Inflatable restraint systems--replacement

(1)(a) A motor vehicle repair garage may replace an inflatable restraint system only with an inflatable restraint system that is newly manufactured or an inflatable restraint system salvaged and sold by a vehicle dismantler or auto parts recycler.

(b) A motor vehicle repair garage is not required to install a salvaged inflatable restraint system and may do so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only upon obtaining specific written authorization from the customer. A motor vehicle repair garage installing a salvaged inflatable restraint system shall include the phrase "salvaged inflatable restraint system" prominently on the face of the invoice. A motor vehicle repair garage may not use other terms, including but not limited to "used" or "as is", to describe a salvaged inflatable restraint system on an invoice.

(2)(a) If a vehicle dismantler or auto parts recycler sells a salvaged inflatable restraint system, the vehicle dismantler or auto parts recycler shall state the following information on the invoice:

(I) The date of sale of the salvaged inflatable restraint system;

(II) The vehicle identification number of the vehicle from which the inflatable restraint system was salvaged; and

(III) The part number of the salvaged inflatable restraint system, if such number is available.

(b) A vehicle dismantler or auto parts recycler shall maintain the bill of sale for any sale of a salvaged inflatable restraint system for at least three years after the date of the sale.

### § 42-9-110. Exemption--antique motor vehicles

The provisions of this article shall not apply to repairs of any motor vehicle twenty-five or more years old or of any motor vehicle which is a collectors' item as defined in section 42-12-101(2).

### § 42-9-111. Prohibited acts

(1) No motor vehicle repair facility or any employee or contract laborer of such facility shall:

(a) Charge for repairs which have not been consented to by the customer or charge for repairs in excess of amounts allowed by this article;

(b) Represent that repairs are necessary when such is not a fact;

(c) Represent that repairs have been performed when such is not a fact;

(d) Represent that a motor vehicle or motor vehicle part being diagnosed is in dangerous condition when such is not a fact;

(e) Perform emissions repairs to bring motor vehicles into compliance with the provisions of sections 42-4-301 to 42-4-316 when such repairs are not indicated by the identified emissions failure;

(f) Fail to issue an invoice as required by section 42-9-108;

(g) Fail to give notice as required by section 42-9-105;

(h) Require a customer to sign a work order that does not state the repairs that are requested by the customer;

(i) Fail to state the motor vehicle odometer reading, unless such reading is unfeasible due to the condition of the odometer; or

(j) Install or reinstall, as part of a vehicle inflatable restraint system, any object in lieu of an air bag that was designed in accordance with federal safety regulations for the make, model, and year of the vehicle.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### § 42-9-112. Criminal penalties

(1) Except as provided in subsection (2) of this section, any motor vehicle repair facility or any employee of such facility that fails to provide a completed written or oral estimate as required under section 42-9-104(2), or an invoice as required under section 42-9-108, is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars nor more than two thousand dollars per violation. No portion of the minimum fine for repeat offenders shall be suspended.

(2) Except as otherwise provided in subsection (4) of this section, any motor vehicle repair facility or any employee of such facility who violates section 42-9-111 is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars nor more than one thousand dollars per violation. No portion of the minimum fine for repeat offenders shall be suspended.

(2.5) Any motor vehicle repair facility or any employee of such facility who violates any provision of this article other than the provisions for which penalties are provided in subsections (1), (2), and (4) of this section is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of five hundred dollars per violation.

(2.7) A violation of this article shall also constitute a deceptive trade practice in violation of the "Colorado Consumer Protection Act", article 1 of title 6, C.R.S., and shall subject the motor vehicle repair facility or any employee of such facility to the remedies or penalties contained in article 1 of title 6.

(3) Deleted by Laws 1997, H.B.97-1105, § 11, eff. May 21, 1997.

(4) Any motor vehicle repair facility or any employee of such facility who violates the provisions of section 42-9-111(1)(j) is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than two thousand five hundred dollars and not more than five thousand dollars per violation, or imprisonment in the county jail for up to one year, or both.

### § 42-9-113. Civil penalties

In any civil action for the enforcement of this article, the court may award reasonable attorney fees and costs to the prevailing party, and a customer shall be entitled to treble damages for failure of any motor vehicle repair facility or any employee of such facility to comply with this article, except for clerical errors or omissions; but in no event shall such damages be less than two hundred fifty dollars. The customer shall first make written demand for the customer's damages from the motor vehicle repair facility by certified mail at least ten days prior to the filing of any such action, exclusive of Saturday, Sunday, and any legal holiday. Such action shall be brought within the time period prescribed in section 13-80-103, C.R.S.

Current through the First Regular Session of the Sixty-Sixth General        Assembly (2007)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FOR EDUCATIONAL USE ONLY                                     Page 1

West's North Carolina General Statutes Annotated Currentness
    Chapter 66. Commerce and Business
        ➡ Article 43. Service Agreements (Refs & Annos)

**§ 66-370. Motor vehicle service agreement companies**

<Text of section eff. Oct. 1, 2007.>

(a) This section applies to all motor vehicle service agreement companies soliciting business in this State, but it does not apply to performance guarantees, warranties, or motor vehicle service agreements made by

   (1) A manufacturer,

   (2) A distributor, or

   (3) A subsidiary or affiliate of a manufacturer or a distributor, where fifty-one percent (51%) or more of the subsidiary or affiliate is owned directly or indirectly by

      a. The manufacturer,

      b. The distributor, or

      c. The common owner of fifty-one percent (51%) or more of the manufacturer or distributor

in connection with the sale of motor vehicles. This section does not apply to any motor vehicle dealer licensed to do business in this State (i) whose primary business is the retail sale and service of motor vehicles; (ii) who makes and administers its own service agreements with or without association with a third-party administrator or who makes its own service agreements in association with a manufacturer, distributor, or their subsidiaries or affiliates; and (iii) whose service agreements cover only vehicles sold by the dealer to its retail customer; provided that the dealer complies with G.S. 66-372 and G. S. 66-373. A motor vehicle dealer who sells a motor vehicle service agreement to a consumer, as defined in 15 U.S.C. § 2301(3), is not deemed to have made a written warranty to the consumer with respect to the motor vehicle sold or to have entered into a service contract with the consumer that applies to the motor vehicle, as provided in 15 U.S.C. § 2308(a), if: (i) the motor vehicle dealer acts as a mere agent of a third party in selling the motor vehicle service agreement; and (ii) the motor vehicle dealer would, after the sale of the motor vehicle service agreement, have no further obligation under the motor vehicle service agreement to the consumer to service or repair the vehicle sold to the consumer at or within 90 days before the dealer sold the motor vehicle service agreement to the consumer.

