IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT T. KENNEDY, et al.,     )
                                 )
            Plaintiff,      )
                                 )     No. 08 C 1862
       vs.               )
                                 )     JUDGE MAROVICH
BUTLER FINANCIAL SOLUTIONS,     )
LLC, et al.                   )
                                 )
            Defendants.    )

**HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC.'S CROSS-CLAIM AGAINST WARRANTECH AUTOMOTIVE, INC., CROSS-CLAIM AGAINST BUTLER FINANCIAL SOLUTIONS, LLC, THIRD PARTY COMPLAINT AGAINST WARRANTECH CORPORATION, THIRD PARTY COMPLAINT AGAINST VEMECO, INC., THIRD PARTY COMPLAINT AGAINST WARRANTECH AUTOMOTIVE OF FLORIDA, INC., THIRD PARTY COMPLAINT AGAINST HARRIS G. MILLER, THIRD PARTY COMPLAINT AGAINST MARDAN REINSURANCE LIMITED, THIRD PARTY COMPLAINT AGAINST MARION REINSURANCE, LTD., THIRD PARTY COMPLAINT AGAINST FUCILLO REINSURANCE COMPANY, LTD., THIRD PARTY COMPLAINT AGAINST DAMAR REINSURANCE, LTD., THIRD PARTY COMPLAINT AGAINST BRADFORD REINSURANCE CO., LTD., THIRD PARTY COMPLAINT AGAINST ALRENDAN RE., LTD., AND THIRD PARTY COMPLAINT AGAINST 12GK REINSURANCE, LTD.**

Comes Now Defendant Heritage Warranty Insurance Risk Retention Group, Inc.

(hereinafter "HRRG"), by and through its counsel, and for its Cross-claim against Warrantech

Automotive, Inc., Cross-claim against Butler Financial Solutions, LLC, Third Party Complaint

against Warrantech Corporation, Third Party Complaint against Vemeco, Inc., Third Party

Complaint against Warrantech Automotive of Florida, Inc., Third Party Complaint against Harris

G. Miller, Third Party Complaint against Mardan Reisurance Limited, Third Party Complaint

Marion Reinsurance, Ltd., Third Party Complaint Fucillo Reinsurance Company, Ltd., Third

Party Complaint Damar Reinsurance, Ltd., Third Party Complaint Bradford Reinsurance, Ltd.,

Third Party Complaint Alrendan Re., Ltd., and Third Party Complaint 12GK Reinsurance, Ltd.,

states as follows:

## THE PARTIES

1.      HRRG is a South Carolina corporation in good standing and duly licensed by the State

of South Carolina to transact business under the Federal Liability Risk Retention Act (15 U.S.C.

§3901, et seq.).  HRRG's principal place of business is within the State of South Carolina.

2.      Warrantech Automotive, Inc. ("Warrantech Automotive") is a Connecticut corporation

with its principal place of business located in the State of Texas.  Warrantech Automotive, Inc. is

a wholly owned subsidiary of Warrantech Corporation.

3.      Warrantech Corporation ("Warrantech Corporation") is a Delaware corporation with its

principal place of business located in the State of Texas.

4.      Vemeco, Inc. ("Vemeco") is a Delaware corporation with its principal place of business

located in the State of Texas.  Vemeco is a subsidiary of Warrantech Corporation.

5.      Warrantech Automotive of Florida, Inc. ("Warrantech Automotive of Florida") is a

Florida Corporation with its principal place of business located in the State of Texas. Warrantech

Automotive of Florida is a subsidiary of Warrantech Corporation.  (Where appropriate,

Warrantech Automotive, Warrantech Corporation, Vemeco, and Warrantech Automotive of

Florida will collectively be referred to as the "Warrantech Entities").

6.      Butler Financial Solutions, LLC ("Butler") is a limited liability corporation organized

under the laws of the State of Delaware.  Butler's principal place of business is located in the

State of North Carolina.

7.      Harris G. Miller ("Miller") is a citizen and resident of the State of North Carolina who

at all times relevant hereto held himself out as the President of Butler and, upon information and

belief, also served as the Manager of Butler. At present he remains employed by Butler as a consultant. Between 1989 and 1999, Miller worked for Warrantech Corporation, including five years as its chief financial officer.

8.     Mardan Reisurance Limited ("Mardan") is a reinsurance company with its principal place of business in the State of New Jersey at 209 Factory Ave., Syracuse, New York 13208.

9.     Marion Reinsurance, Ltd. ("Marian") is a reinsurance company with its principal place of business in the State of New York at 1045 Route 109, Suite 105, Lindenhurst, New York 11757.

10.     Fucillo Reinsurance Company, Ltd. ("Fucillo") is a reinsurance company with its principal place of business in the State of Texas at 3680 Hwy 121, Suite 100, Bedford, Texas 76021.

11.     Damar Reinsurance, Ltd. ("Damar") is a reinsurance company with its principal place of business in the State of New York at 209 Factory Ave., Syracuse, New York 13208.

12.     Bradford Reinsurance, Ltd. ("Bradford") is a reinsurance company with its principal place of business in the State of New Jersey at 2791 Rt. 73 South, Maple Shade, New Jersey 08052.

13.     Alrendan Re., Ltd. ("Alrendan") is a reinsurance company with its principal place of business in the State of New Jersey at 204 W. Rt. 130, Burlington, New Jersey 08016.

14.     12GK Reinsurance, Ltd. ("12GK") is a reinsurance company with its principal place of business in the State of New York at 1045 Route 109, Suite 105, Lindenhurst, New York 11757.

15.     Mardan, Marion, Fucillo, Damar, Bradford, Alrendan, and 12GK, which are Producer Owner Reinsurance Companies/Captives ("Third Party PORC Defendants"), are, upon information and belief, all reinsurance companies domiciled outside the United States.

16.     Third Party PORC Defendants each entered into individual Quota Share Reinsurance Agreements with HRRG.  *See*, Quota Share Reinsurance Agreements between Third Party PORC Defendants and HRRG, copies of which are attached hereto as <u>Exhibit A</u> (the "Quota Agreements").

17.     This Court has jurisdiction over the parties and matters alleged herein pursuant to 28 U.S.C. § 1332 and venue herein is appropriate pursuant to 28 U.S.C. § 1391.  Article XVII of the Quota Agreements provides that Third Party PORC Defendants shall "submit to the jurisdiction of a court of competent jurisdiction within the United States" at the request of HRRG in the event Third Party PORC Defendants fail to pay any amount claimed to be due under the Quota Agreements.  *See*, <u>Exhibit A</u>.

18.     Venue for HRRG's Third Party Complaint against Third Party PORC Defendants is appropriate in the United States District Court for the Northern District of Illinois.  Article XVIII of the Quota Agreements provides that "In the event, however, that there should arise a difference of opinion or interpretation of the Agreement, or any dispute arising from or relating to the performance of this Agreement. . . either party may make use of the federal or state courts of the State of Illinois for the purposes of resolving such dispute."  *See*, <u>Exhibit A</u>.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS

### Warrantech Corporation's Orchestration of the Warrantech Program

19.     Warrantech Corporation, through itself, its parent company, its wholly owned subsidiaries and/or its affiliates, including but not limited to Warrantech Automotive and Vemeco, holds itself out as a leading provider of service contracts and after-market warranties.

20.     The Warrantech Entities pride themselves on being able to capture, maintain, track and analyze all relevant information regarding their service contract plans.  In fact, the Warrantech

Entities have developed and operate proprietary computer software that allows the Warrantech Entities to maintain millions of service contract plans.

21.    The Warrantech Entities use their experience and the information gained from their plans to design, develop, market and act as a third-party administrator for service contracts in three major business segments: automotive, consumer products and international.

22.    The participants in a service contract program typically include consumers, dealers, agents, marketers, distributors, a provider/obligor, an insurer of the provider/obligor, one or more reinsurers, and an administrator.

23.    At issue in this lawsuit is a program dealing with forms of a vehicle service contract ("VSC") created and organized by Warrantech Corporation and the Warrantech Entities (the "Warrantech Program").

24.    With respect to the Warrantech Program, the Warrantech Entities used their knowledge gained by participating in other service contract programs to design a program to cover vehicle service contracts.

25.    Once they had designed the program, the Warrantech Entities needed to entice dealers, obligors, and insurers to participate in the program.

26.    Jeanine M. Folz ("Folz") is also Senior Vice President, Insurance Services and Assistant Corporate Secretary for Warrantech Corporation.  Throughout the course of the Warrantech Program, and until today, Folz has been one of the key voices of the Warrantech Entities and the Warrantech Entities have acted through Folz, as well as others.

## The Warrantech Entities Enlisted Dealers and Obligors
## To Participate in the Warrantech Program

27.     The Warrantech Entities enlist franchised and independent automobile dealers, leasing companies, repair facilities, retail stores, financial institutions and other specialty marketers (collectively "dealers") to sell the VSCs.

28.     The Warrantech Entities market programs such as the Warrantech Program to dealers as a way for the dealers to enhance their profitability in connection with the sale of automobiles, light trucks, recreational vehicles and automotive components.

29.     Because the VSC is typically sold as a contract between a third party obligor and the VSC holder, the Warrantech Entities enlist an obligor to be legally responsible for the cost of valid repairs or replacements under the VSC.

30.     Prior to April 1, 2000, one of Warrantech Corporation's subsidiaries served as the obligor on a number of vehicle service contract programs.

