# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.
8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

### Mardan Reinsurance, Limited
(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by
Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM
This Agreement shall become effective as of 12:01 A.M. Central Time, March 15, 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of <u>Article IX – Termination</u>.

## ARTICLE II – BUSINESS COVERED
The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY
The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS
All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

**EXHIBIT**

A

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.   As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement.   The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.   The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.

    (1)   all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;

    (2)   all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;

    (3)   all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums.   Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.   Net written premiums;

B.   Ceding expenses and allowances to the Company;

C.   Losses and loss adjustment expenses paid by the Company;

D.   Loss reserves at the end of the month, including those for losses incurred but not reported;

E.   Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance.  If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement.  The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.    This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.    In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.    In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.  This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.  The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state of national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

4

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.     The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)     to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)     to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)     to pay any other amounts the Company claims are due under this Agreement;

(4)     to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)     to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.     In lieu of , or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

E.      Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims.  It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 15th day of March 2003.

Attest:

COMPANY

By: _____

Peter Knolla, Senior Vice President

Attest:

REINSURER

By: _____

Mark Fiorini

Title: _____

## **Addendum A**

Listing of Warrantech Administered Programs and Respective Service Contracts.

## **ARTICLE V. PREMIUM AND CEDING COMMISSION**

b.        The ceding commission paid by the Reinsurer to the Company shall be

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.

8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

### Marion Reinsurance, Ltd.

(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM

This Agreement shall become effective as of 12:01 A.M. Central Time, March 15, 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of Article IX – Termination.

## ARTICLE II – BUSINESS COVERED

The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY

The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS

All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.     As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.     The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.
   (1)     all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;
   (2)     all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;
   (3)     all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.     Net written premiums;

B.     Ceding expenses and allowances to the Company;

C.     Losses and loss adjustment expenses paid by the Company;

D.     Loss reserves at the end of the month, including those for losses incurred but not reported;

E.     Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of <u>Article XV – Unauthorized Reinsurance</u>. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

2

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.    This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.    In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.    In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.   This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.   The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state or national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.   The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)   to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)   to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)   to pay any other amounts the Company claims are due under this Agreement;

(4)   to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)   to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.   In lieu of , or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

5

E.    Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims.  It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 15th day of March 2003.

Attest:

COMPANY

By: _____

Peter Knolla, Senior Vice President

Attest:

REINSURER

By: _____

Anthony Pellarin

Title: _____

7

## Addendum A

Listing of Warrantech Administered Programs and Respective Service Contracts.

## ARTICLE V. PREMIUM AND CEDING COMMISSION

b.    The ceding commission paid by the Reinsurer to the Company shall be

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.
8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

## Fuccillo Reinsurance Company, Ltd
(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM
This Agreement shall become effective as of 12:01 A.M. Central Time, 3/15 , 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of Article IX – Termination.

## ARTICLE II – BUSINESS COVERED
The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY
The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS
All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.   As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.   The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.
   (1)   all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;
   (2)   all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;
   (3)   all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.   Net written premiums;

B.   Ceding expenses and allowances to the Company;

C.   Losses and loss adjustment expenses paid by the Company;

D.   Loss reserves at the end of the month, including those for losses incurred but not reported;

E.   Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.    This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.    In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.    In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.   This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.   The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state of national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.    The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)    to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)    to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)    to pay any other amounts the Company claims are due under this Agreement;

(4)    to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)    to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.    In lieu of , or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

E.  Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims.  It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 15th day of March , 2003.

Attest:                                                COMPANY


_____          By:_____
                                                 Peter Knolla, Senior Vice President


Attest:                                                REINSURER


_____          By:_____

                                                 Title:_____

## **Addendum A**

Listing of Warrantech Administered Programs and Respective Service Contracts.

## **ARTICLE V. PREMIUM AND CEDING COMMISSION**

b.     The ceding commission paid by the Reinsurer to the Company shall be

AS PER PROGRAM AGREEMENT

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.

