IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC. f/k/a HERITAGE WARRANTY MUTUAL INSURANCE RISK RETENTION GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> BUTLER FINANCIAL SOLUTIONS, LLC, <br><br> Defendant. | Civil Action No. 2:07cv 2627-DCN |

### AFFIDAVIT OF JEANINE M. FOLZ

STATE OF TEXAS      )
                    ) ss:
TARRANT COUNTY      )

I, Jeanine M. Folz, having been duly sworn, depose and say as follows:

1. My name is Jeanine M. Folz. I am Senior Vice President, Insurance Services and Assistant Corporate Secretary for Warrantech Corporation. I have personal knowledge regarding the matters asserted herein and, if called upon, could testify competently thereto.

2. Warrantech Automotive, Inc., Warrantech Automotive of Florida, Inc. and Vemeco, Inc. (collectively referred to herein as "Warrantech") are subsidiaries of Warrantech Corporation. Warrantech develops, markets, distributes and administers Vehicle Service Contracts ("VSC") that individuals can purchase for their vehicles. With the purchase of a VSC, a VSC holder is promised that he or she will not have to pay for certain types of covered repairs for a certain period of time, generally one to seven years. Instead, those repair costs are to be paid by the party that sells the VSC to the holder.



EXHIBIT B

3. Most states have laws that regulate the marketing, distribution and administration of VSC's. Many of these laws require that VSC's be backed by an "obligor," an entity that is responsible for making sure that repairs are performed and/or paid for when VSC holders make claims under their VSC's. The obligor must establish that it is financially capable of having the repairs performed and/or paid for. One way an obligor can establish its financial responsibility is by purchasing an insurance policy that insures VSC holders' claims and reimburses, or pays on behalf of, the obligor all covered sums that the obligor is legally obligated to pay.

4. As Senior Vice President of Insurance Services, my responsibilities include: (1) securing the insurance that backs the service contracts marketed and administered by Warrantech; (2) assisting the insurance carriers in developing programs to insure the VSC's; (3) ensuring that Warrantech adheres to the insurance carriers' underwriting and claims handling guidelines for the VSC's; (4) monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss costs for the programs; and (5) ensuring the VSC programs' compliance with applicable regulations.

5. The obligor on many of the VSC's marketed, distributed and administered by Warrantech since April of 2000 is Butler Financial Solutions, LLC ("Butler"). As of the date of this Affidavit, 247,921 VSC's have been sold in the United States with Butler as the obligor.

6. Butler is not a subsidiary of Warrantech Corporation or any other Warrantech entity. No Warrantech entity is a member of Butler. No Warrantech officers or employees are also officers or employees of Butler. No Warrantech entity has financial control over Butler. No Warrantech entity "created" or "sponsored" Butler as alleged by Heritage Warranty Insurance Risk Retention Group, Inc. ("Heritage") in Paragraph 6 of its Complaint filed against Butler in the United States District Court for South Carolina.

2

7.  In its Complaint, Heritage does not accurately or completely describe statements made by Warrantech in its public filings with the SEC concerning its relationship with Butler. I would refer interested parties to Warrantech's Form 10-K filings for a complete and accurate description of Warrantech's relationship with Butler, including the 10-K filed on June 28, 2002 for the period ending March 31, 2002, the 10-K filed on August 16, 2004 or the period ending March 31, 2004 and the 10-K filed on July 3, 2006 for the period ending March 31, 2006.

8.  Butler obtained from Heritage a "Service Contract Reimbursement Insurance Policy," Policy No. HWMIRRG-SC-WAR-001 (the "Heritage Insurance Policy"), to insure its obligation to have repairs performed and/or paid for under the VSC's.

9.  On March 1, 2001, Warrantech entered into an "Administrative Agreement" with Heritage. A true and correct copy of the March 1, 2001 Administrative Agreement is attached as Exhibit A.

10. On December 17, 2002, Warrantech entered into "Amendment Number 1" to the Administrative Agreement. A true and correct copy of the December 17, 2002 Amendment Number 1 is attached as Exhibit B. (The Administrative Agreement and Amendment Number 1 are referred to collectively herein as the "Administrative Agreements".)

