## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

HERITAGE WARRANTY INSURANCE
RISK RETENTION GROUP, INC. f/k/a
HERITAGE WARRANTY MUTUAL
INSURANCE RISK RETENTION GROUP,
INC.,

        Plaintiff,

    v.

BUTLER FINANCIAL SOLUTIONS, LLC.

        Defendant.

Civil Action No. 2:07cv2627

Judge David Norton

### AFFIDAVIT OF HARRIS MILLER

I, Harris Miller, having been duly sworn, depose and say as follows:

1.    I have personal knowledge of the facts contained in this affidavit and could competently testify thereto if called as a witness.

2.    I submit this affidavit in opposition to the motion for mandatory preliminary injunctive relief filed in this Court by Heritage Warranty Insurance Risk Retention Group, Inc. ("Heritage").

3.    I have been actively involved in and around the vehicle service contract ("VSC") industry for more than thirty years. From the early 1970s to the early 1980s, I worked for insurance agencies which specialized in marketing of after-sale products to automobile dealers, including VSC programs. Between 1982 and 1986, I served as an executive for a third party administrator of VSC programs, New Car Dealers Associates in Oakland, California. In 1988 and 1989, I worked in Dallas for another third party administrator of VSC programs which was subsequently acquired by Warrantech Corporation ("Warrantech"). Between 1989 and 1999, I



EXHIBIT

D

worked for Warrantech, including five years as its chief financial officer. I started working for Butler in 2001 and was its manager until mid 2007. I now serve as a consultant to Butler. Based on thirty years of employment in the VSC industry, I am familiar with how VSC programs are marketed, insured and administered; the service contract/consumer protection/financial responsibility statutes throughout the United States which apply to VSC programs; and the tripartite roles and responsibilities for VSC programs of insurers (like Heritage), third party administrators (like Warrantech) and obligors (like Butler).

4.    I have reviewed Heritage's motion for mandatory preliminary injunctive relief and the supporting affidavit of Paul Miles.

### The Parties' Course of Dealing Between 2001 and 2006— Heritage Immediately and Unconditionally Pays All VSC Claims Without First Looking to Butler

5.    Between 2001 and January 31, 2007, on information and belief, Heritage paid every claim from day one on all VSC claims which arose after the Heritage Policy went into effect. During this time, Heritage knew, understood, and agreed that Butler would not pay any covered claims under VSCs in the first instance.

6.    After the execution of the Administrative Agreements, between 2001 and April 2007, on information and belief, Warrantech remitted to Heritage all premiums and Claims Reserve Funds for VSC's insured by Heritage and then Heritage used these Claims Reserve Funds to fund the disbursement claim payment bank account at a bank selected by Heritage. Under the Administrative Agreement, Heritage had the sole authority and ability to specify how much in Claims Reserve Funds to place into this bank account.

2

7.    Between 2001 and April 2007, Warrantech administered and adjusted claims made by VSC holders and insured by Heritage. Warrantech determined which claims were covered and the amount that should be paid for those claims. Upon information and belief, Warrantech then, with the approval of Heritage, authorized the payment of these claims from the disbursement claim payment bank account that was set up and funded by Heritage or was reimbursed by Heritage money advanced for the payment of valid claims. Warrantech reported all covered claims and payments to Heritage.

8.    Between 2001 and April 2007, at no time has Butler ever (i) paid or reimbursed any Heritage insured VSC claim that Warrantech determined was covered, or (ii) demonstrated or offered to or been requested to by Heritage to demonstrate its financial inability or failure to pay or reimburse any VSC claim that Warrantech determined was covered.

9.    Between 2001 and April 2007, to the best of my knowledge, Heritage has never requested or required, as conditions to Heritage's payment of covered claims, that (i) Butler demonstrate its financial inability or failure to pay or reimburse any VSC claim; (ii) 60 days elapse before Heritage would pay or honor a claim; or (iii) Butler not pay or reimburse any VSC claim..

10.    In fact, until January 31, 2007, to the best of my knowledge, all VSC claims that Warrantech determined were covered and authorized for payment were funded entirely by Heritage through the disbursement claim payment bank account that Heritage set up and funded with a portion of the monies it received from the sale of VSCs. In addition, to the best of my knowledge, all VSC claims submitted by VSC holders were promptly and expeditiously processed by Warrantech and paid by Heritage.

