

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*
*APR - 7 2009*
*APR 7 2009*
*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | |
|---|---|
| **ROBERT T. KENNEDY, et al.,** ) | **Case No. 08 C 01862** |
| ) | |
| **Plaintiffs,** ) | 08cv1862 |
| ) | |
| **v.** ) | **JUDGE MAROVICH** |
| ) | |
| **BUTLER FINANCIAL SOLUTIONS,** ) | **MAGISTRATE JUDGE KEYS** |
| **LLC, et al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## ANSWER, AFFIRMATIVE DEFENSES, AND CROSS-CLAIMS BY THIRD PARTY DEFENDANTS DAMAR REINSURANCE and MARDAN REINSURANCE TO HERITAGE WARRANTY INSURANCE RISK RETENTION GROUP, INC.'S THIRD PARTY COMPLAINT

NOW COMES third party defendants Damar Reinsurance, Ltd. ("Damar") and Mardan Reinsurance, Ltd. ("Mardan"), by and through their undersigned attorneys, Green & Seifter, Attorneys, PLLC, and hereby file their Answer, Affirmative Defenses, and Cross-Claims to the Third Party Complaint of Defendant Heritage Warranty Insurance Risk Retention Group, Inc. ("HRRG").

### ANSWER

1.      HRRG is a South Carolina corporation in good standing and duly licensed by the State of South Carolina to transact business under the Federal Liability Risk Retention Act (15 U.S.C. §3901, et seq.).  HRRG's principal place of business is within the State of South Carolina.

**ANSWER:** Upon information and belief, Damar and Mardan admit that HRRG is a South

Carolina corporation with its principal place of business in the State of South Carolina.  Damar

and Mardan are without sufficient knowledge or information to either admit or deny the

remaining allegations in this paragraph and therefore deny these allegations.

2.      Warrantech Automotive, Inc. ("Warrantech Automotive") is a Connecticut corporation with its principal place of business located in the State of Texas.  Warrantech Automotive, Inc. is a wholly owned subsidiary of Warrantech Corporation.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

3.      Warrantech Corporation ("Warrantech Corporation") is a Delaware corporation with its principal place of business located in the State of Texas.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

4.      Vemeco, Inc. ("Vemeco") is a Delaware corporation with its principal place of business located in the State of Texas.  Vemeco is a subsidiary of Warrantech Corporation.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

5.      Warrantech Automotive of Florida, Inc. ("Warrantech Automotive of Florida") is a Florida Corporation with its principal place of business located in the State of Texas. Warrantech Automotive of Florida is a subsidiary of Warrantech Corporation.  (Where appropriate, Warrantech Automotive, Warrantech Corporation, Vemeco, and Warrantech Automotive of Florida will collectively be referred to as the "Warrantech Entities").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

6.      Butler Financial Solutions, LLC ("Butler") is a limited liability corporation organized under the laws of the State of Delaware.  Butler's principal place of business is located in the State of North Carolina.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

7.      Harris G. Miller ("Miller") is a citizen and resident of the State of North Carolina who at all times relevant hereto held himself out as the President of Butler and, upon information and belief, also served as the Manager of Butler.  At present he remains employed by Butler as a consultant.  Between 1989 and 1999, Miller worked for Warrantech Corporation, including five years as its chief financial officer.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

8.      Mardan Reinsurance Ltd. ("Mardan") is a reinsurance company with its principal place of business in the State of New York at 209 Factory Ave., Syracuse, New York 13208.

**ANSWER:** Damar and Mardan admit the allegations contained in paragraph 8.

9.      Marion Reinsurance, Ltd. ("Marion") is a reinsurance company with its principal place of business in the State of New York at 1045 Route 109, Suite 105, Lindenhurst, New York 11757.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

10.     Fuccillo Reinsurance Company, Ltd. ("Fuccillo") is a reinsurance company with its principal place of business in the State of Texas at 7581 Pebble Springs Court, Sandy, UT 84093.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

11.     Damar Reinsurance, Ltd. ("Damar") is a reinsurance company with its principal place of business in the State of New York at 209 Factory Ave., Syracuse, New York 13208.

**ANSWER:** Damar and Mardan admit the allegations contained in paragraph 11.

12.     Bradford Reinsurance, Ltd. ("Bradford") is a reinsurance company with its principal place of business in the State of New Jersey at 2791 Rt. 73 South, Maple Shade, New Jersey 08052.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

13.     Alrendan Re., Ltd. ("Alrendan") is a reinsurance company with its principal place of business in the State of New Jersey at 204 W. Rt. 130, Burlington, New Jersey 08016.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

14.     12GK Reinsurance, Ltd. ("12GK") is a reinsurance company with its principal place of business in the State of New York at 1045 Route 109, Suite 105, Lindenhurst, New York 11757.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

15.     Peak Reinsurance Company Limited ("Peak") is a reinsurance company with its principal place of business in the State of New Jersey at 236 Riveria Drive, Long Branch, New Jersey 07740.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

16.     Mardan, Marion, Fuccillo, Damar, Bradford, Alrendan, 12GK, and Peak, which are Producer Owner Reinsurance Companies/Captives ("Third Party PORC Defendants"), are, upon information and belief, all reinsurance companies domiciled outside the United States.

**ANSWER:** Denied in part. Damar and Mardan are reinsurance companies. As to the remainder

of the paragraph, and in particular with respect to the other Defendants, Damar and Mardan are

without sufficient knowledge or information to either admit or deny the allegations and therefore

deny these allegations.

17.     Third Party PORC Defendants each entered into individual Quota Share Reinsurance Agreements with HRRG. *See*, Quota Share Reinsurance Agreements between Third Party PORC Defendants and HRRG, copies of which are attached hereto as <u>Exhibit A</u> (the "Quota Agreements").

**ANSWER:** Admitted in part. Damar and Mardan did enter into a contract entitled "Quota Share

Reinsurance Agreement" ("Quota Agreement" or "Reinsurance Agreement") with HRRG, which

appear to have been attached to HRRG's Third Party Complaint as Exhibit A. To the extent that

the paragraph attempts to categorize this agreement, the Reinsurance Agreement is the best

evidence of the content of the document and the remainder of the paragraph is therefore denied.

18.     This Court has jurisdiction over the parties and matters alleged herein pursuant to 28 U.S.C. § 1332 and venue herein is appropriate pursuant to 28 U.S.C. § 1391. Article XVII of the Quota Agreements provides that Third Party PORC Defendants shall "submit to the jurisdiction of a court of competent jurisdiction within the United States" at the request of HRRG in the event Third Party PORC Defendants fail to pay any amount claimed to be due under the Quota Agreements. *See*, <u>Exhibit A</u>.

**ANSWER:** Paragraph 18 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied. Damar and Mardan respond that the Reinsurance Agreement is the best evidence of its contents and deny the allegations in the paragraph to the extent they are inconsistent with the written document.

19. Venue for HRRG's Third Party Complaint against Third Party PORC Defendants is appropriate in the United States District Court for the Northern District of Illinois. Article XVIII of the Quota Agreements provides that "In the event, however, that there should arise a difference of opinion or interpretation of the Agreement, or any dispute arising from or relating to the performance of this Agreement. . . either party may make use of the federal or state courts of the State of Illinois for the purposes of resolving such dispute." *See*, Exhibit A.

**ANSWER:** Paragraph 19 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied. Damar and Mardan respond that the Reinsurance Agreement is the best evidence of its contents and deny the allegations in the paragraph to the extent they are inconsistent with the written document.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS
### Warrantech Corporation's Orchestration of the Warrantech Program

20. Warrantech Corporation, through itself, its parent company, its wholly owned subsidiaries and/or its affiliates, including but not limited to Warrantech Automotive and Vemeco, holds itself out as a leading provider of service contracts and after-market warranties.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

21. The Warrantech Entities pride themselves on being able to capture, maintain, track and analyze all relevant information regarding their service contract plans. In fact, the Warrantech Entities have developed and operate proprietary computer software that allows the Warrantech Entities to maintain millions of service contract plans.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

22.     The Warrantech Entities use their experience and the information gained from their plans to design, develop, market and act as a third-party administrator for service contracts in three major business segments: automotive, consumer products and international.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

23.     The participants in a service contract program typically include consumers, dealers, agents, marketers, distributors, a provider/obligor, an insurer of the provider/obligor, one or more reinsurers, and an administrator.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

24.     At issue in this lawsuit is a program dealing with forms of a vehicle service contract ("VSC") created and organized by Warrantech Corporation and the Warrantech Entities (the "Warrantech Program").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

25.     With respect to the Warrantech Program, the Warrantech Entities used their knowledge gained by participating in other service contract programs to design a program to cover vehicle service contracts.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

26.     Once they had designed the program, the Warrantech Entities needed to entice dealers, obligors, and insurers to participate in the program.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

27.     Jeanine M. Folz ("Folz") is Senior Vice President, Insurance Services and Assistant Corporate Secretary for Warrantech Corporation. Throughout the course of the Warrantech Program, and until today, Folz has been one of the key voices of the Warrantech Entities and the Warrantech Entities have acted through Folz, as well as others.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

### The Warrantech Entities Enlisted Dealers and Obligors To Participate in the Warrantech Program

28.    The Warrantech Entities enlist franchised and independent automobile dealers, leasing companies, repair facilities, retail stores, financial institutions and other specialty marketers (collectively "dealers") to sell the VSCs.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

29.    The Warrantech Entities market programs such as the Warrantech Program to dealers as a way for the dealers to enhance their profitability in connection with the sale of automobiles, light trucks, recreational vehicles and automotive components.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

30.    Because the VSC is typically sold as a contract between a third party obligor and the VSC holder, the Warrantech Entities enlist an obligor to be legally responsible for the cost of valid repairs or replacements under the VSC.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

31.    Prior to April 1, 2000, one of Warrantech Corporation's subsidiaries served as the obligor on a number of vehicle service contract programs.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

32.    Warrantech Corporation subsequently enlisted Butler to act as the named provider/obligor on VSCs sold through the Warrantech Entities.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

33.     Upon information and belief, Butler was created and sponsored by Warrantech Corporation, its parent, affiliates or subsidiaries, as a special purpose entity ("SPE") to fulfill a specific Warrantech Corporation purpose of isolating financial risk associated with the Warrantech Program.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

34.     Beginning on or about April 1, 2000, Butler has served as the named Provider/Obligor under numerous VSC programs designed, developed, and marketed by the Warrantech Entities.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

35.     For several years initially, Warrantech Corporation did not account for Butler's VSC obligor business in Warrantech Corporation's financial statements.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

36.     Following a review by the Securities and Exchange Commission's Division of Corporation Finance ("SEC"), Warrantech Corporation restated its financial statements for the fiscal years ending on March 31, 2001, 2002 and 2003, changing its method of accounting for its relationship with Butler.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

37.     At all times relevant hereto, Butler's VSC obligor business is included in Warrantech Corporation's statement of financial results (as restated).

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that Warrentech's financial statements are the best evidence of the contents and

deny the allegations in the paragraph to the extent they are inconsistent with the written

document(s).

38.     At the insistence of the SEC, Warrantech Corporation has adopted a policy to treat the Butler obligor VSCs as if they are Warrantech Corporation's, and recognizes Butler's revenues under those contracts as its own. Warrantech Corporation also includes, as its own liabilities, the liabilities of Butler under the VSCs.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

39.     Warrantech Corporation has also referred to itself as the obligor on the Warrantech Program business. For example, in dealing with issues arising out of the Warrantech Program, on at least one occasion, when negotiating a line of credit versus a letter of credit, Christopher Ford of Warrantech Corporation stated that "I will work with you to get Heritage included in the letter. Since Warrantech (through Butler) is the obligor both need to be mentioned."

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

40.     According to Warrantech Corporation's public filings, Butler's business operations "are included in the Company's financial results due to its [Butler's] close transactional ties with the Company."

**ANSWER:** Damar and Mardan respond that the public filings referred to in HRRG's Paragraph

40 are the best evidence of its contents and deny the allegations in the paragraph to the extent

they are inconsistent with the written document. Damar and Mardan are without sufficient

knowledge or information to either admit or deny the allegations in this paragraph and therefore

deny these allegations.