(b) The following definitions apply in this section and in G.S. 66-371, 66-372, and 66-373:

   (1) Authorized insurer. -- An insurance company authorized to write liability insurance under Articles 7, 16, 21, or 22 of Chapter 58 of the General Statutes.

   (2) Distributor. -- Defined in G.S. 20-286(3).

   (3) Licensed insurer. -- An insurance company licensed to write liability insurance under Article 7 or 16 of Chapter 58 of the General Statutes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(4) Motor vehicle. -- Defined in G.S. 20-4.01(23), but also including mopeds as defined in G.S. 20-4.01(27)d1.

(5) Motor vehicle service agreement. -- Any contract or agreement indemnifying the motor vehicle service agreement holder against loss caused by failure, arising out of the ownership, operation, or use of a motor vehicle, of a mechanical or other component part of the motor vehicle that is listed in the agreement. The term does not mean a contract or agreement guaranteeing the performance of parts or lubricants manufactured by the guarantor and sold for use in connection with a motor vehicle where no additional consideration is paid or given to the guarantor for the contract or agreement beyond the price of the parts or lubricants.

(6) Motor vehicle service agreement company. -- Any person that issues motor vehicle service agreements and that is not a licensed insurer.

(c) to (g) Repealed by Laws 1993 (Reg. Sess., 1994), c. 730, § 3, eff. July 11, 1994.

<For text of section eff. until Oct. 1, 2007, see G.S. 58-1-25.>

§ 66-371. Home appliance service agreement companies

<Text of section eff. Oct. 1, 2007.>

(a) This section applies to all home appliance service agreement companies soliciting business in this State, but it does not apply to performance guarantees or warranties made by manufacturers in connection with the sale of new home appliances. This section does not apply to any home appliance dealer licensed to do business in this State (i) whose primary business is the retail sale and service of home appliances; (ii) who makes and administers its own service agreements without association with any other entity; and (iii) whose service agreements cover primarily appliances sold by the dealer to its retail customers, provided that the dealer complies with G.S. 66-372 and G.S. 66-373. This section does not apply to any warranty made by a builder or seller of real property relating to home appliances that are sold along with real property. This section does not apply to any issuer of credit cards or charge cards that markets home appliance service agreements as an ancillary part of its business; provided, however, that such issuer maintains insurance in accordance with G.S. 66-373.

(b) The following definitions apply in this section:

(1) "Home appliance" means a clothes washing machine or dryer; kitchen appliance; vacuum cleaner; sewing machine; home audio or video electronic equipment; home electronic data processing equipment; home exercise and fitness equipment; home health care equipment; power tools; heater or air conditioner, other than a permanently installed unit using internal ductwork; or other personal consumer goods.

(2) "Home appliance service agreement" means any contract or agreement indemnifying the home appliance service agreement holder against loss caused by failure, arising out of the ownership, operation, or use of a home appliance, of a mechanical or other component part of the home appliance that is listed in the agreement.

(3) "Home appliance service agreement company" means any person that issues home appliance service agreements and that is not a licensed insurer.

(c) to (g) Repealed by Laws 1993 (Reg. Sess., 1994), c. 730, § 3, eff. July 11, 1994.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<For text of section eff. until Oct. 1, 2007, see G.S. 58-1-30.>

§ 66-372. Miscellaneous requirements for motor vehicle and home appliance service agreement companies

<Text of section eff. Oct. 1, 2007.>

(a) The provisions of this section and G.S. 66-373 apply to companies specified in G.S. 66-370 and G.S. 66-371.

(b) The following definitions apply in this section and in G.S. 66-373:

    (1) Service agreement. -- Includes motor vehicle service agreements and home appliance service agreements.

    (2) Service agreement company. -- Includes motor vehicle service agreement companies and home appliance service agreement companies.

(c) Before the sale of any service agreement, the service agreement company shall give written notice to the customer clearly disclosing that the purchase of the agreement is not required either to purchase or to obtain financing for a motor vehicle or home appliance, as the case may be.

(d) No service agreement may be used in this State by any service agreement company if the agreement:

    (1) In any respect violates, or does not comply with, the laws of this State;

    (2) Contains, or incorporates by reference when incorporation is otherwise permissible, any inconsistent, ambiguous, or misleading clauses or any exceptions and conditions that deceptively affect the risk purported to be assumed in the general coverage of the agreement;

    (3) Has any title, heading, or other indication of its provisions that is misleading; or

    (4) Is printed or otherwise reproduced in a manner that renders any material provision of the agreement substantially illegible.

(e) All service agreements used in this State by a service agreement company shall:

    (1) Not contain provisions that allow the company to cancel the agreement in its discretion other than for nonpayment of premiums or for a direct violation of the agreement by the consumer where the service agreement states that violation of the agreement would subject the agreement to cancellation;

    (2) With respect to a motor vehicle service agreement as defined in G.S. 66- 370(b)(1), provide for a right of assignability by the consumer to a subsequent purchaser before expiration of coverage if the subsequent purchaser meets the same criteria for motor vehicle service agreement acceptability as the original purchaser; and

    (3) Contain a cancellation provision allowing the consumer to cancel at any time after purchase and receive a pro rata refund less any claims paid on the agreement and a reasonable administrative fee, not to exceed ten percent (10%) of the amount of the pro rata refund.

(f) Each service agreement company, as a minimum requirement for permanent office records, shall maintain:

    (1) A complete set of accounting records, including a general ledger, cash receipts and disbursements

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

journals, accounts receivable registers, and accounts payable registers.

(2) Memorandum journals showing the service agreement forms issued to the company salespersons and recording the delivery of the forms to dealers.

(3) Memorandum journals showing the service agreement forms received by dealers and indicating the disposition of the forms by the dealers.

(4) A detailed service agreement register, in numerical order by agreement number, of agreements in force. The register shall include the following: agreement number, date of issue, issuing dealer, name of agreement holder, description of item covered, service agreement period (and, if applicable, mileage), gross premium, total commission paid, and net premium.

(5) A detailed claims register, in numerical order by service agreement number. The register shall include the following information: agreement number, date of issue, date claim paid, and, if applicable, disposition other than payment and reason for the disposition.

(g) Repealed by Laws 1993, c. 730, § 3, eff. July 11, 1994.