31.     Warrantech Corporation subsequently enlisted Butler to act as the named provider/obligor on VSCs sold through the Warrantech Entities.

32.     Upon information and belief, Butler was created and sponsored by Warrantech Corporation, its parent, affiliates or subsidiaries, as a special purpose entity ("SPE") to fulfill a specific Warrantech Corporation purpose of isolating financial risk associated with the Warrantech Program.

33.     Beginning on or about April 1, 2000, Butler has served as the named Provider/Obligor under numerous VSC programs designed, developed, and marketed by the Warrantech Entities.

34.     For several years initially, Warrantech Corporation did not account for Butler's VSC obligor business in Warrantech Corporation's financial statements.

35.     Following a review by the Securities and Exchange Commission's Division of Corporation Finance ("SEC"), Warrantech Corporation restated its financial statements for the fiscal years ending on March 31, 2001, 2002 and 2003, changing its method of accounting for its relationship with Butler.

36.     At all times relevant hereto, Butler's VSC obligor business is included in Warrantech Corporation's statement of financial results (as restated).

37.     At the insistence of the SEC, Warrantech Corporation has adopted a policy to treat the Butler obligor VSCs as if they are Warrantech Corporation's, and recognizes Butler's revenues under those contracts as its own.  Warrantech Corporation also includes, as its own liabilities, the liabilities of Butler under the VSCs.

38.     Warrantech Corporation has also referred to itself as the obligor on the Warrantech Program business.   For example, in dealing with issues arising out of the Warrantech Program, on at least one occasion, when negotiating a line of credit versus a letter of credit, Christopher Ford of Warrantech Corporation stated that "I will work with you to get Heritage included in the letter.  Since Warrantech (through Butler) is the obligor both need to be mentioned."

39.     According to Warrantech Corporation's public filings, Butler's business operations "are included in the Company's financial results due to its [Butler's] close transactional ties with the Company."

40.     Butler maintains little, if any, of the data related to the Warrantech Program or the VSC's sold under the program.  In fact, upon HRRG's request to audit Butler, HRRG was directed to "Warrantech," and specifically Jeanine Folz, as the keeper of the data, to coordinate the audit.

41.      Upon information and belief, Butler has little or no business activity other than that which is derived from the Warrantech Entities.

**The Warrantech Entities Enlisted HRRG To Participate in the Warrantech Program**

42.      As the provider/obligor, Butler is obligated to pay any valid claims submitted under a VSC which are approved for payment.

43.      VSC providers/obligors such as Butler are required under the laws of many states to meet certain financial responsibility requirements prior to selling VSCs in that state.  Among other options, VSC providers/obligors may satisfy financial responsibility requirements by purchasing insurance coverage commonly referred to in the industry as reimbursement insurance policies.

44.      Having created Butler as a Special Purpose Entity, Warrantech Corporation needed to find an insurer for Butler.  To this end, Warrantech Corporation sought out HRRG and negotiated a reimbursement insurance policy to satisfy Butler's financial responsibility requirements as the provider/obligor of the Warrantech Program.

45.      "As Senior Vice President of Insurance Services for Warrantech Corporation, [Folz's] responsibilities include: 1) securing the insurance that backs the service contracts marketed and administered by [Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco]; 2) assisting the insurance carriers in developing programs to insure the VSC's; 3) ensuring that [Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco] adhere to the insurance carriers' underwriting and claims handling guidelines for the VSC's; 4) monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss cost for the programs; and 5) ensuring the VSC program's compliance with applicable regulations."  *See*, September 18, 2007 Affidavit of Jeanine M. Folz filed in the

United States District Court for the District of South Carolina, a copy of which is attached hereto as <u>Exhibit B</u> ("Folz Affidavit"), ¶ 4.

46. During negotiations with HRRG in connection with obtaining an insurance policy for Butler, as well as throughout the course of the parties' relationship in connection with the Warrantech Program, the Warrantech Entities (through Folz and others) negotiated with HRRG, for themselves and on behalf of Butler.

47. Under the laws of many states, Butler could purchase one of two kinds of reimbursement insurance to prove its financial responsibility. Butler could purchase a policy that either: 1) reimburses or pays on behalf of Butler any covered sums Butler is legally obligated to pay, or 2) upon <u>Butler's failure to perform</u>, provides the service which Butler is legally obligated to perform according to the VSCs it sold to consumers. An insurer selling a policy which reimburses or pays on behalf of Butler any covered sums Butler is legally obligated to pay would charge Butler much more in premium than that which is charged for a policy providing coverage only in the event of Butler's nonperformance.

48. Inherent in a nonperformance coverage agreement is the good faith understanding that the provider/obligor will meet its obligations to VSC holders to the extent it is financially capable. For this reason, coverage afforded upon the failure of a provider/obligor to perform its legal obligations is often called a "Bankruptcy Policy."

49. On May 1, 2001 when Butler applied for coverage from HRRG, Miller specifically declared and warranted in writing to HRRG that Butler was "financially sound, solvent and current within 90 days on payment of legal liabilities to purchasers and insurers of service contracts" *See*, Application for Membership/Insurance Coverage signed by Miller, a copy of which is attached hereto as <u>Exhibit C</u> (the "Miller Declaration of Solvency").

50.     Based upon new information contained in an affidavit executed by Miller ("Miller Affidavit") on September 18, 2007, HRRG is informed and believes the Miller Declaration of Solvency may have been false when presented to HRRG in 2001, and likely was false as of January 9, 2002 when Butler accepted coverage from HRRG.  *See*, September 18, 2007 Affidavit of Harris G. Miller filed in the United States District Court for the District of South Carolina, a copy of which is attached hereto as Exhibit D ("Miller Affidavit").

51.     According to the Miller Affidavit, Butler in 2001 faced "the specter of bankruptcy and the reputations and market share of both Butler and Warrantech [Corporation] in the VSC industry was threatened by…an event entirely outside of Butler's control."  Miller Affidavit, ¶70.

52.     To keep Butler out of bankruptcy and to preserve the reputation of each, Butler's sponsor Warrantech Corporation loaned Butler a sum in the millions of dollars in 2001 which resulted in Butler owing Warrantech Corporation in excess of $10,000,000.

53.     If the Miller Affidavit is true, the Butler-Heritage insurance transaction occurred at a time that Butler was insolvent, a material fact that was not only concealed but also affirmatively misrepresented until September 2007.

54.     Joel San Antonio, as Warrantech Corporation's Chief Executive Officer, and someone with knowledge of the Warrantech Program, was aware of Butler's financial obligations to Warrantech Corporation and, therefore, Butler's insolvency.

55.     Butler, the Warrantech Entities (through Folz and others) and Miller intended for HRRG to rely upon the Miller Declaration of Solvency, which was made and provided to HRRG for the purpose of inducing HRRG to provide coverage.

56.     HRRG did in fact rely upon the Miller Declaration of Solvency and on or about December 17, 2001 HRRG issued Vehicle Service Contract Reimbursement Insurance Policy

number HWMIRRG-SC-WAR-001 (the "Insurance Policy") to Butler. Miller, as President of

Butler, accepted the Insurance Policy on January 9, 2002, a copy of which is attached hereto as

Exhibit G ("Insurance Policy").

57.     As may be seen by reference to the Insuring Agreement of the Insurance Policy, Butler

chose to purchase, and HRRG agreed to sell, the less expensive nonperformance or "Bankruptcy

Policy" of reimbursement insurance coverage. HRRG's insurance commitment, subject to other

terms and conditions, is triggered by Butler's good faith nonperformance of its obligations to its

VSC holders.

58.     The Insurance Policy has been endorsed in certain instances to comply with various

state-specific requirements, which may include first dollar coverage in some states.

59.     Consistent with the covenant of good faith and fair dealing, it was mutually understood

and required that Butler would honor its obligations to its contract holders to the fullest extent of

its financial resources.

60.     To the extent Butler, either itself or through its sponsor, is financially capable of paying

claims under its VSCs, it must do so.

61.     In the event Butler and its sponsor become bankrupt, coverage is afforded to Butler

beginning at the attachment point stated in the Insurance Policy.

62.     Notwithstanding the Miller Affidavit, HRRG is informed and believes that Butler,

through its sponsor, Warrantech, remains financially sound and solvent. Butler must not be

allowed to hide behind a debt to its sponsor in an effort to avoid its promises made to those

consumers who purchased Butler VSCs. If Butler was truly insolvent as a result of the 2001

bail-out loan from its sponsor, Warrantech, then it was insolvent each time it sold a VSC to tens

of thousands of consumers across the country, while simultaneously concealing that condition

from consumers, regulators and its insurer. Either way, Miller, Butler and the Warrantech

Entities misrepresented Butler's financial condition to obtain coverage from HRRG so that

Warrantech could market VSCs through Butler.

63.     The Insurance Policy provides, in IV CONDITIONS, Paragraph 6, "[A]ny act of

insolvency on the part of the Insured shall immediately render this policy cancelled as of such

date." This provision is intended to prevent Butler from selling VSCs insured by HRRG while

Butler is insolvent.

64.     The Insurance Policy contains a claims made provision. Coverage afforded to Butler

by the Insurance Policy is excess of loss. The risk was underwritten and reserved on these bases

by HRRG, in reliance upon the Miller Declaration of Solvency.

65.     Upon insolvency of Butler and its sponsor, subject to other terms and conditions of the

Insurance Policy, including but not limited to the cancellation terms, the understanding that

Butler intended to fulfill its obligations to consumers, and that Butler would not continue to sell

contracts if it is insolvent, the attachment point for coverage to Butler is equal to the Loss

Reserve Fund as stated in the Insuring Agreement, Section I.