8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

## Damar Reinsurance, Ltd.

(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by
Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM

This Agreement shall become effective as of 12:01 A.M. Central Time, March 15, 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of <u>Article IX – Termination</u>.

## ARTICLE II – BUSINESS COVERED

The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY

The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS

All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.    As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.    The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.
    (1)    all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;
    (2)    all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;
    (3)    all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.    Net written premiums;

B.    Ceding expenses and allowances to the Company;

C.    Losses and loss adjustment expenses paid by the Company;

D.    Loss reserves at the end of the month, including those for losses incurred but not reported;

E.    Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.    This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.    In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.    In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

3

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.     This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.     The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state of national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

4

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.     The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)     to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)     to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)     to pay any other amounts the Company claims are due under this Agreement;

(4)     to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)     to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.     In lieu of , or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

E.  Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims. It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 15th day of March 2003.

Attest:

COMPANY

By: _____
Peter Knolla, Senior Vice President

Attest:

REINSURER

By: _____
Dan Fiorini

Title: _____

**Addendum A**

Listing of Warrantech Administered Programs and Respective Service Contracts.

**ARTICLE V. PREMIUM AND CEDING COMMISSION**

b.    The ceding commission paid by the Reinsurer to the Company shall be

8

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.
8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

## BRADFORD REINSURANCE CO., LTD.
(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM

This Agreement shall become effective as of 12:01 A.M. Central Time, June 2, 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of Article IX – Termination.

## ARTICLE II – BUSINESS COVERED

The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY

The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS

All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.  As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.  The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.

   (1)  all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;

   (2)  all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;

   (3)  all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.  Net written premiums;

B.  Ceding expenses and allowances to the Company;

C.  Losses and loss adjustment expenses paid by the Company;

D.  Loss reserves at the end of the month, including those for losses incurred but not reported;

E.  Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.    This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.    In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.    In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.  This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.  The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state or national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

E.   Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims. It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.      The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

    (1)     to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

    (2)     to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

    (3)     to pay any other amounts the Company claims are due under this Agreement;

    (4)     to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

    (5)     to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.      In lieu of, or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 2nd day of June 2003.

Attest:

COMPANY

_H. Oanene Neelsen_

By: _____

Peter Knolla, Senior Vice President

Attest:

REINSURER

_Joann Zweir_

By: _____

James S. Richardson

Title: President

## Addendum A

Listing of Warrantech Administered Programs and Respective Service Contracts.

## ARTICLE V. PREMIUM AND CEDING COMMISSION

b.     The ceding commission paid by the Reinsurer to the Company shall be

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.
8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

## ALRENDAN RE., LTD.
(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by
Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM

This Agreement shall become effective as of 12:01 A.M. Central Time, June 2, 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of Article IX – Termination.

## ARTICLE II – BUSINESS COVERED

The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY

The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS

All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.    As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.    The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.

    (1)    all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;

    (2)    all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;

    (3)    all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.    Net written premiums;

B.    Ceding expenses and allowances to the Company;

C.    Losses and loss adjustment expenses paid by the Company;

D.    Loss reserves at the end of the month, including those for losses incurred but not reported;

E.    Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.      This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.      In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.      In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.  This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.  The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state or national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

4

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.   The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)   to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)   to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)   to pay any other amounts the Company claims are due under this Agreement;

(4)   to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)   to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.   In lieu of, or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

E.    Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims. It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 2nd day of June 2003.

Attest:

COMPANY

By: _____
   Peter Knolla, Senior Vice President

Attest:

REINSURER

By: _____
   J. Richard Mee

Title: _____

## Addendum A

Listing of Warrantech Administered Programs and Respective Service Contracts.