11. Pursuant to the terms of the Administrative Agreements, Warrantech acts on behalf of Heritage as the administrator and claims adjuster for claims made by VSC holders under VSC's that Heritage insures. Warrantech is under an obligation to adjudicate claims fairly and in compliance with the applicable VSC program. Warrantech determines whether a particular claim is covered under the terms of the applicable VSC and will then pay the claim from a fund established and maintained by Heritage pursuant to the terms of the Administrative Agreements and the Heritage Insurance Policy.

12. The Administrative Agreement provides that Heritage retained the services of Warrantech solely to "market and administer" VSC's sold to VSC holders "pursuant to the terms and conditions set forth herein and pursuant to the terms and conditions of the insurance provided by [Heritage]."

13. Section I(B) of the Administrative Agreement provides that "Warrantech shall serve as [Heritage's] administrator of Vehicle Service Contracts which are provided by [Heritage]."

14. Under Section I(I)(1) of the Claims Handling Addendum to the Administrative Agreement, Warrantech maintains a "[Heritage] funded [and] controlled disbursement claim payment bank account" for the purpose of paying out and settling all valid claims submitted by VSC holders. In Section VI(H)(2) of the Administrative Agreement, Heritage specifically requested that Warrantech became responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."

15. Section II(b) of Amendment Number 1 reiterates the relevant language of Section I(I)(1) of the Claims Handling Addendum and states, "Warrantech shall maintain a [Heritage] funded and controlled disbursement claim payment bank account at an FDIC insured bank . . . selected by Heritage." Section II(b) specifies this account is intended for the "payment of Claims" submitted by VSC holders.

16. Section II(g) of Amendment Number 1 mandates that Heritage "shall promptly fund the Claims . . . submitted by Warrantech from the bank account more specifically described in Section I(I)(1) of this Addendum."

17. In Section I(f) of Amendment Number 1, Heritage acknowledges the agency between Heritage and Warrantech, that Heritage is obligated to "indemnify and hold Warrantech

4

harmless" from claims arising from VSCs, and agrees that Heritage is "solely responsible for the satisfaction of such claims."

18. The VSC's insured by Heritage all represent to Warrantech and VSC holders that American Reinsurance Company ("American Re") provided reinsurance coverage to Heritage to further insure valid claims submitted by VSC holders. It was Warrantech's belief and understanding that American Re provided such reinsurance coverage to Heritage for the VSC's insured by Heritage.

19. Heritage's description of the reinsurance available for the VSC's insured by Heritage in Paragraphs 30 and 31 of its Complaint is incorrect. Only the funds deposited in the disbursement claim payment bank account were reinsured by Producer Owned Reinsurance Companies. These Producer Owned Reinsurance Companies are owned by car dealerships and other independent sellers of VSC's. The car dealerships and other VSC sellers are not "associates or affiliates" of Warrantech as alleged in Paragraph 30 of Heritage's Complaint, but are merely sellers of the VSC's. If the bank account funds became depleted or the amount of claims exceeded the available funds in the bank account, claims payments were reinsured by the reinsurance that American Re provided to Heritage, not by the Producer Owned Reinsurance Companies as alleged in Paragraph 31 of Heritage's Complaint.

20. After the execution of the Administrative Agreements, Warrantech administered the VSC's as follows: when car dealerships or other sellers sold VSC's, the sellers would retain a portion of the sale proceeds as their commissions for the sales. Warrantech also would retain a portion of the sale proceeds as its fee for administering the VSC's. Warrantech then would remit a portion of the remainder to Heritage and place the rest of the remainder into a Loss Reserve account. Heritage used the proceeds it received to fund the disbursement claim payment bank

5

account at a bank selected by Heritage. It is my understanding that Heritage also used a portion of the proceeds to pay American Re for reinsurance.

21. Heritage had the sole authority and ability to determine how much of the premiums to place into the disbursement claim payment bank account. Heritage conducted its own actuarial analysis and calculation of claims data based on information supplied by Warrantech related to the type of coverage and terms of the VSCs.