11. At no time has Butler played any role in the administration of claims, the day-to-day operations and management of the Administrative Agreements, the setting of premiums for VSCs, or the determination of the amount of funds to be deposited into the disbursement claim payment bank account.

## Butler and Warrantech Are Separate Entities

12. Preliminarily, I take strong issue with Heritage's contentions and allegations that Warrantech controls Butler and that Warrantech and Butler are one and the same entity, to wit:

- Butler is a limited liability company organized under the laws of the state of Delaware. Butler's principal place of business is located in North Carolina, and the sole member of the limited liability company is domiciled in Florida. Butler is owned by parties unrelated to Warrantech. The members of Butler are SPG Financial Corp., and the company's current manager is Richard Rodriguez.

- Warrantech and Butler do not have common managers, officers or directors. None of the members or managers of Butler are officers or directors of Warrantech.

- To the best of my knowledge and belief Butler caused its own incorporation. Contrary to Heritage's allegation I believe that Butler was neither created nor sponsored by Warrantech for the purpose of isolating financial risk associated with Warrantech's operations.

- Butler's income, expenses, assets, and liabilities are not consolidated with those of Warrantech.

- Warrantech does not own any of Butler's capital stock.

- Warrantech does not exercise any control over Butler's financial affairs or financial reporting.

- Warrantech does not use Butler's property as its own.

- Warrantech does not finance Butler's day-to-day operations.

4

13. In its pleadings in this Court, Heritage emphasizes that earnings derived from transactions with Butler are included in Warrantech's SEC filings. As set forth in Warrantech's 10K filings, Warrantech modified its financial statements for financial reporting purposes and disclosed its transactional ties with Butler.

14. The parties' tri-partite relationship and responsibilities are not determined by the 10Ks but are determined primarily by the course of dealing between them for the last five years and by certain written agreements, including the Heritage policy and an Administrative Agreement between Heritage and Warrantech. As will be set forth below, certain operative provisions in the Heritage Policy and the Administrative Agreement are required by state VSC laws in South Carolina and elsewhere.

## General Description of VSC Programs and the Paramount Importance of Insurance

15. A VSC is a contract typically sold by an automobile dealer or other approved entity to a vehicle purchaser/owner which offers coverage for a specified period of time ( a term of from one to ten years) and/or an elapsed number of miles (sometimes up to 150,000 miles or to an unlimited number of miles) . VCS plans provide customers with expanded product breakdown coverage in the event of the failure of a broad range of mechanical components occurring during the term of the VSC, other than failures encompassed by a manufacturer's warranty.

16. Butler, where authorized by law or otherwise not precluded from doing so, is the obligor under Vehicle Service Contracts ("VSCs") which consumers typically purchase in conjunction with their purchase of automobiles or, later, through such media as the internet.

17. As obligor, Butler is responsible for paying or funding claims submitted under the VSCs for the repairs to the subject vehicles. However, under the operative agreements in this case and pursuant to statutes in many states, including South Carolina, Heritage, as insurer, agreed to insure, fund, honor, and pay these repair claims, and as matter of practice, Heritage was a party to the funding mechanism established by Heritage which paid all VSC claims between 2001 and the end of 2006 in the first instance.

18. Heritage exercised control over virtually all aspects of the VSC program, including (a) the amount of premium to be charged for the VSCs, (b) the amount of money to be placed in Heritage's Loss Reserve Fund for each VSC sold, and withdrawals of monies from the Loss Fund Reserve.

14. Approximately 40 states have consumer protection/financial responsibility laws which regulate the marketing, distribution and administration of and insurance coverage for VSCs. These laws impose certain requirements upon service contract providers such as Butler and insurance carriers of service contracts such as Heritage. I am generally familiar with these states' laws since I have been working in the VSC industry for three decades and I have communicated with various state insurance regulators about VSC programs. In addition, the provisions of the statutes in all these states are very similar since these statutes were premised on a model service contract statute proposed by stakeholders in the VSC industry, such as the National Association of Insurance Commissioners..