41.     Butler maintains little, if any, of the data related to the Warrantech Program or the VSC's sold under the program. In fact, upon HRRG's request to audit Butler, HRRG was directed to "Warrantech," and specifically Jeanine Folz, as the keeper of the data, to coordinate the audit.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

42.     Upon information and belief, Butler has little or no business activity other than that which is derived from the Warrantech Entities.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

## The Warrantech Entities Enlisted HRRG To Participate in the Warrantech Program

43.     As the provider/obligor, Butler is obligated to pay any valid claims submitted under a VSC which are approved for payment.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations. In addition, Paragraph 43 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied.

44.     VSC providers/obligors such as Butler are required under the laws of many states to meet certain financial responsibility requirements prior to selling VSCs in that state. Among other options, VSC providers/obligors may satisfy financial responsibility requirements by purchasing insurance coverage commonly referred to in the industry as reimbursement insurance policies.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations. In addition, Paragraph 44 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied.

45.     Having created Butler as a Special Purpose Entity, Warrantech Corporation needed to find an insurer for Butler. To this end, Warrantech Corporation sought out HRRG and negotiated a reimbursement insurance policy to satisfy Butler's financial responsibility requirements as the provider/obligor of the Warrantech Program.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

46.     "As Senior Vice President of Insurance Services for Warrantech Corporation, [Folz's] responsibilities include: 1) securing the insurance that backs the service contracts marketed and administered by [Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco]; 2) assisting the insurance carriers in developing programs to insure the VSC's; 3) ensuring that [Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco]

adhere to the insurance carriers' underwriting and claims handling guidelines for the VSC's; 4) monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss cost for the programs; and 5) ensuring the VSC program's compliance with applicable regulations." *See,* September 18, 2007 Affidavit of Jeanine M. Folz filed in the United States District Court for the District of South Carolina, a copy of which is attached hereto as Exhibit B ("Folz Affidavit"), ¶ 4.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Folz Affidavit is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

47.     During negotiations with HRRG in connection with obtaining an insurance policy for Butler, as well as throughout the course of the parties' relationship in connection with the Warrantech Program, the Warrantech Entities (through Folz and others) negotiated with HRRG, for themselves and on behalf of Butler.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

48.     Under the laws of many states, Butler could purchase one of two kinds of reimbursement insurance to prove its financial responsibility. Butler could purchase a policy that either: 1) reimburses or pays on behalf of Butler any covered sums Butler is legally obligated to pay, or 2) upon Butler's failure to perform, provides the service which Butler is legally obligated to perform according to the VSCs it sold to consumers. An insurer selling a policy which reimburses or pays on behalf of Butler any covered sums Butler is legally obligated to pay would charge Butler much more in premium than that which is charged for a policy providing coverage only in the event of Butler's nonperformance.

**ANSWER:** Damar and Mardan without sufficient knowledge or information to either admit or

deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 48 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

49.     Inherent in a nonperformance coverage agreement is the good faith understanding that the provider/obligor will meet its obligations to VSC holders to the extent it is financially capable. For this reason, coverage afforded upon the failure of a provider/obligor to perform its legal obligations is often called a "Bankruptcy Policy."

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 49 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

50.     On May 1, 2001 when Butler applied for coverage from HRRG, Miller specifically declared and warranted in writing to HRRG that Butler was "financially sound, solvent and current within 90 days on payment of legal liabilities to purchasers and insurers of service contracts" *See,* Application for Membership/Insurance Coverage signed by Miller, a copy of which is attached hereto as <u>Exhibit C</u> (the "Miller Declaration of Solvency").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Application for Membership, signed by Miller, is the best evidence of

its contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written document.

51.     Based upon new information contained in an affidavit executed by Miller ("Miller Affidavit") on September 18, 2007, HRRG is informed and believes the Miller Declaration of Solvency may have been false when presented to HRRG in 2001, and likely was false as of January 9, 2002 when Butler accepted coverage from HRRG. *See,* September 18, 2007 Affidavit of Harris G. Miller filed in the United States District Court for the District of South Carolina, a copy of which is attached hereto as <u>Exhibit D</u> ("Miller Affidavit").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Miller Affidavit is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

52.     According to the Miller Affidavit, Butler in 2001 faced "the specter of bankruptcy and the reputations and market share of both Butler and Warrantech [Corporation] in the VSC industry was threatened by...an event entirely outside of Butler's control." Miller Affidavit, ¶70.

**ANSWER:** Damar and Mardan respond that the Miller Affidavit is the best evidence of its

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written document.

53.      To keep Butler out of bankruptcy and to preserve the reputation of each, Butler's
sponsor Warrantech Corporation loaned Butler a sum in the millions of dollars in 2001 which
resulted in Butler owing Warrantech Corporation in excess of $10,000,000.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

54.      If the Miller Affidavit is true, the Butler-Heritage insurance transaction occurred at a
time that Butler was insolvent, a material fact that was not only concealed but also affirmatively
misrepresented until September 2007.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 54 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

55.      Joel San Antonio, as Warrantech Corporation's Chief Executive Officer, and someone
with knowledge of the Warrantech Program, was aware of Butler's financial obligations to
Warrantech Corporation and, therefore, Butler's insolvency.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

56.      Butler, the Warrantech Entities (through Folz and others) and Miller intended for
HRRG to rely upon the Miller Declaration of Solvency, which was made and provided to HRRG
for the purpose of inducing HRRG to provide coverage.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

57.      HRRG did in fact rely upon the Miller Declaration of Solvency and on or about
December 17, 2001 HRRG issued Vehicle Service Contract Reimbursement Insurance Policy
number HWMIRRG-SC-WAR-001 (the "Insurance Policy") to Butler. Miller, as President of

Butler, accepted the Insurance Policy on January 9, 2002, a copy of which is attached hereto as Exhibit G ("Insurance Policy").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Vehicle Service Contract Reimbursement Policy between HRRG and

Butler is the best evidence of its contents and deny the allegations in the paragraph to the extent

they are inconsistent with the written document.

58.      As may be seen by reference to the Insuring Agreement of the Insurance Policy, Butler chose to purchase, and HRRG agreed to sell, the less expensive nonperformance or "Bankruptcy Policy" of reimbursement insurance coverage. HRRG's insurance commitment, subject to other terms and conditions, is triggered by Butler's good faith nonperformance of its obligations to its VSC holders.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 58 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

59.      The Insurance Policy has been endorsed in certain instances to comply with various state-specific requirements, which may include first dollar coverage in some states.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 59 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

60.      Consistent with the covenant of good faith and fair dealing, it was mutually understood and required that Butler would honor its obligations to its contract holders to the fullest extent of its financial resources.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 60 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

61.     To the extent Butler, either itself or through its sponsor, is financially capable of paying claims under its VSCs, it must do so.

**ANSWER:** Paragraph 61 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied.

62.     In the event Butler and its sponsor become bankrupt, coverage is afforded to Butler beginning at the attachment point stated in the Insurance Policy.

**ANSWER:** Paragraph 62 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied.

63.     Notwithstanding the Miller Affidavit, HRRG is informed and believes that Butler, through its sponsor, Warrantech, remains financially sound and solvent. Butler must not be allowed to hide behind a debt to its sponsor in an effort to avoid its promises made to those consumers who purchased Butler VSCs. If Butler was truly insolvent as a result of the 2001 bail-out loan from its sponsor, Warrantech, then it was insolvent each time it sold a VSC to tens of thousands of consumers across the country, while simultaneously concealing that condition from consumers, regulators and its insurer. Either way, Miller, Butler and the Warrantech Entities misrepresented Butler's financial condition to obtain coverage from HRRG so that Warrantech could market VSCs through Butler.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 63 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

64.     The Insurance Policy provides, in IV CONDITIONS, Paragraph 6, "[A]ny act of insolvency on the part of the Insured shall immediately render this policy cancelled as of such date." This provision is intended to prevent Butler from selling VSCs insured by HRRG while Butler is insolvent.

**ANSWER:** Damar and Mardan respond that the Insurance Policy is the best evidence of its

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written document. Damar and Mardan are without sufficient knowledge or information to either

admit or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 64 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

65.    The Insurance Policy contains a claims made provision. Coverage afforded to Butler
by the Insurance Policy is excess of loss. The risk was underwritten and reserved on these bases
by HRRG, in reliance upon the Miller Declaration of Solvency.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 65 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied. Damar and Mardan respond that the

Insurance Policy is the best evidence of its contents and deny the allegations in the paragraph to

the extent they are inconsistent with the written document.

66.    Upon insolvency of Butler and its sponsor, subject to other terms and conditions of the
Insurance Policy, including but not limited to the cancellation terms, the understanding that
Butler intended to fulfill its obligations to consumers, and that Butler would not continue to sell
contracts if it is insolvent, the attachment point for coverage to Butler is equal to the Loss
Reserve Fund as stated in the Insuring Agreement, Section I.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 66 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied.

67.    The Insurance Policy was renewed annually until cancelled by HRRG on December 29,
2006.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

68.    As a result of information provided in the Miller Affidavit in September 2007, the Insurance Policy may appropriately be deemed void as of its effective date. Specifically, the Insurance Policy provides, in IV CONDITIONS, paragraph 19, "This policy shall be void if the Insured has concealed or misrepresented or created any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or submission of false or inflated claims or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, whether before or after a Loss."

**ANSWER:** Paragraph 68 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied. Damar and Mardan respond

that the Insurance Policy is the best evidence of its contents and deny the allegations in the

paragraph to the extent they are inconsistent with the written document.

## The Warrantech Entities Enlisted Reinsurance Companies, Including Third Party PORC Defendants, To Participate In The Warrantech Program

69.    As the orchestrator of the Warrantech Program, and in an effort to provide the participants with long-term comfort in the program, and to give the dealers a mechanism that allows them to share in insurance profitability, upon information and belief, the Warrantech Entities assisted dealers in forming reinsurance companies called producer owned reinsurance companies/captives ("PORCs").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan does admit that it was a participating party with the Warrantech Program. Damar and

Mardan deny that it is a producer owned reinsurance company or that it was formed by a dealer.

70.    The creation of PORCs is not uncommon in VSC programs designed, developed, marketed, and administered by the Warrantech Entities, and the contractual arrangements in those VSC programs are typically very similar. Dealers participating in VSC programs designed, developed, marketed, and administered by the Warrantech Entities, such as WarrantybyNet, which sold VSCs under the Warrantech Program to customers via the Internet, created PORCs as captive off-shore companies that the dealers partially or wholly own. The PORCs retain and/or reinsure the risk on all VSC policies written under the various VSC programs.

**ANSWER:**  Damar and Mardan deny that it was owned by a dealer or by WarrantybyNet. As

to the remainder of the paragraph, Damar and Mardan are without sufficient knowledge or

information to either admit or deny the allegations in this paragraph and therefore deny these

allegations.

71.     In this case, the dealers involved in the Warrantech Program created eight PORCs involved in the Warrantech Program which are the Third Party PORC Defendants Mardan, Marion, Fuccillo, Damar, Bradford, Alrendan, 12GK, and Peak. The dealers also created two additional PORCs, KDM Group Reinsurance, LTD. and Massey Reinsurance Limited, which, along with the Third Party PORC Defendants, reinsure, under a 100% quota share arrangement, the VSCs which name Butler as the provider/obligor.

**ANSWER:** Damar and Mardan admits that it was involved with the Warrantech Program.

Damar and Mardan deny that it was owned or operated by any dealer or the producer of the VSC

contracts. To the extent this paragraph make additional allegations, Damar and Mardan are

without sufficient knowledge or information to either admit or deny the allegations in this

paragraph and therefore deny these allegations. Damar and Mardan respond that the Quota

Share Reinsurance Agreement (referred to by HRRG as the "Quota Agreement") is the best

evidence of its contents and deny the allegations in the paragraph to the extent they are

inconsistent with the written document.