(h) No insurer or service agreement company shall act as a fronting company for any unauthorized insurer or service agreement company that is not in compliance with this section. As used in this subsection, "fronting company" means a licensed insurer or service agreement company that, by reinsurance or otherwise, generally transfers to one or more unauthorized insurers or service agreement companies that are not in compliance with this section a substantial portion of the risk of loss under agreements it writes in this State.

(i) All funds belonging to insurers, companies, or others received by a salesperson of a service agreement are trust funds received by the salesperson in a fiduciary capacity; and the salesperson, in the applicable regular course of business, shall account for and pay the funds to the person entitled to the funds. Any salesperson who, not being entitled to the funds, diverts or appropriates the funds or any portion of the funds, other than funds representing the salesperson's commission if authorized by the salesperson agreement, to his or her own use, upon conviction is guilty of embezzlement under G.S. 14-90.

(j) Any person who knowingly offers for sale or sells a service agreement for a company that has failed to comply with the provisions of this section is guilty of a Class 1 misdemeanor. All service agreement companies and individuals selling service agreements are subject to G.S. 75-1 through G.S. 75-19.

(k) Repealed by Laws 1993 (Reg. Sess., 1994), c. 730, § 2, eff. Oct. 1, 1994.

(l) No service agreement company shall use in its name, contracts, literature, advertising in any medium, or any other printed matter the words "insurance", "casualty", "surety", "mutual", or any other words descriptive of the insurance business or deceptively similar to the name or description of any insurer doing business in this State, except to indicate that the obligations of the contract are insured by an insurance company.

(m) Repealed by S.L. 2007-95, § 11, eff. Oct. 1, 2007.

<For text of section eff. until Oct. 1, 2007, see G.S. 58-1-35.>

**§ 66-373. Insurance policy requirements**

<Text of section eff. Oct. 1, 2007.>

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

(a) Each company or person subject to this section shall maintain contractual liability insurance or service agreement reimbursement insurance with an authorized insurer for one hundred percent (100%) of claims exposure, including reported and incurred but not reported claims and claims expenses, on business written in this State unless the company or person:

    (1) Maintains an audited net worth of one hundred million dollars ($100,000,000);

    (2) Has offered service agreement contracts or warranties, as applicable to the respective company, its parent company, or person, for at least the preceding 10 years; and

    (3) Either is required to file and has filed an SEC Form 10K or Form 20-F with the Securities and Exchange Commission (SEC) within the last calendar year or, if the company does not file with the SEC, can produce, upon request, a copy of the company's audited financial statements, which show a net worth of the company or person of at least one hundred million dollars ($100,000,000). A company or person may utilize its parent company's Form 10-K, Form 20-F, or audited financial statements to satisfy this requirement if the parent company agrees to guarantee the obligations of the company or person relating to service agreement contracts or warranties, as applicable to the respective company or person, sold by the company or person in this State.

(b) All forms relating to insurance policies written by authorized insurers under this section shall be filed with and approved by the Commissioner before they may be used for any purpose in this State, irrespective of whether the insurers are licensed insurers.

(c) Each policy shall contain the following provisions:

    (1) If the company or person does not fulfill its obligations under service agreements or warranties issued in this State for any reason, including federal bankruptcy or state receivership proceedings, the insurer will pay losses and unearned premium refunds directly to any person making the claim under the service agreement.

    (2) The insurer shall assume full responsibility for the administration of claims if the company or person is unable to do so.

    (3) The policy is subject to the cancellation, nonrenewal, and renewal provisions of G.S. 58-41-15, 58-41-20, 58-41-25, and 58-41-40.

    (4) The policy shall insure all service agreements and warranties that were issued while the policy was in effect, regardless of whether the premium was remitted to the insurer.

    (5) If the insurer is fulfilling any service agreement covered by the policy and if the service agreement holder cancels the service agreement, the insurer shall make a full refund of the unearned premium to the consumer pursuant to G.S. 66-372(e)(3). This subdivision applies only to service agreement companies.

(d) The Commissioner of Insurance may adopt rules, in addition to the requirements of this section, governing the terms and conditions of policy forms for the insurance required by this section.

(e) Persons and companies subject to G.S. 66-370, 66-371, and 66-374 are subject to and shall comply with this section.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

<For text of section eff. until Oct. 1, 2007, see G.S. 58-1-42.>

**§ 66-374. Mechanical breakdown service agreements**

<Text of section eff. Oct. 1, 2007.>

(a) Except as provided in subsection (c) of this section, all mechanical breakdown service agreement companies soliciting business in this State shall comply with G.S. 66-372 and G.S. 66-373.

(b) As used in this section, "mechanical breakdown service agreement companies" include any person that issues mechanical breakdown service agreements and is not a licensed insurer, and "mechanical breakdown service agreements" are applicable to mechanized equipment, including automobiles, riding mowers, scooters, generators, farm implements, logging equipment, road graders, bulldozers, and power equipment not licensed for road use, whether mobile or not.

(c) This section does not apply to performance guarantees, warranties, mechanical breakdown service agreements, or motor vehicle service agreements made by:

    (1) A manufacturer.

    (2) A distributor.

    (3) A subsidiary of a manufacturer or distributor."

<For text of section eff. until Oct. 1, 2007, see G.S. 58-1-42.>

Current through S.L. 2007-110 of the 2007 Regular Session.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/03/2007 14:58 FAX    GUARANTEED SUBPOENA    ☑ 007/030

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ROBERT T. KENNEDY, On Behalf of Himself    Case No. _____
and All Others Similarly Situated,

      **Plaintiff,**

vs.

BUTLER FINANCIAL SOLUTIONS, LLC, a
Delaware Limited Liability Company, and
HERITAGE WARRANTY INSURANCE RISK
RETENTION GROUP, INC., f/k/a HERITAGE
WARRANTY MUTUAL INSURANCE RISK
RETENTION GROUP, INC., a South Carolina
corporation,

      **Defendants.**

_____/

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, Robert T. Kennedy ("Plaintiff"), individually and on behalf of all others

similarly situated, hereby alleges, by and through his attorneys, based upon personal information

and information obtained through the investigation of counsel, as follows:

### NATURE OF CASE

1.      Plaintiff brings this class action on behalf of himself and a class of similarly

situated individuals who purchased Vehicle Service Contracts ("VSCs") pursuant to which

Defendant, Butler Financial Solutions, LLC ("Butler"), is obligated to provide warranty coverage

on new and used motor vehicles. Under the plain terms of the VSCs, Butler must pay the

reasonable costs associated with certain automobile part failures or mechanical breakdowns

experienced by the contract holders' vehicles. The VSCs further state that Butler's obligations to

pay covered claims under the VSCs are insured under a Vehicle Service Contract

1

EXHIBIT

B

Reimbursement Policy ("Insurance Policy") issued by Defendant, Heritage Warranty Insurance Risk Retention Group, Inc., f/k/a Heritage Warranty Mutual Insurance Risk Retention Group, Inc. ("Heritage"), and that if a covered claim is not paid within sixty days, the consumer may submit his or her claim directly to Heritage.