66.     The Insurance Policy was renewed annually until cancelled by HRRG on December 29,

2006.

67.     As a result of information provided in the Miller Affidavit in September 2007, the

Insurance Policy may appropriately be deemed void as of its effective date. Specifically, the

Insurance Policy provides, in IV CONDITIONS, paragraph 19, "This policy shall be void if the

Insured has concealed or misrepresented or created any material fact or circumstance concerning

this insurance or the subject thereof or in case of any fraud, attempted fraud or submission of

false or inflated claims or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, whether before or after a Loss."

## The Warrantech Entities Enlisted Reinsurance Companies, Including Third Party PORC Defendants, To Participate In The Warrantech Program

68.     As the orchestrator of the Warrantech Program, and in an effort to provide the participants with long-term comfort in the program, and to give the dealers a mechanism that allows them to share in insurance profitability, upon information and belief, the Warrantech Entities assisted dealers in forming reinsurance companies called producer owned reinsurance companies/captives ("PORCs").

69.     The creation of PORCs is not uncommon in VSC programs designed, developed, marketed, and administered by the Warrantech Entities, and the contractual arrangements in those VSC programs are typically very similar.  Dealers participating in VSC programs designed, developed, marketed, and administered by the Warrantech Entities, such as WarrantybyNet, which sold VSCs under the Warrantech Program to customers via the Internet, create PORCs as captive off-shore companies that the dealers partially or wholly own.  The PORCs retain and/or reinsure the risk on all VSC policies written under the various VSC programs.

70.     In this case, the dealers involved in the Warrantech Program created seven PORCs created by the dealers involved in the Warrantech Program are the Third Party PORC Defendants Mardan, Marion, Fucillo, Damar, Bradford, Alrendan, and 12GK.  The dealers also created two additional PORCs, KDM Group Reinsurance, LTD. and Massey Reinsurance Limited, which, along with the Third Party PORC Defendants, reinsure, under a 100% quota share arrangement, the VSCs which name Butler as the provider/obligor.

71.     Each of the PORCS, including the Third Party PORC Defendants, entered into Quota Agreements with HRRG.  In addition to the Quota Agreements, each of the PORCs, including the Third Party PORC Defendants, entered into Reinsurance Custodial Agreements with HRRG. *See*, Reinsurance Custodial Agreements between Third Party PORC Defendants and HRRG, copies of which are attached hereto as <u>Exhibit F</u> (the "Custodial Agreements").

72.     Under the Warrantech Program, and pursuant to its agreement and understandings with the Warrantech Entities and the terms of its reinsurance agreements with the PORCs, HRRG acted only as a fronting insurer.  For a fee, it issued the Insurance Policy, made any filings required by state laws (which were not the responsibility of others under the Administrative Agreement and/or Addendum, the Insurance Policy, or otherwise), paid any premium taxes and assessment fees, and ceded the entire risk of the Insurance Policy to the PORCs, whose owners were the dealers working with the Warrantech Entities to produce VSC business for Butler.

73.     In connection with the Insurance Policy, HRRG: 1) managed the imprest accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; and 5) verified certain VSC claims adjudications done by the Warrantech Entities.

74.     A portion of the funds paid by VSC purchasers for the extended warranty protection provided by Butler was deposited into reinsurance custodial accounts for the benefit of HRRG. The Custodial Agreements between HRRG and the PORCs specified the manner in which these deposits were calculated and made into the reinsurance custodial accounts.

75.     The Warrantech Entities, as administrators of the Warrantech Program, were obligated to provide a monthly report to the PORCs regarding, among other things, the net written premiums, ceding expenses and allowances to HRRG, losses and loss adjustments paid by

HRRG, and loss reserves remaining at the end of the month. Article VI of the Quota Agreements outlines the information the Warrantech Entities were obligated to regularly provide to the PORCs. Upon information and belief, the Warrantech Entities regularly reported such information to the PORCs.

76.     The terms of each Custodial Agreement entered into by PORCs call for the PORCs to deposit certain assets into reinsurance custodial accounts sufficient to pay valid VSC claims. Section 2 of the Custodial Agreements provides that the PORCs "shall deliver or transfer to the Custodian Securities with a market value of not less than the full amount of the [PORCs]' Obligations." Section 4.3 of the Custodial Agreements defines the PORCs' "Obligations" to mean "losses and allocated loss expenses paid by [HRRG], but not recovered from the [PORCs], reserves for losses reported and outstanding, reserves for losses incurred but not reported, and reserves for allocated loss expenses and unearned premiums." *See*, Exhibit F.

77.      Funds placed in the reinsurance custodial accounts are to be utilized only for payment of claims made by consumers, and for refunds owed to a consumer pursuant to a VSC cancellation. Section 4.3 of the Custodial Agreements provides that funds may only be withdrawn to, among other things, "pay or reimburse [HRRG] for [HRRG's] share under the [Quota Agreement] regarding any losses and allocated expenses paid by [HRRG], but not recovered from the [PORCs] or for unearned premiums due to [HRRG], if not otherwise paid by the [PORCs]." *See*, Exhibit F.

78.     Any shortfalls in monies owed by the PORCs to HRRG were to be promptly paid by the PORCs. Article VI of the Quota Agreements obligates the PORCs to remit to HRRG by wire transfer any balance due to HRRG after the premiums, expenses, losses, and reserves are balanced monthly. *See*, Exhibit A.

79.      When and if the attachment point on the Insurance Policy is ever reached and once Butler and its sponsor are bankrupt, 100% of HRRG's liability under the Insurance Policy is reinsured by the PORCs whose owners have a business relationship with the Warrantech Entities.  Article II of the Quota Agreements provides that HRRG "shall cede and the [Third Party Defendant] shall accept as quota share reinsurance a 100% quota share of [HRRG]'s entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date."  *See*, Exhibit A.

80.      The PORCs' assumption of liability for all of HRRG's liability is instantaneous. Article IV of the Quota Agreements specifies that the PORC' liability for HRRG's entire liability attaches "simultaneously and obligatorily with that of" HRRG.  *See*, Exhibit A.

81.      The PORCs are also obligated to assume 100 percent of HRRG's liability for all loss settlements.  Article VII of the Quota Agreements provides that "All loss settlements made by [HRRG], whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the [PORCs], and the [PORCs] agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement."  *See*. Exhibit A.

82.      Third Party PORC Defendants are also contractually obligated to indemnify HRRG against, among other things, all claims, demands, suits, damages, awards, and punitive damages. In Article VIII of the Quota Agreements, Third Party PORC Defendants agreed to accept liability for "100% of [HRRG]'s liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or [HRRG]'s insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance

of the Service Contracts covered hereby or the insurance thereof by [HRRG], the handling of claims thereon, or the violation of breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs." *See*, Exhibit A.

83.     The sum of assets in these reinsurance custodial accounts provided for by the Custodial Agreements equals the attachment point of the excess of loss coverage afforded to Butler by the Insurance Policy once Butler and its sponsor are bankrupt.

84.     When HRRG cancelled the Insurance Policy on December 29, 2006, neither Butler nor its sponsor had declared bankruptcy and the attachment point under the Insurance Policy had not been reached.

85.     Even if the Insurance Policy was not cancelled, Butler individually and its sponsor have not declared bankruptcy and the attachment point for coverage has not been met as of this date.

86.     The Third Party PORC Defendants' reinsurance custodial accounts related to specific programs at issue herein have been completely depleted and there are no funds in those accounts immediately available to continue to pay losses and cancellations for these producer's programs.

87.     Under the terms and provisions of the Quota Agreements and Custodial Agreements, the Third Party PORC Defendants are obligated to fund the custodial accounts in an amount sufficient to continue to pay losses and cancellations under the Warrantech Program.

88.     For reasons not disclosed to HRRG, Butler, as the obligor on the VSCs, is refusing to pay consumer claims, causing a breach of thousands of individual agreements Butler made with consumers.

89.     As a result of Butler's failure to honor its obligations to its contract holders, HRRG has been inundated with hundreds of thousands of dollars of VSC claims which are the responsibility of Butler.

90.     Subject to a full reservation of rights and despite cancellation, HRRG has funded claims payments to consumers on behalf of Butler.  To date, HRRG's payments on behalf of Butler exceed $368,000.  This includes funding of certain imprest accounts in the sum of $220,000 and direct payments to VSC holders, subject to a reservation of rights, in excess of $148,000.

91.     Under the terms and provisions of the Quota Agreements and Custodial Agreements, the Third Party PORC Defendants are obligated to assume 100 percent of all claims and losses as a result of Butler's failure to honor its obligations to Butler's VSC contract holders.  To date, the Third Party PORC Defendants have not done so.

92.     The Third Party PORC Defendants have breached the Quota Agreements with HRRG in each of the following respects, which are not all inclusive:

        a.      Failure to accept as quota share reinsurance 100 percent quota share of HRRG's entire liability under all policies, certificates, contracts, and other evidences of insurance cover the liability arising under the VSCs;

        b.      Failure to deposit into the reinsurance custodial accounts their respective obligations, including but not limited to losses, expenses, and reserves;

c.      Failure to remit to HRRG the balance of ceding expenses, allowances, losses, and loss adjustment expenses paid by HRRG that exceeded the net written premiums received;

d.      Failure to pay their proportionate share of all loss settlements made by HRRG for VSC claims;

e.      Failure to pay their proportionate share of all loss adjustment expenses incurred by HRRG for VSC claims;

f.      Failure to secure delivery to HRRG of an irrevocable, clean, and unconditional letter of credit in the face amount of 100 percent of the Third Party PORC Defendants' proportion of required reserves;

g.      Failure to indemnify HRRG against all claims, demands, and suits, against HRRG, as well as damages, awards, and punitive damages, arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of repairs; and

h.      Failure to pay valid VSC claims that Butler refuses to pay.