## ARTICLE V. PREMIUM AND CEDING COMMISSION

b.     The ceding commission paid by the Reinsurer to the Company shall be

# QUOTA SHARE REINSURANCE AGREEMENT

Issued to

## HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC.
8055 "O" Street Lincoln, Nebraska 68510
(hereinafter referred to individually and collectively as the "Company")

by

### 12GK Reinsurance, Ltd.
(hereinafter referred to individually as the "Reinsurer" for Service Contracts produced on its behalf by
Warrantech Automotive, Inc. "Administrator")

covering

Service Contracts issued, marketed, and/or administered and claims handled by Administrator, or its affiliated corporations and allocated to the account numbers established by the Company for the Service Contracts sold through the programs identified on Addendum A of this Agreement and periodically amended thereto.

## ARTICLE I – AGREMENT TERM
This Agreement shall become effective as of 12:01 A.M. Central Time, March 15 2003 (the "Effective Date") and shall remain in effect until terminated in accordance with the provisions of <u>Article IX – Termination</u>.

## ARTICLE II – BUSINESS COVERED
The Company shall cede and the Reinsurer shall accept as quota share reinsurance a 100% quota share of the Company's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date.

The term "Service Contracts" as used herein shall be understood to mean an agreement or contract that promises repair or replacement, or indemnification thereof, and other ancillary benefits for the operational failure or mechanical breakdown of the covered vehicle, equipment, or other product pursuant to the terms of the Service Contracts.

Reinsurance herein shall apply to the insurance on any warranty processed by Administrator if indicated on Schedule A. If so indicated, the term "Service Contract" as used herein shall also include warranties.

## ARTICLE III – TERRITORY
The liability of the Reinsurer shall extend to all losses covered under the Service Contracts reinsured hereunder, wherever such losses occur.

## ARTICLE IV – ORIGINAL CONDITIONS
All reinsurance for which the Reinsurer shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company, and to the same modifications, alterations, and cancellations as the respective insurances of the Company to which this reinsurance relates, subject always to the limits, terms and conditions of this Agreement. The liability of the Reinsurer hereunder shall attach simultaneously and obligatorily with that of the Company. In the event the Producer fails to remit appropriate Service Contract fees or premiums and the Company is unable to effect cancellation of the related Service Contracts, the Company shall be relieve of the obligation to pay reinsurance premiums with respect to such Service Contracts, but the Reinsurer shall be obligated to provide reinsurance hereunder with respect thereto as if said reinsurance premiums had been paid. Nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not a party to this Agreement.

## ARTICLE V – PREMIUM AND CEDING COMMISSION

A.  As reinsurance premium, the Company shall pay to the Reinsurer its proportionate share of the net written premiums on all Service Contracts covered by this Agreement. The term "Net written premiums" as used herein shall be understood to mean the gross written premiums of the Company for the Service Contracts reinsured hereunder, less return premiums thereon for cancellations and surrenders.

B.  The Reinsurer shall allow to the Company or reimburse the Company for the following expenses and also allow the Company a ceding commission as set forth in Addendum A.

    (1)    all state, county, municipal, city, or other governmental premium taxes or assessments levied against the Company with respect to the premiums ceded to the Reinsurer hereunder;

    (2)    all increases in the fees and assessments levied against the Company by state boards, bureaus, insolvency funds, assigned risk pools, and guaranty associations on account of the Company's increased premium base resulting from the insurance of the Service Contracts ceded under this Agreement;

    (3)    all federal excise taxes payable with respect to the premiums ceded to the Reinsurer under this Agreement, but only to the extent such premiums are subject to the federal excise tax pursuant to the Internal Revenue Code.

In the event any return premiums become due hereunder, the Company shall make reasonable efforts to secure a refund from the appropriate governmental authorities of the proportionate share of fees, taxes, and assessments previously allowed to the Company as provided herein with respect to such return premiums. Any such refund actually recovered by the Company shall be credited to the Reinsurer, it being the true intent of this Agreement that the Reinsurer shall not be entitled to offset any such refund from the return premiums due hereunder in the absence of such recovery by the Company or the Company's written consent.