22. Between 2001 and April 2007, Warrantech administered and adjusted claims made by VSC holders and insured by Heritage. Warrantech determined which claims were covered and the amount that should be paid for those claims. Warrantech then authorized the payment of these claims from the disbursement claim payment bank account that was set up and funded by Heritage. Warrantech also paid refunds owed to those VSC holders whose VSC's were cancelled from the disbursement claim payment bank account. Warrantech reported all covered claims and payments to Heritage. Because Heritage was funding the bank account from which these payments were made, Heritage funded every payment on all VSC claims which arose after the Heritage Policy went into effect.

23. From the sales of the VSC's, Heritage received, up front, more than $25,000,000.00 in insurance premiums and other monies from the VSC's. Heritage allocated a substantial portion of the premiums into the disbursement claim payment bank account upon which Warrantech would draw to pay VSC claims. All premiums due and owing to Heritage for VSC's administered by Warrantech have been received by Heritage.

24. To my knowledge, at no time has Butler: (1) paid or reimbursed any VSC claim that Warrantech determined was covered; or (2) offered to prove its financial inability to pay or reimburse any VSC claim that Warrantech determined was covered. To my knowledge, at no

6

time has Butler played any role in the administration of claims, the day-to day operations and management of the Administrative Agreements, the setting of premiums for VSC's, or the determination of the amount of funds to be deposited into the disbursement claim payment bank account.

25. To my knowledge, at no time prior to April 2007 did Heritage request or require, as conditions to the payment of covered claims, that: (1) Butler demonstrate its financial inability to pay or reimburse any VSC claim; (2) Butler not pay or reimburse any VSC claim; or (3) the dollar amounts paid for covered claims exceed any particular threshold or limit. In fact, until April 2007, all VSC claims that Warrantech determined were covered and authorized for payment were funded entirely by Heritage through the disbursement claim payment bank account that Heritage set up and funded with a portion of the premiums it received from the sale of VSC's.

26. By letter dated May 12, 2006, American Re advised Warrantech that it had no reinsurance obligation and represented that its reinsurance agreement with Heritage was fully commuted and no longer in effect. A true and correct copy of American Re's May 12, 2006 letter is attached as Exhibit C.

27. The commutation of reinsurance was done without the knowledge or consent of Warrantech. Warrantech has no knowledge of what payment or other consideration Heritage may have received from American Re to commute the reinsurance.

28. On December 15, 2006, Heritage advised Warrantech that Heritage would look to Warrantech to continue to pay claims in the event that Butler fails to perform as the VSC obligor or if Butler files a claim under the Heritage Policy.

7

29. By letter dated March 23, 2007 to Warrantech, Heritage agreed to resume paying all valid claims and cancellations "for an interim period" subject to a reservation of rights, including restitution from other parties.

30. By letter dated April 11, 2007 to Warrantech, Heritage reneged on its promise to continue satisfying valid claims submitted by VSC holders as mandated by the Heritage Agreements. To my knowledge, between 2001 and April 2007, Heritage never declared Warrantech to be in default of its obligations under the Administrative Agreements or the Heritage Policy.

31. VSC holders continue to tender covered claims to Warrantech, in its capacity as Heritage's third party administrator for payment by Heritage as required by its insurance policy. Heritage, however, is directing VSC holders to look to Butler for payment of claims. As a result of Heritage's refusal to continue to satisfy valid claims submitted by VSC holders, Warrantech filed a lawsuit against Heritage in Illinois state court on May 3, 2007 to enforce the terms of the Administrative Agreements and the Heritage Policy.

FURTHER AFFIANT SAYETH NAUGHT

_____
Jeanine M. Fox

Subscribed and sworn before me this
13th day of September, 2007.

_____
Notary Public

DONNA A. WYNNE
NOTARY PUBLIC
STATE OF NEVADA
[seal]

State of Nevada
County of Clark
This instrument was acknowledged by Donna J. Wynne on 13th Sept 2007

8