15. Typically, the state statutes allow for three different methods by which a service contract provider or obligor like Butler can provide assurances of faithful performance of its obligations to VSC holders: (i) maintain net worth of at least $100,000,000.00; (ii) maintain a funded reserve account in an amount equal to or greater than 40% of the sums received for the

payment of VSCs; or (iii) purchase an insurance policy directly from an insurer or through a risk retention group  Such insurance and the VSC state statutes ultimately protect the VSC holder, and the consumer from loss under VSCs.

16.     In my thirty years of experience in the VSC  industry. service contract providers almost invariably opt for the third option. namely  to procure insurance to cover claims.     It is also been my experience, that when insurance is chosen as the method by which  assurances of faithful performance of its obligations are given to VSC holders, the insurance company controls and maintains the ultimate authority as to how the VSC program is run. funded, and claims are paid for. Based on my experience, the insurer exercises such control to minimize the exposure to the insurer to an underwriting loss or to a defalcation on another parties part.

17.     In addition, VSC consumer protection statutes throughout the United States require that insurers policies include certain provisions to  ensure that VSC holders are assured that covered VSC claims are actually paid.  To my knowledge, every state VSC statute has a provision substantially similar to Section 38-78-40(A).

18.     A review of the Heritage Policy, the Administration Agreement, and a Claims Handling Addendum establish in my view (i) the control Heritage wields over the VSC program; (ii) renders Heritage's claimed reasons for terminating the policy improper and pretextual; and (iii) warrants denial of Heritage's motion for mandatory preliminary injunctive relief.

## The Insurance Policy Issued by Heritage—Heritage Agreed to Pay and Honor All VSC Claims

19.     Based on the Heritage's insurance policy issued to Butler and the terms of the Administrative Agreement between Heritage and Warrantech. the relationship between these three parties worked as follows: Every time a vehicle dealer sold a VSC, the proceeds from the sale would be distributed as follows:  (1) The dealer kept a portion of the proceeds as its

7

commission from the sale; (2) Warrantech received a fee for serving as the administrator of the VSC; Butler received a fee for being the obligor under the VSC; (3) Heritage received a fee as the premium payment for Heritage's insurance policy on the VSC; (4) Heritage paid a portion of its premium fee to American Reinsurance Company ("American Reinsurance") or other reinsurers to provide reinsurance coverage to Heritage; and (4) the remaining proceeds from the sale were placed into a Loss "Reserve Fund" (a/k/a a Reserve Pool) established to pay the valid claims made under the VSCs. The amount placed in the Reserve Fund was based on Heritage's actuarial analysis and calculations of anticipated claims experience. The data utilized in such analysis by Heritage may have been supplied by Warrantech or may have been Heritages's own historical data. Under the terms of the Administrative Agreement, Warrantech, acting as Heritage's third-party claims administrator, was authorized to use the funds in the Reserve Loss Fund to pay covered warranty claims under the VSCs.

20. The VSCs for which Butler is the obligor are insured by a "Service Contract Reimbursement Insurance Policy." Policy No. HWMTRRG-SC-WAR-001 (the "Heritage Policy") issued by Heritage to Butler. A true and correct copy of the Heritage Policy is attached hereto as **Exhibit** A and incorporated herein by reference.

21. In its pleadings and motions filed in this Court, Heritage repeatedly calls its policy a "bankruptcy policy." The word "bankruptcy" does not appear in the policy, and the phrase "bankruptcy policy" is not a term of art I have encountered in my 30 years in the VSC industry.

22. The Heritage Policy covers twelve (12) month periods and automatically renews unless terminated by notice each period. The first period for the Heritage Policy commenced on December 31, 2001, and the Policy automatically renewed each year thereafter.

8

23. Under the Policy, Heritage agreed to pay for the cost of repairs, claims, and/or losses that are covered under the terms of the VSCs. (See Section 1.1 of **Exhibit A** and quoted verbatim in Butler's supporting memorandum.