72.     Each of the PORCS, including the Third Party PORC Defendants, entered into Quota Agreements with HRRG. In addition to the Quota Agreements, each of the PORCs, including the Third Party PORC Defendants, entered into Reinsurance Custodial Agreements with HRRG. *See,* Reinsurance Custodial Agreements between Third Party PORC Defendants and HRRG, copies of which are attached hereto as Exhibit F (the "Custodial Agreements").

**ANSWER:** Damar and Mardan admit that they entered into a Quota Share Reinsurance

Agreement with HRRG. Damar and Mardan admit that they entered into a Reinsurance

Custodial Agreement with HRRG and Smith Hayes Advisers, Inc. To the extent this paragraph

makes additional allegations, Damar and Mardan are without sufficient knowledge or

information to either admit or deny the allegations in this paragraph and therefore deny these

allegations.

73.     Under the Warrantech Program, and pursuant to its agreement and understandings with the Warrantech Entities and the terms of its reinsurance agreements with the PORCs, HRRG acted only as a fronting insurer. For a fee, it issued the Insurance Policy, made any filings required by state laws (which were not the responsibility of others under the Administrative Agreement and/or Addendum, the Insurance Policy, or otherwise), paid any premium taxes and assessment fees, and ceded the entire risk of the Insurance Policy to the PORCs, whose owners were the dealers working with the Warrantech Entities to produce VSC business for Butler.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. In addition,

Paragraph 73 presents legal conclusions and requires no response. To the extent a response is

required, the allegations in the paragraph are denied. In addition, Damar and Mardan respond

that the Administrative Agreement and Reinsurance Agreement are the best evidence of their

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written documents. Further, Damar and Mardan deny that it was owned by any dealers working

with the Warrentech Entities to produce VSC business for Butler.

74.     In connection with the Insurance Policy, HRRG: 1) managed the imprest accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; and 5) verified certain VSC claims adjudications done by the Warrantech Entities.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. To the extent this

paragraph seeks to indicate the contents of the Insurance Policy, Damar and Mardan respond that

the Insurance Policy is the best evidence of its contents and deny the allegations in the paragraph

to the extent they are inconsistent with the written document.

75.     A portion of the funds paid by VSC purchasers for the extended warranty protection provided by Butler was deposited into reinsurance custodial accounts for the benefit of HRRG. The Custodial Agreements between HRRG and the PORCs specified the manner in which these deposits were calculated and paid into the reinsurance custodial accounts.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations. To the extent this paragraph seeks to indicate the contents of the various agreements mentioned in this complaint, Damar and Mardan respond that the Custodial Agreement is the best evidence of its contents and deny the allegations in the paragraph to the extent they are inconsistent with the written document.

76. The Warrantech Entities, as administrators of the Warrantech Program, were obligated to provide a monthly report to the PORCs regarding, among other things, the net written premiums, ceding expenses and allowances to HRRG, losses and loss adjustments paid by HRRG, and loss reserves remaining at the end of the month. Article VI of the Quota Agreements outlines the information the Warrantech Entities were obligated to regularly provide to the PORCs. Upon information and belief, the Warrantech Entities regularly reported such information to the PORCs.

**ANSWER:** Damar and Mardan admits that the Warrantech Entities did provide reports to them as to a limited portion of the business generated in the Warrantech Program. To the extent this paragraph seeks to indicate the obligations of the parties under the Reinsurance Agreement, Damar and Mardan respond that the Reinsurance Agreement is the best evidence of its contents and deny the allegations in the paragraph to the extent they are inconsistent with the written document.

77. The terms of each Custodial Agreement entered into by PORCs call for the PORCs to deposit certain assets into reinsurance custodial accounts sufficient to pay valid VSC claims. Section 2 of the Custodial Agreements provides that the PORCs "shall deliver or transfer to the Custodian Securities with a market value of not less than the full amount of the [PORCs]' Obligations." Section 4.3 of the Custodial Agreements defines the PORCs' "Obligations" to mean "losses and allocated loss expenses paid by [HRRG], but not recovered from the [PORCs], reserves for losses reported and outstanding, reserves for losses incurred but not reported, and reserves for allocated loss expenses and unearned premiums." *See*, Exhibit F.

**ANSWER:** Damar and Mardan respond that the Custodial Agreement is the best evidence of its contents and deny the allegations in the paragraph to the extent they are inconsistent with the written document.

78.     Funds placed in the reinsurance custodial accounts are to be utilized only for payment of claims made by consumers, and for refunds owed to a consumer pursuant to a VSC cancellation. Section 4.3 of the Custodial Agreements provides that funds may only be withdrawn to, among other things, "pay or reimburse [HRRG] for [HRRG's] share under the [Quota Agreement] regarding any losses and allocated expenses paid by [HRRG], but not recovered from the [PORCs] or for unearned premiums due to [HRRG], if not otherwise paid by the [PORCs]." *See*, Exhibit F.

**ANSWER:** Damar and Mardan respond that the Custodial Agreement is the best evidence of its

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written document.

79.     Any shortfalls in monies owed by the PORCs to HRRG were to be promptly paid by the PORCs. Article VI of the Quota Agreements obligates the PORCs to remit to HRRG by wire transfer any balance due to HRRG after the premiums, expenses, losses, and reserves are balanced monthly. *See*, Exhibit A.

**ANSWER:** Paragraph 79 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied. In addition, Damar and Mardan

respond that the Reinsurance Agreement is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

80.     When and if the attachment point on the Insurance Policy is ever reached and once Butler and its sponsor are bankrupt, 100% of HRRG's liability under the Insurance Policy is reinsured by the PORCs whose owners have a business relationship with the Warrantech Entities. Article II of the Quota Agreements provides that HRRG "shall cede and the [Third Party PORC Defendant] shall accept as quota share reinsurance a 100% quota share of [HRRG]'s entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under Service Contracts sold on or after the Effective Date." *See*, Exhibit A.

**ANSWER:** Paragraph 80 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied. In addition, Damar and Mardan

respond that the Insurance Policy and Reinsurance Agreements are the best evidence of their

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written documents.

81.     The PORCs' assumption of liability for all of HRRG's liability is instantaneous. Article IV of the Quota Agreements specifies that the PORCs' liability for HRRG's entire liability attaches "simultaneously and obligatorily with that of" HRRG.  *See*, Exhibit A.

**ANSWER:** Paragraph 81 presents legal conclusions and requires no response.  To the extent a

response is required, the allegations in the paragraph are denied.  In addition, Damar and Mardan

respond that the Reinsurance Agreement is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

82.     The PORCs are also obligated to assume 100 percent of HRRG's liability for all loss settlements. Article VII of the Quota Agreements provides that "All loss settlements made by [HRRG], whether under the strict policy terms and conditions or by way of compromise, shall be binding upon the [PORCs], and the [PORCs] agrees to pay or allow, as the case may be, its proportionate share of each such settlement in accordance with this Agreement." *See*, Exhibit A.

**ANSWER:** Paragraph 82 presents legal conclusions and requires no response.  To the extent a

response is required, the allegations in the paragraph are denied.  In addition, Damar and Mardan

respond that the Reinsurance Agreement is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

83.     Third Party PORC Defendants are also contractually obligated to indemnify HRRG against, among other things, all claims, demands, suits, damages, awards, and punitive damages. In Article VIII of the Quota Agreements, Third Party PORC Defendants agreed to accept liability for "100% of [HRRG]'s liability for any and all claims, demands, suits, judgments, damages, consequential damages, punitive damages, treble damages, exemplary awards, fines, and penalties, including but not limited to judgments in excess of the limits of the Service Contracts or [HRRG]'s insurance policies, extra-contractual obligations, or damages for the breach of the covenant of good faith and fair dealing, resulting from or arising out of the issuance of the Service Contracts covered hereby or the insurance thereof by [HRRG], the handling of claims thereon, or the violation of breach by a Producer, or any officer, director, employee, agent, or representative of such Producer, of any state or federal law, regulation, or duty, including common-law duties and obligations, pertaining to the sale of the Service Contracts covered hereby or the disclosure thereof in any retail sales document or credit instrument, any unfair business trade practices, or any misrepresentation, gross negligence, or ordinary negligence in the sale of the Service Contracts or the processing of claims thereunder, or the performance of repairs." *See*, Exhibit A.

**ANSWER:** Paragraph 83 presents legal conclusions and requires no response.  To the extent a

response is required, the allegations in the paragraph are denied.  In addition, Damar and Mardan

respond that the Reinsurance Agreement is the best evidence of its contents and deny the

allegations in the paragraph to the extent they are inconsistent with the written document.

84.     The sum of assets in these reinsurance custodial accounts provided for by the Custodial
Agreements equals the attachment point of the excess of loss coverage afforded to Butler by the
Insurance Policy once Butler and its sponsor are bankrupt.

**ANSWER:** Paragraph 84 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied.

85.     When HRRG cancelled the Insurance Policy on December 29, 2006, neither Butler nor
its sponsor had declared bankruptcy and the attachment point under the Insurance Policy had not
been reached.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Paragraph 85

presents legal conclusions and requires no response. To the extent a response is required, the

allegations in the paragraph are denied.

86.     Even if the Insurance Policy was not cancelled, Butler individually and its sponsor have
not declared bankruptcy and the attachment point for coverage has not been met as of this date.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Paragraph 86

presents legal conclusions and requires no response. To the extent a response is required, the

allegations in the paragraph are denied.

87.     The Third Party PORC Defendants' reinsurance custodial accounts related to specific
programs at issue herein have been completely depleted and there are no funds in those accounts
immediately available to continue to pay losses and cancellations for these producer's programs.

**ANSWER:** Damar and Mardan deny the allegations in this paragraph because HRRG neglects to

include the fact that HRRG may have removed the assets from the Damar and Mardan Custodial

Account. Damar and Mardan are without sufficient knowledge or information to either admit or

deny whether or not the funds in the account are depleted because HRRG has provided no

accounting to Damar and Mardan.

88.     Under the terms and provisions of the Quota Agreements and Custodial Agreements, the Third Party PORC Defendants are obligated to fund the custodial accounts in an amount sufficient to continue to pay losses and cancellations under the Warrantech Program.

**ANSWER:** Paragraph 88 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied. Damar and Mardan respond

that the Reinsurance Agreement and Custodial Agreement are the best evidence of their contents

and deny the allegations in the paragraph to the extent they are inconsistent with the written

documents.

89.     For reasons not disclosed to HRRG, Butler, as the obligor on the VSCs, is refusing to pay consumer claims, causing a breach of thousands of individual agreements Butler made with consumers.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

90.     As a result of Butler's failure to honor its obligations to its contract holders, HRRG has been inundated with hundreds of thousands of dollars of VSC claims which are the responsibility of Butler.

**ANSWER:** Paragraph 90 presents legal conclusions and requires no response. To the extent a

response is required, the allegations in the paragraph are denied.

91.     Subject to a full reservation of rights and despite cancellation, HRRG has funded claims payments to consumers on behalf of Butler. To date, HRRG's payments on behalf of Butler exceed $368,000. This includes funding of certain imprest accounts in the sum of $220,000 and direct payments to VSC holders, subject to a reservation of rights, in excess of $148,000.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

92.     Under the terms and provisions of the Quota Agreements and Custodial Agreements, the Third Party PORC Defendants are obligated to assume 100 percent of all claims and losses as

a result of Butler's failure to honor its obligations to Butler's VSC contract holders. To date, the Third Party PORC Defendants have not done so.

**ANSWER:** Paragraph 92 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied. In addition, Damar and Mardan respond that the Reinsurance Agreements and Custodial Agreements are the best evidence of their contents and deny the allegations in the paragraph to the extent they are inconsistent with the written documents.