2.    Despite these express representations, promises and contractual obligations, both Butler and Heritage (collectively "Defendants") routinely and uniformly refuse to pay covered claims under the VSCs. Instead of paying claims as required under the express terms of the VSCs, Butler has taken the position that Heritage is responsible for directly paying all claims. According to Heritage, Butler has yet to pay for a single repair under the VSCs.

3.    Similarly, Heritage has, as of December 2006 at the latest, taken the position that it too has no responsibility to pay claims, directly or indirectly, under the VSCs. Yet, the Insurance Policy that Heritage issued to Butler clearly states that if Butler fails to pay a covered claim under a VSC, Heritage must pay that claim on Butler's behalf.

4.    As a result of the foregoing, claims made by thousands of contract holders have been systematically denied by Defendants without any proper legal basis. *According to Heritage itself, there are tens of thousands of VSCs that were sold throughout the country and claims under these policies are being submitted, but not paid, at a rate exceeding $200,000 per month.*

5.    By this action, Plaintiff seeks damages and other relief on his own behalf, and on behalf of a nationwide class of other similarly situated individuals who purchased the VSCs. As alleged more fully below, Defendants are liable to Plaintiff and other Class members for, among other things, breach of express contract and breach of third-party beneficiary contract. Plaintiff also requests that the Court provide injunctive and/or declaratory relief, including an order

2

declaring that Butler or Heritage, or both, are obligated to pay covered claims and that the VSCs are voidable at the option of the VSC holders.

## PARTIES

6.      Plaintiff is an individual residing in Castle Rock, Colorado.  In December 2002, Plaintiff purchased a VSC, a true and correct copy of which is attached hereto as *Exhibit A*. Plaintiff paid $1,332 for his VSC, which provides coverage for a period of 84 months or 100,000 miles.

7.      Defendant, Butler, is a Delaware Limited Liability Company which, at the time the above-referenced VSC was sold to Plaintiff, had its principal place of business in Boca Raton, Florida.  Upon information and belief, in approximately October 2005, Butler relocated its corporate offices to Ashville, North Carolina, but continues to conduct substantial business in Florida.  Butler is the obligor under the VSCs.

8.      Defendant, Heritage, is a South Carolina corporation in the business of insurance, with its principal place of business also located in South Carolina.  Heritage issued the Insurance Policy with respect to Butler's obligations under the VSCs.

## JURISDICTION AND VENUE

9.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2).  Upon information and belief, this case involves claims that have a value in excess of $5,000,000, exclusive of interest and costs.

10.      Venue in this judicial district is proper pursuant to 28 U.S.C. §1391 because: (a) at the time the VSC was sold to Plaintiff, Butler had its corporate offices in this district and did substantial business in this district, and, upon information and belief, continues to do substantial business in this district; (b) at the time the VSC was sold to Plaintiff, Heritage did

3

substantial business in this district, and, upon information and belief, continues to do substantial business in this district; (c) upon information and belief, Butler negotiated and entered into an agreement with Heritage in this district to insure claims under the VSCs at issue and, therefore, a substantial part of the events giving rise to Plaintiff's claims arose in this district; (d) upon information and belief, Plaintiff's VSC is a standard form contract that was drafted and developed by Butler in this district and, therefore, a substantial part of the events giving rise to Plaintiff's claims arose in this district; (e) upon information and belief, the majority of the VSCs at issue in this case were entered into by Butler and putative Class members while Butler maintained its headquarters in this district and, therefore, the location of those contracts is within this district and a substantial part of the events giving rise to Plaintiff's claims arose in this district; and (f) upon information and belief, many of the witnesses with knowledge of Butler's business operations and the VSCs at issue are current or former employees of Butler, who are currently located in this district.

## FACTUAL BACKGROUND

11.     When purchasing an automobile, a consumer may also buy a third-party vehicle service contract to supplement any manufacturer's warranties. A vehicle service contract typically requires that the issuer pay for certain types of automobile repairs during the term of the contract. Upon information and belief, Butler is a leading provider of vehicle service contracts and is the obligor with respect to tens of thousands of VSCs that were sold, and continue to be sold, to vehicle purchasers throughout the country.

12.     The VSCs at issue here are standard form contracts pursuant to which Butler promises to "pay or reimburse You [meaning Plaintiff and other class members] for reasonable costs to repair or replace any Breakdown of a part listed under Mechanical Coverage."

4

13.     The VSCs further state that Butler's obligations are "insured by a policy issued by Heritage Warranty Mutual Risk Retention Group, Inc....." and that: "[i]f a covered claim is not paid within sixty (60) days...after proof of loss has been filed, You [meaning Plaintiff and other class members] may file a claim directly with the Insurance Company [meaning Heritage]."

14.     In December 2002, Plaintiff purchased his VSC to cover a 2003 GMC Envoy ("Vehicle"), which he bought new in Colorado. In August 2007, Plaintiff's Vehicle sustained a mechanical failure which was covered by his VSC. Plaintiff took the Vehicle to a local dealer which contacted Butler's claims administrator. The administrator approved the repair being sought, acknowledged that the repair was covered under the VSC, but nonetheless refused to authorize payment for the repair—telling Plaintiff and his dealer that they would need to seek payment directly from Heritage. Likewise, the website of Warrantybynet.com, the company that sold VSCs for Butler, now also instructs VSC holders to submit claims directly to Heritage.

15.     As instructed, Plaintiff then contacted Heritage, which denied that it is responsible for paying for the repairs under the VSCs and explained that Butler is the responsible party under the contracts. Indeed, in a recent lawsuit, Heritage admitted that it had recently stopped paying claims on the VSCs and disclosed that Butler itself had never paid any of the claims.

16.     The reason that Defendants both refuse to pay for these repairs is apparently because they each claim that the other is responsible for making payments under the VSCs. In the meantime, some $200,000 per month in consumer claims are going unpaid.