93.     The Third Party PORC Defendants have breached the Custodial Agreements with HRRG in each of the following respects, which are not all inclusive:

a.      Failure to deposit into the reinsurance custodial accounts their respective obligations, including but not limited to losses, expenses, and reserves;

b.      Failure to remit to HRRG the balance of ceding expenses, allowances, losses, and loss adjustment expenses paid by HRRG that exceeded the net written premiums received;

c. Failure to pay their proportionate share of all loss settlements made by HRRG for VSC claims;

d. Failure to pay their proportionate share of all loss adjustment expenses incurred by HRRG for VSC claims;

e. Failure to deposit additional Securities into the reinsurance custodial accounts within forty-five days after the end of the quarterly calendar to maintain the required aggregate market value of the custodial accounts;

f. Failure to pay valid VSC claims that Butler refuses to pay; and

g. Failure to provide HRRG access to all papers in their possession applicable to the Custodial Agreements and custodial accounts.

## Pricing of the Warrantech Program

94. The Warrantech Entities represent to the public that their programs provide clients with the opportunity for increased revenue and income without incurring the costs and responsibilities of operating their own programs.

95. With respect to the Warrantech Program at issue here, in order to entice the dealers, obligors and insurers to participate in the program, the Warrantech Entities represented to these entities that the VSCs sold under the Warrantech Program would be appropriately priced to provide each entity a profit without downside exposure.

96. In order to accomplish this, the Warrantech Entities represented that they would set prices to be charged for the VSCs under the Warrantech Program such that the money collected from the VSC holders would be sufficient to pay all valid VSC claims over the life of the VSCs. Additionally, the Warrantech Entities represented themselves to be capable of properly administering the VSC claims.

97.     For example, upon information and belief, the Warrantech Entities represented to Butler, as the obligor, that Butler would not have downside exposure because the Warrantech Entities would price the VSCs and administer submitted claims such that the reserves withheld from the premiums paid by the VSC holders (held in the PORC accounts) would be sufficient to pay all claims and the obligor's payment obligation would never come to fruition.

98.     Upon information and belief, the Warrantech Entities represented to the dealers and the PORCs created by such dealers that through proper pricing and administration of the Warrantech Program not only would the PORCs not have any downside exposure, but that the dealers (through their PORCs) would likely recognize additional profits on the back end of the Warrantech Program.  The back end profits would result if there were excess funds in the PORC accounts when all VSC claims under the Warrantech Program were paid at the time the VSCs had expired.

99.     The Warrantech Entities made similar representations to HRRG as the direct insurer on the Warrantech Program.  HRRG was led to believe that HRRG would merely be a fronting insurer and, among other things, that the Warrantech Program would be priced properly, that the Warrantech Program would be administered properly, and that HRRG would not have any downside exposure.  As a means for further insulating HRRG from downside exposure, and in order to create the back end profits for the dealers through their PORCs, the Warrantech Entities had HRRG cede 100% of the insurance risk on the Warrantech Program to the PORCs.

**The Warrantech Entities' Front End and Back End Responsibilities As Creator and Administrator of the Warrantech Program**

100.     The Warrantech Entities set themselves up as the third-party administrator of the Warrantech Program.  As a result, the Warrantech Entities were in a position to evaluate, approve and administer claims submitted by VSC holders.

101.     Warrantech Automotive, Warrantech Automotive of Florida and Vemeco performed and/or were obligated to perform this administrator function pursuant to a March 15, 2001 Administrative Agreement (as amended) ("Administrative Agreement") and Claims Handling Addendum to the Administrative Agreement, Addendum A (as amended) ("Addendum") entered into between HRRG and Warrantech Automotive, Warrantech Automotive of Florida and Vemeco.  Folz signed the Administrative Agreement, as Senior Vice President, on behalf of Warrantech Automotive, Warrantech Automotive of Florida and Vemeco, a copy of which is attached hereto as Exhibit H ("Administrative Agreement").

102.     Warrantech Corporation, through Folz and others, had responsibility, among other things, for ensuring that Warrantech Automotive, Warrantech Automotive of Florida and Vemeco adhered to the insurance carrier's underwriting and claims handling guidelines for the VSC's as well as monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss costs for the programs.  *See*, Folz Affidavit, ¶ 4.

103.     Notices required or permitted to be given under the Administrative Agreement are to be sent to Jeanine Folz at Warrantech, with copies to the Chief Executive Officer and Corporate General Counsel at Warrantech Corporation.

104.     Notices required under the Addendum were initially to be sent to Jeanine Folz, Senior Vice President, Warrantech Corporation.

105.     Harris G. Miller, as President of Butler, acknowledged and agreed to the Administrative Agreement on behalf of Butler.

106.     Pursuant to the Administrative Agreement and the Addendum, Warrantech Automotive, Warrantech Automotive of Florida and Vemeco explicitly agreed to perform a number of functions for the Warrantech Program.

107.     Through Jeanine Folz, Christopher Ford and others, Warrantech Corporation oversaw, and/or actively participated in, the administrative functions called for in the Administrative Agreement.

108.     Warrantech Corporation treated the Administrative Agreement as if it were its own. Folz as Senior Vice President, Insurance Services for Warrantech Corporation, referred to the arrangement as "our Administration Agreement."  Moreover, Christopher Ford, Folz and Richard Gavino of Warrantech Corporation attended meetings with HRRG, corresponded with HRRG and/or corresponded with other participants in the Warrantech Program in efforts to protect the viability of the Warrantech Program.  On one such occasion, Christopher Ford of Warrantech Corporation informed WarrantybyNet, which was one of the entities that sold VSCs under the Warrantech Program, that HRRG would no longer accept any further VSCs from WarrantybyNet after June 9, 2004.

109.     At one point, in order to remain in compliance with the terms of the Administrative Agreement, Christopher Ford of Warrantech Corporation, agreed to propose rate increases with the intended effect of causing the programs' loss ratios to not exceed ninety (90) percent and that revised rates would be implemented.

110.     Pursuant to the Administrative Agreement, the Warrantech Entities agreed to:

     a.     Set appropriate prices for the Warrantech Program;

     b.     Keep loss ratios on each program within the Warrantech Program below 90%;

     c.     Notify HRRG when loss ratios exceeded, or were certain, to exceed 90%;

     d.     Implement rate increases requested by HRRG;

     e.     Use commercially reasonable efforts to administer and attend to the program faithfully;

f.      Refrain from making representations to applicants or holders of VSCs regarding coverage which are not consistent with the actual terms and conditions of the VSCs;

g.      Uphold its fiduciary responsibilities to HRRG with respect to premiums collected and received on VSCs under the Warrantech Program;

h.      Not misappropriate HRRG's funds or property;

i.      Not misappropriate funds or property held for the benefit of HRRG and other participants in the Warrantech Program;

j.      Properly perform its claims settlement responsibilities; and

k.      Provide proper and timely reporting to HRRG.

111.    Pursuant to the Addendum, the Warrantech Entities agreed to:

a.      Investigate, evaluate, document and settle claims and loss reports in accordance with the policies covered by the Administrative Agreement and Addendum;

b.      Properly document each claim;

c.      Properly settle claims through the disbursement of monies;

d.      Properly perform all reasonable and necessary work in connection with claims handling and loss reporting;

e.      Promptly and fully report to HRRG all information with respect to claims exceeding Warrantech's settlement Addendum (as set forth in Section III of the Addendum) and all claims and reports of loss where fraud is suspected; and

f.      Obtain HRRG's written approval prior to retaining any professional or expert, including but not limited to claims adjusters, special investigators, engineers, expert witnesses and accountants.

112.     The Warrantech Entities have breached the Administrative Agreement in each of the following respects, which are not all inclusive:

      a.     Failure to keep loss ratios on each program below 90%;

      b.     Failure to properly price the business in the first instance;

      c.     Failure to notify HRRG that loss ratios exceeded, or were certainly going to exceed, 90%;

      d.     Failure to implement HRRG's requested rate increases;

      e.     Failure to use commercially reasonable efforts to administer and attend to the program faithfully;

      f.     Making representations to applicants or holders of Vehicle Service Contracts regarding coverage which are not consistent with the actual terms and conditions of the Vehicle Service Contracts;

      g.     Failure to uphold its fiduciary responsibilities to HRRG with respect to premiums collected and received on policies for HRRG;

      h.     Failure to properly perform its claims settlement responsibilities; and

      i.     Failure to provide proper and timely reporting to HRRG.

113.     The Warrantech Entities have breached the Addendum in each of the following respects, which are not all inclusive:

      a.     Failure to investigate, evaluate, document and settle claims and loss reports in accordance with the policies covered by the Addendum;

      b.     Failure to properly document each claim;

      c.     Failure to properly settle claims through the disbursement of monies as called for in the Addendum;

d.     Failure to perform all reasonable and necessary work in connection with claims handling and loss reporting;

e.     Failure to promptly and fully report to HRRG all information with respect to claims exceeding Warrantech's settlement Addendum (as set forth in Section III of the Addendum) and all claims and reports of loss where fraud is suspected; and

f.     Failure to obtain HRRG's written approval prior to retaining any professional or expert, including but not limited to claims adjusters, special investigators, engineers, expert witnesses and accountants.