## ARTICLE VI – REPORTS AND REMITTANCES

On or before the twenty fifth (25th) day after the close of each calendar month with respect to business conducted during such month, the Administrator shall furnish to the Reinsurer a report containing the following information:

A.  Net written premiums;

B.  Ceding expenses and allowances to the Company;

C.  Losses and loss adjustment expenses paid by the Company;

D.  Loss reserves at the end of the month, including those for losses incurred but not reported;

E.  Unearned premium reserves at the end of the month; and

If item A. exceeds the sum of items B. and C., a balance shall be due the Reinsurer, and the Company shall remit such balance upon submission of the monthly report, less any amounts that have been withheld by the Company and deposited in the reinsurance Custodial account in accordance with Section A. of Article XV – Unauthorized Reinsurance. If a balance is shown to be due the Company, the Reinsurer shall remit the balance due by wire transfer within ten (10) day after receipt of the monthly report.

## ARTICLE VII – LOSS SETTLEMENTS

All loss settlements made by the Company, whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement. The Reinsurer shall also be

liable for its proportionate share of loss adjustment expenses incurred by the Company under policies subject hereto.

The term "loss adjustment expense" as used herein shall be understood to mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense, or appeal of a specific claim, excluding the Company's overhead expenses and the salaries of its employees.

Nothing in this Article shall be construed as meaning that loss and loss adjustment expenses are not recoverable hereunder until the final loss to the Company has been ascertained.

## ARTICLE VIII – EXTRA-CONTRACTUAL DAMAGES

In addition to its proportionate share of all policy obligations and losses reinsured hereunder, if for no fault of Company, the liability of the Reinsurer shall include 100% of the Company's liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or the Company's insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by the Company, the handling of claims thereon, or the violation or breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs. The liabilities described in the preceding sentence shall be deemed incurred and ceded hereunder on the date the Service Contract to which such liabilities relates becomes effective, regardless of the date the acts giving rise to such liabilities are performed.

## ARTICLE IX – TERMINATION

A.   This Agreement may be terminated by either party upon not less than ninety (90) days advance written notice to the party, which termination shall become effective at 12:01 A.M. Central Time on the date specified in the notice of termination.

B.   In the event this Agreement is terminated, no further liability shall be ceded hereunder with respect to Service Contracts issued on or after the date such termination becomes effective.

C.   In the event this Agreement is so terminated by Reinsurer, or all Programs identified on Schedule A attached hereto shall cease to produce Service Contracts insured by the Company under this Agreement, shall continue to apply to all Reinsured Business issued before the date such termination becomes effective until their expiry or cancellation in the normal course of business.

## ARTICLE X – ERRORS AND OMISSIONS

Inadvertent errors or omissions by the Company in any matter reported to the Reinsurer shall not invalidate the reinsurance hereunder, provided such errors or omissions are rectified promptly upon discovery thereof by the Company.

## ARTICLE XI – ACCESS TO BOOKS AND RECORDS

The Company shall place at the disposal of the Reinsurer at all reasonable times during regular business hours, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Agreement and thereafter, all books, records and papers of the Company pertaining to the reinsurance provided hereunder or all losses thereon.

3

## ARTICLE XII – OFFSETS

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances due from such party (or any affiliate of such party) to the other party (or any affiliate of such other party) against any balance or balances due to the former from the latter under this Agreement or any other contract between the parties hereto, or between a party hereto and an affiliate of the other party, or between any affiliates of the parties, whether on account of premiums, loans, commissions, fees, payments or otherwise, and regardless of the capacity, whether as ceding insurer or assuming insurer, buyer or seller of goods or services, or otherwise, in which such party or any affiliates acted under the contract or contracts involved.

## ARTICLE XIII – CURRENCY

Whenever the word Dollars or the "$" appears in this Agreement, they shall be understood to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars. Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange (per the Wall Street Journal) at the date such transaction is entered on the books of the Company.