24. In Section 1.1, under the Heritage Policy's insuring agreements, Heritage agreed to pay all repair and replacement costs of VSC holders under each VSC:

25. Section 1.1 requires Heritage to pay the claims and/or losses of VSC holders directly when Butler fails to make payments on covered claims:

> Upon failure of the Insured to pay or provide service on a valid claim within sixty (60) days after proof of loss has been filed with Insured, coverage hereunder shall be provided directly to the service contract holder claimant.

The 60 day time frame for Heritage's payment of claims has nothing to do with the insolvency of the obligor. Based on my experience and knowledge, this time frame instead finds its genesis in the service contract regulations mentioned above and the time frame seeks to help ensure that VSC holders promptly receive the benefits of the VSCs they purchased. Based on my three decades in the VSC industry, this 60 day time frame provision can be found in a VSC issued in virtually every state which has passed a VSC statute.

26. The Heritage Policy states that subject to the Loss Reserve Fund provisions, Heritage is liable for the payment of losses arising from the reasonable and customary cost of repair or replacement under the provisions of VSCs issued by Butler on ar after the inception date of the Heritage Policy.

27. Under Section II.1 of the Heritage Policy, the term "Administrator" is defined as "[Heritage's] designated administrator in accordance with the Administration and Service Agreement." Thus, under the Heritage Policy, Warrantech was Heritage's administrator, not Butler's as alleged by Heritage in its pleadings.

9

28. On information and belief, Heritage received all premiums due Heritage for the Heritage Policy. Such premiums came from revenues generated from the sales of VSCs. Although the duration of the VSCs could run for as long as 5 to 7 years, Heritage charged and received all premiums for VSCs up-front.

29. Although the VSCs are issued for varying periods of time, usually periods of one to seven years, allowing the submission of claims over the course of several years, Section IV.2 of the Heritage Policy provides that the premium from each VSC "shall be fully earned" by Heritage at the time it is issued.

30. After the Heritage Policy went into effect, more than 50,000 consumers in numerous jurisdictions purchased VSCs. From the sales of these VSCs, Heritage received, up front, more than $25,000,000.00 in insurance premiums and other monies for claim/loss reserves. Heritage and Warrantech agreed upon the portion of the VSC sale proceeds that would be allocated to premiums and the claims/loss reserve funds amount to be allocated to the payment of claims from the Loss Reserve Funds. Butler played no role in this calculus.

31. Heritage does not claim that it has not received all premiums due for the risk Heritage assumed under the terms of its policy. On information and belief, all premiums due and owing Heritage have been received by Heritage.

32. Heritage's obligation to honor, pay, and fund VSC claims would survive Heritage's termination or cancellation of the Policy. The Heritage Policy states as follows:

> **Cancellation of this Policy shall not reduce the Company's [Heritage's] liability for claims incurred under Service Contracts issued prior to the date on which cancellation takes effect.**

33. Again, the VSC statutes of numerous states expressly stipulate that after the termination of a VSC policy, an insurer is still, nonetheless, obligated to honor and pay claims arising under all VSCs sold prior to the cancellation or termination of insurance. These states include, without limitation, Alabama, Arkansas, Georgia, Hawaii, Idaho, Iowa, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New York, North Carolina, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming.

34. Heritage has, since its initial failure to pay claims in February 2007 made statements to service contract holders (claimants) that their obligation to Butler no longer existed because the policy had been canceled effective January 31 2007. Heritage has made statements to claimants that Heritage's insurance obligations with respect to claims made under the terms of service contracts issued while their insurance policy was in full force and effect no longer existed. To the best of my knowledge, such statements to claimants continue to be made by Heritage personnel.

35. The VSCs, in accordance with statute and as approved by Heritage, state that Heritage is the insurance company that will stand behind them and provide protection in the event that claims are made. For example, the VSC attached hereto as Exhibit C states:

> The obligation of the provider [Butler] to perform under this Contract is insured by Heritage Warranty Mutual Insurance Risk Retention Group, Inc. . . . under a motor Vehicle Service Contract reimbursement policy, and reinsured by American Re – a national A+ rated company and a member of the Munich Re Group. If a covered claim is not paid within sixty (60) days [except in Arizona thirty (30) days], after proof of loss has been filed, You may file a claim directly with the Insurance Company.