93.     The Third Party PORC Defendants have breached the Quota Agreements with HRRG in each of the following respects, which are not all inclusive:
   a.     Failure to accept as quota share reinsurance 100 percent quota share of HRRG's entire liability under all policies, certificates, contracts, and other evidences of insurance covering the liability arising under the VSCs;
   b.     Failure to deposit into the reinsurance custodial accounts their respective obligations, including but not limited to losses, expenses, and reserves;
   c.     Failure to remit to HRRG the balance of ceding expenses, allowances, losses, and loss adjustment expenses paid by HRRG that exceeded the net written premiums received;
   d.     Failure to pay their proportionate share of all loss settlements made by HRRG for VSC claims;
   e.     Failure to pay their proportionate share of all loss adjustment expenses incurred by HRRG for VSC claims;
   f.     Failure to secure delivery to HRRG of an irrevocable, clean, and unconditional letter of credit in the face amount of 100 percent of the Third Party PORC Defendants' proportion of required reserves;
   g.     Failure to indemnify HRRG against all claims, demands, and suits, against HRRG, as well as damages, awards, and punitive damages, arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of repairs; and
   h.     Failure to pay valid VSC claims that Butler refuses to pay.

**ANSWER:** Paragraph 93 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied.

94.     The Third Party PORC Defendants have breached the Custodial Agreements with HRRG in each of the following respects, which are not all inclusive:
   a.     Failure to deposit into the reinsurance custodial accounts their respective obligations, including but not limited to losses, expenses, and reserves;

b.      Failure to remit to HRRG the balance of ceding expenses, allowances, losses, and loss adjustment expenses paid by HRRG that exceeded the net written premiums received;

c.      Failure to pay their proportionate share of all loss settlements made by HRRG for VSC claims;

d.      Failure to pay their proportionate share of all loss adjustment expenses incurred by HRRG for VSC claims;

e.      Failure to deposit additional Securities into the reinsurance custodial accounts within forty-five days after the end of the quarterly calendar to maintain the required aggregate market value of the custodial accounts;

f.      Failure to pay valid VSC claims that Butler refuses to pay; and

g.      Failure to provide HRRG access to all papers in their possession applicable to the Custodial Agreements and custodial accounts.

**ANSWER:** Paragraph 94 presents legal conclusions and requires no response. To the extent a response is required, the allegations in the paragraph are denied.

### Pricing of the Warrantech Program

95.      The Warrantech Entities represent to the public that their programs provide clients with the opportunity for increased revenue and income without incurring the costs and responsibilities of operating their own programs.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

96.      With respect to the Warrantech Program at issue here, in order to entice the dealers, obligors and insurers to participate in the program, the Warrantech Entities represented to these entities that the VSCs sold under the Warrantech Program would be appropriately priced to provide each entity a profit without downside exposure.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit or deny the allegations in this paragraph and therefore deny these allegations.

97.      In order to accomplish this, the Warrantech Entities represented that they would set prices to be charged for the VSCs under the Warrantech Program such that the money collected from the VSC holders would be sufficient to pay all valid VSC claims over the life of the VSCs. Additionally, the Warrantech Entities represented themselves to be capable of properly administering the VSC claims.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

98.     For example, upon information and belief, the Warrantech Entities represented to
Butler, as the obligor, that Butler would not have downside exposure because the Warrantech
Entities would price the VSCs and administer submitted claims such that the reserves withheld
from the premiums paid by the VSC holders (held in the PORC accounts) would be sufficient to
pay all claims and the obligor's payment obligation would never come to fruition.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

99.     Upon information and belief, the Warrantech Entities represented to the dealers and the
PORCs created by such dealers that through proper pricing and administration of the Warrantech
Program not only would the PORCs not have any downside exposure, but that the dealers
(through their PORCs) would likely recognize additional profits on the back end of the
Warrantech Program.  The back end profits would result if there were excess funds in the PORC
accounts when all VSC claims under the Warrantech Program were paid at the time the VSCs
had expired.

**ANSWER:** Damar and Mardan admits that Damar and Mardan hoped to recognize a profit if the

premiums ceded to it exceeded claims, cancellations, and other permissible expenses.  Damar

and Mardan deny the explanation provided by HRRG in Paragraph 99 is correct with respect to

the timing of this profit.  To the extent this paragraph seeks to state what Warrentech represented

to other entities, Damar and Mardan are without sufficient knowledge or information to either

admit or deny the allegations in this paragraph and therefore deny these allegations.

100.    The Warrantech Entities made similar representations to HRRG as the direct insurer of
the Warrantech Program.  HRRG was led to believe that HRRG would merely be a fronting
insurer and, among other things, that the Warrantech Program would be priced properly, that the
Warrantech Program would be administered properly, and that HRRG would not have any
downside exposure.  As a means for further insulating HRRG from downside exposure, and in
order to create the back end profits for the dealers through their PORCs, the Warrantech Entities
had HRRG cede 100% of the insurance risk on the Warrantech Program to the PORCs.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

## The Warrantech Entities' Front End and Back End Responsibilities As Creator and Administrator of the Warrantech Program

101.     The Warrantech Entities set themselves up as the third-party administrator of the Warrantech Program. As a result, the Warrantech Entities were in a position to evaluate, approve and administer claims submitted by VSC holders.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

102.     Warrantech Automotive, Warrantech Automotive of Florida and Vemeco performed and/or were obligated to perform this administrator function pursuant to a March 15, 2001 Administrative Agreement (as amended) ("Administrative Agreement") and Claims Handling Addendum to the Administrative Agreement, Addendum A (as amended) ("Addendum") entered into between HRRG and Warrantech Automotive, Warrantech Automotive of Florida and Vemeco. Folz signed the Administrative Agreement, as Senior Vice President, on behalf of Warrantech Automotive, Warrantech Automotive of Florida and Vemeco, a copy of which is attached hereto as Exhibit H ("Administrative Agreement").

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement and Addendum are the best evidence of their

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written documents.

103.     Warrantech Corporation, through Folz and others, had responsibility, among other things, for ensuring that Warrantech Automotive, Warrantech Automotive of Florida and Vemeco adhered to the insurance carrier's underwriting and claims handling guidelines for the VSC's as well as monitoring the performance and profitability of the VSC insurance programs, including the loss ratios and loss costs for the programs. *See*, Folz Affidavit, ¶ 4.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

104.     Notices required or permitted to be given under the Administrative Agreement are to be sent to Jeanine Folz at Warrantech, with copies to the Chief Executive Officer and Corporate General Counsel at Warrantech Corporation.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement is the best evidence of its contents and deny

the allegations in the paragraph to the extent they are inconsistent with the written document.

105.    Notices required under the Addendum were initially to be sent to Jeanine Folz, Senior
Vice President, Warrantech Corporation.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Addendum is the best evidence of its contents and deny the allegations

in the paragraph to the extent they are inconsistent with the written document.

106.    Harris G. Miller, as President of Butler, acknowledged and agreed to the Administrative
Agreement on behalf of Butler.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement is the best evidence of its contents and deny

the allegations in the paragraph to the extent they are inconsistent with the written document.

107.    Pursuant to the Administrative Agreement and the Addendum, Warrantech Automotive,
Warrantech Automotive of Florida and Vemeco explicitly agreed to perform a number of
functions for the Warrantech Program.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement and Addendum are the best evidence of their

contents and deny the allegations in the paragraph to the extent they are inconsistent with the

written documents.

108.    Through Jeanine Folz, Christopher Ford and others, Warrantech Corporation oversaw, and/or actively participated in, the administrative functions called for in the Administrative Agreement.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

109.    Warrantech Corporation treated the Administrative Agreement as if it were its own. Folz as Senior Vice President, Insurance Services for Warrantech Corporation, referred to the arrangement as "our Administration Agreement." Moreover, Christopher Ford, Folz and Richard Gavino of Warrantech Corporation attended meetings with HRRG, corresponded with HRRG and/or corresponded with other participants in the Warrantech Program in efforts to protect the viability of the Warrantech Program. On one such occasion, Christopher Ford of Warrantech Corporation informed WarrantybyNet, which was one of the entities that sold VSCs under the Warrantech Program, that HRRG would no longer accept any further VSCs from WarrantybyNet after June 9, 2004.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

110.    At one point, in order to remain in compliance with the terms of the Administrative Agreement, Christopher Ford of Warrantech Corporation, agreed to propose rate increases with the intended effect of causing the programs' loss ratios to not exceed ninety (90) percent and that revised rates would be implemented.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

111.    Pursuant to the Administrative Agreement, the Warrantech Entities agreed to:
a.    Set appropriate prices for the Warrantech Program;
b.    Keep loss ratios on each program within the Warrantech Program below 90%;
c.    Notify HRRG when loss ratios exceeded, or were certain, to exceed 90%;
d.    Implement rate increases requested by HRRG;
e.    Use commercially reasonable efforts to administer and attend to the program faithfully;
f.    Refrain from making representations to applicants or holders of VSCs regarding coverage which are not consistent with the actual terms and conditions of the VSCs;
g.    Uphold its fiduciary responsibilities to HRRG with respect to premiums collected and received on VSCs under the Warrantech Program;
h.    Not misappropriate HRRG's funds or property;
i.    Not misappropriate funds or property held for the benefit of HRRG and other participants in the Warrantech Program;
j.    Properly perform its claims settlement responsibilities; and

k.    Provide proper and timely reporting to HRRG.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement is the best evidence of its contents and deny

the allegations in the paragraph to the extent they are inconsistent with the written document.

112.    Pursuant to the Addendum, the Warrantech Entities agreed to:
    a.    Investigate, evaluate, document and settle claims and loss reports in accordance
    with the policies covered by the Administrative Agreement and Addendum;
    b.    Properly document each claim;
    c.    Properly settle claims through the disbursement of monies;
    d.    Properly perform all reasonable and necessary work in connection with claims
    handling and loss reporting;
    e.    Promptly and fully report to HRRG all information with respect to claims
    exceeding Warrantech's settlement Addendum (as set forth in Section III of the
    Addendum) and all claims and reports of loss where fraud is suspected; and
    f.    Obtain HRRG's written approval prior to retaining any professional or expert,
    including but not limited to claims adjusters, special investigators, engineers, expert
    witnesses and accountants.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Addendum is the best evidence of its contents and deny the allegations

in the paragraph to the extent they are inconsistent with the written document.

113.    The Warrantech Entities have breached the Administrative Agreement in each of the
following respects, which are not all inclusive:
    a.    Failure to keep loss ratios on each program below 90%;
    b.    Failure to properly price the business in the first instance;
    c.    Failure to notify HRRG that loss ratios exceeded, or were certainly going to
    exceed, 90%;
    d.    Failure to implement HRRG's requested rate increases;
    e.    Failure to use commercially reasonable efforts to administer and attend to the
    program faithfully;
    f.    Making representations to applicants or holders of Vehicle Service Contracts
    regarding coverage which are not consistent with the actual terms and conditions of the
    Vehicle Service Contracts;
    g.    Failure to uphold its fiduciary responsibilities to HRRG with respect to premiums
    collected and received on policies for HRRG;

      h.    Failure to properly perform its claims settlement responsibilities; and
      i.    Failure to provide proper and timely reporting to HRRG.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Administrative Agreement is the best evidence of its contents and deny

the allegations in the paragraph to the extent they are inconsistent with the written document.

114.     The Warrantech Entities have breached the Addendum in each of the following
respects, which are not all inclusive:
      a.    Failure to investigate, evaluate, document and settle claims and loss reports in
      accordance with the policies covered by the Addendum;
      b.    Failure to properly document each claim;
      c.    Failure to properly settle claims through the disbursement of monies as called for
      in the Addendum;
      d.    Failure to perform all reasonable and necessary work in connection with claims
      handling and loss reporting;
      e.    Failure to promptly and fully report to HRRG all information with respect to
      claims exceeding Warrantech's settlement Addendum (as set forth in Section III of the
      Addendum) and all claims and reports of loss where fraud is suspected; and
      f.    Failure to obtain HRRG's written approval prior to retaining any professional or
      expert, including but not limited to claims adjusters, special investigators, engineers,
      expert witnesses and accountants.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Addendum is the best evidence of its contents and deny the allegations

in the paragraph to the extent they are inconsistent with the written document.