17.     Upon information and belief, Defendants routinely and uniformly refuse to pay claims under the VSCs at issue in this case, not because the claims are not covered, but only because they cannot agree on which of them is responsible for making those payments. Moreover, it appears that Butler itself never intended to pay any claims, and instead intended to

wholly rely on Heritage to pay all claims (despite the express contractual language making Butler the sole obligor), since, according to Heritage: "Butler has yet to pay for a single repair." Butler's complete reliance on Heritage, and its inability or unwillingness to pay claims under the VSCs without first receiving payment from Heritage, is contrary to the express terms of the contracts and was not disclosed to Plaintiff or other members of the putative Class at the time they entered into the VSCs.

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all other persons similarly situated, as members of a proposed class ("Class") defined as follows:

> All individuals who purchased a Vehicle Service Contract ("VSC"): (i) in which Butler Financial Solutions, LLC is identified as the obligor; and (ii) which is currently in effect or was in effect as of December 2006.

Specifically excluded from the proposed Class are Defendants and their officers, directors and employees.

19.    The Class, as currently defined, is identifiable and unambiguous based upon objective information and criteria. Plaintiff reserves the right to expand, limit, amend or otherwise alter the class definition which will be presented to the Court in his Motion for Class Certification (or at any other appropriate time), or propose subclasses in response to facts learned through formal or informal discovery, his continuing investigation, legal arguments advanced by Defendants, concerns of the Court, or otherwise.

20.    **Numerosity.** The members of the Class are so numerous that their individual joinder is impracticable. While the precise number of Class members is unknown to Plaintiff, Plaintiff is informed and believes that the proposed Class consists of thousands of members. The

10/03/2007 14:59 FAX                    GUARANTEED SUBPOENA                    ☒013/030

true number and identity of Class members are known by Defendants, however, and, thus, the Class may readily be notified of the pendency of this action.

21.    **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions will include, but are not limited, to the following:

a.      Whether Butler is contractually obligated to pay claims under the VSCs;

b.      Whether a refusal to pay claims by Butler constitutes a breach of its VSCs with Class members;

c.      Whether Heritage's failure to fund or otherwise pay claims excuses Butler from its obligation to pay Class members' claims pursuant to the VSCs;

d.      Whether Butler's conduct, representations or omissions at the time the VSCs were entered into renders the contracts voidable at the option of the Class members;

e.      Whether Heritage is contractually obligated to pay Class members' claims pursuant to the VSCs and/or the Insurance Policy between Butler and Heritage;

f.      Whether Class members are third-party beneficiaries of the Insurance Policy between Butler and Heritage;

g.      Whether Heritage breached its contract with Butler by failing to fund or otherwise pay claims under the VSCs; and

h.      Whether the Court should declare the parties' rights under the VSCs, enjoin Butler and/or Heritage from continuing to refuse to pay claims under the VSCs by asserting that they have no obligations thereunder, or declare the VSCs voidable at the Class members' option.

7

10/03/2007 14:59 FAX    GUARANTEED SUBPOENA    @014/030

22.    **Typicality**.  Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and each member of the Class purchased the VSCs at issue and have the same contractual rights with respect to Butler and Heritage.

23.    **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests that are adverse or antagonistic to those of other Class members.

24.    **Superiority**.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts, and would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economics of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

25.    Adequate notice can be given to Class members directly using information maintained in Defendants' records and, if appropriate, through publication notice.

26.    Furthermore, the prosecution of separate actions by individual members of the Class would create a risk of: (i) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members who are not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (iii) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract Against Butler)

27.    Plaintiff asserts this claim against Butler on behalf of himself and the Class, and hereby incorporates as if fully set forth herein all of the above allegations.

28.    Butler is party to, and owes contractual duties under, the VSCs with Plaintiff and other members of the Class.

29.    Butler is contractually obligated to pay claims under the VSCs on behalf of contract holders, and breached its contractual duties to Plaintiff and other members of the Class by routinely and uniformly refusing to pay any of their claims under those contracts.

30.    As a direct result of Butler's breaches of its contractual obligations, Plaintiff and other members of the Class have sustained damages in an amount to be determined.  The measure of damages may include, *inter alia*, the amount paid for the VSCs, as those contracts have no value to Plaintiff and Class members in light of the fact that both Defendants uniformly refuse to pay any claims under those contracts.

## SECOND CLAIM FOR RELIEF
### (Voidable Contracts Against Butler)

31.    Plaintiff asserts this claim against Butler on behalf of himself and the Class, and hereby incorporates as if fully set forth herein all of the above allegations.

32.     As a result of Butler's intentional or unintentional failure to communicate all of the essential terms, conditions, exclusions and limitations of the VSCs and/or its inability or unwillingness to pay valid claims without first receiving payment from Heritage, the VSCs were entered into as a result of fraud or mistake and Butler never formed enforceable contracts with Plaintiff and the Class.

33.     Based on the foregoing, Plaintiff and the Class are entitled to a ruling that the VSCs are voidable by Plaintiff and the Class.  Plaintiff and the Class are also entitled to compensatory damages, including, but not limited to, unreimbursed repair costs or a return of the premiums paid.

## THIRD CLAIM FOR RELIEF
### (Breach of Third-Party Beneficiary Contract Against Heritage)

34.     Plaintiff asserts this claim against Heritage on behalf of himself and the Class, and hereby incorporates as if fully set forth herein all of the above allegations.

35.     Upon information and belief, Heritage issued the Insurance Policy to Butler whereby it agreed to pay claims under the VSCs if Butler failed to perform under those contracts. According to Butler, the Insurance Policy states:

UPON FAILURE OF THE INSURED [*i.e.*, Butler] TO PERFORM UNDER THE SERVICE CONTRACTS [*i.e.*, the VSCs], HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC. SHALL PAY ON BEHALF OF THE INSURED ANY SUMS THE INSURED IS LEGALLY OBLIGATED TO PAY OR SHALL PROVIDE THE SERVICE THAT THE INSURED IS LEGALLY OBLIGATED TO PERFORM ACCORDING TO THE INSURED'S CONTRACTUAL OBLIGATION UNDER THE SERVICE CONTRACTS ISSUED BY THE INSURED...

Thus, as evident by the express contractual language, and the parties' own conduct, Butler and Heritage clearly manifested their intent that the contract primarily and directly benefit Plaintiff and the Class.