114.     As a result of the Warrantech Entities' failures, including but not limited to failing to properly price the Warrantech Program, failing to institute price increases as necessary, failing to safeguard the premium dollars and failing to properly administer and adjudicate VSC claims, the reserves set aside to pay valid VSC claims are not sufficient to pay such claims.

115.     On July 30, 2007, due to the Warrantech Entities' substantial breaches of the Administrative Agreement and Addendum, HRRG terminated the Administrative Agreement and Addendum and demanded that the Warrantech Entities take those steps required by the Administrative Agreement and Addendum to transition claims administration to a claims administrator identified by HRRG.  A copy of the Letter of Termination is attached hereto as Exhibit E and incorporated herein by this reference.

116.     The Warrantech Entities have further breached their obligations under the Administrative Agreement and Addendum by failing and refusing to honor HRRG's demand to transition the claims administration, placing HRRG and the VSCs at great risk.

117.     Now that the Warrantech Entities have been terminated, they are obligated to return all unearned payments for administrative services to the funds established for payment of VSC claims.

118.     Subject to a full reservation of rights, and despite cancellation of the Insurance Policy, HRRG has funded imprest accounts in the amount of $220,000 and funded claims payments to consumers of the Warrantech Program under a reservation of rights in excess of $168,000 up to the date of filing this Counterclaim and Third Party Claim.  To date, HRRG's payments on behalf of the Warrantech Program exceed Three Hundred Sixty-Eight Thousand Dollars ($368,000).

119.     The priority of responsibility between the obligor and the insurer for funding VSC claims when the reserves are not sufficient to pay such claims was not at issue in this lawsuit when initially filed.  That issue was the subject of an action in the United States District Court for the District of South Carolina, Charleston Division, Civil Action No. 2:07-cv-2627, styled *Heritage Warranty Insurance Risk Retention Group, Inc. f/k/a Heritage Warranty Mutual Insurance Risk Retention Group, Inc. v. Butler Financial solutions, LLC* ("Butler Lawsuit in South Carolina).

120.     HRRG filed a motion for preliminary injunction in the Butler Lawsuit in South Carolina seeking an order that Butler commence paying claims pursuant to its contractual obligations.

121.     By Order and Opinion dated December 6, 2007, the Butler Lawsuit in South Carolina was ordered to be transferred to the United States District Court for the Northern District of Illinois.   The December 6, 2007 Order also denied HRRG's motion for preliminary injunction without prejudice to permit the parties to fully re-argue the matter in this District.

## COUNT I

### <u>DECLARATORY JUDGMENT PURSUANT TO U.S.C. §2201</u>
### <u>AS BETWEEN HRRG, BUTLER, WARRANTECH AUTOMOTIVE, WARRANTECH</u>
### <u>AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION</u>

122.     HRRG repeats and incorporates its allegations in paragraphs 1 through 121 as if fully

set forth herein.

123.     Based upon the foregoing allegations, there exists between the parties a substantial

controversy of sufficient immediacy to warrant declaratory relief.

124.     HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights

and responsibilities of the parties pursuant to the agreements between them, and declare pursuant

to U.S.C. §2201 and Federal Rule of Civil Procedure 57 that HRRG has no obligation to pay

claims on behalf of Butler on one or more of the following bases: 1) the Insurance Policy

between HRRG and Butler has been cancelled at inception due to Butler's insolvency, or at some

point thereafter due to Butler's insolvency; 2) the Insurance Policy between HRRG and Butler is

void at inception due to Butler and the Warrantech Entities fraudulently inducing HRRG to issue

the Insurance policy by hiding Butler's insolvency; and/or 3) the Insurance Policy between

HRRG and Butler has been cancelled effective January 29, 2007.

125.     Alternatively, if the Court finds that the Insurance Policy is still operative, HRRG

requests this Court to inquire into the matters alleged herein, evaluate the rights and

responsibilities of the parties pursuant to the agreements between them, and declare pursuant to

U.S.C. §2201 and Federal Rule of Civil Procedure 57 the priority of each parties' responsibility

to pay valid VSC claims.  Specifically, HRRG seeks a declaration that HRRG has no obligation

to pay claims on behalf of Butler on one or more of the following bases: 1) Butler's losses have

yet to exceed the attachment point of the Insurance Policy; 2) Butler has breached the terms of

the Insurance Policy with HRRG, including but not limited to the covenant of good faith and fair

dealing; 3) Butler is not bankrupt; 4) to the extent Butler is bankrupt, the Warrantech Entities are

not bankrupt and have an obligation to pay valid VSC claims; and/or 5) for such other bases as

may be shown at trial.

126.     If the Court finds that the Insurance Policy is still operative and HRRG has an

obligation to make payments for valid VSC claims, HRRG requests this Court to inquire into the

matters alleged herein, evaluate the rights and responsibilities of the parties pursuant to the

agreements between them, and declare pursuant to U.S.C. §2201 and Federal Rule of Civil

Procedure 57 that: 1) the Warrantech Entities must cease acting as the administrator for the

Warrantech Program; 2) administration responsibilities must be transferred to National

Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017, as

previously directed by HRRG; 3) the Warrantech Entities must comply with all of their

obligations upon termination of the Administrative Agreement (and the Addendum), including

but not limited to: a) immediately communicate its termination and the effective date to all

Dealers who produce Warrantech Program business; b) provide to HRRG all VSC and files

relating to the VSC holders under the Warrantech Program, and claim files if applicable, which

may be required for servicing the Warrantech Program business or to meet record retention

requirements mandated by regulatory organizations or required by HRRG policy; c) within 90

days of termination, must provide HRRG with a full and final accounting and payment of all

Premium due HRRG for all VSC sold under Programs by Warrantech and Dealers; and d)

continue to treat HRRG confidential information as confidential information.

WHEREFORE Heritage Warranty Insurance Risk Retention Group, Inc. prays that this

Court declare that Heritage Warranty Insurance Risk Retention Group, Inc. has no obligation to

pay claims on behalf of Butler Financial Solutions, LLC and/or the Warrantech Entities.

Alternatively, if the Court finds that the Insurance Policy is still operative and if Heritage

Warranty Insurance Risk Retention Group, Inc. has an obligation to make payments for valid

VSC claims  then Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court

declare that administration responsibilities be transferred from the Warrantech Entities to

National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio

43017 and that the Warrantech Entities comply with all of their obligations upon termination of

the Administrative Agreement (and the Addendum).

## COUNT II

## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AS TO BUTLER, WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION

127.    HRRG repeats and incorporates its allegations in paragraphs 1 through 126 as if fully

set forth herein.

128.    Pursuant to VSCs sold under the Warrantech Program, as obligor, Butler agreed to

provide repair services to VSC purchasers in the case of mechanical breakdown during the

contract period.

129.    Pursuant to tens of thousands of VSCs sold to consumers pursuant to the Warrantech

Program, those consumers are entitled to vehicle repair services in the event of a covered

breakdown event.  Butler has chosen to breach those VSCs.

130.    Upon information and belief, Butler has never paid a claim from its own funds separate

from the loss reserve funds to a consumer holding one of Butler's VSCs.

131.    Butler's true intentions to refuse payment of VSC claims once the loss reserve funds

were exhausted were concealed from HRRG until HRRG received an affidavit executed by

Miller on or about September 18, 2007 where, in Paragraph 5 and elsewhere, Miller explains that Butler never intended to pay consumers the benefit of their VSC bargain, but instead intended all along to push its VSC responsibilities upon HRRG.

132.    Moreover, HRRG was unaware until September 2007 that the Miller Declaration of Solvency was false.  HRRG relied upon its truthfulness and used the information to underwrite and price the risk.  HRRG had an enhanced right to rely upon Miller's Declaration of Solvency because Butler, through the Warrantech Entities, was negotiating a Bankruptcy Policy.

133.    As a result, of the foregoing, HRRG has no obligation to pay valid VSC claims for one or more of the following reasons: 1) the Insurance Policy between HRRG and Butler has been cancelled at inception due to Butler's insolvency, or at some point thereafter due to Butler's insolvency; 2) the Insurance Policy between HRRG and Butler is void at inception due to Butler and the Warrantech Entities fraudulently inducing HRRG to issue the Insurance policy by hiding Butler's insolvency and true intentions with respect to the Warrantech Program; 3) the Insurance Policy between HRRG and Butler has been cancelled effective January 29, 2007; and/or 4) for such other bases as may be shown at a hearing or trial.

134.    Alternatively, if the Court finds that the Insurance Policy is still operative, HRRG has no obligation to pay valid VSC claims for one or more of the following reasons: 1) Butler's losses have yet to exceed the attachment point of the Insurance Policy; 2) Butler has breached the terms of the Insurance Policy with HRRG including but not limited to the covenant of good faith and fair dealing; 3) Butler is not bankrupt; and/or 4) to the extent Butler is bankrupt, the Warrantech Entities (which have referred to and considered themselves as the obligor for VSC's sold under the Warrantech program) are not bankrupt and have an obligation to pay valid VSC claims; and 5) for such other bases as may be shown at a hearing or trial.