## ARTICLE XIV – TAXES

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction in respect to the premiums hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or to the District of Columbia.

## ARTICLE XV – UNAUTHORIZED REINSURANCE

A.   This Article shall apply until the Company is entitled to full reserve credit for the reinsurance ceded hereunder in all states in which the Company transacts business. It is agreed that whenever the Company is required by law to establish reserves for the reinsurance ceded hereunder, including but not limited to policy reserves, unearned premium reserves, and losses reserves (including those for losses incurred but not reported), the Company will forward to the Reinsurer a statement showing the proportion of such reserves which is applicable to the Reinsurer. The Reinsurer agrees to deposit assets in a Custodial account pursuant to paragraph B hereof in an aggregate amount not less than 100% of the Reinsurer's proportion of said reserves. So long as the balance of the Custodial account is deficient, the Company is expressly authorized to withhold any remittance otherwise due the Reinsurer, to the extent of the deficiency, and to deposit same in the Custodial account, to be held in accordance with provisions of this Article XV.

B.   The Reinsurer shall enter into a Reinsurance Custodial Agreement with the Company and a state of national bank acceptable to the Company which is a member of the Federal Reserve System (herein called the "Custodian"), for the purpose of establishing a Custodial account for the sole and exclusive benefit and use of the Company. Such Custodial account shall consist solely of cash (United States legal tender, certificates of deposit issued by United States bank and payable in United States legal tender), and investments of the types permitted for reserves under the insurance laws of the State of South Carolina, or any combination of the above, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either the Company or the Reinsurer. The assets deposited in the Custodial account shall be subject to the Company's prior approval, which approval shall not be unreasonably withheld. The Custodial agreement shall comply with the requirements of the insurance laws of the State of South Carolina and any other state asserting jurisdiction over the Company's ceded reinsurance credits.

Prior to depositing assets with the Custodian, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Custodian of all shares, obligations or any other assets requiring assignments so that the Company, or the Custodian upon the direction of the Company, may whenever necessary negotiate any such assets without consent or signature from the Reinsurer. The assets deposited in the Custodial account shall be valued, for the purpose of determining the extent thereof, according to their current fair market value on the date as of which such valuation is to be made. All settlements of account between the Company and the Reinsurer shall be made in cash or its equivalent.

4

The Reinsurer may from time to time while there is no deficiency in the Custodial account, request the Company to withdraw from the Custodial account all or any part of the assets contained therein, and the Company shall deliver same to the Reinsurer as long as the market value of the Custodial account is equal to the amount required to be on deposit. The Company shall not unreasonably or arbitrarily withhold its approval. So long as there is no deficiency in the Custodial account, the Reinsurer shall have the full and unqualified right to vote and execute consents with respect to any shares of voting stock deposited in the Custodial account and shall be entitled to receive from time to time from the Custodian payments of any dividends, interest or other income upon any shares of stock or obligations included in the Custodial account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in the Custodial account. Unless the Custodial account balance equals or exceeds the amount required to be on deposit, the Company may deposit all reinsurance premiums due the Reinsurer under this Agreement in the Custodial account to the extent of any such deficiency.

C.   The Company or its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver, or conservator, may withdraw assets from the Custodial account at any time and from time to time, notwithstanding any other provisions in this Agreement, and such funds shall be applied without diminution because of insolvency on the part of the Company or the Reinsurer, for one or more of the following purposes only:

(1)   to pay or reimburse the Company for the unpaid or unreimbursed portion of the Reinsurer's share of any losses and loss adjustment expenses paid or payable by the Company, or of unearned premiums due to the Company, if not otherwise paid by the Reinsurer, under the Reinsurance Agreement;

(2)   to fund an account with the Company in an amount at least equal to the deduction for reinsurance ceded from the Company's liabilities for policies ceded under this Agreement, such account to include, but not be limited to, amounts for policy reserves, unearned premium reserves, and reserves for losses and allocated loss expenses incurred (including those reserves for losses incurred but not reported);

(3)   to pay any other amounts the Company claims are due under this Agreement;

(4)   to return to the Reinsurer any assets in excess of 100% of the amount required to be on deposit; and

(5)   to permit the substitution of assets as authorized hereinabove.