The 60-day requirement for Heritage to honor and pay claims and losses tracks the 60-day requirement for same under the service contract statutes in many states.

36.     Under Section IV.20 of the Heritage Policy, Heritage may cancel the Policy with "written notice stating a date not less than thirty (30) days thereafter when such cancellation shall be effective."

37.     The Heritage policy contains a cancellation clause which requires Heritage to provide Butler at least 30 days prior written notice of Heritage's intent not to renew the policy, that is, December 1 is the latest date in any year which Heritage can notify Butler of its intent not to renew the subject policy.

38.     Butler's address for the receipt of notices required under the policy is 2300 Corporate Boulevard NW, Suite 214, Boca Raton, Florida, 33431 and Butler's current mailing address in North Carolina was provided to Heritage in 2005.

### The Administrative Agreement Between Warrantech and Heritage— Heritage Controls All Aspects of the VSC Program

39.     On March 15, 2001, Warrantech and Heritage entered into an Administrative Agreement. The Administrative Agreement sets forth the rights and obligations between the parties with respect to the VSCs sold by others and administered by Warrantech and under which valid claims are to be paid by Heritage pursuant to the Heritage Policy. A true and correct copy of the Administrative Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

40.     It was requested that Butler, as the obligor, agree to and acknowledge the terms and conditions of the Administrative Agreement. Under the terms of this agreement, Warrantech would act as the third party administrator for Heritage and, among other things, adjudicate claims made under VSC's for which Heritage was liable, subject to the so-called Claims Reserve Funds, under the terms and conditions of the Heritage policy. The Administrative Agreement gives Heritage control over the disbursements from the Claims Reserve Funds.

12

41.     Butler has played no role in the receipt and disposition of premiums and claims reserve funds; administration of claims; the day-to-day operations and management of the Administration Agreement; the setting of premiums; or the determination of the amount of funds to be deposited into the Loss Reserve Fund. In addition, at all relevant times hereto, Butler had no authority to make, alter, modify any terms of any VSCs, the premiums to be paid to Heritage on the sale of each VSC or the amount to be set aside for the Loss Reserve Fund.

42.     The very first provision of the Administrative Agreement confirms that Warrantech acted as an administrator and claims adjuster for Heritage under Heritage's direction and authority

        I.      Administration

        A.      COMPANY [Heritage] hereby grants WARRANTECH authority to serve as administrator to perform the duties set forth below and vests in WARRANTECH authority to accomplish, effect, and execute such duties upon the terms and conditions set forth in the AGREEMENT.

        B.      WARRANTECH shall serve as COMPANY'S administrator of Vehicle Service Contracts which are provided by COMPANY.
        (Exhibit __, at p. 2).

Again, the terms of the Administrative Agreement contradict Heritage's allegation that Warrantech is Butler's third party administrator.

43.     The Administrative Agreement sets forth Warrantech's role as the administrator in the overall tripartite relationship between Heritage, Warrantech, and Butler. In short, under the Administrative Agreement, Warrantech, among other things, determines whether a particular repair is covered under the terms of the VSC program. Warrantech pays the repair facility or directly reimburse the VSC holder for the reasonable cost of that repair from an account maintained by Warrantech pursuant to the Administrative Agreement and the Heritage Policy.

13

44.     With respect to premiums collected from the sale of VSCs, under the terms of the Administrative Agreement, Section H, Premium., Warrantech acted as Heritage's fiduciary. The funds used to pay VSC claims were drawn from a Loss Reserve account which was controlled by Heritage and for which Warrantech acted solely as trustee.

45.     The Underwriting Authority section of the Administrative Agreement establish that Heritage controlled the terms. conditions. and pricing (premiums and claims reserve funds) for VSC programs.  Specifically, in Section VIQ of the Administrative Agreement, Heritage granted Warrantech, its third party administrator, only the authority to propose to Heritage changes and revisions to the VSC programs based on loss severity data, loss frequency data, and earning patterns to increase profits and decrease losses the parties might sustain under VSCs. (Exhibit B at pp. 9-10.)  Warrantech could not change any of the VSC programs unilaterally; instead, Heritage had sole authority to accept or reject any such proposals and to unilaterally make changes to the VSC programs.  (Id.)  Heritage's retention of the ultimate authority under the Administrative Agreement to change the terms and pricing of VSC programs is consistent with VSC industry practice based on my thirty years in the VSC business.  Based on my knowledge and experience. VSC insurers typically do not cede their right and ability to modify VSC programs to third parties.