115.     As a result of the Warrantech Entities' failures, including but not limited to failing to
properly price the Warrantech Program, failing to institute price increases as necessary, failing to
safeguard the premium dollars and failing to properly administer and adjudicate VSC claims, the
reserves set aside to pay valid VSC claims are not sufficient to pay such claims.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

116.     On July 30, 2007, due to the Warrantech Entities' substantial breaches of the
Administrative Agreement and Addendum, HRRG terminated the Administrative Agreement and

Addendum and demanded that the Warrantech Entities take those steps required by the Administrative Agreement and Addendum to transition claims administration to a claims administrator identified by HRRG. A copy of the Letter of Termination is attached hereto as Exhibit E and incorporated herein by this reference.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Paragraph 116

presents legal conclusions and requires no response. To the extent a response is required, the

allegations in the paragraph are denied.

117.     The Warrantech Entities have further breached their obligations under the Administrative Agreement and Addendum by failing and refusing to honor HRRG's demand to transition the claims administration, placing HRRG and the VSCs at great risk.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Paragraph 117

presents legal conclusions and requires no response. To the extent a response is required, the

allegations in the paragraph are denied.

118.     Now that the Warrantech Entities have been terminated, they are obligated to return all unearned payments for administrative services to the funds established for payment of VSC claims.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Paragraph 118

presents legal conclusions and requires no response. To the extent a response is required, the

allegations in the paragraph are denied.

119.     Subject to a full reservation of rights, and despite cancellation of the Insurance Policy, HRRG has funded impress accounts in the amount of $220,000 and funded claims payments to consumers of the Warrantech Program under a reservation of rights in excess of $168,000 up to the date of filing this Cross-Claim and Third Party Claim. To date, HRRG's payments on behalf of the Warrantech Program exceed Three Hundred Sixty-Eight Thousand Dollars ($368,000).

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

120.     The priority of responsibility between the obligor and the insurer for funding VSC claims when the reserves are not sufficient to pay such claims was not at issue in this lawsuit when initially filed. That issue was the subject of an action in the United States District Court for the District of South Carolina, Charleston Division, Civil Action No. 2:07-cv-2627, styled *Heritage Warranty Insurance Risk Retention Group, Inc. f/k/a Heritage Warranty Mutual Insurance Risk Retention Group, Inc. v. Butler Financial Solutions, LLC* ("Butler Lawsuit in South Carolina).

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the pleadings from the District of South Carolina, referenced above, are the

best evidence of their contents and deny the allegations in the paragraph to the extent they are

inconsistent with the written documents.

121.     HRRG filed a motion for preliminary injunction in the Butler Lawsuit in South Carolina seeking an order that Butler commence paying claims pursuant to its contractual obligations.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the motion for preliminary injunction is the best evidence of its contents

and deny the allegations in the paragraph to the extent they are inconsistent with the written

document.

122.     By Order and Opinion dated December 6, 2007, the Butler Lawsuit in South Carolina was ordered to be transferred to the United States District Court for the Northern District of Illinois. The December 6, 2007 Order also denied HRRG's motion for preliminary injunction without prejudice to permit the parties to fully re-argue the matter in this District.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations. Damar and

Mardan respond that the Order and Opinion dated December 6, 2007, referenced above, is the

best evidence of its contents and deny the allegations in the paragraph to the extent they are

inconsistent with the written document.

**COUNT I**

**DECLARATORY JUDGMENT PURSUANT TO U.S.C. §2201**
**AS BETWEEN HRRG, BUTLER, WARRANTECH AUTOMOTIVE, WARRANTECH**
**AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION**

123.     HRRG repeats and incorporates its allegations in paragraphs 1 through 122 as if fully set forth herein.

**ANSWER:** Count I and Paragraphs 123 through 127 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

124.     Based upon the foregoing allegations, there exists between the parties a substantial controversy of sufficient immediacy to warrant declaratory relief.

**ANSWER:** Count I and Paragraphs 123 through 127 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

125.     HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights and responsibilities of the parties pursuant to the agreements between them, and declare pursuant to U.S.C. §2201 and Federal Rule of Civil Procedure 57 that HRRG has no obligation to pay claims on behalf of Butler on one or more of the following bases: 1) the Insurance Policy between HRRG and Butler has been cancelled at inception due to Butler's insolvency, or at some point thereafter due to Butler's insolvency; 2) the Insurance Policy between HRRG and Butler is void at inception due to Butler and the Warrantech Entities fraudulently inducing HRRG to issue the Insurance policy by hiding Butler's insolvency; and/or 3) the Insurance Policy between HRRG and Butler has been cancelled effective December 29, 2006.

**ANSWER:** Count I and Paragraphs 123 through 127 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

126.     Alternatively, if the Court finds that the Insurance Policy is still operative, HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights and responsibilities of the parties pursuant to the agreements between them, and declare pursuant to U.S.C. §2201 and Federal Rule of Civil Procedure 57 the priority of each parties' responsibility to pay valid VSC claims. Specifically, HRRG seeks a declaration that HRRG has no obligation to pay claims on behalf of Butler on one or more of the following bases: 1) Butler's losses have yet to exceed the attachment point of the Insurance Policy; 2) Butler has breached the terms of the Insurance Policy with HRRG, including but not limited to the covenant of good faith and fair dealing; 3) Butler is not bankrupt; 4) to the extent Butler is bankrupt, the Warrantech Entities are not bankrupt and have an obligation to pay valid VSC claims; and/or 5) for such other bases as may be shown at trial.

**ANSWER:** Count I and Paragraphs 123 through 127 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

127. If the Court finds that the Insurance Policy is still operative and HRRG has an obligation to make payments for valid VSC claims, HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights and responsibilities of the parties pursuant to the agreements between them, and declare pursuant to U.S.C. §2201 and Federal Rule of Civil Procedure 57 that: 1) the Warrantech Entities must cease acting as the administrator for the Warrantech Program; 2) administration responsibilities must be transferred to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017, as previously directed by HRRG; 3) the Warrantech Entities must comply with all of their obligations upon termination of the Administrative Agreement (and the Addendum), including but not limited to: a) immediately communicate its termination and the effective date to all Dealers who produce Warrantech Program business; b) provide to HRRG all VSC and files relating to the VSC holders under the Warrantech Program, and claim files if applicable, which may be required for servicing the Warrantech Program business or to meet record retention requirements mandated by regulatory organizations or required by HRRG policy; c) within 90 days of termination, must provide HRRG with a full and final accounting and payment of all Premium due HRRG for all VSC sold under Programs by Warrantech and Dealers; and d) continue to treat HRRG confidential information as confidential information.

**ANSWER:** Count I and Paragraphs 123 through 127 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

**COUNT II**

**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AS TO BUTLER,
WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA,
VEMECO AND WARRANTECH CORPORATION**

128. HRRG repeats and incorporates its allegations in paragraphs 1 through 127 as if fully set forth herein.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

129. Pursuant to VSCs sold under the Warrantech Program, as obligor, Butler agreed to provide repair services to VSC purchasers in the case of mechanical breakdown during the contract period.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

130.     Pursuant to tens of thousands of VSCs sold to consumers pursuant to the Warrantech Program, those consumers are entitled to vehicle repair services in the event of a covered breakdown event. Butler has chosen to breach those VSCs.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

131.     Upon information and belief, Butler has never paid a claim from its own funds separate from the loss reserve funds to a consumer holding one of Butler's VSCs.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

132.     Butler's true intentions to refuse payment of VSC claims once the loss reserve funds were exhausted were concealed from HRRG until HRRG received an affidavit executed by Miller on or about September 18, 2007 where, in Paragraph 5 and elsewhere, Miller explains that Butler never intended to pay consumers the benefit of their VSC bargain, but instead intended all along to push its VSC responsibilities upon HRRG.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

133.     Moreover, HRRG was unaware until September 2007 that the Miller Declaration of Solvency was false. HRRG relied upon its truthfulness and used the information to underwrite and price the risk. HRRG had an enhanced right to rely upon Miller's Declaration of Solvency because Butler, through the Warrantech Entities, was negotiating a Bankruptcy Policy.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

134.     As a result, of the foregoing, HRRG has no obligation to pay valid VSC claims for one or more of the following reasons: 1) the Insurance Policy between HRRG and Butler has been cancelled at inception due to Butler's insolvency, or at some point thereafter due to Butler's insolvency; 2) the Insurance Policy between HRRG and Butler is void at inception due to Butler and the Warrantech Entities fraudulently inducing HRRG to issue the Insurance policy by hiding Butler's insolvency and true intentions with respect to the Warrantech Program; 3) the Insurance Policy between HRRG and Butler has been cancelled effective January 29, 2007; and/or 4) for such other bases as may be shown at a hearing or trial.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

135.     Alternatively, if the Court finds that the Insurance Policy is still operative, HRRG has no obligation to pay valid VSC claims for one or more of the following reasons: 1) Butler's losses have yet to exceed the attachment point of the Insurance Policy; 2) Butler has breached the terms of the Insurance Policy with HRRG including but not limited to the covenant of good faith and fair dealing; 3) Butler is not bankrupt; and/or 4) to the extent Butler is bankrupt, the Warrantech Entities (which have referred to and considered themselves as the obligor for VSC's sold under the Warrantech program) are not bankrupt and have an obligation to pay valid VSC claims; and 5) for such other bases as may be shown at a hearing or trial.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

136.     Butler's and the Warrantech Entities' conduct and breaches of their obligations to consumers and to HRRG have caused HRRG to fund consumer claims in excess of $368,000. HRRG is at risk of insolvency if it must continue to fund VSC claims to the full extent of underwriters' projections of VSC claims.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

137.     Once HRRG's capital and surplus is reduced below levels required by the South Carolina Department of Insurance, HRRG will be in breach of its insurance license and subject to action by the State of South Carolina pursuant to South Carolina's insurance insolvency laws. Furthermore, HRRG will lose its registration to conduct risk retention insurance business in the various states in which it transacts business.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

138.     Butler and/or the Warrantech Entities must be ordered to commence paying claims pursuant to their obligations because: 1) on the merits, consumers are entitled to the VSC protection promised by the VSC's sold under the Warrantech Program; 2) HRRG has no adequate remedy at law and would be irreparably harmed if Butler and the Warrantech Entities are allowed to voluntarily breach tens of thousands of contracts with consumers; 3) the threatened injury to HRRG outweighs any harm which might be suffered by Butler and the Warrantech Entities; and 4) granting the injunction is in the public interest as consumers holding VSC's need to know where payments will be coming from and need to be paid for valid VSC claims without undue delay.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

139.     Alternatively, if the Court finds that the Insurance Policy is still operative and HRRG
has an obligation to make payments for valid VSC claims, HRRG requests an order that: 1) the
Warrantech Entities cease acting as the administrator for the Warrantech Program; 2)
administration responsibilities be transferred to National Administrative Services Co., LLC,
5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017, as previously directed by HRRG; 3) the
Warrantech Entities comply with all of their obligations upon termination of the Administrative
Agreement (and the Addendum) including but not limited to: a) immediately communicate its
termination and the effective date to all Dealers who produce Warrantech Program business; b)
provide to HRRG all VSC and files relating to the VSC holders under the Warrantech Program,
and claim files if applicable, which may be required for servicing the Warrantech Program
business or to meet record retention requirements mandated by regulatory organizations or
required by HRRG policy; c) within 90 days of termination, the Warrantech Entities must
provide HRRG with a full and final accounting and payment of all Premium due HRRG for all
VSC sold under Programs by Warrantech and Dealers; and d) the Warrantech Entities must
continue to treat HRRG confidential information as confidential information.