10/03/2007 15:00 FAX          GUARANTEED SUBPOENA          ☑017/030

36.    Heritage breached its contract with Butler by refusing to pay the claims of Plaintiff and the Class, thereby causing them damage.

37.    Based on the foregoing, Plaintiff and the Class are entitled to a ruling that the contract between Heritage and Butler creates an obligation on Heritage's behalf to pay the valid claims of Plaintiff and the Class. Plaintiff and the Class are also entitled to compensatory damages, including, but not limited to, unreimbursed repair costs or a return of the premiums paid.

### FOURTH CLAIM FOR RELIEF
#### (Declaratory Relief Against Butler and Heritage)

38.    Plaintiff asserts this claim against Defendants on behalf of himself and the Class, and hereby incorporates as if fully set forth herein all of the above allegations.

39.    Plaintiff and other members of the Class hereby seek declaratory relief in the form of an order declaring their rights under the VSCs and Butler's Insurance Policy with Heritage, including their contractual rights with respect to both Butler and Heritage under those contracts.

40.    The equities support granting the declaratory relief requested herein, as Plaintiff and other Class members have been deprived of the value of the VSCs because of an actual controversy that is ripe for adjudication as to the extent of Defendants' obligations under the contracts.

41.    Granting the declaratory relief requested herein would be just and equitable under the circumstances, particularly because there are believed to be tens of thousands of consumers who purchased VSCs that are still in force, all of whom would benefit from a judicial declaration that Defendants cannot lawfully refuse to pay valid claims solely by "pointing fingers" at each other.

11

10/03/2007 15:00 FAX                    GUARANTEED SUBPOENA                    ☑018/030

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendants as follows:

1.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel of record to represent the Class;

2.    For compensatory damages sustained by Plaintiff and other members of the Class as a result of Defendants' breaches and awarding such prejudgment interest as may be allowed by law;

3.    For imposition of a constructive trust, in favor of Plaintiff and members of the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

4.    For declaratory relief as set forth above, including a declaration that the VSCs are voidable at the option of Plaintiff and the Class;

5.    For restitution, disgorgement and/or other equitable relief as the Court deems proper;

6.    For a permanent injunction prohibiting Defendants and their agents, employees, representatives and all persons acting on their behalf from engaging in the conduct and practices complained of herein;

7.    For reasonable attorneys' fees and costs of suit, including, *inter alia*, expert witness fees; and

8.    For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated this 10th day of September, 2007.

SHEPHERD, FINKELMAN, MILLER
& SHAH, LLC

Scott R. Shepherd  (Fl. Bar No. 069655)
4400 North Federal Highway
Lighthouse Point, Florida 33064
Telephone:     954/943-9191
Facsimile:     954/943-9173
Email: sshepherd@sfmslaw.com

Jeffrey A. Berens
LAW OFFICE OF JEFFREY A. BERENS,
LLC
8691 East 26th Avenue
Denver, Colorado  80238-2549
Telephone:     303/378-8332
Facsimile:     303/395-0393

Douglas P. Dehler
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLC
111 East Wisconsin Avenue, Suite 1750
Milwaukee, Wisconsin 53202
Telephone:     414/226-9900
Facsimile:     414/226-9905

James C. Shah
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLC
35 E. State Street
Media, Pennsylvania  19063
Telephone:     610/891-9880
Facsimile:     610/891-9883
**Attorneys for Plaintiff**

13

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-80835-CIV-HURLEY/HOPKINS

**ROBERT T. KENNEDY,**

      **Plaintiff,**

**v.**

**BUTLER FINANCIAL
SOLUTIONS, LLC, et al.,**

      **Defendants.**

_____/

**CLOSED CASE**

### ORDER TRANSFERRING CASE

    **THIS CAUSE** is before the court upon defendant Heritage Warranty Insurance Risk

Retention Group, Inc.'s motion to dismiss for improper venue or, in the alternative, to transfer venue

[DE # 25]; plaintiff's motion to transfer action [DE # 51]; defendant Butler Financial Solutions,

LLC's motion to dismiss for improper venue or, in the alternative, to transfer venue [DE # 52]; and

defendants' motions to stay discovery [DE # 57, 58].

    This is a putative class action in which plaintiff seeks a determination of liability as between

the two defendants on plaintiff's (and potential class members') vehicle service contracts. These

contracts are typically entered into when a new or used automobile is purchased, and generally

obligate the seller, in this case Butler, to pay for parts failures and breakdowns experienced by the

purchaser's automobile. Butler's financial obligations under the contracts are allegedly insured by

defendant Heritage. Plaintiff alleged that he was unable to obtain payment for repairs under his

vehicle service contract because Butler and Heritage each claimed the other was liable. Plaintiff's

action thus seeks a determination of liability under the contracts as between Butler and Heritage.



EXHIBIT
C

The procedural history of the instant motions is fairly convoluted. When Heritage filed its motion to dismiss and/or transfer on November 28, 2007, related actions were pending in the District of South Carolina and the Northern District of Illinois. By the time plaintiff filed his response to the motion, the South Carolina action had been transferred to Illinois. Heritage's reply thus dropped its request that this case be transferred to South Carolina, but persisted in requesting that this case be dismissed. Plaintiff was permitted to file a sureply opposing the dismissal, and requesting that the case be transferred to Illinois instead. Plaintiff simultaneously filed his own motion requesting transfer to Illinois. The next day, Butler filed its motion to dismiss and/or transfer to Illinois. Finally, both defendants filed motions to stay discovery pending the court's resolution of the motions to dismiss.

A district court may transfer a civil action to another district in which it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The court is persuaded that transfer of this case to the Northern District of Illinois is in the interest of justice. First, defendants' motions raise substantial questions as to whether venue is appropriate in this district. For example, both defendants argue that they were not subject to personal jurisdiction in this district at the time the suit was filed, and therefore do not "reside" in this district for purposes of the venue statute. Defendants also argue that plaintiff's allegation that an agreement between the two defendants was entered into in this district is unsupported, and directly contradicted by afffidavits filed by defendants. Finally, Butler denies that it sold any vehicle service contracts in this district. If defendants were to prevail on all of these arguments – and this order does not decide

2

that they have – then venue would be improper in this district.[1]

Second, two related and consolidated actions are already pending in the Northern District of Illinois. Third, plaintiff, a resident of Colorado, has no particular interest in litigating in this district, and has in fact filed his own motion to transfer to Illinois. Two out of the three parties in this case have thus requested that this case be transferred to Illinois. The remaining party, Heritage, initially requested a transfer as well, albeit to South Carolina rather than Illinois. Upon consideration of all of the circumstances, the court concludes that the interest of justice is served by transfer of this case to the Northern District of Illinois.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.    Defendant Heritage Warranty Insurance Risk Retention Group, Inc's motion to dismiss or transfer venue to the District of South Carolina [DE # 25] is **DENIED.**

2.    Plaintiff's motion to transfer venue to the Northern District of Illinois [DE # 51] is **GRANTED.**

3.    Defendant Butler Financial Solutions, LLC's motion to dismiss for improper venue [DE # 52] is **DENIED**. Defendant Butler Financial Solutions, LLC's motion to transfer venue to the Northern District of Illinois [DE # 52] is **GRANTED**.