135.     Butler's and the Warrantech Entities' conduct and breaches of their obligations to consumers and to HRRG have caused HRRG to fund consumer claims in excess of $368,000. HRRG is at risk of insolvency if it must continue to fund VSC claims to the full extent of underwriters' projections of VSC claims.

136.     Once HRRG's capital and surplus is reduced below levels required by the South Carolina Department of Insurance, HRRG will be in breach of its insurance license and subject to action by the State of South Carolina pursuant to South Carolina's insurance insolvency laws. Furthermore, HRRG will lose its registration to conduct risk retention insurance business in the various states in which it transacts business.

137.     Butler and/or the Warrantech Entities must be ordered to commence paying claims pursuant to their obligations because: 1) on the merits, consumers are entitled to the VSC protection promised by the VSC's sold under the Warrantech Program; 2) HRRG has no adequate remedy at law and would be irreparably harmed if Butler and the Warrantech Entities are allowed to voluntarily breach tens of thousands of contracts with consumers; 3) the threatened injury to HRRG outweighs any harm which might be suffered by Butler and the Warrantech Entities; and 4) granting the injunction is in the public interest as consumers holding VSC's need to know where payments will be coming from and need to be paid for valid VSC claims without undue delay.

138.     Alternatively, if the Court finds that the Insurance Policy is still operative and HRRG has an obligation to make payments for valid VSC claims, HRRG requests an order that: 1) the Warrantech Entities cease acting as the administrator for the Warrantech Program; 2) administration responsibilities be transferred to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017, as previously directed by HRRG; 3) the

Warrantech Entities comply with all of their obligations upon termination of the Administrative Agreement (and the Addendum) including but not limited to: a) immediately communicate its termination and the effective date to all Dealers who produce Warrantech Program business; b) provide to HRRG all VSC and files relating to the VSC holders under the Warrantech Program, and claim files if applicable, which may be required for servicing the Warrantech Program business or to meet record retention requirements mandated by regulatory organizations or required by HRRG policy; c) within 90 days of termination, the Warrantech Entities must provide HRRG with a full and final accounting and payment of all Premium due HRRG for all VSC sold under Programs by Warrantech and Dealers; and d) the Warrantech Entities must continue to treat HRRG confidential information as confidential information.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter an order for preliminary and permanent injunctive relief directing Butler Financial Solutions, LLC, Warrantech Corporation, Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc. and/or Vemeco, Inc. to honor their VSC obligations, cease demanding funds from HRRG, cease directing consumers to HRRG, and immediately commence funding and payment of valid consumer claims brought pursuant to the VSCs. Alternatively, if the Court finds that the Insurance Policy is still operative and if Heritage Warranty Insurance Risk Retention Group, Inc. has an obligation to make payments for valid VSC claims then Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court order that administration responsibilities be transferred from the Warrantech Entities to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017 and that the Warrantech Entities comply with all of their obligations upon termination of the Administrative Agreement (and the Addendum).

**COUNT III**

**ACTION FOR SPECIFIC PERFORMANCE AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION (TRANSFER OF CLAIMS HANDLING ADMINISTRATION)**

139.     HRRG repeats and incorporates its allegations in paragraphs 1 through 138 as if fully set forth herein.

140.     On July 30, 2007, HRRG terminated the Administrative Agreement and the Addendum due to the Warrantech Entities' breaches of those agreements.

141.     In addition, on July 30, 2007, HRRG invoked its contractual rights and under a reservation of rights, demanded transfer of the handling of all claims which fall under the Administrative Agreement and the Addendum to another administrator, National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017.

142.     In connection with this demand, HRRG requested that the Warrantech Entities contact HRRG immediately to make arrangements for the orderly transfer of all files and records, both paper and electronic, to the new administrator so that the new administrator can carry out its administrative responsibilities.

143.     During the weeks of August 6 and August 13, 2007, HRRG followed up with the Warrantech Entities on this demand.  The Warrantech Entities have not acknowledged cancellation of the Administrative Agreement and Addendum and have not transferred the handling of all claims which fall under the Administrative Agreement and Addendum.

144.     As a result of the Warrantech Entities' failure to comply with HRRG's demand, HRRG seeks an order of specific performance and preliminary and permanent injunctive relief requiring that the Warrantech Entities transfer the handling of all claims which fall under the Administrative Agreement and the Addendum to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017.  In addition, HRRG seeks an order that

the Warrantech Entities transfer all files and records, both paper and electronic, to the new administrator so that the new administrator can carry out its administrative responsibilities. HRRG further requests that the order require the Warrantech Entities to return all unearned administrative fees to the loss reserve funds to provide for administration and payment of VSC claims. Finally, HRRG requests that the order enjoin the Warrantech Entities from continuing activities as HRRG's purported administrative agent.

145.     Provided the Court determines that the Insurance Policy is still operative and HRRG has an obligation to make payments for valid VSC claims, the entry of a preliminary and permanent injunction as requested is necessary in order to prevent immediate and irreparable injury to HRRG and VSC holders. Pecuniary compensation will not afford HRRG adequate relief in light of the fact that VSC holders continue to submit claims, and those claims are not being administered efficiently, properly or in the best interests of the VSC holders and the other parties to the Warrantech Program. The failure to properly adjudicate VSC holders' claims will result in dissatisfied VSC holders, increased complaints to various states' insurance departments, and additional financial strain and regulatory pressure on HRRG that will likely lead to insolvency.

146.     HRRG has no adequate remedy at law and will be irreparably harmed if the Warrantech Entities do not transfer claims administration responsibility (and the documents needed to perform claims administration responsibilities) to National Administrative Services, Co., LLC.

147.     The threatened injury to HRRG outweighs any harm which might be suffered by the Warrantech Entities.

148.     Granting the injunction is in the public interest, because, among other reasons, the injunction is in the best interests of the VSC holders who have, or will, submit valid claims.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter a preliminary and permanent injunction in its favor and against Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc., Vemeco, Inc. and Warrantech Corporation requiring that the handling of all claims which fall under the Administrative Agreement and the Addendum be transferred to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017; that all files and records, both paper and electronic, be transferred to the new administrator so that the new administrator can carry out its administrative responsibilities; that all unearned administrative fees to the loss reserve funds be returned to provide for administration and payment of VSC claims; and that Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc., Vemeco, Inc., Warrantech Corporation, or any of their affiliates, subsidiaries or parent companies be enjoined from continuing activities as Heritage's purported administrative agent.

## COUNT IV

## FRAUDULENT INDUCEMENT TO CONTRACT AS TO BUTLER AND MILLER

149.     HRRG repeats and incorporates its allegations in paragraphs 1 through 148 as if fully set forth herein.

150.     Miller, as President of Butler, accepted the Insurance Policy on January 9, 2002.  By so doing, Miller and Butler represented to Heritage that Butler would perform its obligations to its VSC holders to the fullest extent it or its sponsor is capable.

151.     At that time Butler had no intention of performing and Miller knew it.

152.     Instead, Butler and Miller intended to default on Butler's obligations to VSC holders, thereby subjecting HRRG to Butler's VSC liabilities.

153.    Folz, as Senior Vice President of Warrantech Automotive, Warrantech Automotive of Florida, Inc., Vemeco, and Warrantech Corporation, as well as other Warrantech Entities personnel, knew Butler had no intention of performing Butler's obligations to its VSC holders.

154.    Butler's and Miller's true intentions were concealed from HRRG until HRRG received an affidavit executed by Miller on or about September 18, 2007 where, in Paragraph 5 and elsewhere, Miller explains that Butler never intended to pay consumers the benefit of their VSC bargain, but instead intended all along to push its VSC responsibilities upon HRRG.

155.    In addition, Miller as President of Butler made such financial representations as may be seen in the Miller Declaration of Solvency on or about May 1, 2001 for the purpose of fraudulently inducing coverage from HRRG.  Miller knew his Declaration of Solvency was both false and material to HRRG's decision to issue the Insurance Policy.  He made the representation in the context of Butler's application for insurance with the intent that HRRG rely upon them and issue the Insurance Policy.

156.    Butler, Miller, Folz, Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco, and Warrantech Corporation owed a duty to disclose reliable and truthful information in Butler's application for insurance.

157.    HRRG was unaware until September 2007 that the Miller Declaration of Solvency was false.  HRRG relied upon its truthfulness and used the information to underwrite and price the risk.  HRRG had an enhanced right to rely upon Miller's Declaration of Solvency because Butler, through the Warrantech Entities, was negotiating a Bankruptcy Policy.

158.    Alternatively, if the Miller Declaration of Solvency was in fact truthful as of May 1, 2001, it was no longer a true representation of the financial status of Butler at the time Miller accepted the Insurance Policy on January 9, 2002.  Given Butler's dramatic change in financial

circumstances in 2001 as attested by Miller in September 2007, Miller had a duty to update Butler's application in 2001 because he knew HRRG and Butler were negotiating a Bankruptcy Policy and that HRRG would rely upon his Declaration of Solvency. Instead Miller concealed Butler's change in financial condition.

159.    Miller's failure to provide updated insurance application information to HRRG constitutes an intentional, material, false and fraudulent representation known by Butler and Miller, Folz, Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco and Warrantech Corporation, but unknown to HRRG. HRRG relied upon Miller's false representation and the conduct of the Warrantech Entities, in underwriting, pricing and issuing the Insurance Policy.