The Custodian shall have no responsibility or liability whatsoever in connection with the propriety of withdrawals from the Custodial account or the disposition of the funds withdrawn, except to determine that withdrawals are made only upon the order of properly authorized representatives of the Company.

D.   In lieu of , or in addition to, establishing a Custodial account and making the required deposits as required above, the Reinsurer may satisfy its obligations herein by securing delivery to the Company of an irrevocable, clean and unconditional letter of credit in the face amount of 100% of the Reinsurer's proportion of such reserves. The letter of credit shall be issued by a state or national bank acceptable to the Company which is a member of the Federal Reserve System. The letter of credit shall be subject to and issued in compliance with the insurance laws of South Carolina. The Company may draw upon the letter of credit in accordance with paragraph C above only for the reasons permitted in subparagraphs C(1) through C(3) thereof.

E.     Whenever a Custodial account or letter of credit shall be required under this Agreement, the Reinsurer shall make the required deposit to the Custodial account or secure delivery to the Company of an acceptable letter of credit in the required amount not later than the "as of date" of filing prepared by the Company for any state insurance department on the "as of date" of the statement forwarded by the Company to the Reinsurer.

## ARTICLE XVI – INSOLVENCY

In the event of the insolvency and the appointment of a conservator, liquidator, or statutory successor of the Company, the portion of any risk or obligation assumed by the Reinsurer shall be payable to the conservator, liquidator, or statutory successor of the Company on the basis of the claims allowed against the insolvent Company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the Company having authority to allow such claims, without diminution because of the insolvency, or because the conservator, liquidator, or statutory successor has failed to pay all or a portion of any claims. It is further understood and agreed that, in the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable directly by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except (i) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, or (ii) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution fort the obligations of the Company to such payees.

It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company that would involve a possible claim against the Reinsurer under this Agreement within a reasonable time after such claim is filed in the liquidation proceeding, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claims is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose a defense to such claim, the expense thus incurred shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

## ARTICLE XVII – SERVICE OF SUIT

(This Clause applies only to reinsurers domiciled outside of the United States or should the Company be authorized to do business in New York, reinsurers unauthorized in New York, as respects suits instituted in New York.)

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this article constitutes or should be understood to constitute a waiver of the Reinsurer's right to commence an action in any court of competent jurisdictions in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner, or Director of insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suite or proceeding instituted by or an behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## ARTICLE XVIII – RESOLUTION OF DISPUTES

It is understood and agreed that this Agreement is made in good faith. In the event, however, that there should arise a difference of opinion or interpretation of this Agreement, or any dispute arising from or relating to the performance or breach of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal and or state courts of the State of Illinois for the purpose of resolving such dispute.

If a dispute referred to in the preceding paragraph arises out of the alleged failure of one party to make one or more monetary payments, it is hereby acknowledged and agreed that the failure to make such payment(s) could have a material and adverse impact on the other party. Therefore, the parties hereby agree that that party alleging such adverse impact shall be entitled to seek immediate injunctive relief in accordance with the preceding paragraph with respect to any such dispute.

IN WITNESS WHEREOF, the parties have executed this Quota Share Reinsurance Agreement this 15th day of March 2003.

Attest:

COMPANY

By: _____

Peter Knolla, Senior Vice President

Attest:

REINSURER

By: _____

Anthony J. Pellarin

Title: _____

7

## Addendum A

Listing of Warrantech Administered Programs and Respective Service Contracts.

## ARTICLE V. PREMIUM AND CEDING COMMISSION

b.      The ceding commission paid by the Reinsurer to the Company shall be

8