46.     On information and belief, Heritage had its own staff and actuaries on hand to track underwriting profits or  losses under VSCs: perform audits: perform longitudinal and historical analyses of claims made under the VSCs they insured: as well as loss frequency and loss severity. On information and belief. Heritage's actuaries also could determine whether modifications to the pricing and terms of VSCs were necessary to ensure that Heritage's loss fund would not be depleted.  Similarly, based on my 30-years' experience. Heritage could

14

mandate premium and claims reserve increases to the VSC programs. In the past, I have seen VSC insurers implement increases in premium and loss reserves, overruling the recommendations of their administrators.

47.     The terms of the Administrative Agreement state that any alleged negligence by or failure of Warrantech in proposing changes to VSC programs to Heritage might only result in Heritage's withdrawal of its grant of authority to Warrantech to propose changes to the VSC programs. (See **Exhibit B**, Section Q4 at p. 4

48.     Like the Heritage policy, Heritage's obligations under the Administrative Agreements to pay or reimburse claims under then existing VSCs continues even after the Administrative Agreement is terminated or cancelled. Page 15, Section X,.F.1, requires Heritage to continue to perform all functions and obligations required by this AGREEMENT as if this AGREEMENT were in full force with respects [sic] to all Vehicle Service Contracts with effective dates prior to the termination date of this AGREEMENT. Such service shall continue until all Vehicle Service Contracts expire or are canceled and all Claims thereunder have been paid or a mutually acceptable arrangement for the fulfillment of such obligations is evidenced by a written agreement between the parties.

49.     On December 17, 2002, Heritage and Warrantech executed Amendment Number 1 ("Amendment 1") to the Administrative Agreement modifying the rights and obligations between the parties. Under Amendment 1. Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."     Section II.b of Amendment 1 states again that "Warrantech shall maintain a [Heritage] funded and controlled disbursement claim payment bank account at an FDIC insured bank . . . selected by Heritage." Section II.b specifies this account is for the "payment of Claims" submitted by VSC holders.

Section II.g of Amendment 1 requires that Heritage "shall promptly fund the Claims... submitted by Warrantech from the bank account more specifically described in Section I(l)(1) of this Addendum." (See Addendum attached hereto as **Exhibit C.**)

50.    Section 1(f) of Amendment Number 1, states that Heritage is obligated to "indemnify and hold Warrantech harmless" from claims arising from VSCs, and agrees that Heritage is "solely responsible for the satisfaction of such claims." Section II(g) of Amendment Number 1 states that Heritage "shall promptly fund the Claims . . . submitted by Warrantech from the bank account more specifically described in Section I(l)(1) of this Addendum."

### The Claims Handling Addendum—Warrantech Processes Claims and Pays Claims from a Loss Reserve Account Controlled by Heritage

51.    Heritage also delineated Warrantech's duties in a Claims Handling Addendum, attached hereto as **Exhibit D.** Like the Administrative Agreement, Heritage granted authority to Warrantech for claims handling. Again, Butler has played no role at any time in the day-to-day handling of claims.

52.    In Section I.I.1 of the Claims Handling Addendum, Warrantech agreed to maintain a "[Heritage] funded [and] controlled disbursement claim payment bank account" for the "sole" purpose of paying out and settling all covered VSC claims. Under Section VI.H.2 of the Administrative Agreement, Warrantech is responsible for remitting to Heritage "all Premium for Vehicle Service Contracts reported to Warrantech."

### Purported Cancellation of the Policy and Its Cited Reasons

53.    The tripartite relationship between Heritage, Butler, and Warrantech proceeded smoothly until 2006. Between 2001 and 2006, Heritage paid all VSC claims from the Loss Reserve Fund. To the best of my knowledge and belief, during this time, as set forth above,

Heritage never required or even asked that Butler demonstrate a failure or inability to pay VSC claims as a pre-condition to Heritage's payment of a covered VSC claim.