**ANSWER:** Count II and Paragraphs 128 through 139 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

### COUNT III

### ACTION FOR SPECIFIC PERFORMANCE AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION (TRANSFER OF CLAIMS HANDLING ADMINISTRATION)

140.     HRRG repeats and incorporates its allegations in paragraphs 1 through 139 as if fully
set forth herein.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

141.     On July 30, 2007, HRRG terminated the Administrative Agreement and the Addendum
due to the Warrantech Entities' breaches of those agreements.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

142.    In addition, on July 30, 2007, HRRG invoked its contractual rights and under a reservation of rights, demanded transfer of the handling of all claims which fall under the Administrative Agreement and the Addendum to another administrator, National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

143.    In connection with this demand, HRRG requested that the Warrantech Entities contact HRRG immediately to make arrangements for the orderly transfer of all files and records, both paper and electronic, to the new administrator so that the new administrator can carry out its administrative responsibilities.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

144.    During the weeks of August 6 and August 13, 2007, HRRG followed up with the Warrantech Entities on this demand.  The Warrantech Entities have not acknowledged cancellation of the Administrative Agreement and Addendum and have not transferred the handling of all claims which fall under the Administrative Agreement and Addendum.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

145.    As a result of the Warrantech Entities' failure to comply with HRRG's demand, HRRG seeks an order of specific performance and preliminary and permanent injunctive relief requiring that the Warrantech Entities transfer the handling of all claims which fall under the Administrative Agreement and the Addendum to National Administrative Services Co., LLC, 5747 Perimeter Drive, Suite 200, Dublin, Ohio 43017.  In addition, HRRG seeks an order that the Warrantech Entities transfer all files and records, both paper and electronic, to the new administrator so that the new administrator can carry out its administrative responsibilities. HRRG further requests that the order require the Warrantech Entities to return all unearned administrative fees to the loss reserve funds to provide for administration and payment of VSC claims.  Finally, HRRG requests that the order enjoin the Warrantech Entities from continuing activities as HRRG's purported administrative agent.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

146.    Provided the Court determines that the Insurance Policy is still operative and HRRG has an obligation to make payments for valid VSC claims, the entry of a preliminary and permanent injunction as requested is necessary in order to prevent immediate and irreparable

injury to HRRG and VSC holders. Pecuniary compensation will not afford HRRG adequate relief in light of the fact that VSC holders continue to submit claims, and those claims are not being administered efficiently, properly or in the best interests of the VSC holders and the other parties to the Warrantech Program. The failure to properly adjudicate VSC holders' claims will result in dissatisfied VSC holders, increased complaints to various states' insurance departments, and additional financial strain and regulatory pressure on HRRG that will likely lead to insolvency.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

147.    HRRG has no adequate remedy at law and will be irreparably harmed if the Warrantech Entities do not transfer claims administration responsibility (and the documents needed to perform claims administration responsibilities) to National Administrative Services, Co., LLC.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

148.    The threatened injury to HRRG outweighs any harm which might be suffered by the Warrantech Entities.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

149.    Granting the injunction is in the public interest, because, among other reasons, the injunction is in the best interests of the VSC holders who have, or will, submit valid claims.

**ANSWER:** Count III and Paragraphs 140 through 149 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

## COUNT IV

## FRAUDULENT INDUCEMENT TO CONTRACT AS TO BUTLER AND MILLER

150.    HRRG repeats and incorporates its allegations in paragraphs 1 through 149 as if fully set forth herein.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

151.    Miller, as President of Butler, accepted the Insurance Policy on January 9, 2002. By so doing, Miller and Butler represented to Heritage that Butler would perform its obligations to its VSC holders to the fullest extent it or its sponsor is capable.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

152.    At that time Butler had no intention of performing and Miller knew it.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

153.    Instead, Butler and Miller intended to default on Butler's obligations to VSC holders, thereby subjecting HRRG to Butler's VSC liabilities.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

154.    Folz, as Senior Vice President of Warrantech Automotive, Warrantech Automotive of Florida, Inc., Vemeco, and Warrantech Corporation, as well as other Warrantech Entities personnel, knew Butler had no intention of performing Butler's obligations to its VSC holders.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

155.    Butler's and Miller's true intentions were concealed from HRRG until HRRG received an affidavit executed by Miller on or about September 18, 2007 where, in Paragraph 5 and elsewhere, Miller explains that Butler never intended to pay consumers the benefit of their VSC bargain, but instead intended all along to push its VSC responsibilities upon HRRG.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

156.    In addition, Miller as President of Butler made such financial representations as may be seen in the Miller Declaration of Solvency on or about May 1, 2001 for the purpose of fraudulently inducing coverage from HRRG. Miller knew his Declaration of Solvency was both false and material to HRRG's decision to issue the Insurance Policy. He made the representation in the context of Butler's application for insurance with the intent that HRRG rely upon them and issue the Insurance Policy.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

157.     Butler, Miller, Folz, Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco, and Warrantech Corporation owed a duty to disclose reliable and truthful information in Butler's application for insurance.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

158.     HRRG was unaware until September 2007 that the Miller Declaration of Solvency was false. HRRG relied upon its truthfulness and used the information to underwrite and price the risk. HRRG had an enhanced right to rely upon Miller's Declaration of Solvency because Butler, through the Warrantech Entities, was negotiating a Bankruptcy Policy.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

159.     Alternatively, if the Miller Declaration of Solvency was in fact truthful as of May 1, 2001, it was no longer a true representation of the financial status of Butler at the time Miller accepted the Insurance Policy on January 9, 2002. Given Butler's dramatic change in financial circumstances in 2001 as attested by Miller in September 2007, Miller had a duty to update Butler's application in 2001 because he knew HRRG and Butler were negotiating a Bankruptcy Policy and that HRRG would rely upon his Declaration of Solvency. Instead Miller concealed Butler's change in financial condition.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

160.     Miller's failure to provide updated insurance application information to HRRG constitutes an intentional, material, false and fraudulent representation known by Butler and Miller, Folz, Warrantech Automotive, Warrantech Automotive of Florida, Inc. and Vemeco and Warrantech Corporation, but unknown to HRRG. HRRG relied upon Miller's false representation and the conduct of the Warrantech Entities, in underwriting, pricing and issuing the Insurance Policy.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

161.     As a direct and proximate result of the fraud perpetrated by Miller, Butler, Folz, Warrantech Automotive, Warrantech Automotive of Florida and Vemeco, HRRG has suffered

and continues to suffer actual and consequential damages including but not limited to the payment of Butler's obligations to consumers, increased scrutiny by state departments of insurance, an onslaught of direct claims from consumers, and this proposed class action originally filed in the United States District Court for the Southern District of Florida and now pending before this Court, and such other damages including punitive damages as may be shown at trial. In addition, HRRG is entitled to the remedy of rescission at its election.

**ANSWER:** Count IV and Paragraphs 150 through 161 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

## COUNT V

## BREACH OF CONTRACT BY BUTLER

162.    HRRG repeats and incorporates its allegations in paragraphs 1 through 161 as if fully set forth herein.

**ANSWER:** Count V and Paragraphs 162 through 166 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

163.    Butler is in breach of the Insurance Policy, including but not limited to the covenant of good faith and fair dealing which is implied therein.

**ANSWER:** Count V and Paragraphs 162 through 166 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

164.    Butler is in breach of the Conditions of the Insurance Policy, including but not limited to the Conditions set forth in Paragraphs 6 and 19.

**ANSWER:** Count V and Paragraphs 162 through 166 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

165.    To the extent Butler remains solvent and is choosing not to pay consumer claims, Butler has breached the Insurance Policy and placed HRRG in the position of incurring losses which it should not have to incur.

**ANSWER:** Count V and Paragraphs 162 through 166 are not directed at Damar and Mardan and

Damar and Mardan therefore make no response to them.

166.    At this time, HRRG'S losses exceed $368,000.

**ANSWER:** Count V and Paragraphs 162 through 166 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

## COUNT VI

### INDEMNITY FROM BUTLER

167.     HRRG repeats its allegations in paragraphs 1 through 165 as if fully set forth herein.

**ANSWER:** Count VI and Paragraphs 167 through 171 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

168.     As a result of the special relationship between the parties as created by their contract of insurance and the insurance codes of various states, HRRG has been placed by Butler in the position of having to pay Butler's obligations for the purpose of satisfying consumers and insurance regulators, even though Butler has the obligation to pay.

**ANSWER:** Count VI and Paragraphs 167 through 171 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

169.     Said payments made by HRRG were made subject to HRRG's full reservation of rights.

**ANSWER:** Count VI and Paragraphs 167 through 171 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

170.     Butler's conduct placed HRRG in the position of making payments that it otherwise is not obligated to make.

**ANSWER:** Count VI and Paragraphs 167 through 171 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

171.     Butler must indemnify HRRG for all payments made by HRRG due to Butler's refusal to comply with its VSC obligations.

**ANSWER:** Count VI and Paragraphs 167 through 171 are not directed at Damar and Mardan and Damar and Mardan therefore make no response to them.

## COUNT VII

### BREACH OF CONTRACT AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION

172.     HRRG repeats and incorporates its allegations in paragraphs 1 through 171 as if fully set forth herein.

**ANSWER:** Count VII and Paragraphs 172 through 175 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

173.     The Warrantech Entities are in breach of the Administrative Agreement and Addendum, including but not limited to the covenant of good faith and fair dealing which is implied therein.

**ANSWER:** Count VII and Paragraphs 172 through 175 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

174.     HRRG has complied with all of its obligations under the Administrative Agreement and the Addendum.

**ANSWER:** Count VII and Paragraphs 172 through 175 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

175.     HRRG has been damaged due to the Warrantech Entities breaches of the Administrative Agreement and the Addendum.

**ANSWER:** Count VII and Paragraphs 172 through 175 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO AND WARRANTECH CORPORATION

176.     HRRG repeats its allegations in paragraphs 1 through 174 as if fully set forth herein.

**ANSWER:** Count VIII and Paragraphs 176 through 180 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

177.     Pursuant to the Administrative Agreement, Warrantech Automotive, Warrantech Automotive of Florida, Vemeco, and Warrantech Corporation owe fiduciary duties to HRRG with respect to premiums collected and received on VSCs under the Warrantech Program.

**ANSWER:** Count VIII and Paragraphs 176 through 180 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

178.     Warrantech Automotive, Warrantech Automotive of Florida, Vemeco and Warrantech Corporation have breached their fiduciary duties by, among other actions, failing to safeguard the premiums, failing to properly account for the premiums and failing to ensure the premiums were used for proper purposes.

**ANSWER:** Count VIII and Paragraphs 176 through 180 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

179.     Warrantech Automotive, Warrantech Automotive of Florida, Vemeco and Warrantech Corporation's breach of their fiduciary duties to HRRG have contributed to there being insufficient funds to pay valid VSC claims.

**ANSWER:** Count VIII and Paragraphs 176 through 180 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

180.     As a direct and proximate result of the Warrantech Entities' breaches of their fiduciary duties to HRRG, HRRG has suffered such actual and consequential damages as may be shown at trial, including but not limited to funding valid VSC claims which should not have been funded by HRRG.

**ANSWER:** Count VIII and Paragraphs 176 through 180 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

## COUNT IX

### UNJUST ENRICHMENT AGAINST WARRANTECH AUTOMOTIVE, WARRANTECH AUTOMOTIVE OF FLORIDA, VEMECO, WARRANTECH CORPORATION AND BUTLER
### (IN THE ALTERNATIVE)

181.     HRRG repeats its allegations in paragraphs 1 through 179 as if fully set forth herein.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

182.     Provided the Court finds that the Insurance Policy was void at inception due to the fraud surrounding the Insurance Policy's acquisition and/or that the Insurance Policy was cancelled at some point after inception due to Butler's insolvency or the fraud surrounding the Insurance Policy, HRRG must be compensated for the benefit HRRG conferred on the Warrantech Entities and Butler.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

183.     After being misled into believing that a valid insurance policy was operative, HRRG performed valuable services for the benefit of the Warrantech Entities and Butler.  Specifically, in connection with the Warrantech Program and the Insurance Policy, HRRG: 1) managed the imprest accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; 5) verified certain VSC claims adjudications done by the Warrantech Entities; and 6) provided other valuable services which will be proven at trial.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

184.     The Warrantech Entities and Butler are aware that they received a benefit as a result of HRRG's services in connection with the Warrantech Program and Insurance Policy.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

185.     The value of the benefit to the Warrantech Entities and Butler resulting from HRRG's services in connection with the Warrantech Program and Insurance Policy is an amount that will be proven at trial.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

186.     The circumstances are such that it would be unjust for the Warrantech Entities and Butler to retain the benefit of HRRG's services in connection with the Warrantech Program and the Insurance Policy without the Warrantech Entities and Butler compensating HRRG for the benefit received.

**ANSWER:** Count IX and Paragraphs 181 through 186 are not directed at Damar and Mardan

and Damar and Mardan therefore make no response to them.