4.    Defendants' motions to stay discovery pending the resolution of defendants' motions to dismiss and/or transfer [DE # 57, 58] are **DENIED AS MOOT.**

5.    Pursuant to 28 U.S.C. § 1404(a), this case is **TRANSFERRED** to the United States

---

[1] This court has power to transfer the case to another district even if venue in this district is improper. *See* 28 U.S.C. § 1406(a); *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.").

Order Transferring Case
Kennedy v. Butler Financial Solutions, LLC et al.
Case No. 07-80835-CIV-HURLEY/HOPKINS

District Court for the Northern District of Illinois. The Clerk of the Court is directed

to transmit the file in this case and all pertinent records to the Clerk of the Court for

the Northern District of Illinois.

6.    Any motions not otherwise ruled upon are **DENIED AS MOOT.**

7.    The Clerk of the Court is further directed to enter this case as **CLOSED.**

**DONE** and **ORDERED** in Chambers in West Palm Beach, Florida, this ___ day of March,

2008.

Daniel T. K. Hurley
U.S. District Judge

*Copies provided to counsel of record*

For updated court information, visit unofficial Web site
at http://us.geocities.com/uscts

Westlaw.

16 C.F.R. § 700.11

**C**Effective: [See Text Amendments]

Code of Federal Regulations Currentness
  Title 16. Commercial Practices
    Chapter I. Federal Trade Commission
      Subchapter G. Rules, Regulations, Statements and Interpretations Under the Magnuson-Moss Warranty Act
        Part 700. Interpretations of Magnuson-Moss Warranty Act (Refs & Annos)

    → **§ 700.11 Written warranty, service contract, and insurance distinguished for purposes of compliance under the Act.**

(a) The Act recognizes two types of agreements which may provide similar coverage of consumer products, the written warranty, and the service contract. In addition, other agreements may meet the statutory definitions of either "written warranty" or "service contract," but are sold and regulated under state law as contracts of insurance. One example is the automobile breakdown insurance policies sold in many jurisdictions and regulated by the state as a form of casualty insurance. The McCarran-Ferguson Act, 15 U.S.C. 1011 et seq., precludes jurisdiction under federal law over "the business of insurance" to the extent an agreement is regulated by state law as insurance. Thus, such agreements are subject to the Magnuson-Moss Warranty Act only to the extent they are not regulated in a particular state as the business of insurance.

(b) "Written warranty" and "service contract" are defined in sections 101(6) and 101(8) of the Act, respectively. A written warranty must be "part of the basis of the bargain." This means that it must be conveyed at the time of sale of the consumer product and the consumer must not give any consideration beyond the purchase price of the consumer product in order to benefit from the agreement. It is not a requirement of the Act that an agreement obligate a supplier of the consumer product to a written warranty, but merely that it be part of the basis of the bargain between a supplier and a consumer. This contemplates written warranties by third-party non-

suppliers.

(c) A service contract under the Act must meet the definitions of section 101(8). An agreement which would meet the definition of written warranty in section 101(6)(A) or (B) but for its failure to satisfy the basis of the bargain test is a service contract. For example, an agreement which calls for some consideration in addition to the purchase price of the consumer product, or which is entered into at some date after the purchase of the consumer product to which it applies, is a service contract. An agreement which relates only to the performance of maintenance and/or inspection services and which is not an undertaking, promise, or affirmation with respect to a specified level of performance, or that the product is free of defects in materials or workmanship, is a service contract. An agreement to perform periodic cleaning and inspection of a product over a specified period of time, even when offered at the time of sale and without charge to the consumer, is an example of such a service contract.

SOURCE: 42 FR 36114, July 13, 1977, unless otherwise noted.

AUTHORITY: Magnuson-Moss Warranty Act, Pub.L. 93-637, 15 U.S.C. 2301.

16 C. F. R. § 700.11, **16 CFR § 700.11**

Current through May 22, 2008; 73 FR 29880

Copr. © 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



## Appendix
*Magnuson-Moss and service contract case law*

1) **Whether a repair for a particular defect was included in the terms of the service contract.** See *Clark v. Wynn's Extended Care*, 2007 WL 922244 (N.D. Ill. 2007) (court denied defendant's motion to dismiss a breach of service contract claim brought under Magnuson-Moss when the company that sold the service contract refused to pay for 100% of repairs due to a limited liability clause in the contract); *Tang v. C.A.R.S. Protection Plus, Inc.*, 734 N.W.2d 169 (Wis. Ct. App. 2007) (appellate court affirmed trial court's judgment entered in favor of a plaintiff on a breach of service contract claim under Magnuson-Moss based on whether repairs to vehicle's engine were covered by the contract); *Lysek v. Elmhurst Dodge, Inc.*, 325 Ill.App.3d 536 (2nd Dist. 2001) (appellate court held that claim was actionable under Magnuson-Moss for failing to perform duties under a service contract when the alleged breaches involved failing to satisfactorily repair vehicle defects and improperly charging the customer for repairs covered by the contract); *Priebe v. Automobile Protection Corp.*, 2000 WL 283075 (N.D. Ill. 2000) (court granted summary judgment for vehicle service contract provider on plaintiff's breach of service contract claim under Magnuson-Moss because the contract clearly stated that pre-existing damage to the vehicle was not covered); *Kowalke v. Bernard Chevrolet, Inc.*, 2000 WL 656660 (N.D. Ill. 2000) (court granted defendant's motion to dismiss Magnuson-Moss claim based on breach of service contract because plaintiff did not allege sufficient facts that defendant failed to honor the contract and repair the vehicle); *Williams v. Ford Motor Co.*, 980 F.Supp. 938 (N.D. Ill. 1997) (defendant's motion to dismiss



EXHIBIT

E

denied when plaintiff pled a valid Magnuson-Moss claim based on allegations that service contract provided for reimbursement of fair value of defective vehicle rather than the value of repairs); *Fitzgerald v. Chrysler Corp.*, 1996 WL 473456 (N.D. Ill. 1996) (Magnuson-Moss claim based on allegations that defendant misrepresented the scope of coverage of the service contract was dismissed due to lack of subject matter jurisdiction); *Selig v. BMW of North America, Inc.*, 832 S.W.2d 95 (Tex. App. 1992) (plaintiff brought Magnuson-Moss claim based on breach of service contract and allegations that vehicle dealership refused to refund cost of vehicle after it accelerated when driver tried to brake, but the court granted summary judgment for the dealer because plaintiff introduced only lay testimony that was insufficient to counter defendant's expert testimony).