160.    As a direct and proximate result of the fraud perpetrated by Miller, Butler, Folz, Warrantech Automotive, Warrantech Automotive of Florida and Vemeco, HRRG has suffered and continues to suffer actual and consequential damages including but not limited to the payment of Butler's obligations to consumers, increased scrutiny by state departments of insurance, an onslaught of direct claims from consumers, a proposed class action filed in the United States District Court for the Southern District of Florida, and such other damages including punitive damages as may be shown at trial. In addition, HRRG is entitled to the remedy of rescission at its election.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Butler Financial Solutions, LLC and Harris Miller in an amount to be determined at trial, with attorneys' fees, exemplary damages and such further damages that may continue to accrue, plus prejudgment interest and costs incurred. In the alternative, should Heritage Warranty Insurance Risk Retention Group, Inc. so elect, Heritage

Warranty Insurance Risk Retention Group, Inc. prays that the Insurance Policy be rescinded with corresponding payment of appropriate monetary amounts due and owing to Heritage Warranty Insurance Risk Retention Group, Inc., which will be proven at trial.

## COUNT V

## <u>BREACH OF CONTRACT BY BUTLER</u>

161.     HRRG repeats and incorporates its allegations in paragraphs 1 through 160 as if fully set forth herein.

162.     Butler is in breach of the Insurance Policy, including but not limited to the covenant of good faith and fair dealing which is implied therein.

163.     Butler is in breach of the Conditions of the Insurance Policy, including but not limited to the Conditions set forth in Paragraphs 6 and 19.

164.     To the extent Butler remains solvent and is choosing not to pay consumer claims, Butler has breached the Insurance Policy and placed HRRG in the position of incurring losses which it should not have to incur.

165.     At this time, HRRG'S losses exceed $368,000.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Butler Financial Solutions, LLC in an amount to be determined at trial, with attorneys' fees and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

## COUNT VI

## <u>INDEMNITY FROM BUTLER</u>

166.     HRRG repeats its allegations in paragraphs 1 through 165 as if fully set forth herein.

167.     As a result of the special relationship between the parties as created by their contract of insurance and the insurance codes of various states, HRRG has been placed by Butler in the position of having to pay Butler's obligations for the purpose of satisfying consumers and insurance regulators, even though Butler has the obligation to pay.

168.     Said payments made by HRRG were made subject to HRRG's full reservation of rights.

169.     Butler's conduct placed HRRG in the position of making payments that it otherwise is not obligated to make.

170.     Butler must indemnify HRRG for all payments made by HRRG due to Butler's refusal to comply with its VSC obligations.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Butler Financial Solutions, LLC in an amount to be determined at trial, with attorneys' fees and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

## COUNT VII

## <u>BREACH OF CONTRACT AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION</u>

171.     HRRG repeats and incorporates its allegations in paragraphs 1 through 170 as if fully set forth herein.

172.     The Warrantech Entities are in breach of the Administrative Agreement and Addendum, including but not limited to the covenant of good faith and fair dealing which is implied therein.

173.     HRRG has complied with all of its obligations under the Administrative Agreement and the Addendum.

174.     HRRG has been damaged due to the Warrantech Entities breaches of the Administrative Agreement and the Addendum.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc., Vemeco, Inc. and Warrantech Corporation, in an amount to be determined at trial, with attorneys' fees and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION

175.     HRRG repeats its allegations in paragraphs 1 through 174 as if fully set forth herein.

176.     Pursuant to the Administrative Agreement, Warrantech Automotive, Warrantech Automotive of Florida, Vemeco, and Warrantech Corporation owe fiduciary duties to HRRG with respect to premiums collected and received on VSCs under the Warrantech Program.

177.     Warrantech Automotive, Warrantech Automotive of Florida, Vemeco and Warrantech Corporation have breached their fiduciary duties by, among other actions, failing to safeguard the premiums, failing to properly account for the premiums and failing to ensure the premiums were used for proper purposes.

178.     Warrantech Automotive, Warrantech Automotive of Florida, Vemeco and Warrantech Corporation's breach of their fiduciary duties to HRRG have contributed to there being insufficient funds to pay valid VSC claims.

179.     As a direct and proximate result of the Warrantech Entities' breaches of their fiduciary duties to HRRG, HRRG has suffered such actual and consequential damages as may be shown at

trial, including but not limited to funding valid VSC claims which should not have been funded by HRRG.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc., Vemeco, Inc. and Warrantech Corporation, in an amount to be determined at trial, with attorneys' fees, exemplary damages and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

**COUNT IX**

**UNJUST ENRICHMENT AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH
AUTOMOTIVE OF FLORIDA, VEMECO, WARRANTECH CORPORATION AND
BUTLER
(IN THE ALTERNATIVE)**

180.     HRRG repeats its allegations in paragraphs 1 through 179 as if fully set forth herein.

181.     Provided the Court finds that the Insurance Policy was void at inception due to the fraud surrounding the Insurance Policy's acquisition and/or that the Insurance Policy was cancelled at some point after inception due to Butler's insolvency or the fraud surrounding the Insurance Policy, HRRG must be compensated for the benefit HRRG conferred on the Warrantech Entities and Butler.

182.     After being misled into believing that a valid insurance policy was operative, HRRG performed valuable services for the benefit of the Warrantech Entities and Butler.  Specifically, in connection with the Warrantech Program and the Insurance Policy, HRRG: 1) managed the impress accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; 5) verified certain VSC claims adjudications done by the Warrantech Entities; and 6) provided other valuable services which will be proven at trial.

183.     The Warrantech Entities and Butler are aware that they received a benefit as a result of HRRG's services in connection with the Warrantech Program and Insurance Policy.

184.     The value of the benefit to the Warrantech Entities and Butler resulting from HRRG's services in connection with the Warrantech Program and Insurance Policy is an amount that will be proven at trial.

185.     The circumstances are such that it would be unjust for the Warrantech Entities and Butler to retain the benefit of HRRG's services in connection with the Warrantech Program and the Insurance Policy without the Warrantech Entities and Butler compensating HRRG for the benefit received.

        WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc., Vemeco, Inc., Warrantech Corporation and Butler Financial Solutions, LLC, in an amount to be determined at trial, with attorneys' fees and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

### COUNT X

### DECLARATORY JUDGMENT PURSUANT TO U.S.C. §3681
### AS BETWEEN HRRG AND THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCILLO, DAMAR, BRADFORD, ALRENDAN, AND 12GK

186.     HRRG repeats and incorporates its allegations in paragraphs 1 through 185 as if fully set forth herein.

187.     Based upon the foregoing allegations, there exists between the parties a substantial controversy of sufficient immediacy to warrant declaratory relief.

188.     HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights and responsibilities of HRRG and Third Party PORC Defendants pursuant to the agreements

between them, and declare pursuant to U.S.C. §3681 and Federal Rule of Civil Procedure 57 that Third Party PORC Defendants are obligated to: (1) reimburse HRRG for 100 percent of the costs and expenses already paid by HRRG under reservation of rights for valid VSC claims; (2) promptly deposit funds into the custodial accounts equal to or greater than the value of their obligations for deposits, including losses, expenses, and reserves, as defined by the Custodial Agreements and Quota Agreements; (3) assume 100 percent of all of HRRG's liabilities that may arise or have already arisen under the Insurance Policy and all VSCs issued as part of the Warrantech Program; (4) pay all valid VSC claims going forward in the event Butler does not pay those claims; (5) indemnify HRRG against all claims, demands, suits, judgments, damages, and punitive damages arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of repairs; and (6) for such other bases as may be shown at trial.

WHEREFORE Heritage Warranty Insurance Risk Retention Group, Inc. ("HRRG") prays that this Court declare that Third Party PORC Defendants Mardan Reisurance Limited, Marion Reinsurance, Ltd., Fucillo Reinsurance Company, Ltd., Damar Reinsurance, Ltd., Bradford Reinsurance, Ltd., Alrendan Re., Ltd., and 12GK Reinsurance, Ltd. have an obligation to reimburse HRRG for valid VSC claims already paid by HRRG, to properly and fully fund the custodial accounts in accordance with their obligations under their agreements with HRRG, to assume 100 percent of HRRG's liabilities under all VSCs issued under the Insurance Policy and VSCs issued through the Warrantech Program; to indemnify HRRG against all claims, demands, suits, judgments, damages, and punitive damages arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of

repairs; and to pay all valid VSC claims going forward, and for such other and further relief as is just and proper.

## COUNT XI

### SPECIFIC PERFORMANCE AS TO THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCILLO, DAMAR, BRADFORD, ALRENDAN, AND 12GK

189.    HRRG repeats and incorporates its allegations in paragraphs 1 through 188 as if fully set forth herein.

190.    Third Party PORC Defendants entered into valid, binding, and enforceable Quota Agreements with HRRG which clearly and unequivocally obligate Third Party PORC Defendants to assume 100 percent of HRRG's risks and liabilities for valid VSC claims arising under the Warrantech Program.

191.    HRRG has complied with the terms of the Quota Agreements and its obligations thereunder.

192.    Third Party PORC Defendants have failed and refused to perform their obligations under the Quota Agreements.

193.    Third Party PORC Defendants must be ordered to specifically perform their obligations under the Quota Agreements because: 1) on the merits, consumers are entitled to the VSC protection promised by the VSCs sold under the Warrantech Program; 2) HRRG has no adequate remedy at law and would be irreparably harmed if Third Party PORC Defendants are allowed to voluntarily breach their agreements with HRRG to the severe detriment of HRRG and thereby leave tens of thousands of consumers with VSC contracts at risk; 3) the threatened injury to HRRG outweighs any harm which might be suffered by Third Party PORC Defendants; and 4) granting of specific performance is in the public interest as consumers holding VSCs need to

know where payments will be coming from and need to be paid for valid VSC claims without undue delay.