54. Starting in mid 2006 and continuing through 2007, on information and belief, two separate and discrete events occurred which have prompted Heritage's precipitous purported termination of the Policy and its failure to pay and honor VSC claims: (i) Heritage's loss of reinsurance by American Reinsurance, and (ii) the depletion of the Loss Reserve Fund. I will address these events *seriatim*.

### i. The Commutation of Heritage's Reinsurance

55. The declaration page of the VSC's insured by Heritage all represent to Butler and VSC holders that American Reinsurance Company ("American Re") provided reinsurance coverage to Heritage to further insure valid claims submitted by VSC holders.

56. By letter dated May 12, 2006, American Re advised Warrantech that it had no longer had a reinsurance obligation and represented that its reinsurance agreement with Heritage was fully commuted and no longer in effect.

57. The commutation of reinsurance was done without the knowledge or consent of Butler. Butler has no knowledge of what payment or other consideration Heritage may have received from American Re to commute the reinsurance.

58. The existence of reinsurance for an insurer of a service contract provider is not required by any VSC statute with which I am familiar

### ii. Depletion of the Loss Reserve Fund Due to Warrantech's and Butler's Alleged Negligence

59. In a letter dated December 15, 2006, Heritage advised Butler, in care of Warrantech, that Butler and Warrantech had "inadequately priced" several programs, violating "one of your promises to maintain loss ratios at no more than 90%." Heritage further asserted

that "Warrantech's failure to charge adequate rates has recently or will result soon in the depletion of several program's Loss Reserve Funds." (The December 15 letter is attached hereto as **Exhibit E.**)

60. Heritage also cited Butler's and Warrantech's supposed negligence in setting and maintaining adequate prices for the VSCs as the reason for seeking to cancel the Heritage Policy on December 29, 2006, effective December 31, 2006. (Heritage's purported termination letter of December 29, 2006 is attached hereto as **Exhibit F.**)[1]

61. Based upon my knowledge and belief, I dispute that any claimed negligence by Butler or Heritage in the setting of VSC prices and rates or in the administration of the VSC program is a valid ground for terminating the Heritage Policy for several reasons:

- As set forth above, the authority for setting and modifying VSC prices ultimately resided in Heritage.

- Butler played no role at all, and was not permitted to play any role, in the administration of the VSC program generally, or specifically, to set or change rates and prices for VSCs.

- Pursuant to the underwriting authority provisions of the Administrative Agreement, Warrantech only had the authority to suggest changes to Heritage regarding the pricing structures for the VSC programs..

62. Prior to Heritage's filing of its lawsuit in this Court, I articulated to Heritage in March 2007 Butler's stance about Heritage's termination of the Policy and how this termination could injure innocent VSC holders (See letter attached hereto as **Exhibit G.**)

---

[1] As a threshold matter, I do not believe that Heritage's letter of December 29, 2006 complied with the termination provision in its Policy. In direct violation of Section IV.20 of the Heritage Policy requiring thirty (30) day notice of cancellation, on December 29, 2006, Heritage wrote to Butler purporting to cancel the Heritage Policy "effective at midnight on December 31, 2006." Heritage did not send the cancellation notice to Butler in Florida or to Butler in North Carolina, as required by the policy and previous written instruction; instead it sent the purported cancellation notice to Butler in care of Warrantech in Texas. Because Heritage sent the termination letter to the wrong person at the wrong address, Butler did not learn of Heritage's cancellation of the Policy until mid January, 2007.

**Butler Is Being Currently Harmed by Heritage's Refusal
To Pay and Honor VSC Claims—Butler and Innocent VSC Holders
Will Be Irreparably Harmed
If Heritage's Motion for Mandatory Injunctive Relief Is Granted**

63.     VSC holders continue to tender covered claims to Warrantech (or its subsidiaries), in its capacity as Heritage's third party administrator. Heritage has instructed its administrator to authorize valid claims but has refused payment of such claim, either from the Claims Reserve Funds or from its capital and surplus as required by its insurance policy. Heritage, however, is directing VSC holders to look to Butler for payment of claims.