## COUNT X

## DECLARATORY JUDGMENT PURSUANT TO U.S.C. §3681
## AS BETWEEN HRRG AND THIRD PARTY PORC DEFENDANTS MARDAN,
## MARION, FUCCILLO, DAMAR, BRADFORD, ALRENDAN, 12GK, AND DAMAR AND
## MARDAN

187.    HRRG repeats and incorporates its allegations in paragraphs 1 through 186 as if fully set forth herein.

**ANSWER:** Damar and Mardan incorporate its answers to the allegations in Paragraphs 1

through 186 above as if fully set forth herein.

188.    Based upon the foregoing allegations, there exists between the parties a substantial controversy of sufficient immediacy to warrant declaratory relief.

**ANSWER:** Damar and Mardan admits that there exists a substantial controversy between HRRG

and Damar and Mardan as to their respective obligations under the Quota Share Reinsurance

Agreement and denies having sufficient knowledge or information to either admit or deny the

remaining allegations in this paragraph.

189.    HRRG requests this Court to inquire into the matters alleged herein, evaluate the rights and responsibilities of HRRG and Third Party PORC Defendants pursuant to the agreements between them, and declare pursuant to U.S.C. §3681 and Federal Rule of Civil Procedure 57 that Third Party PORC Defendants are obligated to: (1) reimburse HRRG for 100 percent of the costs and expenses already paid by HRRG under reservation of rights for valid VSC claims; (2) promptly deposit funds into the custodial accounts equal to or greater than the value of their obligations for deposits, including losses, expenses, and reserves, as defined by the Custodial Agreements and Quota Agreements; (3) assume 100 percent of all of HRRG's liabilities that may arise or have already arisen under the Insurance Policy and all VSCs issued as part of the Warrantech Program; (4) pay all valid VSC claims going forward in the event Butler does not pay those claims; (5) indemnify HRRG against all claims, demands, suits, judgments, damages, and punitive damages arising from the issuance of the VSCs and the Insurance Policy, the handling of VSC claims, the processing of claims, and performance of repairs; and (6) for such other bases as may be shown at trial.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 189.

## COUNT XI

### SPECIFIC PERFORMANCE AS TO THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCCILLO, DAMAR, BRADFORD, ALRENDAN, 12GK, AND DAMAR and MARDAN

190.     HRRG repeats and incorporates its allegations in paragraphs 1 through 189 as if fully set forth herein.

**ANSWER:** Damar and Mardan incorporate its answers to the allegations in Paragraphs 1

through 189 above as if fully set forth herein.

191.     Third Party PORC Defendants entered into valid, binding, and enforceable Quota Agreements with HRRG which clearly and unequivocally obligate Third Party PORC Defendants to assume 100 percent of HRRG's risks and liabilities for valid VSC claims arising under the Warrantech Program.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 191.

192.     HRRG has complied with the terms of the Quota Agreements and its obligations thereunder.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 192.

193.     Third Party PORC Defendants have failed and refused to perform their obligations under the Quota Agreements.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 193.

194.     Third Party PORC Defendants must be ordered to specifically perform their obligations under the Quota Agreements because: 1) on the merits, consumers are entitled to the VSC protection promised by the VSCs sold under the Warrantech Program; 2) HRRG has no adequate remedy at law and would be irreparably harmed if Third Party PORC Defendants are allowed to voluntarily breach their agreements with HRRG to the severe detriment of HRRG and thereby leave tens of thousands of consumers with VSC contracts at risk; 3) the threatened injury to HRRG outweighs any harm which might be suffered by Third Party PORC Defendants; and 4) granting of specific performance is in the public interest as consumers holding VSCs need to know where payments will be coming from and need to be paid for valid VSC claims without undue delay.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 194.

195.     Article XVIII of the Quota Agreements between Third Party PORC Defendants and HRRG specifically acknowledges that a dispute between HRRG and Third Party PORC Defendants regarding failure to make one or more monetary payments "could have a material

and adverse impact" on HRRG, and therefore specifically provides that HRRG is entitled to seek immediate relief in this Court.

**ANSWER**: Damar and Mardan respond that the Reinsurance Agreement between Damar and

Mardan and HRRG is the best evidence of its contents and deny the allegations in the paragraph

to the extent they are inconsistent with the written document.

## COUNT XII

### BREACH OF CONTRACT BY THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCCILLO, DAMAR, BRADFORD, ALRENDAN, 12GK AND DAMAR AND MARDAN

196. HRRG repeats and incorporates its allegations in paragraphs 1 through 195 as if fully set forth herein.

**ANSWER**: Damar and Mardan incorporate its answers to the allegations in Paragraphs 1

through 195 above as if fully set forth herein.

197. Third Party PORC Defendants are in breach of the Quota Agreements and Custodian Agreements, including but not limited to the covenant of good faith and fair dealing which is implied therein.

**ANSWER**: Damar and Mardan deny the allegations in Paragraph 197.

198. Third Party PORC Defendants are in breach of the Quota Agreements, including but not limited to the conditions and provisions set forth in Articles II, III, IV, V, VI, VII, VIII, and XV.

**ANSWER**: Damar and Mardan deny the allegations in Paragraph 198.

199. Third Party PORC Defendants are in breach of the Custodial Agreements, including but not limited to the conditions and provision set forth in Sections 1, 2, 3, 4, 7, and 9.

**ANSWER**: Damar and Mardan deny the allegations in Paragraph 199.

200. Third Party PORC Defendants' breach of the Quota Agreements and Custodial Agreements has placed HRRG in the position of incurring losses which it should not have to incur.

**ANSWER**: Damar and Mardan deny the allegations in Paragraph 200.

201.    At this time, HRRG'S losses exceed $368,000 and continue to increase as there remain VSC claims that are unpaid and HRRG continues to incur substantial attorney's fees and costs.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 201.

## COUNT XIII

### INDEMNITY FROM THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCCILLO, DAMAR, BRADFORD, ALRENDAN, 12GK, AND DAMAR and MARDAN

202.    HRRG repeats and incorporates its allegations in paragraphs 1 through 201 as if fully set forth herein.

**ANSWER:** Damar and Mardan incorporate its answers to the allegations in Paragraphs 1

through 201 above as if fully set forth herein.

203.    As a result of the special relationship between HRRG and the Third Party PORC Defendants as created by their agreements and the insurance codes of various states, HRRG has been placed by Third Party PORC Defendants in the position of having to pay Butler's obligations for the purpose of satisfying VSC consumers and insurance regulators, even though Third Party PORC Defendants have the obligation to pay.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 203.

204.    Said payments made by HRRG were made subject to HRRG's full reservation of rights.

**ANSWER:** Damar and Mardan are without sufficient knowledge or information to either admit

or deny the allegations in this paragraph and therefore deny these allegations.

205.    Third Party PORC Defendants' conduct placed HRRG in the position of making payments that it otherwise is not obligated to make, attracted increased scrutiny of HRRG by state departments of insurance, an onslaught of direct claims from consumers, and a proposed class action originally filed in the United States District Court for the Southern District of Florida and now pending before this Court in a separate case.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 205.

206.    Third Party PORC Defendants must indemnify HRRG for all payments made by HRRG due to Butler's refusal to comply with its VSC obligations and Third Party PORC Defendants' refusal to accept 100 percent of HRRG's entire liability for all obligations arising under VSCs and Insurance Policy issued as part of the Warrantech Program.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 206.

207.     Third Party PORC Defendants are also contractually obligated to indemnify HRRG against, among other things, all claims, demands, suits, damages, awards, and punitive damages.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 207. Damar and Mardan

respond that the Quota Share Reinsurance Agreement is the best evidence of its contents and

deny the allegations in the paragraph to the extent they are inconsistent with the written

document.

## COUNT XIV

### UNJUST ENRICHMENT AGAINST THIRD PARTY PORC DEFENDANTS MARDAN, MARION, FUCCILLO, DAMAR, BRADFORD, ALRENDAN, 12GK, AND DAMAR and MARDAN

208.     HRRG repeats and incorporates its allegations in paragraphs 1 through 207 as if fully set forth herein.

**ANSWER:** Damar and Mardan incorporate its answers to the allegations in Paragraphs 1

through 207 above as if fully set forth herein.

209.     HRRG must be compensated for the benefit HRRG conferred on the Third Party PORC Defendants.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 209.

210.     HRRG performed valuable services for the benefit of the Third Party PORC Defendants. Specifically, in connection with the Warrantech Program, the Quota Agreements, and the Custodial Agreements, HRRG: 1) managed the imprest accounts created for the Warrantech Program; 2) conducted audits; 3) worked to help the Warrantech Entities and Third Party PORC Defendants reduce claims adjudication costs; 4) performed pricing analysis and sought rate increases; 5) verified certain VSC claims adjudications done by the Warrantech Entities; 6) paid to Third Party PORC Defendants their proportionate share of the net written premiums on VSCs issued through the Warrantech Program; 7) made payments in excess of $368,000 which continues to increase as VSC claims remain that are unpaid and 8) HRRG continues to incur substantial attorney's fees and costs; and 9) provided other valuable services which will be proven at trial.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 210. To the extent that the

allegations in Paragraph 210 deal with HRRG's relationship with Warrantech, Damar and

Mardan are without sufficient knowledge or information to either admit or deny the allegations

in this paragraph and therefore deny these allegations.

211.    Third Party PORC Defendants are aware that they received a benefit as a result of HRRG's services in connection with the Warrantech Program, the Quota Agreements, and the Custodial Agreements.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 211.

212.    The value of the benefit to the Third Party PORC Defendants resulting from HRRG's services in connection with the Warrantech Program, Quota Agreements, and Custodial Agreements is an amount that will be proven at trial.

**ANSWER:**    Damar and Mardan deny the allegations in Paragraph 212.

213.    The circumstances are such that it would be unjust for the Third Party PORC Defendants to retain the benefit of HRRG's services in connection with the Warrantech Program, the Quota Agreements, and the Custodial Agreements without the Third Party PORC Defendants compensating HRRG for the benefit received.

**ANSWER:** Damar and Mardan deny the allegations in Paragraph 213.

## DAMAR'S and MARDAN'S AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because they fail to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Waiver)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of the doctrine of waiver.

### THIRD AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of HRRG's acts, omissions, representations and courses of conduct upon which Damar and Mardan were led to rely to its detriment, thereby barring HRRG's claims under the doctrine of equitable estoppel.

## FOURTH AFFIRMATIVE DEFENSE
### (Laches)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of one or more applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE
### (Statute of Frauds)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because of the doctrine of statute of frauds.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because HRRG failed to take appropriate and reasonable steps to mitigate its damages.

## NINTH AFFIRMATIVE DEFENSE
### (Anticipatory Repudiation)

The answering Defendant Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because HRRG breached its agreement(s) with Damar and Mardan, and as a result of HRRG's breach(es), Damar and Mardan were excused from continued performance under the agreement(s).

## TENTH AFFIRMATIVE DEFENSE
### (Breach of Fiduciary Duties)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because HRRG breached its fiduciary duties to Damar and Mardan.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Offset)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because Damar and Mardan have suffered harm as a direct result of HRRG's actions or inactions, and Damar and Mardan are entitled to offset any amounts due to HRRG by amounts due to Damar and Mardan .

## TWELFTH AFFIRMATIVE DEFENSE
### (Apportionment)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because any harm complained of was proximately caused, in whole or in part, by the acts or omissions of a third party or parties, and the liability claimed against Damar and Mardan should be apportioned to these responsible party(ies) and Damar's and Mardan's liability, if any, should be reduced accordingly.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Conditions Precedent)

The answering Defendants Damar and Mardan allege that the Claims in Heritage's Third Party Complaint against Damar and Mardan are barred, in whole or in part, because HRRG breached its obligations and conditions precedent under an applicable agreement or agreements, thereby excusing Damar's and Mardan's performance.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Mistake)

The answering Defendants Damar and Mardan allege that the parties to the Quota Share Reinsurance Agreement made a mistake as to a material aspect of the Agreement, such that Damar and Mardan believed that the would not be required to make any further contributions to maintain the company and that all expenses, including tax liabilities, would be paid for out of the Custodial Account; HRRG knew or should have known Damar's and Mardan's reliance on this belief.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Misrepresentation)

The answering Defendants Damar and Mardan allege that HRRG knew or should have known that the program benefits represented to Damar and Mardan, on which Damar and Mardan relied to engage in the Quota Share Reinsurance Agreement, were willfully or negligently false.