2) **Whether the service contractor had failed to repair the subject consumer product.** See *Brothers v. Hewlett-Packard Co.*, 2007 WL 485979 (N.D. Cal. 2007) (motion to dismiss denied when plaintiff properly stated a claim under Magnuson-Moss for breach of service contract based on alleged failure to properly repair a computer); *Campbell v. Select Car Co.*, 874 So.2d 391 (La. Ct. App. 2004) (appellate court reversed default judgment in favor of vehicle purchaser who brought claim under Magnuson-Moss for dealership's failure to repair vehicle's transmission); *Haslam v. Lefta, Inc.*, 1994 WL 117463 (N.D. Ill. 1994) (Magnuson-Moss claim based on breach of service contract and allegations that purchased vehicle was improperly repaired survived a motion to dismiss and was retained via supplemental jurisdiction); *Heller v. Travel America, Inc.*, 229 Ill.App.3d 439 (2nd Dist. 1992) (Magnuson-Moss claim against dealership and

manufacturer based on alleged failure to repair the engine and other defects in a motor home was not at issue on appeal).

3)   **Whether the service contract was in fact a warranty.**  See *Nibert v. Al Piemonte Ford Sales, Inc.*, 294 Ill.App.3d 423 (2nd Dist. 1998) (court dismissed plaintiff's Magnuson-Moss claims based on breach of warranty and alleging that purchased vehicle was pre-owned and previously involved in an accident because plaintiff actually had a service contract instead of a warranty); *Saladino v. Team Chevrolet, Inc.*, 242 Ill.App.3d 735 (2nd Dist. 1993) (plaintiff sued under Magnuson-Moss breach of warranty theories but the court dismissed the counts because the warranty was actually a service contract); *Ismael v. Goodman Toyota*, 417 S.E.2d 290 (N.C. Ct. App. 1992) (court drew distinction between a service contract and a warranty under Magnuson-Moss and held that plaintiff could properly recover for breach of warranty for a vehicle the plaintiff took to the dealer many times for repairs and was eventually told the car could not be fixed).

4)   **Whether the plaintiff was a party to the service contract.**  See *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825 (Ariz. 2006) (court denied summary judgment for vehicle dealer because question of fact existed whether dealership was party to service contract that customer purchased from manufacturer); *Hamilton v. O'Connor Chevrolet, Inc.*, 399 F.Supp.2d 860 (N.D. Ill. 2005) (summary judgment granted regarding plaintiff's breach of service contract claim under Magnuson-Moss with respect to the vehicle dealership because the dealer was held not to be a party to the contract).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT T. KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-01862 |
| | ) | |
| v. | ) | Judge George M. Marovich |
| | ) | |
| BUTLER FINANCIAL SOLUTIONS, | ) | |
| LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

PLEASE TAKE NOTICE THAT on the 4th day of August, 2008 we electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division,

**(i) Butler Financial Solutions, LLC's Answer to Plaintiff's First Amended Class Action Complaint and Cross-Claim Against Heritage Warranty Risk Retention Group,** and

**(ii) Memorandum in Support of Butler's Motion to Dismiss Counts I, III and V of Plaintiff's First Amended Class Action Complaint.**

Respectfully submitted,

LAW OFFICES OF MICHAEL MURPHY TANNEN, P.C.

By: s/ *Michael M. Tannen*

Attorneys for Butler Financial Solutions, LLC

Law Offices of Michael Murphy Tannen, P.C.
Michael M. Tannen (#6204635)
39 S. LaSalle Street, Suite 905
Chicago, IL 60603
(312) 641-6650

## CERTIFICATE OF SERVICE

Michael M. Tannen, the attorney for Defendant Butler Financial Solutions, LLC, certifies that a true copy of the foregoing pleading has been filed electronically in the ECF system and service accomplished pursuant to ECF as to counsel of record as follows:

George Vurdelja, Jr.
Harrison & Held LLP
333 W. Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 753-6161
(312) 332-1150 (Fax)

Scott R. Shepherd
Shepherd Finkelman, Miller & Shah, LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
(954) 943-9191
(954) 943-9173
**Attorneys for Plaintiff**

Paul R. Walker-Bright
Reed Smith LLP
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606
(312) 207-1000
(312) 207-6400 (Fax)
E-Mail: pwalkerbright@reedsmith.com

David M. Schlecker
Reed Smith LLP
599 Lexington Avenue
New York, NY 10017
(212) 521-5400
(212) 521-5450 (Fax)
**Attorneys for Warrantech Automotive, Inc.**

2

John Kenneth Kallman
Law Offices of John Kenneth Kallman
221 North Lasalle Street
Suite 1200
Chicago, IL 60601-1305
(312) 578-1515
E-Mail: jkkallman@sbcglobal.net

Joel B. Samson
Thomas M. Dee
Husch & Eppenberger, LLC
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105-3441
(314) 480-1500
E-Mail: joel.samson@husch.com
        Tom.dee@husch.com
**Attorneys for Heritage Warranty Insurance**

except for the following who were served *via* regular mail by depositing the same in the United
States post box at 39 S. LaSalle Street, Chicago, Illinois, postage fully prepaid, before 6:00 p.m.
this 4th day of August, 2008:

Douglas P. Dehler
Shepherd, Finkelman, Miller & Shah, LLC
111 East Wisconsin Ave., Ste. 1750
Milwaukee, WI 53202
Telephone: (414) 226-9900
Facsimile: (414) 226-9905

James C. Shah
Shepherd, Finkelman, Miller & Shah, LLC
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880

James E. Miller
Shepherd Finkelman Miller & Shah, LLC
65 Main Street
Chester, CT 06412


s/ Michael M. Tannen