194.    Article XVIII of the Quota Agreements between Third Party PORC Defendants and HRRG specifically acknowledges that a dispute between HRRG and Third Party PORC Defendants regarding failure to make one or more monetary payments "could have a material and adverse impact" on HRRG, and therefore specifically provides that HRRG is entitled to seek immediate relief in this Court.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. ("HRRG") prays that this Court enter an order directing Third Party PORC Defendants Mardan Reisurance Limited, Marion Reinsurance, Ltd., Fucillo Reinsurance Company, Ltd., Damar Reinsurance, Ltd., Bradford Reinsurance, Ltd., Alrendan Re., Ltd., and 12GK Reinsurance, Ltd. to specifically perform their obligations to reimburse HRRG for valid VSC claims already paid by HRRG, to properly and fully fund the custodial accounts in accordance with their obligations under their agreements with HRRG, to assume 100 percent of HRRG's liabilities under all VSCs issued under the Insurance Policy and VSCs issued through the Warrantech Program; to indemnify HRRG against all claims, demands, suits, judgments, damages, and punitive damages arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of repairs; and to immediately assume responsibility for paying all valid VSC claims going forward, and for such other and further relief as is just and proper.

## COUNT XII

## BREACH OF CONTRACT BY THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCILLO, DAMAR, BRADFORD, ALRENDAN, AND 12GK

195.     HRRG repeats and incorporates its allegations in paragraphs 1 through 194 as if fully set forth herein.

196.     Third Party PORC Defendants are in breach of the Quota Agreements and Custodian Agreements, including but not limited to the covenant of good faith and fair dealing which is implied therein.

197.     Third Party PORC Defendants are in breach of the Quota Agreements, including but not limited to the conditions and provisions set forth in Articles II, III, IV, V, VI, VII, VIII, and XV.

198.     Third Party PORC Defendants are in breach of the Custodial Agreements, including but not limited to the conditions and provision set forth in Sections 1, 2, 3, 4, 7, and 9.

199.     Third Party PORC Defendants' breach of the Quota Agreements and Custodial Agreements has placed HRRG in the position of incurring losses which it should not have to incur.

200.     At this time, HRRG'S losses exceed $368,000 and continue to increase as there remain VSC claims that are unpaid and HRRG continues to incur substantial attorney's fees and costs.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Third Party PORC Defendants Mardan Reisurance Limited, Marion Reinsurance, Ltd., Fucillo Reinsurance Company, Ltd., Damar Reinsurance, Ltd., Bradford Reinsurance, Ltd., Alrendan Re., Ltd., and 12GK Reinsurance, Ltd. in an amount to be determined at trial, with attorneys' fees and such further damages that may continue to accrue, plus pre-judgment interest and costs incurred.

### COUNT XIII

### INDEMNITY FROM THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCILLO, DAMAR, BRADFORD, ALRENDAN, AND 12GK

201.     HRRG repeats and incorporates its allegations in paragraphs 1 through 200 as if fully set forth herein.

202.     As a result of the special relationship between HRRG and the Third Party PORC Defendants as created by their agreements and the insurance codes of various states, HRRG has been placed by Third Party PORC Defendants in the position of having to pay Butler's obligations for the purpose of satisfying VSC consumers and insurance regulators, even though Third Party PORC Defendants have the obligation to pay.

203.     Said payments made by HRRG were made subject to HRRG's full reservation of rights.

204.     Third Party PORC Defendants' conduct placed HRRG in the position of making payments that it otherwise is not obligated to make, attracted increased scrutiny of HRRG by state departments of insurance, an onslaught of direct claims from consumers, and a proposed class action originally filed in the United States District Court for the Southern District of Florida and now pending before this Court in a separate case.

205.     Third Party PORC Defendants must indemnify HRRG for all payments made by HRRG due to Butler's refusal to comply with its VSC obligations and Third Party PORC Defendants' refusal to accept 100 percent of HRRG's entire liability for all obligations arising under VSCs and Insurance Policy issued as part of the Warrantech Program.

206.     Third Party PORC Defendants are also contractually obligated to indemnify HRRG against, among other things, all claims, demands, suits, damages, awards, and punitive damages.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this Court enter judgment in its favor and against Third Party PORC Defendants Mardan Reisurance Limited, Marion Reinsurance, Ltd., Fucillo Reinsurance Company, Ltd., Damar Reinsurance, Ltd., Bradford Reinsurance, Ltd., Alrendan Re., Ltd., and 12GK Reinsurance, Ltd. in an amount

to be determined at trial, including but not limited to with attorneys' fees and such further damages that may continue to accrue, plus prejudgment interest and costs incurred.

## COUNT XIV

### UNJUST ENRICHMENT AGAINST THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCILLO, DAMAR, BRADFORD, ALRENDAN, AND 12GK

207.     HRRG repeats and incorporates its allegations in paragraphs 1 through 206 as if fully set forth herein.

208.     HRRG must be compensated for the benefit HRRG conferred on the Third Party PORC Defendants.

209.     HRRG performed valuable services for the benefit of the Third Party PORC Defendants.  Specifically, in connection with the Warrantech Program, the Quota Agreements, and the Custodial Agreements, HRRG: 1) managed the imprest accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities and Third Party PORC Defendants reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; 5) verified certain VSC claims adjudications done by the Warrantech Entities; 6) paid to Third Party PORC Defendants their proportionate share of the net written premiums on VSCs issued through the Warrantech Program; 7) made payments in excess of $368,000 which continues to increase as remain VSC claims that are unpaid and HRRG continues to incur substantial attorney's fees and costs; and 8) provided other valuable services which will be proven at trial.

210.     Third Party PORC Defendants are aware that they received a benefit as a result of HRRG's services in connection with the Warrantech Program, the Quota Agreements, and the Custodial Agreements.

211.     The value of the benefit to the Third Party PORC Defendants resulting from HRRG's

services in connection with the Warrantech Program, Quota Agreements, and Custodial

Agreements is an amount that will be proven at trial.

212.     The circumstances are such that it would be unjust for the Third Party PORC

Defendants to retain the benefit of HRRG's services in connection with the Warrantech Program,

the Quota Agreements, and the Custodial Agreements without the Third Party PORC Defendants

compensating HRRG for the benefit received.

WHEREFORE, Heritage Warranty Insurance Risk Retention Group, Inc. prays that this

Court enter judgment in its favor and against Third Party PORC Defendants Mardan Reisurance

Limited, Marion Reinsurance, Ltd., Fucillo Reinsurance Company, Ltd., Damar Reinsurance,

Ltd., Bradford Reinsurance, Ltd., Alrendan Re., Ltd., and 12GK Reinsurance, Ltd. in an amount

to be determined at trial, including but not limited to with attorneys' fees and such further

damages that may continue to accrue, plus prejudgment interest and costs incurred.

Dated:  November 18, 2008

                         Respectfully Submitted,

                         HUSCH BLACKWELL SANDERS LLP

                          By:___/s/ Thomas M. Dee_____
                               Thomas M. Dee, *admitted pro hac vice*
                               tom.dee@husch.com
                               Joel B. Samson, ARDC# 06244795
                               joel.samson@husch.com
                               190 Carondelet Plaza, Suite 600
                               St. Louis, Missouri 63105
                               Telephone: (314) 480-1500
                               Facsimile: (314) 480-1505

                         And

                               John K. Kallman
                               221 N. LaSalle St.

Suite 1200
Chicago, IL 60601
(312) 578-1515 voice
(312) 332-3920 fax
jkkallman@sbcglobal.net

***Attorneys for Heritage Warranty Insurance Risk Retention Group, Inc.***

## Certificate of Service

The undersigned certifies that a true copy of the foregoing document has been filed electronically with the Court's ECF system and service accomplished pursuant to ECF as to the following counsel of record:

James C. Shah, Esq.
Shepherd Finkelman Miller & Shah
35 E. State Street
Media, PA 19063

George Vurdelja, Jr.
Harrison & Held LLP
333 W. Wacker Dr., Suite 1700
Chicago, IL 60606

Scott Rhead Shepherd, Esq.
Shepherd Finkelman Miller & Shah
1640 Town Center Circle
Suite 216
Weston, FL 33326

James E. Miller, Esq.
Shepherd Finkelman Miller & Shah
65 Main Street
Chester, CT 60412

Jeffrey A. Berens, Esq.
Jeffrey A. Berens LLC
8691 E. 26th Avenue
Denver, CO 80238

Michael Murphy Tannen, Esq.
39 S. LaSalle Street
Suite 905
Chicago, IL 60603

Iain Johnston
Phil Ackerman
Johnston Greene LLC
42 S. Dearborn, Suite 1310
Chicago, IL 60605

Paul R. Walker-Bright
Reed Smith LLP
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606

David M. Schlecker
Reed Smith LLP
599 Lexington Avenue
New York, NY 10017

Except for the following counsel who were served via depositing a copy of the foregoing
pleading in the United States Mail, postage prepaid, on this 18th day of November, 2008:
Douglas P. Dehler, Esq.
Shepherd Finkelman Miller & Shah
111 E. Wisconsin Avenue
Suite 1750
Milwaukee, WI 53202

By:     /s/ Thomas M. Dee