64.     As of the date of this affidavit, Heritage continues to refuse to pay covered VSC claims and losses, both those already submitted and those that may be submitted in the future.

65.     On information and belief, Heritage has been and continues to be contacted by numerous VSC holders seeking payment or resolution of their claims. Upon information and belief, Heritage has been informing, and continues to inform, VSC holders to seek payment or resolution of their claims from Butler. Butler has received and continues to receive numerous calls from VSC holders and from repair facilities seeking payment or resolution of claims.

66.     Butler had never been declared to be in default of the operative agreements or been advised by Heritage of the need to cure said defaults.

67.     As a result of Heritage's refusal to pay claims under the Policy and Administrative Agreement, Butler is facing mounting claims and potential exposure to legal actions by VSC holders with unsatisfied claims, and other damages.

68.     Heritage's continued refusal to honor and pay VSC claims is subjecting Butler to the specter of regulatory and administrative proceedings in the State of Illinois and other states resulting directly from Heritage's cancellation of statutorily required insurance.

69.     The failure by Heritage to fund covered VCS claims will result in escalating financial exposure to Butler and the refusal of repair facilities to perform repairs or release vehicles for which repairs already have been made. This likely would expose Butler to claims for which Heritage was paid millions of dollars in premiums to honor and pay. More importantly, VSC holders throughout the United States will be left without the protection that Heritage represented to them they would have when they purchased VSCs.

70.     Butler does not have the financial wherewithal to pay claims arising under the Heritage Policy for several reasons.

> o   The existence of insurance through Heritage was the manner by which Butler, as obligor, has provided proof of financial responsibility in the states where VSCs are sold, on which Butler is named as the obligor are sold. This insurance had been in place for five years. Upon information and belief, Heritage paid all VSC claims for five years without requiring Butler to establish an inability or failure to pay these claims. Butler had no ability to establish financial responsibility by other methods countenanced by state statutes—the amassing of $100,000,000 in net worth or the establishment of a reserve fund equal to at least 40% of the amount or premiums received from the sale of VSCs.

> o   Upon information and belief, at the time that Heritage issued the Policy in 2001, Heritage knew that Butler's role was limited to that of VSC obligor and named insured. Heritage knew that Butler played no role in the administration of the VSC program or the handling of claims. Heritage never expected or demanded that Butler pay VSC claims in the first instance to be reimbursed by Heritage at a later date, or that it was expected that Butler would be required to fail to pay VSC claims before Heritage's payment obligations were triggered.

> o   Butler owes Warrantech approximately **in excess of $10,000,000.00.** Butler's indebtedness results from a loan that Warrantech made to Butler in 2001 after one of Butler's prior VSC insurers, Reliance Insurance was placed in liquidation. When Reliance went under, Butler, as the obligor, became obligated to honor VSC claims arising under the Reliance policy. Without this loan, Butler was likely facing the specter of bankruptcy and the reputations and market share of both Butler and Warrantech in the VSC industry was threatened by the insolvency of Reliance, an event entirely outside of Butler's control..

## FURTHER AFFIANT SAYETH NAUGHT

Butler Financial Solutions, LLC

_Harris Miller_

Harris Miller, Its CONSULTANT

_Sharon G. Ponder_

Notary Public

Michael M. Tannen, Esq.
Law Offices of Michael Murphy Tannen, P.C.
39. S. LaSalle Street, Suite 905
Chicago, Illinois 60603
312.641.6650
mtannen@tannenlaw.com

David J. Parrish
Nexsen Pruet Adams Kleemeier LLC
205 King Street, Suite 400
Charleston, South Carolina 29402
843.577.9440
dparrish@nexsenpruet.com

Buncombe County, North Carolina
I, a Notary Public for said County and State, do hereby
certify that _Harris G. Miller_
personally appeared before me this day and acknowledged
the execution of the foregoing instrument. Witness My Hand
and Seal this _14th_ day of _September, 2007_
_Sharon G. Ponder_
NOTARY PUBLIC _Sharon G. Ponder_
MY COMMISSION EXPIRES _10-15-2011_

SHARON G. PONDER
Notary Public
Buncombe County
State Of North Carolina
My Commission Expires 10-15-2011

21