## CROSS-CLAIMS AGAINST HRRG BY DAMAR and MARDAN

Now comes Cross-Claimants Mardan Reinsurance, Ltd. ("Mardan") and Damar

Reinsurance, Ltd. ("Damar"), by and through their counsel, to bring this cross claim against

Heritage Warranty Risk Retention Group, Inc. as follows:

## THE PARTIES

1.      HRRG is a South Carolina corporation. HRRG's principal place of business is within

the State of South Carolina.

2.      Damar and Mardan are companies organized under the laws of the Turks and Caicos

Islands.

## JURISDICTION AND VENUE

3.      Damar and Mardan entered into a Quota Share Reinsurance Agreements with HRRG

("Reinsurance Agreement"). Copies of these agreements are attached hereto as Exhibit A.[1]

4.      This Court has jurisdiction over the parties and matters alleged in this cross-claim

pursuant to 28 U.S.C. § 1332. Venue is appropriate in United States District Court for the

Northern District of Illinois pursuant to 28 U.S.C. § 1391. Article XVIII of the Reinsurance

Agreement provides:

---

[1] For convenience, Damar and Mardan attach certain relevant documents to its cross-claims. To the extent possible, Damar and Mardan shall use the same Exhibit lettering as HRRG where appropriate for its reference to exhibits here.

In the event, however, that there should arise a difference of opinion or interpretation of the Agreement, or any dispute arising from or relating to the performance of this Agreement, that cannot be settled amicably among senior representatives of the parties, either party may make use of the federal or state courts of the State of Illinois for the purposes of resolving such dispute. *See* Exhibit A, which is incorporated in its entirety herein by this reference.

5.      Furthermore, HRRG has brought suit against Damar and Mardan in this Court based on Articles XVII and XVIII of the Reinsurance Agreement. *See* Exhibit A.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS

### Introduction

6.      Damar and Mardan have no culpability in the arrangement alleged in Heritage's complaint. In fact, Damar and Mardan are two of the parties who have been wronged by the arrangement. Damar and Mardan have: (a) consistently and reliably conformed to the contracts, both the letter and in spirit; (b) relied upon HRRG's good faith that it would adhere to the Reinsurance Agreements, and (c) never received any monies from the arrangement. Upon information and belief, HRRG exercised its rights in bad faith under the Reinsurance Agreement to improperly seized the custodial account for its own purposes.

7.      This cross-claim is related to the actions of parties involved in a business arrangement to offer vehicle service contracts ("VSCs") to consumers after the point of purchase of an automobile.

8.      Damar's and Mardan's reinsurance risk originated exclusively from the sale of the VSCs. Premiums ceded by HRRG to Damar and Mardan were held in reserve in a Custodial account with HRRG as beneficiary having exclusive access to pay claims, reimburse the

producer for cancelled policies, and other permissible expenses. Most importantly, Damar and Mardan never had access to the funds of the Custodial account.

### HRRG Seized Funds From Custodial Account

9.     At some point during 2005 HRRG purported to exercise its rights under Section 4.2 of the Custodial Agreement to seize the funds in the Custodial Account and move them to a separate account. HRRG was contractually obligated to continue to use these reserve funds in the new custodial account for the same purposes as before: pay claims, make reimbursements for cancellations, and other permissible outlays as defined in Section 4.3 of the Custodial Agreement. Damar and Mardan were also to continue to receive an accounting of this new account through the Warrantech program.

10.    Damar and Mardan are informed and believe that HRRG had no good faith basis for seizing these funds.

11.    In addition, due to HRRG's seizure of the funds, Damar and Mardan no longer obtained financial institution statements and was not able to access this account for a review of the reserves. In fact, even as of this date, Damar and Mardan have no idea as to whether or where the separate account was established.

12.    HRRG ceased communicating with Damar and Mardan about the Custodial Account or the new custodial account where HRRG sequestered the Damar and Mardan funds after seizure.

13.    Damar and Mardan are informed and believes that at some point, HRRG ceased paying claims that were properly adjusted by Warrantech and were authorized for payment, despite a contractual obligation to do so.

14.     Damar and Mardan are informed and believes that HRRG has ceased making reimbursement for cancellations out of the seized Custodial Account, despite a contractual obligation to do so.

15.     Due to HRRG's failure to pay claims that had been properly adjusted and authorized for payment by Warrantech ("Adjusted Claims"), and failure to reimburse cancelations out of the seized Custodial Account ("Cancellations"), Damar and Mardan each funded the monies necessary to meet HRRG's aforesaid contractual obligations.  To date, Damar and Mardan have funded $128,485.83 to satisfy the Adjusted Claims and approximately $10,861.99 to satisfy Cancellations, for a total amount of $139,347.82.

## COUNT I

### ACCOUNTING BY HRRG OF THE CUSTODIAL ACCOUNT BEFORE AND AFTER SEIZURE OF ACCOUNT

16.     Damar and Mardan repeat and reincorporate its paragraphs 1 through 15 as if they were set forth fully in this Count.

17.     The  facts alleged herein give rise to a cause of action for accounting by HRRG.

## COUNT II

### CONSTRUCTIVE TRUST

18.     Damar and Mardan repeat and reincorporate their paragraphs 1 through 17 as if they were set forth fully in this Count.

19.     The facts alleged herein give rise to a cause of action for the imposition of a constructive trust.  Damar and Mardan  seeks a constructive trust to protect the remaining assets from spoilage or misuse.

## COUNT III

### BREACH OF CONTRACT BY HRRG

20.     Damar and Mardan repeat and reincorporate paragraphs 1 through 19 as if they were set forth fully in this Count.

21.     The facts alleged herein give rise to a cause of action for a breach of contract by HRRG, which has placed Damar and Mardan in a worse position than they would have been had HRRG not breached the Agreements.

22.     Damar and Mardan are entitled to damages for HRRG's breach of contract in an amount to be determined at trial, but not less than $139,347.82.

## COUNT IV

### SPECIFIC PERFORMANCE BY HRRG

23.     Damar and Mardan repeat and reincorporate paragraphs 1 through 22 as if they were set forth fully in this Count.

24.     The facts alleged herein give rise to a cause of action for specific performance.

## COUNT V

### BREACH OF FIDUCIARY DUTY BY HRRG

25.     Damar and Mardan repeat and reincorporate paragraphs 1 through 24 as if they were set forth fully in this Count.

26.     The facts alleged herein give rise to a cause of action for HRRG's breach of fiduciary duty to manage and maintain the Custodial Account.

27.     Damar and Mardan are entitled to damages for this breach of fiduciary duty in an amount to be determined at trial, but not less than $139,347.82.

## COUNT VI

## MISREPRESENTATION AND FRAUD BY HRRG

28.     Damar and Mardan repeat and reincorporate paragraphs 1 through 27 as if they were set forth fully in this Count.

29.     The facts alleged herein give rise to a cause of action for fraud and misrepresentation. HRRG knew at all relevant times that the arrangement under the Warrantech program necessitated that the Custodial Account would be Damar's and Mardan's only asset. It also knew, or should have known, that Damar and Mardan believed that it would not be required to contribute additional assets to the Custodial Account or for other expenses. In particular, HRRG knew, or should have known, at all relevant times that Damar and Mardan would be relying on HRRG to release and make payment for Damar's and Mardan's first year tax liability, particularly because HRRG knew that Damar and Mardan had no other way to make payment of the tax liability. When HRRG became involved in the Warrantech program with Damar and Mardan, it knew that it was required to authorize all payments from the Custodial Account for Damar and Mardan since 100% of Damar's and Mardan's assets were in HRRG's control.

30.     Further, HRRG knew at all relevant times that its Service Contract Reimbursement Insurance Policy with Butler would obligate it to make payment of claims and cancellations under the terms of that policy, and that it would use the premiums held as reserves in the Custodial Account to make these payments.

31.     Damar and Mardan reasonably relied on HRRG's ability to make these payments from the Custodial Account, including payment of expenses for Damar and Mardan. HRRG knew, or

should have known, that Damar and Mardan were relying on it to make these payments, and in particular the payment of the tax lien.

32.     HRRG entered into the Quota Share Reinsurance Agreement knowing, or it should have known, that Damar and Mardan were relying on the belief that HRRG would authorize the business expenses of Damar and Mardan.

33.     The foregoing conduct of HRRG entitles Damar and Mardan to rescission of the Reinsurance Agreement and to damages for HRRG's misrepresentation and fraud in an amount to be determined at trial, but not less than $139,347.82.

## COUNT VII

## INJUNCTIVE RELIEF AGAINST HRRG

34.     Damar and Mardan repeat and reincorporate paragraphs 1 through 33 as if they were set forth fully in this Count.

35.     The facts alleged herein give rise to a cause of action for injunctive relief against HRRG to prohibit HRRG from disposing of any assets of the Custodial Account, based on Article XVIII of the Quota Agreement, so that HRRG is not able to further deplete or convert the remainder of these funds to its own use or any use not authorized under the Quota Share Reinsurance Agreement or the Custodial Agreement.

WHEREFORE, Damar and Mardan pray that Court enter judgment in their favor and against Cross-Defendant HRRG as follows:

A.     In an amount to be proven at trial, but not less than $139,347.82;
B.     For costs of litigation, including court costs, attorneys' fees, and other costs;
C.     For injunctive relief prohibiting HRRG from disposing of any assets of the Custodial Account and constructive trust against remaining assets derived from the Custodial Account;

D.   For an accounting of all funds from the Custodial Account or which have been submitted to HRRG for deposit with the Custodial Account that HRRG has deposited in a different account;

E.   For specific performance by HRRG under the Quota Agreement and Custodial Agreement;

F.   For pre-judgment interest on any amounts awarded;

G.   In the alternative, for rescission of the Quota Share Reinsurance Agreement and attendant Custodial Agreement.

Respectfully Submitted,

Dated: April 3, 2009

GREEN & SEIFTER, ATTORNEYS, PLLC

John L. Valentino, Esq.
By:   Attorneys for Damar and Mardan
One Lincoln Center
110 West Fayette Street, Suite 900
Syracuse, New York  13202
315-422-1391

ROSENFELD/KAPLAN & HALPERIN

Dated: April _6_, 2009

Carl L. Halperin, Esq.
Local Counsel
Attorneys for Damar and Mardan
By:   6160 North Cicero Avenue
Suite 320
Chicago, Illinois  60646

1229818_2.DOC

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF ONONDAGA ) SS:

_____Mark Fiorini_____ being duly sworn, deposes and says that he is the ___Managing Member___ of DAMAR REINSURANCE, LTD., one of the third-party defendants herein, that he has read the foregoing answer and knows the contents thereof, that the same is true to his own knowledge except as to those matters therein stated on information and belief, and as to those matters, he believes them to be true.

DAMAR REINSURANCE, LTD.

_____ MEMBER _____

Sworn to before me this
31st day of March, 2009.

_____
Notary Public

JOHN L. VALENTINO
NOTARY PUBLIC, State of New York
Qualified in Onondaga Co. No. 4929454
My Commission Expires January 3, 19.. 2010

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF ONONDAGA ) SS:

_____Mark Fiorini_____ being duly sworn, deposes and says that he is the ___Managing Member___ of MARDAN REINSURANCE, LTD., one of the third-party defendants herein, that he has read the foregoing answer and knows the contents thereof, that the same is true to his own knowledge except as to those matters therein stated on information and belief, and as to those matters, he believes them to be true.

MARDAN REINSURANCE, LTD.

_____ MEMBER. _____

Sworn to before me this
31st day of March, 2009.

_____
Notary Public
1229818_2.DOC

JOHN L. VALENTINO
NOTARY PUBLIC, State of New York
Qualified in Onondaga Co. No. 4929454
My Commission Expires January 3, 19.. 2010